## Case No. 21-15355

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

RENALDO NAVARRO,

*Plaintiff-Appellant,*

v.

MENZIES AVIATION, INC., d/b/a Menzies,

*Defendant-Appellee.*

---

*Appeal from a Decision of the United States District Court for the Northern District of California,*
*Case No. 3:19-cv-08157-VC · The Honorable Vince Chhabria, District Judge*

## EXCERPTS OF RECORD
## VOLUME II OF IV – Pages 8 to 288

ARLO G. URIARTE
LIBERATION LAW GROUP
2760 Mission Street
San Francisco, California 94110
(415) 695-1000 Telephone
(415) 695-1006 Facsimile
arlo@liberationlawgroup.com

*Attorneys for Appellant,*
*Renaldo Navarro*

 COUNSEL PRESS · (213) 680-2300                    PRINTED ON RECYCLED PAPER 

ARLO GARCIA URIARTE (SBN: 231764)
ELIZABETH LYONS (SBN: 327742)
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006
Email: arlo@liberationlawgroup.com
        elizabeth@liberationlawgroup.com

Attorneys for Plaintiff
**RENALDO NAVARRO**

CHRISTOPHER WARD, CA Bar No. 238777
SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, CA  90071
Telephone:    (213)972-4560
Facsimile:    (213)486-0065
Email:        cward@foley.com
              sabarbanel@foley.com

Attorneys for Defendant
**MENZIES AVIATION, INC., DOING BUSINESS AS MENZIES**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RENALDO NAVARRO,<br><br>                      Plaintiff,<br><br>          vs.<br><br>MENZIES AVIATION, INC., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                      Defendants. | Case No.: 3:19-CV-08157-VC<br><br>[Honorable Vince Chhabria]<br><br>**JOINT CASE MANAGEMENT STATEMENT**<br><br>Date:   February 3, 2021<br>Time:  2:00 p.m.<br>Courtroom:  04 (via Zoom Conference)<br><br>State Court Action Filed:  October 23, 2019<br>Action Removed:  December 16, 2019 |

-1-

1    The Parties to the above-entitled action jointly submit this JOINT CASE

2    MANAGEMENT STATEMENT pursuant to the Standing Order for All Judges of the Northern

3    District of California and Civil Local Rule 16-9.

4    1.  **JURISDICTION & SERVICE**

5    The Parties agree that this is an action removed to this Court under U.S.C. § 1332 due to

6    diversity of citizenship of the Parties. The Parties do not believe that any personal jurisdiction or

7    venue issues exist at this time. No Parties remain to be served.

8    2.  **FACTS**

9    Plaintiff alleges that after he complained to Defendant about a Caucasian supervisor,

10   Andrew Dodge, and signed a petition formally complaining about Mr. Dodge, Defendant

11   suspended him for a week and then terminated his employment. Plaintiff alleges that he signed

12   the petition after having complained about Mr. Dodge sleeping on duty, being unreliable about

13   giving rest and meal periods to Fuelers, harassing Filipino Fuelers and being generally

14   unprofessional and unavailable. Plaintiff alleges that Defendant treated Mr. Dodge preferentially

15   based on his race and did not treat Filipinos, including Plaintiff, in a similar manner. Plaintiff

16   further alleges that he, along with other Fuelers, made prior reports of Mr. Dodge treating

17   Filipinos in a hostile and discriminatory manner. However, Defendant took no action to correct

18   or prevent incidents of ongoing discriminatory conduct. After Plaintiff signed the petition,

19   Defendant allegedly asked Plaintiff to write a letter explaining why he signed the petition, which

20   Plaintiff believes was unnecessary because his complaints were on record and the petition spoke

21   for itself. Plaintiff alleges that although he was not the only one to sign the petition, he was the

22   only person suspended for signing the petition, reflecting Defendant's retaliatory intent to

23   terminate Plaintiff for opposing Mr. Dodge's discriminatory treatment of Filipino Fuelers

24   Plaintiff alleges that Defendant discriminated and retaliated by suspending and terminating him.

25   Defendant denies that Plaintiff was terminated because of his race and national origin or in

26   response to any purported protected activity.

27   As noted in the various materials submitted in connection with Defendant's currently

28   pending Motion for Summary Judgment, Defendant asserts that many of the foregoing

-2-

4850-4023-0361.1

10

1    allegations were not placed at issue in this case until Plaintiff filed his substantive opposition to

2    the Motion for Summary Judgment, in particular Plaintiff's allegations regarding harassment by

3    Dodge relative to Filipino Fuelers and Plaintiff's alleged complaints about such subject matter.

4    Rather, Defendant contends Plaintiff's only complaints about Dodge and all other complaints

5    about Dodge pertained to operational matters only.  Defendant avers that it terminated Plaintiff

6    because it had information from multiple sources indicating that Plaintiff had abused his

7    authority and position as a supervisor to pressure rank-and-file employees to sign a petition

8    against Dodge in violation of the Company's harassment and conduct policies.

9        Plaintiff filed his Complaint in San Francisco County Superior Court on October 22,

10   2019, after receiving a right to sue letter from California Department of Fair Employment and

11   Housing on September 3, 2019. Defendant answered the Complaint and removed the case to this

12   Court on December 16, 2019.

13   3.  **LEGAL ISSUES**

14       Plaintiff alleges four causes of action: 1) discrimination in violation of California

15   Government Code section 12940(a); (2) retaliation in violation of California Government Code

16   section 12940(h); (3) wrongful termination against public policy in violation of California Labor

17   Code section 1102.5(a)-(b); and (4) intentional infliction of emotional distress.

18       Defendant denies that Plaintiff was terminated because of his race and national origin or

19   in response to his complaints, and Defendant alleges that Plaintiff's causes of action fail as a

20   matter of law.

21   4.  **MOTIONS**

22       On October 15, 2020, Defendant filed a Motion for Summary Judgment. On November 2,

23   2020, Plaintiff filed an Opposition to Defendant's Motion for Summary Judgment. On December

24   17, 2020, a hearing for the Motion for Summary Judgment was held.  Pursuant to the Court's

25   January 7, 2021 order, the Parties have now submitted supplemental briefing, with Defendant

26   submitting its brief on January 14, 2021 and Plaintiff submitting his on January 22, 2021.  The

     outcome of the hearing is still pending.

27

28

-3-

4850-4023-0361.1

11

5. **AMENDMENT OF PLEADINGS**

The Parties do not currently anticipate amending their respective pleadings but reserve the right to seek the Court's leave to amend the pleadings so as permitted by the Federal Rules of Civil Procedure. However, as noted below, the deadline to amend the pleadings has passed.

6. **EVIDENCE PRESERVATION**

The Parties confirm that they have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines") and have discussed and taken reasonable steps to preserve electronically stored information and other evidence relevant to the issues reasonably evident in this action.

7. **DISCLOSURES**

The Parties have served their Initial Disclosures on each other.

8. **DISCOVERY**

Fact discovery has closed. Depending on the Court's order regarding the pending summary judgment motion, either party may request reopening of fact discovery. Both Parties have taken depositions.

9. **CLASS ACTIONS**

Not applicable.

10. **RELATED CASES**

Not applicable.

11. **RELIEF**

Plaintiff seeks relief in the form of compensatory, consequential, statutory, punitive, and emotional distress damages. Plaintiff requests any such other relieve as the Court may deem just and proper.

12. **SETTLEMENT AND ADR**

The Parties have met and conferred in compliance with ADR Local Rule 3-5 and have agreed to private mediation. Private mediation took place on August 27, 2020. The Parties did not reach a settlement. The Parties will continue to make a good faith effort in settlement

-4-

4850-4023-0361.1

12

1    negotiations. The Parties do not believe any motions are necessary to facilitate settlement process

2    selection.

3    13. **CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

4       Defendant has declined to consent to proceed before a Magistrate Judge for all purposes.

5    14. **OTHER REFERENCES**

6       The Parties do not believe that this case is suitable for reference to binding arbitration,

7    special master, or the Judicial Panel on Multidistrict Litigation. The Parties have agreed to

8    private mediation. Private mediation took place on August 27, 2020.

9    15. **NARROWING OF ISSUES**

10       The Parties do not believe that it is possible to narrow the issues at this time but will

11    consider such opportunities to do so as the case develops, and trial nears.

12    16. **EXPEDITED TRIAL PROCEDURE**

13       The Parties do not believe this case is appropriate to be handled under the Expedited Trial

14    Procedure of General Order 64.

15    17. **SCHEDULING**

16       ADR Proceedings: The Parties attended a private mediation with Michael Loeb on

17    August 27, 2020. It was not successful..

18       Amendment of Pleadings: The deadline to amend pleadings has passed.

19       Further Case Management Conference: A Case Management Conference is schedule for

20    February 3, 2021 at 2:00 PM.

21       Fact Discovery: Fact discovery has closed. Depending on the Court's order regarding the

22    pending summary judgment motion, either party may request reopening of fact discovery.

23       Expert Designation and Discovery: Expert discovery closed on October 30, 2020, unless

24    it is extended by the Court to mirror the other extensions that have been issued in this case.

25       Preliminary Pretrial Conference. The previously set pre-trial conference has been vacated

26    by the Court.

27       Witness Lists. The parties shall serve preliminary witness lists no later than seven (7)

28    days prior to the filing of the Joint Preliminary Pretrial Conference Statement. The parties shall

-5-

4850-4023-0361.1

13

1    serve final witness lists seven (7) calendar days after the close of fact discovery. The parties have

2    the right to depose any person identified on the final witness list that was not on the preliminary

3    witness list within twenty-one (21) calendar days of the date the final witness list was served.

4    18. **TRIAL**

5         If tried, the case will be a jury trial. The Parties anticipate the trial can be completed in

6    five standard court days. Plaintiff recommends setting of trial in June 2021.

7    19. **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

8         On December 16, 2019, Defendant filed its "Certification of Interested Entities or

9    Persons" as required by Civil Local Rule 3-15. The Certification states that other than the named

10   parties, there are no other interested entities or persons of which the Parties are aware.

11   20. **PROFESSIONAL CONDUCT**

12        Attorneys for all Parities have reviewed the Guidelines for Professional Conduct for the

13   Northern District of California.

14   21. **OTHER MATTERS**

15        None at this time. Pending the Court's summary judgment order, the parties will proceed

16   accordingly.

17

18

19   Dated:  January 25, 2020                    LIBERATION LAW GROUP, P.C.

20                                               By:    ___/s/ Arlo Uriarte_____

21                                                      Arlo Garcia Uriarte
                                                        Attorneys for Plaintiffs

22   Dated:  January 25, 2020                    FOLEY & LARDNER LLP

23                                               By:    ___/s/ Christopher Ward____

24                                                      Christopher Ward

25                                                      Sara Alexis Levine Abarbanel
                                                        Attorneys for Defendants

26

27

28

                                       -6-

4850-4023-0361.1

14

Arlo García Uriarte, SBN 231764
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br>Plaintiff,<br><br>vs.<br><br>MENZIES AVIATION, INC., doing business as MENZIES and DOES 1 through 10, inclusive.<br><br>Defendants. | **Case No.:  3:19-cv-08157 VC**<br><br>**DECLARATION OF ARLO URIARTE IN SUPPORT OF PLAINTIFF'S RESPONSE TO SUPPLEMENTAL BRIEFING**<br><br>Date:     February 3, 2021<br>Time:    2:00 p.m.<br>Place:    video conference link<br><br>Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor<br><br>Action Removed:  December 16, 2019<br>Action Filed:       October 23, 2019 |

15

I, Arlo Uriarte, declare as follows:

1. I am an attorney admitted to practice before all superior courts in the State of California. I am admitted to practice in the United States District Court for the Northern and Eastern Districts of California. I am admitted to the United States Court of Appeals for the Ninth Circuit.

2. I have personal knowledge of the facts stated in this declaration. If called upon to testify as a witness, I would competently testify as to these facts.

3. Exhibit 1 is a true and correct copy of the Parties' Initial Disclosures.

4. Exhibit 2 is a true and correct copy of Bates Stamped 0009.

5. Exhibit 3 is a true and correct copy of Plaintiff's responses to Defendant's Special Interrogatories.

6. Exhibit 4 is a true and correct copy of Plaintiff's Request for Production of Documents to Defendant.

7. Exhibit 5 is a true and correct copy of Plaintiff's special interrogatories to Defendant.

8. Exhibit 6 is a true and correct copy of Plaintiff's deposition. The pages attached are true and correct copies of the certified transcript for Plaintiff.

9. Exhibit 7 is a true and correct copy of the deposition transcript from Andrew Dodge deposed in this matter. The pages attached are true and correct copies of the certified transcripts for Andrew Dodge.

10. Exhibit 8 is a true and correct copy of the deposition transcript from John Qually deposed in this matter. The pages attached are true and correct copies of the certified transcripts for John Qually.

11. Exhibit 9 is a true and correct copy of the deposition transcript from Tracy Aguilera deposed in this matter. The pages attached are true and correct copies of the certified transcripts for Tracy Aguilera.

12. Exhibit 10 is a true and correct copy of the deposition transcript from Raul Vargas deposed in this matter. The pages attached are true and correct copies of the certified transcripts for Raul Vargas.

1        I declare under penalty of perjury under the laws of the United States and in the State of

2    California that the foregoing is true and correct.

3

4    Date:   January 22, 2021                      Arlo Uriarte

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

Arlo Garcia Uriarte, SBN 231764
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006
**Attorney for Plaintiff Renaldo Navarro**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br>Plaintiff,<br><br>vs.<br><br>MENZIES AVIATION, INC., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:19-cv-08157-VC<br><br>**PLAINTIFF'S INITIAL DISCLOSURES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)**<br><br>State Court Action Filed: 10/23/19<br>Action Removed: 12/16/19<br><br>**Judge: Hon. Vince Chhabria** |

Plaintiff Renaldo Navarro (hereinafter "Plaintiff") makes the following initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure:

A.    **Rule 26(a)(1)(A)(i) Individuals.** Plaintiff believes the following individuals are likely to have discoverable information that Plaintiff may use to support his claims:

1.    Renaldo Navarro, may be contacted through counsel;

2.    Jezen Canlas, 650-452-3810;

3.    Rafael Vasquez, 510-715-0014;

4.    Lorvino Samonte, 650-451-8701;

5.    July Macapagal, phone number unknown;

6.    Andrew Dodge, phone number unknown;

7.    William Rodriguez, phone number unknown;

8.  Anastacio Manuel, phone number unknown;

9.  Ricardo Almelda, phone number unknown;

10. Patrick Moran, phone number unknown;

11. Rex Tosan, phone number unknown;

12. Wesley Faatalale, phone number unknown.

The individuals listed above, aside from Plaintiff, are Plaintiff's former co-workers, managers, and/or supervisors. They are likely to have discoverable information concerning the allegations made by Plaintiff in his complaint, including but not limited to matters related to: Plaintiff's termination, Plaintiff's emotional distress due to his termination, and Plaintiff's general day-to-day working conditions.

Without assuming any duty to supplement these disclosures beyond that imposed by Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff reserves the right to identify and/or call as witnesses such other individuals with knowledge of relevant facts as may be discovered or subsequently identified in the course of this litigation, including any individuals listed in Defendant's initial disclosures or subsequent discovery responses.

B.  **Rule 26(a)(1)(A)(ii) Documents.** The following categories of documents, data compilations, and tangible things are in the possession, custody, or control of Plaintiff and may be used to support their claims:

1.  The records produced by Defendant as part of its response to Plaintiff's records request per California Labor Code § 226;

2.  The documents produced concurrently with these initial disclosures, Batestamped "RenaldoNavarro 000001-000014."

Without assuming any duty to supplement these disclosures beyond that imposed by Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff reserves the right to produce, disclose, or introduce additional documents that may be discovered later during this litigation or that may be otherwise subsequently identified.

C. **Rule 26(a)(1)(A)(iii) Damages.** Plaintiff's computation of damages will include: (1) wage loss damages due to his termination; (2) emotional distress damages due to his termination; (3) interest; (4) attorney's fees and costs; and (5) any other damages deemed appropriate by the Court or relevant law. An exact damage estimate or number is not known at this time. Plaintiff will supplement this answer at a later date.

D. **Rule 26(a)(1)(A)(iv) Insurance.** Plaintiff is not aware of any relevant insurance agreement.

DATED: March 17, 2020                           LIBERATION LAW GROUP, P.C.

                                                _____
                                                Arlo Garcia Uriarte
                                                Attorney for PLAINTIFF

20

To whom it may concern,

My name is Rafael Vasquez I am an SEIU Union Shop Steward for Menzies Aviation at SFO International Airport.

On September the 6, 2018
I was asked by the Menzies Aviation Fuelers on 130 side to write up a Petition on behalf of the Fuelers on 130 side vs Andrew Dodge.

The petition was written out and signed by the Fuelers on 130 side of the SFO Team.

The petition was then officially turned into the SEIU Union Hall.
In Addition a copy of the Petition against Supervisor Andrew Dodge was also turned into the Menzies Aviation Fueling Director Raul Vargas.

There have been two separate Petitions turned into Menzies Aviation Fueling Department Director Raul Vargas.

To date there has been no action taken by the Menzies Aviation Management Team to address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass Fuelers under his charge.

If there is any further information that I may be able to provide please feel free to contact me at (510) 715-0014.

Thank you,

Rafael Vasquez

11/18/2018

RenaldoNavarro 000009

21

Arlo Garcia Uriarte, SBN 231764
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for Plaintiff
**RENALDO NAVARRO**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br>               Plaintiff,<br><br>        v.<br><br>MENZIES AVIATION INC., doing business as MENZIES; and DOES 1 through 10, inclusive,<br><br>               Defendants. | Case No.:  3:19-CV-08157-VC<br><br>**PLAINTIFF RENALDO NAVARRO'S RESPONSES TO DEFENDANT MENZIES AVIATION, INC.'S SPECIAL INTERROGATORIES, SET ONE** |

PROPOUNDING PARTY:    Defendant MENZIES AVIATION, INC.

RESPONDING PARTY:    Plaintiff RENALDO NAVARRO

SET NO.:                            ONE

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Renaldo Navarro ("Plaintiff" or "Responding Party"), based on his current knowledge, understanding and belief of the facts and on the information available to him as of the date on which the these responses are made, hereby submits the following objections and responses to Defendant Menzies Aviation, Inc.'s Special Interrogatories, Set One.

//

//

//

//

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaint,f's Responses to Defendant's Special Interrogatories, Set One*

1

22

## PRELIMINARY STATEMENT

Responding Party makes these responses solely for the purpose of this action. Responding Party has not completed its discovery or investigation of the facts underlying this lawsuit and has not completed its preparation of this case for trial. Accordingly, Responding Party provides these responses without prejudice to its right to use or produce at a later date evidence of any subsequently discovered facts or interpretations thereof.

These responses are made without prejudice to Responding Party's right to Supplement or amend these responses in the event that any information previously available to Responding Party may have been omitted by oversight, inadvertence, or good faith error or mistake.

Any information provided in response to Defendant's Special Interrogatories is subject to any and all objections regarding competence, relevance, materiality, propriety and admissibility. Responding Party reserves these objections and any other objections not stated herein that would require the exclusion of any information, if such information is offered as evidence at any time during this action. Responding Party may interpose these objections at any time prior to and during the trial of this case.

Responding Party makes no incidental or implied admissions by these responses. Accordingly, Defendant shall not construe Responding Party's response or objection to any Interrogatory as Responding Party 's admission that it accepts or admits the existence of any facts assumed by the Interrogatory, and Defendant shall not construe Responding Party's response or objection as admissible evidence of any such assumed facts.

## SPECIAL INTERROGATORIES

## SPECIAL INTERROGATORY NO. 1

Please state the names, addresses and phone numbers of all persons who YOU contend are witnesses to the allegations contained in the COMPLAINT.

## RESPONSE TO SPECIAL INTERROGATORY NO. 1

Responding Party objects to the extent that this interrogatory seeks or encompasses documents and information protected by third party's right to privacy and Propounding Party has not demonstrated direct relevance, or a compelling interest or need in the private information sought by this

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

2

interrogatory, nor has Propounding Party explored less obtrusive means to seek or to obtain directly relevant information. Responding Party further objects to the extent that this interrogatory seeks or encompasses information protected by the attorney-client privilege and/or attorney work product doctrine. Without waiving these specific objections, Responding Party responds as follows:

1.      Jezen Canlas, address unknown, 650-452-3810;

2.      Rafael Vasquez, address unknown, 510-715-0014;

3.      Lorvino Samonte, address unknown, 650-451-8701;

4.      July Macapagal, address unknown, 650-270-1968;

5.      Andrew Dodge, address and phone number unknown;

6.      William Rodriguez, address and phone number unknown;

7.      Anastacio Manuel, address and phone number unknown;

8.      Ricardo Almelda, address and phone number unknown;

9.      Patrick Moran, address and phone number unknown;

10.     Rex Tosan, address and phone number unknown;

11.     Wesley Faatalale, address and phone number unknown.

**SPECIAL INTERROGATORY NO. 2**

Please state with particularity the knowledge that each alleged witness to the COMPLAINT has that is in any way relevant to the allegations contained in the COMPLAINT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 2**

Responding Party objects to this request on the ground that this interrogatory is vague and ambiguous so as to make a response impossible without speculation as to the meaning of the question. Responding Party further objects to the extent that this interrogatory seeks or encompasses information protected by the attorney-client privilege and/or attorney work product doctrine. Without waiving these specific objections, Responding Party responds as follows:

1.      Jezen Canlas – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

3

24

was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

2.     Rafael Vasquez – Existence of the petitions filed against Andrew Dodge, Rafael's initiative to author the second petition against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

3.     Lorvino Samonte – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

4.     July Macapagal – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

5.     Andrew Dodge – Existence of the petitions filed against him, the complaints made by the fuelers against him, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

6.     William Rodriguez – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

7.     Anastacio Manuel – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for

*Navarro v. Menzies Aviation, Inc.*, Case No. 13-cv-08157-vc
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

4

25

favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

8.      Ricardo Almelda – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

9.      Patrick Moran – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

10.     Rex Tosan – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

**11.**     Wesley Faatalale – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

**SPECIAL INTERROGATORY NO. 3**

Please state each and every item of damages that YOU claim YOU suffered by reason of the occurrences that form the subject matter of the COMPLAINT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 3**

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

5

26

1      Responding Party objects to this request on the ground that this interrogatory is vague and

2 ambiguous so as to make a response impossible without speculation as to the meaning of the question.

3 Without waiving these specific objections, Responding Party responds as follows:

4      (1) Compensatory damages;

5      (2) Consequential damages;

6      (3) Statutory damages;

7      (4) Punitive damages; and

8      (5) Emotional distress damages.

9 **SPECIAL INTERROGATORY NO. 4**

10      Please IDENTIFY any and all DOCUMENTS that support the existence or amount of any item

11 of damages claimed in Interrogatories Nos. 3.

12 **RESPONSE TO SPECIAL INTERROGATORY NO. 4**

13      Responding Party objects to this request on the ground that this interrogatory is vague and

14 ambiguous so as to make a response impossible without speculation as to the meaning of the question.

15 Responding Party also objects on the ground that it seeks information that is in violation of Responding

16 Party's constitutionally protected right to privacy. Without waiving these specific objections,

17 Responding Party responds as follows:

18      Plaintiff's medical records, W-2 forms and Earnings Summary of Plaintiff from September

19 2018 until the present.

20 **SPECIAL INTERROGATORY NO. 5**

21      Please state the names, addresses and phone numbers of all psychologists, psychoanalysts,

22 and/or psychotherapists that YOU have visited in the last 10 years.

23 **RESPONSE TO SPECIAL INTERROGATORY NO. 5**

24      Responding Party objects to this request on the ground that this interrogatory is oppressive and

25 burdensome as to the time and scope of the request which is "in the last 10 years." Responding Party

26 also objects on the ground that it seeks information that is in violation of Responding Party's

27 constitutionally protected right to privacy. Without waiving these specific objections, Responding Party

28 responds as follows:

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

6

27

1    Erick Garcia Ducut, Kaiser Permanente, Daly City, (650) 742-2000.

2    Eric Joe Edelson, Kaiser Permanente, Daly City, (650) 742-2000.

3    Allyson Leslie Klein, Kaiser Permanente, Daly City, (650) 742-2000.

4    David Andrew Scheid, Kaiser Permanente, Daly City, (650) 742-2000.

5    **SPECIAL INTERROGATORY NO. 6**

6    Please IDENTIFY any and all steps YOU have taken to mitigate any damages YOU have

7    allegedly incurred.

8    **RESPONSE TO SPECIAL INTERROGATORY NO. 6**

9    Responding Party objects to this request on the ground that this interrogatory does not

10   adequately define "IDENTIFY", making it difficult to answer with any specificity. Responding Party

11   assumes IDENTIFY means "state" and therefore provides the following answer on that basis:

12   Plaintiff was employed part-time and full-time from September 2018 until the present.

13   **SPECIAL INTERROGATORY NO. 7**

14   Please IDENTIFY all employment positions for which YOU have applied since August 2018.

15   **RESPONSE TO SPECIAL INTERROGATORY NO. 7**

16   Responding Party objects to this request on the ground that this interrogatory does not

17   adequately define "IDENTIFY", making it difficult to answer with any specificity. Responding Party

18   assumes IDENTIFY means "state" and therefore provides the following answer on that basis:

19   (1) Wheelchair attendant;

20   (2) Warehouse staff; and

21   (3) Lounge attendant.

22   **SPECIAL INTERROGATORY NO. 8**

23   Please IDENTIFY all employment positions YOU have held since August 2018.

24   **RESPONSE TO SPECIAL INTERROGATORY NO. 8**

25   Responding Party objects to this request on the ground that this interrogatory does not

26   adequately define "IDENTIFY", making it difficult to answer with any specificity. Responding Party

27   assumes IDENTIFY means "state" and therefore provides the following answer on that basis:

28   (1) Wheelchair attendant;

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

7

28

(2) Warehouse staff; and

(3) Lounge attendant.

**SPECIAL INTERROGATORY NO. 9**

For each position identified in YOUR response to Interrogatory No. 8, state (a) the date on which YOU were hired, (b) YOUR job position, (c) YOUR hourly wage, and (d) the date on which YOU were terminated.

**RESPONSE TO SPECIAL INTERROGATORY NO. 9**

Responding Party objects to this request on the ground that this interrogatory is vague and ambiguous so as to make a response impossible without speculation as to the meaning of the question.

(1) September 2018; Wheelchair attendant; On average of $19.00 per hour; September 2019;

(2) February 2019 and January 2020 (rehired); Warehouse staff; On average of $19.00 per hour; September 2019 (laid-off);

(3) September 2019; Lounge attendant; On average of $19.00 per hour; Not applicable.

**SPECIAL INTERROGATORY NO. 10**

IDENTIFY each and every DOCUMENT that supports the allegations set forth in the COMPLAINT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 10**

Responding Party objects to this request on the ground that this interrogatory is overbroad and burdensome because it lacks specificity as to the subject matter being requested. Responding Party also objects on the ground that it seeks information that is in violation of Responding Party's constitutionally protected right to privacy. Responding Party further objects to the extent that this interrogatory seeks or encompasses information protected by the attorney-client privilege and/or attorney work product doctrine. Without waiving these specific objections, Responding Party responds as follows:

(1) The petitions made by the fuelers employed by Defendant against Andrew Dodge;

(2) Communications between Plaintiff and Defendant's employees relating to complaints against Andrew Dodge;

(3) Communications between Plaintiff and Defendant regarding Plaintiff's termination;

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

8

29

(4) Plaintiff's W-2 forms and Earnings Summary of from September 2018 until the present; and

(5) Plaintiff's medical records.

Dated: August 18, 2020                    LIBERATION LAW GROUP, P.C.

By: _____

          Arlo Garcia Uriarte
          Attorneys for Plaintiff

[Verification to Follow]

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff's Responses to Defendant's Special Interrogatories, Set One*

9

30

1   Arlo Garcia Uriarte, SBN 231764
2   LIBERATION LAW GROUP, P.C.
    2760 Mission Street
3   San Francisco, CA 94110
    Telephone: (415) 695-1000
4   Facsimile: (415) 695-1006
5   Attorneys for Plaintiff
6   **RENALDO NAVARRO**

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10  RENALDO NAVARRO,                    Case No.:  3:19-CV-08157-VC

11              Plaintiff,              **PLAINTIFF RENALDO**
                                        **NAVARRO'S REQUESTS FOR**
12        v.                            **PRODUCTION OF DOCUMENTS**
                                        **TO DEFENDANT MENZIES**
13  MENZIES AVIATION INC., doing business  **AVIATION, INC., SET ONE**
    as MENZIES; and DOES 1 through 10,
14  inclusive,
15
16              Defendants.

17
18  PROPOUNDING PARTY:   Plaintiff RENALDO NAVARRO
19  RESPONDING PARTY:    Defendant MENZIES AVIATION, INC.
    SET NO.:             ONE
20
21        Plaintiff Renaldo Navarro, in accordance with Rule 34 of the Federal Rules of Civil
22
    Procedure, hereby requests that Defendant Menzies Aviation, Inc. respond to the following
23
    Request for Production of Documents, Set One, not more than thirty (30) days after service of
24
    these Request and to produce the originals of the responsive documents, and permit the
25
    inspection and copying thereof at the office of Liberation Law Group, P.C., at 2760 Mission
26
    Street, San Francisco, California, 94110.
27
28

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

1

**31**

**INSTRUCTIONS**

1. <u>Documents Requested</u>. The requests set out herein call for all documents in DEFENDANT'S actual or constructive possession, custody, control or care, including, but not limited to those documents in the actual or constructive possession, custody, control or care of any attorney, agent or other representative of DEFENDANT.

If DEFENDANT subsequently becomes aware of any document called for by the requests set out herein, DEFENDANT is requested to provide a copy of that document to PLAINTIFF or to identify it if it is in the possession of DEFENDANT or its attorneys.

2. <u>Documents Withheld</u>. If any document is withheld under a claim of privilege or other protection, DEFENDANT is to provide the following information, for the purpose of aiding the Court to determine the validity of the claim of privilege:

    a.   The identity of the person(s) who prepared the document, who signed the document, and/or over whose name the document was sent or issued;

    b.   The identity of the person(s) to whom the document was directed;

    c.   The nature and substance of the document (with sufficient particularity to enable the Court and parties hereto to identify the document);

    d.   The date of the document;

    e.   The identity of the person who has custody of, or control over the document and each copy thereof;

    f.   The identity of each person to whom copies of the document were furnished;

    g.   The number of pages of the document;

    h.   The basis on which any privilege or other protection is claimed; and

    i.   Whether any non-privilege matter is included in the document.

3. <u>Partial Production</u>. If you object to a particular Request, or portion thereof, you must produce all documents called for which are not subject to that objection. Similarly, whenever a document is not produced in full for some other reason, state with particularity the reason(s) it is not being produced in full, and describe, to the best of your knowledge,

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

2

32

information and belief, and with as much particularity as possible, those portions of the document which are not produced.

## DEFINITIONS

1. "RELEVANT PERIOD" shall refer to the past five (5) years until PLAINTIFF's termination of employment in or around August 29, 2018.

2. "COMMUNICATIONS" includes all forms of communication through letters, memoranda, correspondence, telephone conversations, electronic mail (email) messages in their original and unaltered form, voice mail messages, instant messaging or IM, short message service (SMS) or text messages, messages from any messaging mobile or computer software application, information stored on web pages or web servers, and database records.

3. "COMPLAINT" shall refer to the complaint filed by Plaintiff Renaldo Navarro against Defendants Menzies Aviation, Inc. doing business as Menzies, and Does 1 through 10, before The Superior Court of California, County of San Francisco docketed as Case No. CGC-19-580227.

4. "DESTRUCTION" shall mean an act that renders the subject useless for its intended purpose, though it does not literally demolish or annihilate it, which includes cancellation, obliterating, shredding, burning, and tearing into fragments; deletion of data stored on tapes, hard disks and other forms of electronic media.

5. "DISCIPLINARY ACTIONS" shall mean any form of warnings, reprimands or suspensions related to non-compliance with the employer's company policies, and work-related performance that fails to satisfactorily meet job requirements as set forth in the relevant job description, work action plan, or as directed by an employee's supervisor.

6. "DISCRIMINATION" shall refer to the unlawful employment practice defined in California Government Code section ("Gov't Code §") 12940 (a).

7. "DOCUMENTS" is defined as writings, recordings or photographs as defined in Rule 1001 of the Federal Rules of Evidence, including the original or a copy of any handwritten, typewritten, printed, photostatic, photographic, computer, magnetic impulse, mechanical or electronically recorded, or any other form of data compilation, and includes "electronically

---

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

3

33

stored information" as used in Federal Rule of Civil Procedure 34(a). "DOCUMENTS" also includes any and all drafts of, and amendments to, and/or supplements to, any original or copy of DOCUMENTS, including differing copies of DOCUMENTS containing any differences from the original such as handwritten notes, interlineations and the like.)

8. "DOCUMENT RETENTION" shall refer to the storage of DOCUMENTS that are no longer active.

9. "DODGE" shall refer to YOUR employee, Andrew Dodge.

10. "EMPLOYMENT MANUALS" shall include personnel manuals, human resource manuals, employment manuals, employee handbooks, company policies and practices, or other DOCUMENTS related to YOUR employment policies and practices including but not limited to timekeeping policies, payroll policies, off-duty meal and rest period policies, issuance of itemized wage statements, overtime work policies, sick day policies, discrimination policies, harassment policies, retaliation policies, equal employment opportunity policies, disciplinary policies, termination policies and internal complaints procedures.

11. "IDENTIFIED," when used in reference to a natural PERSON, shall mean to state such person's full name, last-known home and business address, last-known business affiliation, employer, and position therewith, and the latest date that such information was true, to YOUR knowledge; when used in reference to a business, firm, partnership, joint venture, company or corporation, shall mean to state, to the extent known, its full name, state of incorporation or creation, address of its principal place of business, and its principal activities or products; when referring to a lawsuit or other legal proceeding, shall mean to state the court of jurisdiction, venue, case number, case title, attorneys of record, and filing date; when used in reference to DOCUMENTS , shall mean to describe specifically the document, including a description of its type (e.g., letter, memorandum, telegram, chart, etc.), and to state its date, author, addressee, title, file identification number or symbol, and to identify the present location and the name and address of the present custodian of such document.  If any such DOCUMENTS is no longer in YOUR possession or subject to YOUR control, state what disposition was made of it and the date of such disposition, identifying the PERSON having knowledge of its content.

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

4

34

12. "INVESTIGATION" shall mean to include the facts relating to the receipt/intake of complaints by any of YOUR employees, YOUR efforts to investigate the complaints, any findings or determination made by YOU with respect to the complaints and actions taken by YOU in response to YOUR findings or determinations.

13. "PERSONS" shall refer to the plural as well as the singular, means any natural person, firm, association, partnership, corporation, public entity, or any other form of legal entity or governmental body unless the context indicates otherwise.

14. "PERSONNEL FILE" shall include any file, collection of DOCUMENTS or other forms in which information is stored concerning an employee, and includes all such collections of DOCUMENTS regardless of the names given them by DEFENDANT which include information on the work history, job titles, job descriptions, job duties and responsibilities, employee status change forms, promotions, demotions, transfers, corrective actions, disciplinary actions, termination; wage or benefit increases granted; investigations; job performance evaluations, performance evaluation plans; labor files, attendance records or calendars, records of sick leave, leaves of absence and vacation leaves; complaints, charges or grievances; notes during meetings; trainings and seminars attended, and correspondences including emails and text messages.

15. "PLAINTIFF" shall refer to Plaintiff Renaldo Navarro.

16. "RETALIATION" shall refer to the unlawful employment practice defined in Gov't Code §12940 (h).

17. "WORKDAY" shall mean any consecutive 24 hours beginning at the same time each calendar day.)

18. "YOU" and "YOUR" refer to Defendant Menzies Aviation, Inc. and/or to any past or present officers, directors, employees and/or agents of said-named entity, and/or all of its divisions, subsidiaries, affiliated or related or predecessor companies.

## **REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1.**

PLAINTIFF's PERSONNEL FILE.

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

5

35

1  **REQUEST FOR PRODUCTION NO. 2.**

2      All of YOUR EMPLOYMENT MANUALS applicable to PLAINTIFF during the

3  RELEVANT PERIOD.

4  **REQUEST FOR PRODUCTION NO. 3.**

5      All written contracts between YOU and PLAINTIFF regarding his employment with

6  YOU.

7  **REQUEST FOR PRODUCTION NO. 4.**

8      All DOCUMENTS related to PLAINTIFF's job duties and responsibilities during his

9  employment with YOU.

10  **REQUEST FOR PRODUCTION NO. 5.**

11      All DOCUMENTS related to the identity of PLAINTIFF's supervisors, including their

12  names, telephone numbers and addresses, during the RELEVANT PERIOD.

13  **REQUEST FOR PRODUCTION NO. 6.**

14      All DOCUMENTS related to YOUR policies, procedures and/or practices regarding

15  DISCRIMINATION applicable during the RELEVANT PERIOD.

16  **REQUEST FOR PRODUCTION NO. 7.**

17      All DOCUMENTS related to YOUR policies, procedures and/or practices regarding

18  RETALIATION applicable during PLAINTIFF's employment with YOU.

19  **REQUEST FOR PRODUCTION NO. 8.**

20      All DOCUMENTS related to trainings, seminars and/or workshops that were attended

21  by YOUR employees, regarding DISCRIMINATION during the RELEVANT PERIOD.

22  **REQUEST FOR PRODUCTION NO. 9.**

23      All DOCUMENTS related to YOUR policies, procedures and/or practices regarding the

24  suspension of YOUR employees' employment during the RELEVANT PERIOD.

25  //

26  **REQUEST FOR PRODUCTION NO. 10.**

27      All DOCUMENTS related to all DISCIPLINARY ACTIONS taken by YOU against

28  PLAINTIFF during his employment with YOU.

---

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

**REQUEST FOR PRODUCTION NO. 11.**

All DOCUMENTS, including reports made by YOU, related to all DISCIPLINARY ACTIONS, complaints, accusations, and charges against PLAINTIFF during his employment with YOU.

**REQUEST FOR PRODUCTION NO. 12.**

All DOCUMENTS related to YOUR Code of Conduct that applied to PLAINTIFF during his employment with YOU.

**REQUEST FOR PRODUCTION NO. 13.**

All DOCUMENTS related to YOUR suspension of PLAINTIFF's employment in or around August 23, 2018.

**REQUEST FOR PRODUCTION NO. 14.**

All DOCUMENTS related to PLAINTIFF's complaints to YOU regarding his employment with YOU.

**REQUEST FOR PRODUCTION NO. 15.**

All DOCUMENTS related to complaints made to YOU by any of YOUR former or present employees regarding DISCRIMINATION during PLAINTIFF's employment with YOU.

**REQUEST FOR PRODUCTION NO. 16.**

All DOCUMENTS that state YOUR policy on imposing DISCIPLINARY ACTIONS on YOUR employees for signing a petition to make a complaint during the RELEVANT PERIOD.

**REQUEST FOR PRODUCTION NO. 17.**

All DOCUMENTS that state DODGE's tasks in a WORKDAY during the RELEVANT PERIOD.

**REQUEST FOR PRODUCTION NO. 18.**

All DOCUMENTS related to YOUR policies, procedures and/or practices on imposing DISCIPLINARY ACTIONS whenever YOUR swing supervisors did not perform their respective job duties during the RELEVANT PERIOD.

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

7

37

**REQUEST FOR PRODUCTION NO. 19.**

All DOCUMENTS related to complaints made to YOU by any of YOUR former or present employees, including PLAINTIFF, against DODGE.

**REQUEST FOR PRODUCTION NO. 20.**

All DOCUMENTS related to the INVESTIGATION YOU conducted following the complaints made to YOU by any of YOUR former or present employees, including PLAINTIFF, against DODGE.

**REQUEST FOR PRODUCTION NO. 21.**

All DOCUMENTS related to all petitions filed by YOUR employees against DODGE regarding his supervision over YOUR employees, including PLAINTIFF.

**REQUEST FOR PRODUCTION NO. 22.**

All DOCUMENTS related to DISCIPLINARY ACTIONS, charges, and lawsuits of any kind against DODGE.

**REQUEST FOR PRODUCTION NO. 23.**

All DOCUMENTS related to YOUR policies, procedures and/or practices regarding the termination of YOUR employees' employment during the RELEVANT PERIOD.

**REQUEST FOR PRODUCTION NO. 24.**

All DOCUMENTS, related to YOUR termination of PLAINTIFF's employment in or around August 29, 2018.

**REQUEST FOR PRODUCTION NO. 25.**

All DOCUMENTS related to COMMUNICATIONS between YOU and PLAINTIFF regarding PLAINTIFF's employment with YOU, including PLAINTIFF's termination of employment.

**REQUEST FOR PRODUCTION NO. 26.**

All DOCUMENTS related to meetings and/or discussions between YOU and any of YOUR current or former employee concerning PLAINTIFF's employment with YOU.

//

//

---

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

8

38

1   **REQUEST FOR PRODUCTION NO. 27.**

2         All DOCUMENTS related to any oral, written, or recorded statements or reports from

3   any PERSONS related to any of the allegations in the COMPLAINT.

4   **REQUEST FOR PRODUCTION NO. 28.**

5         All DOCUMENTS stored on YOUR personal or office computers, laptops, cellphones,

6   hard drives, flash drives, and other similar storage devices, that are related to any of the

7   allegations in the COMPLAINT.

8   **REQUEST FOR PRODUCTION NO. 29.**

9         All DOCUMENTS related to any COMMUNICATIONS between YOU and anyone

10  other than YOUR attorney regarding the claims and allegations contained in the COMPLAINT.

11  **REQUEST FOR PRODUCTION NO. 30.**

12        All DOCUMENTS related to YOUR DOCUMENT RETENTION policies during the

13  RELEVANT PERIOD.

14

15  Dated: July 14, 2020                    LIBERATION LAW GROUP, P.C.

16

17

18                                   By: _____

19                                        Arlo Garcia Uriarte
                                          Attorneys for Plaintiff

20

21

22

23

24

25

26

27

28

---

*Navarro v. Menzies Aviation, Inc., Case No. 13-cv-08157-vc*
*Plaintiff Renaldo Navarro's Request for Production of Documents to Defendant Menzies Aviation, Inc., Set One*

9

39

1

Arlo Garcia Uriarte, SBN 231764

2  LIBERATION LAW GROUP, P.C.
   2760 Mission Street

3  San Francisco, CA 94110
   Telephone: (415) 695-1000

4  Facsimile: (415) 695-1006

5  Attorneys for Plaintiff

6  **RENALDO NAVARRO**

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10  RENALDO NAVARRO,                    Case No.:   3:19-CV-08157-VC

11              Plaintiff,
                                        **PLAINTIFF RENALDO**
12      v.                              **NAVARRO'S INTERROGATORIES**
                                        **TO DEFENDANT MENZIES**
13  MENZIES AVIATION INC., doing business  **AVIATION, INC.,**
    as MENZIES and DOES 1 through 10,   **SET ONE**
14  inclusive,

15

16              Defendants.

17

18  PROPOUNDING PARTY:    Plaintiff RENALDO NAVARRO

19  RESPONDING PARTY:     Defendant MENZIES AVIATION, INC.

20  SET NO.:              ONE

21      Plaintiff Renaldo Navarro hereby requests that Defendant Menzies Aviation, Inc.

22  respond to each of the following interrogatories set forth below under oath and within thirty (30)

23  days of service, pursuant to Rule 33 of the Federal Rules of Civil Procedure.

24  ///

25  ///

26  ///

27  ///

28  ///

---

*Navarro v. Menzies Aviation, Inc., Case No.  3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

1

**40**

## INTERROGATORIES

**INTERROGATORY NO. 1.**

State all of PLAINTIFF's job titles during his employment with YOU.

(As used in this Interrogatory, the following words, when used in all capitals, shall have the following meanings:

"PLAINTIFF" shall refer to Plaintiff Renaldo Navarro.

"YOU" and "YOUR" refer to Defendant Menzies Aviation, Inc., and/or to any of its past or present officers, directors, employees and/or agents, and/or all of its divisions, subsidiaries, affiliated or related or predecessor companies.)

**INTERROGATORY NO. 2.**

State all of PLAINTIFF's job duties during the RELEVANT PERIOD.

(As used in this Interrogatory, the following word, when used in all capitals, shall have the following meaning:

"RELEVANT PERIOD" shall refer to the past five (5) years until PLAINTIFF's termination of employment in or around August 29, 2018.)

**INTERROGATORY NO. 3.**

IDENTIFY PLAINTIFF's supervisors during the RELEVANT PERIOD.

(As used in this Interrogatory, the following word, when used in all capitals, shall have the following meaning:

"IDENTIFY," when used in reference to a natural PERSON, shall mean to state such person's full name, last-known home and business address, last-known business affiliation, employer, and position therewith, and the latest date that such information was true, to YOUR knowledge; when used in reference to a business, firm, partnership, joint venture, company or corporation, shall mean to state, to the extent known, its full name, state of incorporation or creation, address of its principal place of business, and its principal activities or products; when referring to a lawsuit or other legal proceeding, shall mean to state the court of jurisdiction, venue, case number, case title, attorneys of record, and filing date; when used in reference to DOCUMENTS , shall mean to describe specifically the document, including a description of its

*Navarro v. Menzies Aviation, Inc., Case No.  3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

2

41

1  type (e.g., letter, memorandum, telegram, chart, etc.), and to state its date, author, addressee,

2  title, file identification number or symbol, and to identify the present location and the name and

3  address of the present custodian of such document.  If any such DOCUMENTS is no longer in

4  YOUR possession or subject to YOUR control, state what disposition was made of it and the

5  date of such disposition, identifying the PERSON having knowledge of its content.)

6  **INTERROGATORY NO. 4.**

7      IDENTIFY YOUR supervisors who worked the swing shifts before PLAINTIFF's shift

8  during the RELEVANT PERIOD.

9  **INTERROGATORY NO. 5.**

10      State the job duties of YOUR supervisors who worked the swing shifts before

11  PLAINTIFF's shift during the RELEVANT PERIOD.

12   **INTERROGATORY NO. 6.**

13      State YOUR policy on DISCIPLINARY ACTIONS during the RELEVANT PERIOD

14  whenever YOUR swing supervisors did not perform their respective job duties.

15      "DISCIPLINARY ACTIONS" shall mean any form of warnings, reprimands or

16  suspensions related to non-compliance with the employer's company policies, and work-related

17  performance that fails to satisfactorily meet job requirements as set forth in the relevant job

18  description, work action plan, or as directed by an employee's supervisor.)

19  **INTERROGATORY NO. 7.**

20      State DODGE's tasks in a WORKDAY during the RELEVANT PERIOD.

21      (As used in this Interrogatory, the following words, when used in all capitals, shall have

22  the following meanings:

23      "DODGE" shall refer to YOUR employee, Andrew Dodge.)

24  **INTERROGATORY NO. 8.**

25      State all complaints that PLAINTIFF made to YOU regarding DODGE during the

26  RELEVANT PERIOD.

27  **INTERROGATORY NO. 9.**

28      IDENTIFY all PERSONS who have knowledge of the complaints that PLAINTIFF

*Navarro v. Menzies Aviation, Inc., Case No.  3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

3

42

1   made to YOU regarding DODGE during the RELEVANT PERIOD.

2        (As used in this Interrogatory, the following word, when used in all capitals, shall have

3   the following meaning:

4        "PERSON(S)" means any natural person, together with all federal, state, county,

5   municipal and other government units, agencies or public bodies, as well as firms, companies,

6   corporations, partnerships, proprietorships, joint ventures, organizations, groups of natural

7   persons or other associations or entities separately identifiable whether or not such associations

8   or entities have a separate legal existence in their own right.)

9   **INTERROGATORY NO. 10.**

10       State all facts regarding each INVESTIGATION related to PLAINTIFF's complaints to

11  YOU regarding DODGE's work during the RELEVANT PERIOD.

12       (As used in this Interrogatory, the following word, when used in all capitals, shall have

13  the following meaning:

14       "INVESTIGATION" shall mean to include the facts relating to the receipt/intake of

15  complaints by any of YOUR employees, YOUR efforts to investigate the complaints, any

16  findings or determination made by YOU with respect to the complaints and actions taken by

17  YOU in response to YOUR findings or determinations.)

18  **INTERROGATORY NO. 11.**

19       IDENTIFY all PERSONS who have knowledge of the facts regarding each

20  INVESTIGATION related to PLAINTIFF's complaints to YOU regarding DODGE's work

21  during the RELEVANT PERIOD.

22  **INTERROGATORY NO. 12.**

23       State all complaints made to YOU by any of your present or former employees about

24  DODGE's work during the RELEVANT PERIOD.

25  **INTERROGATORY NO. 13.**

26       IDENTIFY all PERSONS who have knowledge of the complaints made to YOU by any

27  of your present or former employees about DODGE's work during the RELEVANT PERIOD.

28  //

---

*Navarro v. Menzies Aviation, Inc., Case No. 3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

4

**INTERROGATORY NO. 14.**

State all facts regarding each INVESTIGATION YOU conducted related to the complaints made to YOU by any of your present or former employees about DODGE's work during the RELEVANT PERIOD.

**INTERROGATORY NO. 15.**

IDENTIFY all PERSONS who have knowledge of the facts regarding each INVESTIGATION YOU conducted related to the complaints made to YOU by any of your present or former employees about DODGE's work.

**INTERROGATORY NO. 16.**

State all DISCIPLINARY ACTIONS taken by YOU against DODGE during his employment with YOU.

**INTERROGATORY NO. 17.**

Describe YOUR Code of Conduct that applied to PLAINTIFF during the RELEVANT PERIOD.

**INTERROGATORY NO. 18.**

State YOUR policy on imposing DISCIPLINARY ACTIONS on YOUR employees for signing a petition to make a complaint during the RELEVANT PERIOD.

**INTERROGATORY NO. 19.**

State YOUR policy on suspension of employment during the RELEVANT PERIOD.

**INTERROGATORY NO. 20.**

State YOUR basis for suspending PLAINTIFF's employment in or around August 23, 2018.

**INTERROGATORY NO. 21.**

IDENTIFY all individuals involved in the determination to suspend PLAINTIFF.

**INTERROGATORY NO. 22.**

State YOUR policy on termination of employment during the RELEVANT PERIOD.

**INTERROGATORY NO. 23.**

IDENTIFY all individuals involved in the determination to terminate PLAINTIFF.

---

*Navarro v. Menzies Aviation, Inc., Case No. 3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

5

44

1    **INTERROGATORY NO. 24.**

2       State the specific violation in the Code of Conduct that was YOUR reason for

3    terminating PLAINTIFF's employment.

4    **INTERROGATORY NO. 25.**

5       List all DOCUMENTS related to PLAINTIFF that YOU DESTROYED.

6       (As used in this Interrogatory, the following word, when used in all capitals, shall have

7    the following meaning:

8       "DESTROYED" shall mean an act that renders the subject useless for its intended

9    purpose, though it does not literally demolish or annihilate it, which includes cancellation,

10    obliterating, shredding, burning, and tearing into fragments; deletion of data stored on tapes,

11    hard disks and other forms of electronic media.)

12

13    Dated: July 14, 2020           LIBERATION LAW GROUP, P.C.

14

15

16                             By: _____

17                                Arlo Garcia Uriarte
                                 Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

*Navarro v. Menzies Aviation, Inc., Case No.  3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

6

45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO, | ) **CERTIFIED COPY** |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. |
| | ) 3:19-cv-08157-VC |
| MENZIES AVIATION, INC., DOING | ) |
| BUSINESS AS MENZIES; and | ) |
| DOES 1 through 10, inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Webex deposition of RENALDO NAVARRO, VOLUME I,
taken remotely on behalf of the Defendant, beginning at
9:41 a.m. and ending at 4:23 p.m., on Thursday,
July 23, 2020, before JOANNA B. BROWN, Certified
Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF RENALDO NAVARRO:
 3           LIBERATION LAW GROUP, P.C.
             BY:  ARLO GARCIA URIARTE, ESQ.
 4           2760 Mission Street
             San Francisco, California 94110
 5           (415) 695-1000
             (415) 695-1006 Fax
 6           arlo@liberationlawgroup.com
 7   FOR DEFENDANT MENZIES AVIATION, INC., dba MENZIES:
 8           FOLEY & LARDNER LLP
             BY:  CHRISTOPHER G. WARD, ESQ.
 9           555 South Flower Street, Suite 3300
             Los Angeles, California 90071-2411
10           (213) 972-4500
             (213) 486-0065 Fax
11           cward@foley.com
12   ALSO PRESENT:
13           CAROLINE CARRERA, TAGALOG INTERPRETER #301298
14
15
16
17
18
19
20
21
22
23
24
25
```

3

47

```
 1                    I N D E X
 2   EXAMINATION OF:                            PAGE
 3   RENALDO NAVARRO
 4
 5           BY MR. WARD                           7
 6           BY MR. URIARTE                      115
 7
 8                  E X H I B I T S
 9   DEFENDANT'S                                PAGE
10   Exhibit 1   Aircraft Service International
                 Group "Incident Report" dated
11               March 18, 2007, Bates
                 No. MENZIES_000146 (1 page)      34
12
     Exhibit 2   Aircraft Service International
13               Group "Notice to Employees as to
                 Change in Relationship," Bates
14               Nos. MENZIES_000143 and
                 MENZIES_000144 (2 pages)         35
15
     Exhibit 3   Aircraft Service International
16               Group "Incident Report" dated
                 March 30, 2009, Bates
17               No. MENZIES_000140 (1 page)      38
18   Exhibit 4   "Employee Coaching Document"
                 for a May 30, 2009, warning,
19               Bates No. MENZIES_000139 (1 page) 39
20   Exhibit 5   "Employee Coaching Document"
                 for a May 18, 2010, warning,
21               Bates Nos. MENZIES_000135 and
                 MENZIES_000136 (2 pages)         40
22
     Exhibit 6   "Employee Coaching Document"
23               for a May 3, 2012, warning,
                 Bates No. MENZIES_000126 (1 page) 41
24
     Exhibit 7   June 30, 2013, warning document,
25               Bates No. MENZIES_000127 (1 page) 42
```

4

48

```
 1                        E X H I B I T S
 2   DEFENDANT'S                                      PAGE
 3   Exhibit 8    Letter to "Menzies Management"
                  from Menzies fueler, Bates
 4                Nos. MENZIES_000152 -
                  MENZIES_000154 (3 pages)            54
 5
     Exhibit 9    Second petition against
 6                Andrew Dodge, Bates
                  No. MENZIES_000150 (1 page)         54
 7
     Exhibit 10   Text-message exchange, Bates
 8                No. MENZIES_000088 (1 page)         56
 9   Exhibit 11   Handwritten statement by
                  Christopher Lawrence, Bates
10                No. MENZIES_000086 (1 page)         64
11   Exhibit 12   Handwritten statement by
                  Andrew Dodge August 16, 2018,
12                Bates No. MENZIES_000089
                  (1 page)                            66
13
     Exhibit 13   "Employee Performance Development,"
14                Bates No. MENZIES_000099 (1 page)   79
15   Exhibit 14   Typed statement by John Qually,
                  Bates No. MENZIES_000084 (1 page)   82
16
     Exhibit 15   Set of documents produced, Bates
17                Nos. RenaldoNavarro 000001 -
                  RenaldoNavarro 000014 (14 pages)    95
18
     Exhibit 16   Plaintiff's Initial Disclosures
19                Pursuant to Federal Rule of
                  Civil Procedure 26(a)(1)
20                (3 pages)                           105
21
22                    UNANSWERED QUESTIONS
23                    PAGE    LINE
24                     14      10
25
                                                         5
```

49

1                    Remotely; Thursday, July 23, 2020

2                         9:41 a.m.

3

4                    CAROLINE CARRERA,

5        having been duly sworn, translated English into

6         Tagalog and Tagalog into English as follows:

7

8                    RENALDO NAVARRO,

9           having been duly sworn, was examined

10                and testified as follows:

11

12        THE REPORTER:  Good morning.  My name is

13   Joanna Brown.  I am a California certified stenographic

14   reporter.  Due to the current national emergency of the

15   COVID-19 virus, this deposition is being handled via

16   remote means.

17        Today's date is Thursday, July 23, 2020, and

18   the time is approximately 9:41 a.m.  This is the

19   deposition of Renaldo Navarro in the matter of

20   Renaldo Navarro v. Menzies Aviation, Inc.  This is

21   venued in the United States District Court, Northern

22   District of California.  The case number is

23   3:19-cv-08157-VC.

24        At this time, I will ask counsel to identify

25   yourselves, state who you represent, and agree on the

                                                         6

50

```
 1   record that there is no objection to this deposition

 2   officer administering a binding oath to the witness

 3   via Webex.  Let's start with the noticing attorneys.

 4           MR. WARD:  Christopher Ward of

 5   Foley & Lardner, representing Menzies Aviation, and I

 6   have no such objection.

 7           MR. URIARTE:  Arlo Uriarte for Plaintiff

 8   Renaldo Navarro.  No objection.

 9           THE REPORTER:  You do solemnly state that you

10   will accurately and correctly translate from English to

11   Tagalog and Tagalog to English to the best of your

12   ability so help you God?

13           THE INTERPRETER:  I do.

14           THE REPORTER:  Mr. Navarro, would you raise

15   your right hand, please.  You do solemnly state that

16   the testimony you shall give in this matter will be the

17   truth, the whole truth, and nothing but the truth?

18           THE WITNESS:  I do.

19           THE REPORTER:  Thank you.

20                   EXAMINATION

21   BY MR. WARD:

22      Q   All right.  Well, good morning, Mr. Navarro.

23   I just introduced myself on the record.  My name is

24   Christopher Ward, and I represent Menzies Aviation.

25   Thanks for being available this morning.
```

7

1      Q    Is that a yes?

2           That's when you learned you had been

3      terminated, when you met with Tracy?

4      A    Yes, sir.

5      Q    Was anybody else present at the time that you

6      met with Tracy other than yourself and Tracy?

7      A    She was with a female there.

8      Q    Was she another Menzies employer, that female?

9      A    Maybe, sir.

10     Q    You don't know who she was, in other words?

11     A    No, sir.

12     Q    So other than Tracy and this unidentified

13     female, nobody else was present; is that true?

14     A    Yes, sir.

15     Q    What did Menzies tell you was the reason they

16     were terminating your employment?

17     A    All I remember that Tracy told me was that you

18     should not have signed it because you were at

19     management site.

20     Q    And when she said you should not have signed

21     it, she was referring to the petition, to your

22     understanding?

23     A    Yes, sir.

24     Q    Were you told that there was any reason for

25     your termination other than signing the petition?

88

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

52

```
1       A    No more, sir.

2       Q    Are you aware of any documents that would

3  indicate that there was a reason for your termination

4  other than you signing the petition?

5       A    No, sir.  What's written on the termination

6  was just code of conduct.

7       Q    Okay.  What about with respect to the decision

8  to suspend your employment?

9            Were you given any explanation other than you

10 signing the petition?

11      A    She did not say anything -- any more.

12      Q    Are you aware of any documents that would

13 indicate there was a reason for your suspension other

14 than your signing the petition?

15      A    I no longer know any.

16      Q    At the time that you were informed you were

17 being suspended, did anybody mention anything about

18 your race?

19      A    The other employees, sir.

20      Q    How about anybody in Menzies management?

21           Did anybody say anything about your race being

22 a factor in the decision to suspend you?

23      A    Nothing was said like that by them.

24      Q    Other than with respect to your termination,

25 did anyone say anything -- did anyone in Menzies
```

89

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

53

1   management, rather, say anything about your race having

2   (Inaudible) in that termination?

3           THE INTERPRETER:  I'm sorry.  I didn't get

4   your whole question, sir.

5           MR. WARD:  Sure.

6       Q    With respect to termination of your

7   employment, did anyone at Menzies management say that

8   race was a factor in that termination?

9       A    I do not know, sir.

10      Q    How about with respect to your suspension?

11          Did anybody say your national origin was a

12  factor in the decision to suspend you?

13      A    I do not know that also.

14      Q    What about with respect to the decision to

15  terminate your employment?

16          Did anybody at Menzies say that your national

17  origin was a factor in that decision?

18      A    Please repeat that, sir.

19      Q    Sure.  With respect to the decision to

20  terminate your employment, did anybody in Menzies

21  management indicate that your national origin was a

22  factor in that decision?

23      A    I do not know, sir.

24      Q    Is it your belief that your race played any

25  role in the decision to suspend you?

90

1      A    Yes, sir.

2      Q    What is that belief based on?

3      A    Maybe because I'm an Asian and he is white.

4      Q    And when you say "maybe," are you just

5  speculating?

6      A    No, sir.

7      Q    Do you have any evidence that supports the

8  belief that your race played a role in your suspension?

9           MR. URIARTE:  Objection.  Calls for a legal

10  conclusion.

11          THE WITNESS:  Please repeat.  Please repeat

12  the question.

13          MR. WARD:  Sure.

14     Q    Do you have any evidence that supports your

15  belief that your race played a role in your

16  termination?

17     A    Yes, sir.

18     Q    What evidence is that?

19     A    First of all, I'm Asian.  He's white.  Second,

20  all the problems, we have brought it up to management.

21  And then why is it that myself, who is taking action in

22  behalf of the others, I am the one being terminated and

23  not himself?

24          I am the one taking care also of this effect

25  on management, on the company too.

91

55

1       Q     Nobody ever told you, from Menzies, that your

2    race was a factor; true?

3       A     No, sir.

4       Q     Who told you that your race was a factor?

5       A     Yes, I've seen it because how come that --

6    even if we tell the company about this person, nothing

7    is being done to reform, to suspend or to terminate

8    him.  He has delays up to 20 flights a day.  With us,

9    just one delay, and we hear from them.  With him, there

10   would be five or six delays, but nothing is done about

11   it.

12      Q     That doesn't answer my question, Mr. Navarro.

13            My question is who told you that your race was

14   a factor in either the termination or suspension

15   decision?

16      A     I see what they did to me.

17      Q     You are not answering my question,

18   Mr. Navarro.  The question is who told you?

19            Not what you think or what you feel or what

20   you believe, but who told you?

21      A     I have a lot of Asian coworkers that, when

22   they commit a mistake, they are already terminated.

23      Q     Okay.  And you are still not answering the

24   question, sir.

25            The question is who told you that your race

92

```
1   was a factor in the decision to either terminate or

2   suspend you?

3          MR. URIARTE:  Maybe if you quantified the

4   universal "who," then maybe he could more possibly --

5          MR. WARD:  I don't need to qualify it.  He can

6   either tell me who did it, or he can say, no, he

7   didn't.  I need an answer to the question I asked.

8          MR. URIARTE:  That would be great.  We have,

9   like, great easy cases.  It's like management told the

10  terminated employee "Hey, I terminated you because I'm

11  discriminating against you."  It's, like, a great

12  question there, Chris.  But other than that,

13  (inaudible).

14         MR. WARD:  I'm entitled to an answer to it,

15  sir.

16         MR. URIARTE:  Yeah, but the question is --

17         (Simultaneous speaking.)

18         MR. WARD:  No.  You and I can debate the

19  merits of the legal system later.  I want an answer

20  from the witness -- who told him this? -- because he

21  testified someone did.

22         THE WITNESS:  No one was telling me, but

23  that's what I feel from what happened.

24  BY MR. WARD:

25      Q    And is it true that you cannot identify any
```

93

57

1   documents that say your race was a factor in the

2   decision to terminate or suspend you?

3           MR. URIARTE:  Objection.  Calls for a legal

4   conclusion.

5           THE WITNESS:  Please repeat again.

6           MR. WARD:  Sure.

7       Q   Is it true that you cannot identify any

8   document that indicates your race was a factor in the

9   decision to terminate or suspend you?

10          MR. URIARTE:  Calls for a legal conclusion.

11          THE WITNESS:  I do not know.

12  BY MR. WARD:

13      Q   You do not know whether any such document

14  exists; is that your testimony?

15      A   Yes, sir.

16      Q   And has anybody ever told you that your

17  national origin was a factor in Menzies' decision to

18  suspend or terminate you?

19      A   No, sir, but that's what I feel.

20      Q   And is it true that you are not aware of any

21  documents that indicate your national origin was a

22  factor in (inaudible)?

23          THE INTERPRETER:  I'm sorry.  A factor in

24  what?

25  ///

94

58

```
1   BY MR. WARD:

2       Q    Is it true that you are not aware of any

3   documents that indicate your national origin was a

4   factor in the suspension or termination decision?

5           MR. URIARTE:  Objection.  Calls for a legal

6   conclusion.

7           THE WITNESS:  I do not know, sir.

8   BY MR. WARD:

9       Q    The letter that you are asked to provide, did

10  you provide such a letter?

11          THE INTERPRETER:  I'm sorry.  The letter he

12  was asked to provide?

13          MR. WARD:  Right.  At the time he was -- at

14  the time he was notified he was being suspended, he was

15  asked to provide a letter, and my question is did he

16  provide such a letter?

17          THE WITNESS:  Yes.  I gave it to Kevin.

18          MR. WARD:  All right.  I am going to mark as

19  Exhibit 15, if I can find it here -- sorry -- a set of

20  documents that were produced to us in the Bates

21  No. RenaldoNavarro -1 to -14.

22          (Deposition Exhibit 15 was marked for

23          identification by the reporter, a

24          copy of which is attached hereto.)

25  ///
```

95

59

1   BY MR. WARD:

2       Q     All right.  Let me get to the right page

3   here.  So looking at this first page of Exhibit 15,

4   Mr. Navarro, do you recognize this document?

5       A     Yes, sir.

6       Q     What is this document?

7       A     I did not know who made this, but I saw that.

8       Q     Is it your testimony that you did not write

9   this Navarro Exhibit 1?

10          THE INTERPRETER:  Again, repeat that.  There

11   is breaking up in the audio.

12   BY MR. WARD:

13       Q     Are you saying, Mr. Navarro, that you are not

14   the person who wrote this document that we are looking

15   at right now?

16          MR. URIARTE:  Do you want me to make it

17   bigger, Mr. Navarro?

18          THE WITNESS:  Yes.

19          Please repeat the question, sir.

20          MR. WARD:  Sure.

21       Q     Let me just ask this:  Are you the one who

22   wrote this, what's marked here as Navarro No. 1?

23       A     All I remember is the one at the last part.

24   All I remember is what's written here on the last part.

25   If this is the benefits for the sake of my job, I will

96

1    not intervene again, just do and focus on my job.  But

2    I do not remember the things about it, the words

3    written above it.  If you could show what I wrote down,

4    I would know where it came from, but this one, the

5    stuff above it, I do not know.

6        Q    So is it your testimony that you did not write

7    all of the content on this page?

8        A    If you give me the letter that I wrote, I

9    would remember all of that, but with this one,

10   especially the last one, that was what Kevin told me to

11   say.  But with regard to the stuff above it, I do not

12   remember this.

13       Q    So am I understanding correctly, you did not

14   write everything on this page?  Yes or no?

15       A    Maybe I wrote all of this, maybe.

16       Q    As you sit here today, you just can't say one

17   way or another; is that true?

18       A    Which is it?  Which is it?  Are you referring

19   that I could not say one way or the other?

20       Q    The entire document, did you write this entire

21   document, or did somebody else write it?

22       A    I'm the one who made this.

23       Q    Okay.  You just told me you are the one who

24   made the entire letter -- or I'm sorry -- the entire

25   document.

97

1      A     Yes.  I was told to write that by Raul Vargas
2   and Kevin.

3      Q     Is this the letter that you provided in
4   response to the request from Kevin and Raul?

5            THE INTERPRETER:  I'm sorry.  Please repeat
6   that.

7   BY MR. WARD:

8      Q     Is this the letter that you provided in
9   response to the request from Kevin and Raul?

10     A     Yes, sir.

11     Q     How did you transmit this to Kevin?

12           THE INTERPRETER:  I'm sorry.  How did he --

13           MR. WARD:  How did he transmit this?  How did
14   he give it to Kevin?  Did he give it to him by hand?
15   Did he email it?

16           THE WITNESS:  When they suspended me, Kevin
17   told me to make a letter.  So I went to my car and made
18   that, and then, before I left, I gave it to Kevin.

19   BY MR. WARD:

20     Q     You wrote this document that we are looking at
21   right now, the first page of Exhibit 15, in your car?

22     A     Yes, sir.

23     Q     Did you keep a computer in your car?

24     A     I did not have a computer.  I hand-wrote it.
25   That's why, what I say right now, I hand-wrote it.  But

                                                          98

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

62

1    this one is already typed on the computer, and then I

2    also had a signature at the bottom.

3         Q    You provided your version of this letter to

4    Kevin; true?

5             THE INTERPRETER:  I'm sorry.  Provide the

6    what?

7    BY MR. WARD:

8         Q    You provided a version of this letter to

9    Kevin; is that true?

10        A    The letter I gave to Kevin, I provided it in

11   handwriting, in my own handwriting, and then I signed

12   it.

13        Q    And then is this typed document that we are

14   looking at right now the same thing that you hand-wrote

15   to Kevin?

16        A    I don't remember very well the letter, but it

17   seems it's, like, the same.

18        Q    Okay.  So after you hand-wrote the letter to

19   Kevin, did you also type this up?

20        A    I do not have a typewriter.

21        Q    You -- all right.  This page right here that's

22   marked Navarro No. 1, did you provide it to your

23   counsel?

24        A    Yes, sir.

25        Q    How did you get it?

99

1      A    It was a copy that was given to me by the

2    people.

3      Q    A copy that was given to you?

4      A    Yes, sir.

5      Q    By whom?

6      A    I'm getting confused.

7      Q    I'm confused too, sir.  I'm trying to

8    understand where this document came from because this

9    is something that your counsel provided to us.  I've

10   never seen this before your counsel sent it to us.

11        I guess my question is you provided a copy of

12   this letter to your counsel; right?

13     A    Yes, sir.

14     Q    But it's your testimony that you are not the

15   one who actually wrote up this typed document; is that

16   right?

17     A    I was the one who wrote it down, but I am

18   thinking who was the one who typed this because I do

19   not have a computer in the house.

20     Q    Is it your testimony that you have no idea how

21   this typewritten or word-processed document was

22   created?

23     A    I'm not sure if Kevin gave me a copy of this

24   because it's been a long time.  What I know is I gave

25   my handwritten letter to Kevin, and I do not know who

100

1   prepared this.

2       Q    But your testimony is that somebody gave you

3   this document; right?

4       A    Yes.  It may be Kevin who gave this to me, who

5   typed this in his computer and gave me a copy because I

6   have no computer.

7       Q    I don't want you to speculate, though,

8   Mr. Navarro.  I want you to tell me what you know

9   happened.

10          Did Kevin type this up and give it to you, or

11  are you guessing that might be what happened?

12      A    I am the one who wrote this down, but who

13  typed it in the computer, I no longer remember.

14      Q    Okay.  But it's your testimony that it wasn't

15  you who typed it; is that true?

16      A    Yes, sir.

17      Q    It's the same thing today?

18          You have no memory of how you came to be in

19  possession of this typed version; is that true?

20      A    I no longer remember, but what I remember is

21  the letter that the attorney had me prepare, this is

22  the one.

23      Q    All right.  This is now page 2 of Exhibit 15.

24  I want to ask you, do you recognize this typed version?

25          Have you seen it before?

101

1       A    I have a copy of this.  I have a copy that I

2    gave to my attorney.

3       Q    Are you the one who created this typed

4    version?

5       A    It's not myself.

6       Q    Where did you get it from?

7       A    The people gave it to me.

8       Q    Who?

9       A    I no longer remember.  All the documents that

10   I think we need, I gave them all to my attorney.  So

11   all of the documents are with my attorney.

12      Q    But as you sit here today, looking at this

13   document stamped RenaldoNavarro -2, you don't remember

14   who gave that to you; is that true?

15           THE INTERPRETER:  I did not get the question.

16   BY MR. WARD:

17      Q    Just looking at page 2 of Exhibit 15, is it

18   true that you do not recall who gave this page to you?

19      A    Yes, sir.

20           MR. WARD:  All right.  I'm showing the

21   witness, still on Exhibit 15, the page Bates-marked

22   Navarro No. 11.

23      Q    Do you recognize what this screen capture

24   appears to show, Mr. Navarro?

25      A    Yes, sir.  Yes, sir.

                                                        102

1      Q    Is this a text message that you have on your

2  phone?

3      A    Yes, sir.

4      Q    And do you still have this text-message chain

5  on your device?

6      A    It's still there, sir.

7      Q    Don't delete it, please.

8           What about this page that is -- I think it's

9  RenaldoNavarro -12.  What is that?

10     A    This was by the supervisor.  I was no longer

11 there, but this was just texted to me.  This was --

12 this text was sent to me saying "Sorry.  Andrew fell

13 asleep, but his hours were already running."

14     Q    Okay.  This appears to be -- so is this a

15 message somebody named Mark sent to you?

16     A    Yes, sir.

17     Q    Okay.  Which side of this text-message chain

18 is yours?  Is it the left side with the image or the

19 right side where it says "Date 11-7-18"?

20     A    This date.

21     Q    Who is Mark?  Who is the Mark that's referred

22 to in this message?

23     A    This was the person, also a supervisor --

24 Andrew was supposed to replace him.

25     Q    So, in other words, this was another

103

67

1    supervisor at Menzies?

2        A    When I was no longer there.  He was the

3    supervisor when I was no longer at Menzies.

4        Q    Okay.  And is this a screen capture of a text

5    message you had with -- or a text capture you had with

6    this individual, Mark?

7        A    He just sent a text to me.

8        Q    Okay.  Do you still have those texts on your

9    device?

10       A    Yes, sir.

11       Q    Don't delete them, please.  How about this

12   next page?  It looks like it's -- or next two pages,

13   13 and 14?  Are these also text messages that you

14   received?

15       A    Yes, sir.

16       Q    Do you still have them on your device?

17       A    It's still there, sir.

18       Q    Okay.  Don't delete that, please.

19            MR. URIARTE:  Chris, can we take a five-minute

20   break to rest?

21            MR. WARD:  Sure.  That's fine.  It's 3:37.  Do

22   you want to reconvene at 3:45?

23            MR. URIARTE:  Sounds good.

24            MR. WARD:  Thank you.  We are off the record.

25            (Off the record.)

                                                          104

```
 1              MR. WARD:  Let's go back on the record.
 2              I'm going to mark as Exhibit 16 "Plaintiff's
 3    Initial Disclosures."
 4              (Deposition Exhibit 16 was marked for
 5              identification by the reporter, a
 6              copy of which is attached hereto.)
 7    BY MR. WARD:
 8       Q    Mr. Navarro, I'm just going to inform you,
 9    this was a document provided to my office by your
10    counsel.  One of the purposes of this document is to
11    identify potential witnesses that you believe may be
12    helpful to your case, and I see --
13       A    Go ahead.
14       Q    -- one of the names you identify here is
15    Jezen Canlas.  Do you see that?
16       A    Yes.
17       Q    Have you communicated with Mr. Canlas since
18    your termination from Menzies?
19       A    We talk, but we talk about different things.
20       Q    Have you had any communication with Mr. Canlas
21    regarding either your termination or your legal claims
22    against Menzies since your termination?
23       A    We don't talk about that.
24       Q    No. 3 lists Rafael Vasquez.  Is that the union
25    shop steward?
```

105

Page 1

**A**

**a.m (3)**
2:17 6:2,18
**ability (1)**
7:12
**able (9)**
26:5 34:8,10
55:4 67:15
79:2 114:2
116:9,10
**academically ...**
21:4
**accepted (2)**
111:8 112:20
**accuracy (1)**
19:21
**accurately (1)**
7:10
**Acknowledg...**
36:24
**acting (1)**
49:9
**action (3)**
14:25 91:21
119:19
**add (1)**
118:2
**added (1)**
72:21
**additional (3)**
25:23 26:1 73:9
**adjusting (1)**
72:2
**administer (1)**
119:11
**administering...**
7:2
**administrativ...**
14:23
**advised (1)**
74:1
**affirmations (1)**
119:12
**afterward (1)**
73:11
**agains (1)**
57:2
**ago (2)**
11:3 25:18
**agree (1)**
6:25
**agreed (1)**
117:17
**agreement (6)**
14:16 15:6,9,20
15:22 117:20
**ahead (2)**
33:9 105:13

**Air (10)**
23:21 24:6,8,9
24:12,13,14
24:23 25:3,6
**Aircraft (3)**
4:10,12,15
**airlines (2)**
72:7,22
**airport (5)**
110:23,24 111:2
111:3,6
**allowed (1)**
120:4
**amazing (1)**
17:18
**ambiguous (10)**
11:19 16:5,7,24
29:8 30:14
33:16 47:15
65:23 81:1
**amount (3)**
26:8 67:16
113:22
**analytically (1)**
21:4
**Andrew (40)**
5:6,11 43:5,16
43:20 44:19
46:25 47:4,6,6
47:9,13,14
49:2,7,9,23
50:3 51:7,16
54:23,25 57:9
58:1,15,21
59:12 61:17
67:3 72:12
78:9,13,16,22
81:22 82:4
85:1 103:12
103:24 116:8
**Angeles (1)**
3:9
**answer (17)**
11:20 14:13
16:10 17:11
27:14 29:9
31:10 44:13
46:12,12,23
81:14 86:9
92:12 93:7,14
93:19
**answered (2)**
15:20 109:22
**answering (2)**
92:17,23
**answers (2)**
11:13,17
**anybody (23)**

13:11 21:18,25
26:21 45:15
45:21 46:2
51:6 72:4
75:25 76:6
78:7,13,21
79:9 88:5
89:17,20,21
90:11,16,20
94:16
**anymore (12)**
57:22 73:17
85:24,25 86:5
86:7,14 87:1
108:22 114:6
114:6 117:25
**apologize (2)**
8:12 62:23
**APPEARAN...**
3:1
**appears (3)**
56:15 102:24
103:14
**appended (1)**
120:5
**applications (1)**
111:5
**applied (2)**
110:22 111:8
**applying (1)**
111:1
**appreciate (1)**
118:5
**approached (4)**
45:6,8,10,12
**appropriate (5)**
30:11,20 46:8
46:17 49:4
**appropriately...**
49:9
**approximate (...**
15:5
**approximatel...**
6:18 15:9 24:18
51:9
**Arlo (3)**
3:3 7:7 118:2
**arlo@liberati...**
3:6
**arrived (3)**
23:17 70:25
74:1
**Asian (3)**
91:3,19 92:21
**ASIG (18)**
23:22,25 24:2,3
24:18,19,20
24:21,24

25:10,17,20
26:11 27:10
27:16,20
37:21 39:2
**asked (27)**
10:9 22:11 27:7
45:4,13,22
46:3 48:9,25
56:4 57:25
58:4 63:7,13
63:17 65:11
66:23 73:2
85:19 86:21
93:7 95:9,12
95:15 107:15
109:24 115:5
**asking (8)**
12:10 23:2
32:22 80:22
80:23 81:6
106:17 107:16
**asleep (1)**
103:13
**assigned (1)**
71:8
**attached (15)**
34:17 35:22
38:5 39:14
40:16 41:21
42:13 54:10
55:22 64:18
66:9 79:22
82:23 95:24
105:6
**attend (2)**
22:23 23:5
**attendance (1)**
42:19
**attended (1)**
49:9
**attorney (17)**
13:10,15,17
78:18,18
101:21 102:2
102:10,11
106:22,24,25
107:1 109:9
109:15 119:16
119:18
**attorneys (2)**
7:3 118:1
**audio (4)**
26:15 53:5
72:17 96:11
**August (2)**
5:11 120:8
**author (2)**
48:15,19

25:10,17,20
26:11 27:10
27:16,20
37:21 39:2
**authority (4)**
29:25 30:8 47:6
47:14
**authorized (1)**
119:11
**available (1)**
7:25
**Aviation (8)**
2:8 3:7 6:20 7:5
7:24 23:16,22
78:8
**avoid (5)**
29:25 30:25
31:4,8,22
**aware (5)**
66:2 89:2,12
94:20 95:2

**B**

**B (4)**
2:18 4:8 5:1
119:5
**back (19)**
8:11 15:4 22:9
27:4 39:5 43:3
53:25 62:9,11
63:3 73:25
74:23,23 75:9
86:19 87:4
105:1 114:1
114:25
**background (1)**
27:13
**bad (4)**
47:9 67:13 68:1
68:2
**bankruptcy (1)**
25:12
**Banks (1)**
64:9
**based (2)**
70:10 91:2
**basis (3)**
19:11 21:14
33:13
**Bates (27)**
4:11,13,16,19
4:21,23,25 5:3
5:6,7,9,12,14
5:15,16 42:4,7
51:25 53:18
54:2,6 62:14
62:22 64:15
66:6,10 95:20
**Bates-marked...**
82:20 102:21
**Bates-number...**
55:19

**Bates-stampe...**
79:19
**beginning (2)**
2:16 115:3
**behalf (2)**
2:16 91:22
**belief (12)**
15:13 16:2,14
16:20 17:3
33:12 72:5
84:24 90:24
91:2,8,15
**believe (4)**
92:20 105:11
115:12,23
**benefits (1)**
96:25
**best (5)**
7:11 12:16 13:1
13:8 34:5
**big (1)**
69:6
**bigger (1)**
96:17
**bills (1)**
111:12
**binding (1)**
7:2
**birth (1)**
36:4
**bit (1)**
14:1
**Board (4)**
109:14,19 110:5
119:9
**Boomer (1)**
84:16
**born (1)**
22:14
**bottom (6)**
35:13 36:23
39:19 41:3
57:1 99:2
**break (11)**
13:23 22:3,4,6,6
40:9,10 42:22
62:1 67:16
104:20
**breaking (3)**
33:7 53:5 96:11
**breaks (7)**
13:19 28:17
67:15,16 79:3
116:9,11
**breakup (1)**
72:17
**bring (2)**
32:17 109:7

Page 2

brought (2)
32:8 91:20
Brown (3)
2:18 6:13 119:5
Bulihan (1)
18:3
BUSINESS (1)
2:8

C

Caballero (3)
63:12,13 64:5
California (10)
2:2 3:4,9 6:13
6:22 118:13
119:2,7,9,12
call (3)
38:16,24,25
called (5)
38:22 70:25
71:10 87:21
109:9
calling (3)
38:13 40:4
41:11
calls (11)
16:6,9,23 33:15
46:10 59:13
78:1 91:9 94:3
94:10 95:5
Canlas (5)
45:14 63:8
105:15,17,20
capacity (1)
29:21
capture (6)
55:25 56:7,23
102:23 104:4
104:5
car (3)
98:17,21,23
care (2)
91:24 109:16
CAROLINE (2)
3:13 6:4
Carrera (6)
3:13 6:4 17:17
20:1,5,14
carrying (1)
75:22
case (14)
2:7 6:22 9:11
10:3,3 105:11
106:18 107:3
107:8,22
109:16,19
110:4 113:5
cases (1)

93:9
cause (1)
68:8
causes (2)
68:4,16
caution (2)
9:15 12:21
cell (10)
56:17,19,21
60:13,16,19
60:20 61:15
83:18,19
certain (3)
15:19,21 116:16
certificate (4)
38:25 41:1
119:1,8
certified (4)
2:18 6:13 18:22
119:6
certify (2)
118:12 119:5
chain (2)
103:4,17
chance (13)
35:25 38:7
39:16 40:19
40:25 42:15
52:11,14
53:20 54:12
66:14 73:1
80:1
change (2)
4:13 58:2
changes (3)
12:21,22 120:3
checkup (1)
113:24
Chinese (1)
71:16
choice (1)
72:25
Chris (15)
10:20 14:14
15:17 26:18
26:18 30:15
32:11 36:2
42:4,21 50:23
62:1 81:4
93:12 104:19
Christopher (6)
3:8 5:9 7:4,24
63:21 65:2
circulated (1)
43:15
circulating (1)
116:21
Civ (5)

119:10,15,20,25
120:5
civil (7)
5:19 10:3,7,11
109:18 110:3
119:12
claim (9)
14:4,10,23
79:11 110:5
113:7 115:6
115:13,13
claiming (1)
113:4
claims (14)
14:19 16:3,15
16:21,22 17:4
17:6 105:21
106:5,11
107:8,14,22
109:7
clarified (1)
54:1
clarify (1)
10:9
clause (1)
14:17
clean (1)
62:23
clear (3)
55:10 62:15
81:14
closer (1)
51:23
coaching (4)
4:18,20,22
42:18
Coast (2)
42:22,23
code (2)
89:6 119:12
college (2)
23:5,9
come (6)
15:3 20:15,17
20:25,25 92:5
coming (2)
20:3 69:19
commit (2)
92:22 113:12
communicate ...
68:21
communicate...
13:11 51:7,10
51:13 105:17
106:10,23
108:20
communicati...
81:20

communicatio...
55:15 105:20
communicatio...
28:24 77:19,24
83:23 84:6
106:3,19
107:2,7,13,21
108:2,7
company (19)
14:8 28:2 29:3
29:13,17,19
33:3,11 47:1
60:7 67:6,10
74:5,6,8 75:17
79:11 91:25
92:6
compared (1)
111:4
complain (2)
59:11 78:7
complained (3)
49:2,7 115:20
complaining (5)
43:15,17,20
63:16,24
complaint (5)
66:2 70:10
109:13,18
110:4
complaints (12)
49:16 50:2 51:7
51:10,14,15
67:14,21
68:20,22 69:2
69:12
complete (2)
11:17 26:16
completion (1)
120:1
computer (7)
98:23,24 99:1
100:19 101:5
101:6,13
conclude (1)
117:22
concluded (2)
118:5,8
concluding (1)
117:18
conclusion (10)
16:6,9,24 33:16
46:11 91:10
94:4,10 95:6
116:5
conduct (1)
89:6
confer (2)
14:14 117:21

confidentialit...
14:17 15:20
conflict (2)
32:3,6
conflicts (1)
32:18
confront (1)
69:8
confrontation...
37:20
confused (4)
9:18 100:6,7
111:13
connection (3)
80:15,24 81:22
consider (3)
22:24 28:1,4
consult (1)
30:3
contact (2)
109:6,10
content (1)
97:7
contention (1)
83:11
contesting (3)
18:11,15 19:10
continue (1)
114:6
continues (1)
19:25
continuous (1)
24:15
continuously (...
24:14,21 110:17
conversation (...
77:14 84:20
conversations...
77:18
convicted (1)
25:14
cool (1)
22:4
copies (1)
54:10
copy (27)
15:22 34:16
35:21 38:4
39:13 40:16
41:20 42:12
54:17 55:9,10
55:22 64:18
66:9 79:22
82:13,16,23
95:24 100:1,3
100:11,23
101:5 102:1,1
105:6

correct (36)
25:18 30:23
32:19 33:1
43:10,12 47:3
48:24 49:17
59:4,9 60:4
69:3 70:14,19
71:20 74:4,25
75:2,5,7,13
80:19 81:23
83:17,23
84:22 85:9
86:23 106:1
107:19 109:20
111:24 115:18
117:5 118:14
corrected (1)
51:1
correctly (4)
7:10 24:1 48:10
97:13
counsel (15)
3:1 6:24 61:25
82:17 99:23
100:9,10,12
105:10 109:6
109:7 112:24
117:17 119:17
119:18
country (1)
17:23
COUNTY (1)
119:3
couple (3)
11:4 25:18
62:12
court (5)
2:1 6:21 11:10
36:3 119:8
coverage (4)
114:3,7,13,15
COVID-19 (3)
6:15 112:1,19
coworkers (1)
92:21
created (2)
100:22 102:3
credibility (1)
12:23
criminal (3)
10:3,7,11
Criminology (1)
23:9
CRR (1)
2:19
CSR (1)
119:8
current (1)

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 65 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 27 of 38

Page 3

6:14
currently (3)
60:13,19 111:18
curser (1)
35:12
cward@foley....
3:11

**D**

D (1)
4:1
damages (1)
113:4
date (9)
6:17 15:5,8
34:12 36:4
50:4 103:19
103:20 118:16
dated (3)
4:10,16 120:8
Davies (1)
51:5
Davis (1)
50:5
day (20)
37:12,12,13
70:24 73:15
73:20 74:13
74:16,17 75:1
75:12,15 79:9
85:5 92:8
106:20 107:4
109:9 117:24
118:5
days (6)
40:5 41:12 58:8
58:22 75:20
87:20
days' (1)
78:11
dba (1)
3:7
dealing (1)
61:9
debate (1)
93:18
decide (3)
58:15,21 72:23
decision (16)
73:5,10 89:7,22
90:12,14,17
90:19,22,25
92:15 93:1
94:2,9,17 95:4
declare (1)
118:12
declared (1)
25:12

defendant (5)
2:16 3:7 9:10,25
10:6
DEFENDAN...
4:9 5:2
Defendants (1)
2:10
defended (1)
9:14
defending (3)
9:12,24 10:12
defined (1)
18:20
definitely (1)
44:8
delay (2)
57:24 92:9
delayed (3)
58:20 68:17
79:1
delays (7)
68:5,8,16 72:15
72:20 92:8,10
delete (7)
61:13,16,20,23
103:7 104:11
104:18
deleted (3)
61:3,6,10
delivered (1)
51:19
deny (1)
69:21
depend (1)
33:19
depends (3)
33:17,20 49:12
deponent (2)
118:18 120:3
deposed (1)
9:8
deposition (34)
2:15 6:15,19 7:1
8:21 9:2,5
12:19 20:1
34:7,15 35:20
38:3 39:12
40:14 41:19
42:11 54:8
55:20 64:16
66:7 79:20
82:21 95:22
105:4 115:4
117:18,23,24
118:8 119:1
119:21,23
120:1
depression (1)

113:10
despite (1)
115:20
destroying (1)
48:1
development (...
5:13 79:23
device (6)
60:23 61:1,7
103:5 104:9
104:16
difference (1)
12:12
different (13)
19:5 24:2,4,25
25:1 32:12
45:11 47:12
67:23 69:19
78:16 105:19
110:22
difficult (1)
15:18
direct (1)
18:22
directly (5)
67:18,24 68:19
69:1 81:6
director (4)
57:13 58:12,12
73:1
disagreement ...
65:22
disciplinary (1)
77:10
Disclosures (2)
5:18 105:3
discriminatin...
93:11
discuss (2)
72:14,19
Discussed (1)
74:10
dismissed (2)
109:20 110:5
dispute (1)
65:20
disputes (3)
30:13,22 31:23
distress (2)
113:4,7
distribute (2)
26:6,7
distributed (1)
116:17
distributing (1)
26:8
District (4)
2:1,2 6:21,22

divorce (1)
10:21
divulge (1)
15:25
doctor (3)
39:8 113:17,24
document (47)
4:18,20,22,24
13:17 34:6
35:13,24 37:4
37:6 39:22
40:2,18 41:8
41:17 51:25
52:2,20 54:5
59:16,17
64:23 66:17
66:20,24
80:11 82:9,20
83:1,5 94:8,13
96:4,6,14
97:20,21,25
98:20 99:13
100:8,15,21
101:3 102:13
105:9,10
documentation...
39:2,8 77:10
81:15
documented (6)
35:8 36:18
37:16,21
41:15 42:1
documents (14)
5:16 13:14,15
36:5 54:2 82:4
89:2,12 94:1
94:21 95:3,20
102:9,11
Dodge (52)
5:6,11 43:5,8,16
43:20 46:25
47:4,6,9,13
49:2,7,9,16
50:3 51:7,16
54:23,25
55:15 59:12
61:10,17
63:24 65:22
66:2 67:3,9,12
67:19,24 68:4
68:7,9,11,15
68:20 69:1,5,8
69:11,14,16
69:18,22,25
72:12 81:22
82:4 85:1
116:16
Dodge's (3)

47:6,14 70:10
doing (18)
2:8 11:3 12:2
16:18 21:3,5,9
21:12,16 47:9
47:10 48:2
49:23 57:9
63:6 107:16
107:17 116:1
drink (1)
13:21
due (2)
6:14 67:14
duly (4)
6:5,9 119:6,14
duty (6)
70:24 111:17,18
112:21 114:14
114:16

**E**

E (3)
4:1,8 5:1
earlier (6)
14:1 31:11
52:23 74:3
74:14 115:3
earn (1)
113:13
easier (2)
19:12 113:1
easy (1)
93:9
education (2)
18:1,2
effect (2)
91:24 119:10
effectively (2)
29:17,22
efforts (2)
115:17,24
either (7)
18:2 84:19
85:18 92:14
93:1,6 105:21
email (2)
98:15 108:13
emergency (1)
6:14
emotional (2)
113:4,7
employed (9)
24:3,8,14 25:20
43:7 60:17,21
111:15,18
employee (17)
4:18,20,22 5:13
32:21,22

33:20,21
39:20 41:4
48:21,25
68:21 79:23
93:10 119:16
119:18
employees (29)
4:13 29:7 30:12
30:22 31:1,5,8
31:8,22 32:8
32:17 33:5,13
33:23 34:2
47:7 48:5 49:3
49:8 58:25
59:3,8,20 60:2
69:2,8,9,13
89:19
employer (8)
14:5 16:3,15
17:4 28:25
88:8 114:13
115:7
employers (5)
16:20 23:16,19
111:5 112:24
employment (...
14:20 15:15
24:18 27:24
79:16 87:19
88:16 89:8
90:7,15,20
106:5 110:7
110:12 112:6
115:13
employment-r...
14:19
ended (1)
106:5
ends (1)
75:4
English (19)
6:5,6 7:10,11
18:7,16 19:7
19:14,15,16
19:17 20:15
20:16,24 21:1
39:4 44:8
47:19 50:16
entire (4)
97:20,20,24,24
entitled (4)
12:16 21:17
93:14 115:12
equally (2)
26:6,9
equivalent (1)
22:24
erase (1)

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 66 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 28 of 38

Page 4

erase (1)
61:16
erased (1)
61:14
erroneous (1)
44:9
errors (2)
33:24 34:3
especially (3)
97:10 116:8
118:6
ESQ (2)
3:3,8
estimate (2)
12:13,16
ethically (1)
19:8
events (1)
74:2
everybody (1)
21:15
everybody's (1)
118:5
evidence (3)
91:7,14,18
EXAMINATI...
4:2 7:20 115:1
examined (2)
6:9 119:13
example (2)
29:6 32:1
exchange (1)
5:7
Executed (1)
118:16
exhibit (91)
4:10,12,15,18
4:20,22,24 5:3
5:5,7,9,11,13
5:15,16,18
34:7,10,15,19
35:7,18,20
36:14,17,21
37:17,19 38:2
38:2,3 39:11
39:12,19
40:13,14 41:3
41:15,18,19
42:2,5,10,11
51:25 52:21
53:12,18 54:3
54:7,12,16
55:6,11,19,20
59:16 60:3
62:16,16,17
62:17,17,18
62:18,19,19
62:20 63:3

64:14,16,21
66:5,7 79:19
79:20 80:1,7
82:20,21
83:11 95:19
95:22 96:3,9
98:21 101:23
102:17,21
105:2,4
exhibits (2)
54:8 62:15
exists (1)
94:14
expected (3)
28:8,14,20
explain (2)
18:11 32:22
explaining (1)
65:3
explanation (1)
89:9
explicitly (1)
81:19

_____ F _____

fact (3)
11:3 83:16
110:15
factor (15)
89:22 90:8,12
90:17,22 92:2
92:4,14 93:1
94:1,8,17,22
94:23 95:4
fair (3)
12:10 23:21
56:22
false (2)
83:5,12
familiar (1)
43:4
family (5)
10:15,16,18
11:2 13:25
far (2)
17:15 78:3
faster (1)
109:16
Father's (1)
107:4
Fax (2)
3:5,10
Fed (5)
119:10,15,20,25
120:5
Federal (1)
5:19
feel (8)

12:25 13:7
68:25 92:19
93:23 94:19
113:11,12
fell (1)
103:12
felony (1)
25:14
female (4)
37:7 88:7,8,13
fighting (1)
46:24
file (3)
79:11 110:3
115:12
filed (3)
109:13,18 115:6
Filipino (3)
20:20,22,23
financially (1)
119:19
find (5)
95:19 106:8
110:20 113:1
113:2
fine (5)
10:23 18:15
19:11 21:24
22:1 36:6 62:4
62:8 104:21
finish (2)
12:19 23:10
finished (1)
42:17
fired (1)
106:11
first (35)
9:1 24:5,5,19
26:3 28:10
30:3 32:22
35:25 36:21
40:20 41:3
43:22 44:2,16
51:21 52:3,12
53:1,7 55:1,1
55:6 56:15
64:10 80:12
84:25 85:4
91:19 96:3
98:21 108:23
109:6 117:23
119:14
five (2)
81:8 92:10
five-minute (4)
22:4,6 42:22
104:19
flight (5)

26:5 68:17
72:15,15,20
flights (14)
68:18 72:2,2,5,6
72:20,22 73:4
73:9,21 74:4
75:17 79:1
92:8
flip (1)
52:6
Flower (1)
3:9
focus (2)
63:4 97:1
Foley (2)
3:8 7:5
follow (5)
11:5 29:3 69:6
69:17,18
follow-up (1)
117:16
following (5)
34:22 69:22
73:15 75:14
114:8
follows (6)
6:6,10 27:9,15
30:19 56:5
force (1)
119:10
foregoing (3)
118:14 119:23
119:23
forgot (3)
45:5,7 46:4
formal (15)
14:24 17:25
18:5,7,8,16,17
18:23,24 19:7
19:8 20:7,16
20:18 21:7
forms (1)
17:21
forward (1)
62:21
found (1)
114:5
foundation (2)
48:11 49:10
Francisco (2)
3:4 118:1
Free (5)
111:17,18
112:21 114:14
114:16

front (3)
53:7 69:6,12
fuel (3)
26:12 27:11,17
fueler (2)
5:3 45:8 47:10
fuelers (4)
44:22 65:21
67:22 115:23
fueling (2)
27:20 43:10
fueling-super...
28:1
fueling-super...
28:4
full (5)
34:10,11 35:18
37:13 119:9
fully (1)
65:3
functions (1)
35:13
funeral (6)
38:10,14,16,19
38:23 39:3
furlough (5)
111:19,20,24
further (2)
61:23 117:14

_____ G _____

G (1)
3:8
Gabapentin (1)
113:19
GARCIA (1)
3:3
gasoline (1)
44:22
gestures (2)
69:17,21
getting (4)
10:25 79:14
100:6 108:4
give (27)
7:16 11:13,17
13:1,4,4,7
16:21 41:2,10
42:4 54:20
57:17,20
58:23,24
74:20 75:4,21
76:17 77:12
97:8 98:14,14
101:10 116:9
117:15
given (13)
25:23 55:9 57:6

57:21 67:17
77:6,8 89:9
100:1,3
113:17,18
119:24
glitches (1)
118:7
go (27)
8:9,11 11:4 22:5
22:9 33:9
35:15 36:1,22
43:3 51:20
53:21 62:11
71:7 74:22,23
76:10 86:18
87:21 105:1
105:13 113:11
113:14 114:1
114:2,21,25
God (1)
7:12
going (41)
12:9 14:12,12
15:3 19:17,25
22:5 34:5,7
37:11 40:12
51:24 53:17
54:6 55:18
61:22,24
62:14,21 63:2
63:4 64:14
66:5 68:12
72:8,21 73:13
73:19 75:13
79:18 81:4
82:19 85:22
87:21 95:18
105:2,8
107:25 108:10
113:12 116:14
good (6)
6:12 7:22 42:25
47:11 51:18
104:23
good-faith (1)
33:11
government-l...
17:19
grab (1)
13:21
graduate (1)
23:1
graveyard (1)
70:25
great (4)
31:16 93:8,9,11
grievances (1)
31:2,5,9

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 67 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 29 of 38

Page 5

**Group (4)**
3:3 4:10,13,16
**guess (4)**
12:12,15 14:18
100:11
**guessing (1)**
101:11

**H**

**H (2)**
4:8 5:1
**half (2)**
55:24 56:6
**hand (4)**
7:15 69:17,21
98:14
**hand-wrote (4)**
98:24,25 99:14
99:18
**handed (3)**
73:23 80:14
87:5
**handle (1)**
26:4
**handled (1)**
6:15
**handwriting (2)**
99:11,11
**handwritten (3)**
5:9,11 100:25
**happened (10)**
73:22 75:17
85:23 86:20
87:3 93:23
101:9,11
108:5 112:12
**happening (1)**
78:19
**hard (1)**
79:2
**head (2)**
26:23 111:13
**hear (9)**
8:2,3,5 26:21,22
27:12 50:7
85:4 92:9
**held (2)**
27:23 43:12
**Hello (1)**
26:14
**help (4)**
7:12 11:5 46:25
47:1
**helpful (1)**
105:12
**helping (2)**
115:23,24
**hereto (16)**

34:17 35:22
38:5 39:14
40:16 41:21
42:13 54:10
55:22 64:18
66:9 79:22
82:23 95:24
105:6 120:5
**Hey (1)**
93:10
**high (2)**
22:24 23:12
**hire (1)**
21:23
**hired (1)**
20:20
**Hold (3)**
8:8 35:14 62:5
**holder (1)**
119:7
**home (4)**
73:24 74:23
75:7 79:9
**honest (1)**
28:24
**hoped (1)**
79:10
**hopefully (1)**
51:23
**hours (2)**
78:25 103:13
**house (1)**
100:19
**housekeeping ...**
62:12
**human (1)**
37:7
**hypothetical (1)**
49:11

**I**

**icon (1)**
26:19
**idea (2)**
65:5 100:20
**identification ...**
34:16 35:21
38:4 39:13
40:15 41:20
42:12 54:9
55:21 64:17
66:8 79:21
82:22 95:23
105:5
**identify (12)**
6:24 21:23
23:15 45:8,21
46:2 62:22

63:6 93:25
94:7 105:11
105:14
**illness (1)**
39:8
**image (2)**
61:24 103:18
**immediately (1)**
74:21 109:2
**impact (1)**
12:22
**important (1)**
11:23 12:1 28:7
28:13,19,23
29:2,5,12,16
29:21,21,25
30:8 31:7
33:23 34:2
**improper (1)**
109:3
**inappropriate...**
21:8
**inaudible (11)**
10:13 17:10
18:13,25 22:1
22:2 34:24
75:25 90:2
93:13 94:22
**incident (9)**
4:10,16 34:12
35:8 36:18
37:16,24
41:14 42:1
**include (1)**
26:2
**inclusive (1)**
2:9
**income (1)**
112:24
**incomplete (1)**
49:11
**indicate (6)**
31:13 89:3,13
90:21 94:21
95:3
**indicates (1)**
94:8
**indication (2)**
10:6,7
**individual (3)**
43:5 45:3 104:6
**individuals (3)**
45:17 63:7
108:19
**inform (1)**
105:8
**information (1)**
112:23

**informed (8)**
72:8 76:19,24
78:12,21 79:5
79:8 89:16
**Initial (2)**
5:18 105:3
**innatist (1)**
21:4
**inquire (2)**
49:21 70:22
**inside (1)**
11:10
**instance (1)**
9:7
**instruct (1)**
14:13
**instructed (1)**
86:1
**instructing (2)**
34:25 35:4
**instruction (1)**
31:11
**instructions (1)**
34:23
**insult (4)**
21:10,11,18,20
**insulting (1)**
21:25
**interested (1)**
119:19
**International ...**
4:10,12,15
**interpret (2)**
17:14 19:16
**interpretation...**
17:9 18:11,15
19:5,10 31:14
44:6,9
**interpreted (3)**
20:12 44:10
47:21
**interpreter (98)**
3:13 7:13 8:5
9:13,13,19,23
10:5,5 13:2,2
16:7 17:13
18:6,6,10,14
19:2,21 20:19
21:1,24 22:3
24:10 25:4
26:13,16,25
27:5 28:10,16
30:2,2 31:17
31:17 32:10
32:14,24 33:6
33:6,9,25 37:9
39:23 40:22
43:17,24

45:23 47:20
47:20 48:16
49:5,20,20
50:7,17,17,24
51:1 53:4
57:15 58:5,5
58:17 59:5,24
64:10 65:7
70:15,21,21
72:16,16 73:6
76:2 80:2,2
81:24 86:10
86:10 87:15
90:3 94:23
95:11 96:10
98:5,12 99:5
102:15 106:6
109:21,21
110:9 111:22
111:23 112:17
114:9 117:1
**intervene (1)**
97:1
**intimidating (1)**
33:12
**intimidation (1)**
33:21
**introduced (1)**
7:23
**introducing (1)**
8:13
**investigating (...**
70:10
**involuntarily ...**
15:16
**involve (3)**
30:12,21 32:2
**involved (5)**
31:5,9,23 46:9
77:18
**involvement (2)**
48:9 77:23
**involving (4)**
31:1 51:15
61:17 81:22
**Isaiah (2)**
64:9,12
**issue (3)**
8:12 21:16
26:15
**issued (1)**
119:8
**issues (1)**
42:19

**J**

**Jezen (4)**
45:14 46:4 63:8

105:15
**Joanna (3)**
2:18 6:13 119:5
**job (16)**
20:5 21:12,16
25:3,9,24
26:11 27:10
27:16,20,23
96:25 97:1
111:10,14
116:2
**jobs (4)**
71:9 111:1,3
112:21
**John (17)**
5:15 50:11,24
51:6 70:25
71:14,17 74:1
76:23 77:14
78:24 79:4,15
79:17 83:2,17
83:19
**July (5)**
2:18 6:1,17
107:18 117:11
**June (2)**
4:24 42:19
**justified (1)**
109:1

**K**

**keep (1)**
98:23
**Kevin (28)**
76:21,21 84:14
84:15,16,21
85:18,21,22
86:3 95:17
97:10 98:2,4,9
98:11,14,16
98:18 99:4,9
99:10,15,19
100:23,25
101:4,10
**kind (1)**
85:21
**kinds (1)**
27:13
**knew (4)**
67:20 107:10
108:5 115:16
**know (68)**
10:24 12:12
13:20,22
14:22 15:21
20:7,8,8 31:14
35:24 36:11
38:7 39:16

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 68 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 30 of 38

Page 6

40:19,24
41:23 42:15
46:20,21,24
47:9 49:13
52:3,14 53:19
57:8 59:15
60:7 64:20
65:10,12,19
65:24 66:4,14
69:23 70:11
70:11 77:20
77:20 78:3
79:25 80:21
82:25 84:7,17
88:10 89:15
90:9,13,23
94:11,13 95:7
96:7 97:4,5
100:24,25
101:8 108:25
116:13,16,19
116:20,23
117:7
**knowledge (2)**
34:21 65:17
**known (1)**
116:21
**knows (2)**
67:20,22

---
L
---
**L.A (1)**
118:1
**Labor (3)**
109:13,19 110:4
**Lacks (2)**
48:11 49:10
**laid (2)**
114:17,19
**language (1)**
20:16,21
**Lardner (2)**
3:8 7:5
**LAW (1)**
3:3
**Lawrence (10)**
5:9 63:21,23
64:1,3 65:2,5
65:9,15,18
**laws (1)**
118:13
**lawsuit (4)**
9:8 14:2,11
16:18
**leadership (1)**
28:5
**learn (5)**
43:22 44:2,16

70:9 73:13
**learned (19)**
44:18,23 70:13
70:19 73:19
75:13 84:20
84:25 85:5,8
85:11,12,13
86:22 87:12
87:13,17,23
88:2
**learning (1)**
109:2
**leave (8)**
38:10,14,17,20
38:23 39:3,6
76:18
**leaving (1)**
69:20
**left (3)**
77:16 98:18
103:18
**legal (22)**
14:4,10 16:3,6,9
16:15,23 17:3
33:15 46:11
91:9 93:19
94:3,10 95:5
105:21 106:4
106:11 107:8
107:14,22
109:7
**Let's (12)**
7:3 8:8,11 22:9
42:21,23 43:3
51:3 62:11
81:8 105:1
114:25
**letter (48)**
5:3 57:6,22 60:6
72:10 73:24
76:14 80:16
80:20,20,21
80:22 81:3,18
81:19 82:2,9
82:14,17
83:20 85:16
85:19,20,21
85:22 86:2,4
87:6,9,25 95:9
95:10,11,15
95:16 97:8,24
98:3,8,17 99:3
99:8,10,16,18
100:12,25
101:21
**level (1)**
18:3
**LIBERATIO...**

3:3
**light (1)**
37:15
**line (7)**
5:23 53:11
63:11,20 64:5
67:4,12
**list (2)**
23:19 63:8
**listed (2)**
63:4 108:19
**lists (1)**
105:24
**little (1)**
113:13
**LLP (1)**
3:8
**location (1)**
71:24
**long (6)**
23:2,2 100:24
112:10 116:13
116:13
**longer (23)**
9:6 15:10,10,11
49:22 50:4
55:4 63:9,19
64:2 86:18
89:15 101:13
101:20 102:9
103:10 104:2
104:3 108:18
111:12,16
114:1,4
**look (9)**
15:21 35:25
38:8 39:17
42:16 52:11
52:14 54:12
80:1
**looked (7)**
53:2,9 106:3,9
110:7,12,14
**looking (10)**
36:8,21 37:19
38:1 96:3,14
98:20 99:14
102:12,17
**looks (3)**
55:25 56:7
104:12
**Lorvino (1)**
107:6
**Los (1)**
3:9
**lose (1)**
114:3
**lost (3)**

26:20 113:25
114:2
**lot (5)**
61:8 67:21
92:21 111:3
111:11
**love (1)**
69:6
**lower (3)**
19:12 55:24
56:6
**lunch (4)**
51:18,19 62:10
67:16

---
M
---
**Macapagal (2)**
107:18 117:11
**magnify (1)**
52:7
**making (1)**
69:21
**man (2)**
20:15,17
**management ...**
5:3 28:2 29:14
76:22 77:4,5
78:22 84:25
88:19 89:20
90:1,7,21
91:20,25 93:9
115:17,24
**manager (2)**
71:16 84:18
**March (7)**
4:11,16 34:21
38:10 40:4
112:2,4
**Mario (1)**
63:12
**mark (21)**
34:7 35:18 38:2
39:10 40:12
41:17 42:10
51:24 53:17
55:18 62:22
64:14 66:5
79:18 82:19
95:18 103:15
103:21,21
104:6 105:2
**marked (21)**
34:15 35:20
38:3 39:12
40:14 41:19
42:11 52:21
53:8 54:2,8
55:20 63:2

64:16 66:7
79:20 82:21
95:22 96:22
99:22 105:4
**matter (8)**
6:19 7:16 10:8
10:11,16,18
11:2 13:25
**mean (8)**
15:17 17:12
24:4 57:3 74:8
80:3 86:9
112:8
**means (1)**
6:16
**meant (2)**
57:5 86:7
**meddle (2)**
85:23,24
**meddling (2)**
86:4,7
**medical (9)**
39:7 41:1 114:1
114:2,3,5,7,12
114:15
**medication (2)**
113:15,20
**meet (2)**
14:14 117:21
**meeting (39)**
57:12,16 58:7
70:23 71:4,6
71:10,13,19
71:23,24 72:1
72:6,9,12,14
72:19,24 73:3
73:8,20,22,23
73:23 74:3,12
74:16,21 75:1
75:4,16 76:11
76:14,16,17
77:11,13
83:17,18
**members (1)**
29:13
**memory (2)**
42:2 101:18
**mention (1)**
89:17
**mentioned (2)**
23:12 71:14
**Menzies (71)**
2:8,8 3:7,7 5:3
5:3 6:20 7:5
7:24 14:5
23:16,19,25
24:21 25:10
25:17 43:8

58:11,12
60:17,21
65:18,21 66:3
67:3 70:9 76:1
76:6 78:8
79:10,16 85:3
85:5,8,10,14
86:17,23,24
87:10,18,19
88:8,15 89:20
89:25 90:7,16
90:20 92:1
104:1,3
105:18,22
106:5 107:19
108:8 109:7
110:8,13,18
111:7 112:9
112:11,13,15
113:9 114:8
115:8,9,18
**Menzies' (3)**
78:22 84:24
94:17
**Menzies/ASI...**
50:21
**MENZIES_0...**
5:15
**MENZIES_0...**
5:10
**MENZIES_0...**
5:8
**MENZIES_0...**
5:12
**MENZIES_0...**
5:14
**MENZIES_0...**
4:23
**MENZIES_0...**
4:25
**MENZIES_0...**
4:21
**MENZIES_0...**
4:21
**MENZIES_0...**
4:19
**MENZIES_0...**
4:17
**MENZIES_0...**
4:14
**MENZIES_0...**
4:14
**MENZIES_0...**
4:11
**MENZIES_0...**
5:6
**MENZIES_0...**
5:4

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 69 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 31 of 38

Page 7

MENZIES_0...
5:4
**merit (9)**
16:22 17:5
18:17,19,20
19:12,13,14
115:14
**merito (1)**
18:21
**merits (1)**
93:19
**message (5)**
70:6 103:1,15
103:22 104:5
**messages (14)**
55:25 56:1,8,9
56:16,24 61:3
61:6,9,17,23
104:13 106:2
106:9
**messaging (1)**
61:1
**met (2)**
88:3,6
**mine (1)**
41:6
**minute (1)**
21:15
**minutes (3)**
51:21 81:5,7
**missed (2)**
27:8 50:24
**Mission (1)**
3:4
**misstating (1)**
50:24
**mistake (1)**
92:22
**moment (3)**
15:4 53:22
114:22
**money (1)**
115:13
**morning (3)**
6:12 7:22,25
**move (4)**
15:4 22:16
40:20 52:4
**moved (2)**
22:21 23:18
**movie (1)**
78:15
**moving (1)**
23:13
**Murieta (1)**
37:11
**muted (2)**
8:6 26:19

**N**
**N (1)**
4:1
**N-a-v-a-r-r-o ...**
8:20
**N-i-c-o (2)**
50:16,18
**name (21)**
6:12 7:23 8:15
14:8 43:5 45:5
45:9,12,18,19
45:20 46:2
58:13 60:8,10
63:12,21 64:8
64:10 65:7
84:17
**named (2)**
45:17 103:15
**names (4)**
63:4,6 105:14
117:10
**national (10)**
6:14 90:11,16
90:21 94:17
94:21 95:3
109:13,19
110:4
**Navarro (76)**
2:5,15 3:2 4:3
6:8,19,20 7:8
7:14,22 8:13
8:14,17,19,22
14:22 16:2,10
17:8 20:2
22:10 27:19
28:19 29:9
31:11,16 36:7
36:15 37:9
40:22 43:4
46:12,23 52:2
52:8 53:19
55:24 56:6,12
56:23 60:14
61:23 62:13
62:24 63:5
64:20 65:2
66:15,19,22
66:24 67:5
79:25 81:5,7
82:25 84:24
92:12,18 96:4
96:9,13,17,22
99:22 101:8
102:22,24
105:8 106:10
108:23 109:25
113:5 115:3
115:16 117:13

**Navarro's (3)**
117:18,20,24
**necessary (1)**
117:22
**need (16)**
10:23 13:20,20
15:3 21:10,17
21:22 36:2
40:9 67:6,10
81:4,5 93:5,7
102:10
**never (9)**
48:24 57:3,4
83:16,22
86:22 87:4,9
100:10
**Nico (8)**
50:11,14,14,16
50:18,20 51:5
71:15
**Nicole (2)**
50:13,18
**night (1)**
75:9
**nod (1)**
26:23
**noise (1)**
27:13
**non- (1)**
32:4
**nonsuperviso...**
30:16
**nonsuperviso...**
29:7 30:12,21
31:1,8,22 32:8
32:17,20 33:4
33:13 47:7
48:5 49:3,8
58:25 59:20
60:2 69:12
**normal (6)**
17:20,23,25
20:15,23,24
**normally (1)**
17:22
**Northern (2)**
2:2 6:21
**Nos (5)**
4:14,21 5:4,17
51:25
**note (1)**
67:4
**notice (4)**
4:13 15:23
36:23 77:10
**noticing (1)**
7:3
**notified (1)**

95:14
**notify (1)**
15:25
**number (8)**
6:22 36:4 42:5,8
66:10 108:15
108:17 119:8
**numbers (2)**
62:14,22

**O**
**oath (3)**
7:2 11:8,9
**oaths (1)**
119:11
**obey (1)**
35:4
**object (2)**
9:15 44:5
**objection (25)**
7:1,6,8 11:19
16:5,23 21:17
29:8 30:14
33:15 46:10
46:13,19
47:15 48:11
49:10 59:13
65:23 78:1
81:1 83:6,13
91:9 94:3 95:5
**obligation (1)**
11:12
**occur (1)**
74:12
**occurred (1)**
75:1
**office (4)**
87:21,24 105:9
109:10
**officer (2)**
7:2 119:21
**OFFICER'S (1)**
119:1
**official (1)**
17:19
**oh (1)**
23:21
**okay (69)**
9:23 10:23,25
11:6,24 13:19
14:21 15:3
20:4,9,10,23
20:23 21:5,25
22:2,5,6 24:17
25:2 31:16
32:14 34:5
37:15 41:10
42:9 44:23

45:3 50:2
51:22 52:6,8,9
55:3,14 56:22
59:22 61:25
63:20 66:19
66:20 67:2
70:3 71:10
73:18 74:7,16
74:25 80:18
84:3,10,15
85:7 87:2,7
89:7 92:23
97:23 99:18
101:14 103:14
103:17 104:4
104:8,18
107:12,18
108:6 114:23
**omitted (1)**
51:2
**once (3)**
8:25,25 87:2
**ones (4)**
47:8,25 63:17
68:23
**oOo- (1)**
118:9
**opinion (20)**
28:7,13,19,23
29:2,5,12,16
29:22,24 30:7
30:12,21
31:21 32:4
33:3,3,11,23
34:2
**opportunity (5)**
12:20 36:12
41:23 64:21
83:1
**ORANGE (1)**
119:3
**orderly (1)**
11:6
**ordinary (3)**
18:18,18 19:3
**origin (6)**
90:11,17,21
94:17,21 95:3
**originally (1)**
113:23
**Overbroad (2)**
83:6,13

**P**
**P (5)**
119:10,15,20,25
120:5
**P.C (1)**

3:3
**p.m (2)**
2:17 118:8
**Pacific (1)**
62:6
**page (47)**
4:2,9,11,17,19
4:23,25 5:2,6
5:8,10,12,14
5:15,23 34:11
35:25 36:1,8
36:12,21
37:19 40:20
40:25 41:3
52:3,6,12,15
52:17 53:1,7
53:12 55:24
56:6 96:2,3
97:7,14 98:21
99:21 101:23
102:17,18,21
103:8 104:12
**pages (6)**
4:14,21 5:4,17
5:20 104:12
**paid (2)**
79:11,14
**paper (2)**
80:13 87:25
**papers (2)**
65:3,14
**part (5)**
28:2,10 96:23
96:24 115:17
**part-time (3)**
23:21,21 111:9
**participant (1)**
84:5
**participate (1)**
106:17
**participated (2)**
83:22 84:20
**particularly (1)**
12:2
**parties (1)**
119:17
**party (2)**
9:7 14:1
**passed (5)**
44:3,24 51:9
87:12,17
**passing (2)**
44:4,19
**patience (1)**
118:6
**pay (2)**
111:12 114:6
**penalty (1)**

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 70 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 32 of 38

Page 8

118:12
**people (35)**
  17:20,23,25
  18:18 26:3,4,4
  26:6,8 44:18
  44:20 45:6
  48:2 49:23
  55:8 57:2,7
  58:23 63:23
  67:15 68:23
  68:24,25
  78:17 84:19
  85:24,25 86:5
  86:7 100:2
  102:7 116:6,8
  116:9,10
**perfectly (1)**
  20:6
**performance ...**
  5:13 79:23
**period (2)**
  112:14 120:4
**periods (1)**
  24:2
**perjury (1)**
  118:13
**person (14)**
  11:10 45:5,12
  57:19,22 64:8
  92:6 96:14
  103:23 107:24
  107:25,25
  108:4,13
**person's (1)**
  58:13
**personal (9)**
  30:13,22 31:1,5
  31:9,23 65:17
  76:8,10
**personally (1)**
  107:12
**petition (107)**
  5:5 43:15,23
  44:2,4,17,19
  45:13,22 46:3
  46:6,9,17 47:5
  47:13 48:3,6,8
  48:15,19,22
  48:25 49:15
  51:11,14
  52:23 53:2,8
  54:21,22,23
  55:3,9,15 57:2
  57:5,8,11,21
  57:21,24 58:3
  58:10,16,20
  58:23,24
  61:10,17 63:7

63:14,18 64:1
64:3,6 65:22
70:1,7,18,24
71:5,8,20,22
72:10,23 73:1
73:5,10,14,16
73:24 74:17
74:20 75:4,18
75:22 76:11
76:12 77:4,25
81:22 82:4,10
83:20 84:25
85:4,5,8 86:8
86:13 88:21
88:25 89:4,10
89:14 109:20
110:16 115:21
116:12,13,17
116:21,24,25
117:4,8
**petitions (1)**
  54:25
**Philippine (1)**
  23:9
**Philippines (5)**
  18:1 22:18,23
  23:6,11
**phone (21)**
  56:17,19,21
  60:13,16,19
  60:20 61:4,15
  61:24 71:17
  71:18 76:23
  83:19,19
  84:11 103:2
  108:12,14,15
  108:16
**physical (1)**
  20:7
**picture (3)**
  78:22,24 79:5
**pictures (1)**
  78:13
**piece (1)**
  18:12
**pitied (3)**
  58:1,15,21
**Place (1)**
  118:16
**placed (1)**
  53:14
**places (2)**
  110:22 111:4
**plaintiff (4)**
  2:6 3:2 7:7 9:10
**Plaintiff's (2)**
  5:18 105:2
**played (3)**

90:24 91:8,15
**please (56)**
  7:15 8:15 12:6
  13:22 16:12
  16:25 19:2
  21:18 22:12
  23:15,19
  24:10 25:4
  27:2,14 28:11
  30:5,18 31:6
  31:18 33:25
  38:8 40:19
  41:10 42:16
  43:24 44:14
  46:14 48:16
  49:5 53:4 56:4
  57:17 58:17
  59:5,24 68:6
  73:6 76:2
  81:24 82:6
  87:15 90:18
  91:11,11 94:5
  96:19 98:5
  103:7 104:11
  104:18 106:6
  110:1,9 113:2
  117:1
**point (10)**
  13:19 25:18
  70:9,13,18
  77:13,17
  108:23 117:16
  117:24
**Polaris (1)**
  112:21
**policy (1)**
  29:3
**portion (1)**
  44:8
**position (3)**
  28:2,5 43:12
**positive (1)**
  29:6
**possess (3)**
  60:13,16,20
**possession (1)**
  101:19
**possible (2)**
  20:6 82:8
**possibly (1)**
  93:4
**potential (2)**
  105:11 117:19
**potentially (1)**
  117:23
**prefer (1)**
  19:15
**prepare (3)**

13:11,16 101:21
**prepared (2)**
  60:6 101:1
**prescribed (1)**
  113:23
**present (6)**
  3:12 76:19,23
  84:19 88:5,13
**presented (4)**
  52:23 53:3,9
  77:9
**pressuring (4)**
  31:4,8,22 33:4
**previous (1)**
  115:7
**previously (1)**
  49:16
**prior (9)**
  14:24 23:13,16
  49:15 54:15
  66:24 71:4
  80:7 119:13
**private (2)**
  14:24 15:1
**probably (1)**
  61:24
**problem (5)**
  31:13,15 32:1,2
  32:9
**problems (8)**
  68:14 72:15,20
  91:20 111:12
  116:6,8,10
**procedural (1)**
  11:4
**Procedure (2)**
  5:19 119:13
**proceeding (1)**
  10:21
**process (2)**
  15:18 118:6
**produced (3)**
  5:16 42:6 95:20
**proficiency (1)**
  17:18
**profiting (1)**
  74:10
**promoted (1)**
  25:21
**Prospect (9)**
  111:8,15 112:7
  112:8,11,13
  112:20 113:13
  114:13
**provide (12)**
  44:12 65:14
  82:16 85:14
  85:19 95:9,10

95:12,15,16
99:5,22
**provided (20)**
  39:1 65:1,18,21
  67:3 80:23
  81:15 82:13
  85:1 87:8 98:3
  98:8 99:3,8,10
  100:9,11
  105:9 112:23
  120:4
**psychiatrist (2)**
  113:11,17
**purchase (1)**
  24:13
**purchased (6)**
  23:23,24,25
  24:9,21 25:17
**purely (1)**
  14:24
**purported (1)**
  69:2
**purports (1)**
  65:1
**purpose (2)**
  72:14,19
**purposes (1)**
  105:10
**pursuant (2)**
  5:19 119:12
**put (4)**
  44:22 63:2 86:1
  86:3
**putting (1)**
  35:18

Q
**qualified (1)**
  119:6
**qualify (1)**
  93:5
**Qualley (1)**
  77:18
**Qually (19)**
  5:15 50:11,24
  51:6 71:14,17
  74:1 76:23
  77:14,20,22
  77:23 79:15
  79:17 83:5,17
  83:19,22 84:5
**quantified (1)**
  93:3
**question (73)**
  9:17,23 10:8,15
  11:5 15:14
  16:14,25
  24:10 25:4

26:17 27:7,14
27:19 28:11
30:18 31:6,10
31:12,18,21
32:12 35:1
44:14,16
45:11,24
46:14,16
47:12,12 49:5
51:3 53:4 56:4
57:19 61:12
61:13 63:17
66:21,23
67:23 78:20
79:4 81:15,25
83:10,10
86:21 90:4
91:12 92:12
92:13,17,18
92:24,25 93:7
93:12,16
95:15 96:19
100:11 102:15
107:12 108:6
108:7 109:22
110:3 114:9
115:4,5,6
**questioning (2)**
  117:19,20
**questions (11)**
  5:22 10:24
  11:18 12:2,5
  12:17 22:11
  40:8,9 81:6
  117:14

R
**R (5)**
  119:10,15,20,25
  120:5
**R-e-n-a-l-d-o ...**
  8:19
**race (13)**
  89:18,21 90:1,8
  90:24 91:8,15
  92:2,4,13,25
  94:1,8
**Rafael (11)**
  45:16,17,18,20
  46:5 54:19,20
  55:9,11 60:9
  105:24
**Rafael's (1)**
  45:19
**raise (1)**
  7:14
**Randy (5)**
  50:5,6,10,20

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 71 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 33 of 38

Page 9

51:5
**Raul (37)**
57:6,12,17,20
57:23 58:14
60:10 71:1,2
71:13 73:16
73:24 74:1
75:14,15,21
76:21 77:3,16
77:21,21,23
78:5,5 83:20
83:25 84:8,14
84:21 85:1,10
85:19,20,20
98:1,4,9
**Ray (2)**
56:23 67:5
**reach (1)**
116:4
**reached (1)**
106:24
**read (16)**
27:6,9,14,15
30:19 54:14
56:5 62:14
64:22 66:16
66:20,22 80:3
83:1,3,11
**reading (1)**
42:17
**ready (1)**
62:24
**really (2)**
52:8 111:13
**reason (9)**
12:25 65:20
71:25 77:1,8
88:15,24 89:3
89:13
**reasons (1)**
77:6
**recall (15)**
37:16,20,23
38:10,13
39:22,23 40:2
40:4 41:11
42:18 43:14
64:8 82:10
102:18
**receive (4)**
55:12 80:16,20
81:3
**received (7)**
22:20 26:11
27:10,16
55:11 72:11
104:14
**receiving (7)**

37:4 39:22 40:2
42:18 82:10
114:7,12
**recess (1)**
62:10
**recognize (4)**
52:20 96:4
101:24 102:23
**recollection (3)**
35:7 36:18
41:14
**reconvene (2)**
42:24 62:6
104:22
**record (39)**
7:1,23 8:9,10,11
8:16 18:12
22:7,8,9 27:1
27:2,3,4,9,15
30:19 36:3
43:1,2,3 53:22
53:24,25 56:5
62:9,11,14
81:11,12
104:24,25
105:1 114:21
114:24 117:17
117:25 118:7
119:24
**recorded (1)**
119:22
**recordkeepin...**
42:7
**redact (1)**
36:3
**referenced (1)**
13:25
**referred (1)**
103:21
**referring (11)**
29:19,20 44:21
59:19 65:6
68:17,19
84:16 86:24
88:21 97:18
**refers (1)**
22:2
**reform (1)**
92:7
**refresh (1)**
81:5
**refuse (2)**
81:2 82:3
**refused (8)**
80:11,15,19,24
81:16,17,21
82:11
**regard (3)**

15:24 86:8
97:11
**regarding (11)**
65:21 77:10,14
82:4 84:25
105:21 106:4
107:8,22
109:14 112:23
**regardless (2)**
16:22 17:5
**regards (3)**
14:19 15:21
115:21
**register (2)**
19:5,13
**regular (1)**
19:3
**relating (1)**
82:10
**Relations (3)**
109:14,19 110:5
**Relationship (1)**
4:13
**relative (2)**
119:16,17
**remain (1)**
24:8
**remember (42)**
9:6 15:11 31:11
34:24 35:3,9
36:19,19 37:4
37:6,7,18
41:13,16,25
42:20 45:20
49:22 50:4
57:2,22 60:11
61:21 63:9,19
64:2 81:17
83:2 88:17
96:23,24 97:2
97:9,12 99:16
101:13,20,20
102:9,13
114:4,18
**remote (1)**
6:16
**remotely (2)**
2:16 6:1
**Renaldo (12)**
2:5,15 3:2 4:3
6:8,19,20 7:8
8:17,19 65:2
117:13
**RenaldoNava...**
5:17,17 95:21
102:13 103:9
**Renil (8)**
50:11,21,25

51:2,6 71:15
78:24 79:4
**repeat (44)**
13:3 16:12,25
24:10 25:4
28:11 30:5,17
31:6 33:25
35:1 43:24
44:14 45:23
46:14 48:17
49:5 53:4 56:4
58:6,17 59:5
59:24 68:6
70:15 72:17
73:6 76:3
81:24 82:6
85:17 86:11
87:15 90:18
91:11,11 94:5
96:10,19 98:5
106:7 110:1,9
117:1
**repeated (2)**
28:16 31:19
**replace (1)**
103:24
**report (3)**
4:10,16 37:12
**reported (2)**
39:5 49:24
**reporter (27)**
2:19 6:12,14 7:9
7:14,19 8:6
30:17 35:1
36:3 40:15
41:20 42:12
53:21 54:1,4,9
55:21 56:3
64:17 66:8
79:21 82:22
95:23 105:5
119:7 120:4
**Reporters (1)**
119:9
**reports (1)**
83:5
**represent (3)**
6:25 7:24 67:2
**represented (2)**
59:3,8
**representing (1)**
7:5
**represents (1)**
67:13
**request (3)**
61:24 98:4,9
**requested (2)**
120:2,3

**requirement (1)**
15:24
**resolve (1)**
9:20
**resources (1)**
37:7
**respect (7)**
83:21 89:7,24
90:6,10,14,19
**respond (3)**
12:1,8,8
**responding (1)**
10:24
**response (7)**
12:16 27:7 44:7
48:12 85:14
98:4,9
**responsibilitie...**
25:7,24 26:2
**responsibility ...**
33:24 34:3
**rest (2)**
74:23 104:20
**restart (1)**
62:13
**restroom (1)**
13:21
**result (2)**
78:11 113:8
**resume (2)**
62:25 81:9
**retain (1)**
19:15
**review (9)**
12:20 36:12
40:25 41:24
53:20 63:5
64:21 66:14
120:1
**reviewed (3)**
13:15 36:17
52:3
**reviewing (1)**
35:6
**right (81)**
7:15,22 10:4
11:1 14:13
16:1 19:24,24
20:11,15 24:6
25:10,21 27:6
27:12,19
35:10,17
36:11 39:10
40:12,24
46:21,25
48:25 50:20
51:21,24
52:11,20 53:1

53:8,17 54:3,6
56:19 59:12
59:23 62:4,8
62:24 63:2
64:24 66:18
70:4,7 71:11
71:14 75:10
79:18 81:8
82:19 87:3,4
87:10 95:13
95:18 96:2,2
96:15 98:21
98:25 99:14
99:21,21
100:12,16
101:3,23
102:20 103:19
107:15 109:8
109:9,10,14
110:5 112:10
116:25 117:16
118:4
**RMR (1)**
2:19
**Rodriguez (2)**
108:3,8
**role (4)**
28:5 90:25 91:8
91:15
**RPR (1)**
2:19
**rude (1)**
67:5
**Rule (1)**
5:19
**rules (1)**
11:5
**running (1)**
103:13

_____
**S**
_____
**S (2)**
4:8 5:1
**sake (1)**
96:25
**Samonte (1)**
107:6
**San (2)**
3:4 118:1
**saw (3)**
55:6 56:17 96:7
**saying (9)**
10:16,17 19:23
26:22 50:25
65:10 67:22
96:13 103:12
**says (8)**
36:23 39:19

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 72 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 34 of 38

Page 10

41:4 56:22
57:1 67:4
80:11 103:19
**scene (1)**
69:6
**school (2)**
22:24 23:12
**schooling (2)**
22:20 23:11
**scratch (1)**
32:4
**screen (10)**
8:7 26:18,19
35:19 55:25
56:7,23 63:3
102:23 104:4
**scroll (1)**
35:12
**sec (1)**
8:8
**second (22)**
5:5 14:15 17:13
18:10 19:2
20:19 32:24
36:1 37:9
40:20 41:6,10
52:15 53:12
54:22,23 55:3
55:3 57:15
67:4 91:19
117:15
**Section (1)**
119:13
**security (1)**
36:4
**see (22)**
24:23 34:5,8,10
35:14 36:22
40:19 55:6
63:11,21 67:7
67:12 69:16
69:25 78:11
80:3,13 81:14
82:7 92:16
105:12,15
**seen (17)**
34:19 36:14
52:17 54:15
56:1,8,11,15
64:23 66:17
66:21,24 80:7
92:5 100:10
101:25 116:16
**send (1)**
15:22
**sending (1)**
78:15
**sense (1)**

18:19
**sent (8)**
78:16,17,17,18
100:10 103:12
103:15 104:7
**Separation (1)**
10:22
**September (2)**
23:22 114:20
**sequence (2)**
73:18 74:2
**Service (14)**
4:10,12,15
23:21,21 24:6
24:8,9,12,13
24:14,23 25:3
25:6
**session (1)**
118:8
**set (3)**
5:16 29:6 95:19
**settled (1)**
116:7
**settlement (12)**
14:16,24 15:1,6
15:8,22 16:4
16:16,21 17:5
115:9 117:20
**share (1)**
76:5
**sharing (3)**
34:6 35:10,17
**shift (12)**
68:9,10,11
70:25 73:25
74:12,24 75:2
75:10 86:17
86:23 87:9
**shifts (1)**
69:19
**shit (1)**
22:5
**shop (8)**
54:19 59:17,22
60:3,5,8
105:25 106:1
**Shorthand (2)**
2:19 119:6
**show (7)**
62:5 78:13,18
78:21 79:4
97:3 102:24
**showed (3)**
55:2 59:16
78:24
**showing (1)**
102:20
**shown (1)**

13:14
**shows (2)**
26:19 36:4
**sick (11)**
38:13,16,19,22
38:24,25,25
39:2,6 40:4
41:11
**side (3)**
103:17,18,19
**sign (41)**
32:21,23 37:10
41:7 44:24
45:2,4,6,13,22
46:3,6,17 48:3
48:6,21,25
55:3,4 57:2
63:7,14,18
64:1,3,6 65:3
65:11,15
80:11,15,19
80:25 81:2,16
81:17,21 82:3
82:11 86:13
86:14
**signature (14)**
36:23,25 37:2
39:20,20 41:4
41:5,9 52:24
53:11,14
77:25 99:2
118:18
**signed (18)**
44:4 48:8 51:11
51:14 54:21
55:8 70:18
77:4 88:18,20
99:11 110:16
115:20 116:12
116:25 117:4
117:7,8
**signing (10)**
37:5 47:5,8,13
49:15 55:2
88:25 89:4,10
89:14
**simple (1)**
82:8
**simplify (1)**
10:4
**Simultaneous ...**
19:1 21:2,21
93:17
**sir (253)**
8:1,23,25 9:3,9
10:22 11:7,11
11:14,16,21
11:25 12:4,7

12:11,14,18
12:24 13:9,13
13:17,24 14:3
14:6 16:17,19
17:7 22:13,15
22:17,19,22
22:25 23:2,4,7
23:14 24:7,25
25:8,11,13,16
25:19,22,25
26:10 27:22
27:22,25 28:3
28:3,6,22 29:1
29:4,10,15,19
29:23 30:5,10
30:23 31:3,24
32:19 33:1,17
34:4,9,12,12
34:14,20 36:9
36:16 37:1,3
37:18,22,25
38:9,12,15,18
38:21,21 39:4
39:9,9,18,21
40:3,6,11,21
41:1,16,25
42:3 43:6,9,11
43:13,21
44:11 46:7
47:16,22 48:4
48:7,13,20,23
49:1,18 51:17
52:5,13,16,22
52:25 53:10
53:13,16
54:14 55:17
56:25 59:2,10
59:21 60:12
60:15,18,22
60:25 61:2,11
61:21 62:3
61:3 22:25
64:4,7,13 65:7
65:16 66:25
67:8,25 68:3
69:4,10,14
70:8 71:6,12
71:12,21
73:12,15 74:5
74:19,22 75:3
75:6,8,11,14
75:19 76:7,9
77:16 79:7,13
80:5,9,12
82:12,15,18
83:14 84:23
85:2 86:24
87:11,15 88:4

88:9,11,14,23
89:1,5,19 90:4
90:9,18,23
91:1,6,17 92:3
92:24 93:15
94:15,19 95:7
96:5,19 98:10
98:22 99:24
100:4,7,13
101:16 102:19
102:25,25
103:3,6,16
104:10,15,17
107:20 108:14
108:17,22
109:4,12,15
110:11,21
111:11,21
112:5,17,25
113:3,6,21
115:11,15,19
115:22,25
116:3,15
117:9
**sit (4)**
15:19 97:16
102:12 114:18
**site (1)**
88:19
**six (1)**
92:10
**slang (1)**
20:20
**sleeping (4)**
78:14,16,22,25
**small (1)**
52:8
**smooth (1)**
116:7
**social (1)**
36:3
**solemnly (2)**
7:9,15
**somebody (7)**
26:22 44:24
58:11 63:13
97:21 101:2
103:15
**sorry (37)**
8:8 16:7 24:25
26:13 28:17
32:10 39:1,23
42:23 43:17
43:24 45:17
45:23 48:16
50:7 56:3 59:5
70:15 76:2
81:24 85:12

86:21 90:3
94:23 95:11
95:19 97:24
98:5,12 99:5
102:12 106:6
110:9 111:22
112:16 114:9
117:1
**soul (1)**
81:5
**sound (1)**
26:20
**Sounds (2)**
42:25 104:23
**South (1)**
3:9
**Spanish (1)**
18:22
**speak (5)**
18:14 20:20,22
21:15 69:14
**speaking (6)**
18:7 19:1 21:2
21:21 31:18
93:17
**speaks (6)**
11:24 17:24
18:21 20:14
20:17,24
**specific (2)**
45:3 57:19
**specifically (3)**
14:10 44:20
57:10
**speculate (1)**
101:7
**speculating (1)**
91:5
**speculation (2)**
59:14 78:2
**spell (3)**
8:15,18 50:15
**spoke (7)**
17:25 20:15,17
63:9 107:24
108:16 109:15
**spoken (2)**
34:22 109:6
**ss (1)**
119:2
**stamped (1)**
102:13
**stand (1)**
51:1
**start (8)**
7:3 23:17 32:5
68:13 111:23
111:25 112:1

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 73 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 35 of 38

Page 11

112:6
**started (8)**
23:22 24:6,12
24:17 71:19
87:2,7 112:11
**state (10)**
6:25 7:9,15 8:15
21:17 44:7
56:22 118:13
119:2,7
**stated (1)**
83:12
**statement (9)**
5:9,11,15 21:13
65:1,1,18 67:3
70:4
**statements (1)**
65:21
**States (8)**
2:1 6:21 22:14
22:16,21
23:13,18
25:15
**stating (2)**
48:1 65:2
**status (3)**
74:6,7 75:17
**stenographic ...**
6:13
**stenographica...**
119:22
**steps (1)**
110:20
**steward (9)**
45:18 54:19
59:17,23 60:3
60:5,8 105:25
106:1
**stipulation (1)**
36:2
**stipulations (1)**
117:25
**stop (4)**
19:25 35:10
114:5,16
**street (5)**
3:4,9 17:21 19:3
20:20
**stress (3)**
86:19 110:14
113:10
**stressful (1)**
113:13
**strike (2)**
15:13 51:3
**stuff (2)**
97:5,11
**subject (1)**

117:18
**submit (16)**
57:3,4,7,8,11,14
58:3,16,22
71:7,22 72:23
73:1,2,5,10
**submitted (10)**
39:5,7 49:16
57:6 58:10
60:6 70:24
71:5,20 73:14
**submitting (2)**
57:24 58:20
**substantive (1)**
12:22
**suffered (1)**
113:8
**suicide (1)**
113:12
**Suite (1)**
3:9
**super- (1)**
68:2
**superiors (1)**
49:24
**supervise (1)**
26:9
**supervisor (41)**
25:21,24 27:21
29:13,24 30:7
30:11,20,25
31:4,7,22 32:4
32:6,7,16,18
32:20 33:4,12
33:14 34:22
37:21 43:8,10
46:9,18 52:19
56:18,20,20
67:13 68:2
103:10,23
104:1,3
107:18 115:17
115:21 117:5
**supervisors (15)**
28:8,14,20,24
29:3,6,17,18
29:22 30:1,9
30:15 116:20
116:24 117:8
**supervisory (8)**
25:3,7,9 26:11
27:10,16,20
29:20
**support (1)**
29:13
**supports (2)**
91:7,14
**supposed (1)**

103:24
**sure (36)**
15:10 17:2,20
20:3 24:11
25:5 28:12
30:4,6 31:7,15
31:20 34:1
42:6 49:6
53:23 58:19
59:7 61:15
62:21 68:7
73:7 74:25
82:1,7 87:16
90:5,19 91:13
94:6 96:20
100:23 104:21
106:8 110:11
115:5
**suspend (12)**
21:18,18,22
89:8,22 90:12
90:25 92:7
93:2 94:2,9,18
**suspended (33)**
36:20 37:12,23
70:14,19 71:2
72:9 73:14,17
73:20 75:13
75:15 76:20
76:24 77:7,16
78:8,13,21
79:6,8 84:1,4
84:12,21
85:13 86:16
86:22 87:13
87:20 89:17
95:14 98:16
**suspension (23)**
77:2,11,15,19
77:24 78:11
80:15,16,24
82:5,11 83:21
84:8 85:15
87:2,5,8,18
89:13 90:10
91:8 92:14
95:4
**Swissport (16)**
14:8,9,11,16,20
14:23 15:7,15
15:25 23:24
23:24 24:9,13
79:12,15
117:21
**sworn (6)**
6:5,9 19:9,16,21
119:14
**symptoms (1)**

113:16
**system (1)**
93:19

_____

**T**

**T (2)**
4:8 5:1
**Tagalog (33)**
3:13 6:6,6 7:11
7:11 9:16 17:9
17:11,16,19
17:20,22,22
17:24,25 18:4
18:5,7,16,21
18:23 19:8,17
19:17 20:3,7
20:14,17,18
20:24 31:12
31:14 110:2
**take (21)**
11:9 13:19,23
22:3,4,6 33:24
34:3 38:7
39:16 42:15
42:21 62:1,5
67:15 79:2
81:8 104:19
110:15 111:10
113:21
**taken (8)**
2:16 8:7,21 9:2
9:5 78:24
109:16 110:20
**talk (8)**
40:8 69:11 74:9
77:21 78:10
105:19,19,23
**talked (6)**
73:9,20 74:3
75:16 106:20
107:1
**talking (3)**
10:21 26:7
33:21
**technology (1)**
118:7
**tell (17)**
12:6 33:20
64:25 67:9,24
68:1,4,7 72:4
85:22 86:4
87:22 88:15
92:6 93:6
101:8 108:12
**telling (5)**
58:25 67:5
77:22 93:22
109:5

**term (1)**
18:18
**terminate (7)**
90:15,20 92:7
93:1 94:2,9,18
**terminated (23)**
15:15 55:5,8,13
79:10 81:20
87:4,14,24
88:3 91:22
92:22 93:10
91:3 107:10
108:25 109:3
109:8 110:16
110:18 112:8
112:13 115:10
**terminating (1)**
88:16
**termination (...**
27:24 33:14
55:7,12 81:18
82:2,9,14,16
87:6,9,18,25
88:25 89:3,5
89:24 90:2,6,8
91:16 92:14
95:4 105:18
105:21,22
106:4,11,19
107:3,9,13,23
108:3,8,21,24
109:1,14
110:8,13,21
111:6 112:10
112:15 113:8
114:8
**terms (1)**
19:4
**testified (2)**
6:10 93:21
**testify (1)**
107:11
**testifying (2)**
11:10 41:7
**testimony (29)**
7:16 13:1,8,11
13:16 35:6
48:8 54:24
56:14 73:3,8
77:17 80:10
80:18 81:20
82:3 83:4,16
83:22 84:4
94:14 96:8
97:6 100:14
100:20 101:2
101:14 119:22
119:24

**text (17)**
55:25 56:8,15
61:1,3,9,17
70:2,6 103:1
103:12 104:4
104:5,7,13
106:2,9
**text-message (...**
5:7 55:14 103:4
103:17
**texted (1)**
103:11
**texts (1)**
104:8
**Thank (5)**
7:19 20:11
66:12 81:10
104:24
**Thanks (1)**
7:25
**thing (4)**
18:16 87:3
99:14 101:17
**things (12)**
47:3,9,10 48:2
62:12,22
67:18,24
74:10 97:2
105:19 107:4
**think (30)**
9:21 10:3,15,20
10:20 15:23
17:17 26:22
32:21 33:17
44:8 46:8,16
47:2,5,13 49:3
49:8 50:23
54:22 55:2
66:21,23
86:12 92:19
102:10 103:8
108:24 116:5
118:4
**thinking (4)**
49:13 100:18
115:8 116:1
**third (1)**
52:17
**thought (2)**
58:2 109:3
**three (3)**
87:20 113:25
114:2
**three-page (1)**
52:2
**Thursday (3)**
2:17 6:1,17
**time (39)**

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 74 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 36 of 38

Page 12

6:18,24 9:1,4
11:3,24 14:1
22:5 24:2,19
24:24 25:23
42:21 43:7
51:9,18 55:5
56:15 62:4
71:1,7,19 79:2
80:13 83:18
84:3 85:12
86:13 87:12
87:17 88:5
89:16 95:13
95:14 100:24
112:22 114:4
116:12 118:6
times (4)
8:24 24:4
113:25 114:2
today (21)
11:5,9,12 12:15
13:1,8,12,16
13:19 21:22
54:15 56:11
60:23 64:23
66:17,24 80:8
97:16 101:17
102:12 114:18
today's (2)
6:17 117:22
told (58)
37:8,10,11
44:25,25 45:1
49:23 50:4,22
57:7,10,17,20
58:23,24
67:13 68:1
68:15,24,24
69:1,25 70:2
70:25 71:25
73:16 75:14
75:15 77:1,3
77:20 78:4
83:25 84:3,11
85:20,20,21
85:22 86:3
88:17,24 92:1
92:4,13,18,20
92:25 93:9,20
94:16 97:10
97:23 98:1,17
106:12,21
108:10
totally (1)
21:8
Tracy (9)
50:12,20 51:5
87:20 88:3,6,6

88:12,17
Tracy's (1)
87:24
traditional (1)
17:19
transcript (3)
12:20 119:23
120:2
transferred (1)
111:16
translate (4)
7:10 9:17,22
32:25
translated (2)
6:5 9:25
translation (1)
9:16
translations (1)
10:25
transmit (2)
98:11,13
treat (1)
113:15
truck (2)
78:14,23
true (23)
37:5 41:15 69:1
70:3 71:5
77:19 84:6
88:13 92:2
93:25 94:7,20
95:2 97:17
99:4,9 101:15
101:19 102:14
102:18 112:15
118:14 119:24
truth (3)
7:17,17,17
truthful (1)
11:13
try (5)
19:25 20:1 33:8
69:7 110:20
trying (7)
20:5,6 52:7
73:18 74:2
100:7 106:8
turn (1)
70:1
turned (1)
70:7
two (15)
17:21 24:2,4
41:12 45:16
45:17 54:24
75:20 78:10
81:4,6 104:12
112:21 116:15

117:9
two-page (2)
35:24 40:18
type (15)
14:4,10,22,24
22:20 23:5,11
25:2,6 42:18
43:14 65:14
77:9 99:19
101:10
typed (11)
5:15 99:1,13
100:15,18
101:5,13,15
101:19,24
102:3
types (1)
113:7
typewriter (1)
99:20
typewritten (1)
100:21

U

UNANSWER...
5:22
undermine (3)
30:8 47:6,14
undermining ...
29:25
understand (26)
11:8,12,23 12:5
12:9,17,23
16:11 17:18
18:4 19:20,22
20:2,3 21:1
22:10 24:1
25:17 26:1
31:12 46:23
48:10 100:8
109:24 110:1
115:5
understandin...
17:9,16 32:7,16
59:12,23 60:4
60:5 85:3,8
86:6 88:22
97:13
understood (2)
12:3,9
unemployed (1)
110:17
unemploymen...
112:15
unidentified (1)
88:12
union (9)
59:3,9,11,17,22

60:3,6 105:24
106:1
United (8)
2:1 6:21 22:14
22:16,21
23:13,18
25:15
universal (1)
93:4
university (2)
17:24 23:6
university-lev...
18:2
unknown (1)
108:15
unlawful (1)
108:24
unnecessary (1)
21:19
untrue (1)
80:11
Uriarte (94)
3:3 4:6 7:7,7
8:2,4 9:15,21
10:2,14,20
11:19 14:12
15:1,17 16:5,9
16:23 17:8,11
17:12,17 18:9
18:13,25
19:19,24
20:11,13,22
21:3,7,9,11,13
21:20 22:1
26:15,18,24
27:1 29:8
30:14 31:10
33:15 35:12
35:16 36:2,7
40:7 42:4,9,25
44:5,12 46:10
46:19 47:15
48:11 49:10
50:13,15,23
51:18,22 52:7
59:13 62:1,7
65:23 66:10
66:12,19 78:1
81:1,4,10 83:6
83:13 91:9
93:3,8,16 94:3
94:10 95:5
96:16 104:19
104:23 114:23
115:2 117:3
117:14 118:3
Uriarte's (1)
109:10

use (16)
13:20 17:18,21
17:23 18:3,16
18:19 19:4,4,7
19:11 20:23
20:24 21:24
61:1 76:5
usual (1)
17:20

V

v (1)
6:20
Vague (12)
11:19 16:5,7,24
29:8 30:14
33:16 46:10
47:15 49:11
65:23 81:1
valid (1)
33:13
validating (1)
39:8
Vargas (15)
57:6,12,17,20
58:14 71:1,2
74:18,20 75:5
76:12 83:20
83:20,25 98:1
various (4)
68:20 69:2,12
113:16
Vasquez (6)
105:24 106:4,10
106:15,23
107:3
vehicle (6)
75:24,25 76:5,7
76:8,10
venued (1)
6:21
verbally (1)
12:2
version (5)
99:3,8 101:19
101:24 102:4
video (6)
8:7 9:2,2 11:4
12:3 20:4
violating (1)
15:19
virus (1)
6:15
VOLUME (1)
2:15
vs (1)
2:7

W

wait (9)
44:5 56:14 71:1
74:1 77:21,22
78:5,5 83:25
waited (1)
78:10
want (29)
9:15 11:4 12:15
12:21 13:21
13:22 15:18
21:23,23 22:3
22:6 31:15
44:6 55:10
62:6,13 66:19
67:3 74:22
84:7 93:19
96:16 101:7,8
101:24 104:22
113:2 115:4
118:2
wanted (3)
8:14 19:3 86:13
wants (4)
33:20 58:6
66:22 86:12
Ward (192)
3:8 4:5 7:4,4,21
7:24 8:3,6,8
8:11 10:10,23
11:22 13:6
14:21 15:3
16:1,13 17:2
20:19 21:6,8
21:10,12,15
21:22 22:7,9
24:11,16 25:5
26:20 27:2,4,6
27:12,18
28:12,18
29:11 30:4,6
30:17,24
31:20 32:12
32:15 33:2,8
33:10,18 34:1
34:18 35:5,10
35:14,17,23
36:6,10 37:14
38:1,6 39:10
39:15 40:1,12
40:17,23
41:17,22 42:6
42:10,14,21
43:1,3,19 44:1
44:15 46:1,15
46:22 47:17
47:23 48:14
48:18 49:6,14

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 75 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 37 of 38

Page 13

50:1,9,19 51:3
51:20,24
52:10 53:6,17
53:21,23,25
54:5,11 55:18
55:23 56:3,10
57:18 58:9,18
58:19 59:7,18
59:25 60:1
61:22 62:4,8
62:11 64:11
64:12,14,19
65:9,13 66:1,5
66:11,13,23
67:1 70:16,17
71:3 72:18
73:7 76:2,4
78:6 79:18,24
80:3,4,6 81:8
81:11,13,25
82:1,19,24
83:9,15 86:15
87:16 90:5
91:13 93:5,14
93:18,24 94:6
94:12 95:1,8
95:13,18 96:1
96:12,20 98:7
98:13,19 99:7
102:16,20
104:21,24
105:1,7 106:8
106:14 109:23
110:11 111:24
112:3,18
114:11,21,25
117:15 118:4
**warning (5)**
4:18,20,23,24
42:19
**wasn't (3)**
76:25 83:10
101:14
**way (5)**
11:6 24:5 97:17
97:19 116:5
**we'll (8)**
19:24 20:1
39:10 41:17
42:10 62:9
81:9 117:21
**we've (1)**
62:1
**Webex (2)**
2:15 7:3
**weeks (1)**
116:15
**went (9)**

17:24 73:24,24
75:7 79:9
87:24 98:17
113:24,25
**West (2)**
42:22,23
**white (2)**
91:3,19
**whoa (4)**
21:6,6,6,6
**William (1)**
108:3
**witness (72)**
7:2,18 9:18
10:13,18,22
11:21 13:4
14:13 16:12
16:25 17:10
17:15 19:19
20:10 24:15
29:10 30:5,23
33:1,17 35:3
36:9 37:10
40:11 44:7,11
44:14 46:14
46:20 47:16
47:22 48:13
49:12,22
50:14,16 52:9
57:16 58:7
59:15 62:3
64:13 65:10
65:24 66:25
70:23 78:3
80:5 81:2 83:7
83:14 86:12
91:11 93:20
93:22 94:5,11
95:7,17 96:18
98:16 102:21
106:12,13,18
107:25 108:4
108:11 112:1
119:14,24
**witnesses (1)**
105:11
**word (5)**
18:17 30:3
47:21 66:20
66:20
**word-process...**
100:21
**words (22)**
9:16 17:24
18:23 19:12
19:12,15 20:8
20:9,23,24
28:17 42:1

48:24 76:8
80:18 85:7
86:18 88:10
97:2 103:25
109:2 112:14
**work (19)**
24:20 26:8 28:8
28:14,20,21
29:17,22 34:6
37:13 39:5
67:16 68:12
86:16 87:4
107:16 110:14
110:15,20
**worked (7)**
23:20,23 24:1
24:19,21
86:22 87:9
**workers (3)**
69:7 79:1
116:18
**working (7)**
24:23 71:8,8
78:25 111:16
112:12 115:7
**workplace (2)**
116:14,22
**worth (1)**
18:20
**write (7)**
56:24 96:8 97:6
97:14,20,21
98:1
**writes (1)**
69:5
**written (3)**
89:5 96:24 97:3
**wrong (2)**
47:3 48:2
**wrote (13)**
57:4 65:12
69:16,25
96:14,22 97:3
97:8,15 98:20
100:15,17
101:12

---
**X**
**X (3)**
4:1,8 5:1
**XX (1)**
120:2

---
**Y**
**yeah (10)**
10:2,18,19 15:2
15:17 17:12
51:1,22,23

93:16
**year (2)**
112:4 114:20
**years (3)**
25:18 51:12,12
**Yep (1)**
35:17

---
**Z**

---
**0**
**000001 (1)**
5:17
**000014 (1)**
5:17

---
**1**
**1 (25)**
2:9 4:10,11,17
4:19,23,25 5:6
5:8,10,12,14
5:15 34:7,15
34:19 35:7
36:8 62:16
63:11 64:5
95:21 96:9,22
99:22
**1:00 (2)**
68:12,13
**1:30 (2)**
62:7,9
**1:50 (1)**
68:12
**10 (8)**
2:9 5:7,24 51:20
51:23 55:19
55:20 62:20
**10:00 (1)**
68:11
**105 (1)**
5:20
**11 (5)**
5:9 64:14,16,21
102:22
**11-7-18 (1)**
103:19
**11:00 (2)**
73:25 74:24
**11:24 (1)**
42:23
**11:30 (1)**
42:22
**11:35 (1)**
42:24
**115 (1)**
4:6
**12 (5)**
5:11 66:5,7

103:9 108:20
**12:00 (1)**
68:10
**12:30 (1)**
62:6
**126 (2)**
42:7 62:18
**127 (1)**
62:18
**13 (6)**
5:13 79:19,20
80:1,7 104:13
**135 (1)**
62:18
**136 (1)**
62:18
**139 (1)**
62:17
**14 (9)**
5:15,17,24
15:11 82:20
82:21 83:11
95:21 104:13
**140 (1)**
62:17
**143 (1)**
62:16
**144 (1)**
62:16
**146 (1)**
62:16
**15 (9)**
5:16 51:21
95:19,22 96:3
98:21 101:23
102:17,21
**150 (3)**
53:18 54:6
62:19
**152 (4)**
51:25 53:8 54:2
62:19
**154 (3)**
52:1 54:2 62:19
**16 (5)**
5:11,18 53:11
105:2,4
**18 (3)**
4:11,20 63:20
**19th (1)**
112:2

---
**2**
**2 (16)**
4:12,14,21
35:18,20
36:12,14,17
36:21 37:17

37:19,19
62:16 101:23
102:13,17
**2:00 (2)**
68:10,11
**2:30 (1)**
81:9
**20 (1)**
92:8
**2005 (5)**
22:17 23:20,22
23:23 24:20
**2007 (3)**
4:11 9:6 34:21
**2008 (1)**
9:6
**2009 (4)**
4:16,18 38:11
40:4
**2010 (2)**
4:20 41:11
**2012 (1)**
4:23
**2013 (4)**
4:24 15:10,11
42:19
**2014 (1)**
15:11
**2015 (2)**
15:11 23:24
**2016 (4)**
23:25 24:18,20
25:19
**2018 (6)**
5:11 60:16,20
60:24 61:3
112:9
**2020 (5)**
2:18 6:1,17
112:4 120:8
**2093(b) (1)**
119:13
**213 (2)**
3:10,10
**23 (3)**
2:18 6:1,17
**26(a)(1) (1)**
5:19
**2760 (1)**
3:4
**28 (1)**
119:20
**28(a) (1)**
119:15
**28(a)) (1)**
119:10

---
**3**

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 76 of 281
Case 3:19-cv-08157-VC   Document 60-7   Filed 01/22/21   Page 38 of 38

Page 14

**3 (8)**
4:15,23 5:4,20
  38:2,3 62:17
  105:24
**3:00 (1)**
74:14
**3:19-cv-08157...**
2:7 6:23
**3:37 (1)**
104:21
**3:45 (1)**
104:22
**30 (3)**
4:16,18,24
**30(e)) (1)**
120:5
**30(f)(1)) (2)**
119:15,25
**301298 (1)**
3:13
**3300 (1)**
3:9
**34 (1)**
4:11
**35 (1)**
4:14
**38 (1)**
4:17
**39 (1)**
4:19

─────── **4** ───────
**4 (6)**
4:18 39:11,12
  39:19 62:17
  120:8
**4:23 (2)**
2:17 118:8
**40 (1)**
4:21
**41 (1)**
4:23
**415 (2)**
3:5,5
**42 (1)**
4:25
**486-0065 (1)**
3:10

─────── **5** ───────
**5 (6)**
4:20 40:13,14
  41:3,15 62:17
**5:00 (3)**
68:12,13 73:25
**54 (2)**
5:4,6
**555 (1)**

**3:9**
**56 (1)**
5:8

─────── **6** ───────
**6 (6)**
4:22 41:18,19
  42:2,5 62:18
**6:00 (2)**
68:10,10
**64 (1)**
5:10
**66 (1)**
5:12
**695-1000 (1)**
3:5
**695-1006 (1)**
3:5

─────── **7** ───────
**7 (8)**
4:5,24 42:10,11
  51:25 52:21
  54:3 62:18
**7:00 (2)**
73:25 74:24
**79 (1)**
5:14

─────── **8** ───────
**8 (7)**
5:3 53:18 54:3,8
  62:19 63:3
  108:20
**82 (1)**
5:15
**84 (1)**
82:20
**8570 (2)**
2:19 119:8
**86 (1)**
64:15
**88 (2)**
55:19 62:20
**89 (2)**
66:6,11

─────── **9** ───────
**9 (10)**
5:5 54:7,8,12,16
  55:6,11 59:16
  60:3 62:19
**9:41 (3)**
2:17 6:2,18
**90071-2411 (1)**
3:9
**94110 (1)**
3:4

**95 (1)**
5:17
**972-4500 (1)**
3:10
**99 (1)**
79:19

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

83

1              IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6                    Plaintiff,

7   v.                                  No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
                     Defendants.
11  _____/

12  Zoom Remote Deposition of

13       ANDREW DODGE

14   Tuesday, July 28, 2020

15     **CERTIFIED COPY**

16

17

18

19

20  REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23           NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
24         San Francisco, California 94103
                 (415) 398-1889

25

84

```
 1                        I N D E X

 2                                          Page Number

 3   EXAMINATION BY MR. URIARTE                  4

 4                     ---oOo---

 5                   E X H I B I T S

 6   Plaintiff's

 7   Exhibit 3      Copy of two photographs     26

 8   Exhibit 5      Statement by Andrew Dodge   42
                    dated 8-16-18
 9
     Exhibit 8      Petition from Menzies       33
10                  fuelers to Menzies
                    Management
11
     Exhibit 10     Statement by Rafael         40
12                  Vasquez dated 11/18/18

13                     ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

85

1          BE IT REMEMBERED that, pursuant to Notice of

2     Taking Deposition and on Tuesday, the 28th day of July,

3     2020, commencing at the hour of 9:00 o'clock a.m.

4     thereof, via Zoom videoconference, before me, CINDY

5     TUGAW, a Certified Shorthand Reporter in the State of

6     California, personally appeared,

7                    ANDREW DODGE,

8     Called as a witness by the Plaintiff, having been by me

9     first duly sworn, was examined and testified as

10    hereinafter set forth.

11                    ---o0o---

12              APPEARANCES OF COUNSEL

13    For the Plaintiff
           LIBERATION LAW GROUP, P.C.
14         2760 Mission Street
           San Francisco, California 94110
15         BY:  ARLO GARCIA URIARTE, Attorney at Law
           (415) 695-1000
16

17    For the Defendants
           FOLEY & LARDNER, LLP
18         555 California Street, Suite 1700
           San Francisco, California 94104
19         BY:  JASON Y. WU, Attorney at Law
           (415) 984-9848
20

      Also Present:  David Ho, Zoom Host.
21
                      ---o0o---
22

23

24

25

86

1    Q.   Did Mr. Lal ever tell you that he was doing

2    that as part of, you know, investigating these

3    petitions against you?

4    A.   No.  He one time mentioned that Ray was

5    complaining, so he just wanted to see what I did

6    compared -- you know, compared to other supervisors and

7    how they were doing their schedules.

8    Q.   I see.  And -- okay.  And out of those

9    meetings, was any kind of -- was there any

10   recommendation given to you as to, like, do your job

11   better, or was there any comment or anything like that?

12   A.   I don't recall what he said to me at all.

13   Q.   Did you have to change the way you were doing

14   things in order to give your breaks better or something

15   like that?

16   A.   No.  Up until March, I was doing the same way.

17   Q.   And you're saying up until March of 2020?

18   A.   Yeah, until I got furloughed, yes.

19   Q.   Okay.  Also in Exhibit 10, it says, "I have

20   spoken to The Menzies Aviation Fueling Director Raul

21   Vargas on three separate occasions regarding Mr. Dodge,

22   who continues to abuse his authority and at times

23   harass Fuelers under his charge."

24        Do you see that?

25   A.   Yes, I do see that.  Yeah.

1      Q.   What do you think -- what's your opinion on

2 that with regard to Rafael Vargas stating that you

3 continue to abuse your authority?

4      Do you know anything about that?

5      A.   I mean --

6      MR. WU:   Objection.   Assumes facts not in

7 evidence.

8      But you can answer.

9      MR. URIARTE:   Q.   Mr. Dodge?

10      A.   Sorry.   Okay.   I -- I mean, from when I see

11 that, I can tell you that's just not true.   I mean,

12 I've never harassed any of my employees or any of that

13 type of circumstance.

14      Q.   I see.   When you say -- when it says "abuse

15 his authority," like how would you be able to abuse

16 your authority during your shifts?

17      A.   Honestly, I don't know how I could abuse my

18 authority to this current day.   I'm still a supervisor

19 here --

20      Q.   I see.

21      A.   -- with the same employees.

22      Q.   I'm sorry.   What was that?

23      A.   I said I'm still a supervisor here with the

24 same employees.

25      Q.   Okay.   And have any fuelers gotten a complaint

DEPOSITION OF ANDREW DODGE - 07/28/2020
Case 3:19-cv-08157-VC Document 60-3 Filed 01/22/21 Page 6 of 6

1    against you that you were harassing them?

2        A.   No.

3        Q.   Have any of the fuelers ever come up to you

4    and said, hey, Andrew, you know, you're doing this

5    wrong, or, you know, complained to you about not giving

6    their breaks, or them working too hard because you're

7    not doing your job?  Anything along those lines?

8        A.   I've had fuelers just come up to me and try

9    to, like, give suggestions on how they want to -- how

10   they see things -- on how they see things, but, you

11   know -- and then I have to explain to them what's going

12   on, and I'd show them, and they would understand.

13   That's about it.

14        But I've never had -- I've had someone coming

15   up to me asking when they would get their break, and I

16   would explain to them as well, you know, the situation,

17   and they would understand.

18        Q.   I see.  All right.  Can we go back to Exhibit

19   5, please.  Okay.  I know it's hard to read, but I was

20   going to start with -- well, that first sentence kind

21   of ends with "the company don't need me, that I'm a bad

22   supervisor, and all I do is cause delays."

23        What do you mean by that, "all I do is cause

24   delays"?

25        MR. WU:  Objection.  Objection.  Assumes facts not

1              IN THE UNITED STATES DISTRICT COURT

2         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6                   Plaintiff,

7    v.                                No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,
10
                    Defendants.
11   _____/

12   Zoom Remote Deposition of

13        JOHN QUALLY

14    Monday, July 27, 2020

15         Volume I

16     (Pages 1 through 32)

17     **CERTIFIED COPY**

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24            NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
           San Francisco, California 94103
25              (415) 398-1889

DEPOSITION OF JOHN QUALLY 03/27/2020

```
 1                        I N D E X

 2                                          Page Number

 3    EXAMINATION BY MR. URIARTE                4

 4                   ---oOo---

 5                 E X H I B I T S

 6    Plaintiff's

 7    Exhibit 1      Plaintiff Renaldo            9
                     Navarro's Notice of
 8                   Deposition of John
                     Qually
 9
      Exhibit 2      Missed Punch Form           28
10

11                   ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

91

DEPOSITION OF JOHN QUALLY - 07/27/2020

1          BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Monday, the 27th day of July,

3    2020, commencing at the hour of 8:58 o'clock a.m.

4    thereof, via Zoom videoconference, before me, CINDY

5    TUGAW, a Certified Shorthand Reporter in the State of

6    California, personally appeared,

7                      JOHN QUALLY,

8    Called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                    ---o0o---

12            APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                      ---o0o---
22

23

24

25

92

DEPOSITION OF JOHN QUALLY 03/27/2020

```
 1    managers, is that what it was?

 2         A.  Yes.

 3         Q.  And how many duty managers were there at that

 4    time?

 5         A.  Four.

 6         Q.  Four duty managers.  And then with regards to

 7    you, were the supervisors assigned to specific duty

 8    managers or was it just who the duty manager was on

 9    that day?

10         A.  It was basically the manager who was on duty

11    that day.

12         Q.  So then if you were working on a shift wherein

13    Mr. Navarro was there, then you would be supervising

14    Mr. Navarro.  That's how it worked?

15         A.  Yes.

16         Q.  Gotcha.  And then, so it's the supervisors,

17    then the duty managers, and then who else above the

18    duty managers?

19         A.  It would be the general manager.

20         Q.  And then anybody above the general manager?

21         A.  Now we have a director.

22         Q.  So there is a director on-site now?

23         A.  Yes.

24         Q.  But in 2018, no?

25         A.  Not that I recall, no.
```

1    head at this time.

2        Q.  Okay.  Great.  Thank you very much.

3            And then there was a person by the name of

4    Jeff who was from Seattle who was helping out.  Do you

5    remember that?

6        A.  Jeff Stevenson, yes.

7        Q.  And what was his role, do you remember?

8        A.   To the best of my knowledge, he was in town

9    helping out the new managers, you know, director and

10   GM, get into the station, to the best of my knowledge.

11   But I never -- you know, he had multi different tasks

12   in this station, but what his actual role was, I don't

13   know.

14       Q.  Okay.  Sounds good.  Were you involved in the

15   decision-making with regards to the suspension for Ray

16   Navarro?

17       A.  No.

18       Q.  So you were not asked by any of the managers,

19   "Hey, what's your opinion on this, do you think it's

20   correct for us to suspend Mr. Navarro?"

21       A.  No.

22       Q.  No, okay.  Were you at the meeting where Ray

23   Navarro was -- where it was communicated to Ray Navarro

24   that he was going to be suspended?

25       A.  No.  If you -- no.

1        MR. WU:  And, John, we don't want you to guess

2   today.  It's a forbidden word that makes attorneys'

3   ears perk up a little bit.

4        THE WITNESS:  Yeah.

5        MR. WU:  If you have an idea, please let us know,

6   but, otherwise, don't guess.

7        THE WITNESS:  Okay.

8        MR. URIARTE:  Q.  What about with regards to the

9   termination?  Were you involved at all in the

10  decision-making behind the decision to terminate Ray

11  Navarro?

12       A.  No.

13       Q.  So nobody asked for your opinion?  You never

14  gave your opinion?

15       A.  No.

16       Q.  Did you do any investigation or ask around,

17  anything like that?

18       A.  No.

19            (Discussion off the record.)

20       MR. URIARTE:  Q.  Do you remember seeing the

21  petition that was going around against Andrew Dodge

22  before Mr. Navarro was terminated?

23       A.  No.

24       Q.  So what about today, like, have you seen that

25  petition today?  Have you seen it since his termination

1   at all?

2       MR. WU:  I'm going to object here on grounds of

3   attorney-client privilege and instruct the witness to

4   answer only as to whether he's seen the document

5   outside of any confidential or communications with his

6   attorneys.

7       MR. URIARTE:  Q.  That's correct, Mr. Qually, yes.

8   So my question really is whether you've ever seen the

9   -- either of the petitions, either of the two petitions

10  that were circulated, and not because your attorney

11  showed it to you but because of other events.

12      A.  As I said, no.

13      Q.  Would it be accurate to state that as a duty

14  manager, that Andrew Dodge is an employee that you

15  would have been supervising?

16      A.  At some point, yes.

17      Q.  And so it wasn't like an interest of yours to

18  figure out what it is that the fuelers were complaining

19  about against Dodge?  That wasn't an interest of yours?

20      MR. WU:  Objection.  Vague.

21      You can answer if you understand the question.

22      THE WITNESS:  I did not hear complaints directly

23  from the fuelers.

24      MR. URIARTE:  Q.  Okay.  So you're saying none of

25  the fuelers ever came up to you and said, hey, these

96

DEPOSITION OF JOHN QUALLS, VOLUME 1   07/28/2020

1    started serving the suspension?  Do you see what I'm

2    saying?

3         A.   He -- best of my knowledge, he had not served

4    his suspension.

5         Q.   So he didn't start serving the suspension

6    until you tried to serve him the suspension notice, is

7    that correct?

8         A.   To the best of my knowledge, yes.

9         Q.   Okay.  Did you leave him with a copy?

10        A.   He had a copy, yes.

11        Q.   When you say he had a copy, was the copy --

12   the copy that he had, that came from you or --

13        A.   He took a picture of it with his phone.

14        Q.   I see.  Okay.  So, okay.  All right.  And then

15   let me just read under goal and the expectation part

16   there, it says, "It is expected that employees will

17   follow all policies and procedures.  Failure to follow

18   Company policies and procedures will result in further

19   disciplinary action up to and including termination."

20             Do you read that?

21        A.   Yes.

22        Q.   Are you knowledgeable at all with regards to

23   the policies and procedures that this notice was

24   talking about?

25        A.   Directly, no.

1      Q.  It says "Failure to follow Company policies

2   and procedures..."  Do you know what company policies

3   and procedures that he failed to follow?

4      A.  Let's see.  I can't remember off my head, no.

5      Q.  Do you have an opinion as to why he was

6   suspended or terminated from Menzies, like, do you know

7   the specific violation that he may have violated?

8          Do you have any kind of memory as to that, or

9   what's your memory with regards to that?

10     MR. WU:  Objection.  Compound.  Lack of

11  foundation.

12         You can answer if you understand the question.

13     THE WITNESS:  Can you repeat it.

14     MR. URIARTE:  Q.  Yeah.  So sitting here today and

15  looking back at the suspension and the termination, we

16  know that Menzies -- Menzies' position is he violated

17  certain policies and procedures, right?

18         So just kind of talking about that, do you

19  have a memory or an understanding in your head what it

20  is that Mr. Navarro actually violated to justify his

21  termination?

22     MR. WU:  Same objection.

23     THE WITNESS:  To justify, looking back now?

24     MR. URIARTE:  Q.  Yes.

25     A.  I can't think of it off my head, no.  I can't,

 1    me, but that's it.

 2        MR. URIARTE:  Q.  And did Mr. Dodge have any

 3    opinion or did he kind of have his position as to why

 4    these breaks were short -- I mean, the breaks weren't

 5    happening, or the breaks were late, or anything like

 6    that?

 7            Did Andrew Dodge try to explain himself as to

 8    why those things were happening?

 9        MR. WU:  Objection.  Assumes facts not in

10    evidence.

11        THE WITNESS:  Yes.

12        MR. URIARTE:  Q.  And what would he say in those

13    discussions?

14        A.  He gave me the explanation of what happened

15    during the night and why some fuelers weren't able to

16    get a longer break than they did or any break at all.

17    And that's it, you know.

18            We -- there is a policy where, if they don't

19    get a break, they get a missed meal penalty.  So they

20    get paid for their lunch.

21        Q.  Did you ever have a discussion with a Rafael

22    Vasquez about Andrew Dodge?

23        A.  I might have at one point.  I don't recall.

24        Q.  And what do you remember as to that

25    discussion?

1    MR. WU:  Objection.  Lack of foundation.

2    THE WITNESS:  I don't recall what was talked about

3 in that conversation.

4    MR. URIARTE:  Q.  So -- okay.  So let's just kind

5 of clarify.  Are you saying maybe you had a discussion

6 with him about Andrew Dodge and maybe not?  Or you may

7 recall a particular discussion, you just don't remember

8 the contents of it?  Is that -- yeah, can you just

9 clarify the nature of your memory?

10    A.  We probably had a conversation, but what we

11 talked about, I don't recall.

12    Q.  Let me show you Exhibit 10.  So Exhibit 10 is

13 a statement from Rafael Vasquez, I guess, about his

14 efforts to talk to Raul Vargas about something about

15 Andrew Dodge.  If you see the date below, it says

16 November 2018.  Do you see that?

17    A.  Yes.

18    Q.  Does this refresh your recollection as to

19 about when you may have talked to Rafael Vasquez about

20 Andrew Dodge?

21    A.  No.  And, for the record, I have not seen this

22 before.

23    Q.  Okay.  Maybe another way of putting it is did

24 you talk to Rafael Vasquez before Mr. Navarro was

25 terminated or after his termination?  Do you remember

100

1    that at all?

2        A.  If I talked to Rafael, it would have been

3    before.

4        Q.  So here he says something about "I have spoken

5    to The Menzies Aviation Fueling Director Raul Vargas on

6    three separate occasions regarding Mr. Andrew Dodge,

7    who continues to abuse his authority and at times

8    harass Fuelers under his charge."

9            Do you have any information or knowledge with

10   regards to that allegation, "continues to abuse his

11   authority and at times harass Fuelers under his

12   charge"?

13           Does that ring a bell at all, Mr. Qually?

14       A.  No.

15       Q.  And in the complaint that you received against

16   Andrew Dodge, was there any type of language along

17   these lines or actions along these lines, like

18   harassing, abusing authority?

19           Was that the types of complaints that you

20   received?

21       A.  No.

22       Q.  So you received complaints about meal breaks

23   and rest breaks, but nothing about harassing fuelers,

24   right?  You never heard that type of complaint?

25       A.  Correct.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   RENALDO NAVARRO,

 6               Plaintiff,

 7   v.                              No.  3:19-CV-8157

 8   MENZIES AVIATION, INC.,
     doing business as MENZIES
 9   and DOES 1 through 10,
     inclusive,
10
                 Defendants.
11   _____/

12   Zoom Remote Deposition of

13        TRACY AGUILERA

14    Tuesday, August 25, 2020

15
```

**CERTIFIED COPY**

```
16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23
              NOGARA REPORTING SERVICE
24             5 Third Street, Suite 415
             San Francisco, California 94103
25                  (415) 398-1889
```

1                         I N D E X

2                                          Page Number

3      EXAMINATION BY MR. URIARTE                  5

4      EXAMINATION BY MR. WU                        48

5      FURTHER EXAMINATION BY MR. URIARTE          53

6                         ---oOo---

7                     E X H I B I T S

8      Plaintiff's

9      Exhibit 8      Petition to Menzies           26
                      Management from Menzies
10                    Fuelers

11     Exhibit 9      Termination notice for        48
                      Renaldo Navarro
12

13     Exhibit 11     Employee Performance          35
                      Development dated
                      8/29/2018
14

15     Exhibit 12     Email chain culminating       31
                      in an email from Raul
                      Vargas to Tracy Aguilera
16                    dated August 29, 2018

17     Exhibit 13     Menzies Aviation Code of      18
                      Conduct
18

19     Exhibit 14     Menzies Aviation Employee     21
                      Handbook California - 2017

20     Exhibit 15     Menzies Aviation Applicant    23
                      Declaration Form
21

22     Exhibit 17     Employee Performance          43
                      Development Steps to
                      Progressive Discipline
23

24     Exhibit 18     Job Description, Fueling      54
                      Supervisor (North America)

25

1                    I N D E X

2                   (Continued)

3   Plaintiff's                    Page Number

4   Exhibit 19    Letter from Rafael Vasquez      41
                  to whom it may concern
5                 dated 11/18/2018 with
                  attached petition
6
    Exhibit 20    Menzies Aviation Employee       44
7                 Handbook California - 2018

8                      ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1       BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 25th day of

3    August, 2020, commencing at the hour of 1:04 o'clock

4    p.m. thereof, via Zoom videoconference, before me,

5    CINDY TUGAW, a Certified Shorthand Reporter in the

6    State of California, personally appeared,

7                    TRACY AGUILERA,

8    called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                    ---o0o---

12             APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                    ---o0o---
22

23

24

25

<< NOGARA REPORTING SERVICE >>                    4

1              Did you read this part of the petition?  And
2     pertaining to July, August of 2018, did you read this
3     part of the petition?
4         A.  I believe I did.
5         Q.  And as an HR or human resources professional,
6     when you read this part of the petition, does that put
7     you in any type of concern?
8         A.  Disciplinary action and -- disciplinary
9     action -- let me back up here.
10             This was given to Raul.  In HR I had no issues
11    regarding Andrew's performance.  This was given to Raul
12    and we had Kevin Blumberg investigate it.
13        Q.  Okay.  Does the part about "looks like they
14    are always covering his mistake," referring to Nicco,
15    John and Renil, does that raise any red flags of
16    concern for you as the HR manager?
17        A.  No.
18        Q.  You were around when Mr. Dodge was promoted to
19    supervisor, correct?
20        A.  I believe so.
21        Q.  Meaning that he was a fueler for about a year,
22    then he received a promotion as a supervisor, is that
23    correct?
24        A.  Yes.
25        Q.  And for that promotion, were there other

1    people vying for that promotion?

2        A.   I don't know.  I don't remember.

3        Q.   Given that Mr. Dodge had only one year of

4    experience, do you remember any of the old-timers,

5    old-timer fuelers, also wanting to be a supervisor?

6    Does that refresh your recollection at all?

7        A.   Can you repeat the question.

8        Q.   Sure.  Mr. Dodge received a promotion to

9    supervisor after only one year of being a fueler.  At

10   that point there were many fuelers who had worked there

11   as fuelers for many, many years who also wanted to be a

12   supervisor.  Do you remember any of those --

13       A.   No, we post the position, they would apply for

14   the position, they would be reviewed by the manager,

15   and the person best qualified for the position would be

16   granted the promotion.

17       Q.   And for fueling supervisor, who would be the

18   manager that decides that?

19       A.   It would have been the -- between the general

20   manager and the director.

21       Q.   So it would have been Renil and John Qually or

22   Renil and the operations manager?

23       A.   It would have been Renil.

24       Q.   It would have been Renil.

25       A.   Uh-huh.

1        MR. URIARTE:  All right.  Let's go to the last, I

2    guess -- if we can go to Menzies 200, which is on the

3    bottom, David, a little bit more, like two pages down.

4    All right.  Go up a little bit, please.  Let's see the

5    date stamp.  There we go.

6        Q.  So, Ms. Aguilera, this string of emails, did

7    you provide this to your attorney?  Is this something

8    you printed out and provided to your attorney?

9        A.  I sent this to my manager.  I sent it to

10   Talin.

11       Q.  Gotcha.  All right.  So you see here it says,

12   "On August 27, 2018, at 5:11 PM Tracy Aguilera wrote."

13   Do you see that?

14       A.  Yes.

15       Q.  And then it says "Talin," and then it has

16   different points.  Do you see that?

17       A.  Yes.

18       Q.  Okay.  And then if we go down a little bit --

19   a little bit down, please, David -- here's the question

20   I have.  It says, "Now today, 10/27/2018 Raul Vargas

21   receives the same petition from Rafael Martinez, no

22   signature just wanting Andrew removed - I did not

23   attach it to this email."

24           Do you see that?

25       A.  Yes, I do, and that's a typo with the date.

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1    Q.   That's a typo with the date?

2    A.   Yeah, it shouldn't have been October.

3    Q.   Okay.  So it should have been October 27,

4    2018?

5    A.   No, I believe --

6    Q.   I mean -- yeah.

7    A.   I believe it should have been August 27th.

8    Q.   Okay.  So you believe that to be a typo?

9    A.   I believe so.

10   Q.   All right.  So are you saying that two days

11   before Mr. Navarro was terminated, Mr. Rafael Martinez

12   also gave Raul Vargas a petition asking Andrew to be

13   removed?

14   A.   Yes.

15   Q.   With regards to the suspension on August 20,

16   who recommended and approved the suspension?

17   A.   Raul Vargas and Kevin Blumberg.

18   Q.   Before the issue with the petition, did you

19   receive any complaints or did you hear about complaints

20   from fuelers against Andrew Dodge?

21   A.   Only from Rey.

22   Q.   Did you see the pictures that were circulating

23   of Mr. Andrew Dodge sleeping on the job?  Was that

24   something that you saw?

25   A.   Yes, I did see one.

1      Q.  Wasn't there another picture where he was kind

2  of like in a Menzies vehicle as well?

3      A.  That's the one I'm talking about.  He was in

4  the Menzies truck sitting outside.

5      Q.  And do you remember any kind of concern about

6  Andrew Dodge like causing delays to flights?  Was that

7  something that was discussed?

8      A.  No, it wasn't discussed with me.

9      Q.  What about Andrew Dodge causing fuelers to

10  miss breaks?

11      A.  No.

12      Q.  Did Andrew Dodge ever get some sort of

13  reprimand as a result of the petition?

14      A.  No.

15      Q.  Sitting here today, do you remember if any

16  kind of reprimand was ever issued -- has been issued to

17  Andrew Dodge?

18      A.  No.

19      MR. URIARTE:  Can we have Exhibit 19, please,

20  David.

21          (Plaintiff's Exhibit 19 marked for

22          identification.)

23      MR. URIARTE:  Q.  So Exhibit 19 starts with a

24  statement by Mr. Rafael Vasquez.  Do you see the

25  document, Ms. Aguilera?

```
1        A.  If I'm not mistaken, this is for the same
2   issue.
3        Q.  So no additional investigation was done?
4        A.  Not to my knowledge.
5        MR. URIARTE:  Now, let's go to Exhibit 17, please.
6            (Plaintiff's Exhibit 17 marked for
7            identification.)
8        MR. URIARTE:  Q.  Okay.  You see Exhibit 17, I
9   believe it's Employee Performance Development and Steps
10  to Progressive Discipline.
11           If you could go down a little bit, David, that
12  would be better.
13           This is a reverse pyramid here.  And you're
14  familiar with this, Ms. Aguilera?
15       A.  Yes, I am.
16       Q.  My question here really is how come
17  progressive discipline was not instituted?
18       A.  Harassment has zero tolerance.
19       Q.  And was it discussed as an option?
20       A.  I'm sorry?
21       Q.  Was it discussed as an option?
22       A.  Progressive discipline for harassment?
23       Q.  Yes.
24       A.  No.
25       Q.  Is that written somewhere where harassment,
```

111

1  the type Mr. Navarro was accused of, has zero

2  tolerance?

3      A.  Any type of harassment.

4      Q.  If we go back to Exhibit 19, at the bottom

5  here it says, "I have spoken to Menzies Aviation

6  Fueling Director Raul Vargas on three separate

7  occasions regarding Andrew Dodge, who [continues] to

8  abuse his authority and at times harass Fuelers under

9  his charge."

10         Was that type of harassment investigated?

11     A.  I can't tell you -- I didn't see the

12  investigation, but this was turned over to Kevin

13  Blumberg.

14     MR. URIARTE:  Okay.  Aside from the employee

15  handbook, Jason, I have no further questions.

16     MR. WU:  Arlo, can we go off the record for a

17  second?

18     MR. URIARTE:  Sure.

19         (Brief recess.)

20         (Plaintiff's Exhibit 20 marked for

21         identification.)

22     MR. WU:  Can we go back on the record now?

23     THE REPORTER:  Yes.

24     MR. WU:  Earlier in the deposition, Mr. Uriarte

25  asked Ms. Aguilera about a document that was described

1          IN THE UNITED STATES DISTRICT COURT

2       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    RENALDO NAVARRO,

6              Plaintiff,

7    v.                              No.  3:19-CV-8157

8    MENZIES AVIATION, INC.,
     doing business as MENZIES
9    and DOES 1 through 10,
     inclusive,

10
              Defendants.
11   _____/

12   Zoom Remote Deposition of

13       RAUL VARGAS

14    Tuesday, August 25, 2020

15      **CERTIFIED COPY**

16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24           NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
          San Francisco, California 94103
25              (415) 398-1889

```
 1                    I N D E X

 2                                      Page Number

 3   EXAMINATION BY MR. URIARTE                4

 4   EXAMINATION BY MR. WU                     73

 5   FURTHER EXAMINATION BY MR. URIARTE        74

 6                    ---o0o---

 7                E X H I B I T S

 8   Plaintiff's

 9   Exhibit 1     Plaintiff Renaldo            9
                   Navarro's Amended Notice
10                 of Deposition of Raul
                   Vargas
11
     Exhibit 8     Petition to Menzies         26
12                 Management from Menzies
                   Fuelers
13
     Exhibit 9     Termination notice for      60
14                 Renaldo Navarro

15   Exhibit 11    Employee Performance        61
                   Development dated
16                 8/29/2018

17   Exhibit 12    Email chain culminating     66
                   in an email from Raul
18                 Vargas to Tracy Aguilera
                   dated August 29, 2018
19
     Exhibit 19    Letter from Rafael Vasquez  43
20                 to whom it may concern
                   dated 11/18/2018 with
21                 attached petition

22                    ---o0o---

23

24

25
```

```
 1              BE IT REMEMBERED that, pursuant to Notice of

 2    Taking Deposition and on Tuesday, the 25th day of

 3    August, 2020, commencing at the hour of 9:03 o'clock

 4    a.m. thereof, via Zoom videoconference, before me,

 5    CINDY TUGAW, a Certified Shorthand Reporter in the

 6    State of California, personally appeared,

 7                      RAUL VARGAS,

 8    called as a witness by the Plaintiff, having been by me

 9    first duly sworn, was examined and testified as

10    hereinafter set forth.

11                      ---o0o---

12              APPEARANCES OF COUNSEL

13    For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17    For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

      Also Present:  David Ho, Zoom Host.
21
                      ---o0o---
22

23

24

25
```

1  Q.  Okay.  And then with regards to forcing

2  employees to sign the petition, I saw those letters

3  from different employees, them saying whatever they're

4  saying, and then I saw the one from Andrew as well.  I

5  see that.

6  But did the investigation, or did you, ever

7  ask to talk to the fuelers?

8  A.  No.

9  Q.  Okay.  Did you ever ask to talk to the union

10 representative?

11 A.  Well, the union representative, he brought a

12 letter for me -- for me, too.

13 Q.  Right.  You mean like an additional petition,

14 is that what you're saying?

15 A.  It was a different letter.

16 Q.  What letter was that?

17 A.  It was pretty much the same as the petition.

18 Q.  Right.  But I think that -- I don't want to

19 confuse you.  We should probably maybe clear this up.

20 That second petition by Rafael Vasquez or Rafael

21 Martinez, right, is that what you're talking about?

22 A.  Yes.

23 MR. WU:  Objection.  Lack of foundation.

24 MR. URIARTE:  Q.  That second petition, that was

25 like already in October, wasn't it?

DEPOSITION OF RAUL VARGAS - 08/25/2020

1   feedback and it's becoming a little unclear.

2       THE WITNESS:  Okay.

3       MR. URIARTE:  Q.  Did you ever have a discussion

4   with Mr. Navarro, before this whole petition started,

5   did you ever have a discussion with Mr. Navarro about

6   Andrew Dodge?

7       A.  Not that I recall.

8       Q.  So you don't remember him going up to you and

9   trying to talk to you about concerns about Andrew

10  Dodge?

11      A.  No, I don't recall that.

12      Q.  Aside from the petition and maybe Mr. Navarro,

13  did you ever get complaints against -- or about Andrew

14  Dodge in those -- June, July, August, the time you were

15  there?

16      A.  No, I did not.

17      Q.  And so you were not involved in the promotion

18  of Mr. Dodge, correct?

19      A.  No, I was not.

20      Q.  And before being at Menzies at the San

21  Francisco Airport, where were you working?

22      A.  I was working for TAS.

23      Q.  What does that mean?

24      A.  TAS, Total Airport Services.  I worked there

25  as a general manager in San Francisco.

1   apnea, is that correct?

2       A.  In regards to the issues that they were

3   having -- that they are complaining about Andrew.

4       Q.  Okay.  So it says, "the way he supervised is

5   very unprofessional when he run the operation or

6   supervised."  Anything that was done about that?

7       A.  At the moment that I get there, I hadn't had

8   any problem with Andrew.  And I didn't get any

9   complaint from any fueler in relation to Andrew.

10      Q.  Did you talk to any of the fuelers about the

11  way he supervises is very unprofessional and run the

12  operation or supervise?

13      A.  I'm sorry, no, I did not talk to any fuelers

14  about the way he supervise.

15      Q.  Do you know if Tracy or HR did that?

16      A.  In the conversations we had, it wasn't

17  specific about his performance in terms of OTP, which

18  is operational -- on time performance, I'm sorry.

19      Q.  And then it says -- okay.  I'm sorry, I think

20  we missed the last part.  Did you say something there?

21      A.  No.

22      Q.  Okay.  "People are not taking their breaks

23  it's because the way he set up the flights."  That one,

24  did you ask about that?  Was that something that was

25  taken care of?

1    outcome of that conversation with HR.

2        Q.   Okay.  Mr. Vargas, let me put it directly

3    here.  If it's true, just theoretically, if it's true

4    that Nicco, John and Renil are covering up for the

5    mistakes of Andrew Dodge, would that be something that

6    maybe Nicco, John and Renil should be terminated for?

7        A.   I think that it would be important to make an

8    investigation before we take into consideration.

9        Q.   But that's a serious allegation, right?

10       A.   I'm sorry?

11       Q.   That's a serious allegation.

12       MR. WU:  Objection.  Improper hypothetical.

13            You can answer the question.

14       MR. URIARTE:  Q.   That's a serious allegation.

15       A.   And as I said before, for me, anything that

16   affect the environment of our employees is valid.

17       Q.   Yeah, it's valid, definitely.  But my question

18   was that would be serious, wouldn't you agree, as a

19   manager, if somebody --

20       A.   Again, it all depends on the investigation.

21   So I cannot tell you, because the letter says that,

22   but --

23       Q.   Sure.

24       A.   -- we did an investigation as we did with

25   Navarro.

DEPOSITION OF RAUL VARGAS - 08/25/2020

1    Q.  I agree.  But that's not what I'm asking.  I'm

2    asking a more simple question, which is, if that

3    allegation by itself, right, alleging that Nicco, John

4    and Renil are covering up for the mistake of Andrew

5    Dodge, just that allegation itself, standing on its

6    own, would you characterize that as a serious

7    allegation?

8        MR. WU:  Objection.  Improper hypothetical.

9        MR. URIARTE:  You can answer.

10       THE WITNESS:  I already did.

11       MR. URIARTE:  Q.  And what was your answer?

12       A.  That I will have to perform an investigation

13   to understand exactly.

14       Q.  That would be the result, right?  That would

15   be the result, the conclusion.  I'm not talking about

16   the result or the conclusion.  I'm just talking about

17   how you would characterize an allegation such as that.

18       A.  Well, and as I said, if I see something like

19   that, I will perform an investigation.  So if I perform

20   an investigation, it means that it is important.

21       Q.  Okay.  And did you perform the investigation?

22       A.  No, I did not.  As I said, I talked to HR

23   about this case, specific case.  Based on the fact that

24   there were people harassed to sign this petition, I did

25   not perform that investigation.

120

1          MR. URIARTE:  Okay.  Let's look at Exhibit 19,

2    please.

3          ZOOM HOST:  One second, coming up.

4          MR. URIARTE:  Q.  Actually, Mr. Vargas, did you

5    have a conversation with Renil about how many times Mr.

6    Navarro or other people had gone up to Renil with

7    regards to Andrew Dodge?

8          A.  No, I did not.  I don't recall it.

9          MR. URIARTE:  Okay.  So can we have Exhibit 19,

10   please.

11         (Plaintiff's Exhibit 19 marked for

12         identification.)

13         MR. URIARTE:  Thank you.

14         Q.  So Exhibit 19 starts with a statement by

15   Mr. Vasquez.  You know Mr. Vasquez, right?  I think you

16   called him Rafael Martinez or something like that.  It

17   might be Vasquez Martinez, actually.  But he was the

18   shop steward for Menzies, is that correct?

19         A.  Yes.

20         Q.  Okay.  And here, if you go to page 2, please.

21   Just to kind of make sure, this refers to you -- here's

22   the petition Mr. Vasquez kind of wrote up.  Does this

23   look familiar to you?

24         MR. WU:  Objection.  Assumes facts not in

25   evidence.

DEPOSITION OF RAUL VARGAS - 08/25/2020

1    only testify to what he knows.  So I'm not going to

2    agree or disagree with that statement.

3        MR. URIARTE:  Okay.  I'll represent to you,

4    Mr. Vargas, that by September 6th, 2018, Mr. Navarro

5    was not your employee anymore.

6        Q.  So then he goes on to talk about you.  "The

7    petition was then officially turned in to the SEIU.  In

8    addition, the Petition was also turned over to Raul

9    Vargas."  Do you remember that?

10       A.  I don't recall it.  I don't recall having that

11   petition, to tell you the truth.

12       Q.  So you don't remember Mr. Vasquez getting

13   close to you and giving you some pieces of paper?

14       A.  I do not.

15       Q.  "There have been two separate Petitions turned

16   in to Menzies Aviation Fueling Department Director Raul

17   Vargas."  Do you remember that?

18       A.  Well, I believe the first one was the one that

19   they signed.

20       Q.  Okay.  And then the second one, do you

21   remember receiving a second one?

22       A.  I don't recall it.

23       Q.  Okay.  All right.  "I have spoken to Menzies

24   Aviation Fueling Director Raul Vargas on three separate

25   occasions regarding Mr. Andrew Dodge."  Do you remember

122

1    that?

2        A.  No, I do not.

3        Q.  When I say "Rafael Vasquez," does a face go

4    into your mind?

5        A.  Yes, I do remember Rafael who was the steward

6    that was on leave of absence during the time that I was

7    over there.

8        Q.  He was on leave of absence during the time?

9        A.  Yeah.  I don't recall if he was during the

10   time that this petition was made or not, but I recall

11   him being on leave of absence for most of the time.

12       Q.  But do you remember talking to him?

13       A.  Yes, I do remember talking to him about

14   operational things.

15       Q.  Do you remember talking to him about Andrew

16   Dodge?

17       A.  I don't recall it.

18       Q.  Do you remember talking to him three times

19   about the same topic?

20       A.  About what?

21       Q.  I'm sorry?

22       A.  About what?  Three times about what?

23       Q.  Three times about any topic but it's the same

24   topic?

25       A.  I do -- I do remember that.

```
1          Q.   So you remember him going to you on several
2    occasions talking to you about the same topic?
3          A.   About topics, about operational things.
4          Q.   Okay.  And what kinds of operational things
5    would he talk to you about?
6          A.   Talk about issues on -- on the operation.
7          Q.   Okay.  Like give me an example.
8          A.   Talk about attendance issues.  Talking about
9    safety issues.  We used to have -- we used to have
10   meetings with the union every two weeks, if I remember
11   correctly, to talk about operational issues.
12         Q.   Okay.  And that when you say these meetings
13   with the union every two weeks, that was Mr. Vasquez?
14         A.   Some of the meetings Mr. Vasquez was in there.
15         Q.   Was he the one leading the discussion for the
16   union?
17         A.   No.
18         Q.   Did you say "yes" or "no"?
19         A.   I said no.
20         Q.   Okay.  So for the union somebody else talked,
21   right, not Mr. Vasquez?
22         A.   Well, he was talking, too, but the lead of the
23   union was another person that I don't recall right now.
24         Q.   In those meetings, do you remember them
25   talking about Andrew Dodge at all?
```

1    A.  No, no, I don't.

2    Q.  Okay.  And here he says "on three separate

3  occasions regarding Mr. Andrew Dodge, who continues to

4  abuse his authority and at times harass Fuelers under

5  his charge."  Did you ever talk to Mr. Vasquez about

6  that?

7    A.  I don't recall it.

8    Q.  Okay.  So it could have happened or might not

9  have happened, what's your memory like?

10   A.  I can't recall it.

11   Q.  Okay.  All right.  So if we just scroll down

12  more pages, please, second page.  Second page of

13  Exhibit 19.  So the second page of Exhibit 19 looks

14  like the petition that Mr. Vasquez gave to you

15  according to him.  Okay?

16   MR. WU:  Assumes facts.

17   MR. URIARTE:  Q.  I'll kind of give you a moment

18  here to read it.  Let me know when you finish reading

19  it.

20   A.  Looks like kind of the same as the letter they

21  brought me when they signed the petition.  It's the

22  same as the petition.

23   Q.  You mean the first one?

24   A.  I mean -- I don't know if this -- this letter.

25  Yeah.

1   foundation.

2          You can answer.

3      THE WITNESS:  If I get that, I will -- I will want

4   to look at it and perform an investigation.

5      MR. URIARTE:  Q.  But as far as you know, no

6   investigation happened as a result of Exhibit 19,

7   correct?

8      MR. WU:  Objection.  Lacks foundation.

9      THE WITNESS:  Can I respond?

10     MR. WU:  Yes, you can answer.  You can answer

11  unless I instruct you specifically not to.

12     THE WITNESS:  All right.  Can you repeat the

13  question.

14     MR. URIARTE:  Q.  Sure.  As far as you know, based

15  on this petition, this second petition that we called

16  it, as far as you know, no investigation happened

17  because of it?

18     A.  As far as I know, no investigation happened

19  because of it.

20     Q.  Is that correct?

21     A.  That is correct, as far as I know.

22     Q.  Very good.  Were you involved in the decision

23  to suspend Mr. Navarro while the investigation was

24  going on?

25     A.  I don't recall it.

1     A.  Yes, it is a yes.

2     Q.  Okay.  And then did you ask or were you

3   curious, maybe you should have had a conversation with

4   Mr. Navarro?

5     A.  I don't participate in the investigations.

6     Q.  Maybe like a phone call to Mr. Navarro to get

7   his side of the story?

8     A.  No, I do not.  I do not participate in any

9   investigation.

10    Q.  And do you know whether or not they actually

11  talked to Mr. Navarro and got his side of the story?

12    A.  I just get the final outcome.

13    Q.  You just get the final decision?

14    A.  The final outcome for -- from the

15  investigation.

16    Q.  My question is different.  My question is when

17  you were looking at all the different elements to

18  decide whether to terminate or not, did you try to find

19  out whether somebody talked to Mr. Navarro to get his

20  side of the story?

21    A.  No, I did not.  I did not try to find out.

22    Q.  Would you say that's kind of like basic

23  investigation right there?

24    MR. WU:  Objection.  Lack of foundation.  Improper

25  hypothetical.

1          You can answer if you know.

2          THE WITNESS:  I won't say that is -- it all

3     depends on the kind of investigation they're running.

4          MR. URIARTE:  Q.  They -- what's the last word?

5          A.  They are running.

6          Q.  That they are running.  Okay.  But you didn't

7     look into what kind of investigation they were running?

8          A.  I just look into the final outcome of the

9     investigation.

10         Q.  And you never, like, got into your head and

11    said, what does Mr. Navarro say about all of this?

12    That's not something that you ever asked yourself?

13         A.  No, I do not.  I do not because I just look

14    into the final outcome of the investigation.  So I

15    think that that question is for the people who perform

16    the investigation.

17         Q.  So you said earlier that the goal of

18    terminating Mr. Navarro was to protect the employees

19    from the harassment, right?  The environment of

20    harassment, correct?

21         A.  Yes.

22         Q.  How is it different, in achieving that goal,

23    how is termination different from, let's say, a

24    suspension?

25         A.  Well, I think that is important, too, if you

1      Q.  Meaning Talin and Tracy?

2      A.  Yes.  So then Tracy agreed because she had a

3  conversation with Talin, so we all agreed on -- on this

4  termination.

5      MR. URIARTE:  Okay.  Why don't we take a

6  five-minute break and then we'll be right back.  Thank

7  you.

8      MR. WU:  All right.

9          (Brief recess.)

10     MR. URIARTE:  Okay, Mr. Vargas, it looks like I

11 have no further questions for you today.

12     THE WITNESS:  Okay.

13     MR. WU:  And I have just a few questions for you,

14 Raul.

15                   EXAMINATION BY MR. WU

16     MR. WU:  Q.  So, Raul, during the time you were

17 the director of operations at SFO, aside from the

18 petition, did you hear of any complaints that Andrew

19 Dodge was harassing employees?

20     A.  No, I did not.

21     Q.  During the time you were the director of

22 operations at SFO, aside from the petition, did you

23 hear of any complaints that Andrew Dodge wasn't giving

24 fuelers breaks?

25     A.  No, I did not.

1  CHRISTOPHER WARD, CA Bar No. 238777
   cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3500
3  LOS ANGELES, CA 90071-2411
   TELEPHONE: 213.972.4500
4  FACSIMILE:   213.486.0065

5  JASON WU, CA Bar No. 313368
   jwu@foley.com
6  SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
   sabarbanel@foley.com
7  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET, SUITE 1700
8  SAN FRANCISCO, CA 94104-1520
   TELEPHONE: 415.434.4484
9  FACSIMILE:   415.434.4507

10
   Attorneys for Defendant MENZIES
11 AVIATION, INC.

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14

15 Renaldo Navarro,                     )  Case No. 3:19-cv-8157
                                        )
16                      Plaintiff,      )  **DEFENDANT MENZIES AVIATION,**
                                        )  **INC.'S FURTHER SUPPLEMENTAL**
17           vs.                        )  **APPENDIX OF EVIDENCE IN RESPONSE**
                                        )  **TO COURT'S ORDER TO SUPPLEMENT**
18 Menzies Aviation, Inc., DOING BUSINESS AS )  **THE RECORD**
   MENZIES; and DOES 1 through 10, inclusive, )
19                                      )
                                        )
20                      Defendants.     )
                                        )
21                                      )
                                        )  State Court Action Filed: 10/23/19
22                                      )
                                        )  Action Removed: December 16, 2019
23                                      )
                                        )
24 ──────────────────────────────────── )

25

26

27

28

     MENZIES AVIATION, INC.'S FURTHER SUPPLEMENTAL APPENDIX OF EVIDENCE
                                                        Case No. 3:19-cv-8157

1         In response to the Court's Order of December 23, 2020 directing Defendant Menzies Aviation,

2    Inc. to supplement the record on summary judgment, Menzies hereby submits this Further Supplemental

3    Appendix of Evidence with true and correct copies of the materials requested by the Court.

4

| Exhibit | Description |
|---------|-------------|
| 53. | Further Supplemental Declaration of Christopher Ward |
| 54. | August 23, 2018 Employee Performance Development Suspension Notice regarding Plaintiff Renaldo Navarro (authenticated at 46:4-48-13 of the previously-filed Exhibit 48) |
| 55. | August 29, 2018 Notice To Employees As To Change In Relationship issued to Plaintiff Renaldo Navarro (containing both the Navarro-produced and Menzies-produced versions, along with extracts of Plaintiff's deposition testimony providing additional authentication for the document) |

16   DATED:  December 28, 2020          **FOLEY & LARDNER LLP**
                                       Christopher Ward
17                                     Jason Wu
                                       Sara Alexis Levine Abarbanel
18

19

20                                     _____/s/ Christopher Ward_____
21                                     CHRISTOPHER WARD
                                       Attorneys for Defendant MENZIES AVIATION,
22                                     INC.

# EXHIBIT 53

1  CHRISTOPHER WARD, CA Bar No. 238777
     cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3500
3  LOS ANGELES, CA 90071-2411
   TELEPHONE:  213.972.4500
4  FACSIMILE:   213.486.0065

5  JASON WU, CA Bar No. 313368
     jwu@foley.com
6  SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
     sabarbanel@foley.com
7  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET, SUITE 1700
8  SAN FRANCISCO, CA 94104-1520
   TELEPHONE:  415.434.4484
9  FACSIMILE:   415.434.4507

10
   Attorneys for Defendant MENZIES
11 AVIATION, INC.

12                    **UNITED STATES DISTRICT COURT**

13                    **NORTHERN DISTRICT OF CALIFORNIA**

14

15 Renaldo Navarro,                    )  Case No. 3:19-cv-8157
                                       )
16                      Plaintiff,     )  **FURTHER SUPPLEMENTAL**
                                       )  **DECLARATION OF CHRISTOPHER**
17          vs.                        )  **WARD**
                                       )
18 Menzies Aviation, Inc., DOING BUSINESS AS )
19 MENZIES; and DOES 1 through 10, inclusive, )
                                       )
20                      Defendants.    )
                                       )  State Court Action Filed: 10/23/19
21                                     )
                                       )  Action Removed:  December 16, 2019
22                                     )
                                       )
23                                     )
                                       )
24 ─────────────────────────────────── )

25

26

27

28

                    FURTHER SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD
                                                     Case No. 3:19-cv-8157

4843-0032-4053.1

133

## SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD

I, Christopher Ward, declare as follows:

1.     I am an attorney admitted to practice before all state and federal courts in the State of California, including the United States District Court for the Northern District of California, and a partner at Foley & Lardner LLP, counsel of record for Defendant Menzies Aviation, Inc. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.     On August 23, 2018, Menzies' Duty Manager John Qually attempted to deliver to Renaldo Navarro an Employee Performance Development Document informing him of Menzies' decision to suspend him pending an investigation. Mr. Qually noted on that document that Mr. Navarro refused to sign it. Menzies produced a copy to Plaintiff Bates marked as MENZIES _000099. A true and correct copy of that suspension notice is attached hereto as **Exhibit 54**. Additionally, Mr. Qually's testimony, found at 46:4-48:13 of the previously filed Exhibit 48, authenticates this document.

3.     On August 29, 2018, Menzies notified Mr. Navarro that it was terminating his employment and issued him a written notice memorializing the reasons for that decision. Plaintiff refused to sign a copy of that notice, but retained a copy and produced it to Menzies, Bates marked as RenaldoNavarro 000004. Menzies also produced a copy of the same document to Mr. Navarro (although Mr. Navarro's copy is easier to read) as MENZIES_000083. A true and correct copy of this termination notice, containing both the Navarro and Menzies versions, along with the deposition testimony of Mr. Navarro offering additional authentication, is attached hereto as **Exhibit 55**.

I declare under penalty of perjury under the laws of the States of California and Illinois, and the laws of the United States, that the foregoing is true and correct.

Executed on December 28, 2020 at Elmhurst, Illinois.


*/s/ Christopher Ward*
Christopher Ward

FURTHER SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD
-2-                                                    Case No. 3:19-cv-8157

4843-0032-4053.1

134

# EXHIBIT 54

## EMPLOYEE PERFORMANCE DEVELOPMENT

| EMPLOYEE NAME | Renaldo R. Navarro | | TODAY'S DATE: | 8/20/18 |
|---|---|---|---|---|
| AIRPORT/ LOCATION: SFO | CLOCK#: 200827 | | DEPARTMENT: SFO-ITP | |

**JOB TITLE:** Fueling Supervisor II

### INCIDENT DESCRIPTION GOAL/EXPECTATION

[ ] Attendance   [X] Conduct   [ ] Safety   [ ] Work Performance

Nature of Incident: Unpaid suspension pending investigation.

Goal / Expectation: It is expected that employees follow all policies and procedures. Failure to follow Company policies and procedures will result in further disciplinary action up to and including termination.

| [ ] Coaching | [X] Suspension |
|---|---|
| [ ] Level 1 | [ ] Demotion to : _____ |
| [ ] Level 2 | [ ] Final Warning |

### EMPLOYEE GOALS/CORRECTIVE ACTIONS

**Employee's Comments:**

RAY NAVARRO Refused to Sign.

### SIGNATURES

| _Joel Clark (signature)_ | John Qually | 8/23/18 |
|---|---|---|
| **Signature of Supervisory Manager** | **Print Name** | **Date** |
| | | |
| **Signature of Hr/Senior Management** | **Print Name** | **Date** |
| | | |
| **Employee Signature Received** | | **Date** |

C:\Users\kevin.blumberg\Desktop\EPD's\EPD - Renaldo Navarro - Conduct - Suspension EPD.doc
/22/2018

MENZIES_000099

136

# EXHIBIT 55

# MENZIES AVIATION

### NOTICE TO EMPLOYEES AS TO CHANGE IN RELATIONSHIP
(Termination Notice Pursuant to Provisions on Section 1089 of the California Unemployment Insurance Code)

NAME: ___Renaldo Navarro___    SSN: ___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___

Your employment status has changed for the reason(s) checked below:

| [ ] | You are being suspended from work on | _____ , 20 ____ |
| [x] | You are being laid off or terminated on | ___29-Aug-18___ , 20 ____ |
| [ ] | You are choosing to quit your job on | _____ , 20 ____ |
| [ ] | You are going on leave of absense starting | _____ , 20 ____ |
| | with a return to work date of | _____ , 20 ____ |

The reason(s) for the separation:

[ ] Voluntary quit.

[ ] Layoff due to unavailable work.

[ ] Leave of absence for reason(s) specified in the comment section below.

[ ] Discharged for cause as specified in the comment section below.

[ ] Refusal to accept avaiable work. Job refused is described in the comment section below.

Comments: ___"Code of Conduct"___

_____

_____

_____

_____

_____    Menzies Aviation-650-697-7260
Human Resource Signature                     Company

Date ___8/29/18___

### Notice of Acknowledgement

I received a copy of this notice on _____ 20 ____

Signed ___Rey rec'd copy refused to sign TN___    8/29/18

*Notice to Manager/Supervisor: Give employee a copy of signed notice. Forward original and all associated documentation (including Employee Status Change Notice) to Human Resources.*

r\s\c my\documents\human\resources\forms\ (revised 5/01)

RenaldoNavarro 000004

138

# MENZIES AVIATION

**NOTICE TO EMPLOYEES AS TO CHANGE IN RELATIONSHIP**
(Termination Notice Pursuant to Provisions on Section 1089 of the California Unemployment Insurance Code)

NAME:   Renaldo Navarro          SSN:       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

Your employment status has changed for the reason(s) checked below:

[ ]  You are being suspended from work on _____ , 20 ____

[x]  You are being laid off or terminated on   29-Aug-18 , 20 ____

[ ]  You are choosing to quit your job on _____ , 20 ____

[ ]  You are going on leave of absense starting _____ , 20 ____

with a return to work date of _____ , 20 ____

The reason(s) for the separation:

[ ]  Voluntary quit.

[ ]  Layoff due to unavailable work.

[ ]  Leave of absence for reason(s) specified in the comment section below.

[ ]  Discharged for cause as specified in the comment section below.

[ ]  Refusal to accept avaiable work. Job refused is described in the comment section below.

Comments:   "Code of Conduct"

_____

_____

_____

_____

Human Resource Signature          Menzies Aviation-650-697-7260
                                  Company

Date   8/29/18

**Notice of Acknowledgement**

I received a copy of this notice on _____ , 20 ____

Signed _____

Notice to Manager/Supervisor: Give employee a copy of signed notice. Forward original and all associated documentation
(including Employee Status Change Notice) to Human Resources.

j/slc:mydocuments\human\resources\informs\ (revised 5/01)

MENZIES_000083

139

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| RENALDO NAVARRO, ) | **CERTIFIED COPY** |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | 3:19-cv-08157-VC |
| MENZIES AVIATION, INC., DOING ) | |
| BUSINESS AS MENZIES; and ) | |
| DOES 1 through 10, inclusive, ) | |
| ) | |
| Defendants. ) | |
| _____) | |


Webex deposition of RENALDO NAVARRO, VOLUME I,
taken remotely on behalf of the Defendant, beginning at
9:41 a.m. and ending at 4:23 p.m., on Thursday,
July 23, 2020, before JOANNA B. BROWN, Certified
Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF RENALDO NAVARRO:
 3          LIBERATION LAW GROUP, P.C.
            BY:  ARLO GARCIA URIARTE, ESQ.
 4          2760 Mission Street
            San Francisco, California 94110
 5          (415) 695-1000
            (415) 695-1006 Fax
 6          arlo@liberationlawgroup.com
 7   FOR DEFENDANT MENZIES AVIATION, INC., dba MENZIES:
 8          FOLEY & LARDNER LLP
            BY:  CHRISTOPHER G. WARD, ESQ.
 9          555 South Flower Street, Suite 3300
            Los Angeles, California 90071-2411
10          (213) 972-4500
            (213) 486-0065 Fax
11          cward@foley.com
12   ALSO PRESENT:
13          CAROLINE CARRERA, TAGALOG INTERPRETER #301298
14
15
16
17
18
19
20
21
22
23
24
25
```

                                                                    3

141

```
 1                      I N D E X
 2   EXAMINATION OF:                            PAGE
 3   RENALDO NAVARRO
 4
 5        BY MR. WARD                              7
 6        BY MR. URIARTE                         115
 7
 8                  E X H I B I T S
 9   DEFENDANT'S                                 PAGE
10   Exhibit 1   Aircraft Service International
                 Group "Incident Report" dated
11               March 18, 2007, Bates
                 No. MENZIES_000146 (1 page)       34
12
     Exhibit 2   Aircraft Service International
13               Group "Notice to Employees as to
                 Change in Relationship," Bates
14               Nos. MENZIES_000143 and
                 MENZIES_000144 (2 pages)          35
15
     Exhibit 3   Aircraft Service International
16               Group "Incident Report" dated
                 March 30, 2009, Bates
17               No. MENZIES_000140 (1 page)       38
18   Exhibit 4   "Employee Coaching Document"
                 for a May 30, 2009, warning,
19               Bates No. MENZIES_000139 (1 page) 39
20   Exhibit 5   "Employee Coaching Document"
                 for a May 18, 2010, warning,
21               Bates Nos. MENZIES_000135 and
                 MENZIES_000136 (2 pages)          40
22
     Exhibit 6   "Employee Coaching Document"
23               for a May 3, 2012, warning,
                 Bates No. MENZIES_000126 (1 page) 41
24
     Exhibit 7   June 30, 2013, warning document,
25               Bates No. MENZIES_000127 (1 page) 42
```

4

```
 1                    E X H I B I T S
 2   DEFENDANT'S                                      PAGE
 3   Exhibit 8   Letter to "Menzies Management"
                 from Menzies fueler, Bates
 4               Nos. MENZIES_000152 -
                 MENZIES_000154 (3 pages)              54
 5

     Exhibit 9   Second petition against
 6               Andrew Dodge, Bates
                 No. MENZIES_000150 (1 page)           54
 7

     Exhibit 10  Text-message exchange, Bates
 8               No. MENZIES_000088 (1 page)           56
 9   Exhibit 11  Handwritten statement by
                 Christopher Lawrence, Bates
10               No. MENZIES_000086 (1 page)           64
11   Exhibit 12  Handwritten statement by
                 Andrew Dodge August 16, 2018,
12               Bates No. MENZIES_000089
                 (1 page)                              66
13

     Exhibit 13  "Employee Performance Development,"
14               Bates No. MENZIES_000099 (1 page)     79
15   Exhibit 14  Typed statement by John Qually,
                 Bates No. MENZIES_000084 (1 page)     82
16

     Exhibit 15  Set of documents produced, Bates
17               Nos. RenaldoNavarro 000001 -
                 RenaldoNavarro 000014 (14 pages)      95
18

     Exhibit 16  Plaintiff's Initial Disclosures
19               Pursuant to Federal Rule of
                 Civil Procedure 26(a)(1)
20               (3 pages)                            105
21
22                  UNANSWERED QUESTIONS
23                  PAGE    LINE
24                   14      10
25
```

5

```
 1                    Remotely; Thursday, July 23, 2020

 2                             9:41 a.m.

 3

 4                    CAROLINE CARRERA,

 5        having been duly sworn, translated English into

 6         Tagalog and Tagalog into English as follows:

 7

 8                    RENALDO NAVARRO,

 9              having been duly sworn, was examined

10                 and testified as follows:

11

12        THE REPORTER:  Good morning.  My name is

13   Joanna Brown.  I am a California certified stenographic

14   reporter.  Due to the current national emergency of the

15   COVID-19 virus, this deposition is being handled via

16   remote means.

17        Today's date is Thursday, July 23, 2020, and

18   the time is approximately 9:41 a.m.  This is the

19   deposition of Renaldo Navarro in the matter of

20   Renaldo Navarro v. Menzies Aviation, Inc.  This is

21   venued in the United States District Court, Northern

22   District of California.  The case number is

23   3:19-cv-08157-VC.

24        At this time, I will ask counsel to identify

25   yourselves, state who you represent, and agree on the
```

6

1    record that there is no objection to this deposition

2    officer administering a binding oath to the witness

3    via Webex.  Let's start with the noticing attorneys.

4             MR. WARD:  Christopher Ward of

5    Foley & Lardner, representing Menzies Aviation, and I

6    have no such objection.

7             MR. URIARTE:  Arlo Uriarte for Plaintiff

8    Renaldo Navarro.  No objection.

9             THE REPORTER:  You do solemnly state that you

10   will accurately and correctly translate from English to

11   Tagalog and Tagalog to English to the best of your

12   ability so help you God?

13            THE INTERPRETER:  I do.

14            THE REPORTER:  Mr. Navarro, would you raise

15   your right hand, please.  You do solemnly state that

16   the testimony you shall give in this matter will be the

17   truth, the whole truth, and nothing but the truth?

18            THE WITNESS:  I do.

19            THE REPORTER:  Thank you.

20                     EXAMINATION

21   BY MR. WARD:

22      Q    All right.  Well, good morning, Mr. Navarro.

23   I just introduced myself on the record.  My name is

24   Christopher Ward, and I represent Menzies Aviation.

25   Thanks for being available this morning.

7

```
 1              MR. URIARTE:  Objection.  Vague and ambiguous.

 2              THE WITNESS:  How can I refuse to sign if I

 3    did not receive any letter?

 4              MR. URIARTE:  Chris, I'm going to need two

 5    minutes with Mr. Navarro.  I need to refresh his soul.

 6    You are asking him questions directly.  Let me have two

 7    minutes with Mr. Navarro.

 8              MR. WARD:  All right.  Let's just take five.

 9    We'll resume at 2:30.

10              MR. URIARTE:  Thank you.

11              MR. WARD:  We are off the record.

12              (Off the record.)

13    BY MR. WARD:

14       Q    Let me see if I can get a clear answer to this

15    question:  Were you provided any documentation that you

16    refused to sign?

17       A    The one that I remember I refused to sign was

18    the termination letter.

19       Q    And other than a letter explicitly

20    communicating that you were terminated, your testimony

21    is there's nothing else you refused to sign in

22    connection with this petition involving Andrew Dodge;

23    is that correct?

24              THE INTERPRETER:  I'm sorry.  Please repeat

25    the question, Mr. Ward.
```

81

1          MR. WARD:  Sure.

2      Q     Other than this termination letter, is it your

3   testimony that you did not refuse to sign any other

4   documents regarding the petition against Andrew Dodge

5   or your suspension?

6      A     Will you please repeat that.

7      Q     Sure.  Let me just see if I can make this as

8   simple as possible.

9          Is the termination letter the only document

10  you can recall receiving relating to this petition or

11  your suspension that you refused to sign?

12     A     Yes, sir.

13     Q     Were you also provided a copy of that

14  termination letter?

15     A     Yes, sir.

16     Q     Did you provide a copy of that termination

17  letter to your counsel?

18     A     Yes, sir.

19          MR. WARD:  All right.  I am going to mark as

20  Exhibit 14 a document that's Bates-marked No. -84.

21          (Deposition Exhibit 14 was marked for

22          identification by the reporter, a

23          copy of which is attached hereto.)

24  BY MR. WARD:

25     Q    Mr. Navarro, let me know when you've had an

82

```
1              THE INTERPRETER:  I'm sorry.  Please repeat
2    that.
3    BY MR. URIARTE:
4        Q    The petition was signed by at least one
5    supervisor; is that correct?
6        A    Yes.
7        Q    Do you know how many signed -- how many
8    supervisors signed the petition?
9        A    Two, sir.
10       Q    What are those names?
11       A    July Macapagal.
12       Q    Who else?
13       A    And Renaldo Navarro, myself.
14             MR. URIARTE:  No further questions.
15             MR. WARD:  Give me just a second.
16             All right.  I have no follow-up at this point.
17   Counsel and I agreed off the record that we would not
18   be concluding Mr. Navarro's deposition subject to some
19   questioning about his -- or I should say potential
20   questioning about Mr. Navarro's settlement agreement
21   with Swissport, which we'll meet and confer about as
22   necessary; but, otherwise, we can conclude today's
23   deposition, at least this first and potentially last
24   day of Mr. Navarro's deposition.  And at this point --
25   we don't do any stipulations on the record anymore, at
```

117

148

1    least in San Francisco.  Some L.A. attorneys still do

2    it unless there's something that you want to add, Arlo.

3              MR. URIARTE:  No.

4              MR. WARD:  All right.  I think we are

5    concluded, then, for the day.  I appreciate everybody's

6    time and patience with this process, especially with

7    the technology glitches on my end.  Off the record.

8         (Deposition session concluded at 4:23 p.m.)

9                        -oOo-

10

11

12         I certify (or declare) under penalty of

13   perjury under the laws of the State of California that

14   the foregoing is true and correct.

15

16   Executed at _____ on _____.

                         (Place)                    (Date)

17

18         _____

                    (Signature of Deponent)

19

20

21

22

23

24

25

118

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
1                    DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA )

                         ) ss.

3    COUNTY OF ORANGE    )

4

5         I, Joanna B. Brown, hereby certify:

6         I am a duly qualified Certified Shorthand

7    Reporter in the State of California, holder of

8    Certificate Number CSR 8570 issued by the Court

9    Reporters Board of California and which is in full

10   force and effect. (Fed. R. Civ. P. 28(a)).

11        I am authorized to administer oaths or

12   affirmations pursuant to California Code of Civil

13   Procedure, Section 2093(b) and prior to being examined,

14   the witness was first duly sworn by me.

15   (Fed R. Civ. P. 28(a), 30(f)(1)).

16        I am not a relative or employee or attorney or

17   counsel of any of the parties, nor am I a relative or

18   employee of such attorney or counsel, nor am I

19   financially interested in this action.

20   (Fed R. Civ. P. 28).

21        I am the deposition officer that

22   stenographically recorded the testimony in the

23   foregoing deposition, and the foregoing transcript is a

24   true record of the testimony given by the witness.

25   (Fed. R. Civ. P. 30(f)(1)).
```

119

150

```
1            Before completion of the deposition, review of

2    the transcript [XX] was [ ] was not requested.  If

3    requested, any changes made by the deponent (and

4    provided to the reporter) during the period allowed,

5    are appended hereto. (Fed. R. Civ. P. 30(e)).

6

7

8    Dated: August 4, 2020

9

10                        Janna B. Brown

11                        _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

120

151

CHRISTOPHER WARD, CA Bar No. 238777
 cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE: 213.972.4500
FACSIMILE:  213.486.0065

JASON WU, CA Bar No. 313368
 jwu@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE: 415.434.4484
FACSIMILE:  415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro, | Case No. 3:19-cv-8157 |
| Plaintiff, | **DEFENDANT MENZIES AVIATION, INC.'S APPENDIX OF SUPPORTING EVIDENCE IN SUPPORT OF ITS MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive, | |
| Defendants. | |
| | State Court Action Filed:  10/23/19 |
| | Action Removed:  December 16, 2019 |

Defendant Menzies Aviation, Inc. hereby submits this Appendix of Supporting Evidence ("AOE") with true and correct copies of the exhibits referenced below and attached hereto in support of its Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment.

| Exhibit | Description |
|---------|-------------|
| 1. | Declaration of Tracy Aguilera |
| 2. | Declaration of Christopher Ward |
| 3. | Declaration of John Qually |
| 4. | Declaration of July Macapagal |
| 5. | Declaration of Jayson Manalang |
| 6. | Declaration of Angelo Sadiq |
| 7. | Declaration of Wesley Faatalale |
| 8. | Declaration of Roberto Pangalilangan |
| 9. | Declaration of Efren DeLos Reyes |
| 10. | Declaration of Rex Tosco |
| 11. | Declaration of Modesto Compas |
| 12. | Excerpts from the Deposition Transcript of Plaintiff Renaldo Navarro taken on July 23, 2020 (authenticated in Ward Declaration at p. 2, ¶ 2 [Exhibit 2 to AOE]) |
| 13. | Excerpts from Volume I of the Deposition Transcript of John Qually taken on July 27, 2020 (authenticated in Ward Declaration at p. 2, ¶ 3 [Exhibit 2 to AOE]) |
| 14. | Excerpts from Volume II of the Deposition Transcript of John Qually taken on July 28, 2020 (authenticated in Ward Declaration at p. 2, ¶ 3 [Exhibit 2 to AOE]) |
| 15. | Excerpts from the Deposition Transcript of Tracy Aguilera taken on August 25, 2020 (authenticated in Ward Declaration at p. 2, ¶ 4 [Exhibit 2 to AOE]) |
| 16. | Excerpts from the Deposition Transcript of Raul Vargas taken on August 25, 2020 (authenticated in Ward Declaration at p. 2, ¶ 5 [Exhibit 2 to AOE]) |
| 17. | Excerpts from the Deposition Transcript of Andrew Dodge taken on July 28, 2020 (authenticated in Ward Declaration at pp. 2-3, ¶ 6 [Exhibit 2 to AOE]) |

MENZIES AVIATION, INC.'S APPENDIX OF SUPPORTING EVIDENCE
-2-
Case No. 3:19-cv-8157

| Exhibit | Description |
|---|---|
| 18. | Fueling Supervisor Job Description (authenticated in Aguilera Declaration at p. 2, ¶ 3 [Exhibit 1 to AOE]) |
| 19. | Excerpts from the Menzies Aviation California Employee Handbook (authenticated in Aguilera Declaration at p. 2, ¶ 4 [Exhibit 1 to AOE]) |
| 20. | Excerpts from the Menzies Aviation International Code of Conduct (authenticated in Aguilera Declaration at p. 2, ¶ 4 [Exhibit 1 to AOE]) |
| 21. | August 16, 2018 Written Complaint submitted by Andrew Dodge with supporting text message screen shot (authenticated in Plaintiff Deposition Excerpts at 55:18-57:9 [Exhibit 12 to AOE] and at Dodge Deposition Excerpts at 42:9-45:21 [Exhibit 17 to AOE]) |
| 22. | First Petition regarding Andrew Dodge (authenticated in in Plaintiff Deposition Excerpts at 51:24-53:16 [Exhibit 12 to AOE] and Aguilera Deposition Excerpts at 26:10-27:1 [Exhibit 15 to AOE]) |
| 23. | Written Statement prepared by John Qually (authenticated in Qually Declaration at p. 2, ¶ 3 [Exhibit 3 to AOE]) |
| 24. | Statement prepared by Plaintiff and submitted to Menzies (authenticated in Plaintiff Deposition Excerpts at 95:9-98:10 [Exhibit 12 to AOE]) |
| 25. | Fueler Statements submitted to Menzies during investigation (authenticated in Aguilera Declaration at pp. 2-3, ¶ 5 [Exhibit 1 to AOE]) |
| 26. | Email Chain regarding termination decision (authenticated in Aguilera Declaration at p. 3, ¶ 6 [Exhibit 1 to AOE]) |
| 27. | Second Petition regarding Andrew Dodge (authenticated in Plaintiff Deposition Excerpts at 54:5-55:9 [Exhibit 12 to AOE]) |

4842-4031-3294.2

154

| Exhibit | Description |
|---------|-------------|
| 28. | Photographic image of what appears to be a letter authored by Rafael Vasquez and dated November 18, 2019 (authenticated in Ward Declaration at p 3, ¶ 7 [Exhibit 2 to AOE]) |
| 29. | Text messages produced by Plaintiff between Plaintiff and "Rafael" (authenticated in Plaintiff Deposition Excerpts at 102:20-103:6 and 104:11-17 [Exhibit 12 to AOE]) |

DATED: October 15, 2020

**FOLEY & LARDNER LLP**
Christopher Ward
Jason Wu


_/s/ Christopher Ward_
CHRISTOPHER WARD
Attorneys for Defendant MENZIES AVIATION, INC.

4842-4031-3294.2

# EXHIBIT 1

CHRISTOPHER WARD, CA Bar No. 238777
   cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE: 213.972.4500
FACSIMILE:   213.486.0065

JASON WU, CA Bar No. 313368
   jwu@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE: 415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro, | Case No. 3:19-cv-8157 |
| Plaintiff, | **DECLARATION OF TRACY AGUILERA** |
| vs. | |
| Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive, | State Court Action Filed: 10/23/19 |
| Defendants. | Action Removed: December 16, 2019 |

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

# DECLARATION OF TRACY AGUILERA

I, Tracy Aguilera, declare as follows:

1.    I am employed by Menzies Aviation as the Human Resources Manager for the Company's operations at San Francisco International Airport ("SFO"). I have been employed by Menzies in the SFO Human Resources Department since 1997 and have held my current position as Human Resources Manager since March 2010. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.    Menzies Aviation has operated at SFO for decades, competing for commercial aviation ground handling contracts with other subcontractors such as Swissport and Aircraft Service International, Inc. ("ASIG"). On February 1, 2017, Menzies Aviation, Inc. completed the acquisition of Aircraft Service International, Inc. from BBA Aviation, and thereafter continued to operate the ASIG business at SFO under the trade name Menzies Aviation. As part of that acquisition, Menzies inherited SFO ASIG employees from BBA Aviation. At the time Menzies completed this acquisition and for many years prior, the Service Employees International Union (the "Union") had represented the non-exempt Fuelers of ASIG, and the SEIU has continued to represent those Fuelers on an uninterrupted basis since the Menzies acquisition of ASIG.

3.    One of the positions maintained by ASIG and now Menzies within the Fueling Department, both before and after the Menzies acquisition, is Fueling Supervisor. A true and correct copy of the job description for the Fueling Supervisor position after it was re-branded under the Menzies Aviation trade name is attached hereto as **Exhibit 18**.

4.    After Menzies completed the acquisition of ASIG, it adopted and applied the Menzies Aviation employment policies and procedures to all former ASIG employees at SFO, including those in the Fueling Department. Including amongst those policies are Menzies' California Employee Handbook and its international Code of Conduct. A true and correct copy of excerpts of the California Employee Handbook are attached hereto as **Exhibit 19**, and a true and correct copy of excerpts of the Code of Conduct are attached hereto as **Exhibit 20**.

5.    In my capacity as Human Resources Manager, my job responsibilities include maintaining as business records all the personnel file and related Human Resources material generated

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

4819-9098-6958.1

1    by Menzies and received by Menzies from other sources.  I keep such records in my own files housed

2    within my office, which I keep locked to ensure no unauthorized individuals can access such materials.

3    In the course of an investigation into a petition received by Menzies regarding Andrew Dodge in August

4    2018, three Menzies employees provided written statements regarding the circumstances of placing their

5    signature on that petition.  These statements were prepared by Menzies employees themselves, based on

6    their own personal knowledge, during the August 2018 time period of the investigation.  I received the

7    original copies of these three statements, filed them within Renaldo Navarro's personnel file, and retain

8    possession of and control over the originals of these three statements in the ordinary course of my

9    business, just as I do regularly with respect to other investigation and Human Resources/personnel-

10   related materials.  True and correct copies of these three statements provided to Menzies are attached

11   hereto as **Exhibit 25**.

12       6.      In addition to the three statements contained within Exhibit 23, as part of the

13   investigation into the petition I referenced above, I exchanged several emails with former SFO Director

14   of Operations Raul Vargas and former SFO Safety Supervisor Kevin Blumberg regarding the process of

15   the investigation and potential outcomes.  Following completion of that investigation and the decision to

16   terminate Plaintiff's employment, I personally printed a copy of that email exchange and placed it into

17   Plaintiff's personnel file, and to this day I have continued to retain possession and control over

18   Plaintiff's personnel file and the materials therein, including the email exchange I have just described.

19   A true and correct copy of that email exchange is attached hereto as **Exhibit 26**.

20       7.      Following commencement of this litigation, I received from Menzies' legal counsel

21   copies of a letter appearing to be authored by Union steward Rafael Vazquez and what look like text

22   messages between Plaintiff and Mr. Vasquez.  I do not recall ever seeing these documents prior to

23   commencement of this litigation, and Menzies does not have copies of these documents either within

24   Plaintiff's personnel file or any other record.

25   ///

26   ///

27   ///

28   ///

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

-3-

4819-9048-6958.1

159

1    I declare under penalty of perjury under the laws of the States of California, and the laws of the

2  United States, that the foregoing is true and correct.

3        Executed on October 14, 2020 at Burlingame, California.

4

5

6        Tracy Aguilera

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-

DECLARATION OF TRACY AGUILERA
Case No. 3:19-cv-8157

4819-9098-6958.1

160

# EXHIBIT 2

1  CHRISTOPHER WARD, CA Bar No. 238777
       cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3500
3  LOS ANGELES, CA 90071-2411
   TELEPHONE:  213.972.4500
4  FACSIMILE:   213.486.0065

5  JASON WU, CA Bar No. 313368
       jwu@foley.com
6  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET, SUITE 1700
7  SAN FRANCISCO, CA 94104-1520
   TELEPHONE:  415.434.4484
8  FACSIMILE:   415.434.4507

9
   Attorneys for Defendant MENZIES
10 AVIATION, INC.

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13

14 Renaldo Navarro,                    ) Case No. 3:19-cv-8157
15                                     )
                          Plaintiff,   ) **DECLARATION OF CHRISTOPHER**
16                                     ) **WARD**
              vs.                      )
17                                     )
   Menzies Aviation, Inc., DOING BUSINESS AS )
18 MENZIES; and DOES 1 through 10, inclusive, )
19                                     )
                          Defendants.  ) State Court Action Filed:  10/23/19
20                                     )
                                       ) Action Removed:  December 16, 2019
21                                     )
                                       )
22                                     )
                                       )
23                                     )

24

25

26

27

28

4816-9823-7646.1

162

**DECLARATION OF CHRISTOPHER WARD**

I, Christopher Ward, declare as follows:

1.     I am an attorney admitted to practice before all state and federal courts in the State of California, including the United States District Court for the Northern District of California, and a partner at Foley & Lardner LLP, counsel of record for Defendant Menzies Aviation, Inc.  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.     On July 23, 2020, I took the deposition of Plaintiff Renaldo Navarro.  Following that deposition, I received a certified copy of the transcript of that deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from the transcript of Plaintiff's deposition is attached hereto as **Exhibit 12**.

3.     On July 27, 2020, Plaintiff's counsel deposed Menzies' Duty Manager John Qualley for a first time, and on July 28, 2020, Plaintiff's counsel completed the deposition of Mr. Qually.  Following those depositions, I received a certified copy of the transcripts of both deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of excerpts from Volume I of the transcript of Mr. Qually's deposition is attached hereto as **Exhibit 13**, and a true and correct copy of excerpts from Volume II of the transcript of Mr. Qually's deposition is attached hereto as **Exhibit 14**.

4.     On August 25, 2020, Plaintiff's counsel deposed Menzies' Human Resources Manager Tracy Aguilera.  Following that deposition, I received a certified copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from Ms. Aguilera's deposition is attached hereto as **Exhibit 15**.

5.     On August 25, 2020, Plaintiff's counsel deposed Menzies' former SFO Director of Operations Raul Vargas.  Following that deposition, I received a certified copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and correct copy of excerpts from Mr. Vargas's deposition is attached hereto as **Exhibit 16**.

6.     On July 28, 2020, Plaintiff's counsel deposed Menzies' Fueling Supervisor Andrew

DECLARATION OF CHRISTOPHER WARD
Case No. 3:19-cv-8157
-2-

163

1  Dodge.  Following that deposition, I received a certified copy of the transcript of the deposition, and I

2  have read, reviewed and maintained a copy of that transcript in connection with this matter.  A true and

3  correct copy of excerpts from Mr. Dodge's deposition is attached hereto as **Exhibit 17**.

4        7.     On March 17, 2020, Plaintiff's counsel served on me Plaintiff's Fed. R. Civ. P. 26(a)(1)

5  Initial Disclosures, which included a production of 14 total documents.  One of those documents, Bates

6  marked "Renaldo Navarro 000009" appears to be a picture of a letter authored by a Rafael Vasquez.  I

7  had never seen this document prior to receiving Plaintiff's Initial Disclosures production because it was

8  not part of any of the files Menzies Aviation provided me in response to my file requests regarding

9  Plaintiff.  A true and correct copy of "Renaldo Navarro 000009" produced to me by Plaintiff's counsel is

10  attached hereto as **Exhibit 28**.

11       I declare under penalty of perjury under the laws of the States of California and Illinois, and the

12  laws of the United States, that the foregoing is true and correct.

13       Executed on October 15, 2020 at Elmhurst, Illinois.

14

15

16                              */s/ Christopher Ward*
                            Christopher Ward

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CHRISTOPHER WARD
-3-
Case No. 3:19-cv-8157

# EXHIBIT 3

1  CHRISTOPHER WARD, CA Bar No. 238777
     cward@foley.com
2  **FOLEY & LARDNER LLP**
   555 SOUTH FLOWER STREET, SUITE 3500
3  LOS ANGELES, CA 90071-2411
   TELEPHONE: 213.972.4500
4  FACSIMILE:   213.486.0065

5  JASON WU, CA Bar No. 313368
     jwu@foley.com
6  **FOLEY & LARDNER LLP**
   555 CALIFORNIA STREET, SUITE 1700
7  SAN FRANCISCO, CA 94104-1520
   TELEPHONE: 415.434.4484
8  FACSIMILE:   415.434.4507

9
   Attorneys for Defendant MENZIES
10 AVIATION, INC.

11                    **UNITED STATES DISTRICT COURT**

12                   **NORTHERN DISTRICT OF CALIFORNIA**

13

14 Renaldo Navarro,                        )  Case No. 3:19-cv-8157
                                           )
15                        Plaintiff,       )  **DECLARATION OF JOHN QUALLY**
                                           )
16             vs.                         )
                                           )
17                                         )
   Menzies Aviation, Inc., DOING BUSINESS AS )
18 MENZIES; and DOES 1 through 10, inclusive, )
                                           )  State Court Action Filed:  10/23/19
19                        Defendants.      )
                                           )  Action Removed:  December 16, 2019
20                                         )
                                           )
21                                         )
                                           )
22                                         )
                                           )
23                                         )

24

25

26

27

28

                                         DECLARATION OF JOHN QUALLY
                                               Case No. 3:19-cv-8157

4840-7666-8046.1

166

1          **DECLARATION OF JOHN QUALLY**

2    I, John Qually, declare as follows:

3          1.      I am employed by Menzies Aviation as a Duty Manager for the Company's operations at

4    San Francisco International Airport ("SFO"). I have been employed by either Menzies or a predecessor

5    business known as ASIG at SFO since approximately 2005 and have held my current position as Duty

6    Manager for approximately four years. I have personal knowledge of the facts contained in this

7    declaration, and if called upon as a witness, I could and would competently testify thereto.

8          2.      In the August 2018 time period, I typically worked the morning shift and would take the

9    handoff for my responsibilities from employees coming off the graveyard shift. As a consequence, I did

10   not often work directly with Plaintiff Renaldo Navarro and most of my interactions with him occurred

11   during this "handoff" between the graveyard and morning shifts. Because Plaintiff worked the

12   graveyard shift and I handled the morning shift, I was asked by Menzies to notify Plaintiff that he had

13   been suspended in August 2018 pending an investigation.

14         3.      After I notified Plaintiff of the suspension on or about August 23, 2018, I immediately

15   prepared a written statement summarizing what I remembered as the information communicated to

16   Plaintiff by me during that interaction. After preparing that statement, I provided it to Menzies

17   management for inclusion in the investigation records. A true and correct copy of the written statement

18   I prepared is attached hereto as **Exhibit 23**.

19         I declare under penalty of perjury under the laws of the States of California, and the laws of the

20   United States, that the foregoing is true and correct.

21         Executed on October 14, 2020 at Burlingame, California.

22

23

24   _____

     John Qually

25

26

27

28

                                                      DECLARATION OF JOHN QUALLY
                                            -2-       Case No. 3:19-cv-8157

4840-7646-8046.1

167

# EXHIBIT 4

## DECLARATION OF JULY MACAPAGAL

I, July Macapagal, hereby state and declare as follows:

1.    I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueling Supervisor, a title that I have held since approximately 2017. Prior to that, I held the title of Fueler with ASIG. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.    I am familiar with Renaldo Navarro. Around August 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.    Around 2018, I learned that there was a petition being circulated regarding Andrew Dodge, another Fueling Supervisor for Menzies at SFO. I had heard that the petition was being circulated to make complaints about Dodge.

4.    I signed the signature page that was being circulated in connection with the petition. By signing it, I believed I was saying that there should be some corrective action to address fuelers' complaints with Dodge. I did not sign the petition with the goal of demoting or removing Dodge. I never saw or read the petition itself. I only saw and signed the signature page. I also never asked any other Fueler to sign the petition nor otherwise took steps to support it beyond my own signature, as I thought it would be inappropriate for me, in my role as Supervisor, to do so.

5.    I knew that some of the fuelers I supervised had problems with how Dodge ran his operation. Because of that, I felt pressure to sign the signature page so that I could back up and support my fuelers. I also felt pressured to sign the signature page because Navarro had trained me when I was a Fueler, and I felt like I needed to back him up because of what he had done for me. I reported to Menzies in 2018 when asked that I felt pressured to sign the petition.

6.    My best recollection, which I cannot say with complete certainty, is that Navarro was one of the individuals driving the petition. I believe this because Navarro was constantly

4811-9452-3338.2

complaining about Dodge behind his back. Navarro and Dodge used to get along well, but after Dodge was promoted to Fueling Supervisor, Navarro and Dodge would constantly get into arguments. In my opinion, both of their behaviors were childish but it did appear to me that Navarro had it out for Dodge and was regularly taking actions that undermined Dodge.

7.    I informed Tracy Aguilera, who works in Menzies' Human Resources Department, that I felt pressure to sign the signature page as noted above.

8.    I did not have any problems with Dodge abusing his authority or harassing me, and I am not aware of Dodge abusing his authority towards fuelers or harassing fuelers. I have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge

9.    I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it. or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this ⌐1 th day of September 2020. at San Francisco, California.

July Macapagal

4811-9452-3338 2

170

# EXHIBIT 5

## DECLARATION OF JAYSON MANALANG

I, Jayson Manalang, hereby state and declare as follows:

1.      I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO").  Currently, my job title at Menzies is Fueler, a title that I have held since 1997 (prior to 2017, I held this title with ASIG).  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      I am familiar with Renaldo Navarro.  Around 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.      When Mr. Navarro was employed by Menzies, Mr. Navarro approached me with a petition while I was on duty at Menzies and asked me to sign it.  He told me it was a petition against Andrew Dodge to teach him a lesson.  I told Mr. Navarro, no, I did not want to sign the petition.  I ignored him and made myself busy doing my job so he could not ask me to sign again.  I did not want to sign the petition, because I did not want to get involved or get in trouble, because Mr. Navarro and Mr. Dodge were both supervisors.

4.      After that, Mr. Navarro asked me one or two more times to sign the petition again.  The last time Mr. Navarro asked me, I signed the petition.  I did not want to sign the petition.  I only signed the petition so that Mr. Navarro would stop bothering me.

5.      I felt pressured by Mr. Navarro to sign the petition.  I felt pressured because Mr. Navarro was a supervisor, and I was worried he would give me a hard time for not signing the petition.

6.      I am executing this declaration voluntarily and of my own free will.  No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

4849-9412-2698.1

Executed this 4th day of September 2020, at San Francisco. California.

[Jayson Manalang]

# EXHIBIT 6

## DECLARATION OF ANGELO SADIQ

I, Angelo Sadiq, hereby state and declare as follows:

1.     I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"), and have worked for Menzies at SFO since approximately August 2017. In 2018, my job title at Menzies was Fueler. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.     I am familiar with Renaldo Navarro. Around 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.     In 2018, Mr. Navarro approached me with a paper that had the several signatures on it, and he asked me to sign it. Mr. Navarro did not explain to me what I was signing. However, I had previously seen many similar signature pages before relating to the company, such as safety protocol documents, that fuelers would have to sign. I assumed that Mr. Navarro was collecting signatures for a similar reason, and signed the paper without asking Mr. Navarro what it was for.

4.     Later the same day, I learned from other fuelers that the signatures were being used as part of a petition against Andrew Dodge.

5.     If I had known that the signatures were being used as part of a petition against Andrew Dodge, I would not have signed it, because I did not want to get involved in that.

6.     Later that day, I spoke with Isiah Banks, another fueler, and he said he also signed a signature page without knowing what it was for. I informed Mr. Banks that I had learned from other fuelers that the signatures were being used as part of a petition against Andrew Dodge. Mr. Banks also stated that if he had known this beforehand, he would not have signed the signature page.

7.     I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign

it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 4th day of September 2020. at San Francisco. California.

Angelo Sadiq

# EXHIBIT 7

## DECLARATION OF WESLEY FAATALALE

I, Wesley Faatalale, hereby state and declare as follows:

1.      Around August 2018, I was employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). My job title at Menzies at that time was Fueler. I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      I am familiar with Renaldo Navarro. At the time around August 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.      In 2018, Mr. Navarro approached me with a petition while I was waiting to clock out at Menzies and asked me to sign the petition. I reviewed the petition and saw that it was a petition to remove Andrew Dodge from his job at Menzies. I did not feel comfortable signing the petition, and I told Mr. Navarro that I would not sign it.

4.      The next day, Mr. Navarro approached me again with the petition while I was waiting to clock out. This time, instead of asking me, he told me to look at the petition and sign it.

5.      Again, I did not want to sign the petition and did not feel comfortable signing the petition that Mr. Navarro presented to me. However, I felt pressured by Mr. Navarro to sign the petition because he was approaching me for a second time, and he was telling me to sign the petition more sternly this time. I also felt pressured by Mr. Navarro to sign the petition because he was a Fueling Supervisor, and I was a Fueler.

6.      I also saw Mr. Navarro approach approximately 10-15 other Fuelers with the petition. It looked to me that Mr. Navarro was taking the same approach with those individuals by instructing them to sign the petition. Approximately 5-10 of those Fuelers stated they would not sign the petition. Sometime after, Mr. Navarro again approached the 5-10 Fuelers who stated they would not sign the petition, and asked them to sign the petition again. I do not know whether those 5-10 Fuelers signed.

7.      I also spoke with three Fuelers at the time, James Johnson, Rohit Kumar, and

Malik, regarding the petition that Mr. Navarro asked me to sign. All three of them stated that Mr. Navarro asked them to sign a petition. All three of them did not want to sign the petition.

8.      I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this 4th day of September 2020, at San Francisco, California.

Wesley Faatalale

# EXHIBIT 8

## DECLARATION OF ROBERTO PANGALILINGAN

I, Roberto Pangalilingan, hereby state and declare as follows:

1.      I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held for approximately 10 years (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      Some time ago, another fueler named Jezen Canlas approached me with a petition regarding Andrew Dodge. I read the petition and signed it. My only reason for signing it was based on operational concerns and not Dodge's manner of communicating or working with Fuelers.

3.      I like Dodge and his manner of communicating with Fuelers and others, but sometimes he does things differently from other supervisors. Sometimes, he sets up the flights too close, so I have heard that Fuelers have to skip their breaks. I personally never had a problem with breaks, but I heard about other Fuelers not getting breaks.

4.      I did not have any problems with Dodge abusing his authority or harassing me and have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge.

5.      I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

4841-4469-1658.2

181

Executed this _16_ th day of September 2020, at San Francisco, California.

_____

Roberto Pangalilingan

# EXHIBIT 9

**DECLARATION OF EFREN DELOS REYES**

I, Efren DeLos Reyes, hereby state and declare as follows:

1.      I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held since 1995 (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.      In 2018, another Fueler named Jezen Canlas approached me with a petition regarding Andrew Dodge. I read the petition and signed it. My only reason for signing it was based on operational concerns and not Dodge's manner of communicating or working with Fuelers.

3.      Before his promotion to Fueling Supervisor, Dodge was a good Fueler. However, in my opinion Dodge was not completely ready to be promoted to Fueling Supervisor because he was still learning how to run the show and organize the schedules of Fuelers and flights.

4.      I did not have any problems with Dodge abusing his authority or harassing me, and have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge.

5.      I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this  16  th day of September 2020, at San Francisco, California.

_____
Efren DeLos Reyes

# EXHIBIT 10

## DECLARATION OF REX TOSCO

I, Rex Tosco, hereby state and declare as follows:

1.    I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held for approximately 25 years (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.    A couple of years ago, someone approached me with a signature page and asked me to sign it. I do not remember exactly who it was, but I remember feeling that I should sign the signature page because the person presenting it to me was asking me to do so and I felt that I needed to sign it.

3.    There was no letter or anything else with the signature page. I just saw a signature page by itself. Nobody explained to me what the signature was for.

4.    I signed the signature page so that nobody would get mad even though I did not know what it was that I was signing. I thought it was okay because other people signed it too.

5.    I later learned that the signature was to get someone out or fired at Menzies. I did not know this before signing the signature page.

6.    I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

Executed this _16_ th day of September 2020, at San Francisco, California.

Rex Tosco

4843-0276-4234 2

186

# EXHIBIT 11

## DECLARATION OF MODESTO COMPAS

I, Modesto Compas, hereby state and declare as follows:

1.    I am currently employed by Menzies Aviation ("Menzies") at San Francisco International Airport ("SFO"). Currently, my job title at Menzies is Fueler, a title that I have held for approximately 5 years (prior to 2017, I held this title with ASIG). I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I believe that I could and would competently testify to the same facts as stated in this declaration.

2.    I am familiar with Renaldo Navarro. Around August 2018, Mr. Navarro was a Fueling Supervisor for Menzies at SFO.

3.    Around 2018, I was approached by Mr. Navarro with a petition regarding Andrew Dodge. Mr. Navarro asked me to sign the petition and I did so. My only reason for signing it was based on operational concerns and not Dodge's manner of communicating or working with Fuelers.

4.    I had heard complaints from some other Fuelers that they were not getting breaks when working with Dodge because of the way he set up flights. I never personally had any such problems with Dodge however.

5.    Also, sometimes, when I called Andrew, he would not answer the phone. I heard that Andrew has sleep apnea, which may be why he did not answer the phone.

6.    I did not have any problems with Dodge abusing his authority or harassing me and have never complained to Menzies or anyone else about harassment from Dodge. I am also not aware of any other Fueler expressing concerns about alleged harassment from Dodge.

7.    I am executing this declaration voluntarily and of my own free will. No one at Menzies has pressured me to sign this declaration, promised me any type of benefit or positive treatment from signing it, or threatened me with negative consequences for deciding not to sign it.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct.

4837-7788-6922 2

188

Executed this 30th day of September 2020, at San Francisco, California.

_____
Modesto Compas

4837-7788-6922.2

# EXHIBIT 12

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


RENALDO NAVARRO,           )   **CERTIFIED COPY**

                            )

          Plaintiff,       )

                            )

      vs.               ) Case No.

                            ) 3:19-cv-08157-VC

MENZIES AVIATION, INC., DOING )

BUSINESS AS MENZIES; and      )

DOES 1 through 10, inclusive, )

                            )

          Defendants.      )

_____ )


       Webex deposition of RENALDO NAVARRO, VOLUME I, taken remotely on behalf of the Defendant, beginning at 9:41 a.m. and ending at 4:23 p.m., on Thursday, July 23, 2020, before JOANNA B. BROWN, Certified Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF RENALDO NAVARRO:
 3            LIBERATION LAW GROUP, P.C.
              BY:  ARLO GARCIA URIARTE, ESQ.
 4            2760 Mission Street
              San Francisco, California 94110
 5            (415) 695-1000
              (415) 695-1006 Fax
 6            arlo@liberationlawgroup.com
 7    FOR DEFENDANT MENZIES AVIATION, INC., dba MENZIES:
 8            FOLEY & LARDNER LLP
              BY:  CHRISTOPHER G. WARD, ESQ.
 9            555 South Flower Street, Suite 3300
              Los Angeles, California 90071-2411
10            (213) 972-4500
              (213) 486-0065 Fax
11            cward@foley.com
12    ALSO PRESENT:
13            CAROLINE CARRERA, TAGALOG INTERPRETER #301298
14
15
16
17
18
19
20
21
22
23
24
25
```

3

192

```
 1                    I N D E X
 2   EXAMINATION OF:                            PAGE
 3   RENALDO NAVARRO
 4
 5        BY MR. WARD                             7
 6        BY MR. URIARTE                        115
 7
 8                  E X H I B I T S
 9   DEFENDANT'S                                PAGE
10   Exhibit 1   Aircraft Service International
                 Group "Incident Report" dated
11               March 18, 2007, Bates
                 No. MENZIES_000146 (1 page)     34
12
     Exhibit 2   Aircraft Service International
13               Group "Notice to Employees as to
                 Change in Relationship," Bates
14               Nos. MENZIES_000143 and
                 MENZIES_000144 (2 pages)        35
15
     Exhibit 3   Aircraft Service International
16               Group "Incident Report" dated
                 March 30, 2009, Bates
17               No. MENZIES_000140 (1 page)     38
18   Exhibit 4   "Employee Coaching Document"
                 for a May 30, 2009, warning,
19               Bates No. MENZIES_000139 (1 page)  39
20   Exhibit 5   "Employee Coaching Document"
                 for a May 18, 2010, warning,
21               Bates Nos. MENZIES_000135 and
                 MENZIES_000136 (2 pages)        40
22
     Exhibit 6   "Employee Coaching Document"
23               for a May 3, 2012, warning,
                 Bates No. MENZIES_000126 (1 page)  41
24
     Exhibit 7   June 30, 2013, warning document,
25               Bates No. MENZIES_000127 (1 page)  42
```

4

```
1                    E X H I B I T S
2    DEFENDANT'S                                       PAGE
3    Exhibit 8    Letter to "Menzies Management"
                  from Menzies fueler, Bates
4                 Nos. MENZIES_000152 -
                  MENZIES_000154 (3 pages)             54
5
     Exhibit 9    Second petition against
6                 Andrew Dodge, Bates
                  No. MENZIES_000150 (1 page)          54
7
     Exhibit 10   Text-message exchange, Bates
8                 No. MENZIES_000088 (1 page)          56
9    Exhibit 11   Handwritten statement by
                  Christopher Lawrence, Bates
10                No. MENZIES_000086 (1 page)          64
11   Exhibit 12   Handwritten statement by
                  Andrew Dodge August 16, 2018,
12                Bates No. MENZIES_000089
                  (1 page)                             66
13
     Exhibit 13   "Employee Performance Development,"
14                Bates No. MENZIES_000099 (1 page)    79
15   Exhibit 14   Typed statement by John Qually,
                  Bates No. MENZIES_000084 (1 page)    82
16
     Exhibit 15   Set of documents produced, Bates
17                Nos. RenaldoNavarro 000001 -
                  RenaldoNavarro 000014 (14 pages)     95
18
     Exhibit 16   Plaintiff's Initial Disclosures
19                Pursuant to Federal Rule of
                  Civil Procedure 26(a)(1)
20                (3 pages)                            105
21
22                  UNANSWERED QUESTIONS
23                  PAGE    LINE
24                   14      10
25
```

5

194

```
 1              Remotely; Thursday, July 23, 2020

 2                      9:41 a.m.

 3

 4                  CAROLINE CARRERA,

 5      having been duly sworn, translated English into

 6       Tagalog and Tagalog into English as follows:

 7

 8                  RENALDO NAVARRO,

 9          having been duly sworn, was examined

10              and testified as follows:

11

12      THE REPORTER:  Good morning.  My name is

13   Joanna Brown.  I am a California certified stenographic

14   reporter.  Due to the current national emergency of the

15   COVID-19 virus, this deposition is being handled via

16   remote means.

17          Today's date is Thursday, July 23, 2020, and

18   the time is approximately 9:41 a.m.  This is the

19   deposition of Renaldo Navarro in the matter of

20   Renaldo Navarro v. Menzies Aviation, Inc.  This is

21   venued in the United States District Court, Northern

22   District of California.  The case number is

23   3:19-cv-08157-VC.

24          At this time, I will ask counsel to identify

25   yourselves, state who you represent, and agree on the
```

6

```
 1    bit earlier, is that the only time you've been a party

 2    to a lawsuit?

 3        A    Yes, sir.

 4        Q    Have you ever made any type of legal claim

 5    against a former employer other than Menzies?

 6        A    There was, sir.

 7        Q    What was that?

 8        A    At Swissport.  It's the name of the company,

 9    Swissport.

10        Q    And specifically what type of legal claim did

11    you make against Swissport, if it was not a lawsuit?

12        MR. URIARTE:  I'm going to -- I'm just going

13    to instruct the witness not to answer right now.

14        Chris, can we, like, just meet and confer for

15    a second here?

16        He has a settlement agreement with Swissport,

17    and it has a confidentiality clause.  So we cannot --

18    I guess what we could say is that they were

19    employment-related claims with regards to his

20    employment at Swissport.

21        MR. WARD:  Okay.  May I -- did he -- what I'd

22    like to know is if Mr. Navarro made any type of

23    administrative claim against Swissport or if it was

24    purely a private settlement prior to any type of formal

25    action.
```

14

```
 1              MR. URIARTE:  It was a private settlement.
 2    Yeah.
 3              MR. WARD:  Okay.  We are going to need to come
 4    back to that, but I'll move on at the moment.
 5         Q    Let me ask, what is the approximate date of
 6    that settlement agreement?
 7         A    What's that for?  Swissport?
 8         Q    Yes.  What is the date of that settlement
 9    agreement, approximately?
10         A    I no longer -- I'm no longer sure about 2013
11    or '14.  I no longer remember, 2014, 2013, 2015, like
12    that.
13         Q    Is it your belief that -- well, strike that
14    question.  Were you --
15              Was your employment with Swissport terminated
16    involuntarily?
17              MR. URIARTE:  Yeah.  I mean, Chris, I don't
18    want to make this process difficult.  I'm just not
19    certain as we sit here whether he'd be violating his
20    confidentiality agreement if he answered that, you
21    know.  I'm not certain with regards to that.  Look, if
22    I can send to you a copy of the settlement agreement, I
23    would, but I'm just not -- I think we have a notice
24    requirement with regard to that.  We would have to
25    notify Swissport before we divulge.
```

```
 1              MR. WARD:  All right.

 2      Q    Mr. Navarro, is it your belief that if you

 3   make legal claims against a former employer, that you

 4   are likely to get a settlement from them?

 5              MR. URIARTE:  Objection.  Vague and ambiguous.

 6   Calls for a legal conclusion.

 7              THE INTERPRETER:  Sorry.  Vague and ambiguous

 8   and what?  What's the other one?

 9              MR. URIARTE:  Calls for a legal conclusion.

10              You can answer, Mr. Navarro, if you

11   understand.

12              THE WITNESS:  Yes.  Please repeat.

13   BY MR. WARD:

14      Q    My question is, is it your belief that if you

15   make legal claims against a former employer, you are

16   likely to get a settlement?

17      A    Yes, sir.

18      Q    Is that what you are doing in this lawsuit?

19      A    Yes, sir.

20      Q    Is it your belief that employers are likely to

21   give you a settlement if you make claims against them

22   regardless of the merit of those claims?

23              MR. URIARTE:  Objection.  Calls for a legal

24   conclusion.  Vague and ambiguous.

25              THE WITNESS:  Please repeat the question
```

                                                          16

```
 1    again.

 2           MR. WARD:  Sure.

 3       Q    Is it your belief that if you make legal

 4    claims against a former employer, you are likely to get

 5    a settlement from them regardless of the merit of those

 6    claims?

 7       A    Yes, sir.

 8           MR. URIARTE:  Mr. Navarro, are you

 9    understanding the Tagalog interpretation?

10           THE WITNESS:  (Inaudible.)

11           MR. URIARTE:  You have to answer in Tagalog.

12           MR. URIARTE:  Yeah.  I mean, I have --

13           THE INTERPRETER:  Just a second.  Let me

14    interpret that.

15           THE WITNESS:  It seems it's far from my

16    understanding in Tagalog.

17           MR. URIARTE:  I think -- Ms. Carrera, I

18    understand your proficiency and your amazing use of the

19    official, traditional, government-level Tagalog, but

20    it's sure not what usual, normal people in Tagalog

21    would use in the street.  There are two forms of

22    Tagalog.  There's the Tagalog that is normally used

23    around the country by normal people, but when you use

24    words like (speaks Tagalog) -- I went to a university

25    there, and I spoke formal Tagalog; but normal people
```

17

```
 1      Q    And did you graduate?

 2      A    Are you asking how long?  How long, sir?

 3      Q    Yes.

 4      A    Yes, sir.

 5      Q    Did you attend any type of college or

 6  university in the Philippines?

 7      A    Yes, sir.

 8      Q    Where was that?

 9      A    Philippine College of Criminology, but I did

10  not finish it.

11      Q    Any other type of schooling in the Philippines

12  other than high school and what you just mentioned

13  prior to moving to the United States?

14      A    No more, sir.

15      Q    Can you please identify for me all of your

16  employers prior to Menzies Aviation since you

17  arrived -- well, let me start over.

18           After you moved to the United States, can you

19  please list all of your employers up to Menzies.

20      A    In 2005, when I got here, I worked at

21  Service Fair part-time -- oh, Service Air part-time.

22  2005, in September, I started at ASIG Aviation.  In

23  2005, where I worked for, it was purchased by

24  Swissport.  It was purchased in 2015 by Swissport, and

25  in 2016, ASIG was purchased by Menzies.
```

23

```
 1      Q     Did I understand you correctly that you worked
 2   for ASIG -- you've had two different periods of time
 3   where you were employed by ASIG?
 4      A     What do you mean two different times?
 5      Q     So let me do it this way:  First you -- first
 6   you started at Service Air; right?
 7      A     Yes, sir.
 8      Q     And did you remain employed by Service Air up
 9   to when Swissport purchased Service Air?
10            THE INTERPRETER:  Please repeat the question.
11            MR. WARD:  Sure.
12            From when he started at Service Air until the
13   purchase by Service Air of Swissport, was he
14   continuously employed by Service Air?
15            THE WITNESS:  Yes, it was continuous.
16   BY MR. WARD:
17      Q     Okay.  And then, when you started your
18   employment with ASIG in approximately 2016, was that
19   the first time you had worked for ASIG?
20      A     What I did was work in 2005 at ASIG up to 2016
21   when Menzies purchased ASIG, and I continuously worked
22   for them.
23      Q     I see.  You were working for both Service Air
24   and ASIG at the same time?
25      A     Yes, sir.  I'm sorry.  Different.  They were
```

24

```
 1    different.
 2         Q    Okay.  Did you ever have any type of
 3    supervisory job at Service Air?
 4              THE INTERPRETER:  Please repeat the question.
 5              MR. WARD:  Sure.
 6         Q    At Service Air, did you have any type of
 7    supervisory responsibilities?
 8         A    No, sir.
 9         Q    The only supervisory job you've had was at
10    ASIG and Menzies; right?
11         A    Yes, sir.
12         Q    Have you ever declared bankruptcy?
13         A    No, sir.
14         Q    Have you ever been convicted of a felony in
15    the United States?
16         A    No, sir.
17         Q    And you understand that Menzies purchased ASIG
18    at some point a couple of years ago; correct?
19         A    2016, sir.
20         Q    While you were employed by ASIG, you were
21    promoted to supervisor; right?
22         A    Yes, sir.
23         Q    And at that time, were you given additional
24    job responsibilities as a supervisor?
25         A    Yes, sir.
```

25

```
 1      Q    What did you understand those additional
 2  responsibilities to include?
 3      A    First of all, with people.  Before you were
 4  with people and then you had to handle people, and
 5  then -- and also, with the flight, you should be able
 6  to distribute it to the people equally.
 7      Q    And when you say "distribute," are you talking
 8  about distributing the amount of work across the people
 9  you supervise equally?
10      A    Yes, sir.
11      Q    The supervisory job that you received at ASIG,
12  was it fuel?
13           THE INTERPRETER:  I'm sorry.  Was it what?
14  Hello?
15           MR. URIARTE:  There's an audio issue.
16           THE INTERPRETER:  I didn't get the complete
17  question.
18           MR. URIARTE:  Chris, your screen -- Chris,
19  your screen shows a muted icon again.
20           MR. WARD:  I just lost sound in here again.
21  Can you -- I cannot hear anything that anybody is
22  saying, but I think you can all hear me.  Can somebody
23  nod their head yes.
24           MR. URIARTE:  Yes.
25           THE INTERPRETER:  Yes, yes.
```

26

```
 1              MR. URIARTE:  Can we get off the record?

 2              MR. WARD:  Off the record again, please.

 3              (Off the record.)

 4              MR. WARD:  Are we back on the record?

 5              THE INTERPRETER:  Yes, I'm here.

 6              MR. WARD:  All right.  Can you read off the

 7    last question that I asked as well as the response.  I

 8    missed all of that.

 9              (The record was read as follows:  "The

10              supervisory job that you received at ASIG,

11              was it fuel?")

12              MR. WARD:  All right.  I couldn't hear that,

13    and there's all kinds of background noise.  Can you

14    read the question and answer again, please.

15              (The record was read as follows:  "The

16              supervisory job that you received at ASIG,

17              was it fuel?")

18    BY MR. WARD:

19       Q      All right.  So the question, Mr. Navarro, the

20    supervisory job that you had at ASIG, was it fueling

21    supervisor?

22       A      Yes, sir.  Yes, sir.

23       Q      And is that the same job you held until your

24    termination of employment?

25       A      Yes, sir.
```

27

```
 1      Q   Do you consider the fueling-supervisor

 2   position to be part of company management?

 3      A   Yes, sir.  Yes, sir.

 4      Q   Do you consider that fueling-supervisory

 5   position to be a leadership role?

 6      A   Yes, sir.

 7      Q   In your opinion, is it important for

 8   supervisors to be at work when they are expected to be

 9   there?

10          THE INTERPRETER:  I didn't get the first part

11   of the question.  Please repeat that.

12          MR. WARD:  Sure.

13      Q   In your opinion, is it important for

14   supervisors to be at work when they are expected to be

15   there?

16          THE INTERPRETER:  I'd ask that to be repeated.

17   Sorry.  There are some breaks in the words.

18   BY MR. WARD:

19      Q   In your opinion, Mr. Navarro, is it important

20   for supervisors to be at work when they are expected to

21   be at work?

22      A   Yes, sir.

23      Q   In your opinion, is it important for

24   supervisors to be honest in their communications with

25   their employer?
```

28

1      A      Yes, sir.

2      Q      In your opinion, is it important for

3   supervisors to follow company policy?

4      A      Yes, sir.

5      Q      In your opinion, is it important for

6   supervisors to set a positive example for

7   nonsupervisory employees?

8          MR. URIARTE:   Objection.   Vague and ambiguous.

9          You can answer, Mr. Navarro.

10         THE WITNESS:   Yes, sir.

11  BY MR. WARD:

12     Q      In your opinion, is it important for a

13  supervisor to support the other members of company

14  management?

15     A      Yes, sir.

16     Q      In your opinion, is it important for

17  supervisors to work effectively with other company

18  supervisors?

19     A      Are you referring to another company, sir?

20     Q      I'm just referring to, in a supervisory

21  capacity, is it important -- is it important, in your

22  opinion, to work effectively with other supervisors?

23     A      Yes, sir.

24     Q      In your opinion as a supervisor, is it

25  important to avoid undermining the authority of other

29

1    supervisors?

2              THE INTERPRETER:  This is the interpreter.  I

3    would like to consult a word first.

4              MR. WARD:  Sure.

5              THE WITNESS:  Please repeat that, sir.

6              MR. WARD:  Sure.

7         Q    As a supervisor, in your opinion, is it

8    important not to undermine the authority of other

9    supervisors?

10        A    Yes, sir.

11        Q    As a supervisor, is it appropriate, in your

12   opinion, to involve nonsupervisory employees in

13   personal disputes?

14             MR. URIARTE:  Objection.  Vague and ambiguous.

15   Chris, did you say other supervisors or other

16   nonsupervisors?

17             MR. WARD:  I will have the reporter repeat my

18   question, please.

19             (The record was read as follows:  "As a

20             supervisor, is it appropriate, in your

21             opinion, to involve nonsupervisory

22             employees in personal disputes?")

23             THE WITNESS:  Yes, sir.  That's correct.

24   BY MR. WARD:

25        Q    And as a supervisor, should you avoid

                                                           30

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
 1    involving nonsupervisory employees in personal
 2    grievances?
 3         A    Yes, sir.
 4         Q    As a supervisor, should you avoid pressuring
 5    employees to get involved in personal grievances?
 6         A    Will you please repeat the question again.
 7         Q    Sure.  As a supervisor, is it important to
 8    avoid pressuring employees, nonsupervisory employees,
 9    to get involved in personal grievances?
10         MR. URIARTE:  Before you answer that question,
11    Mr. Navarro, remember the instruction earlier.  If you
12    do not understand the question that is said in Tagalog,
13    indicate that if you are having a problem with the
14    Tagalog interpretation.  Do say that so that we know
15    where the problem is.  I just want to make sure that
16    you do that.  Okay?  Great, Mr. Navarro.
17         THE INTERPRETER:  This is the interpreter
18    speaking.  I would like to have the question, please,
19    repeated.
20         MR. WARD:  Sure.
21         Q    My question is, in your opinion, should a
22    supervisor avoid pressuring nonsupervisory employees to
23    become involved in personal disputes?
24         A    No, sir.
25         Q    Why not?
```

31

```
 1      A    For example, it's my own problem.  Why should
 2   I involve them in my own problem?
 3      Q    And if you had a conflict with another
 4   supervisor, in your opinion, should non- -- scratch
 5   that.  Start over.
 6           As a supervisor, if you have a conflict with
 7   another supervisor, is it your understanding that
 8   nonsupervisory employees should not be brought into
 9   that problem?
10           THE INTERPRETER:  Should that be -- I'm sorry.
11   Chris, should not be what?
12           MR. WARD:  I'll just ask a different question
13   again.
14           THE INTERPRETER:  Okay.
15   BY MR. WARD:
16      Q    As a supervisor, is it your understanding that
17   you should not bring nonsupervisory employees into
18   conflicts you have with another supervisor?
19      A    That's correct, sir.
20      Q    As a supervisor, if you ask a nonsupervisory
21   employee to sign something, do you think you should
22   first explain to the employee what you are asking them
23   to sign?
24           THE INTERPRETER:  Just a second.  I have to
25   translate this again.
```

32

1           THE WITNESS:  That's correct, sir.

2   BY MR. WARD:

3      Q    In your opinion, if a company has an opinion

4   that a supervisor has been pressuring nonsupervisory

5   employees --

6           THE INTERPRETER:  This is the interpreter.

7   It's breaking up.

8           MR. WARD:  I'll try again.

9           THE INTERPRETER:  Go ahead.

10  BY MR. WARD:

11     Q    In your opinion, if a company has a good-faith

12  belief that a supervisor has been intimidating

13  nonsupervisory employees, would that be a valid basis

14  for termination of the supervisor?

15          MR. URIARTE:  Objection.  Calls for a legal

16  conclusion.  Vague and ambiguous.

17          THE WITNESS:  I think it depends, sir.

18  BY MR. WARD:

19     Q    What would it depend upon?

20     A    It depends on what the employee wants to tell

21  them on what intimidation the employee is talking

22  about.

23     Q    In your opinion, is it important for employees

24  to take responsibility for their errors?

25          THE INTERPRETER:  Please repeat that.

33

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

210

```
 1              MR. WARD:  Sure.
 2       Q    In your opinion, is it important for employees
 3   to take responsibility for their errors?
 4       A    Yes, sir.
 5       Q    Okay.  I'm going to do my best to see if we
 6   can make this work.  I am sharing a document that I am
 7   going to mark as Exhibit 1 to your deposition.
 8            Are you able to see that?
 9       A    Yes, sir.
10       Q    Are you able to see the full exhibit -- the
11   full page?
12       A    No, sir.  Just the date of incident, sir.
13       Q    How about now?
14       A    Yes, sir.
15            (Deposition Exhibit 1 was marked for
16            identification, a copy of which is
17            attached hereto.)
18   BY MR. WARD:
19       Q    Have you ever seen Exhibit 1 before?
20       A    No, sir.
21       Q    To your knowledge, in March of 2007, were you
22   ever spoken to by a supervisor about not following
23   instructions?
24       A    I don't remember anything (inaudible), what
25   they were instructing me.
```

34

211

```
 1              MR. WARD:  We are off the record.

 2              (Off the record.)

 3              MR. WARD:  Let's go back on the record.

 4      Q    Mr. Navarro, are you familiar with an

 5   individual by the name of Andrew Dodge?

 6      A    Yes, sir.

 7      Q    And at the time that you were employed by

 8   Menzies, was Mr. Dodge also a supervisor?

 9      A    Yes, sir.

10      Q    And he was also a fueling supervisor; correct?

11      A    Yes, sir.

12      Q    So the same position you held; correct?

13      A    Yes, sir.

14      Q    Do you recall that there was some type of

15   petition that was circulated, complaining about

16   Andrew Dodge?

17              THE INTERPRETER:  I'm sorry.  Complaining

18   about what?

19   BY MR. WARD:

20      Q    Complaining about Andrew Dodge?

21      A    Yes, sir.

22      Q    And how did you first learn about that

23   petition?

24              THE INTERPRETER:  I'm sorry.  Please repeat

25   that.
```

43

```
1    BY MR. WARD:

2         Q    Anybody else you can identify by name who

3    asked you to sign the petition?

4         A    I forgot the others, but it was Jezen and

5    Rafael.

6         Q    Did you sign the petition?

7         A    Yes, sir.

8         Q    Did you think it was appropriate to get

9    involved in a petition against another supervisor?

10             MR. URIARTE:  Objection.  Vague and calls for

11   a legal conclusion.

12             You can answer, Mr. Navarro.  You can answer

13   after my objection.

14             THE WITNESS:  Please repeat the question.

15   BY MR. WARD:

16        Q    The question was did you think it was

17   appropriate to sign a petition against another

18   supervisor?

19             MR. URIARTE:  Same objection.

20             THE WITNESS:  Maybe because, you know -- just

21   on the right, you know.

22   BY MR. WARD:

23        Q    I don't understand your answer, Mr. Navarro.

24        A    If we know that what they are fighting for

25   against Andrew Dodge is right, so why not help them and
```

46

1     also help the company also --

2          Q     Do you think --

3          A     -- to correct the wrong things that

4     Andrew Dodge did.

5          Q     And do you think signing a petition about

6     Andrew Dodge might undermine Andrew Dodge's authority

7     with nonsupervisory employees?

8          A     They are the ones who are signing that.  They

9     know the bad things that Andrew Dodge was doing to me;

10    and, also, the things he was doing against the fueler,

11    that was not good.

12         Q     My question is different.  My question is did

13    you think signing a petition against Andrew Dodge might

14    undermine Andrew Dodge's authority?

15              MR. URIARTE:  Objection.  Vague and ambiguous.

16              THE WITNESS:  Maybe not, sir.

17    BY MR. WARD:

18         Q     Maybe not or no?

19         A     No, no (In English).

20              THE INTERPRETER:  This is the interpreter.  I

21    interpreted "not" and "no" the same word.

22              THE WITNESS:  No, sir.

23    BY MR. WARD:

24         Q     Why not?

25         A     If what's being said is the ones that is

47

```
 1      A    Yes, sir.

 2      Q    If Andrew Dodge had complained to

 3  nonsupervisory employees about you, do you think that

 4  would have been appropriate for him to do so?

 5           THE INTERPRETER:  Please repeat that question.

 6           MR. WARD:  Sure.

 7      Q    If Andrew Dodge had complained to

 8  nonsupervisory employees about you, do you think

 9  Andrew Dodge would be acting appropriately?

10           MR. URIARTE:  Objection.  Lacks foundation.

11  Vague and incomplete hypothetical.

12           THE WITNESS:  It depends on him.  I do not

13  know what he is thinking of.

14  BY MR. WARD:

15      Q    Now, prior to signing this petition, you had

16  previously submitted complaints about Mr. Dodge;

17  correct?

18      A    Yes, sir.

19      Q    When was that?

20           THE INTERPRETER:  The interpreter would like

21  to inquire.

22           THE WITNESS:  I no longer remember.  The

23  people told me what Andrew was doing.  So I had that --

24  I had that reported to the superiors.

25  ///
```

49

```
 1          THE INTERPRETER:  Yeah.  I stand corrected.  I
 2    omitted Renil.
 3          MR. WARD:  Let's strike that question.  I'll
 4    ask it again.
 5      Q   So other than Randy Davies, Nico, Tracy,
 6    Renil, and John Qually, is there anybody else who you
 7    communicated complaints about Andrew Dodge to?
 8      A   No more.
 9      Q   How much time passed, approximately, between
10    when you communicated these complaints and when you
11    signed the petition?
12      A   Maybe those are years.  Years.
13      Q   And in between when you communicated the
14    complaints and when you signed the petition, did you
15    make, yourself, any other complaints involving
16    Andrew Dodge?
17      A   No more -- no, sir.
18          MR. URIARTE:  Is this a good time for lunch?
19    We have lunch being delivered.  So --
20          MR. WARD:  We can go maybe for another 10 or
21    15 minutes first, if that's all right.
22          MR. URIARTE:  That's okay.  Yeah.  Maybe --
23    yeah, closer to 10 hopefully.
24          MR. WARD:  All right.  I am going to mark
25    as Exhibit 7 a document which has the Bates Nos. -152
```

51

```
 1    to -154.

 2         Q     Mr. Navarro, this is a three-page document.

 3    So let me know when you've reviewed the first page, and

 4    then I'll move to the next one.

 5         A     Yes, sir.

 6         Q     Okay.  Can I flip to the next page?

 7               MR. URIARTE:  I'm trying to magnify it because

 8    it's really small.  Is that okay, Mr. Navarro?

 9               THE WITNESS:  Okay.

10    BY MR. WARD:

11         Q     All right.  Have you had a chance to look at

12    this first page?

13         A     Yes, sir.

14         Q     Let me know when you've had a chance to look

15    at this second page.

16         A     Yes, sir.

17         Q     And how about this third page?  Have you seen

18    this?

19         A     Yes.  The supervisor also.

20         Q     All right.  Do you recognize this document

21    I've marked as Exhibit 7?

22         A     Yes, sir.

23         Q     And is this the petition that was presented to

24    you for signature?

25         A     Yes, sir.
```

52

```
 1        Q    This first page that I have up right now, is
 2   that what the petition looked like when it was
 3   presented to you?
 4             THE INTERPRETER:  Please repeat the question.
 5   The audio is breaking up.
 6   BY MR. WARD:
 7        Q    For this first page that I have up in front of
 8   you right now marked as -152, is that what the petition
 9   looked like when it was presented to you?
10        A    Yes, sir.
11        Q    And is that your signature on line 16 there on
12   the second page of this exhibit?
13        A    Yes, sir.
14        Q    And you are the one who placed your signature
15   there?
16        A    Yes, sir.
17             MR. WARD:  All right.  I'm going to mark this
18   Exhibit 8.  It's Bates No. -150.
19        Q    Mr. Navarro, let me know when you've had a
20   chance to review this.
21             THE REPORTER:  Mr. Ward, can we go off the
22   record one moment?
23             MR. WARD:  Sure.
24             (Off the record.)
25             MR. WARD:  We are back on the record.
```

53

```
1              The reporter just clarified for me that

2    documents Bates No. -152 to -154 I had marked as

3    Exhibit 7, but it should actually be 8; is that right?

4              THE REPORTER:  Yes.

5              MR. WARD:  So then this document I have up

6    right now, Bates No. -150, is actually going to be

7    Exhibit 9.

8              (Deposition Exhibits 8 and 9 were marked

9              for identification by the reporter,

10             copies of which are attached hereto.)

11   BY MR. WARD:

12        Q    Have you had a chance to look at Exhibit 9

13   here?

14        A    I already read it, sir.

15        Q    Prior to today, have you ever seen this

16   Exhibit 9?

17        A    They gave me a copy.

18        Q    When you say "they," who is "they"?

19        A    The shop steward gave it to me, Rafael.

20        Q    Did Rafael give this to you after you had

21   signed the petition?

22        A    I think this is the second petition, that this

23   is the second petition they made against Andrew Dodge.

24        Q    So is it your testimony that there were two

25   petitions against Andrew Dodge?
```

54

```
 1      A    The first one was the first one that you
 2  showed with my signing, and I think this is the second.
 3      Q    Okay.  Did you ever sign this second petition?
 4      A    I was not -- no longer able to sign it because
 5  they already terminated me at that time.
 6      Q    I see.  So this, Exhibit 9, you first saw it
 7  after your termination?
 8      A    When they terminated me and the people signed
 9  that petition, I was given a copy by Rafael.
10      Q    I just want to be clear though.  The copy of
11  this, Exhibit 9 that you received from Rafael, did you
12  receive that before or after your termination?
13      A    I was already terminated.
14      Q    Okay.  Did you ever have any text-message
15  communication with Mr. Dodge about the petition against
16  him?
17      A    No, sir.
18           MR. WARD:  I'm going to mark this as
19  Exhibit 10, and this is Bates-numbered -88.
20           (Deposition Exhibit 10 was marked for
21           identification by the reporter, a
22           copy of which is attached hereto.)
23  BY MR. WARD:
24      Q    On the lower half of the page, Mr. Navarro, it
25  looks like a screen capture of some text messages.
```

55

```
 1   Have you ever seen those messages before?

 2       A    Yes.

 3            MR. WARD:  I'm sorry.  The reporter, can you

 4   repeat my question, please, the last one I just asked.

 5            (The record was read as follows:  "On

 6            the lower half of the page, Mr. Navarro,

 7            it looks like a screen capture of some

 8            text messages.  Have you ever seen those

 9            messages before?")

10   BY MR. WARD:

11       Q    Where have you seen this before today,

12   Mr. Navarro?

13       A    It's here.

14       Q    So wait.  Is your testimony that this is the

15   first time you've ever seen what appears to be text

16   messages?

17       A    I already saw that on the cell phone of the

18   supervisor.

19       Q    All right.  When you say "on the cell phone of

20   the supervisor," what supervisor?

21       A    The cell phone that we were using.

22       Q    Okay.  So is it fair to state -- where it says

23   "Ray Navarro" on this screen capture and then there's

24   some messages below there, did you write that?

25       A    Yes, sir.
```

56

```
1      Q    At the very bottom there, where it says
2    "...remember all people sign to that petition agains
3    you but i never submit it yet," what did you mean when
4    you wrote "i never submit it yet"?
5      A    What I meant there is because the petition
6    letter was given to me to be submitted to Raul Vargas,
7    I did not submit it; but the people told me that I
8    should submit the petition so that they would know what
9    Andrew was doing.
10     Q    Who specifically told you that you should be
11   the one to submit the petition?
12     A    Because, at that meeting, Raul Vargas was
13   there.  He was our director.  He said that we -- that I
14   submit it --
15          THE INTERPRETER:  Just a second.
16          THE WITNESS:  It's just, in that meeting, I
17   was told "Please give this to Raul Vargas."
18   BY MR. WARD:
19     Q    And my question is who is the specific person
20   who told you to give it to Raul Vargas?
21     A    I was just given the petition -- the petition
22   letter.  I don't remember the person anymore.  That's
23   why I just gave it to Raul.
24     Q    Why did you delay in submitting the petition
25   after you were asked to do so?
```

57

1  statement, or what purports to be a statement, provided

2  by Christopher Lawrence, stating that Renaldo Navarro

3  had you sign the papers without fully explaining to me

4  what it was for.

5       Do you have any idea what Mr. Lawrence might

6  be referring to there?

7       THE INTERPRETER:  What's the last name, sir,

8  again?

9       MR. WARD:  Lawrence.

10      THE WITNESS:  I do not know what he's saying

11 because I was not the one who asked him to sign.  So I

12 do not know what he wrote here.

13 BY MR. WARD:

14     Q    Did you ever provide any type of papers to

15 Mr. Lawrence and ask him to sign them?

16     A    No, sir.

17     Q    Do you have any personal knowledge whether

18 Mr. Lawrence provided this statement to Menzies?

19     A    I do not know any.

20     Q    Do you have any reason to dispute whether

21 other fuelers provided statements to Menzies regarding

22 their disagreement with the petition against Mr. Dodge?

23          MR. URIARTE:  Objection.  Vague and ambiguous.

24          THE WITNESS:  I do not know any of that.

25 ///

65

```
 1    BY MR. WARD:

 2         Q    Are you aware that Mr. Dodge made a complaint

 3    to Menzies about you?

 4         A    I do not know.

 5              MR. WARD:  I'm going to mark as Exhibit 12

 6    what is Bates No. -89.

 7              (Deposition Exhibit 12 was marked for

 8              identification by the reporter, a

 9              copy of which is attached hereto.)

10              MR. URIARTE:  What was the Bates number?

11              MR. WARD:  This is -89.

12              MR. URIARTE:  Thank you.

13    BY MR. WARD:

14         Q    Let me know when you've had a chance to review

15    this, Mr. Navarro.

16         A    Yes, I've read it already.

17         Q    Have you ever seen this document before today?

18         A    That's right.

19              MR. URIARTE:  Okay.  Mr. Navarro, I want you

20    to read the whole document word for word -- okay? --

21    not that you've seen it, but I think the question is --

22    he wants you to read it, Mr. Navarro.

23              MR. WARD:  I think the question I asked was

24    had Mr. Navarro ever seen this document prior to today.

25              THE WITNESS:  No, sir.
```

66

224

```
 1    BY MR. WARD:

 2         Q    Okay.  I'll represent to you that this is a

 3    statement provided to Menzies by Andrew Dodge.  I want

 4    you to note in the second line there where it says

 5    "Ray Navarro, he has been very rude to me by telling me

 6    that the company don't need me."

 7              Do you see that?

 8         A    Yes, sir.

 9         Q    And did you ever tell Mr. Dodge that the

10    company doesn't need him?

11         A    I did not say anything like that.

12         Q    Do you see the next line where Mr. Dodge

13    represents that you told him he's a bad supervisor?

14         A    I said that due to the complaints of the

15    people about their breaks and not able to take their

16    breaks, their lunch break, and the amount of work that

17    was being given to them by him.

18         Q    So those are things that you said directly to

19    Mr. Dodge?

20         A    He knows about that because he knew himself

21    that there were a lot of complaints about him.  He

22    knows about what the fuelers were saying about him.

23         Q    My question is different though.  It's did you

24    tell those things to Mr. Dodge directly yourself?

25         A    No, sir.
```

67

```
1        Q     Did you ever tell him that you were a bad

2   super- -- that he's a bad supervisor?

3        A     No, sir.

4        Q     Did you ever tell Mr. Dodge that he causes

5   delays?

6        A     Please repeat that.

7        Q     Sure.  Did you tell Mr. Dodge that he -- that

8   all he does is cause delays?

9        A     I said that because the shift of Dodge was

10  2:00 to 6:00 and my shift was 12:00 to 6:00 and then --

11  the shift of Dodge is 2:00 to 10:00.  Those who are

12  going to work at 1:50, when I get them, 5:00 to 1:00 --

13  those who start at 5:00 to 1:00, they told me the

14  problems.

15       Q     So is that a yes?  You told Mr. Dodge that he

16  causes delays?

17       A     Are you referring to a flight -- delayed

18  flights?

19       Q     I'm referring to what you said directly to

20  Mr. Dodge about these various complaints.

21             Did you communicate any of these employee

22  complaints about him to him yourself?

23       A     The people themselves were the ones that --

24  the people told me about it, and I told him also what

25  the people feel about him.
```

68

```
 1      Q    So it's true that you told Mr. Dodge directly
 2   about these various complaints that employees purported
 3   to have about him; correct?
 4      A    Yes, sir.
 5      Q    Where Mr. Dodge writes below that that you
 6   follow him around and love to make a big scene in front
 7   of other workers, did you ever try -- did you ever
 8   confront Mr. Dodge about what these employees said,
 9   these other employees?
10      A    No, sir.
11      Q    Did you ever talk to Mr. Dodge at all about
12   these various complaints in front of nonsupervisory
13   employees?
14      A    No, sir.  When Dodge and I speak to each
15   other, we are just by ourselves.
16      Q    Do you see where Mr. Dodge wrote that you
17   would follow him around and make hand gestures at him?
18      A    Ever since, I do not follow Dodge around
19   because we are different shifts.  I'm coming in.  He's
20   leaving.
21      Q    So you deny ever making hand gestures or
22   following Mr. Dodge around?
23      A    I don't know anything about that.  I do not do
24   that.
25      Q    Do you see where Mr. Dodge wrote that you told
```

69

227

1    him that you would turn a petition in against him?

2         A    I told that to him on text.

3         Q    Okay.  So that at least is something of a true

4    statement; right?

5         A    How is that?

6         Q    Well, you said in the text message that you

7    have a petition that you haven't turned in; right?

8         A    Yes, sir.  That's the one.

9         Q    At some point, did you ever learn that Menzies

10   was investigating you based on Mr. Dodge's complaint?

11        A    I do not know.  I do not know anything about

12   that.

13        Q    At some point, you learned you were being

14   suspended, though; correct?

15             THE INTERPRETER:  I'm sorry.  Repeat that,

16   Mr. Ward.

17   BY MR. WARD:

18        Q    At some point after you signed the petition,

19   you learned that you were being suspended; correct?

20        A    When --

21             THE INTERPRETER:  This is the interpreter.  I

22   would like to inquire.

23             THE WITNESS:  When we had the meeting, I

24   submitted the petition after.  That day, I was on duty,

25   graveyard shift, and John called me, arrived.  He told

70

```
 1    me to wait for Raul Vargas, and then that was the time

 2    Raul Vargas suspended me.

 3    BY MR. WARD:

 4         Q    And prior to that meeting, you had not

 5    submitted this petition; is that true?

 6         A    No, sir, because -- only at that meeting

 7    because I have no time to go there to submit the

 8    petition because I was working.  I was working assigned

 9    jobs.

10         Q    Okay.  So you were called into a meeting;

11    right?

12         A    Yes, sir.  Yes, sir.

13         Q    And that was the meeting with Raul and

14    John Qually that you just mentioned; right?

15         A    He was not there.  It was just Renil, Nico,

16    and the other manager who was, like, a Chinese.  And

17    John Qually was just on the phone.  He was just on the

18    phone.

19         Q    At the time that meeting started, you had not

20    submitted the petition; correct?

21         A    Yes, sir.

22         Q    And then did you submit the petition during

23    that meeting?

24         A    Also the same location after the meeting.

25         Q    What were you told was the reason for the
```

71

```
 1      Q    What were you told was the reason for your
 2  suspension?
 3      A    What Raul told me was that I should not have
 4  signed the petition because I am with management -- I
 5  was with management.
 6      Q    Were you given any other reasons for why you
 7  were being suspended?
 8      A    No other reason was given, just that.
 9      Q    Were you presented with any type of
10  documentation or disciplinary notice regarding your
11  suspension at that meeting?
12      A    They did not give any.
13      Q    At any point, did you have a meeting or a
14  conversation with John Qually regarding your
15  suspension?
16      A    No, sir.  After Raul suspended me, I left.
17      Q    So it's your testimony that at no point was
18  Mr. Qualley involved in any conversations or
19  communications with you about your suspension; true?
20      A    I don't know any.  All I know is Qually told
21  me that Raul will talk to me, to wait for Raul.
22      Q    And other than Qually telling you to wait for
23  Raul, did Qually have any other involvement in the
24  communications to you about your suspension or about
25  your signature of the petition?
```

77

1   Andrew Dodge when you provided it to Raul?

2       A    No, sir.

3       Q    When did, to your understanding, Mr. Menzies

4   first hear about that petition?

5       A    Menzies learned about the petition on that day

6   that I gave it to them.

7       Q    Okay.  So, in other words, to your

8   understanding, Menzies learned about the petition from

9   you; correct?

10      A    When I gave it to Raul, that's when Menzies

11  learned about it.

12      Q    At the time that you learned -- I'm sorry.

13  After you learned that you were being suspended, did

14  you provide anything to Menzies in response to that

15  suspension?

16      A    They had me make a letter if I would like to

17  repeat that again.

18      Q    And when you say "they," is that either Kevin

19  or Raul that asked you to provide that letter?

20      A    Raul told me to make a letter.  Raul told me

21  to make the letter, and then Kevin told me what kind of

22  letter it's going to be.  Kevin told me to tell them

23  what happened and that he will not meddle with the

24  people anymore -- that I will not meddle with the

25  people anymore.

                                                        85

```
 1      Q    That was something you were instructed to put

 2   in the letter?

 3      A    That's what Kevin told me to put in the

 4   letter, to tell them that I will not be meddling with

 5   the people anymore like that.

 6      Q    And then what, to your understanding, was

 7   meant by "not meddling with the people anymore"?

 8      A    Maybe with regard to the petition like that.

 9      Q    What do you mean by that answer?

10           THE INTERPRETER:  This is the interpreter.  I

11   would like him to repeat.

12           THE WITNESS:  I think what he wants me to say

13   is if, next time, they wanted to sign a petition, do

14   not sign that anymore.

15   BY MR. WARD:

16      Q    After you were suspended, did you ever work

17   another shift at Menzies?

18      A    In other words, because I could no longer go

19   back to the same one because of the stress that

20   happened to me.

21      Q    I'm sorry.  The question I asked was after you

22   learned you were suspended, you never worked another

23   shift at Menzies; correct?

24      A    Are you referring to Menzies, sir?

25      Q    Yes.
```

86

```
 1     A    Not anymore.

 2     Q    Okay.  But once you started your suspension --

 3   right? -- the next thing that happened was you were

 4   terminated.  You never came back to work; right?

 5     A    After my suspension, I was handed a

 6   termination letter.

 7     Q    Okay.  And in between when you started your

 8   suspension and then when you were provided that

 9   termination letter, you never worked another shift at

10   Menzies; right?

11     A    Yes, sir.

12     Q    How much time passed between when you learned

13   you had been suspended and when you learned you had

14   been terminated?

15          THE INTERPRETER:  Please repeat that, sir.

16          MR. WARD:  Sure.

17     Q    How much time passed between when you learned

18   of your suspension from Menzies and your termination of

19   employment from Menzies?

20     A    After I was suspended, three days after, Tracy

21   called me to go to her office because she was going to

22   tell me something.

23     Q    Is that when you learned you had been

24   terminated, when you went to Tracy's office?

25     A    She gave me the paper, the termination letter.
```

87

```
 1      Q    Is that a yes?
 2           That's when you learned you had been
 3      terminated, when you met with Tracy?
 4      A    Yes, sir.
 5      Q    Was anybody else present at the time that you
 6      met with Tracy other than yourself and Tracy?
 7      A    She was with a female there.
 8      Q    Was she another Menzies employer, that female?
 9      A    Maybe, sir.
10      Q    You don't know who she was, in other words?
11      A    No, sir.
12      Q    So other than Tracy and this unidentified
13      female, nobody else was present; is that true?
14      A    Yes, sir.
15      Q    What did Menzies tell you was the reason they
16      were terminating your employment?
17      A    All I remember that Tracy told me was that you
18      should not have signed it because you were at
19      management site.
20      Q    And when she said you should not have signed
21      it, she was referring to the petition, to your
22      understanding?
23      A    Yes, sir.
24      Q    Were you told that there was any reason for
25      your termination other than signing the petition?
```

88

1         A    No more, sir.

2         Q    Are you aware of any documents that would

3    indicate that there was a reason for your termination

4    other than you signing the petition?

5         A    No, sir.  What's written on the termination

6    was just code of conduct.

7         Q    Okay.  What about with respect to the decision

8    to suspend your employment?

9              Were you given any explanation other than you

10   signing the petition?

11        A    She did not say anything -- any more.

12        Q    Are you aware of any documents that would

13   indicate there was a reason for your suspension other

14   than your signing the petition?

15        A    I no longer know any.

16        Q    At the time that you were informed you were

17   being suspended, did anybody mention anything about

18   your race?

19        A    The other employees, sir.

20        Q    How about anybody in Menzies management?

21             Did anybody say anything about your race being

22   a factor in the decision to suspend you?

23        A    Nothing was said like that by them.

24        Q    Other than with respect to your termination,

25   did anyone say anything -- did anyone in Menzies

89

```
1    management, rather, say anything about your race having

2    (Inaudible) in that termination?

3          THE INTERPRETER:  I'm sorry.  I didn't get

4    your whole question, sir.

5          MR. WARD:  Sure.

6      Q    With respect to termination of your

7    employment, did anyone at Menzies management say that

8    race was a factor in that termination?

9      A    I do not know, sir.

10     Q    How about with respect to your suspension?

11         Did anybody say your national origin was a

12   factor in the decision to suspend you?

13     A    I do not know that also.

14     Q    What about with respect to the decision to

15   terminate your employment?

16         Did anybody at Menzies say that your national

17   origin was a factor in that decision?

18     A    Please repeat that, sir.

19     Q    Sure.  With respect to the decision to

20   terminate your employment, did anybody in Menzies

21   management indicate that your national origin was a

22   factor in that decision?

23     A    I do not know, sir.

24     Q    Is it your belief that your race played any

25   role in the decision to suspend you?
```

90

```
 1      A    Yes, sir.

 2      Q    What is that belief based on?

 3      A    Maybe because I'm an Asian and he is white.

 4      Q    And when you say "maybe," are you just

 5   speculating?

 6      A    No, sir.

 7      Q    Do you have any evidence that supports the

 8   belief that your race played a role in your suspension?

 9           MR. URIARTE:  Objection.  Calls for a legal

10   conclusion.

11           THE WITNESS:  Please repeat.  Please repeat

12   the question.

13           MR. WARD:  Sure.

14      Q    Do you have any evidence that supports your

15   belief that your race played a role in your

16   termination?

17      A    Yes, sir.

18      Q    What evidence is that?

19      A    First of all, I'm Asian.  He's white.  Second,

20   all the problems, we have brought it up to management.

21   And then why is it that myself, who is taking action in

22   behalf of the others, I am the one being terminated and

23   not himself?

24           I am the one taking care also of this effect

25   on management, on the company too.
```

91

```
 1      Q    Nobody ever told you, from Menzies, that your
 2  race was a factor; true?
 3      A    No, sir.
 4      Q    Who told you that your race was a factor?
 5      A    Yes, I've seen it because how come that --
 6  even if we tell the company about this person, nothing
 7  is being done to reform, to suspend or to terminate
 8  him.  He has delays up to 20 flights a day.  With us,
 9  just one delay, and we hear from them.  With him, there
10  would be five or six delays, but nothing is done about
11  it.
12      Q    That doesn't answer my question, Mr. Navarro.
13          My question is who told you that your race was
14  a factor in either the termination or suspension
15  decision?
16      A    I see what they did to me.
17      Q    You are not answering my question,
18  Mr. Navarro.  The question is who told you?
19          Not what you think or what you feel or what
20  you believe, but who told you?
21      A    I have a lot of Asian coworkers that, when
22  they commit a mistake, they are already terminated.
23      Q    Okay.  And you are still not answering the
24  question, sir.
25          The question is who told you that your race
```

92

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

238

```
 1    was a factor in the decision to either terminate or

 2    suspend you?

 3         MR. URIARTE:  Maybe if you quantified the

 4    universal "who," then maybe he could more possibly --

 5         MR. WARD:  I don't need to qualify it.  He can

 6    either tell me who did it, or he can say, no, he

 7    didn't.  I need an answer to the question I asked.

 8         MR. URIARTE:  That would be great.  We have,

 9    like, great easy cases.  It's like management told the

10    terminated employee "Hey, I terminated you because I'm

11    discriminating against you."  It's, like, a great

12    question there, Chris.  But other than that,

13    (inaudible).

14         MR. WARD:  I'm entitled to an answer to it,

15    sir.

16         MR. URIARTE:  Yeah, but the question is --

17         (Simultaneous speaking.)

18         MR. WARD:  No.  You and I can debate the

19    merits of the legal system later.  I want an answer

20    from the witness -- who told him this? -- because he

21    testified someone did.

22         THE WITNESS:  No one was telling me, but

23    that's what I feel from what happened.

24    BY MR. WARD:

25        Q    And is it true that you cannot identify any
```

93

```
 1   documents that say your race was a factor in the

 2   decision to terminate or suspend you?

 3            MR. URIARTE:  Objection.  Calls for a legal

 4   conclusion.

 5            THE WITNESS:  Please repeat again.

 6            MR. WARD:  Sure.

 7       Q    Is it true that you cannot identify any

 8   document that indicates your race was a factor in the

 9   decision to terminate or suspend you?

10            MR. URIARTE:  Calls for a legal conclusion.

11            THE WITNESS:  I do not know.

12   BY MR. WARD:

13       Q    You do not know whether any such document

14   exists; is that your testimony?

15       A    Yes, sir.

16       Q    And has anybody ever told you that your

17   national origin was a factor in Menzies' decision to

18   suspend or terminate you?

19       A    No, sir, but that's what I feel.

20       Q    And is it true that you are not aware of any

21   documents that indicate your national origin was a

22   factor in (inaudible)?

23            THE INTERPRETER:  I'm sorry.  A factor in

24   what?

25   ///
```

94

1  BY MR. WARD:

2      Q     Is it true that you are not aware of any

3  documents that indicate your national origin was a

4  factor in the suspension or termination decision?

5          MR. URIARTE:  Objection.  Calls for a legal

6  conclusion.

7          THE WITNESS:  I do not know, sir.

8  BY MR. WARD:

9      Q     The letter that you are asked to provide, did

10  you provide such a letter?

11          THE INTERPRETER:  I'm sorry.  The letter he

12  was asked to provide?

13          MR. WARD:  Right.  At the time he was -- at

14  the time he was notified he was being suspended, he was

15  asked to provide a letter, and my question is did he

16  provide such a letter?

17          THE WITNESS:  Yes.  I gave it to Kevin.

18          MR. WARD:  All right.  I am going to mark as

19  Exhibit 15, if I can find it here -- sorry -- a set of

20  documents that were produced to us in the Bates

21  No. RenaldoNavarro -1 to -14.

22          (Deposition Exhibit 15 was marked for

23          identification by the reporter, a

24          copy of which is attached hereto.)

25  ///

95

1   BY MR. WARD:

2       Q     All right.  Let me get to the right page

3   here.  So looking at this first page of Exhibit 15,

4   Mr. Navarro, do you recognize this document?

5       A     Yes, sir.

6       Q     What is this document?

7       A     I did not know who made this, but I saw that.

8       Q     Is it your testimony that you did not write

9   this Navarro Exhibit 1?

10          THE INTERPRETER:  Again, repeat that.  There

11  is breaking up in the audio.

12  BY MR. WARD:

13      Q     Are you saying, Mr. Navarro, that you are not

14  the person who wrote this document that we are looking

15  at right now?

16          MR. URIARTE:  Do you want me to make it

17  bigger, Mr. Navarro?

18          THE WITNESS:  Yes.

19          Please repeat the question, sir.

20          MR. WARD:  Sure.

21      Q     Let me just ask this:  Are you the one who

22  wrote this, what's marked here as Navarro No. 1?

23      A     All I remember is the one at the last part.

24  All I remember is what's written here on the last part.

25  If this is the benefits for the sake of my job, I will

96

```
 1    not intervene again, just do and focus on my job.  But

 2    I do not remember the things about it, the words

 3    written above it.  If you could show what I wrote down,

 4    I would know where it came from, but this one, the

 5    stuff above it, I do not know.

 6        Q    So is it your testimony that you did not write

 7    all of the content on this page?

 8        A    If you give me the letter that I wrote, I

 9    would remember all of that, but with this one,

10    especially the last one, that was what Kevin told me to

11    say.  But with regard to the stuff above it, I do not

12    remember this.

13        Q    So am I understanding correctly, you did not

14    write everything on this page?  Yes or no?

15        A    Maybe I wrote all of this, maybe.

16        Q    As you sit here today, you just can't say one

17    way or another; is that true?

18        A    Which is it?  Which is it?  Are you referring

19    that I could not say one way or the other?

20        Q    The entire document, did you write this entire

21    document, or did somebody else write it?

22        A    I'm the one who made this.

23        Q    Okay.  You just told me you are the one who

24    made the entire letter -- or I'm sorry -- the entire

25    document.
```

97

```
 1      A    Yes.   I was told to write that by Raul Vargas

 2  and Kevin.

 3      Q    Is this the letter that you provided in

 4  response to the request from Kevin and Raul?

 5           THE INTERPRETER:  I'm sorry.  Please repeat

 6  that.

 7  BY MR. WARD:

 8      Q    Is this the letter that you provided in

 9  response to the request from Kevin and Raul?

10      A    Yes, sir.

11      Q    How did you transmit this to Kevin?

12           THE INTERPRETER:  I'm sorry.  How did he --

13           MR. WARD:  How did he transmit this?  How did

14  he give it to Kevin?  Did he give it to him by hand?

15  Did he email it?

16           THE WITNESS:  When they suspended me, Kevin

17  told me to make a letter.  So I went to my car and made

18  that, and then, before I left, I gave it to Kevin.

19  BY MR. WARD:

20      Q    You wrote this document that we are looking at

21  right now, the first page of Exhibit 15, in your car?

22      A    Yes, sir.

23      Q    Did you keep a computer in your car?

24      A    I did not have a computer.  I hand-wrote it.

25  That's why, what I say right now, I hand-wrote it.  But
```

98

1    prepared this.

2        Q    But your testimony is that somebody gave you

3    this document; right?

4        A    Yes.  It may be Kevin who gave this to me, who

5    typed this in his computer and gave me a copy because I

6    have no computer.

7        Q    I don't want you to speculate, though,

8    Mr. Navarro.  I want you to tell me what you know

9    happened.

10           Did Kevin type this up and give it to you, or

11   are you guessing that might be what happened?

12       A    I am the one who wrote this down, but who

13   typed it in the computer, I no longer remember.

14       Q    Okay.  But it's your testimony that it wasn't

15   you who typed it; is that true?

16       A    Yes, sir.

17       Q    It's the same thing today?

18           You have no memory of how you came to be in

19   possession of this typed version; is that true?

20       A    I no longer remember, but what I remember is

21   the letter that the attorney had me prepare, this is

22   the one.

23       Q    All right.  This is now page 2 of Exhibit 15.

24   I want to ask you, do you recognize this typed version?

25           Have you seen it before?

101

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

245

```
 1      A    I have a copy of this.  I have a copy that I
 2   gave to my attorney.
 3      Q    Are you the one who created this typed
 4   version?
 5      A    It's not myself.
 6      Q    Where did you get it from?
 7      A    The people gave it to me.
 8      Q    Who?
 9      A    I no longer remember.  All the documents that
10   I think we need, I gave them all to my attorney.  So
11   all of the documents are with my attorney.
12      Q    But as you sit here today, looking at this
13   document stamped RenaldoNavarro -2, you don't remember
14   who gave that to you; is that true?
15           THE INTERPRETER:  I did not get the question.
16   BY MR. WARD:
17      Q    Just looking at page 2 of Exhibit 15, is it
18   true that you do not recall who gave this page to you?
19      A    Yes, sir.
20           MR. WARD:  All right.  I'm showing the
21   witness, still on Exhibit 15, the page Bates-marked
22   Navarro No. 11.
23      Q    Do you recognize what this screen capture
24   appears to show, Mr. Navarro?
25      A    Yes, sir.  Yes, sir.
```

102

```
 1      Q   Is this a text message that you have on your
 2   phone?
 3      A   Yes, sir.
 4      Q   And do you still have this text-message chain
 5   on your device?
 6      A   It's still there, sir.
 7      Q   Don't delete it, please.
 8          What about this page that is -- I think it's
 9   RenaldoNavarro -12.  What is that?
10      A   This was by the supervisor.  I was no longer
11   there, but this was just texted to me.  This was --
12   this text was sent to me saying "Sorry.  Andrew fell
13   asleep, but his hours were already running."
14      Q   Okay.  This appears to be -- so is this a
15   message somebody named Mark sent to you?
16      A   Yes, sir.
17      Q   Okay.  Which side of this text-message chain
18   is yours?  Is it the left side with the image or the
19   right side where it says "Date 11-7-18"?
20      A   This date.
21      Q   Who is Mark?  Who is the Mark that's referred
22   to in this message?
23      A   This was the person, also a supervisor --
24   Andrew was supposed to replace him.
25      Q   So, in other words, this was another
```

103

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

247

```
 1    supervisor at Menzies?

 2        A    When I was no longer there.  He was the

 3    supervisor when I was no longer at Menzies.

 4        Q    Okay.  And is this a screen capture of a text

 5    message you had with -- or a text capture you had with

 6    this individual, Mark?

 7        A    He just sent a text to me.

 8        Q    Okay.  Do you still have those texts on your

 9    device?

10        A    Yes, sir.

11        Q    Don't delete them, please.  How about this

12    next page?  It looks like it's -- or next two pages,

13    13 and 14?  Are these also text messages that you

14    received?

15        A    Yes, sir.

16        Q    Do you still have them on your device?

17        A    It's still there, sir.

18        Q    Okay.  Don't delete that, please.

19             MR. URIARTE:  Chris, can we take a five-minute

20    break to rest?

21             MR. WARD:  Sure.  That's fine.  It's 3:37.  Do

22    you want to reconvene at 3:45?

23             MR. URIARTE:  Sounds good.

24             MR. WARD:  Thank you.  We are off the record.

25             (Off the record.)
```

104

```
1              THE INTERPRETER:  I'm sorry.  Please repeat
2       that.
3       BY MR. URIARTE:
4          Q    The petition was signed by at least one
5       supervisor; is that correct?
6          A    Yes.
7          Q    Do you know how many signed -- how many
8       supervisors signed the petition?
9          A    Two, sir.
10         Q    What are those names?
11         A    July Macapagal.
12         Q    Who else?
13         A    And Renaldo Navarro, myself.
14              MR. URIARTE:  No further questions.
15              MR. WARD:  Give me just a second.
16              All right.  I have no follow-up at this point.
17      Counsel and I agreed off the record that we would not
18      be concluding Mr. Navarro's deposition subject to some
19      questioning about his -- or I should say potential
20      questioning about Mr. Navarro's settlement agreement
21      with Swissport, which we'll meet and confer about as
22      necessary; but, otherwise, we can conclude today's
23      deposition, at least this first and potentially last
24      day of Mr. Navarro's deposition.  And at this point --
25      we don't do any stipulations on the record anymore, at
```

117

```
 1    least in San Francisco.  Some L.A. attorneys still do
 2    it unless there's something that you want to add, Arlo.
 3              MR. URIARTE:  No.
 4              MR. WARD:  All right.  I think we are
 5    concluded, then, for the day.  I appreciate everybody's
 6    time and patience with this process, especially with
 7    the technology glitches on my end.  Off the record.
 8         (Deposition session concluded at 4:23 p.m.)
 9                        -oOo-
10
11
12         I certify (or declare) under penalty of
13    perjury under the laws of the State of California that
14    the foregoing is true and correct.
15
16    Executed at _____ on _____.
                        (Place)              (Date)
17
18         _____
                   (Signature of Deponent)
19
20
21
22
23
24
25
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
1               DEPOSITION OFFICER'S CERTIFICATE

2      STATE OF CALIFORNIA )

                           ) ss.

3      COUNTY OF ORANGE    )

4

5              I, Joanna B. Brown, hereby certify:

6              I am a duly qualified Certified Shorthand

7      Reporter in the State of California, holder of

8      Certificate Number CSR 8570 issued by the Court

9      Reporters Board of California and which is in full

10     force and effect. (Fed. R. Civ. P. 28(a)).

11             I am authorized to administer oaths or

12     affirmations pursuant to California Code of Civil

13     Procedure, Section 2093(b) and prior to being examined,

14     the witness was first duly sworn by me.

15     (Fed R. Civ. P. 28(a), 30(f)(1)).

16             I am not a relative or employee or attorney or

17     counsel of any of the parties, nor am I a relative or

18     employee of such attorney or counsel, nor am I

19     financially interested in this action.

20     (Fed R. Civ. P. 28).

21             I am the deposition officer that

22     stenographically recorded the testimony in the

23     foregoing deposition, and the foregoing transcript is a

24     true record of the testimony given by the witness.

25     (Fed. R. Civ. P. 30(f)(1)).
```

119

```
 1          Before completion of the deposition, review of

 2     the transcript [XX] was [ ] was not requested.  If

 3     requested, any changes made by the deponent (and

 4     provided to the reporter) during the period allowed,

 5     are appended hereto. (Fed. R. Civ. P. 30(e)).

 6

 7

 8     Dated: August 4, 2020

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

120

252

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:    RENALDO NAVARRO v. MENZIES AVIATION, INC.
Case Number:  3:19-cv-08157-VC
Dep. Date:     August 4, 2020
Deponent:     RENALDO NAVARRO
Place:         Via Zoom

CORRECTIONS:

Pg.  Ln.  Now Reads       Should Read      Reasons Therefore

_____

Signature of Deponent

# EXHIBIT 13

1            IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6                Plaintiff,

7   v.                              No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
                 Defendants.
11   _____/

12  Zoom Remote Deposition of

13       JOHN QUALLY

14   Monday, July 27, 2020

15        Volume I

16    (Pages 1 through 32)

17      **CERTIFIED COPY**

18

19

20

21  REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24          NOGARA REPORTING SERVICE
            5 Third Street, Suite 415
            San Francisco, California 94103
25             (415) 398-1889

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-3, Page 249 of 281
Case 3:19-cv-03575-WHO Document 151-1 Filed 11/03/20 Page 9 of 12

```
 1                          I N D E X

 2                                          Page Number

 3    EXAMINATION BY MR. URIARTE                   4

 4                       ---oOo---

 5                     E X H I B I T S

 6    Plaintiff's

 7    Exhibit 1     Plaintiff Renaldo            9
                    Navarro's Notice of
 8                  Deposition of John
                    Qually
 9
      Exhibit 2     Missed Punch Form           28
10

11                       ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

256

```
1            BE IT REMEMBERED that, pursuant to Notice of

2   Taking Deposition and on Monday, the 27th day of July,

3   2020, commencing at the hour of 8:58 o'clock a.m.

4   thereof, via Zoom videoconference, before me, CINDY

5   TUGAW, a Certified Shorthand Reporter in the State of

6   California, personally appeared,

7                    JOHN QUALLY,

8   Called as a witness by the Plaintiff, having been by me

9   first duly sworn, was examined and testified as

10  hereinafter set forth.

11                   ---o0o---

12            APPEARANCES OF COUNSEL

13  For the Plaintiff
         LIBERATION LAW GROUP, P.C.
14       2760 Mission Street
         San Francisco, California 94110
15       BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
16

17  For the Defendants
         FOLEY & LARDNER, LLP
18       555 California Street, Suite 1700
         San Francisco, California 94104
19       BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
20

21  Also Present:  David Ho, Zoom Host.

                     ---o0o---
22

23

24

25
```

257

1    THE REPORTER:  At this time, I will ask counsel to

2    stipulate on the record that there is no objection to

3    this deposition officer administering a binding oath to

4    the witness via Zoom, starting with the noticing

5    attorney.

6         MR. URIARTE:  So stipulated.

7         THE REPORTER:  Mr. Wu?

8         MR. WU:  So stipulated on behalf of defendant,

9    Menzies Aviation.

10                    EXAMINATION BY MR. URIARTE

11        MR. URIARTE:  Q.  Good morning, Mr. Qually.  My

12   name is Arlo Uriarte.  I am attorney for Renaldo

13   Navarro.  Do you understand that?

14        A.  Yes.

15        Q.  And you are aware that Mr. Navarro has an

16   action against Menzies for his termination?

17        A.  I heard, yes.

18        Q.  And you know that you are here for your

19   deposition as a witness?

20        A.  Yes.

21        MR. URIARTE:  David, can we have Exhibit 1 brought

22   up, please.

23        ZOOM HOST:  Give me one second.  I'm bringing it

24   up right now.  Hold on.

25        MR. URIARTE:  Okay.

<< NOGARA REPORTING SERVICE >>                    4

258

1    Q.  Okay.  All right.  So let's see.  So you

2    said -- when you started with ASIG -- and is that the

3    right way to call it, ASIG, by the way, A-S-I-G, ASIG?

4    Do you guys say that, ASIG?

5        A.  Yes.

6        Q.  When you started with ASIG, what was your

7    position with them?

8        A.  Supervisor.

9        Q.  Can you tell me what the duties of a

10   supervisor would be?

11       A.  The duties are basically overseeing of the --

12   overseeing and assigning the flights to the fuelers and

13   making communication with the airlines on -- as we go

14   through the day.

15       Q.  And by 2018, how many fuelers were assigned to

16   a supervisor?  Do you remember?

17       A.  It could -- I guess it varies by shift.

18       Q.  I see.  What would be the range, like would

19   you say between three and ten, or was there like a

20   range?

21       A.  I guess it depends on the shift.  Some shifts

22   had upwards of 12 to 15.  Some shifts had anywhere from

23   three to four.

24       Q.  Gotcha.  And the interesting -- or the date

25   most interesting for us is August of 2018 because

1        A.   Yeah.

2        Q.   What was the next?

3        A.   Ramp service.

4        Q.   Lead ramp services.  Okay.  And how long were

5    you with United?

6        A.   Eight and a half years.

7        Q.   So when did you become a duty manager for ASIG

8    or Menzies?

9        A.   It was back -- honestly, I don't remember the

10   exact date, but it's been -- I've been a duty manager

11   for roughly four years.

12       Q.   Four years now?

13       A.   Yeah.

14       Q.   Okay.  So like 2016, around that time?

15       A.   Around that time.

16       Q.   Were you a duty manager by the time Menzies

17   came in?

18       A.   Around that time, yes.

19       Q.   Like close, yeah.  I guess the key question is

20   when Menzies took over ASIG, were you already a duty

21   manager or you became a duty manager after Menzies came

22   in?

23       A.   I was already.

24       Q.   Okay.  Gotcha.  All right.

25            So we were talking about the role of

1   supervisors with regards to how they work with fuelers,

2   right?  You said earlier that you would -- one of the

3   duties would be to assign flights to the fuelers for

4   the shift, right?

5       A.  Yes.

6       Q.  That's one of the duties.  What other duties

7   do supervisors have?

8       A.  They -- besides assigning the flights, they

9   are obviously in communication with airlines as needed.

10  They're overseeing the safety of the operation, making

11  sure that, you know, everything is going safely.

12      Q.  Okay.  So is it the supervisor that's actually

13  on the headphone with the plane during the fueling

14  operation, or with the airline?

15      A.  No.

16      Q.  No?  That could be any of the fuelers?

17      A.  Well, the fuelers don't communicate with the

18  flight crew.  They communicate with the airline

19  representative.

20      Q.  Gotcha.  Okay.  And who is that?  Is that the

21  fueler or is that the supervisor?

22      A.  Sometimes both.  But, in general, when you're

23  actually fueling, it would be more so the fueler than

24  the supervisor.

25      Q.  Okay.  Are supervisors sometimes -- like do

DEPOSITION OF JOHN QUALLY - 07/31/2020
Case 3:18-cv-00705-VC Document 39-1 Filed 07/17/20 Page 3 of 12

1     A.  Yes.

2     Q.  Okay.  And then what other duties do

3 supervisors have with regards to the fuelers?

4     A.  Basically, you know, for operational purposes,

5 it's making sure that the flights are getting done, the

6 fuelers are getting to the flights when they're

7 supposed to, you know, addressing whatever issues may

8 come up.

9     Q.  What about giving breaks, for example, like

10 timing the breaks, when people can go for meal periods,

11 when people can go for their ten-minute breaks, is that

12 the supervisor's duties?

13     A.  Yes.

14     MR. WU:  Objection.  Relevance.

15     MR. URIARTE:  Q.  And then what about clocking in

16 and clocking out, do the supervisors have any duties

17 with regards to that?

18     MR. WU:  Same objection.

19     THE WITNESS:  No.

20     MR. URIARTE:  Q.  Like if there are issues with

21 regards to they forgot to clock out or, oh, they forgot

22 to clock in, something like that, is that the

23 supervisor's duty or is that somebody else's?

24     MR. WU:  Same objection.

25     MR. URIARTE:  Q.  Mr. Qually?

1    supervisor, is that correct?

2         A.  I had no -- that would be my guess.  I don't

3    know -- I don't have any knowledge on where he started,

4    but that's my understanding.

5         MR. WU:  I don't want you to guess.

6         MR. URIARTE:  Q.  Yeah, no guessing.

7              I guess what I was leading to was whether you

8    had any part in recommending or having Mr. Navarro be

9    promoted from fueler to supervisor.  Do you remember

10   anything like that?

11        A.  No.

12        Q.  So you weren't part of that process at all?

13        A.  No.

14        Q.  Did you and Mr. Navarro get along at all?  Was

15   your relationship cordial or was it combative?  How

16   would you characterize your relationship with Mr.

17   Navarro?

18        A.  Working relationship was okay.  No, you know,

19   just -- it was okay.

20        Q.  Did Mr. Navarro ever bring up any complaints

21   to you?

22        A.  From time to time, yes.

23        Q.  And what would be the nature of those

24   complaints?

25        A.  Varies.  Could be airline issue, staffing

1    issue.  It just depends on the day and what he felt to
2    complain about.
3         Q.  And before his termination, did he ever bring
4    up complaints against Andrew Dodge to you?
5         A.  Yes.
6         Q.  And what was the nature of those complaints?
7         A.  It wasn't many.  Let's see if I can remember,
8    because it's been a while.  But there was probably
9    one -- I can remember at least one where Andrew might
10   have been caught seen sleeping on the job.
11        Q.  And he brought that up to you?
12        A.  Yes.
13        Q.  So was Andrew also a graveyard shift
14   supervisor?
15        A.  Yes.  At that time.
16        Q.  Okay.  So you're coming in to work, and Mr.
17   Navarro is mentioning to you that maybe Andrew Dodge
18   was sleeping on the job.  And so what would you, as a
19   duty manager, do about that?
20        A.  Well, there were different shifts, so they
21   weren't working together.
22        Q.  Okay.
23        A.  So when the complaints came, I addressed the
24   complaints with Andrew.
25        Q.  Okay.

<< NOGARA REPORTING SERVICE >>                    25

264

1          A.   And it was brought up to the higher-ups.

2          Q.   And who were the higher-ups at that time?

3          A.   Let's see.  Who was it?  Renil was one of

4     them.

5          Q.   Who?

6          A.   Renil Lal.  Because he was the acting GM at

7     the time, so --

8          Q.   Okay.  Anybody else, do you remember?

9          A.   No.

10         Q.   Did anything happen because of the complaints

11    that Andrew Dodge was sleeping?  Do you know what

12    happened to Andrew Dodge?  Was he reprimanded?  Was he

13    written up?

14              Did anything happen because of that?

15         A.   Not that I know of.

16         Q.   Did Mr. Dodge explain to you what happened or

17    did he admit it or anything like that?

18         A.   He did.  He had sleep depravation -- or sleep

19    apnea, sorry.

20         Q.   So he had sleep apnea, and so --

21         A.   According to what I heard, what the

22    explanation was, at times it's easy for a person to

23    fall asleep.

24         Q.   Aside from his -- aside from Mr. Navarro

25    mentioning that Mr. Dodge was sleeping, any other

```
 1                    CERTIFICATE OF WITNESS

 2                         ---o0o---

 3

 4         I, JOHN QUALLY, hereby declare under

 5    penalty of perjury that I have read the foregoing

 6    deposition testimony; and that the same is a true

 7    and correct transcription of my said testimony

 8    except as corrected pursuant to my rights under

 9    Rule 30(e) of the Federal Rules of Civil

10    Procedure.

11

12                    _____
                                Signature
13

14                    _____
                                   Date
15

16

17

18

19

20

21

22

23

24

25
```

266

```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF SAN FRANCISCO  )

 3          I, CINDY TUGAW, a Certified Shorthand Reporter

 4   of the State of California, duly authorized to

 5   administer oaths pursuant to Section 8211 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8                  JOHN QUALLY,

 9   the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21          Dated the 7th day of August, 2020.

22

23

24          CINDY TUGAW
            CSR No. 4805 (California)
25
```

267

```
 1    John Qually
      c/o Foley & Lardner
 2    555 California Street, Suite 1700
      San Francisco, CA 94104
 3    Attn:  Jason Y. Wu, Esq.

 4    Date:  August 7th, 2020
      Re:  Navarro vs. Menzies
 5    Deposition Date:  Monday, July 27, 2020

 6    Dear Mr. Qually,

 7          Please be advised the original transcript of
      your deposition is ready for your review.
 8          Pursuant to FRCP Rule 30(e), you have
      30 days following the date of this notice to read,
 9    correct if necessary, and sign your transcript unless
      the attending parties and the deponent agree on the
10    record or otherwise in writing to a longer or shorter
      time period.  The deponent may change the form or the
11    substance of the answer to a question, and may either
      approve the transcript of the deposition by signing it,
12    or refuse to approve the transcript by not signing it.
      You are not required by law to read and sign your
13    deposition transcript.  All parties will be informed of
      the corrections.  The original transcript will then be
14    sealed and sent to the examining attorney pursuant to
      the applicable law.
15          You may either come to our office to read and
      sign the original transcript, or you may contact your
16    attorney or the attorney who arranged for you to be
      present at your deposition.  If they have ordered a
17    copy of the transcript, you may review their copy and
      make corrections by submitting, signing and returning
18    the attached form.  If you choose to review your
      transcript at our office, please call first to make an
19    appointment.  Should you have any question regarding
      these instructions, please call.
20
      Sincerely,
21


22
      NOGARA REPORTING SERVICE
23    5 Third Street, Suite 415
      San Francisco, California 94103
24    (415) 398-1889

25    cc:  All counsel, original deposition
```

# EXHIBIT 14

1          IN THE UNITED STATES DISTRICT COURT

2       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5   RENALDO NAVARRO,

6                  Plaintiff,

7   v.                                    No.  3:19-CV-8157

8   MENZIES AVIATION, INC.,
    doing business as MENZIES
9   and DOES 1 through 10,
    inclusive,
10
                   Defendants.
11   _____/

12   Zoom Remote Deposition of

13       JOHN QUALLY

14    Tuesday, July 28, 2020

15        Volume II

16    (Pages 33 through 58)

17

18      **CERTIFIED COPY**

19

20

21

22   REPORTED BY:  CINDY TUGAW, CSR #4805

23

24          NOGARA REPORTING SERVICE
            5 Third Street, Suite 415
         San Francisco, California 94103
25             (415) 398-1889

270

```
 1                         I N D E X

 2                                        Page Number

 3    EXAMINATION BY MR. URIARTE                 36

 4                      ---o0o---

 5                    E X H I B I T S

 6    Plaintiff's

 7    Exhibit 6      Employee Performance        46
                     Development dated
 8                   8/20/18

 9                 PREVIOUSLY MARKED EXHIBITS

10    Exhibit 10     Statement by Rafael         53
                     Vasquez dated 11/18/18
11
                         ---o0o---
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

271

```
1              BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 28th day of July,

3    2020, commencing at the hour of 2:07 o'clock p.m.

4    thereof, via Zoom videoconference, before me, CINDY

5    TUGAW, a Certified Shorthand Reporter in the State of

6    California, personally appeared,

7                          JOHN QUALLY,

8    called as a witness by the Plaintiff, having been by me

9    previously duly sworn, was examined and testified

10   further as hereinafter set forth.

11                         ---o0o---

12                 APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

21   Also Present:  David Ho, Zoom Host.

21                         ---o0o---

22

23

24

25
```

|     |                                                           |
| --- | --------------------------------------------------------- |
|     | EXAMINATION BY MR. URIARTE                                 |
| 1   |                                                           |
| 2   | MR. URIARTE:  Let's get back on the record.               |
| 3   | Q.  Mr. Qually, how are you?  Thank you for coming        |
| 4   | back today.                                               |
| 5   | Off the record we had a little bit of a                   |
| 6   | clarification discussion with your counsel.  And I just   |
| 7   | wanted you to confirm that, in preparation for your       |
| 8   | deposition, that aside from your counsel, you also        |
| 9   | spoke with Tracy from HR, Andrew Dodge, and also Ran --   |
| 10  | A.  Randy Davies.                                         |
| 11  | Q.  -- Randy Davies, correct?                             |
| 12  | A.  Correct.                                              |
| 13  | Q.  And then, aside from those people, did you            |
| 14  | talk to anybody else in preparation --                    |
| 15  | A.  No.                                                   |
| 16  | Q.  -- for your deposition?                               |
| 17  | A.  No.                                                   |
| 18  | Q.  That's a no?                                          |
| 19  | A.  No.                                                   |
| 20  | Q.  Great.  So let's just jump right in here.             |
| 21  | Yesterday you were having a little bit of a difficulty    |
| 22  | trying to remember the different supervisors and          |
| 23  | different managers that were at Menzies Aviation office   |
| 24  | in 2018.  And I've got a list of names here.  I wanted    |
| 25  | to throw it by you.  In August of 2018, Nico, N-i-c-o,    |

1    Q.   And I read your note, and I think I've got to

2    piece it together a little bit, and let me see if this

3    is correct.   What happened was, after the suspension

4    meeting, they asked you to deliver the suspension

5    notice, and then Ray Navarro -- a couple of days later,

6    and then Ray Navarro would not sign it.   Is that how it

7    happened?

8    A.   He, as I remember, trying to serve him with a

9    suspension document, and he did refuse to sign.

10   Q.   But that was -- when did you try to serve --

11   when did you try to serve it to Ray Navarro?   Did that

12   happen after the meeting, same day?

13   A.   I believe it must have -- I can't remember a

14   hundred percent, but it must have been before the

15   meeting.

16   Q.   Okay.

17   A.   But like I say, I don't have -- not knowing

18   when Tracy had the meeting, but, you know, so my guess

19   would be -- like I say, it's a guess, but it was

20   probably before the meeting with them.

21   Q.   So because it's a guess, you don't actually

22   know whether it was before the meeting or after the

23   meeting?

24   A.   Correct.

25   Q.   You don't remember.

1   at all?

2       MR. WU:   I'm going to object here on grounds of

3   attorney-client privilege and instruct the witness to

4   answer only as to whether he's seen the document

5   outside of any confidential or communications with his

6   attorneys.

7       MR. URIARTE:   Q.   That's correct, Mr. Qually, yes.

8   So my question really is whether you've ever seen the

9   -- either of the petitions, either of the two petitions

10  that were circulated, and not because your attorney

11  showed it to you but because of other events.

12      A.   As I said, no.

13      Q.   Would it be accurate to state that as a duty

14  manager, that Andrew Dodge is an employee that you

15  would have been supervising?

16      A.   At some point, yes.

17      Q.   And so it wasn't like an interest of yours to

18  figure out what it is that the fuelers were complaining

19  about against Dodge?   That wasn't an interest of yours?

20      MR. WU:   Objection.   Vague.

21          You can answer if you understand the question.

22      THE WITNESS:   I did not hear complaints directly

23  from the fuelers.

24      MR. URIARTE:   Q.   Okay.   So you're saying none of

25  the fuelers ever came up to you and said, hey, these

<< NOGARA REPORTING SERVICE >>                    42

275

1    negatives things are happening?  You never heard that?

2         A.  No.

3         Q.  What about the video, did you ever see that

4    video where they put together a video of Mr. Dodge

5    sleeping and all that?  Did you see that one?

6         A.  No.

7         Q.  You knew that a petition was going around

8    against Mr. Dodge?  Did you know that, as it was

9    happening?

10        A.  I have heard through -- that, yes, there was.

11        Q.  And did you see the note that Andrew Dodge

12   wrote, the statement he wrote around the same time that

13   the petition was going around, was that something that

14   you saw?

15        A.  I did not.

16        Q.  Do you know one way or the other if Menzies

17   Aviation ever did an investigation with regards to the

18   facts that are contained within those petitions?

19        A.  No.

20        Q.  You don't know?

21        A.  I don't know if -- what was done with all the

22   information.

23        Q.  I see.  Were you made aware at some point that

24   Mr. Dodge was suffering from sleep apnea?

25        A.  Yes.

```
 1        Q.   And how were you made aware of that?

 2        A.   He brought it to our attention.

 3        Q.   Do you know when that was?

 4        A.   No, I don't have the exact date.

 5        Q.   Was it before or after the termination of Ray

 6   Navarro?

 7        A.   Before.

 8        Q.   A lot of time before?  I think Mr. Dodge came

 9   in in 2016.  And then Ray Navarro was August of 2018.

10   So that's kind of like the time frame there.  I don't

11   know if that assists you, but do you know about when

12   Mr. Dodge let you know of his condition?

13        A.   I don't have the exact date, no.

14        Q.   And did you see any kind of medical note or a

15   medical slip or anything like that written by a doctor?

16        A.   Personally, no.

17        Q.   Did somebody tell you that he had one?

18        A.   He told me he gave it to the general manager

19   at the time, Renil.

20        Q.   Renil Lal?

21        A.   Yes.

22        Q.   Did Mr. Lal ever talk to you about the note,

23   the medical note?

24        A.   No.

25        Q.   Was there some sort of accommodation or a game
```

277

DEPOSITION OF JOHN QUALLY — VOLUME II — 07/28/2020

1      plan with regards to how to deal with the sleep apnea,

2      anything like that?

3             A.   Nothing directed to me.

4             Q.   Did you think that maybe the sleep apnea

5      condition was interfering with his job?

6             A.   No.

7             Q.   You didn't think that it's of concern?

8             A.   There's always a concern, but I don't believe

9      it interfered with his job.

10            Q.   And why is that?

11            A.   Because most of the time, as I heard, it was

12     already, like, early in the morning, like, 1:00, 2:00,

13     3:00 o'clock in the morning when there's nothing on the

14     airport.  When he's actually on the airport, he was not

15     sleeping.  He was actually doing his job.

16            Q.   Did you see that one picture of him where he's

17     inside the truck and he's sleeping?  Did you see that

18     one?

19            A.   I've seen one, yes.

20            Q.   And that's not a concern at all for Menzies?

21            A.   For me personally or Menzies?  Me, personally,

22     the time frame, no.  Whether the company did, I can't

23     say.

24            Q.   So I guess you weren't part of some sort of

25     discussion as to whether his condition interfered with

1   him being able to correctly perform his job functions,

2   right?  You weren't purview to that type of discussion?

3       A.   Correct.

4       Q.   Have you seen the termination notice of

5   Renaldo Navarro?

6       A.   No.

7       Q.   So you saw only the suspension notice, right?

8       A.   Correct.

9       Q.   And then you actually -- did you write that?

10  Did you actually -- were you the one who wrote it?

11      A.   The one that basically saying that he -- that

12  I attempted to serve him the suspension notice and he

13  refused to sign?

14      Q.   No, no, let me put it up, that way we're

15  talking about the same thing.  I'm talking about the

16  actual notice itself.

17          So it's Exhibit 6, please, David.

18          (Plaintiff's Exhibit 6 marked for

19          identification.)

20  MR. URIARTE:  Q.  Do you see that, Mr. Qually?

21      A.   Oh, that one.  Okay.  Yes, I did -- that was

22  the one -- that was the -- okay, yes.  That was a

23  suspension document that was tried to serve to

24  Mr. Navarro that he refused to sign.

25      Q.   Correct.  So my question first is did you type

1   this up?

2          A.   Yes.

3          Q.   So you typed it up, is that right?

4          A.   You know what, hold on a minute.  No, I did

5   not type that.

6          Q.   Okay.  So somebody gave this to you to -- for

7   example, it seems like somebody filled out the field

8   "Employee Name:  Renaldo Navarro," "Today's Date,"

9   "Airport/Location," "Clock #," "Department."  Somebody

10  put that information in there.

11             Were you the one who put that in there?

12         A.   Negative, no.

13         Q.   Do you know who did that?

14         A.   Do I remember, no.  There's only --

15         Q.   Who asked you to serve the document?

16         A.   I believe it was HR.

17         Q.   Meaning Tracy?

18         A.   Tracy.

19         Q.   Okay.  So this might refresh your recollection

20  with regards to before or after the meeting.  So it

21  says "Today's Date" on the top there, and it says

22  August 20, 2018.  Do you see that?

23         A.   Okay.

24         Q.   And then, if you scroll down and you see your

25  signature, it's a different date.  Your signature has a

1    date of August 23.  Do you see that?

2        A.  Yes.

3        Q.  Does that help you or refresh your

4    recollection at all with regards to when you served

5    this?

6        A.  When he refused to sign, I dated it on the

7    23rd because that's when I tried to serve it to him.

8        Q.  I see.  So that's when your encounter with him

9    actually happened, is that correct?

10       A.  Correct.

11       Q.  So you only had one encounter with him, one

12   attempt?

13       A.  Correct.

14       Q.  And because he was not -- he wasn't working at

15   that point, correct?

16       MR. WU:  Objection.  Vague.

17       THE WITNESS:  I can't remember --

18       MR. WU:  You can answer if you understand the

19   question.

20       THE WITNESS:  I understand the question.  I don't

21   remember if that was his scheduled shift.  I don't

22   remember if that was his scheduled day or not.

23       MR. URIARTE:  Q.  I understand you're a little

24   confused.  By the time you were trying to serve him,

25   was he already serving the suspension or he had not

1    started serving the suspension?  Do you see what I'm

2    saying?

3        A.    He -- best of my knowledge, he had not served

4    his suspension.

5        Q.    So he didn't start serving the suspension

6    until you tried to serve him the suspension notice, is

7    that correct?

8        A.    To the best of my knowledge, yes.

9        Q.    Okay.  Did you leave him with a copy?

10       A.    He had a copy, yes.

11       Q.    When you say he had a copy, was the copy --

12   the copy that he had, that came from you or --

13       A.    He took a picture of it with his phone.

14       Q.    I see.  Okay.  So, okay.  All right.  And then

15   let me just read under goal and the expectation part

16   there, it says, "It is expected that employees will

17   follow all policies and procedures.  Failure to follow

18   Company policies and procedures will result in further

19   disciplinary action up to and including termination."

20           Do you read that?

21       A.    Yes.

22       Q.    Are you knowledgeable at all with regards to

23   the policies and procedures that this notice was

24   talking about?

25       A.    Directly, no.

1    no.

2        Q.  Did you -- like either part of the petition or

3    part of what was happening, or anything like that, did

4    you ever have a discussion with Mr. Dodge with regards

5    to his fuelers and his fuelers maybe not being able to

6    take breaks?  Did you ever engage in such a discussion

7    with him?

8        A.  It probably came up once or twice, yes.

9        Q.  And was this once or twice before the

10   termination of Mr. Navarro?

11       A.  Likely, yes.

12       Q.  And can you tell us what your memory is of

13   that, like, what was that discussion about?

14       A.  Basically fuelers not being able to take a

15   break just by the fact that they were shorthanded or

16   just lots of flights.  Nothing I can remember in

17   general, but those are usually the only things that

18   would prevent that.

19       Q.  Okay.  And what brought up the need to talk to

20   Mr. Andrew Dodge about the breaks and his fuelers?

21   What brought it up to you?  What kind of triggered

22   that?

23       MR. WU:  Objection.  Assumes facts not in

24   evidence.

25       THE WITNESS:  Sometimes a fueler would complain to

283

1   me, but that's it.

2       MR. URIARTE:  Q.  And did Mr. Dodge have any

3   opinion or did he kind of have his position as to why

4   these breaks were short -- I mean, the breaks weren't

5   happening, or the breaks were late, or anything like

6   that?

7         Did Andrew Dodge try to explain himself as to

8   why those things were happening?

9       MR. WU:  Objection.  Assumes facts not in

10  evidence.

11      THE WITNESS:  Yes.

12      MR. URIARTE:  Q.  And what would he say in those

13  discussions?

14      A.  He gave me the explanation of what happened

15  during the night and why some fuelers weren't able to

16  get a longer break than they did or any break at all.

17  And that's it, you know.

18        We -- there is a policy where, if they don't

19  get a break, they get a missed meal penalty.  So they

20  get paid for their lunch.

21      Q.  Did you ever have a discussion with a Rafael

22  Vasquez about Andrew Dodge?

23      A.  I might have at one point.  I don't recall.

24      Q.  And what do you remember as to that

25  discussion?

1    that at all?

2        A.   If I talked to Rafael, it would have been

3    before.

4        Q.   So here he says something about "I have spoken

5    to The Menzies Aviation Fueling Director Raul Vargas on

6    three separate occasions regarding Mr. Andrew Dodge,

7    who continues to abuse his authority and at times

8    harass Fuelers under his charge."

9            Do you have any information or knowledge with

10   regards to that allegation, "continues to abuse his

11   authority and at times harass Fuelers under his

12   charge"?

13           Does that ring a bell at all, Mr. Qually?

14       A.   No.

15       Q.   And in the complaint that you received against

16   Andrew Dodge, was there any type of language along

17   these lines or actions along these lines, like

18   harassing, abusing authority?

19           Was that the types of complaints that you

20   received?

21       A.   No.

22       Q.   So you received complaints about meal breaks

23   and rest breaks, but nothing about harassing fuelers,

24   right?  You never heard that type of complaint?

25       A.   Correct.

```
 1                    CERTIFICATE OF WITNESS

 2                        ---o0o---

 3

 4        I, JOHN QUALLY, hereby declare under

 5   penalty of perjury that I have read the foregoing

 6   deposition testimony; and that the same is a true

 7   and correct transcription of my said testimony

 8   except as corrected pursuant to my rights under

 9   Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12                    _____
                                Signature
13

14                    _____
                                  Date
15

16

17

18

19

20

21

22

23

24

25
```

```
 1   STATE OF CALIFORNIA     )
                             )
 2   COUNTY OF SAN FRANCISCO )

 3           I, CINDY TUGAW, a Certified Shorthand Reporter

 4   of the State of California, duly authorized to

 5   administer oaths pursuant to Section 8211 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8                   JOHN QUALLY,

 9   the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21           Dated the 7th day of August, 2020.

22

23

24

             CINDY TUGAW
25           CSR No. 4805 (California)
```

```
 1    John Qually
      c/o Foley & Lardner
 2    555 California Street, Suite 1700
      San Francisco, CA 94104
 3    Attn:  Jason Y. Wu, Esq.

 4    Date:  August 7th, 2020
      Re:  Navarro vs. Menzies
 5    Deposition Date:  Tuesday, July 28, 2020

 6    Dear Mr. Qually,

 7         Please be advised the original transcript of
      your deposition is ready for your review.
 8         Pursuant to FRCP Rule 30(e), you have
      30 days following the date of this notice to read,
 9    correct if necessary, and sign your transcript unless
      the attending parties and the deponent agree on the
10    record or otherwise in writing to a longer or shorter
      time period.  The deponent may change the form or the
11    substance of the answer to a question, and may either
      approve the transcript of the deposition by signing it,
12    or refuse to approve the transcript by not signing it.
      You are not required by law to read and sign your
13    deposition transcript.  All parties will be informed of
      the corrections.  The original transcript will then be
14    sealed and sent to the examining attorney pursuant to
      the applicable law.
15         You may either come to our office to read and
      sign the original transcript, or you may contact your
16    attorney or the attorney who arranged for you to be
      present at your deposition.  If they have ordered a
17    copy of the transcript, you may review their copy and
      make corrections by submitting, signing and returning
18    the attached form.  If you choose to review your
      transcript at our office, please call first to make an
19    appointment.  Should you have any question regarding
      these instructions, please call.
20
      Sincerely,
21


22
      NOGARA REPORTING SERVICE
23    5 Third Street, Suite 415
      San Francisco, California 94103
24    (415) 398-1889

25    cc:  All counsel, original deposition
```