**Case No. 21-15355**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

---

RENALDO NAVARRO,

*Plaintiff-Appellant,*

v.

MENZIES AVIATION, INC., d/b/a Menzies,

*Defendant-Appellee.*

---

*Appeal from a Decision of the United States District Court for the Northern District of California,*
*Case No. 3:19-cv-08157-VC · The Honorable Vince Chhabria, District Judge*

## EXCERPTS OF RECORD
## VOLUME III OF IV – Pages 289 to 574

ARLO G. URIARTE
LIBERATION LAW GROUP
2760 Mission Street
San Francisco, California 94110
(415) 695-1000 Telephone
(415) 695-1006 Facsimile
arlo@liberationlawgroup.com

*Attorneys for Appellant,*
*Renaldo Navarro*

 

# EXHIBIT 15

```
 1              IN THE UNITED STATES DISTRICT COURT

 2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    RENALDO NAVARRO,

 6               Plaintiff,

 7    v.                              No.  3:19-CV-8157

 8    MENZIES AVIATION, INC.,
      doing business as MENZIES
 9    and DOES 1 through 10,
      inclusive,
10
               Defendants.
11    _____/

12    Zoom Remote Deposition of

13        TRACY AGUILERA

14     Tuesday, August 25, 2020

15         CERTIFIED COPY

16

17

18

19

20

21    REPORTED BY:  CINDY TUGAW, CSR #4805

22

23
              NOGARA REPORTING SERVICE
24            5 Third Street, Suite 415
           San Francisco, California 94103
25               (415) 398-1889
```

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 4 of 286
Case 3:19-cv-06361-JD Document 142-1 Filed 03/25/2021 Page 4 of 312

```
 1                        I N D E X

 2                                      Page Number

 3   EXAMINATION BY MR. URIARTE                5

 4   EXAMINATION BY MR. WU                    48

 5   FURTHER EXAMINATION BY MR. URIARTE       53

 6                    ---oOo---

 7                  E X H I B I T S

 8   Plaintiff's

 9   Exhibit 8     Petition to Menzies        26
                   Management from Menzies
10                 Fuelers

11   Exhibit 9     Termination notice for     48
                   Renaldo Navarro
12
     Exhibit 11    Employee Performance       35
13                 Development dated
                   8/29/2018
14
     Exhibit 12    Email chain culminating    31
15                 in an email from Raul
                   Vargas to Tracy Aguilera
16                 dated August 29, 2018

17   Exhibit 13    Menzies Aviation Code of   18
                   Conduct
18
     Exhibit 14    Menzies Aviation Employee  21
19                 Handbook California - 2017

20   Exhibit 15    Menzies Aviation Applicant 23
                   Declaration Form
21
     Exhibit 17    Employee Performance       43
22                 Development Steps to
                   Progressive Discipline
23
     Exhibit 18    Job Description, Fueling   54
24                 Supervisor (North America)

25
```

1                          I N D E X

2                         (Continued)

3    Plaintiff's                      Page Number

4    Exhibit 19      Letter from Rafael Vasquez        41
                     to whom it may concern
5                    dated 11/18/2018 with
                     attached petition
6
     Exhibit 20      Menzies Aviation Employee          44
7                    Handbook California - 2018

8                         ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<< NOGARA REPORTING SERVICE >>                    3

1           BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 25th day of

3    August, 2020, commencing at the hour of 1:04 o'clock

4    p.m. thereof, via Zoom videoconference, before me,

5    CINDY TUGAW, a Certified Shorthand Reporter in the

6    State of California, personally appeared,

7                     TRACY AGUILERA,

8    called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                      ---o0o---

12              APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

21   Also Present:  David Ho, Zoom Host.

22                      ---o0o---

23

24

25

                 << NOGARA REPORTING SERVICE >>            4

                           294

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1       THE REPORTER:  At this time, I will ask counsel to

2   stipulate on the record that there is no objection to

3   this deposition officer administering a binding oath to

4   the witness via Zoom, starting with the noticing

5   attorney.

6       MR. URIARTE:  No objection from plaintiff.

7       MR. WU:  And no objections for defendant, Menzies

8   Aviation.

9           (Whereupon, the Witness was duly sworn by the

10          Reporter.)

11              EXAMINATION BY MR. URIARTE

12      MR. URIARTE:  Q.  Good afternoon, Ms. Aguilera.

13      A.  Good afternoon.

14      Q.  Could you please state and spell your full

15  legal name for the record.

16      A.  Tracy T r-a-c-y, Marie, M-a-r-i-e, Aguilera,

17  A-g-u-i-l-e-r-a.

18      Q.  Thank you.  Have you had your deposition taken

19  before?

20      A.  Yes.

21      Q.  And how many times?

22      A.  Two or three.  A couple times.

23      Q.  And are these like as part of your duties as

24  an HR professional?

25      A.  Yes.

```
 1        A.  Yes.
 2        Q.  And you know who Renaldo Navarro is?
 3        A.  Yes.
 4        Q.  How long did you actually work with Mr.
 5   Navarro?
 6        A.  When Menzies Aviation purchased ASIG, so it
 7   would be around 2017.
 8        Q.  So Menzies arrived -- do you remember what
 9   part of the year Menzies actually started their
10   operation in SFO --
11        A.  Yeah --
12        Q.  -- for ASIG?
13        A.  Oh, for ASIG.  Could have been June or July.
14        Q.  So about June or July 2017?
15        A.  Yes.
16        Q.  And then were you already at SFO doing other
17   parts of airport services for Menzies?
18        A.  Yes.
19        Q.  And then how long has Menzies been in San
20   Francisco Airport?
21        A.  I can't give you an exact date.
22        Q.  Yeah, what about yourself, about how long --
23        A.  I've been at SFO since 1997.
24        Q.  All for Menzies?
25        A.  No.
```

1    that you're using for today's testimony?

2        A.  No.

3        Q.  What's the highest level of education that you

4    finished with?

5        A.  High school.

6        Q.  And then any kind of HR-related classes that

7    you've taken in the last five years?

8        A.  No.

9        Q.  Any wage and hour related seminars or classes

10   that you've taken in the last five years?

11       A.  I'm sorry, I can't hear you.  I didn't.

12       Q.  Any kind of wage and hour seminars or

13   compliance classes or anything like that?

14       A.  No.

15       Q.  And then how long have you been an HR manager

16   for Menzies at SFO airport?

17       A.  Ten years.

18       Q.  When Menzies took over ASIG, did Menzies bring

19   with it its own employment policies and handbook?

20       A.  They had one, yes.

21       Q.  Were those distributed to the employees that

22   they took over in July of 2017?

23       A.  I'm sorry, can you repeat the question.

24       Q.  Sure.  When Menzies took over ASIG in July of

25   2017, did they distribute the Menzies employment

Case 3:19-cv-00577-VC Document 172-1 Filed 01/22/20 Page 10 of 12

DEPOSITION OF TRACY AGUILERA - 08/25/2020

```
 1    handbooks and policies --
 2         A.  Not right at the time, no.
 3         Q.  When were those eventually distributed?
 4         A.  I don't have an exact date.  I do know that we
 5    posted the notice stating that they would be following
 6    the Menzies Aviation policies.
 7         Q.  Okay.  And where was that notice posted?
 8         A.  It was posted in the employee bulletin board.
 9         Q.  And then where would -- like if somebody
10    wanted to see them, where would they see them?
11         A.  They would see them in the HR department.  We
12    were preparing a package for them.
13         Q.  If somebody needed to see them, you said they
14    could see it in the HR department, is that correct?
15         A.  Yes, once we put them all together.
16         Q.  By August of 2018, had you put them all
17    together?
18         A.  I believe they did have a package for them.
19         Q.  For each one of them?
20         A.  Yes.
21         Q.  Are you certain of that or are you guessing on
22    that?
23         A.  No, I believe they did have a package put
24    together.
25         Q.  And when you say "they," who's "they"?
```

1   right, you give it to the employees and then they

2   acknowledge receipt of it, correct?

3       A.  Yes.

4       Q.  And they acknowledge that they have been given

5   one, isn't that the practice?

6           So the practice, Ms. Aguilera, is that once

7   the handbooks become available, you provide the

8   handbook to the employee and then they sign an

9   acknowledgment for receipt of them, is that correct?

10      A.  Yes.

11      Q.  And then are you familiar with the Menzies

12  code of conduct?

13      A.  Yes.

14      Q.  And that's another kind of set of policies or

15  paperwork that's given to each employee, is that

16  correct?

17      A.  It's in the handbook, yes.

18      Q.  Oh, so it's part of the handbook?

19      A.  Yes, it is.

20      Q.  Is there a separate acknowledgment of receipt

21  for the code of conduct or it's all just one?

22      A.  It's all just one.

23      Q.  Was there ever a training with regards to the

24  Menzies California handbook and code of conduct?  Was

25  there any kind of training like that?

<< NOGARA REPORTING SERVICE >>                    15

299

1    A.  There was, when the employees came in to sign
2    all the documents, we went over the documents with
3    them.
4        Q.  So how did that go?  You called some of the
5    employees one by one or like a seminar?  How did that
6    go?
7        A.  They would come in according to their
8    schedule, if they didn't have flights, they would come
9    into the HR department.  We would -- I would arrange it
10   with their manager.
11       Q.  Like how many people would come in at one
12   time?
13       A.  A couple at a time.
14       Q.  And then when you said you would go over it
15   with them, you actually went through some of the pages
16   and --
17       A.  What they were signing, yes.
18       Q.  What they signed.
19       A.  Either myself or my clerk.
20       Q.  I see.  Do you have an independent
21   recollection of doing something like that with
22   Mr. Renaldo Navarro?
23       A.  No, I can't say that I do.  I didn't do a lot
24   of them.  My clerk did a lot of them, most of them.
25       Q.  In July or August of 2018, who was your clerk?

300

```
 1        A.  I believe it was Loretta Katoa.

 2        Q.  We're going to need a spelling for the last

 3   name.

 4        A.  K-a-t-o-a.

 5        Q.  Was there another clerk or was it just

 6   Loretta?

 7        A.  No, I had Loretta and I had another clerk, her

 8   name was Precious.

 9        Q.  Do you remember her last name?

10        A.  Sagaga.

11        Q.  Do you know the spelling of that?

12        A.  I believe it's S-a-g-a-g-a.

13        Q.  What is your understanding as to why Menzies

14   terminated Mr. Navarro?

15        A.  For harassment.

16        Q.  And as you know, harassment is a bit of a term

17   of art in employment circles.  So what type of

18   harassment are we talking about?  When you say

19   harassment in this circumstance, what kind of

20   harassment?

21        A.  Unprofessional conduct, forcing employees

22   to -- pressuring employees.

23        Q.  Pressuring employees to sign the petition, is

24   that what you mean?

25        A.  Yes.
```

301

1       Q.  Any other reason?

2       A.  No.

3       Q.  Is it your understanding that -- is it your

4    understanding that somehow in the code of conduct

5    there's something there that addresses the concern that

6    you're not supposed to force employees to sign a

7    petition?

8       A.  Yes.

9       Q.  And do you remember seeing something like that

10   in the code of conduct?

11      A.  Yes.

12      MR. URIARTE:  So, David, can we get Exhibit 13,

13   please.

14          (Plaintiff's Exhibit 13 marked for

15          identification.)

16      ZOOM HOST:  I sent a Chat to Tracy, and she should

17   be able to open that link, and she has a laptop, so she

18   can see the whole document.

19      MR. URIARTE:  Okay.  Very good.  So you're not

20   going to open it over here or --

21      ZOOM HOST:  If you like, I can do that.  It's up

22   to you.

23      MR. URIARTE:  Yeah, can we do that?

24      ZOOM HOST:  Okay.  Sure.  Coming back up.

25      MR. URIARTE:   I think Jason and I are kind of used

302

1    memory is that they had the handbook at that point

2    already, is that correct?

3        A.  Yes.

4        Q.  And who would know for certain whether that's

5    true or not?

6        A.  The documents should be in the files.

7        Q.  Yeah, well, I guess what I can represent to

8    you is that -- and I should show you that -- let's look

9    at Exhibit 15, please.

10            (Plaintiff's Exhibit 15 marked for

11            identification.)

12       MR. URIARTE:  Q.  So here is one of those

13    documents that lists the signature.  If we look below,

14    it's got a blank, no employee name, no employee

15    signature.  This was produced to us by your attorneys.

16            And so I have yet -- I mean, I guess, if you

17    get back to your office and you see some sort of

18    acknowledgment form that has Mr. Navarro's signature on

19    it, I think that would be helpful, but we have yet to

20    see that.

21            Okay, Ms. Aguilera?  Did you understand my

22    request?

23       A.  Yes.

24       Q.  All right.  How did you first find out that

25    there was a petition circulating about Andrew Dodge?

```
 1        A.   The union notified me.

 2        Q.   And how did they notify you?

 3        A.   They called me.  It wasn't "they."  Charles

 4   called me, the man named Charles that worked in the

 5   union office.

 6        Q.   And what did Charles say to you?

 7        A.   He said, "Tracy, are you aware that there's a

 8   petition being circulated?  Our members -- several

 9   members have called and complained that they were being

10   forced to sign a petition."

11        Q.   Okay.  And then anything else that Charles

12   said to you?

13        A.   No.

14        Q.   And so, in response to that, what did you do?

15        A.   Well, I asked him if he had a copy of the

16   petition and who was being forced, but he never got

17   back to me on that.  With that being said, I made

18   contact with the acting general manager at the time,

19   and his name was Renil Lal, and I told him that I

20   received the call from the union.

21        Q.   Okay.  And did Renil get you a copy of the

22   petition?

23        A.   Not right away.  I don't believe -- no, he did

24   not.

25        Q.   Do you know how long before you actually got a
```

304

1    copy of it?

2         A.   I got it -- actually, I got it from Raul

3    Vargas.  I'd seen it.

4         Q.   I see.  Okay.  And did you read the petition

5    itself?

6         A.   I've seen the names on there, yes, but I

7    didn't go through each one.  I'm sorry.

8         Q.   What about the topic that the petition was

9    talking about, did you read that part?

10        A.   No, I -- I gave everything to Kevin Blumberg

11   to open up an investigation.

12        Q.   And what was the investigation for?

13        A.   Well, to find out what was going on.

14        Q.   What do you mean, "to find out what was going

15   on"?

16        A.   With the petition, why it was being

17   circulated.

18        Q.   Okay.  And then what was the conclusion of

19   Kevin, the security person?

20        A.   The conclusion?

21        Q.   Yes.

22        A.   It was that Rey Navarro was forcing employees

23   to sign a petition to have Andrew Dodge removed.

24        Q.   Okay.  And that's what is contained in the

25   email, right, is that what you're talking about, where

1    Mr. Blumberg actually sent an email to you with the

2    result of his investigation?

3        A.  Yes.

4        Q.  Okay.  So that's with regards to the inquiry

5    as to Mr. Navarro's involvement in the petition itself,

6    right?  But what about the part of, like, what the

7    fuelers were complaining about?  Was that ever

8    investigated?

9        A.  I'm sorry, can you repeat that.

10       Q.  Sure.  What about the part, that section of

11   the petition where the fuelers are asking for certain

12   relief or what they're complaining about, right, in the

13   petition, was that part of the petition ever

14   investigated?

15       A.  What part are you talking about?

16       MR. URIARTE:  Okay.  Let me show you.  So let's

17   bring up Exhibit 8.

18           (Plaintiff's Exhibit 8 marked for

19           identification.)

20       MR. URIARTE:  Q.  Can you see Exhibit 8,

21   Ms. Aguilera?

22       A.  Yes.

23       Q.  Do you remember this to be the petition that

24   we're talking about?

25       A.  This is the one that I believe was given to

<< NOGARA REPORTING SERVICE >>                    26

306

1   Raul Vargas.

2       Q.  Okay.  Let's scroll to page 2 just to make

3   sure Ms. Aguilera sees the whole document.  It's a

4   three-page document.

5           And this is the one that has Renaldo Navarro's

6   signature on line 16, as you see there.  Do you see

7   that, Ms. Aguilera?

8       A.  Yes.

9       Q.  Okay.  And then it also has the signature of

10  the other supervisor, July Macapagal.  Do you see that?

11      A.  Yes.

12      Q.  Okay.  So we've been calling this the first

13  petition.  So if we scroll back to page 1 -- and I

14  understand that you've said that you asked the security

15  department or Raul Vargas asked the security department

16  to investigate the role of Mr. Navarro.  I understand

17  that part.

18          What I'm now distinguishing with you is with

19  regards to the subject matter of this petition.  And

20  I'll let you read it, or if you want, I can read it for

21  you.

22          Are you able to read it fine, Ms. Aguilera?

23      A.  Yes, I know how to read, yes.

24      Q.  Okay.  So it says, "We the fuelers on Menzies

25  130 side would like to make a petition against Andrew

1   Dodge.  The way he supervised is very unprofessional
2   when he run the operation or supervised, people are not
3   [taking] their breaks it's because the way he set up
4   the flights" -- okay?  -- "and he always blaming the
5   people there's a delay or always saying lack of
6   manpower and trucks issues."
7       Okay.  So let's just stop there.  That part of
8   the petition, was that ever investigated?
9       A.  The whole scenario was investigated by Kevin
10  Blumberg.
11      Q.  Aside from the email that contains some of
12  Mr. Blumberg's conclusion, is there another document
13  that addresses these concerns?
14      A.  I don't have them.
15      Q.  So if there is an investigation, it would be
16  part of what Mr. Blumberg engaged in, correct?  Is that
17  correct?
18      A.  Yes.
19      Q.  Okay.  Let's go on to the next one.  "The
20  truth is he doesn't know how to run the show, we also
21  addressed the problem to the higher position managers
22  (Nicco, John and Renil) as usual nothing happened,
23  looks like they always covering his mistake or maybe
24  these managers don't know anything about fueling also
25  like Andrew Dodge lack of experience about fueling."

DEPOSITION OF TRACY AGUILERA, 08/25/2020

1    document that writes or has further conclusions

2    regarding his investigation?  Ms. Aguilera?

3         A.  No, I don't have a copy of it.

4         Q.  Okay.  I guess my question is more -- when we

5    see Mr. Blumberg's product or result of his

6    investigation into the petition, this is what we're

7    looking at right here, the email that he wrote to you

8    with his conclusions, is that correct?

9         A.  This says a statement, yes.

10        Q.  Aside from this statement, is there any other

11   written document?

12        A.  Not that I have.

13        Q.  And here his conclusion really is

14   "unprofessional behavior by a supervisor."  Do you see

15   that?

16        A.  Yes, I see it.

17        Q.  Just taking that kind of like in its

18   isolation, "unprofessional behavior by a supervisor,"

19   would that result in a termination?  Is that something

20   that would normally result in a termination?

21        A.  It depends on the caliber of the -- what he's

22   done.

23        Q.  And your recommendation actually was not to

24   terminate, correct?

25        A.  Myself and our directors, yes -- my director,

<< NOGARA REPORTING SERVICE >>                            33

309

1    yes.  Talin.

2         Q.  Correct.  So Talin and yourself had a

3    discussion, and your recommendation to Mr. Vargas was

4    not to terminate but instead issue a final warning, is

5    that correct?

6         A.  It was not to terminate, yes.

7         Q.  Did you recommend the final warning to

8    Mr. Vargas?

9         A.  I was going to.  Oh, to Mr. Vargas, no.  Let

10   me back up, I'm sorry.

11        Q.  Go ahead.

12        A.  Yes, I did write up the document, but it

13   was -- and my recommendation was made.

14        Q.  Did you actually send that document to

15   Mr. Vargas?

16        A.  I don't believe so.

17        Q.  Now, was there ever a discussion between you

18   and Mr. Vargas about, hey, there's an option here of

19   issuing a final warning; was that discussion made?

20        A.  No.  I gave my recommendation.

21        Q.  So you gave your recommendation of not

22   terminating, but you didn't communicate an option to

23   Mr. Vargas.  Is that an accurate way of characterizing

24   it?

25        A.  Not via email.  After I made my

<< NOGARA REPORTING SERVICE >>                    34

1    recommendation, and he came up to my office and we

2    discussed it, and that's when Kevin came up and said --

3    and gave me the details of the investigation.

4         Q.  And so Raul Vargas went to your office, you

5    had a discussion about it, and in that discussion the

6    final warning option was discussed?

7         A.  He asked me why I came to that conclusion of

8    not to terminate, and I told him based on Renaldo's

9    tenure and what was in his personnel file.

10        Q.  Okay.  And what's your opinion as to why

11   Mr. Vargas did not follow that recommendation?

12        A.  After speaking with Mr. Vargas and Kevin in my

13   office and them going into detail about harassment, my

14   opinion changed, and I reviewed it with my director,

15   and we were in agreement to terminate him.

16        Q.  And then I guess I understand all of that.

17   But I think the only kind of unclear portion of that is

18   the -- and maybe let's pull it up.

19        MR. URIARTE:  If we could pull up Exhibit 11.  I

20   wanted to kind of focus on the issue of the issuance of

21   the final warning and what Mr. Vargas knew about that.

22             (Plaintiff's Exhibit 11 marked for

23             identification.)

24        MR. URIARTE:  Q.  And issuance is not the right

25   word, right?  You drafted a document of final warning.

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1    Q.  That's a typo with the date?

2    A.  Yeah, it shouldn't have been October.

3    Q.  Okay.  So it should have been October 27,

4    2018?

5    A.  No, I believe --

6    Q.  I mean -- yeah.

7    A.  I believe it should have been August 27th.

8    Q.  Okay.  So you believe that to be a typo?

9    A.  I believe so.

10   Q.  All right.  So are you saying that two days

11   before Mr. Navarro was terminated, Mr. Rafael Martinez

12   also gave Raul Vargas a petition asking Andrew to be

13   removed?

14   A.  Yes.

15   Q.  With regards to the suspension on August 20,

16   who recommended and approved the suspension?

17   A.  Raul Vargas and Kevin Blumberg.

18   Q.  Before the issue with the petition, did you

19   receive any complaints or did you hear about complaints

20   from fuelers against Andrew Dodge?

21   A.  Only from Rey.

22   Q.  Did you see the pictures that were circulating

23   of Mr. Andrew Dodge sleeping on the job?  Was that

24   something that you saw?

25   A.  Yes, I did see one.

1     Q.   And that was before the petition, correct?

2     A.   Yes.

3     Q.   And Rey complaining about Andrew Dodge,

4    wouldn't you say that that could have been part of his

5    duties as a supervisor?

6     A.   Yes.

7     Q.   Aside from Rey, you did not hear from fuelers

8    complaining about Andrew Dodge?

9     A.   No.

10    Q.   At that time, in July or August of 2018, aside

11   from Mr. Dodge, was there any other white supervisor

12   working for the fueling department?

13    A.   I -- I really don't know.  I can't -- I don't

14   know.

15    Q.   It could be that Mr. Dodge was the only white

16   supervisor?

17    A.   Could be.

18    Q.   Did you ever have a discussion with Renil with

19   regards to Rey Navarro's complaints against Andrew

20   Dodge?

21    A.   Yes.

22    Q.   And how many times do you think Renaldo

23   Navarro complained to Renil about Andrew Dodge?  Do you

24   remember any of that?

25    A.   No.

313

1      Q.   Was it more than two times?

2      A.   Possibly.

3      Q.   Less than five and more than two, maybe?

4      A.   Possibly.

5      Q.   And with regards to -- and this happened

6   before the petition, correct?

7      A.   Him showing me the picture, yes.

8      Q.   And then did you see the video, the kind of

9   comical video that the fuelers made?

10     A.   No.

11     Q.   What about Renil and you discussing complaints

12  against Andrew Dodge, how many times did you guys

13  discuss that?

14     A.   I spoke to Renil a couple of times and told

15  him Rey's concerns.

16     Q.   Okay.  And what did Renil say?

17     A.   He would check into it.

18     Q.   Any result from it or any kind of follow-up

19  from it from Renil?

20     A.   No, he said he would -- well, he told me that

21  he would talk to Andrew, and that's it.  Rey didn't

22  come in and make formal complaints.  He would just --

23  he showed me the picture and the picture was Andrew

24  Dodge sitting in his car outside after -- sleeping in

25  his truck after he was off work.

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1    A.  Yes.

2    Q.  It says that, quote, "On September 6th, 2018"

3  -- it's about nine days after the termination of

4  Mr. Navarro -- "I was asked by Menzies fuelers to write

5  a Petition on behalf of the Fuelers on 130 side vs.

6  Andrew Dodge.  The petition was written out and signed

7  by the Fuelers" and then turned over to the union.  In

8  addition, it was also given to Raul Vargas.

9        Were you made aware of this particular

10 petition?

11   A.  After it was given to Raul Vargas and given to

12 Kevin Blumberg.

13   Q.  So, and just to make sure we're speaking of

14 the same thing, so there was a first petition, and this

15 seems to be the second petition.  And this is a

16 separate petition, you understand that?

17   A.  Yes.

18   Q.  What came out of this second petition, if

19 anything?

20   A.  Nothing on the HR side.  There was no union

21 grievance, there was no complaint by the union except

22 for the original phone call I received.

23   Q.  And so you said it was given to Mr. Blumberg.

24 Was an investigation actually done because of this

25 second petition?

315

1    A.  If I'm not mistaken, this is for the same

2    issue.

3    Q.  So no additional investigation was done?

4    A.  Not to my knowledge.

5    MR. URIARTE:  Now, let's go to Exhibit 17, please.

6         (Plaintiff's Exhibit 17 marked for

7         identification.)

8    MR. URIARTE:  Q.  Okay.  You see Exhibit 17, I

9    believe it's Employee Performance Development and Steps

10   to Progressive Discipline.

11        If you could go down a little bit, David, that

12   would be better.

13        This is a reverse pyramid here.  And you're

14   familiar with this, Ms. Aguilera?

15   A.  Yes, I am.

16   Q.  My question here really is how come

17   progressive discipline was not instituted?

18   A.  Harassment has zero tolerance.

19   Q.  And was it discussed as an option?

20   A.  I'm sorry?

21   Q.  Was it discussed as an option?

22   A.  Progressive discipline for harassment?

23   Q.  Yes.

24   A.  No.

25   Q.  Is that written somewhere where harassment,

1    later on about the extent to which you had discussions

2    regarding Andrew Dodge's work performance.  If there

3    were issues with Andrew Dodge's work performance, would

4    those typically be brought to your attention or to

5    someone else's attention?

6         A.   Usually it would go to the manager, if there

7    were issues, it would go to -- it's a protocol.  It

8    would go to the supervisor, the supervisor would go to

9    the general manager, the general manager would go to

10   the director.

11        Usually if there's -- I usually get involved

12   if it comes down to a final warning or a suspension

13   pending termination.

14        Q.   Okay.  But in terms of everyday work

15   performance, that's something that you're not usually

16   involved with?

17        A.   No.

18        MR. WU:  David, we can take off Exhibit 8.  Thank

19   you.

20        Q.   Mr. Uriarte also asked you about some pictures

21   of Andrew Dodge that you had seen.

22        A.   Yes.

23        Q.   I think I lost count.  How many photos have

24   you seen?

25        A.   One or two.  I believe I can really remember

1   one.

2        Q.  And in that -- I'm sorry, I didn't mean to

3   interrupt.

4        A.  Possibly two.  I'm trying to think.  There was

5   one sitting -- oh, there was one sitting in the truck,

6   but he was off duty.  And he had a habit of just

7   sitting in his truck after he got off work, and he

8   would sleep in front of the parking lot in his truck,

9   take a quick nap.

10          And I know he'd be off work because I come to

11  work at 8:30, and he'd get off work -- I think his

12  schedule ended, like, 6:00 or 7:00.  But I would go up

13  and sometimes I'd knock on the window and say, "Are you

14  okay?"

15          "Oh, yeah, I'm just taking a nap before I

16  drive home."

17          "Okay."  So I knew he was off the clock.

18       Q.  Okay.  And do you remember anything about the

19  other photo that you might have seen?

20       A.  I believe I seen one of him sitting in the

21  supervisor chair, but, again, he was off duty.

22       Q.  And how were you able -- I'm sorry, I didn't

23  mean to interrupt.

24       A.  I was going to say I knew he was off duty

25  because his shift ended at, again, 6:00 or 7:00.  I

```
 1    come in at 8:30.  And it was -- like the picture

 2    outside, it was, you know, after 8:30, it was light

 3    out, and I actually seen him.  But the one in the

 4    office I only know because, you know, even Rey would

 5    say, "This is what I took this morning," and Rey would

 6    come in later.

 7         Q.  Okay.  So just to make sure I understood that

 8    all correctly, the photo where Andrew was sleeping in

 9    his truck, you could tell he was off duty because there

10    was light out in the photo?

11         A.  Yes, it was light, because I come in at 8:30

12    in the morning, and he's off work by then.

13         Q.  And the second photo with Andrew sleeping in

14    the supervisor's office, you knew that he was off duty

15    because Rey mentioned that it was a photo he took in

16    the morning?

17         A.  Yeah, exactly, yes.

18         Q.  And Andrew would be off duty in the morning?

19         A.  Yes, because he worked graveyard.

20         Q.  Do you remember Mr. Uriarte asking you whether

21    Mr. Navarro complaining about any issues with Andrew

22    Dodge would be part of Mr. Navarro's duties as a

23    supervisor?

24         A.  Yes.

25         Q.  And do you remember answering yes to that
```

```
 1        A.   Yes, it's in the job description.

 2        MR. URIARTE:  Okay.  No further questions.

 3        MR. WU:  Nothing else from me.

 4        MR. URIARTE:  Thank you, Ms. Aguilera.  Thank you

 5   very much.

 6        MR. WU:  Thanks so much for your time, Tracy.

 7        THE WITNESS:  Thank you.

 8           (Whereupon, the concluded at 2:51

 9           o'clock p.m.)

10                        ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

320

1        CERTIFICATE OF WITNESS

2              ---o0o---

3

4        I, TRACY AGUILERA, hereby declare under

5    penalty of perjury that I have read the foregoing

6    deposition testimony; and that the same is a true

7    and correct transcription of my said testimony

8    except as corrected pursuant to my rights under

9    Rule 30(e) of the Federal Rules of Civil

10   Procedure.

11

12                    _____

13                              Signature

14                    _____

15                              Date

16

17

18

19

20

21

22

23

24

25

321

DEPOSITION OF TRACY AGUILERA - 08/25/2020

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF SAN FRANCISCO )

 3          I, CINDY TUGAW, a Certified Shorthand Reporter

 4    of the State of California, duly authorized to

 5    administer oaths pursuant to Section 8211 of the

 6    California Code of Civil Procedure, do hereby certify

 7    that

 8                     TRACY AGUILERA,

 9    the witness in the foregoing deposition, was by me duly

10    sworn to testify the truth, the whole truth and nothing

11    but the truth in the within-entitled cause; that said

12    testimony of said witness was reported by me, a

13    disinterested person, and was thereafter transcribed

14    under my direction into typewriting and is a true and

15    correct transcription of said proceedings.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21          Dated the 10th day of September, 2020.

22

23

24

            CINDY TUGAW
25          CSR No. 4805 (California)
```

<< NOGARA REPORTING SERVICE >>                    57

322

```
 1   Tracy Aguilera
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn:  Jason Y. Wu, Esq.

 4   Date:  September 10, 2020
     Re:  Navarro vs. Menzies
 5   Deposition Date:  Tuesday, August 25, 2020

 6   Dear Ms. Aguilera,

 7        Please be advised the original transcript of
     your deposition is ready for your review.
 8        Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
 9   necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15        You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21

22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```

# EXHIBIT 16

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   RENALDO NAVARRO,

 6                Plaintiff,

 7   v.                              No.  3:19-CV-8157

 8   MENZIES AVIATION, INC.,
     doing business as MENZIES
 9   and DOES 1 through 10,
     inclusive,
10
                Defendants.
11   _____/

12   Zoom Remote Deposition of

13        RAUL VARGAS

14    Tuesday, August 25, 2020

15        CERTIFIED COPY

16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24           NOGARA REPORTING SERVICE
             5 Third Street, Suite 415
25         San Francisco, California 94103
                (415) 398-1889
```

325

```
 1                    I N D E X

 2                                          Page Number

 3     EXAMINATION BY MR. URIARTE                  4

 4     EXAMINATION BY MR. WU                      73

 5     FURTHER EXAMINATION BY MR. URIARTE         74

 6                    ---o0o---

 7                 E X H I B I T S

 8     Plaintiff's

 9     Exhibit 1      Plaintiff Renaldo            9
                      Navarro's Amended Notice
10                    of Deposition of Raul
                      Vargas
11
       Exhibit 8      Petition to Menzies         26
12                    Management from Menzies
                      Fuelers
13
       Exhibit 9      Termination notice for      60
14                    Renaldo Navarro

15     Exhibit 11     Employee Performance        61
                      Development dated
16                    8/29/2018

17     Exhibit 12     Email chain culminating     66
                      in an email from Raul
18                    Vargas to Tracy Aguilera
                      dated August 29, 2018
19
       Exhibit 19     Letter from Rafael Vasquez  43
20                    to whom it may concern
                      dated 11/18/2018 with
21                    attached petition

22                    ---o0o---

23

24

25
```

326

1         BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 25th day of

3    August, 2020, commencing at the hour of 9:03 o'clock

4    a.m. thereof, via Zoom videoconference, before me,

5    CINDY TUGAW, a Certified Shorthand Reporter in the

6    State of California, personally appeared,

7                   RAUL VARGAS,

8    called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                  ---o0o---

12            APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                    ---o0o---
22

23

24

25

```
1         THE REPORTER:  Good morning.  At this time, I will
2    ask counsel to stipulate on the record that there is no
3    objection to this deposition officer administering a
4    binding oath to the witness via Zoom, starting with the
5    noticing attorney.
6         MR. URIARTE:  No objection.
7         MR. WU:  And no objections on behalf of Menzies
8    Aviation.
9              (Whereupon, the Witness was duly sworn by the
10             Reporter.)
11              EXAMINATION BY MR. URIARTE
12        MR. URIARTE:  Good morning, Mr. Vargas.
13        A.  Good morning.
14        Q.  Could you please state and spell your name for
15   the record.
16        A.  Yes, so my name is Raul Vargas, R-a-u-l, last
17   name V, as in Victor, a-r-g-a-s.
18        Q.  Okay.  And if I ask you what your formal name
19   is, like, for example, what's on your passport or
20   something like that, what would you say?
21        A.  Raul Herman Vargas Aroca.
22        Q.  And so, Herman, Herman is H-e-r-m-a-n, is that
23   what it is?  Herman, did you hear me?
24        A.  Yes, it's H-e-r-m-a-n.
25        Q.  And then I missed your mother's maiden name.
```

DEPOSITION OF RAUL VARGAS - 8/25/2020

1    around in the workplace?

2        A.  I don't recall that.

3        Q.  Would you say that it was going around for a

4    month already and then his termination happened?

5        A.  I don't recall it.

6        Q.  Can you give me your best estimate, like a

7    week, or do you have a time frame in your head at all?

8        A.  I don't have a time frame in my head right

9    now.

10       Q.  So you don't remember kind of like whether it

11   was days or weeks?

12       A.  I don't remember when this was brought to my

13   attention.

14       Q.  And "this" being the petition, correct?

15       A.  In relation to the petition.

16       Q.  I think, Mr. Vargas, we need you to speak up a

17   little bit or maybe get closer to the microphone.

18       A.  Yes.

19       Q.  Thank you.  So what about this:  Do you

20   remember who brought the petition to your attention?

21       A.  Tracy Aguilera.

22       Q.  So it was HR who actually let you know that,

23   hey, there's this petition going around?

24       A.  HR.

25       Q.  Aside from Tracy, did anybody else talk to you

329

1    about the petition?

2        A.  Nobody else talked to me.  She was the first

3    person who talked to me about the petition.

4        Q.  Okay.  And then when you say she's the first

5    person, was she also the only person that talked to you

6    about the petition?

7        A.  No.

8        Q.  Did anybody else talk to you about the

9    petition before Mr. Navarro's termination?

10       A.  Yes.

11       Q.  Who else?

12       A.  Our operation manager for fuel.

13       Q.  Who was that?

14       A.  I don't recall his last name.  Renil.

15       Q.  Renil?

16       A.  Renil.

17       Q.  R-e-n-i-l?

18       A.  That is, yes.

19       Q.  I believe he's not with the company anymore,

20   correct?

21       A.  He's not.

22       Q.  Do you know where he is right now?

23       A.  I do not know.

24       Q.  All right.  Aside from Renil, did anybody else

25   talk to you about the petition?

1     A.  Nobody else.

2     Q.  Okay.  What did Renil tell you about the

3 petition?

4     A.  That there was a petition going around to

5 terminate Andrew.

6     Q.  To terminate Andrew.  Anything else?

7     A.  Nothing else that I can recall.

8     Q.  Okay.  Did you actually read the petition?

9     A.  I read the petition, yes, I did.

10     Q.  And you read the petition before the

11 termination?

12     A.  Yes, I did.

13     Q.  And when you read it, that's what it said, to

14 terminate Andrew?

15     A.  I don't recall exactly what it says, but it

16 was about Andrew's performance, and it was about

17 removing Andrew from the position.

18     Q.  And then, aside from saying that to you,

19 anything else Renil told you about the petition?

20     A.  Nothing else -- nothing else that I can

21 recall.

22     Q.  Okay.  What about Tracy, what did she talk to

23 you about the petition?

24     A.  Well, Tracy told me about everything that she

25 was getting information from.  The first conversation I

1   had with her, it was about somebody from the union

2   contacting her to let her know that somebody was

3   requesting to sign a petition to the employees.

4        Q.   Anything else?

5        A.   Yes.  She mentioned that -- that employees

6   were -- were not agreeing on signing it.

7        Q.   Okay.  Anything else?

8        A.   Nothing else that I can recall.

9        Q.   And then, with regards to the content of the

10  petition, after you read it, did you make any decision

11  related to the contents of the petition?

12       A.   Yes, I talked to Tracy to -- to have the

13  investigation.

14       Q.   What type of investigation?

15       A.   An investigation about the petition and about

16  the -- how the petition was made.

17       Q.   How the petition was --

18       A.   Performed.

19       Q.   Was performed?

20       A.   Yes.

21       Q.   So you mean, when you say "how the petition

22  was performed," you mean how the petition was put

23  together, correct?

24       A.   Yes.

25       Q.   Anything else that you asked Tracy to do in

DEPOSITION OF RAUL VARGAS - 08/25/2020

```
 1    relation to the petition?
 2         A.  Nothing else at that time.
 3         Q.  Okay.  And so you said to do an investigation
 4    about the petition.  What does that mean?  What did you
 5    actually tell Tracy to do?
 6         A.  To perform an investigation about how --
 7    because we received some calls from the union, and also
 8    received some information about Andrew, that he
 9    received a message from Navarro.  So at that time it
10    was important for me to understand how that petition
11    was created.  How they did it.
12         Q.  All right.  And then you said also about how
13    the petition was put together.  So why was it important
14    for you to know how or who put together the petition?
15         A.  Because of the feedback that I received from
16    Tracy, from HR.
17         Q.  And what's that information that you received
18    from HR?
19         A.  As I said before, she told me that somebody
20    from the union contact her telling her that there was a
21    person asking for sign a petition, who was forcing the
22    employees to do it.
23         Q.  And did you ever find out who actually put
24    together the petition?
25         A.  Yes, we did.
```

333

1    Q.   And who was it?

2    A.   Mr. Navarro.

3    Q.   I'm sorry?

4    A.   Mr. Navarro.

5    Q.   And how did you reach -- how was that

6    conclusion reached?  Like how did you guys reach the

7    conclusion that Mr. Navarro wrote the petition?

8    A.   There was an investigation done, performed by

9    the safety department.

10   Q.   So the safety department person actually said

11   Mr. Navarro wrote the petition, is that your

12   understanding?

13   A.   Yes.  And also because of the messages that

14   Andrew received from Mr. Navarro.

15   Q.   Right.  But that message said, "I'm holding on

16   to the petition.  I haven't submitted it."  It doesn't

17   say, "I wrote the petition that I'm going to give."  Do

18   you know what I'm saying?  It says, "I'm holding on to

19   the petition and I haven't submitted it."

20        So I don't know how that text message kind of

21   leads to the conclusion that he wrote it.  Can you

22   explain it to me?

23   MR. WU:  Objection.  Assumes facts not in

24   evidence.

25        You can answer if you understand the question.

334

DEPOSITION OF RAUL VARGAS - 08/25/2020

1      MR. URIARTE:  Q.  Mr. Vargas?

2      A.  Well, I think that when you receive a message

3  from -- I don't know where -- somebody in relation to a

4  petition, that is an alert.

5      Q.  Is what?

6      A.  Is an alert.

7      Q.  Okay.  But I guess my question is how does

8  that text message lead you to conclude that Mr. Navarro

9  wrote the petition?

10      A.  That was not the one that drove me to

11  understand that Mr. Navarro did the petition.

12      Q.  What did make you understand that Mr. Navarro

13  wrote it?

14      A.  Well, because the investigation from the

15  safety department.

16      Q.  Okay.  So the investigation from the safety

17  department actually has a report?

18      A.  They have statements from employees.

19      Q.  Statements from employees.  Okay.  Anything

20  else?

21      A.  They had a statement from employees and their

22  final outcome out of the investigation.

23      Q.  Are you talking about the final outcome as

24  they wrote it in the email?

25      A.  Yes.

1   this petition.

2        A.  Well, and if I can go back --

3        Q.  Yes.

4        A.  -- I never asked to investigate on who wrote

5   the petition.

6        Q.  So for you that wasn't important?

7        A.  No.

8        Q.  So when you finally concluded that termination

9   was the proper discipline, that wasn't part of the --

10  for you, that's not the important part, right?

11       A.  About who wrote the petition, no, no, not at

12  all.

13       Q.  For you it was, hey, you've got this guy

14  forcing employees to sign the petition.  That's what it

15  was, right?

16       A.  Yes.

17       Q.  I got it.  Okay.  So that leads to the

18  question of when -- so let's say August 29 is

19  eventually the time that he gets terminated.  Do you

20  remember about when you concluded in your head, hey, I

21  need to terminate Mr. Navarro?  Do you remember when?

22       A.  The specific date, no, but it should be around

23  that time.

24       Q.  Like within days of it or within a week or --

25       A.  I cannot tell.  I don't -- I don't recall it.

336

1        A.  I don't recall the date.

2        Q.  Okay.  So, but before concluding that Navarro

3   actually forced employees to sign the petition, I kind

4   of want to make sure that I get all of the steps that

5   you took to be satisfied that your conclusion was

6   correct.  All right?

7        A.  Yes.

8        Q.  So I saw the investigation statement.  I saw

9   the letters from the employees.  That's understandable.

10  But other than that -- and then you talked to Tracy as

11  well, right?  You had email communication with Tracy.

12  Other than those steps, did you do any other steps?

13       A.  No.  Well, actually I was waiting for the

14  final outcome from the investigation.  And it was not

15  just the feedback that I received from the safety

16  department.  Also the conversations I had with Tracy in

17  relation to this case.

18       Q.  Okay.  But did you ever ask the safety

19  department, hey, did you guys talk to the fuelers?

20       A.  Yes, I did.

21       Q.  And what did they say?

22       A.  They told me that they -- he was -- so the

23  safety department told me that Mr. Navarro was forcing

24  employees to sign the petition, and he was creating --

25  he was harassing people to have this petition signed.

Case 3:19-cv-00817-WHO Document 231 Filed 05/26/20 Page 86 of 252

1      Q.  Okay.  So forcing employees to sign the

2  petition.  What's wrong with that?

3      A.  Well, I think that when you have -- you take

4  advantage of your rank, that is harassment because of

5  how the other people feel.

6      Q.  Anything else that's wrong with that?

7      A.  Yes.  So when they use this rank, people feel

8  scared of having this confrontation with the

9  supervisor, so they prefer to sign the petition without

10  understanding what the petition was for.

11      Q.  So are you saying that the safety department

12  talked to everybody that signed that petition and

13  verified whether they actually signed it or not?

14      A.  I cannot guarantee that they talked to hundred

15  percent of the employees.

16      Q.  Okay.  But do you know how many people they

17  talked to?

18      A.  I don't know exactly how many people they

19  talked to.

20      Q.  And then you used the word "harassment."  How

21  are you using that word "harassment"?  What do you mean

22  by that?

23      A.  Well, for me, harassment is pretty much --

24  it's to force or intimidate people.  So, in this case,

25  when he's taking his rank as a supervisor, telling

338

```
 1    people to sign a petition that they don't know what
 2    it's for, that for me is intimidation.  And that's how
 3    they -- the employees felt.
 4         Q.  How many employees are we talking about --
 5         A.  Well --
 6         Q.  -- that felt like that?
 7         A.  I'm sorry?
 8         Q.  How many employees felt like that?
 9         A.  I cannot tell you exactly the number of, but I
10    can tell you in terms of the -- the statements we
11    received.  There were around three employees.
12         Q.  And then there were over 20 people who signed
13    the petition, right?
14         A.  Yeah.
15         Q.  So out of the more than 20 people who signed
16    the petition, three people felt like, oh, maybe I
17    didn't read it and then I signed it and maybe I --
18         MR. WU:  Objection.  Objection.  Lack of
19    foundation.  Calls for speculation.  Misstates prior
20    testimony.
21         MR. URIARTE:  Q.  So, Mr. Vargas, when your
22    attorney objects, we allow him to finish his objection
23    so that it's written into the record.  Please allow him
24    to finish, and then you can answer afterwards unless
25    your attorney tells you not to answer.  Okay?
```

339

1      A.   So, for me, if we have people that feel that

2   way, it's really important to ensure that we have the

3   right environment for our employees.   Harassment is a

4   really important matter in our environment in a

5   business.

6      Q.   I got that.   I got that.   So you've got three

7   people complaining about the way that the harassment --

8      A.   We have -- remember -- sorry, can I --

9      Q.   Please, please.

10     Q.   So, remember, we had those three guys, but

11  also we had some feedback from the union saying that

12  this person was harassing people to sign the petition.

13     Q.   Okay.   But what about the subject matter of

14  the petition itself?   Weren't they doing the same thing

15  as well?   You said it's very important for you that

16  people work in a proper environment, right?

17     A.   Yes.

18     Q.   But the nature of the petition itself kind of

19  complains about the environment, right?

20     A.   Yes.

21     Q.   Okay.   So isn't that also a valid concern?

22     A.   It is.   Definitely it is.

23     Q.   Okay.   And what was done about that?

24     A.   Well, I think that it's important from the

25  extent of the document, where the document is coming

```
 1    Tracy and Renil?  Does that make sense?
 2         A.  I cannot confirm a hundred percent that this
 3    was the one.
 4         Q.  Okay.  So if we go down a little bit, yeah,
 5    you'll see Mr. Navarro's signature on this one.
 6         A.  Yes.
 7         Q.  And this document actually comes from your
 8    company, if you see the Menzies number there, Menzies
 9    153.  And so line 24 there on the second page -- I'm
10    sorry, line 16 of the second page has Mr. Navarro's
11    signature.  Do you see that?
12         A.  Yes.
13         Q.  All right.  So, again, going back to your
14    conclusion earlier, you're saying, if you think that
15    Mr. Navarro was forcing all of these people to sign the
16    petition, you believe the petition is now without
17    validity, is that correct?
18         A.  Well, I don't think that it has the same
19    validity, definitely.  Now, what is most important to
20    bring out is that I had a conversation with HR about
21    Andrew, because they were -- in the letter I believe
22    they complained also about him falling asleep on the
23    operation.
24              So I had this conversation with HR.  And they
25    explained to me and they addressed that issue before I
```

341

1  started working at Menzies.  Because, again, I started

2  June 2018.  And this was happening -- this happened in

3  August.

4      Q.  Yes.  Right.  So you started in June of 2018,

5  and this was happening in August.  So you didn't have

6  that much kind of context with regard to what was

7  happening from the last year, is that correct?

8      A.  (Indicates affirmatively.)

9      Q.  Mr. Vargas?

10     A.  Yes.

11     MR. WU:  Arlo, I'm sorry to interrupt.  Can we

12  take a quick break in the next five minutes?  Whatever

13  is a good stopping point for now.

14     MR. URIARTE:  That's fine.  We can take a break

15  now.  No problem.

16     MR. WU:  Thanks a lot, Arlo.  Let's go off the

17  record.

18     MR. URIARTE:  No problem.

19         (Brief recess.)

20     MR. URIARTE:  Q.  So we were talking about Exhibit

21  8, Mr. Vargas.  My question is with regards to the

22  actual things that the fuelers were complaining about.

23  And I just want to clarify something.

24         Was there ever an investigation by Menzies

25  with regard to the context or the content of their

```
1    petition, the subject matter of their petition?

2         A.   Well, there was an investigation before in

3    terms of what they were complaining about, that this

4    was happening at the company.   And that was the

5    conversation that I had with Tracy, with HR, in

6    relation to this petition, what they were saying.

7         Q.   And what was the result of that investigation?

8         A.   Well, that Andrew pretty much falls asleep

9    because he has sleep onea [sic].

10        Q.   You're talking about sleep apnea?

11        A.   Yes.

12        Q.   Anything else?

13        A.   And -- no, nothing else.

14        Q.   What about the complaint that rest breaks or

15   breaks were being -- were being missed or not taken?

16        A.   I don't recall about that.

17        Q.   What about like delays that were being caused

18   by Andrew, was that ever investigated?

19        A.   No, no, not brought to my attention.

20        Q.   So when you read this petition, I guess the

21   focus became Mr. Navarro asking people to sign the

22   petition.   That was your focus, right?

23        A.   Yeah.   The environment that he create by doing

24   that.

25        Q.   Okay.   And you didn't really put focus on the
```

343

1    environment that Mr. Dodge was creating as alleged by

2    this petition?

3         A.   Well, I did when I asked HR about that

4    petition, about those things that happened before I got

5    there, and that was what I received from HR.

6         Q.   So what I heard you say, they already --

7         A.   That they already took action on it.

8         Q.   And that's with regard to the sleep apnea?

9         A.   That is regard of everything.

10        Q.   Okay.  So you're saying you did ask Tracy

11   about what the fuelers were talking about in the

12   petition, correct?

13        A.   (Indicates affirmatively.)

14        Q.   Okay.  And that involved what was happening to

15   Andrew Dodge before, and something about sleep apnea

16   and sleeping and him falling asleep, correct?

17        A.   Yes.

18        Q.   Anything else, aside from that, that came as a

19   result of your inquiry with regards to the petition?

20        A.   Also that, for me, nothing else for me to take

21   action for.

22        MR. WU:  And, Raul, if you could just give a brief

23   pause between the end of Arlo's question and the

24   beginning of your answer.  I think sometimes, when

25   there's a bit of overlap, is when we're getting that

```
 1    feedback and it's becoming a little unclear.

 2        THE WITNESS:  Okay.

 3        MR. URIARTE:  Q.  Did you ever have a discussion

 4    with Mr. Navarro, before this whole petition started,

 5    did you ever have a discussion with Mr. Navarro about

 6    Andrew Dodge?

 7        A.  Not that I recall.

 8        Q.  So you don't remember him going up to you and

 9    trying to talk to you about concerns about Andrew

10    Dodge?

11        A.  No, I don't recall that.

12        Q.  Aside from the petition and maybe Mr. Navarro,

13    did you ever get complaints against -- or about Andrew

14    Dodge in those -- June, July, August, the time you were

15    there?

16        A.  No, I did not.

17        Q.  And so you were not involved in the promotion

18    of Mr. Dodge, correct?

19        A.  No, I was not.

20        Q.  And before being at Menzies at the San

21    Francisco Airport, where were you working?

22        A.  I was working for TAS.

23        Q.  What does that mean?

24        A.  TAS, Total Airport Services.  I worked there

25    as a general manager in San Francisco.
```

345

1    like, June to August of 2018.  What were your duties

2    and responsibilities?

3        A.  Pretty much whatever -- as US director of

4    operation, I'm looking for different -- different

5    elements.  So I have four different elements.  The

6    first one is financial.  I look for all the financials

7    of the station, all the four business lines that we

8    have there at that moment, which it was the fueling

9    business, the ramp business, the cargo business and the

10   GSC business.  GSC is ground service equipment.  So we

11   provide service to all the equipment that pretty much

12   you see on the runway.

13           So I look also in terms of customer service,

14   all the retention or attraction of new customers,

15   interactions.  I also look into the safety, ensuring

16   that we run a smooth operation in a safe basis, putting

17   all the safety processes in place to reduce every kind

18   of risk out there on the ramp or in the different

19   departments.

20           And I also look into the people.  What I mean

21   by the people, well, I make sure that environments, the

22   retention, the attraction of new employees, and how can

23   we retain employees in the long-term.

24       Q.  Okay.  Thank you for that.  Being that you

25   were new to the San Francisco Airport operation, before

346

```
 1      pulling the trigger and actually recommending the
 2      termination of Mr. Navarro, did you talk to anyone with
 3      regards to that decision?
 4          A.  Yes.   I talked to HR.
 5          Q.  Who else?
 6          A.  I talked to HR and nobody else about that
 7      decision.
 8          Q.  So you didn't talk to Renil and say, "Renil, I
 9      know you've been here a while.  What do you think about
10      this?"
11          A.  I don't recall it, talking to Renil.
12          Q.  How much did you know about Mr. Navarro at the
13      time that you terminated him?
14          A.  I didn't know that much about Mr. Navarro.
15          Q.  Okay.  Did you know that he had been working
16      for Menzies a long time at that point?
17          A.  Yes, I did.
18          Q.  And then what were you trying to accomplish by
19      choosing to terminate Mr. Navarro?
20          A.  Well, I think that, as I said before, my job
21      there is to ensure that we can retain employees.  And
22      the only way to retain employees is to ensure an
23      environment where they work is a good environment.  So
24      when you have one person, just one person, complaining
25      about supervisor harassment, then you need to take
```

347

1    actions.

2        Q.  So your belief is that it was all Mr. Navarro

3    complaining, it was just him?

4        A.  I think that, based on the statements we

5    received, they were focused on that -- on him.

6        Q.  Okay.  But what about all those other people

7    that signed the petition?

8        A.  Well, as I said before, we need to ensure that

9    environment is good.  So, for me, just one person

10   complaining about harassment, it's an issue.

11       Q.  Okay.

12       A.  More than one, then you have a petition signed

13   by people.  So we have a person, and more than one

14   person being harassed to sign a petition, that is a

15   huge issue for me.

16       MR. URIARTE:  Okay.  All right.  Can we take a

17   look at Exhibit 8 again, please.

18           David, are you there?

19       ZOOM HOST:  Yes, coming up shortly.

20       MR. URIARTE:  Thank you.

21       ZOOM HOST:  Give me one second.  It's not coming

22   up.

23       MR. URIARTE:  No problem.  Thank you, David.

24       Q.  Let's go to the top part of Exhibit 8, please.

25   So it says, "To:  Menzies Management.  Sir/madam."

1     A.   "We think this is the right time to broadcast

2     the problem in this company.  We are hoping this

3     problem will be addressed."

4     Q.   Okay.  Was this problem ever addressed,

5     Mr. Vargas?

6     A.   It was addressed at the moment, but I was not

7     there.

8     Q.   I'm sorry?

9     A.   It was addressed at the moment because this is

10    old case, but I was not there when that happened.

11    Q.   Okay.  When did you go to Los Angeles?

12    A.   September.

13    Q.   Of?

14    A.   September -- September 1st, 2019.

15    Q.   So that was a year later, right?

16    A.   Yes.

17    Q.   So within -- from August to -- August 2018 to

18    September 2019, was there anything done about what was

19    written here?

20    A.   No, as I said before, the conversation with

21    HR, because I was not aware of all this that was

22    happening with Andrew, I had a conversation with HR

23    where they -- where HR told me about what happened and

24    what the final outcome of that investigation was.

25    Q.   With regards to the investigation on the sleep

1    apnea, is that correct?

2         A.   In regards to the issues that they were

3    having -- that they are complaining about Andrew.

4         Q.   Okay.  So it says, "the way he supervised is

5    very unprofessional when he run the operation or

6    supervised."  Anything that was done about that?

7         A.   At the moment that I get there, I hadn't had

8    any problem with Andrew.  And I didn't get any

9    complaint from any fueler in relation to Andrew.

10        Q.   Did you talk to any of the fuelers about the

11   way he supervises is very unprofessional and run the

12   operation or supervise?

13        A.   I'm sorry, no, I did not talk to any fuelers

14   about the way he supervise.

15        Q.   Do you know if Tracy or HR did that?

16        A.   In the conversations we had, it wasn't

17   specific about his performance in terms of OTP, which

18   is operational -- on time performance, I'm sorry.

19        Q.   And then it says -- okay.  I'm sorry, I think

20   we missed the last part.  Did you say something there?

21        A.   No.

22        Q.   Okay.  "People are not taking their breaks

23   it's because the way he set up the flights."  That one,

24   did you ask about that?  Was that something that was

25   taken care of?

1    A.  Well, I didn't receive no complaints about

2    people not taking the breaks.  And I want to -- can

3    I -- the policy that I have, when I manage people, is

4    really open.  And what I do is I always invite people,

5    when they have issues, to talk about the problems they

6    have.  The moment that I raised all those points with

7    people, I never would receive no complaints from no

8    fueler in relation to Andrew's performance.

9    Q.  Okay.  But if you see the second page there of

10   this petition, they did.  They did come forward, right?

11   Because you have 25, 26 people signing.

12        If you have an open-door policy about letting

13   you know about the complaint, wasn't this what these

14   people are doing?  I don't see how --

15   MR. WU:  Objection.  Lack of foundation.

16   Misstates prior testimony.

17        You can answer if you understand the question.

18   THE WITNESS:  I think that that question I already

19   answered.

20   MR. URIARTE:  Q.  Which is you don't believe that

21   these people were really complaining?

22   A.  We have people feel harassed to sign this

23   petition.

24   Q.  So you feel every one of these people were

25   harassed to sign this petition, is that correct?

DEPOSITION OF RAUL VARGAS - 08/25/2020

1    Q.   And then did HR give you recommendation with

2    regards to other options available aside from

3    termination?

4    A.   Well, the recommendation -- the recommendation

5    from HR was not to terminate him.

6    Q.   And you didn't follow that?

7    A.   No, actually, I asked why those

8    recommendations, which I think it's normal procedure.

9    Q.   So you're saying you asked the recommendation

10   from HR, and then what did HR say?

11   A.   That based on the -- on the recommendation and

12   the conversation they had with the director, they're

13   recommending not to terminate, but it was just -- I'm

14   sorry, that it was just a recommendation, I'm sorry.

15   Q.   Okay.  So HR's recommendation is not to

16   terminate, right?

17   A.   Yes.

18   Q.   But you did not follow that, right?

19   A.   No, because I -- I needed to see the final

20   outcome of the investigation to take the right

21   decision.

22   Q.   And what did you see in the final outcome that

23   made you conclude that termination was the right

24   action?

25   A.   I get the final outcome from safety department

DEPOSITION OF RAUL VARGAS 08/25/2020

1    with the statements, plus the messages from Navarro to

2    Andrew, plus, well, the letter with the petition, the

3    call from the union in that there is somebody

4    instigating the people to sign this petition.

5         Q.  Okay.  Weren't there other options available?

6         MR. WU:  Objection.  Vague.

7              You can answer.

8         THE WITNESS:  There are always different options.

9         MR. URIARTE:  Q.  Did you consider those options?

10        A.  I think the harassment for me is -- is very

11   important.  I need to look into the environment for all

12   the employees and not just one.

13        Q.  Okay.

14        A.  And I think that is important that this person

15   was supervisor.

16        Q.  So you're saying the harassment is so

17   important that that was like a very big part of why you

18   decided to terminate.  That's what you're saying?

19        A.  Yes.

20        Q.  So what did you learn -- what if you learned

21   that harassment was also going on between Andrew Dodge

22   and the fuelers, would that be enough to terminate

23   Andrew Dodge?

24        MR. WU:  Objection.  Improper hypothetical.  Lacks

25   foundation.

```
 1              You can answer.
 2         THE WITNESS:  We investigated everything.
 3    Everything -- we need to investigate everything to look
 4    into how that is affecting the employees.
 5         MR. URIARTE:  Q.  Right.  I know you have to
 6    investigate.  I guess my hypothetical is more, if you
 7    learned that harassment was actually going on between
 8    Andrew Dodge and his fuelers, then it would lead to the
 9    conclusion that he should be terminated, too, right?
10         MR. WU:  Same objection.
11         MR. URIARTE:  Q.  Is that correct, Mr. Vargas?
12         A.  It is.  I protect the team.
13         Q.  I was looking at some of your corporate
14    documents with regards to handbooks and HR materials
15    and all that.  And there's this thing called
16    progressive discipline.  Were you aware of that?
17         A.  Yes, I am.
18         Q.  Okay.  And why is it that you did not use
19    progressive discipline in this situation?
20         A.  Because there are cases that they're severe,
21    and then that's one of the outcome of the
22    investigation.
23         Q.  So it's like serious enough to terminate?
24         A.  Yes.
25         Q.  Is that a yes?
```

1    A.  Yes, it is a yes.

2    Q.  Okay.  And then did you ask or were you

3 curious, maybe you should have had a conversation with

4 Mr. Navarro?

5    A.  I don't participate in the investigations.

6    Q.  Maybe like a phone call to Mr. Navarro to get

7 his side of the story?

8    A.  No, I do not.  I do not participate in any

9 investigation.

10    Q.  And do you know whether or not they actually

11 talked to Mr. Navarro and got his side of the story?

12    A.  I just get the final outcome.

13    Q.  You just get the final decision?

14    A.  The final outcome for -- from the

15 investigation.

16    Q.  My question is different.  My question is when

17 you were looking at all the different elements to

18 decide whether to terminate or not, did you try to find

19 out whether somebody talked to Mr. Navarro to get his

20 side of the story?

21    A.  No, I did not.  I did not try to find out.

22    Q.  Would you say that's kind of like basic

23 investigation right there?

24    MR. WU:  Objection.  Lack of foundation.  Improper

25 hypothetical.

DEPOSITION OF PAUL VARGAS 08/25/2020

1          You can answer if you know.

2          THE WITNESS:  I won't say that is -- it all

3    depends on the kind of investigation they're running.

4          MR. URIARTE:  Q.  They -- what's the last word?

5          A.  They are running.

6          Q.  That they are running.  Okay.  But you didn't

7    look into what kind of investigation they were running?

8          A.  I just look into the final outcome of the

9    investigation.

10         Q.  And you never, like, got into your head and

11   said, what does Mr. Navarro say about all of this?

12   That's not something that you ever asked yourself?

13         A.  No, I do not.  I do not because I just look

14   into the final outcome of the investigation.  So I

15   think that that question is for the people who perform

16   the investigation.

17         Q.  So you said earlier that the goal of

18   terminating Mr. Navarro was to protect the employees

19   from the harassment, right?  The environment of

20   harassment, correct?

21         A.  Yes.

22         Q.  How is it different, in achieving that goal,

23   how is termination different from, let's say, a

24   suspension?

25         A.  Well, I think that is important, too, if you

<< NOGARA REPORTING SERVICE >>                    56

356

DEPOSITION OF RAUL VARGAS - 08/25/2020

 1    find out that there is a harassment in the -- in the

 2    crew and in the environment, then the only way for you

 3    to ensure that we remove that harassment from the

 4    environment is to remove the person who is doing the

 5    harassment.  In that every case is different, but when

 6    you have three people complaining about it, and at the

 7    same time you have a petition involving another

 8    employee which you're trying to achieve by harassing

 9    people is -- is not good.

10         Q.  Okay.  But the part about that that needs a

11    little bit of explanation is you have this -- you say

12    at the same time you have this petition, but what about

13    the people that actually wrote the petition, right?  So

14    they have a concern, right?  So --

15         A.  Well, we go back to the same -- to the same

16    conversations we had before, of the petition, when you

17    have somebody that is pushing somebody to sign a paper

18    that they don't even know what it's for.

19         Q.  Right.  For those three people, right?

20         A.  Could be one, two, three, I don't know.

21         Q.  Now, in your emails, you mentioned July or

22    Julie Macapagal, it M-a-c-a-p-a-g-a-l.  Actually, the

23    name of an old Filipino president.  July Macapagal.

24    Does that name sound familiar to you?

25         A.  He's also part of a supervisor crew.

357

1    Q.  Was an investigation ever conducted?

2    A.  Well, I investigate.  I saw the name of the

3  person that it was on that list.  And I request to open

4  an investigation about that person.

5    Q.  Was an investigation opened?

6    A.  Yeah, but because I needed to know if this

7  supervisor was also -- was also harassed to sign

8  this -- this petition.

9    Q.  Okay.  And what was the result of the

10  investigation?

11    A.  That he was.

12    Q.  I'm sorry?

13    A.  That he was.  He was also intimidated to sign

14  the paper.

15    Q.  I'm unclear about that.  What is that --

16  that's a person, a guy, right?  A male?

17    A.  Yes.

18    Q.  He's a guy.

19    A.  Yes.

20    Q.  So what was -- what was Mr. Macapagal -- what

21  did Mr. Macapagal do?

22    A.  He's a supervisor.

23    Q.  Yeah, and he signed the petition, correct?

24    A.  The petition, yes.

25    Q.  And then what was the result of the

1    investigation on Mr. Macapagal?

2         A.   That he was forced to sign that paper.

3         Q.   That he was forced to sign the paper, is that

4    correct?

5         A.   Yes.

6         Q.   You talked to Mr. Macapagal?

7         A.   No, I did not.

8         Q.   Okay.  So who gave you the results of the

9    investigation?

10        A.   Safety department.  It was a conversation we

11   had.

12        Q.   Over the telephone?

13        A.   No, person to person.

14        Q.   Who in the safety department?

15        A.   Kevin Blumberg.

16        MR. URIARTE:  Let me get you, before we forget, so

17   it's Kevin Blumberg, B-l-u-m-b-e-r-g.  All right.

18        Q.   So he told you that Mr. Macapagal told him

19   that he was forced to sign the petition, is that

20   correct?

21        A.   Yes.

22        Q.   Did you review the termination notice before

23   it was issued?

24        A.   No, I did not.

25        MR. URIARTE:  I just want to make sure we're clear

1    on this.  Exhibit 9, please, David.  Thank you.

2            (Plaintiff's Exhibit 9 marked for

3            identification.)

4        MR. URIARTE:  So if you could just scroll all the

5    way, David, so Mr. Vargas can see the whole document.

6    So this will be Exhibit 9.  This is "Notice to

7    Employees as to Change in Relationship" dated August

8    29, 2018.  I'm good with my word with regard to the

9    date there, even though Jason did not want to go with

10   me on it.

11       Q.  So do you see that, Mr. Vargas?

12       A.  Yes, I see that.

13       Q.  Okay.  So you didn't see this document before

14   it was issued?

15       A.  I don't recall it, but it looks like the first

16   time that I see this document.

17       Q.  No problem.  And then when it says "Code of

18   Conduct," does that mean anything to you?

19       A.  Yeah.

20       Q.  What does that mean to you?

21       A.  It means that the person was not conducting

22   correctly.

23       Q.  Okay.  And specifically what was he not

24   conducting correctly?

25       A.  He was forcing people to sign a petition.

1    Q.  Okay.  Anything else that he wasn't doing

2    correctly?

3        A.  I think that is enough for me.

4        Q.  I'm just trying to complete things, so I'm

5    sorry I keep saying, "Anything else?  Anything else?"

6    I'm just making sure it's complete.

7            So aside from him forcing people to sign the

8    petition, anything else that might have caused him to

9    violate code of conduct, or was that it?

10       A.  I think that -- I think that -- well, no,

11   nothing -- well, but the reason why we terminate --

12       Q.  Yeah.

13       A.  -- because of forcing people to sign a

14   petition.

15       MR. URIARTE:  Gotcha.  Okay.

16           And then could we have Exhibit 11, please.

17           (Plaintiff's Exhibit 11 marked for

18           identification.)

19       MR. URIARTE:  Q.  So here's Exhibit 11.  This one

20   was given to us by your lawyers as well.  It's Menzies

21   95, if you look on the bottom.

22       A.  Can you repeat that.

23       Q.  I'm sorry?

24       A.  Can you repeat it, please.

25       Q.  Sure.  So this is Exhibit 11.  This is a

361

1      Q.  All right.  And here it says this option, I

2  guess, would have placed Mr. Navarro on final warning

3  for unprofessional conduct of a supervisor, right?  Do

4  you see that?

5      A.  Yes.

6      Q.  And it says "distributing a petition and

7  disruption of the workforce."  Do you see that?

8      A.  Yes, I do see it.

9      Q.  And then it says, "You are being placed on a

10 Final Warning which is your last and final opportunity

11 to" -- we don't know.  I'm thinking it's like "change

12 your behavior," maybe.  I don't know.  We don't know

13 that.  And then, "Any infraction, no matter how minor

14 in any of the 4 categories of Attendance, Conduct,

15 Safety or Work Performance, may result in your

16 immediate discharge."  Do you see that?

17     A.  Yes, I see that.

18     Q.  And then the Final Warning box is marked.

19     A.  Uh-huh.  Yes.

20     Q.  Okay.  And then if you see a little bit down,

21 just to make sure, there's no signature because it was

22 not used, presumably, correct?  So my question about

23 this document is what's wrong with this option,

24 Mr. Vargas?

25         MR. WU:  Objection.  Improper hypothetical.  Lacks

```
 1   foundation.
 2        THE WITNESS:  I think that, based on the
 3   investigation we come up with, this was not the option,
 4   the right option for me at that moment.
 5        MR. URIARTE:  Q.  Thinking about it now and
 6   knowing a little bit more about the situation?
 7        A.  I already had final outcome of the
 8   investigation.  Make sure I need to have the right -- I
 9   need to take the right decision.
10        Q.  You still think it's the right decision then,
11   Mr. Vargas?
12        A.  I do believe that it was the right decision,
13   and that's why I took it.  And you can tell when I
14   asked Tracy on -- in terms of her recommendation,
15   because I needed to ensure that we had all information
16   available to take the right decision moving forward.
17        Q.  Okay.  I guess I would have to ask, though,
18   don't you think that a final warning, one more little
19   mistake, may have resulted in the same outcome for you
20   in your goal of eliminating harassment?  Because your
21   goal is to eliminate harassment.
22        A.  Yes.
23        Q.  And a final warning like this --
24        MR. WU:  Improper -- sorry, I didn't know if you
25   were done with your question.  I don't mean to cut off
```

1   your question, Arlo.

2       MR. URIARTE:  It's okay, Jason.  Go ahead with

3   your objection.

4       MR. WU:  The objection is improper hypothetical

5   and lack of foundation.

6       MR. URIARTE:  Q.  Mr. Vargas?

7       A.  I'm sorry, but I don't know.  That's the

8   reason why I'm thinking about risk, I need to ensure

9   that we can reduce the risk as much as we can.  So

10  since I don't know what's going to happen with a

11  warning, the way for me to reduce the risk is

12  terminating the person.

13      Q.  Go ahead.

14      A.  With enough documentation to support that

15  decision.

16      Q.  Right.  And for you the documentation is the

17  conclusion of the security people, right?  And then the

18  statement of the three people that you're talking

19  about.

20      A.  Do you want me to go through it?

21      Q.  No, no, we've gone through it.  Don't worry

22  about it.  But that's your position, you felt like you

23  had enough documentation to do a termination?

24      A.  Yes.

25      Q.  And you're avoiding the risk.  Now, the risk

```
 1        Q.  Okay.  So at this point did you think that you

 2   needed to investigate more?

 3        A.  Yes, definitely, because she was not answering

 4   my question on that -- at that point.

 5        Q.  Okay.  Very good.  All right.  And then if we

 6   go up a little bit.  So here is your response, I guess,

 7   August 29 at 5:01 p.m.  And you kind of made the

 8   decision to terminate Mr. Navarro, correct?

 9        A.  Yes.

10        Q.  So in the hour between 4:04 p.m. and 5:01

11   p.m., what additional investigation occurred?

12        A.  Well, we had a -- we had a conversation with

13   HR also, and I reviewed all the documentation in terms

14   of what the outcome of the investigation was.  And at

15   that point I took the decision to terminate Mr.

16   Navarro.

17        Q.  Okay.  Anything else that you did in that

18   hour?

19        A.  Well, we talked -- as I say, we talked with

20   HR, talked about the case.  We collected all the

21   documentation, put all the documentation together.  And

22   then we took the right -- the last decision, and that's

23   why I send that email to HR.

24        Q.  At this point you were not provided a document

25   with regard to the final warning, right?  You didn't
```

365

```
 1    review that at this point?
 2         A.  No, I did not.  That's HR.  And I think that
 3    is also important to remember -- it's important to
 4    remark that HR take decisions -- decisions in terms
 5    of --
 6         Q.  In terms of?
 7         A.  The person.
 8         Q.  HR made decisions in terms of the person, you
 9    said?
10         A.  Of the person, exactly.
11         Q.  And what do you mean by that?
12         A.  Because they look into everything that you're
13    saying, or they take a look to the seniority of the
14    person, that this person is being 15 years at the
15    company, so they look on the -- on the recommendation
16    of the document, warnings and all that, and then, based
17    on that, they gave a recommendation.
18             Now, we, as directors, we look into the more
19    open situation of -- in terms of the whole operation,
20    how this will affect the rest of the employees.  And
21    during that -- during that meeting, of course, we
22    agreed on -- on a final termination for Mr. Navarro.
23         Q.  And when you say "agreed," who actually agreed
24    with you?
25         A.  HR.
```

DEPOSITION OF RAUL VARGAS - 8/25/2020

1    Q.  Meaning Talin and Tracy?

2    A.  Yes.  So then Tracy agreed because she had a

3    conversation with Talin, so we all agreed on -- on this

4    termination.

5        MR. URIARTE:  Okay.  Why don't we take a

6    five-minute break and then we'll be right back.  Thank

7    you.

8        MR. WU:  All right.

9            (Brief recess.)

10       MR. URIARTE:  Okay, Mr. Vargas, it looks like I

11   have no further questions for you today.

12       THE WITNESS:  Okay.

13       MR. WU:  And I have just a few questions for you,

14   Raul.

15                   EXAMINATION BY MR. WU

16       MR. WU:  Q.  So, Raul, during the time you were

17   the director of operations at SFO, aside from the

18   petition, did you hear of any complaints that Andrew

19   Dodge was harassing employees?

20       A.  No, I did not.

21       Q.  During the time you were the director of

22   operations at SFO, aside from the petition, did you

23   hear of any complaints that Andrew Dodge wasn't giving

24   fuelers breaks?

25       A.  No, I did not.

367

1    Q.   During the time you were the director of

2    operations at SFO, aside from the petition that we've

3    already been discussing, did you hear any complaints

4    that Andrew Dodge wasn't running the operation

5    smoothly?

6    A.   I did not.

7    Q.   During the time you were director of

8    operations at SFO, aside from the petition, have you

9    heard any complaints about Andrew's job performance?

10   A.   No, I did not.

11   Q.   During the time you were the director of

12   operations at SFO, did you ever hear of any grievance

13   filed by the union against Andrew Dodge?

14   A.   There is nothing on Andrew Dodge.

15   MR. WU:   Okay.   I think that's all the questions I

16   have on my end, Arlo, unless you have any further

17   questions.

18   MR. URIARTE:   Yeah, let me just follow up with

19   what you just said.

20        FURTHER EXAMINATION BY MR. URIARTE

21   MR. URIARTE:   Q.   Mr. Vargas, you said there was

22   nothing on Andrew Dodge, right?   One, two, three, four,

23   five items there.   You never heard anybody complaining

24   about harassing him, you never heard that he was not

25   giving breaks, you never heard that he was not running

1    Q.  And when you say you do not recall, does that

2   mean it could have happened or does that mean you

3   didn't do it?

4    A.  It means that I don't have anything documented

5   that's important, and I don't recall having a

6   conversation.

7    Q.  Okay.  What about with Tracy or with HR?  Do

8   you recall talking to them about all these different

9   items?

10    A.  We had a conversation, as I said, in terms of

11   the investigation and in terms of what the letter --

12   letter said about Andrew, as I explained it before, and

13   nothing else on that.

14    MR. URIARTE:  Okay.  All right.  Thank you.

15    THE WITNESS:  Thank you.

16    MR. URIARTE:  Thank you, Mr. Vargas.

17    MR. WU:  Thank you very much for your time, Raul.

18   We appreciate it.

19    THE WITNESS:  Thank you very much.

20    MR. URIARTE:  We'll stop the record.

21    (Whereupon, the concluded at 11:15

22    o'clock a.m.)

23                    ---o0o---

24

25

369

```
 1                    CERTIFICATE OF WITNESS

 2                        ---o0o---

 3

 4          I, RAUL VARGAS, hereby declare under

 5    penalty of perjury that I have read the foregoing

 6    deposition testimony; and that the same is a true

 7    and correct transcription of my said testimony

 8    except as corrected pursuant to my rights under

 9    Rule 30(e) of the Federal Rules of Civil

10    Procedure.

11

12                      _____
                               Signature
13

14                      _____
                               Date
15

16

17

18

19

20

21

22

23

24

25
```

370

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF SAN FRANCISCO  )

 3          I, CINDY TUGAW, a Certified Shorthand Reporter

 4    of the State of California, duly authorized to

 5    administer oaths pursuant to Section 8211 of the

 6    California Code of Civil Procedure, do hereby certify

 7    that

 8                      RAUL VARGAS,

 9    the witness in the foregoing deposition, was by me duly

10    sworn to testify the truth, the whole truth and nothing

11    but the truth in the within-entitled cause; that said

12    testimony of said witness was reported by me, a

13    disinterested person, and was thereafter transcribed

14    under my direction into typewriting and is a true and

15    correct transcription of said proceedings.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21          Dated the 10th day of September, 2020.

22

23

24
                      CINDY TUGAW
25                    CSR No. 4805 (California)
```

371

```
 1   Raul Vargas
     c/o Foley & Lardner
 2   555 California Street, Suite 1700
     San Francisco, CA 94104
 3   Attn:  Jason Y. Wu, Esq.

 4   Date:  September 10, 2020
     Re:  Navarro vs. Menzies
 5   Deposition Date:  Tuesday, August 25, 2020

 6   Dear Mr. Vargas,

 7          Please be advised the original transcript of
     your deposition is ready for your review.
 8          Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
 9   necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15          You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22

     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```

# EXHIBIT 17

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    RENALDO NAVARRO,

 6                 Plaintiff,

 7    v.                                      No.   3:19-CV-8157

 8    MENZIES AVIATION, INC.,
      doing business as MENZIES
 9    and DOES 1 through 10,
      inclusive,
10
                   Defendants.
11    _____/

12    Zoom Remote Deposition of

13       ANDREW DODGE

14     Tuesday, July 28, 2020

15        CERTIFIED COPY

16

17

18

19

20    REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23            NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
24          San Francisco, California 94103
                 (415) 398-1889
25
```

374

```
 1                          I N D E X

 2                                          Page Number

 3    EXAMINATION BY MR. URIARTE                    4

 4                      ---oOo---

 5                  E X H I B I T S

 6    Plaintiff's

 7    Exhibit 3      Copy of two photographs      26

 8    Exhibit 5      Statement by Andrew Dodge     42
                     dated 8-16-18
 9
      Exhibit 8      Petition from Menzies         33
10                   fuelers to Menzies
                     Management
11
      Exhibit 10     Statement by Rafael           40
12                   Vasquez dated 11/18/18

13                      ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25
```

375

1          BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 28th day of July,

3    2020, commencing at the hour of 9:00 o'clock a.m.

4    thereof, via Zoom videoconference, before me, CINDY

5    TUGAW, a Certified Shorthand Reporter in the State of

6    California, personally appeared,

7                    ANDREW DODGE,

8    Called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                    ---o0o---

12              APPEARANCES OF COUNSEL

13   For the Plaintiff
          LIBERATION LAW GROUP, P.C.
14        2760 Mission Street
          San Francisco, California 94110
15        BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
16

17   For the Defendants
          FOLEY & LARDNER, LLP
18        555 California Street, Suite 1700
          San Francisco, California 94104
19        BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                    ---o0o---
22

23

24

25

              << NOGARA REPORTING SERVICE >>              3

DEPOSITION OF ANDREW DODGE - 07/28/2020

```
 1        ZOOM HOST:  Good morning.  I am David Ho and I
 2   will be the Zoom host.  I am going to be -- as soon as
 3   the deposition gets going, I'll be off screen and I'll
 4   mute myself.  The only time you will hear my voice if
 5   there are any exhibits that you need to bring up.  And
 6   so, Cindy, take it away.
 7        THE REPORTER:  At this time, I will ask counsel to
 8   stipulate on the record that there is no objection to
 9   this deposition officer administering a binding oath to
10   the witness via Zoom, starting with the noticing
11   attorney.
12        MR. URIARTE:  No objection.
13        MR. WU:  No objections for defendant Menzies
14   Aviation.
15             (Whereupon, the Witness was duly sworn by the
16             Reporter.)
17             EXAMINATION BY MR. URIARTE
18        MR. URIARTE:  Q.  Good morning, Mr. Dodge.  My
19   name is Arlo Uriarte.  I am attorney for Renaldo
20   Navarro in this matter of Mr. Navarro against Menzies.
21             Are you aware of that?
22        A.  Yes.
23        Q.  Okay.  Would you please state and then spell
24   your full name for the record, please.
25        A.  Yeah.  Andrew Dodge, A-n-d-r-e-w, and then
```

```
 1   D-o-d-g-e.
 2        Q.   Okay.  And, Mr. Dodge, what's your current
 3   position with Menzies?
 4        A.   I am a supervisor here at Menzies.
 5        Q.   Have you had your deposition taken before?
 6        A.   Yes.
 7        Q.   And in what context?
 8        A.   Can you, like, rephrase the question?
 9        Q.   Yeah.  Why was your deposition -- why did you
10   provide a deposition?
11        A.   I had an incident on the -- on the airport.
12        Q.   Okay.  So it was your case or was it somebody
13   else's case?
14        A.   It was somebody else's versus Menzies.
15        Q.   Gotcha.  And do you remember the name of that
16   person?
17        A.   The first name.  It was a police officer named
18   Robert.
19        Q.   Okay.  So it was a police officer who filed a
20   lawsuit against Menzies, and you were a witness?
21        MR. WU:  I'm just going to object, relevance, to
22   this line of questioning.
23             But you can answer.
24        THE WITNESS:  It was something against Menzies
25   Aviation because I was a part of it.
```

```
 1         A.  No, more like two hours.

 2         Q.  Okay.  Sounds good.  All right.

 3             Can you tell me the highest level of education

 4    that you achieved.

 5         A.  I have some college.

 6         Q.  Did you graduate from college?

 7         A.  No, I did not.

 8         Q.  And when you say college, what college did you

 9    go to?

10         A.  I attended DeAnza Community College.

11         Q.  Did you get an AA?

12         A.  No.  I was going for my AA.

13         Q.  And when was the last time you actually

14    participated in a class at DeAnza?  Like what year?

15         A.  I want to say like 2015, 2016.

16         Q.  And what were you trying -- what AA were you

17    trying to graduate?

18         A.  Criminal justice.

19         Q.  And when did you start with Menzies?  What

20    year?

21         A.  February of 2016.

22         Q.  So February of 2016, is that with Menzies

23    already?

24         A.  That was when we were ASIG.

25         Q.  So that's still ASIG.
```

<< NOGARA REPORTING SERVICE >>                    12

379

1    A.   Yeah.

2    Q.   And then shortly thereafter -- shortly

3    thereafter, Menzies came in, is that correct?

4    A.   Yeah, Menzies came in, like, 2018, or

5    something like that, or in 2000 -- or like in the

6    middle of 2018, I want to say.

7    Q.   All right.  What was the position you had when

8    you started with ASIG?

9    A.   When I first started at ASIG, I was a fueler.

10   Q.   How long were you a fueler for before becoming

11   a supervisor?

12   A.   I want to say about a year.

13   Q.   And who approved your promotion to supervisor

14   from a fueler?

15   A.   Renil Lal, the general manager at the time.

16   Q.   The termination of Mr. Navarro is about August

17   of 2018.  Do you remember that?

18   A.   Yeah, I remember him not being there anymore.

19   Q.   And in August of 2018, you were a supervisor,

20   correct?

21   A.   Yes.

22   Q.   And your shift was -- can you tell me, what

23   was your shift?

24   A.   During the time -- like, your question is,

25   like -- like, now or in the past?

1    Q.   In August of 2018.

2    A.   I was -- I was doing swing shift and -- which

3    would start -- swing shift.  It would probably start

4    around, what, 2:00 or 3:00 in the afternoon until about

5    11:00 p.m. at night.  And then I would also cover

6    graveyard at the time, which started around 11:00 p.m.

7    to about 7:00 a.m., if someone called off work.  I also

8    covered people's call sicks as well.

9    Q.   Gotcha.  Okay.  So if you had your regular

10   shift, which was the swing shift, of 2:00 to 3:00 until

11   11:00 p.m., you sometimes overlapped with the beginning

12   of Renaldo Navarro's shift, is that correct, graveyard?

13   A.   So I would see -- I would see Ray and give him

14   an update on the shift on what's going on and what

15   needs to be done, who's here, who called out.  And

16   sometimes you go a little past that because operation

17   can be a little bit busy, but we never overlapped by no

18   more than 30 minutes or 20 minutes.

19   Q.   So it would be kind of like a handoff?

20   A.   Yeah.  It's always a handoff to the next

21   supervisor.  You give them the cell phone and just talk

22   about what happened on the operation, and stuff that

23   needs to be done, or flights that come in, or flights

24   that were delayed, or anything about what's going on

25   with the fuelers, or anything about the equipment, you

1    know, stuff like that.

2        Q.   Gotcha.  And then, aside from yourself, so you

3    have Andrew Dodge, you have Renaldo Navarro, a

4    supervisor.  Who else were supervisors at that time, in

5    August of 2018?

6        A.   Just a quick question.  When you mean

7    supervisors, are you talking about supervisors as,

8    like, in general all the supervisors, or are you

9    talking about supervisors that I just worked with on my

10   side of the airport?

11       Q.   No, I'm talking about the same level as you,

12   so, like, fueling --

13       A.   So on my operation on my side of the airport,

14   it was me, Ray Navarro, July -- I can't pronounce his

15   last name.  July, Edsel and Tevita.

16       Q.   What was the last one?  I'm sorry.

17       A.   Tevita.

18       Q.   How do you spell that?

19       A.   T-e-v-i-t-a.

20       Q.   Okay.  And when you say your side, is that the

21   103?  Is what you guys called it?

22       A.   The one at the time, yes, it was is 130 side.

23   The 1-3-0 side.

24       Q.   I mean 130.

25       A.   Yes.

1          Why don't you give me -- have your duties --

2     have your duties as a supervisor changed from August

3     2018 to today?

4          A.   Well, up until the Corona virus in March it

5     was the same, but now I just got back from furlough, so

6     I'm kind of just doing training as of right now, going

7     back.

8          Q.   Gotcha.  Yeah, I mean, I think everybody is

9     hoping that things kind of go back to normal hopefully

10    soon, but it doesn't look that way.

11         Okay.  So let's just talk about your duties.

12    And I really want to focus on your duties and

13    responsibilities with regards to August of 2018 as a

14    supervisor.

15         A.   Yeah.

16         Q.   Can you tell me what you remember to be your

17    duties and responsibilities.

18         A.   So as a supervisor at the time -- at the time

19    was to -- when you first come in, was to get the other

20    supervisor's information:  Get the cell phone, find out

21    who's on the operation, who called out sick.  After

22    that it was to schedule the flights.

23         So I would set up -- find out what flight are

24    coming in during my shift, what time the plane was

25    coming in, what time the plane was leaving, and from

<< NOGARA REPORTING SERVICE >>                    17

383

1    there put fuelers on a schedule for, hey, you're going

2    to go from this flight to this flight.

3            And also, after that, it was to drive on the

4    airport and just monitor the fuelers, if they needed

5    help with something, or also monitor their safety.  So

6    making sure they're wearing their uniform.  Making sure

7    they're wearing their vest, earplugs, had their boots

8    on.  Make sure -- just come and check on them and make

9    sure their equipment is running properly.

10           And also, if they call me, I would go assist

11   them, or, you know -- and also just change things

12   throughout the operation.  Maybe the guy might call me

13   and be, hey, my flight never showed up, and then I

14   might just change their flights around.

15       Q.  Right.  Were you also in charge of providing

16   breaks for people, like when they can go on --

17       A.  Oh, yes, of course.  So you would -- when you

18   schedule flights, you would -- before their fifth hour,

19   California law, you try to find a break period for 30

20   minutes.  There were days that sometimes the way the

21   flights came in, you know, the guys would be fueling

22   and would go over that because they're still on the

23   aircraft.  You can't just leave the aircraft.  They

24   would have to take their break after they were done

25   fueling the aircraft.

1    Q.  Right.  So the fuelers under your supervision,
2    they depended on you for when they can take their
3    breaks?
4       A.  Yes.  They would take -- some of the guys
5    were, Hey, I need to take a break, or asking ahead of
6    time, Hey, what time am I taking my break?  So
7    everything would be coordinated depending on what's
8    going on on the operation at the time.
9       Q.  And then, like you said, there are times where
10   the fuelers would depend on you to help out with a
11   particular situation.  So you become kind of like an
12   extra hand as well?
13      A.  Say that again.  Like, what do you mean?
14   Sorry.
15      Q.  Like if they're busy or they're shorthanded,
16   you could come in also to help them?
17      A.  Yeah, if there was something going on in the
18   operation, I would report to my duty manager, know
19   what's going on, let him know, Hey, we're short.  Can I
20   get some assistance from your side?  And if we didn't
21   have the manpower, I would help on a flight and hook up
22   and help, you know.
23      Q.  Exactly.  Okay.  And then, during the swing
24   shift, how many fuelers did you normally supervise?
25      A.  On a busy day, on a really busy day, I have

<< NOGARA REPORTING SERVICE >>                    19

385

1    between maybe eight to ten guys on a really busy day,

2    with full staff.

3         Q.  Gotcha.  And then if it's slow or not too

4    busy --

5         A.  There's some nonbusy days.  Probably --

6         MR. WU:  Andrew, make sure you hear Arlo's entire

7    question before you start.

8         THE WITNESS:  Sorry.

9         MR. URIARTE:  Q.  Yeah, because, Andrew, sometimes

10   it gets hard for the court reporter, for Cindy, to

11   actually kind of write down what we're saying if we're

12   talking on top of each other.  So let's give each

13   other -- let's try give each other like a pause in

14   between.

15        A.  Okay.

16        Q.  Thank you.  So you said -- we were talking

17   about, like, maybe on a slow or a normal day, how many

18   people would you supervise?

19        A.  About maybe five or six guys.

20        Q.  Okay.  In August of 2018, did you have some

21   sort of accommodation or medical condition that where

22   you actually asked the employer for an accommodation in

23   the workplace?

24        A.  I had given Renil Lal a doctor's note at the

25   time, like in 2017, from my doctor, having sleep apnea.

1    Q.  And did you and the company or Renil kind of

2    go through how to deal with the condition, the medical

3    condition, with regards to your job and, you know, what

4    type of -- was there any type of accommodation worked

5    out?

6    A.  I don't recall any conversation with Renil.  I

7    just don't remember the conversations we had in the

8    past.

9    Q.  Okay.

10   A.  I don't remember.

11   Q.  Did you have some sort of official or in place

12   disability accommodation that kind of changed your

13   normal workday that the company had to accommodate?

14       Was something like that in place?

15   A.  Well, they tried, like I said -- I mean, how

16   you say, like it was -- I remember trying to stay doing

17   things, stay -- like stay on top of doing things, try

18   not to just, you know, sit in one place.  Just move

19   around.

20   Q.  Right.  I guess I'm asking more from like a

21   formal perspective.  Usually different companies deal

22   with this in different ways, but usually, when an

23   employee goes to an employer and says, hey, I have this

24   medical condition that affects my workday, usually

25   something is worked out, and then some things written

387

1    what was in place, whether there was something --

2        A.  Yes.

3        Q.  -- in writing, or was it more informal, and

4    you just told them the condition and nothing else.

5        A.  Well, like, even with a piece of paper from

6    the doctor stating, because, like I said, in the past

7    people were saying, like, I was just sleeping, but I

8    provided a doctor's note showing what I had.  I didn't,

9    you know -- I didn't know about it either until I had

10   to go see the doctor, and that's when I provided them

11   with a note what I had because I had to go to sleep

12   tests and all that, and they finally diagnosed me with

13   that.  And I had to show proof why it was happening,

14   you know.

15       Q.  Okay.  So then who did you actually give that

16   doctor's note to?

17       A.  Renil.

18       Q.  To Renil.  And then did Renil talk to you

19   about it?

20       A.  I don't remember the -- we sat down.  I just

21   don't remember the conversation.

22       Q.  Okay.  Did you guys work something out?  Was

23   there some sort of game plan or --

24       A.  I don't remember, to be honest.

25       Q.  Okay.

388

DEPOSITION OF ANDREW DODGE - 07/28/2020

```
 1              identification.)
 2      MR. URIARTE:  Q.  Mr. Dodge, do you know if
 3 clicking on the Chat box -- there you go.  We have a
 4 screen share.  Do you see it?
 5      A.  Yes.
 6      Q.  Great.  So when we were talking about
 7 sleeping, I guess these pictures were taken of you.  So
 8 you're saying that when you were falling asleep in the
 9 office or in the vehicle like that, that was part of
10 your sleep apnea condition?
11      MR. WU:  Objection.
12      THE WITNESS:  Yeah.
13      MR. WU:  Objection.  Assumes facts not in evidence
14 that these are photos of him.
15      MR. URIARTE:  So, Mr. Dodge, just let your
16 attorney finish his objection, and then you can answer
17 after if you understand the question.
18      THE WITNESS:  Sorry.  Can you repeat the question
19 one more time?  Sorry.
20      MR. URIARTE:  Q.  Yes.  So in these photographs,
21 that's you, right, in the photograph?
22      A.  Yeah, that's me, yes.
23      Q.  And are you saying that when you fall asleep
24 like this, that you -- that these events right here
25 were part of your sleep apnea condition?
```

<< NOGARA REPORTING SERVICE >>                    26

389

1      A.  I can tell you that in the photo, the one with
2  the truck, yes.  The one in the office, that was at the
3  end -- I was done with my shift already.
4      Q.  Gotcha.  And do you remember if the one in the
5  office was after a graveyard shift?  Is that what that
6  was?
7      A.  I can't remember the dates.  It's in the
8  office.  I don't remember.  But I remember this -- I
9  remember this photo.
10     Q.  Gotcha.  So you're saying the one in the
11 office you were already done with your shift, and you
12 went to the office to just nod off, is that correct?
13     A.  I was done.  I had transferred all my
14 information.  I went to the office and, yeah, fell
15 asleep.
16     Q.  And then the vehicle, is this -- the vehicle
17 is a vehicle located in the tarmac?  Is that where it
18 is?
19     A.  It's black and white, so I can't -- yeah.
20     Q.  Okay.  But you remember that the vehicle --
21 when you were sleeping in the vehicle in this
22 photograph, that was because of sleep apnea, is that
23 correct?
24     A.  Yeah, yes.
25     Q.  Okay.  So we're done with Exhibit 3.

1    Can you tell me, by August of 2018, how long

2  you had been working with Renaldo Navarro at that time?

3    A.  Good question.  Do you mean like how long had

4  I been working with him as a co-worker, as like a --

5  how do you say -- as a -- supervisors together or as,

6  in general, a fueler and a supervisor?

7    Q.  Yes.  In general.

8    A.  Since I began working for ASIG in 2016, I was

9  his night fueler.  So I began working with him as a

10  night fueler, and then once I got promoted, I became a

11  swing supervisor, so I would transfer my information to

12  him.

13    And then while -- our schedules changed, and

14  then I would cover the days he was off as a swing -- I

15  mean, as a graveyard.  And then there -- if someone

16  called off, and I would see him from the night shift or

17  into the morning shift, or I would cover his sick day.

18  So, yeah, I worked with him a lot.

19    Q.  Gotcha.  And what was your general opinion

20  with regards to Ray Navarro and how he did his job?

21    A.  Oh, Ray's a great supervisor.  There's no

22  questions asked.  He was there for a long time, and,

23  you know, he's -- he did his job.

24    Q.  And you and Ray -- at some point you and Ray

25  started to have, like, difference of opinion with

391

1  you.  Him saying I shouldn't be a supervisor.  Stuff

2  like that.

3      Q.  Yeah.  And when you say scheduling, you're

4  talking about how you're scheduling the fuelers with

5  regards to their workday and them being able to take

6  breaks?  Is that what it is?

7      A.  Yeah, scheduling meaning how I schedule my

8  flights to my crew.

9      Q.  And then breaks, what were the complaints

10  about breaks?

11      A.  He was saying that I was giving the breaks

12  late or not giving their breaks at all.  Stuff like

13  that.

14      Q.  Did you ever inquire, you or Renil, with

15  regard to, like, where he was getting his information?

16  Because he wasn't working with you, so how did he know

17  about the breaks and the scheduling and all of that?

18      A.  Renil would -- Renil would investigate, find

19  out what was going on from fuelers and ask what was

20  going on.  And, if anything, Renil -- if anything was

21  questioned, Renil would ask me.  But the main question,

22  Renil would ask me if I am giving the fuelers breaks.

23  He never said fuelers are complaining.  It would be

24  more like, Andrew, what did you -- can I see what you

25  did, or can I see your text messages, stuff like that,

 1    to see what I was doing.  But he never said, hey,

 2    Andrew, so and so said they didn't get their break.

 3    You know what I mean?

 4        Q.   Okay.  And did Renil ever suggest to you a

 5    better what way of doing things?  Was there anything

 6    like that?

 7        A.   No, because -- no, because Renil knew how the

 8    operation was as well.  Him being a general manager,

 9    he's been in that position knowing how the schedules

10    work as well.  He sees that.

11        Q.   Okay.  And Renil thought that you were

12    providing the breaks properly?

13        A.   Yeah.

14        MR. URIARTE:  Okay.  Let me show you Exhibit 8.

15        VIDEO OPERATOR:  Okay.  I will bring that up

16    shortly.

17        MR. URIARTE:  Okay.

18            (Plaintiff's Exhibit 8 marked for

19            identification.)

20        MR. URIARTE:  Are you doing a screen share on

21    that, David?

22        THE WITNESS:  I see it now.

23        MR. URIARTE:  Great.  Okay.  Do you know what

24    Exhibit 8 is?  I'll give you some time to take a look

25    at that.  Do you see that at all?

1    depends on how long you're waiting for that fuel to be

2    done, you're waiting for that mechanic to be done.  And

3    then, you know, we always serve out a break.  You know

4    what I mean?  They'd get their breaks.

5        Q.  Right.  But sometimes they'd just be --

6        A.  It just depends on how the flights are coming

7    in and stuff like that, you know.  That's how -- how we

8    ran it, you know, and that's how I was trained as well.

9    You just -- and also, like I said, sometimes you're

10   short manpower and sometimes you fuel longer a little

11   bit and then get your break.  It just depends, like I

12   said, on the schedule.

13       Q.  I see.  What about this item here with regards

14   to "Andrew Dodge lack of experience about fueling"?

15   What do you think about that?

16       A.  To be honest, that's just -- I don't know -- I

17   don't know what word he used for that, but I became a

18   supervisor because I know what I was doing.  I was

19   trained on everything.  I was actually -- at the time,

20   before Menzies bought us, I was considered a Class A

21   fueler, which is one of the top fuelers.  Like, having

22   that title is really high, meaning I know how to do

23   everything, from fueling, defueling, driving every

24   piece of equipment on the thing, knowing how to fix

25   equipment.  It's just the knowledge of fueling in

DEPOSITION OF ANDREW RODGE - 07/28/2020

1    general, safety.  I was, like, one of the top people.

2         Q.  Okay.  Aside from this petition, did you have

3    fuelers go up to you and complain to you about their

4    breaks, like maybe they're late, maybe they're short,

5    or anything like that?

6              Was that something that was happening in or

7    around August of 2018?

8         A.  I actually had people asking me, Hey, when am

9    I going to get my break?  And, you know, they'll come

10   up to me, ask me what's going on, or can I see what

11   you're planning, and I always talk to my fuelers.

12   That's the main thing about the job, is communication,

13   communication, talking and finding out, you know,

14   plans, planning things out.

15        Q.  So why do you think these fuelers, you know,

16   all 26 of them, signed a petition against you?  Why

17   would that happen?

18        A.  Honestly, I don't know -- actually, a lot of

19   these names on here that I see people call me saying

20   that, you know, they were forced to sign a petition.

21   And they would tell me, Hey, I didn't want to sign it,

22   you know, but they were forced to sign it, or they

23   didn't read it, or stuff like that.

24        Q.  I see.  And they were forced to sign the

25   petition.  Like, do you know by whom and why they were

1   forced to sign the petition?

2       A.   A lot of the guys -- a lot of the guys on the

3   list would call me and say Ray was telling them to sign

4   the paper to try to get me terminated or -- how do you

5   say -- demoted from being a supervisor.

6       Q.   Gotcha.  And then do you know who Rafael

7   Vasquez is?

8       A.   Yeah.  At the time, he was one -- a fueler and

9   a union representative.

10      Q.   Okay.  Did you know that it was actually

11  Rafael Vasquez who put together the petition?

12      MR. WU:  Objection.  Assumes facts not in

13  evidence.

14      MR. URIARTE:  Q.  Did you know that, Mr. Dodge?

15      A.   No, I did not.

16      MR. URIARTE:  Let's go ahead and put up Exhibit

17  10.

18          (Plaintiff's Exhibit 10 marked for

19          identification.)

20      MR. URIARTE:  Q.  So here we go.  So this one will

21  be Exhibit 10.  And as you see, it's signed by Rafael

22  Vasquez.  I think there's a date in the bottom there of

23  November 18, 2018, when he signed this statement.

24          So did you have problems with Rafael Vasquez

25  at all in or around August or November of 2018?  Were

1  you having problems with him, Mr. Dodge?

2      A.  Rafael didn't work with me on my side of the

3  airport.

4      Q.  Oh, I see.  I see.  So he's on another side of

5  the airport?

6      A.  Yes.

7      Q.  Gotcha.  Okay.  So it looks like, from this

8  statement that he signed, that says that he was asked

9  by Menzies Aviation fuelers to write a petition on

10  behalf of the fuelers on the 130 side.

11      Did you know that they -- that these fuelers

12  submitted two petitions?  Did you know that?

13      A.  No, I did not.

14      Q.  Okay.  So, based on your responses, is it fair

15  to say that nobody from Menzies Aviation ever sat you

16  down to discuss one or two petitions that were written

17  out against you at that time while it was happening?

18      A.  No.  I'm the one that brought it up to Renil,

19  saying that there was a petition going around, because

20  one of the fuelers had called me about it.

21      Q.  So you knew that a petition was going around,

22  but nobody from Menzies Aviation management ever kind

23  of, like, sat down with you or talked to you about it,

24  right?  Is that correct?

25      A.  No, I don't -- I never, no.

1    Q.  And you found out that there was a petition

2    going around against you, but you never read the actual

3    petition.  Is that how it was?

4    A.  Yeah, I never got to see it, no.

5    Q.  And you're saying that the first time you saw

6    it was actually a part of this litigation.  Is that

7    what you're saying?

8    A.  Yes.

9    MR. URIARTE:  Let's put up Exhibit 5, please.

10   VIDEO OPERATOR:  Okay.  Coming up shortly.

11   MR. URIARTE:  Thank you.

12        (Plaintiff's Exhibit 5 marked for

13        identification.)

14   MR. URIARTE:  It's not a very good copy, so I

15   guess Exhibit 5, Mr. Dodge, if we can just make it

16   smaller so he sees the whole thing.  There you go.

17   A.  Yeah.

18   Q.  Is this the letter that you wrote after you

19   found out that a petition was being turned in against

20   you?

21   A.  I can't read what I wrote, but I think this is

22   the one I wrote after I found out there was a petition.

23   One of the fuelers called me.

24   Q.  Correct.  Correct.  If you go to the bottom of

25   it, I think this is your signature, right?

```
 1        A.  Yeah.

 2        Q.  That one there?

 3        A.  Yes.

 4        Q.  Okay.  And did you have a meeting with Menzies

 5   management about this letter at all?

 6        A.  I do not recall -- I don't remember from when

 7   I wrote it.  I think I wrote it during my shift, and I

 8   turned it in or -- I either wrote it in the office with

 9   Raul at the time or -- I just don't remember.

10        Q.  I see.  I see.  So it's possible that you

11   wrote it with the assistance of Raul.  Is that what

12   you're saying?

13        A.  Yeah, it was Raul or Renil that told me to

14   write -- write a statement.

15        Q.  And why did they tell you to write a

16   statement?  Do you know?

17        A.  Just to have it on file that they were going

18   to look into it.

19        Q.  Okay.  But how did that meeting start?  Was

20   that -- like, why did you kind of arrive at that

21   meeting?

22        A.  Like, why did I -- are you saying, like, why

23   did I write it or --

24        Q.  No.  Well, you said that you had a meeting

25   with Raul or Renil --
```

1      A.   It wasn't a meeting.   It was more like a --

2   like you walk in, let them know, hey, this is what's

3   going on on the operation.   Like, here's -- like this

4   is what people are telling me.

5      Q.   Okay.

6      A.   And they tell you, hey, just write statement

7   down and --

8      Q.   Okay.   Okay.   So it started with a fueler

9   calling you and saying, Hey, there's a petition going

10  around against you.   Is that how it started?

11     A.   Yes.

12     Q.   Okay.   And then, with that information, you

13  then go to Renil or Raul.   We don't know, right?   Renil

14  or Raul or both of them?

15     A.   Yeah, it was either/or.   Yeah, it was

16  either/or.

17     Q.   So you went to either one of them to tell them

18  that?   What exactly did you tell them?

19     A.   "Oh, hey, I got a phone call from a couple of

20  fuelers on my personal cell at home saying that

21  they" -- "there was a petition going around against me

22  that they didn't want to sign, but they felt forced to

23  sign it."

24          And then when I told them that -- I don't

25  remember if it was Renil or Raul -- they just told me

400

1    to write a statement down and to turn it in to them and

2    that they would look into it.

3         Q.   All right.   And then when you say -- how much

4    help did you get from Renil or Raul with regards to

5    writing the statement?   Like, did you guys --

6         A.   I don't know what -- like, from there on, I

7    don't know what they -- how they did their

8    investigation or anything like that.   So I just went on

9    and kept doing my job.

10        Q.   I see.   But with regards to writing the

11   statement, are these words totally yours?

12             Like, you sat there and started --

13        A.   Yeah, I went to a different office and wrote

14   this statement.

15        Q.   I see.   I see.   Okay.   And then you turned it

16   in?

17        A.   Yes.

18        Q.   Would it be not accurate to say that they

19   helped you with the words that are in this statement?

20        A.   Those are all me.   No, they didn't help me

21   with wording at all.

22        Q.   All right.   But when they said -- when they

23   told you to write this statement, did they tell you

24   what to write about?

25        A.   No.   They just said write -- like, write

1    what's going on, like, why -- you know, what you heard.

2    Stuff like that.

3         MR. URIARTE:  All right.  So we're done with

4    Exhibit 8.  I need like a five-minute break.  Let's see

5    where we are.  Let's take a five-minute break.  Off the

6    record.

7         MR. WU:  That's fine.  Thank you.

8              (Brief recess.)

9         MR. URIARTE:  Let's go back on the record.  We

10   don't have much more, but let me go through a couple

11   more here.

12        Q.   Mr. Dodge, you said that a fueler had called

13   you that a petition was going around.  Do you remember

14   who that fueler was?

15        A.   Yeah, Mario Caballero -- Caballero.  Mario

16   Caballero.

17        Q.   And you said that he felt like he was forced

18   to sign the petition or he didn't understand the

19   petition.  Is that what he said?

20        A.   When I -- when I received a phone call from

21   him, his first words, "Hey, Andrew, just want to let

22   you know there's a petition going around.  I didn't

23   want to sign it, but he made me sign it.  I'm just

24   letting you know.  I don't want to get into trouble or

25   anything."

DEPOSITION OF ANDREW HODGE - 07/28/2020

```
1          And then -- and I said -- told him thank you,
2    and I would -- I said, "Thank you, and I will," you
3    know, "talk to management."
4          Q.  Okay.  And when you say "he made me sign it,"
5    who's "he"?
6          A.  He mentioned Ray Navarro.
7          Q.  Okay.  And, then, let's go back to Exhibit 10,
8    please.
9          VIDEO OPERATOR:  Hold on.  I'll bring it up.
10         MR. URIARTE:  Thank you.
11         THE WITNESS:  Okay.
12         MR. URIARTE:  Q.  So I wanted to discuss something
13   here.  It says, "There have been two separate Petitions
14   turned into Menzies Aviation Fueling Department
15   Director Raul Vargas."  Do you see that?
16         A.  Yes.
17         Q.  Okay.  Did Raul Vargas ever talk to you about
18   these two petitions?
19         A.  Sorry, can you repeat that one more time.  You
20   broke up.
21         Q.  Sure.  Did Raul Vargas ever talk to you about
22   two petitions being signed against you?
23         A.  No, he did not.
24         Q.  Did Raul Vargas ever talk to you about how you
25   give your breaks, and fuelers complaining against you,
```

403

```
 1    or anything like that?
 2         A.  No, he did not.
 3         Q.  Did anybody from Menzies, you know, from John
 4    Qually, the duty mangers, or Renil Lal at that time,
 5    did any one of them kind of, like, talk to you about
 6    maybe, you know, you giving your breaks better or
 7    having some sort of plan of action?
 8         A.  Like I said before, Renil and I spoke, but he
 9    just wanted -- he reviews my schedules.  I used to turn
10    in -- we'd turn, like, you know, a shift report in
11    every night.
12         Q.  Okay.
13         A.  And, also, I would turn in my schedules to him
14    so he would see everything written down, so -- from
15    what I did.  So, basically, for example, with let's say
16    fueler A, I'd write down his flights, and in the middle
17    I'll put a "B," stands for break, and what else he did.
18    You know what I mean?  And then I also -- he could
19    research the times, you know, because -- with the phone
20    app or online.
21         Q.  Okay.  And you went through -- you went
22    through meetings with Renil Lal about that in around
23    August of 2018?
24         A.  I -- I don't remember the time or date, any of
25    that.
```

DEPOSITION OF ANDREW DODGE - 07/28/2020

1    Q.  Did Mr. Lal ever tell you that he was doing

2   that as part of, you know, investigating these

3   petitions against you?

4    A.  No.  He one time mentioned that Ray was

5   complaining, so he just wanted to see what I did

6   compared -- you know, compared to other supervisors and

7   how they were doing their schedules.

8    Q.  I see.  And -- okay.  And out of those

9   meetings, was any kind of -- was there any

10   recommendation given to you as to, like, do your job

11   better, or was there any comment or anything like that?

12    A.  I don't recall what he said to me at all.

13    Q.  Did you have to change the way you were doing

14   things in order to give your breaks better or something

15   like that?

16    A.  No.  Up until March, I was doing the same way.

17    Q.  And you're saying up until March of 2020?

18    A.  Yeah, until I got furloughed, yes.

19    Q.  Okay.  Also in Exhibit 10, it says, "I have

20   spoken to The Menzies Aviation Fueling Director Raul

21   Vargas on three separate occasions regarding Mr. Dodge,

22   who continues to abuse his authority and at times

23   harass Fuelers under his charge."

24        Do you see that?

25    A.  Yes, I do see that.  Yeah.

1    Q.  What do you think -- what's your opinion on

2    that with regard to Rafael Vargas stating that you

3    continue to abuse your authority?

4         Do you know anything about that?

5    A.  I mean --

6    MR. WU:  Objection.  Assumes facts not in

7    evidence.

8         But you can answer.

9    MR. URIARTE:  Q.  Mr. Dodge?

10   A.  Sorry.  Okay.  I -- I mean, from when I see

11   that, I can tell you that's just not true.  I mean,

12   I've never harassed any of my employees or any of that

13   type of circumstance.

14   Q.  I see.  When you say -- when it says "abuse

15   his authority," like how would you be able to abuse

16   your authority during your shifts?

17   A.  Honestly, I don't know how I could abuse my

18   authority to this current day.  I'm still a supervisor

19   here --

20   Q.  I see.

21   A.  -- with the same employees.

22   Q.  I'm sorry.  What was that?

23   A.  I said I'm still a supervisor here with the

24   same employees.

25   Q.  Okay.  And have any fuelers gotten a complaint

1    against you that you were harassing them?

2        A.   No.

3        Q.   Have any of the fuelers ever come up to you

4    and said, hey, Andrew, you know, you're doing this

5    wrong, or, you know, complained to you about not giving

6    their breaks, or them working too hard because you're

7    not doing your job?   Anything along those lines?

8        A.   I've had fuelers just come up to me and try

9    to, like, give suggestions on how they want to -- how

10   they see things -- on how they see things, but, you

11   know -- and then I have to explain to them what's going

12   on, and I'd show them, and they would understand.

13   That's about it.

14        But I've never had -- I've had someone coming

15   up to me asking when they would get their break, and I

16   would explain to them as well, you know, the situation,

17   and they would understand.

18        Q.   I see.   All right.   Can we go back to Exhibit

19   5, please.   Okay.   I know it's hard to read, but I was

20   going to start with -- well, that first sentence kind

21   of ends with "the company don't need me, that I'm a bad

22   supervisor, and all I do is cause delays."

23        What do you mean by that, "all I do is cause

24   delays"?

25        MR. WU:   Objection.   Objection.   Assumes facts not

1       Q.  Oh, okay.  So he told Ray not to come early

2   anymore.  Do you see that?

3       A.  Okay, yeah.  That's a -- yeah, yeah.

4       Q.  So that would be Jeff Cook or --

5       A.  No, that's Jeff -- I don't remember his last

6   name.  I can get his last name for you, but I just

7   don't remember his last name.

8       Q.  And that Jeff -- that Jeff, you said, works

9   for Menzies in Seattle International?

10      A.  Yeah, that's his main station, yes.

11      Q.  I see.  So how come he would get involved in

12  telling Ray not to come in early?

13      A.  So the reason -- we were going through a

14  transition, you know, from ASIG to Menzies.  At the

15  time, Renil was the acting general manager.  Raul

16  Vargas was the director -- new director we had, so they

17  were getting things together.  So Jeff would come down

18  and help our station.

19      MR. URIARTE:  Gotcha.  Okay.  I have no further

20  questions.

21      MR. WU:  No questions on my end either.

22      MR. URIARTE:  Okay.  Thank you, Mr. Dodge.  Thank

23  you for your time today.  Thank you for providing this

24  deposition.

25      THE WITNESS:  You're welcome.

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 121 of 286
Case 3:16-cv-08557-WC Document 3611 Filed 11/5/20 Page 17 of 202

```
1              (Whereupon, the deposition

2         concluded at 10:32 o'clock a.m.)

3                    ---o0o---

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF WITNESS

 2                         ---o0o---

 3

 4         I, ANDREW DODGE, hereby declare under

 5    penalty of perjury that I have read the foregoing

 6    deposition testimony; and that the same is a true

 7    and correct transcription of my said testimony

 8    except as corrected pursuant to my rights under

 9    Rule 30(e) of the Federal Rules of Civil

10    Procedure.

11

12                    _____
                                Signature
13

14                    _____
                                  Date
15

16

17

18

19

20

21

22

23

24

25
```

410

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF SAN FRANCISCO  )

 3          I, CINDY TUGAW, a Certified Shorthand Reporter

 4    of the State of California, duly authorized to

 5    administer oaths pursuant to Section 8211 of the

 6    California Code of Civil Procedure, do hereby certify

 7    that

 8                    ANDREW DODGE,

 9    the witness in the foregoing deposition, was by me duly

10    sworn to testify the truth, the whole truth and nothing

11    but the truth in the within-entitled cause; that said

12    testimony of said witness was reported by me, a

13    disinterested person, and was thereafter transcribed

14    under my direction into typewriting and is a true and

15    correct transcription of said proceedings.

16          I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21          Dated the 7th day of August, 2020.

22

23

24

25          CINDY TUGAW
            CSR No. 4805 (California)
```

411

```
 1    Andrew Dodge
      c/o Foley & Lardner
 2    555 California Street, Suite 1700
      San Francisco, CA 94104
 3    Attn:  Jason Y. Wu, Esq.

 4    Date:  August 7th, 2020
      Re:  Navarro vs. Menzies Aviation
 5    Deposition Date:  Tuesday, July 28, 2020

 6    Dear Mr. Dodge,

 7            Please be advised the original transcript of
      your deposition is ready for your review.
 8            Pursuant to FRCP Rule 30(e), you have
      30 days following the date of this notice to read,
 9    correct if necessary, and sign your transcript unless
      the attending parties and the deponent agree on the
10    record or otherwise in writing to a longer or shorter
      time period.  The deponent may change the form or the
11    substance of the answer to a question, and may either
      approve the transcript of the deposition by signing it,
12    or refuse to approve the transcript by not signing it.
      You are not required by law to read and sign your
13    deposition transcript.  All parties will be informed of
      the corrections.  The original transcript will then be
14    sealed and sent to the examining attorney pursuant to
      the applicable law.
15            You may either come to our office to read and
      sign the original transcript, or you may contact your
16    attorney or the attorney who arranged for you to be
      present at your deposition.  If they have ordered a
17    copy of the transcript, you may review their copy and
      make corrections by submitting, signing and returning
18    the attached form.  If you choose to review your
      transcript at our office, please call first to make an
19    appointment.  Should you have any question regarding
      these instructions, please call.
20
      Sincerely,
21

22
      NOGARA REPORTING SERVICE
23    5 Third Street, Suite 415
      San Francisco, California 94103
24    (415) 398-1889
      cc:  All counsel, original deposition
25
```

412

# EXHIBIT 18



# Job Description, Fueling Supervisor (North America)

**Department**: Los Angeles-Fueling
**Reports To:** Manager
**FLSA Status:** Non-Exempt (Hourly)

## Job Purpose Summary: Supervises and coordinates air carrier fueling and service operations.

## Primary Accountabilities and Duties:

- Comfortably and continuously lift/move 70 lbs.
- Duties include, but are not limited to;
- Ensuring the effective operation of the air carrier fueling function;
- Issuing written and oral instructions;
- Ensuring workforce adherence to safety procedures;
- Conduct investigations of irregular operations, such as accidents, injuries and/or delay, and prepare comprehensive reports on same;
- Recommending manpower requirements;
- Maintaining harmony among workers and resolving grievances;
- Performing or assisting subordinates in performing duties;
- Ensuring disciplinary procedures are conducted in accordance with e in a fair, timely, and consistent manner;
- Uphold the company's commitment to Equal Employment Opportunity; Carrying out supervisory responsibilities in accordance with the organization's policies and applicable laws;
- Ability to comply with attendance/tardiness standards.

## Essential Skills and Qualifications:

- Must be at least 18 years of age.
- 1 year certificate from a college or technical school 6 months to 1 year job related experience preferred
- Valid Driver's License Possess/Maintain a valid Driver's License and other government agency required identification/seals or authorizations
- Must be able to speak, read, and write in English
- Ability to perform basic math calculations
- Must pass pre-employment drug test
- Must be available and flexible to work variable shifts including weekends and holidays Work is done indoors and outdoors.
- Must be comfortable working in all weather conditions with exposure to loud noises
- Able to routinely lift, push and pull up to 70 lbs.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

## Employee Acknowledgement

I, _____, acknowledge review of this job description.  I realize that it is subject to change or amendment as deemed appropriate by Menzies Aviation.

I also understand that all job duties are not described above and that I will be expected to perform other related duties as directed by my supervisor and management.

Signature: _____ Date: _____



# EXHIBIT 19



EMPLOYEE HANDBOOK

California

## TABLE OF CONTENTS

1.1 Purposes Of This Handbook ...................................................................................... 4

1.2 Company Values ....................................................................................................... 4

2.1 Employment-At-Will ................................................................................................. 5

2.2 Introductory Period .................................................................................................. 5

2.3 Employment Eligibility Verification .......................................................................... 5

2.4 Equal Employment Opportunity .............................................................................. 5

2.5 Zero Tolerance For Discrimination And Harassment .............................................. 6

2.6 Reasonable Accommodation .................................................................................... 8

2.7 Open Door Policy ...................................................................................................... 8

2.8 Safety Policy ............................................................................................................. 8

2.9 Security Policy .......................................................................................................... 9

2.10 Use Of Electronic Devices ..................................................................................... 10

2.11 Training .................................................................................................................. 10

2.12 Railway Labor Act Notice ..................................................................................... 11

3.1 Part-Time and Full-Time Employees ..................................................................... 12

3.2 Exempt And Non-Exempt Employees .................................................................... 12

3.3 Working Hours and Days ........................................................................................ 12

3.4 Meal Periods ........................................................................................................... 12

3.5 Rest Periods ............................................................................................................ 13

3.6 Employee Rest ........................................................................................................ 13

3.7 Overtime ................................................................................................................. 14

3.8 Transfers and Promotions ...................................................................................... 14

3.9 Payroll Schedules ................................................................................................... 15

3.10 Employee Pay ....................................................................................................... 15

3.11 Personnel Records ................................................................................................ 15

4.1 Code of Conduct .................................................................................................... 16

4.2 Progressive Discipline ............................................................................................ 17

4.3 Attendance ............................................................................................................. 18

4.4 Alcohol and Drug Abuse ........................................................................................ 18

4.5 Uniform Attire & Appearance ............................................................................... 20

4.6 Conflict of Interest ................................................................................................. 21

5.1 Health And Welfare Benefit Plan .......................................................................... 22

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF



418

5.2 Eligibility .................................................................................................................. 22

5.3 Benefit Election Period .............................................................................................. 22

5.4 COBRA ...................................................................................................................... 23

5.5 Vacation, Sick Leave And Paid Time Off ................................................................... 23

5.6 Family and Medical Leave Act ................................................................................... 23

5.7 Pregnancy Disability Leave ....................................................................................... 25

5.8 Bereavement Leave ................................................................................................... 26

5.9 Military Leave ............................................................................................................. 26

5.10 Voting Time Off ........................................................................................................ 26

5.11 Time Off For School Activities .................................................................................. 26

5.12 Workers' Compensation ........................................................................................... 27

6.1 Internet Use ............................................................................................................... 28

6.2 E-Mail Use ................................................................................................................. 29

6.3 Voice Mail .................................................................................................................. 29

6.4 Monitoring Of Email And Internet Usage ................................................................... 29

6.5 Use Of Company Property ......................................................................................... 29

6.6 Confidential Information Security ............................................................................... 30

6.7 Non-Solicitation/Disclosure ....................................................................................... 31

6.8 Bulletin Board ............................................................................................................ 31

6.9 Travel ......................................................................................................................... 31

6.10 Claiming Business Expenses ................................................................................... 31

6.11 Personal Belongings ................................................................................................ 31

6.12 Media Communications ............................................................................................ 32

7.1 Resignation, Termination and Layoff ......................................................................... 32

7.2 Exit Interview ............................................................................................................. 32

7.3 Terminations .............................................................................................................. 32

7.4 Layoff ......................................................................................................................... 32

7.5 Final Paycheck .......................................................................................................... 32

7.6 Employment References ............................................................................................ 33

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

## SECTION 1 - INTRODUCTION

### 1.1 Purposes Of This Handbook

This Employee Handbook is intended to explain some of the key terms and conditions of employment on a non-exempt basis with the Menzies Aviation family of companies, which includes Menzies Aviation, Aeroground, ASIG and Simplicity (USA). This version of the Employee Handbook supersedes all previously issued handbooks.

Every employee is expected to read this Employee Handbook carefully as it is a valuable reference for understanding your employment. The Company reserves the right to revise, modify, delete, and/or add to any and all policies, procedures, work rules, or benefits stated in this Employee Handbook or in any other document. No oral statements or representations can in any way alter the provisions of this Employee Handbook. This Employee Handbook is not a contract of employment.

Not all Company policies and procedures are set out in this Employee Handbook. We have summarized only some of the more important ones. Additionally, if your employment is subject to a different contract setting forth terms and conditions of employment, in the event of a conflict between that contract and the provisions of this Employee Handbook, the contract will govern. If you have any questions or concerns about this Employee Handbook or any other policy or procedure please ask your local Human Resources representative.

### 1.2 Company Values

**Spirit** is our way of doing business. It represents the core values that our employees must adhere to in doing their job. These values are:
**S**afety and Security
We take responsibility for the safety and security of ourselves, our customers, and our co-workers.
**P**assion
We work hard and enjoy our job, we do it to the best of our ability, and we put the customer at the heart of everything we do.
**I**nnovation
We encourage and reward ability and creativity, look for better ways to do our job, and have a "can do" attitude open to new ideas.
**R**eliability
We take pride in our work, we do it well, and we follow through on commitments to consistently deliver the best to our customers.
**I**ntegrity
We treat others with dignity and respect, we are trustworthy, and we act with high professional, moral, and ethical standards in supporting Company goals, values, and decision-making.
**T**eamwork
We participate and involve others in team efforts, we cooperate with others and share resources, we see things from the "other point" of view, and we take responsibility to fix mistakes so that they don't happen again.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

## SECTION 2 – GENERAL EMPLOYMENT POLICIES

### 2.1 Employment-At-Will

Employment with the Company is at-will, meaning that either you or the Company can terminate your employment at any time, with or without cause or notice. This policy of at-will employment is the sole and entire agreement between you and Company as to the duration of employment and the circumstances under which employment can be terminated.

Nothing in this Employee Handbook or any other Company policy alters or modifies the at-will nature of your employment. This policy of at-will employment may not be modified orally or in writing by any individual or document other than by a written employment agreement signed by the Senior Vice President, Americas. The Company's policy of at-will employment further allows it in its sole discretion to modify or change any terms or conditions of employment, including, but not limited to, assigning duties to employees outside their customary assignments.

### 2.2 Introductory Period

The first 90 days of employment are considered an Introductory Period. During this period, your supervisor will work with you to help you perform your job successfully. This period provides you with the opportunity to evaluate your job satisfaction and provides the Company with the opportunity to evaluate your performance. Employees who complete the Introductory Period are not automatically entitled to a salary increase, transfer, promotion, job reclassification, or continued employment.

### 2.3 Employment Eligibility Verification

U.S. immigration law prohibits employers from recruiting, hiring, or continuing to employ undocumented immigrants who are not eligible to work in the United States. The Immigration Reform and Control Act (IRCA) establishes employment eligibility verification procedures that all employers must follow when filling a job vacancy. IRCA also prohibits employers from discriminating in recruitment, hiring, or discharge on the basis of national origin or citizenship status.

The U.S. Citizenship and Immigration Services within the Department of Homeland Security administers and enforces regulations implementing IRCA's requirement that employers verify employees' legal authorization to work. Under the regulations, employers must obtain from each new employee certification of identity and authorization to work in the United States. If you are not legally authorized to work in the United States or become unauthorized, you must inform Human Resources immediately.

### 2.4 Equal Employment Opportunity

The Company is an equal opportunity employer and makes employment decisions exclusively on the basis of merit. The Company prohibits unlawful discrimination based on race, color, creed, sex, religion, age, national origin or ancestry, citizenship, physical or mental disability, military or veteran status, marital status, medical condition, genetic information, sexual orientation, gender, gender expression or identity, or any other category protected by federal, state, or local law. All such discrimination is unlawful and all individuals employed by Menzies Aviation are prohibited

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

from engaging in this type of conduct. The Company further will make all employment decisions, including but not limited to, recruitment, hiring, promotion, retention, compensation, training, discipline and termination of employment decisions without regard to any characteristic protected by federal, state or local law.

### 2.5 Zero Tolerance For Discrimination And Harassment

Pursuant to its policy of equal employment opportunity, the Company is committed to compliance with all applicable laws providing equal employment opportunities and has therefore adopted a policy of zero tolerance with respect to workplace discrimination and harassment. This policy of zero tolerance for discrimination and harassment applies to all individuals at every level of the Company's operations and prohibits harassment or discrimination against any employee whether or not the incidents occur on Company premises and whether or not the incidents occur during working hours. Supervisors, co-workers and third-parties with whom Company employees encounter through their job duties are prohibited from engaging in unlawful behavior under both federal law and the California Fair Employment and Housing Act ("FEHA").

**Sexual Harassment**
The Company's policy of zero tolerance for discrimination and harassment includes a zero tolerance policy with respect to unlawful sexual harassment. Sexual harassment is a form of unlawful sex discrimination that occurs when an employee is subject to unwelcome sexual attention or conduct affecting the terms or conditions of employment. Sexual harassment includes sexually oriented conduct which is sufficiently pervasive or severe and that unreasonably interferes with an employee's job performance or creates an intimidating, hostile, or offensive working environment. Examples of unlawful sexual harassment include unwanted sexual attention from co-workers of a persistent or offensive nature, promises to an employee to reward an employee if he or she complies with a sexually-oriented request or a threat of adverse treatment for refusing a sexually-oriented request, engaging in sexually suggestive and unwelcome behavior in the workplace, such as touching another employee, making sexually explicit commentary, leering or ogling at another employee, commenting inappropriately on a co-worker's physical appearance, displaying, storing, or transmitting pornographic or sexually oriented messages or materials in the workplace or using Company equipment or facilities to do so, making sexual or romantic advances toward an employee who has previously rejected such advances, and/or retaliating against an employee for reporting or threatening to report sexual harassment, or for participating in a Company investigation into an allegation of sexual harassment.

**Other Types Of Unlawful Harassment**
The Company's policy of zero tolerance for discrimination and harassment also includes a zero tolerance policy with respect to unlawful harassment on the basis of race, color, creed, sex, religion, age, national origin or ancestry, citizenship, physical or mental disability, veteran status, marital status, medical condition including genetic characteristics, sexual orientation, gender expression or identity, or any other category protected by federal, state, or local law. Such harassment may include behavior similar to unlawful sexual harassment, such as making threats or racially motivated slurs, epithets, derogatory jokes or commentary, displaying derogatory or offensive posters, photographs, cartoons or drawings, making offensive or racially-motivated gestures, and/or retaliation for reporting harassment or threatening to report harassment.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

## Employee Responsibilities

You **must** immediately report, preferably in writing, every instance of perceived discrimination or harassment to your supervisor or Human Resources, regardless of whether you or someone else is the subject of the discrimination or harassment. If you are not comfortable making such a report or complaint to anyone at your location, you **must** report your concerns to the Regional HR Director in the first instance. You should provide as much detail as possible in your complaint or report and include names, dates, descriptions, documents and actual events or statements made so that the Company can perform as thorough an investigation as possible and take appropriate remedial measures where inappropriate conduct has been found to have occurred. The Company will make reasonable efforts to protect the privacy of any employee who makes a complaint or report of discrimination or harassment or who supplies any information pertaining to an allegation of discrimination or harassment, but, due to the Company's obligation to thoroughly investigate all allegations of discrimination or harassment, it cannot guarantee complete confidentiality with respect to any allegation or report of discrimination or harassment.

Employees may also direct any complaints of harassment or discrimination to the California Department of Fair Employment and Housing ("DFEH") or to the Equal Employment Opportunity Commission ("EEOC"). Contact information for the DFEH and the EEOC field office nearest an employee's work location can be found in the telephone directory.

## Supervisor/Manager Responsibilities

Supervisors and managers must deal quickly and fairly with all allegations of discrimination or harassment, whether or not there has been a written or formal complaint. This responsibility requires that a supervisor or manager receiving a complaint or report of discrimination or harassment, or witnessing conduct that may constitute unlawful harassment, to immediately report the fact of the complaint and any supporting information to Human Resources, ensure that an investigation is immediately commenced, and take appropriate corrective action pursuant to guidance provided by Human Resources. Supervisors and managers who tolerate discrimination or harassment and/or who fail to comply with any the responsibilities listed above will be subject to disciplinary action, up to and including termination of employment.

## Investigation

Every good faith complaint of discrimination and harassment will be followed by a fair, complete and timely investigation. The investigation will be as thorough as possible based on the information provided to the Company. Menzies Aviation will attempt to keep the investigation as confidential as is reasonably possible and will disclose information pertaining to a complaint or report of discrimination or harassment on a strict "need to know" basis, but cannot guarantee complete confidentiality due to its obligation to thoroughly investigate every allegation of discrimination and harassment. Interference with an investigation into a complaint of alleged harassment or discrimination is prohibited, and will result in disciplinary action up to and including termination of employment. Likewise, a complaint of harassment or discrimination that is found to have been made in bad faith will subject the complainer to disciplinary action, up to and including termination of employment. However, where the investigation into a complaint of alleged harassment or discrimination does not reveal a violations of this policy, that does not necessarily mean the complaint was made in bad faith.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

**Discipline**

Employees found to have violated the Company's policy of zero tolerance with respect to discrimination and harassment are subject to disciplinary action, up to and including immediate termination of employment.

**Prohibition On Retaliation**

The Company will not tolerate retaliation toward any individual who submits a complaint of discrimination or harassment, who provides any information pertaining to an alleged incident of discrimination or harassment or who participates in an investigation into an alleged incident of discrimination or harassment. Any individual found to have retaliated against anyone for making a complaint or providing information relating to an alleged incident of harassment or discrimination will be disciplined, up to and including discharge from employment.

## 2.6 Reasonable Accommodation

The Company will not discriminate against qualified individuals with disabilities in any aspect of the employment relationship, and will attempt to reasonably accommodate a qualified individual with a known physical or mental disability to enable the employee to perform the essential functions of his or her job, unless doing so would create an undue hardship or pose a direct threat to the employee or others. The Company further will not discriminate against any individual based on his or her sincerely held religious beliefs and practices, and will attempt to reasonably accommodate an individual's sincerely held religious beliefs and practices.

Employees who believe they require or who are requesting an accommodation related to their disability in order to perform the essential functions of the job or an accommodation for their sincerely held religious beliefs and practices should contact both their supervisors and the Human Resources Department and describe the specific accommodation requested or required. The Company will communicate directly with the employee to explore possible accommodations and attempt to work out a mutually agreeable resolution.

## 2.7 Open Door Policy

The Company strives to maintain a positive work environment for all of its employees, and therefore maintains an open door policy and encourages employees to feel free to bring forward and discuss openly any work related concerns. No employee will be retaliated against for bringing forward any work-related concerns pursuant to this open door policy.

## 2.8 Safety Policy

Employee safety is the Company's top priority. Employees must comply with all safety regulations, whether established by the Company or by federal, state, or local law. Employees must report any/all safety hazards to their direct supervisors or the safety department.

The Company maintains a comprehensive Safety Manual that is regularly updated to ensure employees are aware of the most up-to-date safety standards. Employees are responsible for being familiar with the standards and protocols contained in that Safety Manual. However, due to the critical importance of safety in all that the Company does, highlights of the Safety Program are also repeated in this Handbook.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

# SECTION 4 – PERFORMANCE STANDARDS

## 4.1 Code of Conduct

Employee conduct is governed by certain rules and policies that are intended to ensure orderly operations and protect the interests and safety of all individuals. It is not possible to list all the forms of behavior that are considered unacceptable in the workplace.  However, the following are examples of conduct that may result in disciplinary action, up to and including immediate termination of employment:

- Possession, distribution, consumption, or being under the influence of alcohol or illicit and/or illegal drugs (including non-prescription use of legal drugs) during working hours and/or while on Company or customer premises;
- Unauthorized possession, removal, theft, misappropriation or use of Company funds or property belonging to any employee, passenger or client, or to the Company;
- Falsification of employment records (including recording the work time of another employee or allowing any other employee to record your work time), employment information, or other records;
- Willful damage or destruction of property of another, which includes negligence or improper conduct leading to damage of said property;
- The possession or use of any firearm or weapon on the job, or on Company or customer premises, unless expressly permitted by law;
- Failure to effectively perform job duties;
- Insubordination, including but not limited to failure or refusal to obey reasonable work-related orders or instructions of a supervisor or manager, failure to follow any work guidelines or Company policies, and the use of abusive, malicious and/or threatening language or conduct toward any coworker, customer, passenger, or client of the Company that causes or tends to cause a threatening, hostile or intimidating work environment;
- Failure to properly follow notification rules when unable to report to work;
- Failure to observe working schedules, including any scheduled or required break periods;
- Unauthorized or excessive absenteeism or tardiness;
- Sleeping on the job and while on working time;
- Working overtime without authorization or refusing to work assigned overtime;
- Gross misconduct while on Company property, or while conducting Company business, including: attempting bodily injury, fighting or threatening violence, boisterous or disruptive activity that interferes with your job duties, others' job duties, or passenger service;
- Sexual, racial, religious, ethnic, or any other unlawful harassment or discrimination;
- Violation of any safety or any security rule;
- Unauthorized disclosure of confidential financial data (not including information about your personal wages, benefits or terms and conditions of employment), or other non-public proprietary information of the Company, its business partners, or customers;
- Unauthorized use of airport identification badge or identification;
- Failure to report any employee injury or damage to Company or customer equipment;
- Wagering, betting, gambling, or encouraging such behavior on Company property; and
- Concealment or working time use of any video camera equipment, tape recorder, CD player, radio or other audio visual device, or the failure to report the concealment or use of these devices without supervisory approval.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

425

Nothing in the foregoing Standards of Conduct modifies in any way the at-will nature of employment with the Company.

## 4.2 Progressive Discipline

The Company enforces work rules through discipline as necessary in order for the Company to maintain order, promote safety, and ensure quality work. The Company's progressive discipline policy is intended to correct misconduct or improper behavior with the goal of eliminating future occurrences of inappropriate conduct, though in certain circumstances immediate termination of employment may be deemed by the Company, in its sole discretion, to be necessary.

Depending on the nature of and severity of the inappropriate conduct, the Company may discipline employees through any of the below disciplinary steps. Repeated instances of inappropriate conduct will generally result in progression through the following disciplinary steps toward termination of employment. However, progressive discipline is not a "one size fits all" approach, and the Company may in its sole discretion skip one or more disciplinary steps. Furthermore, nothing in the Company's progressive discipline policy creates any expectation of continued employment or in any way alters the at-will nature of employment with Menzies Aviation.

**Formal Or Informal Counseling**
A supervisor or manager will meet with the employee, explain the unsatisfactory behavior and establish that the employee understands what is expected. The fact of the formal or informal counseling will be documented by the supervisor or manager and placed in the employee's personnel file.

**Coaching**
As with counseling, a supervisor or manager meets with the employee to discuss the unsatisfactory behavior and establish what is expected of the employee, notifying the employee that he or she has received a verbal warning. The supervisor or manager will document the discussion and a follow-up counseling date to determine whether or not the performance or conduct issue has been corrected. The verbal counseling documentation is placed in the employee's personnel file.

**Written Warning**
A written warning is the result of a more serious violation or a second violation addressed in a prior counseling session or verbal warning. A memo or reprimand is given to the employee and a copy is placed in his or her personnel file. Written warnings may take the form of a "final" warning indicating that subsequent unsatisfactory behavior will result in termination of employment.

**Suspension**
The employee is sent home without pay for a defined period of time depending on the seriousness of the offense and prior disciplinary action taken. During the suspension, the Company will assess the severity of inappropriate conduct and may decide to terminate the individual's employment upon return from suspension. Employees who are not terminated at the conclusion of a suspension are deemed to be on "final" warning.

EXCELLENCE FROM TOUCHDOWN TO TAKEOFF

**Discharge**

Termination of employment may either be the result of continuous and uncorrected behavior that has been addressed through previous disciplinary steps or the result of a single instance of inappropriate conduct depending on the nature of infraction.

## 4.3 Attendance

In any organization such as ours, where the flow of work depends upon the cooperation, coordination and teamwork of a number of people, the absence or tardiness of one person can delay and interfere with the work of others. As part of the expectation that employees conduct themselves in a professional manner, the Company requires employees to report to work as scheduled, on time and ready to start their job duties. The Company also requires employees to remain at work for the duration of their entire shift, except for any meal or break periods, or where otherwise excused from work by a supervisor.

The Company maintains a formal and separate attendance policy with which you are expected to be familiar. Generally speaking, under that policy, failure to comply with attendance requirements will result in disciplinary action for unexcused tardiness, unauthorized absence, or no-call/no-show absence. Three (3) consecutive no-call/no-shows is considered job abandonment and will result in immediate termination of employment. Other attendance violations will normally be addressed through the disciplinary steps set forth in the separate written attendance policy, though the Company may in its sole discretion address employee attendance concerns in a manner different from the separate written attendance policy.

Under some circumstances, absence or tardiness on your part may be excused, but only if you give proper notice as described in the attendance policy of such a problem before the start of your shift so that other arrangements can be made to cover your absence, if necessary.

## 4.4 Alcohol and Drug Abuse

The Company is committed to providing employees, customers, and the general public with a safe, comfortable, and productive work environment. As part of our effort to provide a drug-free work environment, new employees must undergo a pre-employment drug test. As a condition of employment, employees must agree, in writing, that drug test results may be furnished and used by the Company. Refusal by an applicant or employee to submit to a drug or alcohol test administered in accordance with this policy, or refusal to permit the test results from being furnished to the Company will result in the employee's termination for violation of this policy. Applicants and employees who are subject to Department of Transportation regulations may be subject to separate testing requirements.

The Company does not discriminate against employees with drug or alcohol addictions on the basis of that addiction, but does reserve the right to discipline employees who violate this policy.

Employees who are prescribed medical marijuana must also comply with this policy. The Company does not discriminate against employees for engaging in lawful activities outside the workplace during non-working hours, so long as such lawful activity does not violate this policy or otherwise inhibit an employee from performing his or her job duties.

# EXHIBIT 20



John Menzies plc M
## Code of Conduct

MENZIES_000332

## CONTENTS

**Welcome to the new Code**
John Menzies plc. This is ou
right thing, at the right time
Our Code provides a set of
to guide us all in our decisi
the behaviour expected o

Our Code applies to every
every level within our busin
it underpins is fundamenta
the Group. It is critical tha
to understand and comply
the Group's policies more
everyone to conduct busine
integrity and refrain from
could harm our reputation
Failure to do so puts our b

We operate in over 35 cour
conflict with this Code. It
local practices that violate
concerns about someone's

No code of conduct can do
unsure about a decision yo
Compliance.

Please have the courage to
may, breach our Code. You
against anyone raising con

Thank you for your co-oper

John Geddes

| | |
|---|---|
| Our Code | 4 |
| Everyone, Everywhere | 5 |
| Key Principles | 6 |
| Our People | 8 |
| Our Integrity | 12 |
| Our Assets | 18 |
| HSSE & Risk Management | 24 |
| What Should I Do? | 28 |
| Reporting A Violation Of Our Code | 30 |
| Guidance For Managers | 32 |

MENZIES_000333

430




# OUR CODE

Our Code of Conduct details the values, ethics and behaviours we expect and promote to help guide our People make the correct choices in a consistent and ethical manner, whatever we do and wherever we do it.

This Code is our roadmap and compass for doing business the right way.

Whether you are new to the Group or have been with us for many years, it is important you become familiar with this Code, understand it, and apply it in all that you do.

**Board** – The Board of Directors of the Company is ultimately responsible to the Company's stakeholders for all policies and activities of the Group and the approval of the Board is required prior to the adoption of any material policy or the taking of any significant action. Any changes to the divisional or legal structure of the Group must also be approved by the Board.

Details of the Board and its Committees can be found on our website at: http://www.johnmenziesplc.com/investor-centre/corporate-governance/our-committees/.

# EVERYONE, |

Our Group operates in over . bound together by shared go

Our Code applies to every o Group companies (including interest). There are no exc

You have a responsibility

**HELPFUL RESOURCES**

MENZIES_000334

431

# OUR PEOPLE

## OUR PRINCIPLES

Our People are our most highly-valued resource: our operational performance and delivery of shareholder value are dependent upon attracting and retaining a highly-skilled, motivated and talented employee base. We are committed to having a diverse workforce and creating a workplace that promotes mutual trust and respect. Everyone should feel they are treated with dignity and empowered to reach their full potential.

Employees with any concerns or issues are encouraged to discuss these with their Line Manager or an HR representative to ensure prompt resolution.

## OUR EXPECTATIONS

### A WORKPLACE FREE FROM HARASSMENT AND INTIMIDATION

We all have a right to work free from intimidation and harassment and in an environment where we feel safe and comfortable. Any form of abuse or harassment is strictly forbidden and this includes actions that might reasonably be considered to be offensive or discriminatory.

We expect all employees to treat each other with courtesy, dignity and respect.

Help create a work environment free from harassment and intimidation.

Report any incidents to your Line Manager or HR representative.

### DIVERSITY AND INCLUSION

We actively promote tolerance and diversity at every level of our business. As a global organisation, we aim for a workforce that is representative of the societies in which we operate.

As such, we are committed to providing equal opportunities and avoiding any form of unfair discrimination in the workplace. We seek to create an environment of inclusion and acceptance.

### EQUAL OPPORTUNITIES

Our policies and procedures for recruitment, training, promotion and reward promote equality of opportunity, regardless of background and personal circumstances.

All work-related decisions are based on merit, not on race, colour, national origin, religion, gender, age, sexual orientation, gender identity, marital status, disability or any other characteristic protected by applicable laws. Offensive remarks, messages or jokes and inappropriate behaviour are never acceptable and will not be tolerated.

MENZIES_000336

432



## How to contact us:
If, having read this Code of Conduct, you require further information, you should contact:

Group Compliance
John Menzies plc
2 Lochside Avenue
Edinburgh
EH12 9DJ

+44 (0)131 225 8555

compliance@johnmenziesplc.com

# EXHIBIT 21

It has been very hard latley to work with co-worker Ray Navarow he does been very rude to me by toling me that the company dont need me, that Im a bad Supervisor, and that I do IS Cause delays. I try to Ignore him but he follows me around & loves to make a big scene in front of other workers, then that's were I get upset and tell him to Stop and go do his Job but he keeps following me making hand gestures but also saying he will turn in a Petision against me. One more thing he says I Steal time when I'm on AOA Working making sure the transition goes well I'm off at 11 but Sometimes stuff happens on the AOA before so I Stay to help & Solve, Ray Shows up at 5:30 or 9pm when Renil told him not to come early anymore to come in & Jeff at his time.

Andrew Dodge 8-16-18

MENZIES 000089

435

Mon, Aug 13, 2:24 PM

# Here it is again about the petition but this time it's from his own words about it he causing a lot of issues with the guys again

 calling out

Ray Navarro

 Im not feeling well

Who is the bad supervisor maybe you because everytime you are the supervisor more people call in see right now 4 guys call in and remenber all people sign to that petition agains you but i never submit it yet

All the delay to your

MENZIES_000088

436

# EXHIBIT 22

To     :     Menzies Management

Sir/ madam,

We the fuelers on Menzies 130 side would like to make a petition against Andrew Dodge. The way he supervised is very unprofessional when he run the operation or supervised, people are not taken their breaks it's because the way he set up the flights, and he always blaming the people there's a delay or always saying lack of man power and trucks issues. The truth is he doesn't know how to run the show, we also addressed the problem to the higher position managers (Nicco, John and renil) as usauls nothing happened, looks like they always covering his mistake or maybe these managers don't know anything about fueling also like Andrew Dodge lack of experience about fueling.

We think this is the right time to broadcast the problem in this company. We are hoping this problem will be address.

Sincerely Yours,

Menzies fueler

| # | Name | Signature |
|---|------|-----------|
| 1 | MARIO CABALLERO | |
| 2 | Jozey Canlas | |
| 3 | LORONZO SAMONTE | |
| 4 | WILLIAM RODRIGUEZ | |
| 5 | Marc Hagan | |
| 6 | Juan dela cruz | |
| 7 | Antony Williams | |
| 8 | malik wilson | |
| 9 | Ryan A Harris | |
| 10 | RPANGALILINGAN | |
| 11 | MARK CENTENO | |
| 12 | Thomas Isaac | |
| 13 | Modesto Compas | |
| 14 | | |
| 15 | Ros Ricardo Almeida | |
| 16 | RONALDO NAVARRO | |
| 17 | Jayson Manalang | |
| 18 | Christopher Lewrence | |
| 19 | ROY TOSCU | |
| 20 | Anar Saliy | |
| 21 | | |
| 22 | EFREN DELOS REYES | |
| 23 | A. VERLIS | |
| 24 | RCMANALO | |
| 25 | Wesley Fantaisle | |

MENZIES_000153

439

| name | signature |
|------|-----------|
| 1 JULY MACAPAGAL | _(signature)_ |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

MENZIES_000154

440

# EXHIBIT 23

On 8/23/2018 I John Qually served the suspension document to Reynaldo Navarro. He looked it over for a few minutes and then I asked him if he was going to sign it.  He said he would not. At that time, I put refused to sign and I signed the document. Later after Tevita Tokataha arrived and working on his set up Ray was complaining why he was being suspended instead of Andrew. He showed me a picture of Andrew sleeping in the truck and said that long time back Andrew was stealing time or sleeping on the job and nothing was done with that. As far as the petition he said that all the guys that signed it are all adults and can read what it's all about before signing it and making it sound like they did so of their own free will. Just before he left he was saying that he hopes that he does get terminated so he can go to his Lawyer and file a suit against the company for being biased or harassment and get 2 years pay like he did with Swissport.

**John Qually**

MENZIES_000084

442

# EXHIBIT 24

Some people working in Mensis as a fueller on 130 sides have always complained to Andrew. They often call him but he does not reply to the cellphone. if there is a problem. we keep calling him and he is sleeping. so everyone is reporting to me and there is one hour of them looking at andrew he is asleep as to why the fueller took a picture of him and send it to me.if andrews hours of duty they always have a delay and the fueller ask him about the airline complain that they always ask who is the supervisor. The fueller said it's Andrew and they just shaking their head and they said thats why its delay again.if the fueller tell Andrew he said dont worry about it. I'm just wondering why you suspended me because of helping the people and my concern in this company .If this is the benefits for the sake of my concern .I will not intervene again just do and focus my job

RenaldoNavarro 000001

# EXHIBIT 25

On the morning of 03/17/2018, I signed a piece of paper
to which, I was not fully aware of the contents listed there within.
My normal state of mind when arriving to work, is not always fully
aware of all workings outside of work related issues. ~~In~~ ~~~~
In regards to Menzies aviation personel, I wish to remain
courteous and respectfully. ~~and~~ I do not fill entirely comfortable
with my signature on the afore mentioned paper work, after
learning the full discourse of it's contents. Rest assured,
I will take ~~~~ all steps neccessary to make sure
that such a situation involving myself will not occore
again.     xxxx

MENZIES 000087
ISIAH BANKS

446

Renaldo Navarro had me
sign the papers without fully
explaining to me what it was for
and I feel really uncomfortable

I feel put in that postion and
disagree 100% with what

I was told to sign on.

CHRISTOPHER LAWRENCE

MENZIES_000086

447

Hi, on August 17 I signed a list.
I did not know this list is a
petition to remove Supervisor Andrew
Dodge from his position. I do not
want Supervisor Andrew Dodge to
loose his position. Please remove
my name from that list. Also,
I think that petition is illegal
and that it goes against Menzies
Companie policy.

Thank you

MARIO CABALLERO SALAZAR

MENZIES_000100

448

# EXHIBIT 26

**Tracy Aguilera**

| | |
|---|---|
| **From:** | Raul Vargas |
| **Sent:** | Wednesday, August 29, 2018 5:01 PM |
| **To:** | Tracy Aguilera |
| **Cc:** | Talin Bazerkania; Kevin Brown |
| **Subject:** | RE: Reynaldo Navarro |

Hello Tracy,
Based in your email bellow, where you mention that Raynaldo Navarro, as a member of the management team, was soliciting signatures and intimidating Employees to sign a petition. Please proceed with the termination of Reynaldo Navarro.
We cannot allow our management team to harass our people in any way.

There is another supervisor involved in this petition letter. Could you also open an investigation for July Magapagal.

Best Regards


Raul Vargas
Director | Operations | San Francisco | Menzies Aviation

M +1 415 290 4060 | www.menziesaviation.com




-----Original Message-----
From: Tracy Aguilera
Sent: Wednesday, August 29, 2018 4:04 PM
To: Raul Vargas <Raul.Vargas@menziesaviation.com>
Cc: Talin Bazerkania <talin.bazerkania@menziesaviation.com>; Kevin Blumberg <kevin.blumberg@menziesaviation.com>
Subject: Reynaldo Navarro

Raul,

Please see My documented findings below that I originally sent and Kevin statement.  I have also attached the statements from the Employees and the petition.

I can only make a recommendation, the final decision is yours.

I cannot have the meeting with Rey at 4:30 today without a decision.

Kind Regards,

Tracy

Tracy M. Aguilera
Human Resource Manager | Menzies Aviation Inc. I San Francisco

1

MENZIES_000197

450

1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA
M: (650) 697-7260  F: (650) 697-7229
Tracy.aguilera@menziesaviation.com

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it

-----Original Message-----
From: Kevin Blumberg
Sent: Wednesday, August 29, 2018 3:58 PM
To: Tracy Aguilera <tracy.aguilera@menziesaviation.com>
Subject: RE: Reynaldo Navarro

Tracy,

Based on the information provided via statement and conversation with employee Reynaldo Navarro, it has been found that there was unprofessional behavior by a supervisor.  The supervisor (Reynaldo Navarro) was actively soliciting signatures from employees in an effort to petition against having Andrew Dodge as a Supervisor.  Several employees indicated in statements that they were told to sign a document but were not advised what the document was.  Employees followed the instructions of their supervisor to avoid confrontation.

Kevin Blumberg
**Safety and Security Manager | Menzies Aviation | San Francisco**

M: +1 650 490 0040 | www.menziesaviation.com

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it

-----Original Message-----
From: Raul Vargas
Sent: Wednesday, August 29, 2018 2:30 PM
To: Tracy Aguilera
Subject: RE: Reynaldo Navarro

Hello Tracy,
Could you please explain this recommendation.

Regards


Raul Vargas

MENZIES_000198

451

Director | Operations | San Francisco | Menzies Aviation

M +1 415 290 4060 | www.menziesaviation.com

-----Original Message-----
From: Tracy Aguilera
Sent: Tuesday, August 28, 2018 4:27 PM
To: Raul Vargas <Raul.Vargas@menziesaviation.com>
Subject: Reynaldo Navarro

Raul,

After reviewing the case with my HR Director, our recommendation is not to terminate the employee at this time. However, since this is just a recommendation, please advise if you still would like to move forward with the termination

Kind Regards,

Tracy

Tracy M. Aguilera
Human Resource Manager | Menzies Aviation Inc. I San Francisco
1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA
M: (650) 697-7260  F: (650) 697-7229
Tracy.aguilera@menziesaviation.com

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it

He is the Fueling Supervisor going around and having Employee's sign a petition to have another Supervisor , Andrew Dodge removed from the Operation. I had heard about this from  Employee but no one could tell me who generated it until I seen the text message Rey sent to Andrew.

Then Charles from the Union called and said Management was trying to get their Members to sign a petition and make statements.

Kind Regards,

Tracy

Tracy M. Aguilera
Human Resource Manager | Menzies Aviation Inc. I San Francisco
1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA

3

MENZIES_000199

M: (650) 697-7260  F:  (650) 697-7229
Tracy.aguilera@menziesaviation.com

> On Aug 27, 2018, at 5:11 PM, Tracy Aguilera <tracy.aguilera@menziesaviation.com> wrote:
>
> Talin,
>
> I have attached documents from the investigation of Reynaldo Navarro(Fuel Supervisor non-Union):
>
> 8/23/2018 John Qually, Operations Manager Fueling, statement when suspending Reynaldo for "Code of Conduct"..
However, before Reynaldo walked out of the meeting, he specifically said, to terminate him, so he could go to his lawyer
and win 2 years of pay like he did with Swissport.
>
> 8/20/2018 10:00 AM Reynaldo did not show up for the meeting in HR
>
> Copy of the Petition that Reynaldo was having Union Fuelers sign, trying to get Andrew Dodge removed (2 Supervisors
signed it, Reynaldo Navarro & July Magpantay.)
>
> Written complaint from Andrew Dodge
>
> Copy of Text Message from Rey to Andrew trying to hold the petition over Andrew
>
> Copy of two statements from Fuelers, Isiah Banks & Christopher Lawrence stating they did not feel comfortable signing
the petition, but did
>
> Approx. 2 weeks prior, I received a call from Charles, Union Rep. stating that someone was forcing the Fuelers to sign a
petition.  I asked him who and for a copy, however he has not called back
>
> Now today, 10/27/2018 Raul Vargas receives the same petition from Rafael Martinez, no signature just wanting Andrew
removed- I did not attached it to this email
>
> It is not appropriate for a member of the Management team to solicited signatures or try and intimidate Employees to
sign a petition.
>
> ADR on File & Signed.
>
> Please advise as Reynaldo will be in tomorrow at 10:00AM.
>
> Kind Regards,
>
> Tracy
>
> Tracy M. Aguilera
> Human Resource Manager | Menzies Aviation Inc. I San Francisco
> 1601 Bayshore Highway | Suite 159 | Burlingame, CA 94010 | USA
> M: (650) 697-7260  F:  (650) 697-7229
> Tracy.aguilera@menziesaviation.com
>

4

MENZIES_000200

> [cid:image002.jpg@01D21B33.80386FB0]<http://www.menziesaviation.com/>
>
>
> NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 USC §§2510-2521, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it
>
>
> <2018_08_27_16_19_20.pdf>
> <image001.jpg>

5

MENZIES_000201

454

# EXHIBIT 27

We the fuelers on Menzies 130 side would like to make a petition against Andrew Dodge.

The way he supervises is very unprofessional. When Andrew is in charge of running the operation or supervises people, he will not provide people with their rest and lunch breaks, due to a poor flight set up.

Andrew always blames the people if there is a delay and lies and places blame on lack of man power or hydrant truck issues. The truth is that Andrew does not know how to run the operation.

We have tried to address these issues with upper management, but this issue has never been addressed by management and it continues.

Andrews lack of knowledge and experience of the fueling operation  on the 130 continues to hurt both the employees and the company Menzies Aviation. We are asking that the company management resolve this issue.
We the fuelers would like Andrew Dodge demoted from supervisor at the 130 side or removed from the 130 operation side.

| NAME | SIGNATURE |
|------|-----------|
| 1 | |
| 2 M. Compas | |
| 3 J Chin | |
| 4 A. Vepad | |
| 5 j Manalang | |
| 6 Anonymous | XXX |
| 7 Jose Meza | |
| 8 R CManalo | |
| 9 L Simonte | |
| 10 J. Canlas | |
| 11 Rohit Kumar | |
| 12 Wesley Fantalade | |
| 13 Malcia wilson | M wilson |
| 14 WILLIAM RODRIGUEZ | |
| 15 Anastacio Manuel | |
| 16 | |
| 17 | |
| 18 Ramon Bantas | |
| 19 Ricardo Almelda | |
| 20 Rex Tosco | |
| 21 Patrick Moran | |

RenaldoNavarro 000006

| 22 | PPANGALILINGAN | |
| 23 | E. DELOS REYES | |
| 24 | MARC Ilagan | |
| 25 | Matthew Sage | |
| 26 | ?? DELA CRUZ | |
| 27 | ?? | |
| 28 | RAFAEL VASQUEZ | |
| 29 | | |
| 30 | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

RenaldoNavarro 000007

458

# EXHIBIT 28

To whom it may concern,

My name is Rafael Vasquez I am an SEIU Union Shop Steward for Menzies Aviation at SFO International Airport

On September the 6, 2018
I was asked by the Menzies Aviation Fuelers on 130 side to write up a Petition on behalf of the Fuelers on 130 side vs Andrew Dodge.

The petition was written out and signed by the Fuelers on 130 side of the SFO Team.

The petition was then officially turned into the SEIU Union Hall.
In Addition a copy of the Petition against Supervisor Andrew Dodge was also turned into the Menzies Aviation Fueling Director Raul Vargas.

There have been two separate Petitions turned into Menzies Aviation Fueling Department Director Raul Vargas.

To date there has been no action taken by the Menzies Aviation Management Team to address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass Fuelers under his charge.

If there is any further information that I may be able to provide please feel free to contact me at (510) 715-0014.

Thank you,

Rafael Vasquez

11/18/2018

RenaldoNavarro 000009

460

# EXHIBIT 29

◀ Phone



Rafael ›

To whom it may concern,

My name is Rafael Vasquez I am an SEIU Union Shop Steward for Menzies Aviation at SFO International Airport

On September the 6, 2018 I was asked by the Menzies Aviation Fuelers on 130 side to write up a Petition on behalf of the Fuelers on 130 side vs Andrew Dodge.

The petition was written out and signed by the Fuelers on 130 side of the SFO Team.

The petition was then officially turned into the SEIU Union Hall. In Addition a copy of the Petition against Supervisor Andrew Dodge was also turned

  iMessage 

 

Rafael ›

Andrew Dodge was also turned into the Menzies Aviation Fueling Director Raul Vargas.

There have been two separate Petitions turned into Menzies Aviation Fueling Department Director Raul Vargas.

To date there has been no action taken by the Menzies Aviation Management Team to address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation  Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times

  iMessage 

Case 3:19-cv-04593-VC Document 17-4 Filed 01/15/20 Page 4 of 12



..ll AT&T 🛜                    11:13 AM                    64% 🔋

‹                         R

Rafael ›

address the Petitions to have Mr. Andrew Dodge demoted from his Supervisory role at the 130 side.

I have spoken to The Menzies Aviation Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass Fuelers under his charge.

If there is any further information that I may be able to provide please feel free to contact me at (510) 715-0014 .

Thank you,

Rafael Vasquez

  iMessage 

1   Arlo García Uriarte, SBN 231764
    Ernesto Sánchez, SBN 278006
2   Un Kei WU, SBN 270058
3   Daniel P. Iannitelli, SBN 203388
    Elizabeth Lyons, SBN 327742
4   LIBERATION LAW GROUP, P.C.
    2760 Mission Street
5   San Francisco, CA 94110
    Telephone: (415) 695-1000
6   Facsimile: (415) 695-1006

7
    Attorneys for PLAINTIFF
8   RENALDO NAVARRO

9

10                  UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13

14  RENALDO NAVARRO,              Case No.:  3:19-cv-08157 VC

15                                PLAINTIFF'S APPENDIX OF
                                  SUPPORTING EVIDENCE
16            Plaintiff,

17       vs.
                                  Date:    November 19, 2020
18  MENZIES AVIATION, INC., doing  Time:    10:00 a.m.
    business as MENZIES and DOES 1 through  Place:   video conference link
19  10, inclusive.
                                  Hon. Vince Chhabria
20                                San Francisco Courthouse
21            Defendants.         Courtroom 4 – 17th Floor

22                                Action Removed:  December 16, 2019
                                  Action Filed:     October 23, 2019
23

24

25

26

27

28

INDEX OF EXHIBITS

| Exhibit No. | Title | Page No. |
|---|---|---|
| 30 | Declaration of Arlo Uriarte | 1 |
| 31 | Declaration of Renaldo Navarro | 4 |
| 32 | Declaration of Rafael Vasquez | 10 |
| 33 | Declaration of Jezen Canlas | 17 |
| 34 | Declaration of July Macapagal | 23 |
| 35 | Declaration of Modesto Compas | 27 |
| 36 | Declaration of Marc Ilagan | 31 |
| 37 | Deposition of Renaldo Navarro | 36 |
| 38 | Errata Sheet with attached relevant pages changed | 51 |
| 39 | Deposition of Andrew Dodge | 66 |
| 40 | Deposition of Tracy Aguilera | 77 |
| 41 | Deposition of Raul Vargas | 91 |
| 42 | Deposition of John Qually | 109 |
| 43 | Photographs of Andrew Dodge sleeping | 124 |
| 44 | Copies of Acknowledgment Forms in Menzies' document production | 126 |

*Exhibit*

*30*

467

1  UrArlo García Uriarte, SBN 231764
   Ernesto Sánchez, SBN 278006
2  Un Kei WU, SBN 270058
   Daniel P. Iannitelli, SBN 203388
3  Elizabeth Lyons, SBN 327742
   LIBERATION LAW GROUP, P.C.
4  2760 Mission Street
   San Francisco, CA 94110
5  Telephone: (415) 695-1000
   Facsimile: (415) 695-1006
6
7
   Attorneys for PLAINTIFF
8  RENALDO NAVARRO

9

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12

13

14  RENALDO NAVARRO,              Case No.:  3:19-cv-08157 VC

15                                DECLARATION OF ARLO URIARTE
                                  AUTHENTICATING COPIES OF
16            Plaintiff,          PLAINTIFF'S SUPPORTING EVIDENCE

17       vs.

18  MENZIES AVIATION, INC., doing  Date:   November 19, 2020
    business as MENZIES and DOES 1 through  Time:   10:00 a.m.
19  10, inclusive.                Place:  video conference link

20                                Hon. Vince Chhabria
21            Defendants.         San Francisco Courthouse
                                  Courtroom 4 – 17th Floor
22
                                  Action Removed:  December 16, 2019
23                                Action Filed:     October 23, 2019

24

25

26

27

28

DECLARATION OF ARLO URIARTE         CASE No. 3:19-cv-08157

**000002**

468

I, Arlo Uriarte, declare as follows:

1. I am an attorney admitted to practice before all superior courts in the State of California. I am admitted to practice in the United States District Court for the Northern and Eastern Districts of California. I am admitted to the United States Court of Appeals for the Ninth Circuit.

2. I have personal knowledge of the facts stated in this declaration. If called upon to testify as a witness, I would competently testify as to these facts.

3. Exhibits 31 – 35 are declarations obtained from witnesses and are true and correct copies of the originals signed and executed by each witness.

4. Exhibits 36, 38-41 are copies of deposition transcripts from witnesses deposed in this matter. The pages attached are true and correct copies of the certified transcripts for each witness.

5. Exhibits 37 is a true and correct copy of the Errata sheet downloaded from the deposition depository Sound Deposition Service, from the deposition officer selected by Menzies. The errata sheet has been available since Sept. 2, 2020. The username and passwords for our access is uriarte / uriarte (all lower case).

6. Exhibit 42 is a true and correct copy of a photograph of Andrew Dodge, authenticated by him during his deposition.

7. I reviewed the production of documents by Menzies, no acknowledgment of receipt for the employment handbook nor the Code of Conduct was provided.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

Date: 11/2/2020                                              Arlo Uriarte

*Exhibit*

*3*

470

1   Arlo García Uriarte, SBN 231764
2   Ernesto Sánchez, SBN 278006
    Un Kei WU, SBN 270058
3   Daniel P. Iannitelli, SBN 203388
    Elizabeth Lyons, SBN 327742
4   LIBERATION LAW GROUP, P.C.
    2760 Mission Street
5   San Francisco, CA 94110
    Telephone: (415) 695-1000
6   Facsimile: (415) 695-1006

7

8   Attorneys for PLAINTIFF
    RENALDO NAVARRO

9

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

14  RENALDO NAVARRO,                    Case No.: 3:19-cv-08157 VC

15                                      DECLARATION OF RENALDO NAVARRO
16                                      IN SUPPORT OF PLAINTIFF'S
            Plaintiff,                  OPPOSITION TO SUMMARY JUDGMENT
17
        vs.
18
                                        Date:    November 19, 2020
19  MENZIES AVIATION, INC., doing       Time:    10:00 a.m.
    business as MENZIES and DOES 1 through   Place:   video conference link
20  10, inclusive.
                                        Hon. Vince Chhabria
21          Defendants.                 San Francisco Courthouse
                                        Courtroom 4 – 17th Floor
22
                                        Action Removed:  December 16, 2019
23                                      Action Filed:    October 23, 2019

24

25

26

27

28

471

I, Renaldo Navarro, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1. I am the Plaintiff in this matter.

2. I add this declaration to the testimony I have provided during my deposition.

3. In August 2018, my estimate is that in Mr. Dodge's swing shift as the Fueling Supervisor at Menzies Aviation, he was supervising about 10-12 Fuelers. Of these Fuelers about 7-8 are Filipino. In my shift, I usually supervised his 10-12 Fuelers and from 1:00 a.m. to 6:00 a.m. I supervised 4-5 Fuelers, 2 of which are Filipinos. Between 5:00 a.m. to 6:00 a.m. I then supervised an additional 8 Fuelers, all of whom are Filipinos.

4. During my tenure both at ASIG and MENZIES, I loved my job. I treated my job with respect and pride. I tried to help people and knew the importance of my role at the airport, as well as with the airlines. This was my way of life and how I contributed to society.

5. When Andrew Dodge was promoted to supervisor, I tried to assist him just like any other new supervisor before him. We gave him the benefit of our training and experience. We treated him as part of the team.

6. It was only because of the way he treated other people and how he acted around Filipino fuelers that the workplace began to deteriorate. Mr. Dodge kept missing flights, and the health and safety of the Fuelers was of concern of mine. They were working hard and they were missing breaks.

7. I tried to work with Mr. Dodge before I had to raise the concern with upper management. We tried to communicate with him as to how his work and attitude was affecting others. I was in constant communication with John Qually about the performance and attitude of Mr. Dodge. Somehow, Mr. Qually kept ignoring the issue.

8. He would use the flashlight and the truck lighting against Filipino fuelers acting as if he was an ICE agent at the airport.

9. Often when the Filipino fuelers were already over worked, he would force additional flights on them even when the fuelers were already over booked. He would punish the fuelers if they did not agree with him. He did not do such to Fuelers who were of Caucasian or

1 | African American descent.

2     10. Several times between 2017 and 2018, fuelers would come to me as the shift
3 supervisor telling me that Mr. Dodge acted unprofessionally with them, bullying them or acting
4 as if he would physically intimated them.  For example, Dodge once bullied Lodrino Samonte
5 (Filipino fueler) forcing him to engage in an operation that Mr. Samonte was not certified for.
6 Mr. Samonte was afraid and told by Mr. Dodge that he would lose his job.  Mr. Samonte was
7 advised that he needed to follow Mr. Dodge despite the fact that he was not certified.

8     11. Until my separation from Menzies, I never received the employment handbook,
9 nor the Code of Conduct.

10     12. I believe that Mr. Dodge was promoted too soon. He only had one year of service
11 as a fueler.  Other Filipino fuelers with more years of service were available for that position.
12 Jezen Canlas, July Macapagal, Marc Ilagan, Primo de la Cruz and Ryan Quinsao are some
13 examples.

14     13. When I complained to Renil Lal and John Qually about Mr. Dodge, between 2017
15 and 2018, I would complain about the way Mr. Dodge treated Filipino fuelers.  It got to the point
16 that the fuelers were very upset with Mr. Dodge.  I was trying to appease the fuelers and was
17 asking for help from management. I was clear to management that the Filipino fuelers were
18 feeling like they were being harassed and treated differently by Mr. Dodge. Such treatment
19 resulted in them being overworked, humiliated, unhealthy working conditions and safety
20 concerns.  I did not understand why management was ignoring my communications and
21 complaint.

22     14. I signed petition but did not force others to sign. I was asked to deliver the petition
23 to management.  Of the 26 people who signed, 17 are Filipinos.

24     15. After giving the petition to Raul Vargas at about 4 to 5 p.m. on or about August
25 22, 2018, the next morning at about 5 a.m., I was told by John Qually to wait for Raul Vargas.
26 About an hour later, Mr. Vargas arrived and told me that I was being suspended pending an
27 investigation.

28

**DECLARATION OF RENALDO NAVARRO**

**000007**

473

16. Kevin Blumberg was also present that morning. Raul Vargas explained to me that signing the petition and siding with the fuelers was not appropriate. Mr. Blumberg added that I need to make a statement conceding that I will not do this again.

17. Mr. Vargas and Mr. Blumberg did not allow me explain the situation. They did not ask many questions. They were just there to let me know that I was suspended. They did not ask to hear my side or what the fuelers were complaining of. The whole meeting lasted about 3-5 minutes. Aside from this interaction, there were no other meetings, phones calls nor interviews about the petition or the working conditions created by Dodge.

18. With regards to the text that I sent to Mr. Dodge, my attorney has shown me again, what is MENZIES 000088, my intention on that August 13, 2018, text is to tell Dodge that I have the petition and had been giving him time to change, that I have not submitted the petition yet. He was complaining in a previous text as to me being a bad supervisor for calling in sick. That was my response.

19. About one week later, August 30, 2018, Tracy Aguilera asked me to go to her office where she informed me that I was terminated. Thirteen years of service came to an end. It pained me so much and caused me so much anxiety.

20. Since I was fired from Menzies I have really pondered long and hard what mistake I have committed. I cannot think of any. I have offered nothing but loyalty and hard work; the company that had been part of my life and lifestyle. Signing the petition that, in my mind, will help Menzies appreciate and understand what was going on in the field. The injustices that the employees were suffering from Dodge. I signed the petition not to fight Menzies but to bring to Menzies attention to Dodge's wrongdoings and to protect Menzies, the Company I have learned to love and hope to retire from.

21. Since I was fired, I suffered mental anguish, anxiety, pondering what I did wrong to the Company. I could not sleep and eat because of what had happened to me. I cannot stop thinking about it. I was kicking myself for signing the petition. However, I felt that my team was suffering injustice and were being maltreated by Dodge, and it hurt me to my core.

22. As a result of the anxiety and stress, I have to see a Doctor to help me overcome

1   the stress and the anxiety.   I was over 40 years old when I was fired and kept thinking where to
2   look and how to find a job.  I was anxious and stressed thinking about the bills, the house rent,
3   how to pay bills and how to support my family. I was very anxious and did not know what to do.
4   I experienced more than a year of hardship.  After over a year, I found some odd jobs at the
5   airport.

6         23. Until now it still enters my mind why I was fired especially now with the pandemic
7   and I just rely from unemployment. Until now I still think about what Menzies has done to me.
8   Until now, I still ask myself if signing that petition was worth it.  I told them even back then that
9   if that is what they believe I should do, I won't do it again.  I thought I was doing the company a
10  good thing by bring up the bad that Dodge was doing to the company.

11        I declare under penalty of perjury under the laws of the United States and in the State of
12  California that the foregoing is true and correct.

13

14

15  _____          11- 2· 20
16  Renaldo Navarro                       Date
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF RENALDO NAVARRO**

475

*Exhibit*

*3*

476

Arlo García Uriarte, SBN 231764
Ernesto Sánchez, SBN 278006
Un Kei WU, SBN 270058
Daniel P. Iannitelli, SBN 203388
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br><br>           Plaintiff,<br><br>   vs.<br><br>MENZIES AVIATION, INC., doing business as MENZIES and DOES 1 through 10, inclusive.<br><br>        Defendants. | **Case No.:  3:19-cv-08157 VC**<br><br>**DECLARATION OF RAFAEL VAZQUEZ IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**<br><br>Date:    November 19, 2020<br>Time:   10:00 a.m.<br>Place:  video conference link<br><br>Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor<br><br>Action Removed: December 16, 2019<br>Action Filed:     October 23, 2019 |

1

2

3       I, Rafael Vasquez, have personal knowledge of the matters stated herein and if called upon

4   as a witness, I would competently testify as follows:

5       1.   I am an employee of Menzies Aviation, Inc. ("Defendant"). I started working for

6   Defendant in 2017 as an aircraft fueler. I am a union steward for SEIU Airports Division

7   ("Union"). It was in this capacity that I became aware of the complaints made by many of my

8   fellow aircraft fuelers (also employed by Defendant hereinafter "Fuelers") regarding Andrew

9   Dodge and their working conditions.

10      2.   I know Mr. Renaldo Navarro as the supervisor of many of Defendant's fuelers

11  during the 11:00 p.m. to 7:00 a.m. shift.  He is well respected.  He respects fuelers and is not

12  abusive.  Fuelers listened to him and he was not intimidating.  He is known to be even handed

13  and someone you can talk to.  During my time as a union steward there we no complaints made

14  to the Union about Mr. Navarro.  On the contrary, we often talked to Mr. Navarro – pleading that

15  he help us talk to management and make them understand our complaints against Mr. Dodge.

16      3.   Before August 2018, between 2017 and 2018, the Fuelers made multiple

17  complaints to the Union regarding an abusive supervisor by the name of Andrew Dodge. The

18  complaints included verbal abuse, threats, and even physical confrontations with some of the

19  fuelers. These complaints were communicated to management for over a year.  We would have

20  meetings with management every week to two weeks.   The complaints were communicated

21  during these meetings.  The shop stewards would communicate these to management attendees:

22  Renil Lal, John Qually, Nicco, Raul Vargas would often attend.  They knew that especially the

23  Filipino fuelers were being harassed and discriminated by Mr. Dodge.

24      4.   Mr. Dodge is a strange individual.  Please remember that this time frame – 2016,

25  when Mr. Dodge was hired, 2017 when I came on board, through 2018, was when Trump had

26  just gotten elected.  Mr. Dodge, as a white man, and most likely anti-immigrant, would engage in

27  really strange behaviour towards the Filipino fuelers.  One time, before August 2018, I witnessed

28  as Dodge lit up the fuelers with truck lights- very strong lights – as they were exiting the

---

**DECLARATION OF RAFAEL VASQUEZ**                                    **000012**

workplace. He was pretending that he was an ICE agent, inspecting the fuelers as they walked by. We communicated this incident to management but nothing was done.

5. It is my sincere belief that management looked the other way regarding Mr. Dodge because he is a white man. Ms. Aguilera is also a white person. Mr. Qually as well. They "needed" a white supervisor for appearance purposes, and given the political situation then, these white folks bonded together.

6. Fuelers also accused Mr. Dodge of sleeping while on duty. This was common knowledge and dangerous in my opinion. There are pictures of Mr. Dodge sleeping in the truck, a company truck that was in the tarmac. This is dangerous. I do not believe that a Filipino supervisor who slept on the job would be given any accommodation, it is dangerous.

7. I was personally told by several fuelers then that Mr. Dodge's poor supervision and deficient performance led to flights being delayed and the Fuelers not getting their meal and rest periods as they should have. As far as I know he was not reprimanded for this. If Filipino supervisors did that, they would be treated differently, reprimanded, even suspended.

8. Due to Defendant's inactions, the work environment of the Fuelers became hostile as Mr. Dodge continued his abusive behavior towards the Fuelers. I could not believe how Defendant could allow Mr. Dodge to continue harassing the Fuelers and setting them up for failure as the Union continued to receive complaints. When we receive these complaints, we communicated these to management in our weekly meetings and when we saw them.

9. I found out around August 2018, that the Fuelers decided to write a petition against Mr. Dodge. I signed this petition. Along with many fuelers and two supervisors, including Mr. Navarro.

10. I am aware that the Union office was aware we were getting signatures from fuelers in a petition against a supervisor, Mr. Dodge. The union officer I spoke about the petitions was Charles Owinche. I know that Mr. Owinche knows Mr. Navarro. It does not make sense to me that Mr. Owinche would be upset that Mr. Navarro or any supervisor would be lending support to the fuelers and making people sign the petition. I, Mark Ilagan, Jezen Canlas, union stewards, were asking people to sign the petition. Mr. Navarro played a minor role, by signing the petition and lending support. He also helped us deliver the first petition to management.

DECLARATION OF RAFAEL VASQUEZ

000013

11. The attorneys for Mr. Navarro explained to me that supposedly Mr. Owinche called Ms. Aguilera to complain that fuelers were being pressured to sign a petition. But this does not make sense. We are the union stewards, me, Jezen Canlas, and Mark Ilagan. It was us who were asking people to sign the petition. Why would we complain, including Mr. Charles Owinche, that a supervisor would be pressuring others to sign the petition? We wanted people, fuelers and supervisors, to sign the petition. That was not the subject of our concern then, nor that of Mr. Owinche.

12. I was informed by others that Mr. Owinche has now moved to the East Coast and is no longer with the Union. I believe he left his job with the Union in late 2018.

13. After the first petition was going around the workplace in July and/or August 2018, fuelers complained to me that Andrew Dodge was stopping them from signing the petition. He told fuelers that it was illegal to engage in such conduct in the workplace. I then talked to Charles about this matter and he instructed me to tell the fuelers that as long as the signing of the petition did not interfere with their job functions, and it occurred in the break room or outside the premises, after or before the shift hours, then union members can sign the petition. I informed the fuelers about this, but the complaints that Andrew Dodge engaged in illegal anti-union activities continued. I believe that it was at this point that Mr. Owinche may have called Ms. Aguilera.

14. Instead of taking the complaints and the petition seriously, Defendant did not do anything to discipline or retrain Mr. Dodge. We were instead "put in our place" when Mr. Dodge not only did not get in trouble, it was Mr. Navarro who was terminated. The Union reported the Fuelers' complaints to Defendant.

15. Several months after the first petition, I took it upon myself to write a second petition. Again, this second petition was not acted on. I took this petition to Raul Vargas and gave him the petition myself. No investigation was ever done.

16. The reason I took it upon myself to write this petition is because management needed to do something for the Filipino fuelers who were getting harassed and subjected to abusive behavior by Andrew Dodge. It had been going on for over a year already.

17. I personally witnessed how Mr. Dodge spoke and treated Filipinos, Latinos and South Asians differently compared to white employees. Mr. Dodge was demeaning and degrading to nonwhites. It was obvious that Mr. Dodge feels racially superior to nonwhites.

18. My opinion is that because Mr. Dodge is Caucasian and a supervisor, management wanted to side with him because of his race. Mr. Navarro is Filipino and a supervisor. Management discriminated against him. That is my opinion.

19. I know that John Qually, Renil Lal, Raul Vargas, Nicco were all aware of these issues of discrimination, harassment and abusive behavior but ignored it.

20. I wrote the November 18, 2018, letter and gave that to Mr. Navarro.

21. I spoke to Raul Vargas three times about Mr. Dodge. I spoke to him about the abusive behavior of Mr. Dodge, his harassment and his discriminatory attitude towards the fuelers. Mr. Vargas nor anyone from management did not address our concerns. I remember giving Raul Vargas the second petition myself. Another time, I told Mr. Vargas that Mr. Dodge's harassing and abusive behavior had not changed. These conversations happened between August and November 2018.

22. When Menzies took over the ASIG operations, they did not give us handbooks to sign or any code of conduct documents. I know this because for the longest time we were still using forms from ASIG. I do not remember getting handbooks specifically from Menzies.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

*Rafael cano vasquez*
_____
Rafael Vasquez

Oct 31, 2020
_____
Date

**DECLARATION OF RAFAEL VASQUEZ**

**000015**

481

 SignRequest

# Signing Log

Document ID: W6J5JLP5

**Liberation Law Group P.C. (signrequest@liberationlawgroup.com)**

| | |
|---|---|
| Document name: | Declaration of Vasquez 10312020 Navarro v Menzies v2.pdf |
| | SHA256 security hash: |
| | b0b2321d7195968346086e13b4b0f2a3088573607774702b664c2b7b190a9d74 |
| Sent on: | Nov. 1, 2020, 4:01 a.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of |
| | (signrequest@liberationlawgroup.com) |
| To: | falocanovasquez@msn.com |
| Subject: | Liberation Law Group P.C. |
| | (signrequest@liberationlawgroup.com) has sent you a |
| | SignRequest |

Message:

Hello Rafael,
Please sign the declaration per Arlo Uriarte's request.
Thank you.

| | |
|---|---|
| IP address: | 73.92.8.235 |
| User agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/ |
| | 537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/ |
| | 537.36 |

**signrequest@liberationlawgroup.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

**falocanovasquez@msn.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |
| Text added, page 5: | Oct 31, 2020 |
| Signature added, page 5: | |

*Rafael cano vasquez*

| | |
|---|---|
| IP address: | 172.56.39.58 |
| User agent: | Mozilla/5.0 (iPhone; CPU iPhone OS 13_6_1 like Mac OS X) |
| | AppleWebKit/605.1.15 (KHTML, like Gecko) Version/13.1.2 |
| | Mobile/15E148 Safari/604.1 |
| Document signed: | Nov. 1, 2020, 4:39 a.m. (UTC) |

**000016**

*Exhibit*

*33*

483

Arlo García Uriarte, SBN 231764
Ernesto Sánchez, SBN 278006
Un Kei WU, SBN 270058
Daniel P. Iannitelli, SBN 203388
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

# UNITED STATES DISTRICT COURT

## NORTHEN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br><br>Plaintiff,<br><br>vs.<br><br>MENZIES AVIATION, INC., doing business as MENZIES and DOES 1 through 10, inclusive.<br><br>Defendants. | **Case No.: 3:10-cv-08157 VC**<br><br>**DECLARATION OF JEZEN B. CANLAS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT**<br><br>Date:     November 19, 2020<br>Time:     10:00 a.m.<br>Place:    video conference link<br><br>Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor<br><br>Action Removed:  December 16, 2019<br>Action Filed:      October 23, 2019 |

I, Jezen B. Canlas, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.    I started working at ASIG since July of 2002, as a fueler, until the company was bought by Menzies Aviation, Inc. ("Defendant"). I continued to work for Defendant, until I left the company in 2020.

2.    In 2017 and 2018 I was a fueler who was helping the Union.

3.    In 2017 Andrew Dodge became a supervisor. He was only a fueler for one year.

4.    Me, along with other fuelers believed that Mr. Dodge was less qualified in the job of supervisor than many other Filipino fuelers who had been with the company for many years. For example, I know of at least three fuelers who were all fuelers that had more seniority than Andrew Dodge. These fuelers were better equipped to be supervisors.

5.    Not long after Andrew Dodge became a supervisor, problems with the way he ran his shifts happened. He also had many problems working with Filipino fuelers. Andrew Dodge is white. I know that fuelers complained to management that they believe they were being discriminated by Dodge in the years 2017 and 2018.

6.    For example, often he would act as if he was a security force watching over the Filipino fuelers, using his flash light.

7.    Management, especially, Renil and John Qually treated Andrew Dodge with favoritism. First of all, they did not even open the position of supervisor to everyone, and he got the job as a supervisor. Also, when there were issues in Andrew Dodge shifts, John and Renil, who are his managers did not get mad at him. But if us fuelers make mistakes, or if the supervisors that are Filipino makes mistakes, I know that John and Renil would get mad at them. I remember that Andrew Dodge caused a lot of delays to airlines schedules, because of fueling delays but he was not reprimanded.

8.    In or around July and August 2018, we fuelers started to talk to one another, started a petition because we wanted our voices heard about the problems and concerns, we had about one of Defendant's supervisor: Andrew Dodge.

9.    We started the petition because when we complained to Defendant's management, nothing was done. We, the fuelers, met and discussed what was the best thing to do. Our objective

---

**DECLARATION OF JEZEN B. CANLAS**
2

1  was to let Defendant know and to take our concerns seriously about Mr. Dodge, who was not

2  really doing his job and not helping the company at all.

3       10.    I collected all the concerns of the fuelers and started to write the petition letter on

4  behalf of the fuelers. The letter was passed around the fuelers.  Those who agreed and believed

5  in what we are fighting for, signed the petition. Nobody was forced to sign the petition.

6       11.    Mr. Navarro also signed the petition because he believed and understood what we

7  were fighting.  Then, we asked Mr. Navarro the favor of handing over the letter to Defendant.

8       12.    Mr. Navarro was not involved in any way in the organization of the petition.

9       13.    Mr. Navarro did not ask anybody to sign the petition.

10       14.    I want to be clear that it was me who organized the petition and Mr. Navarro did

11  not participate in the writing and asking fuelers to sign the petition.  Mr. Navarro, being the

12  supervisor of the fuelers, did us the favor of submitting the petition to Defendant.  That was the

13  extent of his involvement in the petition.

14       15.    Between 2017 and 2018, management was aware that there were numerous

15  complaints against Mr. Dodge.  There were complaints of meal breaks being missed, there were

16  complaints of harassment of fuelers, there were complaints of abuse of his authority.  I personally

17  got complaints from fuelers about Dodge.

18       16.    We were really surprised that instead of investigating Mr. Dodge, they fired Mr.

19  Navarro.  I believe this way their way of making an example of the Filipinos for complaining.

20       17.    Unlike Mr. Dodge, Mr. Navarro was well known for keeping flight schedules and

21  maintaining good harmonious relationships with fuelers.  He did not abuse his authority and was

22  well like by fuelers of all races.  He loved Menzies and was loyal.

23

24

25

26

27

28

---

**DECLARATION OF JEZEN B. CANLAS**
3

486

1    18.    When Menzies took over ASIG, between 2017 to 2018, we had not gotten any

2    employment handbooks, nor code of conduct documents.  We were still using ASIG forms.  The

3    handbook and code of conduct came later, after Mr. Navarro was already out of the company.

4    I declare under penalty of perjury under the laws of the United States and in the State of California

5    that the foregoing is true and correct.

6

7    *Jezen B canlas*                                        Oct 31, 2020

8    _____                    _____
     Jezen B. Canlas                                          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF JEZEN B. CANLAS**
**4**

487

✒️ SignRequest                                              Signing Log

Document ID: 92K7K8YX

**Liberation Law Group P.C. (signrequest@liberationlawgroup.com)**

| | |
|---|---|
| Document name: | Declaration of Jezen B Canlas (3).pdf |
| | SHA256 security hash: |
| | 9ddd7683277021fe8295a7779886299af4e511fe955fb1cd6db611d70b21c82d |
| Sent on: | Nov. 1, 2020, 1:52 a.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of (signrequest@liberationlawgroup.com) |
| To: | cjezen@att.net |
| Subject: | Liberation Law Group P.C. (signrequest@liberationlawgroup.com) has sent you a SignRequest |
| Message: | |

Hi Jezen,
Please sign the declaration per Arlo Uriarte's request.
Thank you.

| | |
|---|---|
| IP address: | 73.92.8.235 |
| User agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |

**signrequest@liberationlawgroup.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

**cjezen@att.net**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |
| Text added, page 4: | Oct 31, 2020 |
| Signature added, page 4: | |

*Jezen B canlas*

| | |
|---|---|
| IP address: | 98.234.142.217 |
| User agent: | Mozilla/5.0 (iPhone; CPU iPhone OS 14_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0 Mobile/15E148 Safari/604.1 |
| Document signed: | Nov. 1, 2020, 2:09 a.m. (UTC) |

*Exhibit*

*3*

489

Arlo García Uriarte, SBN 231764
Ernesto Sánchez, SBN 278006
Un Kei WU, SBN 270058
Daniel P. Iannitelli, SBN 203388
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

## UNITED STATES DISTRICT COURT

## NORTHEN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO, | **Case No.: 3:10-cv-08157 VC** |
| | **DECLARATION OF JULY MACAPAGAL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT** |
| Plaintiff, | |
| vs. | |
| MENZIES AVIATION, INC., doing business as MENZIES and DOES 1 through 10, inclusive. | Date:    November 19, 2020<br>Time:    10:00 a.m.<br>Place:    video conference link |
| Defendants. | Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor |
| | Action Removed:  December 16, 2019<br>Action Filed:       October 23, 2019 |

---

**DECLARATION OF JULY MACAPAGAL**

1

490

I, July Macapagal, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1.    I want to add the following to the declaration I signed for Menzies.

2.    Mr. Navarro is a good supervisor.  I was not agreeable to him being terminated. He was well liked by fuelers and well respected.

3.    The petition was so that management would investigate Mr. Dodge.  I do not understand how Mr. Navarro ended up being terminated.  He should not have been.

4.    Many fuelers had complaints against Dodge in 2017 and 2018.  Some of the complaints I know of is that he caused people to miss their meal breaks.  We communicated this to the union and to management.  Nothing was done.  I believe that is why the petition was put together.

5.    This is serious because missing meal breaks sometimes becomes a safety concern, because people are tired.

6.    When I signed the petition, as a supervisor, I did not think that is a problem.  It was the truth.  No one from management ever investigated me about me signing the petition.

7.     Also, in 2017 and 2018 we had not yet received Menzies handbooks or code of conduct documents.  We have yet to receive these documents until today.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.


*July J Macapagal Jr*                                    Oct 31, 2020
_____                    _____
July Macapagal                                         Date

---

**DECLARATION OF JULY MACAPAGAL**
2

491

# SignRequest

# Signing Log

Document ID: WX1Z16JV

**Liberation Law Group P.C. (signrequest@liberationlawgroup.com)**

| | |
|---|---|
| Document name: | Declaration of July Macapagal .pdf |
| | SHA256 security hash: |
| | 779463b4a52f7d222179d0e7de08d8b0ba2475c8b21306614cfb5ecf7e985664 |
| Sent on: | Nov. 1, 2020, 1:50 a.m. (UTC) |
| From: | SignRequest <no-reply@signrequest.com> on behalf of (signrequest@liberationlawgroup.com) |
| To: | hulyomacapagal@yahoo.com |
| Subject: | Liberation Law Group P.C. (signrequest@liberationlawgroup.com) has sent you a SignRequest |

Message:

> Hi July,
> Please sign the declaration per Arlo Uriarte's request.
> Thank you.

| | |
|---|---|
| IP address: | 73.92.8.235 |
| User agent: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |

**signrequest@liberationlawgroup.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |

**hulyomacapagal@yahoo.com**

| | |
|---|---|
| Email address verification: | Verified by SignRequest |
| Text added, page 2: | Oct 31, 2020 |
| Signature added, page 2: | |

*July J Macapagal Jr*

| | |
|---|---|
| IP address: | 174.194.142.106 |
| User agent: | Mozilla/5.0 (iPhone; CPU iPhone OS 14_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0 Mobile/15E148 Safari/604.1 |
| Document signed: | Nov. 1, 2020, 2:14 a.m. (UTC) |

492

*Exhibit*

*3*

493

1  Arlo García Uriarte, SBN 231764
   Ernesto Sánchez, SBN 278006
2  Un Kei WU, SBN 270058
3  Daniel P. Iannitelli, SBN 203388
   LIBERATION LAW GROUP, P.C.
4  2760 Mission Street
   San Francisco, CA 94110
5  Telephone: (415) 695-1000
6  Facsimile: (415) 695-1006

7  Attorneys for PLAINTIFF
   RENALDO NAVARRO
8

9

10              UNITED STATES DISTRICT COURT

11              NORTHEN DISTRICT OF CALIFORNIA

12

13

14  RENALDO NAVARRO,                    **Case No.:  3:10-cv-08157 VC**

15                                      **DECLARATION OF MODESTO COMPAS**
                                        **IN SUPPORT OF PLAINTIFF'S**
16              Plaintiff,              **OPPOSITION TO SUMMARY JUDGMENT**

17       vs.

18  MENZIES AVIATION, INC., doing       Date:    November 19, 2020
    business as MENZIES and DOES 1 through   Time:    10:00 a.m.
19  10, inclusive.                      Place:   video conference link

20              Defendants.             Hon. Vince Chhabria
                                        San Francisco Courthouse
21                                      Courtroom 4 – 17th Floor

22                                      Action Removed:  December 16, 2019
                                        Action Filed:       October 23, 2019
23

24

25

26

27

28

                    **DECLARATION OF MODESTO COMPAS**
                                    1

                                  494

I, Modesto Compas, have personal knowledge of the matters stated herein and if called upon as a witness, I would competently testify as follows:

1. I started working at ASIG since 2015, as a fueler, until the company was bought by Menzies Aviation, Inc. ("Defendant'). I continue to work for Defendant.

2. I signed the petition against Andrew Dodge because I believe he is not doing a good job at Menzies. I still can't believe that instead of demoting Mr. Dodge the company fired Mr. Navarro. It was the union stewards, Jenzen, Mark and others who were the ones working to put together the petition. I remember they were working on it for some time until they started getting signatures.

3. I never saw Mr. Navarro pressure others, nor ask others to sign the petition.

4. Mr. Navarro is a good employee. Loyal to the company with the company's interest in mind. He only wanted what was good for the fuelers and the company. Harmonious work.

5. Almost all of the fuelers signed the petition and yet they still did not do anything to Mr. Dodge. I truly believe that had a Filipino supervisor was subject to even just 5 people complaining, the company would fire the Filipino supervisor. Mr. Dodge is favored in the company over the Filipinos because he is white. This is my opinion.

6. I have seen Filipinos getting reprimands for far less than what Mr. Dodge does at the job. I have seen him sleeping at the job. I have seen him sleeping in the tarmac. Management knows this. It is common knowledge. It is embarrassing to the other companies and airlines. This is dangerous.    et, nothing happens to him.

7. I know that fuelers kept telling the union stewards in 2017 and 2018 that Mr. Dodge was causing meal breaks being missed, delays in schedules and plane delays. Nothing happened. This is why we asked for help from Mr. Navarro.

I declare under penalty of perjury under the laws of the United States and in the State of California that the foregoing is true and correct.

_Modesto Compas_                    10/31/2020
Modesto Compas                         Date

DECLARATION OF MODESTO COMPAS
2

495

**SignRequest**

# Registro de Firma

Document ID: W6J5J3KL

---

**andrea@liberationlawgroup.com**

| | |
|---|---|
| Nombre del documento: | Declaration of Modesto Compas.pdf |
| | Función hash de seguridad SHA256: |
| | 9cfd6134d95f991276dd26437f46a6ab4e4bb1a7d07d8e7f0864631a58e8042a |
| Enviado el: | 31 de Octubre de 2020 a las 22:17 (UTC) |
| De: | SignRequest <no-reply@signrequest.com> on behalf of (andrea@liberationlawgroup.com) |
| A: | mcompas97@gmail.com |
| Sujeto: | andrea@liberationlawgroup.com le ha enviado una solicitud de firma SignRequest |
| Mensaje: | |

> Dear Mr. Compas:
>
> Please sign and date where indicated. Should you have questions or concerns, please contact me at andrea@liberationlawgroup.com. Thank you.
>
> Sincerely,
>
> Andrea Ortiz

| | |
|---|---|
| Dirección IP: | 71.202.210.109 |
| Agente de usuario: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |

---

**andrea@liberationlawgroup.com**

| | |
|---|---|
| Verificación por correo electrónico: | Verificado por SignRequest |

---

**mcompas97@gmail.com**

| | |
|---|---|
| Verificación por correo electrónico: | Verificado por SignRequest |
| Texto añadido, página 2: | 10/31/2020 |
| Firma añadida, página 2: | |

*Modesto Compas*

| | |
|---|---|
| Dirección IP: | 107.77.211.31 |
| Agente de usuario: | Mozilla/5.0 (iPhone; CPU iPhone OS 14_0_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0 Mobile/15E148 Safari/604.1 |
| Documento firmado: | 31 de Octubre de 2020 a las 22:51 (UTC) |

*Exhibit*

*3*

497

1   Arlo García Uriarte, SBN 231764
    Ernesto Sánchez, SBN 278006
2   Un Kei WU, SBN 270058
3   Daniel P. Iannitelli, SBN 203388
    LIBERATION LAW GROUP, P.C.
4   2760 Mission Street
    San Francisco, CA 94110
5   Telephone: (415) 695-1000
6   Facsimile: (415) 695-1006

7   Attorneys for PLAINTIFF
    RENALDO NAVARRO
8

9

10              UNITED STATES DISTRICT COURT

11            NORTHEN DISTRICT OF CALIFORNIA

12

13

14  RENALDO NAVARRO,                    **Case No.:  3:10-cv-08157 VC**

15                                      **DECLARATION OF MARC ILAGAN**
                                        **IN SUPPORT OF PLAINTIFF'S**
16              Plaintiff,              **OPPOSITION TO SUMMARY JUDGMENT**

17         vs.

18  MENZIES AVIATION, INC., doing       Date:    November 19, 2020
    business as MENZIES and DOES 1 through   Time:    10:00 a.m.
19  10, inclusive.                      Place:   video conference link

20                                      Hon. Vince Chhabria
              Defendants.               San Francisco Courthouse
21                                      Courtroom 4 – 17th Floor

22                                      Action Removed:  December 16, 2019
                                        Action Filed:     October 23, 2019
23

24

25

26

27

28

---

**DECLARATION OF MARC ILAGAN**
1

498

1       I, Marc Ilagan, have personal knowledge of the matters stated herein and if called upon as

2    a witness, I would competently testify as follows:

3       1.    I started working at ASIG as a fueler, until the company was bought by Menzies

4    Aviation, Inc. ("Defendant').  I continued to work for Defendant, until I left the company in

5    February 2020.  I became a supervisor after Mr. Navarro left in September 2018.

6       2.    I am Filipino American.  My national origin is the Philippines.  My race is Filipino.

7       3.    In 2018, I was a shop steward – for the Union.  It was part of my job to

8    communicate to supervisors and managers problems or complaints fuelers had that happened

9    while working.

10       4.    In 2017 Andrew Dodge became a supervisor.

11       5.    Many fuelers had complaints against Dodge in 2017 and 2018.  Some of the

12    complaints I received from fuelers were that they missed their meal breaks.  I heard that Mr.

13    Dodge would use flashlights against fuelers, acting like he was a security force.

14       6.    It was well known that Dodge slept in the truck, even when the company truck

15    was in the tarmac.  This is dangerous but there was no action done with Dodge.  Even the general

16    manager knew about this but there was no action.

17       7.    One time, he harassed me as well.  He was abusing his authority and tried to get

18    me in trouble because of my use of the company truck.  He did this just to power trip over me.

19    He did this to many Filipino fuelers just because he can.

20       8.    I spoke to Ray Navarro about this incident because he was the supervisor during

21    that graveyard shift.  Ray assisted me and calmed things down.  Ray said he would talk to

22    management.

23       9.    It was only when management was not listening to us that we decided to put

24    together a petition.  The first petition, it was Jezen Canlas and myself who worked on it.  Rafael

25    Vasquez helped us as well.  We got signatures from most of the fuelers.

26       10.    Mr. Navarro also signed the petition but I did not see him ask others to sign, or to

27    pressure others to sign.  The truth of the matter, it was easy to have fuelers sign the petition.  Most

28    understood that Mr. Dodge was bad for the company.

       11.    During the union meetings with management that I attended, we complained about

**DECLARATION OF MARC ILAGAN**
2

1

2 Dodge.  No action was taken by management.

3

4     I declare under penalty of perjury under the laws of the United States and in the State of

5 California that the foregoing is true and correct.

6

7

8 _marc ilagan_                    Oct. 31, 2020
                                   _____
9 Marc Ilagan                      Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

**DECLARATION OF MARC ILAGAN**
3

📝 SignRequest

# Registro de Firma

Document ID: 9VY4Y152

**andrea@liberationlawgroup.com**

| | |
|---|---|
| Nombre del documento: | Declaration of Marc Ilagan.pdf |
| | Función hash de seguridad SHA256: |
| | f1eb93b496666f31b5e16a2d7db277f4871220064c78e5e4c23d1997f8c29768 |
| Enviado el: | 31 de Octubre de 2020 a las 23:34 (UTC) |
| De: | SignRequest <no-reply@signrequest.com> on behalf of |
| | (andrea@liberationlawgroup.com) |
| A: | marc_ilagan@yahoo.com |
| Sujeto: | andrea@liberationlawgroup.com le ha enviado una solicitud |
| | de firma SignRequest |
| Mensaje: | |

> Dear Mr. Ilagan:
>
> Good afternoon. Please sign where indicated. Should you have questions, please email me at
> andrea@liberationlawgroup.com. Thank you.
>
> Sincerely,
>
> Andrea Ortiz

| | |
|---|---|
| Dirección IP: | 71.202.210.109 |
| Agente de usuario: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/ |
| | 537.36 (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/ |
| | 537.36 |

**andrea@liberationlawgroup.com**

| | |
|---|---|
| Verificación por correo electrónico: | Verificado por SignRequest |

**marc_ilagan@yahoo.com**

| | |
|---|---|
| Verificación por correo electrónico: | Verificado por SignRequest |
| Texto añadido, página 3: | Oct. 31, 2020 |
| Firma añadida, página 3: | |

*marc ilagan*

| | |
|---|---|
| Dirección IP: | 12.251.123.98 |
| Agente de usuario: | Mozilla/5.0 (Windows NT 6.1; Win64; x64) AppleWebKit/537.36 |
| | (KHTML, like Gecko) Chrome/86.0.4240.111 Safari/537.36 |
| Documento firmado: | 31 de Octubre de 2020 a las 23:57 (UTC) |

501

*Exhibit*

*3*

502

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


RENALDO NAVARRO,                    )   **CERTIFIED COPY**
                                    )
            Plaintiff,              )
                                    )
        vs.                         )   Case No.
                                    )   3:19-cv-08157-VC
MENZIES AVIATION, INC., DOING       )
BUSINESS AS MENZIES; and            )
DOES 1 through 10, inclusive,       )
                                    )
            Defendants.             )
_____)


        Webex deposition of RENALDO NAVARRO, VOLUME I,
taken remotely on behalf of the Defendant, beginning at
9:41 a.m. and ending at 4:23 p.m., on Thursday,
July 23, 2020, before JOANNA B. BROWN, Certified
Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

503

```
1       Q     And did you graduate?

2       A     Are you asking how long?  How long, sir?

3       Q     Yes.

4       A     Yes, sir.

5       Q     Did you attend any type of college or

6   university in the Philippines?

7       A     Yes, sir.

8       Q     Where was that?

9       A     Philippine College of Criminology, but I did

10  not finish it.

11      Q     Any other type of schooling in the Philippines

12  other than high school and what you just mentioned

13  prior to moving to the United States?

14      A     No more, sir.

15      Q     Can you please identify for me all of your

16  employers prior to Menzies Aviation since you

17  arrived -- well, let me start over.

18            After you moved to the United States, can you

19  please list all of your employers up to Menzies.

20      A     In 2005, when I got here, I worked at

21  Service Fair part-time -- oh, Service Air part-time.

22  2005, in September, I started at ASIG Aviation.  In

23  2005, where I worked for, it was purchased by

24  Swissport.  It was purchased in 2015 by Swissport, and

25  in 2016, ASIG was purchased by Menzies.
```

                                                               23

504

1    different.

2        Q    Okay.  Did you ever have any type of

3    supervisory job at Service Air?

4             THE INTERPRETER:  Please repeat the question.

5             MR. WARD:  Sure.

6        Q    At Service Air, did you have any type of

7    supervisory responsibilities?

8        A    No, sir.

9        Q    The only supervisory job you've had was at

10   ASIG and Menzies; right?

11       A    Yes, sir.

12       Q    Have you ever declared bankruptcy?

13       A    No, sir.

14       Q    Have you ever been convicted of a felony in

15   the United States?

16       A    No, sir.

17       Q    And you understand that Menzies purchased ASIG

18   at some point a couple of years ago; correct?

19       A    2016, sir.

20       Q    While you were employed by ASIG, you were

21   promoted to supervisor; right?

22       A    Yes, sir.

23       Q    And at that time, were you given additional

24   job responsibilities as a supervisor?

25       A    Yes, sir.

                                                          25

505

1      Q    What did you understand those additional

2   responsibilities to include?

3      A    First of all, with people.  Before you were

4   with people and then you had to handle people, and

5   then -- and also, with the flight, you should be able

6   to distribute it to the people equally.

7      Q    And when you say "distribute," are you talking

8   about distributing the amount of work across the people

9   you supervise equally?

10      A    Yes, sir.

11      Q    The supervisory job that you received at ASIG,

12   was it fuel?

13           THE INTERPRETER:  I'm sorry.  Was it what?

14   Hello?

15           MR. URIARTE:  There's an audio issue.

16           THE INTERPRETER:  I didn't get the complete

17   question.

18           MR. URIARTE:  Chris, your screen -- Chris,

19   your screen shows a muted icon again.

20           MR. WARD:  I just lost sound in here again.

21   Can you -- I cannot hear anything that anybody is

22   saying, but I think you can all hear me.  Can somebody

23   nod their head yes.

24           MR. URIARTE:  Yes.

25           THE INTERPRETER:  Yes, yes.

26

```
1    BY MR. WARD:

2         Q    How did you first learn about that petition?

3         A    They passed it to me when they were -- after

4    they signed, they were passing that petition.

5              MR. URIARTE:  Wait.  I have to object on the

6    interpretation there.  You might want to ask the

7    witness to state his response again because that's

8    definitely -- I think your English portion of that

9    interpretation is erroneous.

10             (Interpreted.)

11             THE WITNESS:  Yes, sir.

12             MR. URIARTE:  You have to -- can you provide

13   the answer again.

14             THE WITNESS:  Please repeat your question.

15   BY MR. WARD:

16        Q    My question was how did you first learn about

17   that petition?

18        A    I learned from the people that they were

19   passing a petition against Andrew.

20        Q    When you say the "people," who specifically

21   are you referring to?

22        A    The fuelers, those who put the gasoline.

23        Q    Okay.  And when you learned that it was being

24   passed around, did somebody ask you to sign it?

25        A    They told me.  They told me.
```

44

```
1        Q    They told you what?

2        A    If I would like to sign it.

3        Q    Okay.  And who is the specific individual who

4    asked if you would like to sign it?

5        A    I forgot the name of the person.  There were

6    many people who approached me to sign it, but I already

7    forgot.

8        Q    Can you identify any one fueler who approached

9    you by name?

10       A    There were so many who approached me.

11       Q    My question is different though.

12            Can you name one person who approached you and

13    asked you to sign the petition?

14       A    Jezen Canlas.

15       Q    Anybody else?

16       A    There's two who are Rafael.

17       Q    I'm sorry.  Two individuals named Rafael?

18       A    No.  One, a steward, the name is Rafael.

19       Q    What is Rafael's last name?

20       A    I do not remember the last name, just Rafael.

21       Q    Is there anybody else that you can identify

22    who asked you to sign the petition?

23            THE INTERPRETER:  I'm sorry.  Can you repeat

24    the question.

25    ///
```

45

1   BY MR. WARD:

2       Q      Anybody else you can identify by name who

3   asked you to sign the petition?

4       A      I forgot the others, but it was Jezen and

5   Rafael.

6       Q      Did you sign the petition?

7       A      Yes, sir.

8       Q      Did you think it was appropriate to get

9   involved in a petition against another supervisor?

10          MR. URIARTE:  Objection.  Vague and calls for

11  a legal conclusion.

12          You can answer, Mr. Navarro.  You can answer

13  after my objection.

14          THE WITNESS:  Please repeat the question.

15  BY MR. WARD:

16      Q      The question was did you think it was

17  appropriate to sign a petition against another

18  supervisor?

19          MR. URIARTE:  Same objection.

20          THE WITNESS:  Maybe because, you know -- just

21  on the right, you know.

22  BY MR. WARD:

23      Q      I don't understand your answer, Mr. Navarro.

24      A      If we know that what they are fighting for

25  against Andrew Dodge is right, so why not help them and

46

1        A     Yes, sir.

2        Q     If Andrew Dodge had complained to

3   nonsupervisory employees about you, do you think that

4   would have been appropriate for him to do so?

5              THE INTERPRETER:  Please repeat that question.

6              MR. WARD:  Sure.

7        Q     If Andrew Dodge had complained to

8   nonsupervisory employees about you, do you think

9   Andrew Dodge would be acting appropriately?

10             MR. URIARTE:  Objection.  Lacks foundation.

11   Vague and incomplete hypothetical.

12             THE WITNESS:  It depends on him.  I do not

13   know what he is thinking of.

14   BY MR. WARD:

15       Q     Now, prior to signing this petition, you had

16   previously submitted complaints about Mr. Dodge;

17   correct?

18       A     Yes, sir.

19       Q     When was that?

20             THE INTERPRETER:  The interpreter would like

21   to inquire.

22             THE WITNESS:  I no longer remember.  The

23   people told me what Andrew was doing.  So I had that --

24   I had that reported to the superiors.

25   ///

49

1   BY MR. WARD:

2       Q    Okay.   And when did you make these complaints

3   yourself about Andrew Dodge?

4       A    I no longer remember the date, but I told

5   Randy Davis.

6       Q    Anyone other than Randy?

7            THE INTERPRETER:  I'm sorry.  I didn't hear

8   that.

9   BY MR. WARD:

10      Q    Anyone other than Randy?

11      A    There were Nico, John Qually, and also Renil

12  and Tracy.

13           MR. URIARTE:  Did you say Nicole?

14           THE WITNESS:  Nico.  Nico.

15           MR. URIARTE:  Can you spell that.

16           THE WITNESS:  Nico, N-i-c-o (In English).

17           THE INTERPRETER:  This is the interpreter.

18  It's not Nicole but Nico, N-i-c-o.

19  BY MR. WARD:

20      Q    All right.  Other than Randy, Nico, Tracy, and

21  Renil, is there anyone else at Menzies/ASIG that you

22  told?

23           MR. URIARTE:  I think, Chris, you are

24  misstating John Qually, and then the interpreter missed

25  saying Renil.

50

1          THE INTERPRETER:  Yeah.  I stand corrected.  I

2    omitted Renil.

3          MR. WARD:  Let's strike that question.  I'll

4    ask it again.

5     Q    So other than Randy Davies, Nico, Tracy,

6    Renil, and John Qually, is there anybody else who you

7    communicated complaints about Andrew Dodge to?

8     A    No more.

9     Q    How much time passed, approximately, between

10   when you communicated these complaints and when you

11   signed the petition?

12    A    Maybe those are years.  Years.

13    Q    And in between when you communicated the

14   complaints and when you signed the petition, did you

15   make, yourself, any other complaints involving

16   Andrew Dodge?

17    A    No more -- no, sir.

18         MR. URIARTE:  Is this a good time for lunch?

19   We have lunch being delivered.  So --

20         MR. WARD:  We can go maybe for another 10 or

21   15 minutes first, if that's all right.

22         MR. URIARTE:  That's okay.  Yeah.  Maybe --

23   yeah, closer to 10 hopefully.

24         MR. WARD:  All right.  I am going to mark

25   as Exhibit 7 a document which has the Bates Nos. -152

51

1       Q    At the very bottom there, where it says

2    "...remember all people sign to that petition agains

3    you but i never submit it yet," what did you mean when

4    you wrote "i never submit it yet"?

5       A    What I meant there is because the petition

6    letter was given to me to be submitted to Raul Vargas,

7    I did not submit it; but the people told me that I

8    should submit the petition so that they would know what

9    Andrew was doing.

10       Q    Who specifically told you that you should be

11    the one to submit the petition?

12       A    Because, at that meeting, Raul Vargas was

13    there.  He was our director.  He said that we -- that I

14    submit it --

15            THE INTERPRETER:  Just a second.

16            THE WITNESS:  It's just, in that meeting, I

17    was told "Please give this to Raul Vargas."

18    BY MR. WARD:

19       Q    And my question is who is the specific person

20    who told you to give it to Raul Vargas?

21       A    I was just given the petition -- the petition

22    letter.  I don't remember the person anymore.  That's

23    why I just gave it to Raul.

24       Q    Why did you delay in submitting the petition

25    after you were asked to do so?

57

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

513

1       A     For myself, I pitied Andrew.  For myself, I

2    thought about him, that he could still change.

3       Q     Did you ever submit the petition after you

4    were asked to do so?

5              THE INTERPRETER:  This is the interpreter.  He

6    wants me to repeat.

7              THE WITNESS:  After our meeting.  After a few

8    days.

9    BY MR. WARD:

10      Q     So, yes, you submitted this petition to

11   somebody at Menzies?

12      A     Yes.  To the director -- director of Menzies.

13      Q     What was that person's name?

14      A     Raul Vargas.

15      Q     If you pitied Andrew, what made you decide to

16   then submit the petition?

17             THE INTERPRETER:  Please repeat that,

18   Mr. Ward.

19             MR. WARD:  Sure.

20      Q     If you delayed in submitting the petition

21   because you pitied Andrew, why did you then decide to

22   submit it a few days later?

23      A     I was told by the people to give the petition.

24   I was told by them to give the petition.

25      Q     And these are nonsupervisory employees telling

58

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

514

```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2    STATE OF CALIFORNIA )
                          ) ss.
 3    COUNTY OF ORANGE    )
 4
 5         I, Joanna B. Brown, hereby certify:
 6         I am a duly qualified Certified Shorthand
 7    Reporter in the State of California, holder of
 8    Certificate Number CSR 8570 issued by the Court
 9    Reporters Board of California and which is in full
10    force and effect. (Fed. R. Civ. P. 28(a)).
11         I am authorized to administer oaths or
12    affirmations pursuant to California Code of Civil
13    Procedure, Section 2093(b) and prior to being examined,
14    the witness was first duly sworn by me.
15    (Fed R. Civ. P. 28(a), 30(f)(1)).
16         I am not a relative or employee or attorney or
17    counsel of any of the parties, nor am I a relative or
18    employee of such attorney or counsel, nor am I
19    financially interested in this action.
20    (Fed R. Civ. P. 28).
21         I am the deposition officer that
22    stenographically recorded the testimony in the
23    foregoing deposition, and the foregoing transcript is a
24    true record of the testimony given by the witness.
25    (Fed. R. Civ. P. 30(f)(1)).
```

119

515

1          Before completion of the deposition, review of

2     the transcript [XX] was [ ] was not requested.  If

3     requested, any changes made by the deponent (and

4     provided to the reporter) during the period allowed,

5     are appended hereto. (Fed. R. Civ. P. 30(e)).

6

7

8     Dated: August 4, 2020

9

10

11     _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

120

516

*Exhibit*

*3*

517

**CHANGES TO TRANSCRIPT OF**

RENALDO NAVARRO _____ , 08 / 10 / 2020

CASE NAME  Renaldo Navarro _____ v. Menzies Aviation, Inc. _____

(If Federal case, provide reason for change)

| Page / Line | |
|---|---|
| 17:7 | No, sir. |
| 24:20-22 | No, I worked at Asig since September 2005 and I continuously worked |
| | even after it was purchased by Menzies on 2016. |
| 31:24 | Yes, sir. |
| 40:6 | No, sir. |
| 44:25 | Yes, they told me to sign it. |
| 46:20-21 | Maybe, when you're in the right. |
| 47:25 - 48:2 | Because the petition states the wrong things that he was doing to the fuelers. |
| 50:5 | Randy Davies |
| 54:22-23 | Yes, sir. This was the second petition the fuelers made against Andrew Dodge. |
| 55:1-2 | Yes, sir. |
| 60:12 | No, sir. |
| 88:17-19 | All I remember that Tracy told me was that you should not have signed it |
| | because you were at the management side. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Signature of Deponent  _Renaldo Navarro_ _____

**000052**

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 231 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 3 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 40 of 312

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


RENALDO NAVARRO,                    )   **CERTIFIED COPY**
                                    )
              Plaintiff,            )
                                    )
        vs.                         )   Case No.
                                    )   3:19-cv-08157-VC
MENZIES AVIATION, INC., DOING       )
BUSINESS AS MENZIES; and            )
DOES 1 through 10, inclusive,       )
                                    )
              Defendants.           )
_____    )



        Webex deposition of RENALDO NAVARRO, VOLUME I,
taken remotely on behalf of the Defendant, beginning at
9:41 a.m. and ending at 4:23 p.m., on Thursday,
July 23, 2020, before JOANNA B. BROWN, Certified
Shorthand Reporter No. 8570, RPR, CRR, RMR.

2

**000053**

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 232 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 4 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 48 of 312

```
 1    again.
 2              MR. WARD:  Sure.
 3         Q    Is it your belief that if you make legal
 4    claims against a former employer, you are likely to get
 5    a settlement from them regardless of the merit of those
 6    claims?
 7         A    Yes, sir.                NO, SIR
 8              MR. URIARTE:  Mr. Navarro, are you
 9    understanding the Tagalog interpretation?
10              THE WITNESS:  (Inaudible.)
11              MR. URIARTE:  You have to answer in Tagalog.
12              MR. URIARTE:  Yeah.  I mean, I have --
13              THE INTERPRETER:  Just a second.  Let me
14    interpret that.
15              THE WITNESS:  It seems it's far from my
16    understanding in Tagalog.
17              MR. URIARTE:  I think -- Ms. Carrera, I
18    understand your proficiency and your amazing use of the
19    official, traditional, government-level Tagalog, but
20    it's sure not what usual, normal people in Tagalog
21    would use in the street.  There are two forms of
22    Tagalog.  There's the Tagalog that is normally used
23    around the country by normal people, but when you use
24    words like (speaks Tagalog) -- I went to a university
25    there, and I spoke formal Tagalog; but normal people
```

17

520

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 233 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 5 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 50 of 312

```
 1      Q    Did I understand you correctly that you worked

 2   for ASIG -- you've had two different periods of time

 3   where you were employed by ASIG?

 4      A    What do you mean two different times?

 5      Q    So let me do it this way:  First you -- first

 6   you started at Service Air; right?

 7      A    Yes, sir.

 8      Q    And did you remain employed by Service Air up

 9   to when Swissport purchased Service Air?

10           THE INTERPRETER:  Please repeat the question.

11           MR. WARD:  Sure.

12           From when he started at Service Air until the

13   purchase by Service Air of Swissport, was he

14   continuously employed by Service Air?

15           THE WITNESS:  Yes, it was continuous.

16   BY MR. WARD:

17      Q    Okay.  And then, when you started your

18   employment with ASIG in approximately 2016, was that

19   the first time you had worked for ASIG?

20      A    What I did was work in 2005 at ASIG up to 2016

21   when Menzies purchased ASIG, and I continuously worked

22   for them.      OK — changes immaterial

23      Q    I see.  You were working for both Service Air

24   and ASIG at the same time?

25      A    Yes, sir.  I'm sorry.  Different.  They were
```

                                                            24

521

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 234 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 6 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 57 of 312

```
1    involving nonsupervisory employees in personal

2    grievances?

3         A    Yes, sir.

4         Q    As a supervisor, should you avoid pressuring

5    employees to get involved in personal grievances?

6         A    Will you please repeat the question again.

7         Q    Sure.  As a supervisor, is it important to

8    avoid pressuring employees, nonsupervisory employees,

9    to get involved in personal grievances?

10             MR. URIARTE:  Before you answer that question,

11   Mr. Navarro, remember the instruction earlier.  If you

12   do not understand the question that is said in Tagalog,

13   indicate that if you are having a problem with the

14   Tagalog interpretation.  Do say that so that we know

15   where the problem is.  I just want to make sure that

16   you do that.  Okay?  Great, Mr. Navarro.

17             THE INTERPRETER:  This is the interpreter

18   speaking.  I would like to have the question, please,

19   repeated.

20             MR. WARD:  Sure.

21        Q    My question is, in your opinion, should a

22   supervisor avoid pressuring nonsupervisory employees to

23   become involved in personal disputes?

24        A    No, sir.   Yes, Sir

25        Q    Why not?
```

                                                                    31

522

```
 1   BY MR. WARD:

 2        Q    Do you recall receiving this document?

 3        A    No, sir.

 4        Q    Do you recall calling in sick in March of 2009

 5   before your days off?

 6        A    Yes, sir.          NO

 7             MR. URIARTE:  You have to get your

 8   questions -- you can't talk to me.  You have to get

 9   your questions from him.  If you need a break, you just

10   ask for a break.

11             THE WITNESS:  No, sir.

12             MR. WARD:  All right.  We are going to mark

13   this as Exhibit 5.

14             (Deposition Exhibit 5 was marked for

15             identification by the reporter, a

16             copy of which is attached hereto.)

17   BY MR. WARD:

18        Q    This is a two-page document as well.  So

19   please let me know when you've had a chance to see the

20   first page, and I'll move to the second one.

21        A    Yes, sir.

22             THE INTERPRETER:  Mr. Navarro said yes.

23   BY MR. WARD:

24        Q    All right.  Let me know when you've had a

25   chance to review this page as well.
```

40

523

```
 1    BY MR. WARD:
 2        Q    How did you first learn about that petition?
 3        A    They passed it to me when they were -- after
 4    they signed, they were passing that petition.
 5             MR. URIARTE:  Wait.  I have to object on the
 6    interpretation there.  You might want to ask the
 7    witness to state his response again because that's
 8    definitely -- I think your English portion of that
 9    interpretation is erroneous.
10             (Interpreted.)
11             THE WITNESS:  Yes, sir.
12             MR. URIARTE:  You have to -- can you provide
13    the answer again.
14             THE WITNESS:  Please repeat your question.
15    BY MR. WARD:
16        Q    My question was how did you first learn about
17    that petition?
18        A    I learned from the people that they were
19    passing a petition against Andrew.
20        Q    When you say the "people," who specifically
21    are you referring to?
22        A    The fuelers, those who put the gasoline.
23        Q    Okay.  And when you learned that it was being
24    passed around, did somebody ask you to sign it?
25        A    They told me.  They told me.
```

Yes, to sign it.

44

524

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 237 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 9 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 62 of 312

```
 1   BY MR. WARD:

 2       Q    Anybody else you can identify by name who

 3   asked you to sign the petition?

 4       A    I forgot the others, but it was Jezen and

 5   Rafael.

 6       Q    Did you sign the petition?

 7       A    Yes, sir.

 8       Q    Did you think it was appropriate to get

 9   involved in a petition against another supervisor?

10            MR. URIARTE:  Objection.  Vague and calls for

11   a legal conclusion.

12            You can answer, Mr. Navarro.  You can answer

13   after my objection.

14            THE WITNESS:  Please repeat the question.

15   BY MR. WARD:

16       Q    The question was did you think it was

17   appropriate to sign a petition against another

18   supervisor?

19            MR. URIARTE:  Same objection.

20            THE WITNESS:  Maybe, because, you know -- just

21   on the right, you know.  when you're in the right

22   BY MR. WARD:

23       Q    I don't understand your answer, Mr. Navarro.

24       A    If we know that what they are fighting for

25   against Andrew Dodge is right, so why not help them and
```

                                                              46

525

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 238 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 10 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 63 of 312

```
 1    also help the company also --

 2        Q    Do you think --

 3        A    -- to correct the wrong things that

 4    Andrew Dodge did.

 5        Q    And do you think signing a petition about

 6    Andrew Dodge might undermine Andrew Dodge's authority

 7    with nonsupervisory employees?

 8        A    They are the ones who are signing that.  They

 9    know the bad things that Andrew Dodge was doing to me;

10    and, also, the things he was doing against the fueler,

11    that was not good.

12        Q    My question is different.  My question is did

13    you think signing a petition against Andrew Dodge might

14    undermine Andrew Dodge's authority?

15             MR. URIARTE:  Objection.  Vague and ambiguous.

16             THE WITNESS:  Maybe not, sir.

17    BY MR. WARD:

18        Q    Maybe not or no?

19        A    No, no (In English).

20             THE INTERPRETER:  This is the interpreter.  I

21    interpreted "not" and "no" the same word.

22             THE WITNESS:  No, sir.

23    BY MR. WARD:

24        Q    Why not?

25        A    If what's being said is the ones that is
```

*Because the petition states the wrong things that he was doing to the fuelers*

47

526

1   BY MR. WARD:

2       Q    Okay.  And when did you make these complaints

3   yourself about Andrew Dodge?

4       A    I no longer remember the date, but I told

5   Randy Davis.

6       Q    Anyone other than Randy?

7            THE INTERPRETER:  I'm sorry.  I didn't hear

8   that.

9   BY MR. WARD:

10      Q    Anyone other than Randy?

11      A    There were Nico, John Qually, and also Renil

12  and Tracy.

13           MR. URIARTE:  Did you say Nicole?

14           THE WITNESS:  Nico.  Nico.

15           MR. URIARTE:  Can you spell that.

16           THE WITNESS:  Nico, N-i-c-o (In English).

17           THE INTERPRETER:  This is the interpreter.

18  It's not Nicole but Nico, N-i-c-o.

19  BY MR. WARD:

20      Q    All right.  Other than Randy, Nico, Tracy, and

21  Renil, is there anyone else at Menzies/ASIG that you

22  told?

23           MR. URIARTE:  I think, Chris, you are

24  misstating John Qually, and then the interpreter missed

25  saying Renil.

50

527

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 240 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 12 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 68 of 312

```
1              The reporter just clarified for me that
2      documents Bates No. -152 to -154 I had marked as
3      Exhibit 7, but it should actually be 8; is that right?
4              THE REPORTER:  Yes.
5              MR. WARD:  So then this document I have up
6      right now, Bates No. -150, is actually going to be
7      Exhibit 9.
8                  (Deposition Exhibits 8 and 9 were marked
9                  for identification by the reporter,
10                 copies of which are attached hereto.)
11     BY MR. WARD:
12         Q    Have you had a chance to look at Exhibit 9
13     here?
14         A    I already read it, sir.
15         Q    Prior to today, have you ever seen this
16     Exhibit 9?
17         A    They gave me a copy.
18         Q    When you say "they," who is "they"?
19         A    The shop steward gave it to me, Rafael.
20         Q    Did Rafael give this to you after you had
21     signed the petition?
22         A    I think this is the second petition, that this
23     is the second petition they made against Andrew Dodge.
24         Q    So is it your testimony that there were two
25     petitions against Andrew Dodge?
```

54

528

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 241 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 13 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 69 of 312

*Yes sir*

1     A     ~~The first~~ one was the first one ~~that you~~

2     ~~showed with my signing, and I think this is the second.~~

3     Q     Okay.  Did you ever sign this second petition?

4     A     I was not -- no longer able to sign it because

5     they already terminated me at that time.

6     Q     I see.  So this, Exhibit 9, you first saw it

7     after your termination?

8     A     When they terminated me and the people signed

9     that petition, I was given a copy by Rafael.

10     Q     I just want to be clear though.  The copy of

11     this, Exhibit 9 that you received from Rafael, did you

12     receive that before or after your termination?

13     A     I was already terminated.

14     Q     Okay.  Did you ever have any text-message

15     communication with Mr. Dodge about the petition against

16     him?

17     A     No, sir.

18           MR. WARD:  I'm going to mark this as

19     Exhibit 10, and this is Bates-numbered -88.

20           (Deposition Exhibit 10 was marked for

21           identification by the reporter, a

22           copy of which is attached hereto.)

23     BY MR. WARD:

24     Q     On the lower half of the page, Mr. Navarro, it

25     looks like a screen capture of some text messages.

55

529

```
 1    BY MR. WARD:

 2        Q     And the nonsupervisory employees gave

 3    Exhibit 9 to the union shop steward, to your

 4    understanding; correct?

 5        A     No.  My understanding is the shop steward who

 6    prepared the letter, and then the union submitted it to

 7    the company.  That's what I know.

 8        Q     And what is the name of the shop steward?

 9        A     Rafael.

10        Q     And is this the same Raul whose last name you

11    do not remember?

12        A     No Yes, sir.

13        Q     Do you currently possess a cell phone,

14    Mr. Navarro?

15        A     Yes, sir.

16        Q     And did you possess a cell phone in 2018 while

17    you were employed by Menzies?

18        A     Yes, sir.

19        Q     And is the cell phone that you currently

20    possess the same cell phone that you used in 2018 while

21    you were employed by Menzies?

22        A     Yes, sir.

23        Q     Are you still using the same device today that

24    you used in 2018?

25        A     Yes, sir.
```

60

Case: 21-15355, 08/30/2021, ID: 12215633, DktEntry: 12-4, Page 243 of 286
Case 3:19-cv-08157-VC   Document 31-10   Filed 11/02/20   Page 15 of 15
Case 3:19-cv-08157-VC   Document 28-1   Filed 10/15/20   Page 83 of 312

```
1       Q    Is that a yes?

2            That's when you learned you had been

3  terminated, when you met with Tracy?

4       A    Yes, sir.

5       Q    Was anybody else present at the time that you

6  met with Tracy other than yourself and Tracy?

7       A    She was with a female there.

8       Q    Was she another Menzies employer, that female?

9       A    Maybe, sir.

10      Q    You don't know who she was, in other words?

11      A    No, sir.

12      Q    So other than Tracy and this unidentified

13 female, nobody else was present; is that true?

14      A    Yes, sir.

15      Q    What did Menzies tell you was the reason they

16 were terminating your employment?

17      A    All I remember that Tracy told me was that you

18 should not have signed it because you were at

19 management site. Side

20      Q    And when she said you should not have signed

21 it, she was referring to the petition, to your

22 understanding?

23      A    Yes, sir.

24      Q    Were you told that there was any reason for

25 your termination other than signing the petition?
```

                                                              88

531

*Exhibit*

*3*

532

1              IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5     RENALDO NAVARRO,

6                    Plaintiff,

7     v.                                No.  3:19-CV-8157

8     MENZIES AVIATION, INC.,
      doing business as MENZIES
9     and DOES 1 through 10,
      inclusive,
10
                     Defendants.
11    _____/

12    Zoom Remote Deposition of

13        ANDREW DODGE

14     Tuesday, July 28, 2020

15        **CERTIFIED COPY**

16

17

18

19

20    REPORTED BY:  CINDY TUGAW, CSR #4805

21

22

23              NOGARA REPORTING SERVICE
                5 Third Street, Suite 415
24           San Francisco, California 94103
                   (415) 398-1889
25

1       A.  No, more like two hours.

2       Q.  Okay.  Sounds good.  All right.

3           Can you tell me the highest level of education

4   that you achieved.

5       A.  I have some college.

6       Q.  Did you graduate from college?

7       A.  No, I did not.

8       Q.  And when you say college, what college did you

9   go to?

10      A.  I attended DeAnza Community College.

11      Q.  Did you get an AA?

12      A.  No.  I was going for my AA.

13      Q.  And when was the last time you actually

14  participated in a class at DeAnza?  Like what year?

15      A.  I want to say like 2015, 2016.

16      Q.  And what were you trying -- what AA were you

17  trying to graduate?

18      A.  Criminal justice.

19      Q.  And when did you start with Menzies?  What

20  year?

21      A.  February of 2016.

22      Q.  So February of 2016, is that with Menzies

23  already?

24      A.  That was when we were ASIG.

25      Q.  So that's still ASIG.

DEPOSITION OF ANDREW DODGE - 07/28/2020

1      A.  Yeah.

2      Q.  And then shortly thereafter -- shortly

3  thereafter, Menzies came in, is that correct?

4      A.  Yeah, Menzies came in, like, 2018, or

5  something like that, or in 2000 -- or like in the

6  middle of 2018, I want to say.

7      Q.  All right.  What was the position you had when

8  you started with ASIG?

9      A.  When I first started at ASIG, I was a fueler.

10      Q.  How long were you a fueler for before becoming

11  a supervisor?

12      A.  I want to say about a year.

13      Q.  And who approved your promotion to supervisor

14  from a fueler?

15      A.  Renil Lal, the general manager at the time.

16      Q.  The termination of Mr. Navarro is about August

17  of 2018.  Do you remember that?

18      A.  Yeah, I remember him not being there anymore.

19      Q.  And in August of 2018, you were a supervisor,

20  correct?

21      A.  Yes.

22      Q.  And your shift was -- can you tell me, what

23  was your shift?

24      A.  During the time -- like, your question is,

25  like -- like, now or in the past?

1    there put fuelers on a schedule for, hey, you're going

2    to go from this flight to this flight.

3            And also, after that, it was to drive on the

4    airport and just monitor the fuelers, if they needed

5    help with something, or also monitor their safety.  So

6    making sure they're wearing their uniform.  Making sure

7    they're wearing their vest, earplugs, had their boots

8    on.  Make sure -- just come and check on them and make

9    sure their equipment is running properly.

10           And also, if they call me, I would go assist

11   them, or, you know -- and also just change things

12   throughout the operation.  Maybe the guy might call me

13   and be, hey, my flight never showed up, and then I

14   might just change their flights around.

15       Q.  Right.  Were you also in charge of providing

16   breaks for people, like when they can go on --

17       A.  Oh, yes, of course.  So you would -- when you

18   schedule flights, you would -- before their fifth hour,

19   California law, you try to find a break period for 30

20   minutes.  There were days that sometimes the way the

21   flights came in, you know, the guys would be fueling

22   and would go over that because they're still on the

23   aircraft.  You can't just leave the aircraft.  They

24   would have to take their break after they were done

25   fueling the aircraft.

1      Q.  Right.  So the fuelers under your supervision,
2  they depended on you for when they can take their
3  breaks?
4      A.  Yes.  They would take -- some of the guys
5  were, Hey, I need to take a break, or asking ahead of
6  time, Hey, what time am I taking my break?  So
7  everything would be coordinated depending on what's
8  going on on the operation at the time.
9      Q.  And then, like you said, there are times where
10  the fuelers would depend on you to help out with a
11  particular situation.  So you become kind of like an
12  extra hand as well?
13      A.  Say that again.  Like, what do you mean?
14  Sorry.
15      Q.  Like if they're busy or they're shorthanded,
16  you could come in also to help them?
17      A.  Yeah, if there was something going on in the
18  operation, I would report to my duty manager, know
19  what's going on, let him know, Hey, we're short.  Can I
20  get some assistance from your side?  And if we didn't
21  have the manpower, I would help on a flight and hook up
22  and help, you know.
23      Q.  Exactly.  Okay.  And then, during the swing
24  shift, how many fuelers did you normally supervise?
25      A.  On a busy day, on a really busy day, I have

<< NOGARA REPORTING SERVICE >>                    19

537

1          Can you tell me, by August of 2018, how long
2   you had been working with Renaldo Navarro at that time?
3          A.   Good question.  Do you mean like how long had
4   I been working with him as a co-worker, as like a --
5   how do you say -- as a -- supervisors together or as,
6   in general, a fueler and a supervisor?
7          Q.   Yes.  In general.
8          A.   Since I began working for ASIG in 2016, I was
9   his night fueler.  So I began working with him as a
10  night fueler, and then once I got promoted, I became a
11  swing supervisor, so I would transfer my information to
12  him.
13         And then while -- our schedules changed, and
14  then I would cover the days he was off as a swing -- I
15  mean, as a graveyard.  And then there -- if someone
16  called off, and I would see him from the night shift or
17  into the morning shift, or I would cover his sick day.
18  So, yeah, I worked with him a lot.
19         Q.   Gotcha.  And what was your general opinion
20  with regards to Ray Navarro and how he did his job?
21         A.   Oh, Ray's a great supervisor.  There's no
22  questions asked.  He was there for a long time, and,
23  you know, he's -- he did his job.
24         Q.   And you and Ray -- at some point you and Ray
25  started to have, like, difference of opinion with

1   you having problems with him, Mr. Dodge?

2       A.  Rafael didn't work with me on my side of the

3   airport.

4       Q.  Oh, I see.  I see.  So he's on another side of

5   the airport?

6       A.  Yes.

7       Q.  Gotcha.  Okay.  So it looks like, from this

8   statement that he signed, that says that he was asked

9   by Menzies Aviation fuelers to write a petition on

10  behalf of the fuelers on the 130 side.

11          Did you know that they -- that these fuelers

12  submitted two petitions?  Did you know that?

13      A.  No, I did not.

14      Q.  Okay.  So, based on your responses, is it fair

15  to say that nobody from Menzies Aviation ever sat you

16  down to discuss one or two petitions that were written

17  out against you at that time while it was happening?

18      A.  No.  I'm the one that brought it up to Renil,

19  saying that there was a petition going around, because

20  one of the fuelers had called me about it.

21      Q.  So you knew that a petition was going around,

22  but nobody from Menzies Aviation management ever kind

23  of, like, sat down with you or talked to you about it,

24  right?  Is that correct?

25      A.  No, I don't -- I never, no.

539

1    Q.  And you found out that there was a petition

2    going around against you, but you never read the actual

3    petition.  Is that how it was?

4    A.  Yeah, I never got to see it, no.

5    Q.  And you're saying that the first time you saw

6    it was actually a part of this litigation.  Is that

7    what you're saying?

8    A.  Yes.

9    MR. URIARTE:  Let's put up Exhibit 5, please.

10    VIDEO OPERATOR:  Okay.  Coming up shortly.

11    MR. URIARTE:  Thank you.

12        (Plaintiff's Exhibit 5 marked for

13        identification.)

14    MR. URIARTE:  It's not a very good copy, so I

15    guess Exhibit 5, Mr. Dodge, if we can just make it

16    smaller so he sees the whole thing.  There you go.

17    A.  Yeah.

18    Q.  Is this the letter that you wrote after you

19    found out that a petition was being turned in against

20    you?

21    A.  I can't read what I wrote, but I think this is

22    the one I wrote after I found out there was a petition.

23    One of the fuelers called me.

24    Q.  Correct.  Correct.  If you go to the bottom of

25    it, I think this is your signature, right?

1      A.  Yeah.

2      Q.  That one there?

3      A.  Yes.

4      Q.  Okay.  And did you have a meeting with Menzies

5  management about this letter at all?

6      A.  I do not recall -- I don't remember from when

7  I wrote it.  I think I wrote it during my shift, and I

8  turned it in or -- I either wrote it in the office with

9  Raul at the time or -- I just don't remember.

10     Q.  I see.  I see.  So it's possible that you

11  wrote it with the assistance of Raul.  Is that what

12  you're saying?

13     A.  Yeah, it was Raul or Renil that told me to

14  write -- write a statement.

15     Q.  And why did they tell you to write a

16  statement?  Do you know?

17     A.  Just to have it on file that they were going

18  to look into it.

19     Q.  Okay.  But how did that meeting start?  Was

20  that -- like, why did you kind of arrive at that

21  meeting?

22     A.  Like, why did I -- are you saying, like, why

23  did I write it or --

24     Q.  No.  Well, you said that you had a meeting

25  with Raul or Renil --

DEPOSITION OF ANDREW DODGE - 07/28/2020

```
 1   STATE OF CALIFORNIA     )
                             )
 2   COUNTY OF SAN FRANCISCO )

 3          I, CINDY TUGAW, a Certified Shorthand Reporter

 4   of the State of California, duly authorized to

 5   administer oaths pursuant to Section 8211 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8                    ANDREW DODGE,

 9   the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21          Dated the 7th day of August, 2020.

22

23

24

25          CINDY TUGAW
            CSR No. 4805 (California)
```

<< NOGARA REPORTING SERVICE >>                    57

542

*Exhibit*

*40*

000077

543

DEPOSITION OF TRACY AGUILERA - 08/25/2020

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5    RENALDO NAVARRO,

 6                   Plaintiff,

 7    v.                                 No.   3:19-CV-8157

 8    MENZIES AVIATION, INC.,
      doing business as MENZIES
 9    and DOES 1 through 10,
      inclusive,
10
                     Defendants.
11    _____/

12    Zoom Remote Deposition of

13        TRACY AGUILERA

14     Tuesday, August 25, 2020

15         CERTIFIED COPY

16

17

18

19

20

21    REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24             NOGARA REPORTING SERVICE
               5 Third Street, Suite 415
               San Francisco, California 94103
25                 (415) 398-1889
```

000078

544

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1     A.  The corporate office.

2     Q.  So I would imagine that the corporate office

3  would have kind of like the same materials they would

4  have for the other Menzies departments, other

5  Menzies --

6     A.  I'm sorry?

7     Q.  I would imagine that the Menzies corporation

8  would be using the same employment handbooks as they

9  were using for the other services that Menzies was

10  already doing at SFO, right?  Those would be the same

11  handbooks?

12     A.  Well, yes, they have a California Menzies

13  handbook, yes.

14     Q.  So that's the part I don't understand too

15  much.  Why did it take a little bit of time to package

16  them for the Menzies fuelers?

17         Did you hear the question?

18     A.  No, I didn't hear your question.

19     Q.  Okay.  So the question is if there's a

20  California employment handbook -- by July of 2017,

21  Menzies was already at San Francisco Airport, correct?

22  Ms. Aguilera?

23     A.  Yes, I believe it was around July.

24     Q.  No, what I mean is by July of 2017, there were

25  already operations in San Francisco?

000079

1    A.   Yes.

2    Q.   Other services, correct?

3    A.   Yes.

4    Q.   So those services already had an employment

5    handbook for California, correct?

6    A.   Yes.

7    Q.   So wasn't that the same handbook that was

8    going to be used for Menzies fuelers?

9    A.   I can't answer that because I know they were

10   revising our handbook.

11   Q.   I see.  Okay.  And then, but we don't know the

12   exact date that the handbook was distributed to the

13   Menzies fuelers?

14   A.   No.

15   Q.   And I took a look at the documents that were

16   produced to us by your attorneys, and I didn't see any

17   type of acknowledgment paperwork with regards to Mr.

18   Navarro or acknowledging receipt of corporate policies.

19   A.   Hmm.

20   Q.   So do you know anything about that, whether

21   you've seen one or anything like that?

22   A.   No, I actually didn't look, but I do know that

23   a package was put together for all of the ASIG

24   employees for them to sign.

25   Q.   Right.  Because that's the normal procedure,

DEPOSITION OF TRACY AGUILERA - 08/25/2020
Case 3:19-cv-08167-VC  Document 33  Filed 11/03/20  Page 5 of 14

1    right, you give it to the employees and then they

2    acknowledge receipt of it, correct?

3         A.  Yes.

4         Q.  And they acknowledge that they have been given

5    one, isn't that the practice?

6              So the practice, Ms. Aguilera, is that once

7    the handbooks become available, you provide the

8    handbook to the employee and then they sign an

9    acknowledgment for receipt of them, is that correct?

10        A.  Yes.

11        Q.  And then are you familiar with the Menzies

12   code of conduct?

13        A.  Yes.

14        Q.  And that's another kind of set of policies or

15   paperwork that's given to each employee, is that

16   correct?

17        A.  It's in the handbook, yes.

18        Q.  Oh, so it's part of the handbook?

19        A.  Yes, it is.

20        Q.  Is there a separate acknowledgment of receipt

21   for the code of conduct or it's all just one?

22        A.  It's all just one.

23        Q.  Was there ever a training with regards to the

24   Menzies California handbook and code of conduct?  Was

25   there any kind of training like that?

000081

547

DEPOSITION OF TRACY AGUILERA, 08/25/2020

1       A.   There was, when the employees came in to sign

2   all the documents, we went over the documents with

3   them.

4       Q.   So how did that go?  You called some of the

5   employees one by one or like a seminar?  How did that

6   go?

7       A.   They would come in according to their

8   schedule, if they didn't have flights, they would come

9   into the HR department.  We would -- I would arrange it

10  with their manager.

11      Q.   Like how many people would come in at one

12  time?

13      A.   A couple at a time.

14      Q.   And then when you said you would go over it

15  with them, you actually went through some of the pages

16  and --

17      A.   What they were signing, yes.

18      Q.   What they signed.

19      A.   Either myself or my clerk.

20      Q.   I see.  Do you have an independent

21  recollection of doing something like that with

22  Mr. Renaldo Navarro?

23      A.   No, I can't say that I do.  I didn't do a lot

24  of them.  My clerk did a lot of them, most of them.

25      Q.   In July or August of 2018, who was your clerk?

548

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1    memory is that they had the handbook at that point
2    already, is that correct?
3        A.  Yes.
4        Q.  And who would know for certain whether that's
5    true or not?
6        A.  The documents should be in the files.
7        Q.  Yeah, well, I guess what I can represent to
8    you is that -- and I should show you that -- let's look
9    at Exhibit 15, please.
10               (Plaintiff's Exhibit 15 marked for
11               identification.)
12       MR. URIARTE:  Q.  So here is one of those
13   documents that lists the signature.  If we look below,
14   it's got a blank, no employee name, no employee
15   signature.  This was produced to us by your attorneys.
16               And so I have yet -- I mean, I guess, if you
17   get back to your office and you see some sort of
18   acknowledgment form that has Mr. Navarro's signature on
19   it, I think that would be helpful, but we have yet to
20   see that.
21               Okay, Ms. Aguilera?  Did you understand my
22   request?
23       A.  Yes.
24       Q.  All right.  How did you first find out that
25   there was a petition circulating about Andrew Dodge?

549

1     A.  The union notified me.

2     Q.  And how did they notify you?

3     A.  They called me.  It wasn't "they."  Charles

4  called me, the man named Charles that worked in the

5  union office.

6     Q.  And what did Charles say to you?

7     A.  He said, "Tracy, are you aware that there's a

8  petition being circulated?  Our members -- several

9  members have called and complained that they were being

10  forced to sign a petition."

11     Q.  Okay.  And then anything else that Charles

12  said to you?

13     A.  No.

14     Q.  And so, in response to that, what did you do?

15     A.  Well, I asked him if he had a copy of the

16  petition and who was being forced, but he never got

17  back to me on that.  With that being said, I made

18  contact with the acting general manager at the time,

19  and his name was Renil Lal, and I told him that I

20  received the call from the union.

21     Q.  Okay.  And did Renil get you a copy of the

22  petition?

23     A.  Not right away.  I don't believe -- no, he did

24  not.

25     Q.  Do you know how long before you actually got a

1    copy of it?

2         A.   I got it -- actually, I got it from Raul

3    Vargas.  I'd seen it.

4         Q.   I see.  Okay.  And did you read the petition

5    itself?

6         A.   I've seen the names on there, yes, but I

7    didn't go through each one.  I'm sorry.

8         Q.   What about the topic that the petition was

9    talking about, did you read that part?

10        A.   No, I -- I gave everything to Kevin Blumberg

11   to open up an investigation.

12        Q.   And what was the investigation for?

13        A.   Well, to find out what was going on.

14        Q.   What do you mean, "to find out what was going

15   on"?

16        A.   With the petition, why it was being

17   circulated.

18        Q.   Okay.  And then what was the conclusion of

19   Kevin, the security person?

20        A.   The conclusion?

21        Q.   Yes.

22        A.   It was that Rey Navarro was forcing employees

23   to sign a petition to have Andrew Dodge removed.

24        Q.   Okay.  And that's what is contained in the

25   email, right, is that what you're talking about, where

DEPOSITION OF TRACY AGUILERA, 08/25/2020

```
 1       Mr. Blumberg actually sent an email to you with the
 2       result of his investigation?
 3           A.  Yes.
 4           Q.  Okay.  So that's with regards to the inquiry
 5       as to Mr. Navarro's involvement in the petition itself,
 6       right?  But what about the part of, like, what the
 7       fuelers were complaining about?  Was that ever
 8       investigated?
 9           A.  I'm sorry, can you repeat that.
10           Q.  Sure.  What about the part, that section of
11       the petition where the fuelers are asking for certain
12       relief or what they're complaining about, right, in the
13       petition, was that part of the petition ever
14       investigated?
15           A.  What part are you talking about?
16           MR. URIARTE:  Okay.  Let me show you.  So let's
17       bring up Exhibit 8.
18               (Plaintiff's Exhibit 8 marked for
19               identification.)
20           MR. URIARTE:  Q.  Can you see Exhibit 8,
21       Ms. Aguilera?
22           A.  Yes.
23           Q.  Do you remember this to be the petition that
24       we're talking about?
25           A.  This is the one that I believe was given to
```

<< NOGARA REPORTING SERVICE >>                    26

**000086**

552

1    Dodge.  The way he supervised is very unprofessional

2    when he run the operation or supervised, people are not

3    [taking] their breaks it's because the way he set up

4    the flights" -- okay?  -- "and he always blaming the

5    people there's a delay or always saying lack of

6    manpower and trucks issues."

7              Okay.  So let's just stop there.  That part of

8    the petition, was that ever investigated?

9         A.  The whole scenario was investigated by Kevin

10   Blumberg.

11        Q.  Aside from the email that contains some of

12   Mr. Blumberg's conclusion, is there another document

13   that addresses these concerns?

14        A.  I don't have them.

15        Q.  So if there is an investigation, it would be

16   part of what Mr. Blumberg engaged in, correct?  Is that

17   correct?

18        A.  Yes.

19        Q.  Okay.  Let's go on to the next one.  "The

20   truth is he doesn't know how to run the show, we also

21   addressed the problem to the higher position managers

22   (Nicco, John and Renil) as usual nothing happened,

23   looks like they always covering his mistake or maybe

24   these managers don't know anything about fueling also

25   like Andrew Dodge lack of experience about fueling."

000087

DEPOSITION OF TRACY AGUILERA, 08/25/2020

1    Raul Vargas?  And really what I first want to put my

2    attention to -- or put your attention to, it says,

3    "Could you also open an investigation for July" --

4    which should be Macapagal.  Do you see that,

5    Ms. Aguilera?

6         MR. WU:  Tracy, I think you are on mute.

7         THE WITNESS:  I'm sorry.  To answer your question,

8    yes, I see it.

9         MR. WU:  Thank you.

10        MR. URIARTE:  Q.  Was an investigation ever opened

11   for July Macapagal?

12        A.  It was turned over to Kevin Blumberg.

13        Q.  Was there any result of that investigation

14   that was put on paper?

15        A.  Not that I've seen, no.

16        Q.  Did Mr. Blumberg let you know the result of

17   that investigation?

18        A.  No.

19        Q.  And then let's go down on the second page.

20   Here is the email from Mr. Blumberg.  And I just want

21   to make sure, when we were talking about the results of

22   the investigation of Mr. Blumberg, are we talking about

23   this email here, August 29, 2018 at 3:58 p.m.?

24        A.  I see it, yes.

25        Q.  So aside from this, there's no other written

DEPOSITION OF TRACY AGUILERA - 08/25/2020

1    document that writes or has further conclusions

2    regarding his investigation?  Ms. Aguilera?

3        A.  No, I don't have a copy of it.

4        Q.  Okay.  I guess my question is more -- when we

5    see Mr. Blumberg's product or result of his

6    investigation into the petition, this is what we're

7    looking at right here, the email that he wrote to you

8    with his conclusions, is that correct?

9        A.  This says a statement, yes.

10       Q.  Aside from this statement, is there any other

11   written document?

12       A.  Not that I have.

13       Q.  And here his conclusion really is

14   "unprofessional behavior by a supervisor."  Do you see

15   that?

16       A.  Yes, I see it.

17       Q.  Just taking that kind of like in its

18   isolation, "unprofessional behavior by a supervisor,"

19   would that result in a termination?  Is that something

20   that would normally result in a termination?

21       A.  It depends on the caliber of the -- what he's

22   done.

23       Q.  And your recommendation actually was not to

24   terminate, correct?

25       A.  Myself and our directors, yes -- my director,

```
 1   STATE OF CALIFORNIA       )
                               )
 2   COUNTY OF SAN FRANCISCO   )

 3           I, CINDY TUGAW, a Certified Shorthand Reporter

 4   of the State of California, duly authorized to

 5   administer oaths pursuant to Section 8211 of the

 6   California Code of Civil Procedure, do hereby certify

 7   that

 8                   TRACY AGUILERA,

 9   the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21           Dated the 10th day of September, 2020.

22

23

24

             CINDY TUGAW
25           CSR No. 4805 (California)
```

*Exhibit*

557

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4

 5   RENALDO NAVARRO,

 6                 Plaintiff,

 7   v.                                   No.  3:19-CV-8157

 8   MENZIES AVIATION, INC.,
     doing business as MENZIES
 9   and DOES 1 through 10,
     inclusive,
10
                   Defendants.
11   _____/

12   Zoom Remote Deposition of

13       RAUL VARGAS

14    Tuesday, August 25, 2020

15       CERTIFIED COPY

16

17

18

19

20

21   REPORTED BY:  CINDY TUGAW, CSR #4805

22

23

24           NOGARA REPORTING SERVICE
              5 Third Street, Suite 415
25          San Francisco, California 94103
                  (415) 398-1889
```

558

```
1                      I N D E X

2                                      Page Number

3    EXAMINATION BY MR. URIARTE                4

4    EXAMINATION BY MR. WU                     73

5    FURTHER EXAMINATION BY MR. URIARTE        74

6                      ---oOo---

7                   E X H I B I T S

8    Plaintiff's

9    Exhibit 1      Plaintiff Renaldo            9
                    Navarro's Amended Notice
10                  of Deposition of Raul
                    Vargas
11
     Exhibit 8      Petition to Menzies        26
12                  Management from Menzies
                    Fuelers
13
     Exhibit 9      Termination notice for     60
14                  Renaldo Navarro

15   Exhibit 11     Employee Performance       61
                    Development dated
16                  8/29/2018

17   Exhibit 12     Email chain culminating    66
                    in an email from Raul
18                  Vargas to Tracy Aguilera
                    dated August 29, 2018
19
     Exhibit 19     Letter from Rafael Vasquez 43
20                  to whom it may concern
                    dated 11/18/2018 with
21                  attached petition

22                      ---oOo---

23

24

25
```

559

1           BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition and on Tuesday, the 25th day of

3    August, 2020, commencing at the hour of 9:03 o'clock

4    a.m. thereof, via Zoom videoconference, before me,

5    CINDY TUGAW, a Certified Shorthand Reporter in the

6    State of California, personally appeared,

7                      RAUL VARGAS,

8    called as a witness by the Plaintiff, having been by me

9    first duly sworn, was examined and testified as

10   hereinafter set forth.

11                    ---o0o---

12            APPEARANCES OF COUNSEL

13   For the Plaintiff
         LIBERATION LAW GROUP, P.C.
14       2760 Mission Street
         San Francisco, California 94110
15       BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
16

17   For the Defendants
         FOLEY & LARDNER, LLP
18       555 California Street, Suite 1700
         San Francisco, California 94104
19       BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
20

     Also Present:  David Ho, Zoom Host.
21
                      ---o0o---
22

23

24

25

                << NOGARA REPORTING SERVICE >>                3

DEPOSITION OF RAUL VARGAS - 08/25/2020

1    had with her, it was about somebody from the union

2    contacting her to let her know that somebody was

3    requesting to sign a petition to the employees.

4        Q.  Anything else?

5        A.  Yes.  She mentioned that -- that employees

6    were -- were not agreeing on signing it.

7        Q.  Okay.  Anything else?

8        A.  Nothing else that I can recall.

9        Q.  And then, with regards to the content of the

10   petition, after you read it, did you make any decision

11   related to the contents of the petition?

12       A.  Yes, I talked to Tracy to -- to have the

13   investigation.

14       Q.  What type of investigation?

15       A.  An investigation about the petition and about

16   the -- how the petition was made.

17       Q.  How the petition was --

18       A.  Performed.

19       Q.  Was performed?

20       A.  Yes.

21       Q.  So you mean, when you say "how the petition

22   was performed," you mean how the petition was put

23   together, correct?

24       A.  Yes.

25       Q.  Anything else that you asked Tracy to do in

561

1    relation to the petition?

2        A.  Nothing else at that time.

3        Q.  Okay.  And so you said to do an investigation

4    about the petition.  What does that mean?  What did you

5    actually tell Tracy to do?

6        A.  To perform an investigation about how --

7    because we received some calls from the union, and also

8    received some information about Andrew, that he

9    received a message from Navarro.  So at that time it

10   was important for me to understand how that petition

11   was created.  How they did it.

12       Q.  All right.  And then you said also about how

13   the petition was put together.  So why was it important

14   for you to know how or who put together the petition?

15       A.  Because of the feedback that I received from

16   Tracy, from HR.

17       Q.  And what's that information that you received

18   from HR?

19       A.  As I said before, she told me that somebody

20   from the union contact her telling her that there was a

21   person asking for sign a petition, who was forcing the

22   employees to do it.

23       Q.  And did you ever find out who actually put

24   together the petition?

25       A.  Yes, we did.

```
 1          MR. URIARTE:  Q.  Mr. Vargas?
 2          A.  Well, I think that when you receive a message
 3     from -- I don't know where -- somebody in relation to a
 4     petition, that is an alert.
 5          Q.  Is what?
 6          A.  Is an alert.
 7          Q.  Okay.  But I guess my question is how does
 8     that text message lead you to conclude that Mr. Navarro
 9     wrote the petition?
10          A.  That was not the one that drove me to
11     understand that Mr. Navarro did the petition.
12          Q.  What did make you understand that Mr. Navarro
13     wrote it?
14          A.  Well, because the investigation from the
15     safety department.
16          Q.  Okay.  So the investigation from the safety
17     department actually has a report?
18          A.  They have statements from employees.
19          Q.  Statements from employees.  Okay.  Anything
20     else?
21          A.  They had a statement from employees and their
22     final outcome out of the investigation.
23          Q.  Are you talking about the final outcome as
24     they wrote it in the email?
25          A.  Yes.
```

563

```
 1          Q.  Okay.  So aside from the final outcome that
 2   they wrote in the email, is there another document that
 3   they put together or that was it?
 4          A.  No.
 5          Q.  That was it?
 6          A.  That was it.
 7          Q.  Okay.  And then the statement from the
 8   employees, from that you conclude that Mr. Navarro
 9   wrote it?
10          A.  Yes.
11          Q.  Okay.  So if I read those statements,
12   somewhere in those statements it would say Mr. Navarro
13   wrote the petition?
14          A.  I think that -- no, it doesn't say about Mr.
15   Navarro writing the petition.  It's says about Mr.
16   Navarro forcing the employees to sign the petition
17   which is -- this isn't about writing the petition.
18   It's about creating harassment environment in the
19   workplace.
20          Q.  Okay.  I understand that.  I understand that.
21   Your attorneys have kind of said that to me many times,
22   so I understand that.  But I'm still kind of like
23   before that, right?  I'm still trying to get to the
24   point of trying to understand how you got to the
25   conclusion in your head that, hey, Mr. Navarro wrote
```

1    Q.  Okay.  So forcing employees to sign the

2    petition.  What's wrong with that?

3    A.  Well, I think that when you have -- you take

4    advantage of your rank, that is harassment because of

5    how the other people feel.

6    Q.  Anything else that's wrong with that?

7    A.  Yes.  So when they use this rank, people feel

8    scared of having this confrontation with the

9    supervisor, so they prefer to sign the petition without

10   understanding what the petition was for.

11   Q.  So are you saying that the safety department

12   talked to everybody that signed that petition and

13   verified whether they actually signed it or not?

14   A.  I cannot guarantee that they talked to hundred

15   percent of the employees.

16   Q.  Okay.  But do you know how many people they

17   talked to?

18   A.  I don't know exactly how many people they

19   talked to.

20   Q.  And then you used the word "harassment."  How

21   are you using that word "harassment"?  What do you mean

22   by that?

23   A.  Well, for me, harassment is pretty much --

24   it's to force or intimidate people.  So, in this case,

25   when he's taking his rank as a supervisor, telling

DEPOSITION OF RAUL VARGAS - 08/25/2020
Case 3:19-cv-08157-VC - Document 31-12 - Filed 11/03/20 - Page 15 of 18

1    people to sign a petition that they don't know what
2    it's for, that for me is intimidation.  And that's how
3    they -- the employees felt.
4        Q.  How many employees are we talking about --
5        A.  Well --
6        Q.  -- that felt like that?
7        A.  I'm sorry?
8        Q.  How many employees felt like that?
9        A.  I cannot tell you exactly the number of, but I
10   can tell you in terms of the -- the statements we
11   received.  There were around three employees.
12       Q.  And then there were over 20 people who signed
13   the petition, right?
14       A.  Yeah.
15       Q.  So out of the more than 20 people who signed
16   the petition, three people felt like, oh, maybe I
17   didn't read it and then I signed it and maybe I --
18       MR. WU:  Objection.  Objection.  Lack of
19   foundation.  Calls for speculation.  Misstates prior
20   testimony.
21       MR. URIARTE:  Q.  So, Mr. Vargas, when your
22   attorney objects, we allow him to finish his objection
23   so that it's written into the record.  Please allow him
24   to finish, and then you can answer afterwards unless
25   your attorney tells you not to answer.  Okay?

1   from, if the document is signed by people who felt

2   harassment.  So what's the validation of that document?

3        Q.  But we also have other people who didn't feel

4   that way, right?

5        A.  We don't know.

6        MR. WU:  Objection.  Lack of foundation.

7   Misstates prior testimony.

8        MR. URIARTE:  Q.  So I guess my question is this:

9   So the document itself, the petition itself, talks

10  about things that they're not happy about, correct?

11  Would you agree with that?

12       A.  I disagree with it.

13       Q.  Okay.

14       A.  I don't agree with it because you're saying

15  "they," and at this point, when I see there's employees

16  forced to sign it, it means that there is somebody, one

17  person, that is pretty much complaining for that, not

18  the whole thing.

19       Q.  I see what you're saying.  You're saying

20  because you believe that there's one person forcing

21  people to sign, that you don't believe the petition

22  anymore.

23       A.  I don't -- I don't -- I don't have the same

24  validity of the petition anymore.

25       Q.  Validity?

1      A.   Validity, I'm sorry.

2      Q.   No problem.   I talk the same way, so I totally

3    understand you.

4           Okay.   I get that.   I guess, from your mind, I

5    could see how you could think that way.   But that might

6    not make sense when you take into consideration a

7    second petition after the termination of Mr. Navarro.

8    What about that?

9      A.   The second petition, it was not brought after.

10     Q.   It was.   It was.   It was brought after.

11     MR. WU:   Objection.   Assumes facts.   Lack of

12   foundation.

13     MR. URIARTE:   I'll show it to you so we can put

14   that to rest.   I'll show that to you, don't worry.

15          So here's -- can we have Exhibit 8 up, please,

16   David.   Thank you.

17          (Plaintiff's Exhibit 8 marked for

18          identification.)

19     MR. URIARTE:   Q.   So, Mr. Vargas, do you see this

20   one --

21     A.   Yes.

22     Q.   -- which we've been calling the first

23   petition?

24          Is this the one -- do we agree this is the one

25   that you saw initially when you say that you talked to

1    Tracy and Renil?  Does that make sense?

2         A.  I cannot confirm a hundred percent that this

3    was the one.

4         Q.  Okay.  So if we go down a little bit, yeah,

5    you'll see Mr. Navarro's signature on this one.

6         A.  Yes.

7         Q.  And this document actually comes from your

8    company, if you see the Menzies number there, Menzies

9    153.  And so line 24 there on the second page -- I'm

10   sorry, line 16 of the second page has Mr. Navarro's

11   signature.  Do you see that?

12        A.  Yes.

13        Q.  All right.  So, again, going back to your

14   conclusion earlier, you're saying, if you think that

15   Mr. Navarro was forcing all of these people to sign the

16   petition, you believe the petition is now without

17   validity, is that correct?

18        A.  Well, I don't think that it has the same

19   validity, definitely.  Now, what is most important to

20   bring out is that I had a conversation with HR about

21   Andrew, because they were -- in the letter I believe

22   they complained also about him falling asleep on the

23   operation.

24             So I had this conversation with HR.  And they

25   explained to me and they addressed that issue before I

1    started working at Menzies.  Because, again, I started

2    June 2018.  And this was happening -- this happened in

3    August.

4         Q.  Yes.  Right.  So you started in June of 2018,

5    and this was happening in August.  So you didn't have

6    that much kind of context with regard to what was

7    happening from the last year, is that correct?

8         A.  (Indicates affirmatively.)

9         Q.  Mr. Vargas?

10        A.  Yes.

11        MR. WU:  Arlo, I'm sorry to interrupt.  Can we

12   take a quick break in the next five minutes?  Whatever

13   is a good stopping point for now.

14        MR. URIARTE:  That's fine.  We can take a break

15   now.  No problem.

16        MR. WU:  Thanks a lot, Arlo.  Let's go off the

17   record.

18        MR. URIARTE:  No problem.

19           (Brief recess.)

20        MR. URIARTE:  Q.  So we were talking about Exhibit

21   8, Mr. Vargas.  My question is with regards to the

22   actual things that the fuelers were complaining about.

23   And I just want to clarify something.

24           Was there ever an investigation by Menzies

25   with regard to the context or the content of their

1   outcome of that conversation with HR.

2       Q.   Okay.  Mr. Vargas, let me put it directly

3   here.  If it's true, just theoretically, if it's true

4   that Nicco, John and Renil are covering up for the

5   mistakes of Andrew Dodge, would that be something that

6   maybe Nicco, John and Renil should be terminated for?

7       A.   I think that it would be important to make an

8   investigation before we take into consideration.

9       Q.   But that's a serious allegation, right?

10      A.   I'm sorry?

11      Q.   That's a serious allegation.

12  MR. WU:  Objection.  Improper hypothetical.

13       You can answer the question.

14  MR. URIARTE:  Q.  That's a serious allegation.

15      A.   And as I said before, for me, anything that

16  affect the environment of our employees is valid.

17      Q.   Yeah, it's valid, definitely.  But my question

18  was that would be serious, wouldn't you agree, as a

19  manager, if somebody --

20      A.   Again, it all depends on the investigation.

21  So I cannot tell you, because the letter says that,

22  but --

23      Q.   Sure.

24      A.   -- we did an investigation as we did with

25  Navarro.

<< NOGARA REPORTING SERVICE >>                    41

1                    CERTIFICATE OF WITNESS

2                       ---o0o---

3

4         I, RAUL VARGAS, hereby declare under

5  penalty of perjury that I have read the foregoing

6  deposition testimony; and that the same is a true

7  and correct transcription of my said testimony

8  except as corrected pursuant to my rights under

9  Rule 30(e) of the Federal Rules of Civil

10  Procedure.

11

12                   _____

13                            Signature

14                   _____

15                            Date

16

17

18

19

20

21

22

23

24

25

572

DEPOSITION OF RAUL VARGAS - 05/25/2020

```
 1    STATE OF CALIFORNIA      )
                               )
 2    COUNTY OF SAN FRANCISCO  )

 3         I, CINDY TUGAW, a Certified Shorthand Reporter

 4    of the State of California, duly authorized to

 5    administer oaths pursuant to Section 8211 of the

 6    California Code of Civil Procedure, do hereby certify

 7    that

 8                    RAUL VARGAS,

 9    the witness in the foregoing deposition, was by me duly

10    sworn to testify the truth, the whole truth and nothing

11    but the truth in the within-entitled cause; that said

12    testimony of said witness was reported by me, a

13    disinterested person, and was thereafter transcribed

14    under my direction into typewriting and is a true and

15    correct transcription of said proceedings.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    caption.

21         Dated the 10th day of September, 2020.

22

23

24
                    CINDY TUGAW
25                  CSR No. 4805 (California)
```

573

DEPOSITION OF RAUL VARGAS - 08/25/2020

```
1    Raul Vargas
     c/o Foley & Lardner
2    555 California Street, Suite 1700
     San Francisco, CA 94104
3    Attn:  Jason Y. Wu, Esq.

4    Date:  September 10, 2020
     Re:  Navarro vs. Menzies
5    Deposition Date:  Tuesday, August 25, 2020

6    Dear Mr. Vargas,

7         Please be advised the original transcript of
     your deposition is ready for your review.
8         Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
9    necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
10   or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
11   substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
12   or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
13   deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
14   sealed and sent to the examining attorney pursuant to
     the applicable law.
15        You may either come to our office to read and
     sign the original transcript, or you may contact your
16   attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
17   copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
18   the attached form.  If you choose to review your
     transcript at our office, please call first to make an
19   appointment.  Should you have any question regarding
     these instructions, please call.
20
     Sincerely,
21


22
     NOGARA REPORTING SERVICE
23   5 Third Street, Suite 415
     San Francisco, California 94103
24   (415) 398-1889

25   cc:  All counsel, original deposition
```

<< NOGARA REPORTING SERVICE >>                     79

574