No. 21-15355

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### RENALDO NAVARRO,

**Plaintiff-Appellant,**

**vs.**

### MENZIES AVIATION, INC., d/b/a Menzies,
### Defendant-Appellee.

Appeal from a Decision of the United States District Court for the Northern District of California, Case No. 3:19-cv-08157-VC The Honorable Vince Chhabria, District Judge

---

### SUPPLEMENTAL EXCERPTS OF RECORD

---

Christopher G. Ward
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3500
Los Angeles, California 90071-2421
(213) 972-4500

*Attorneys for Defendant-Appellee MENZIES AVIATION, INC., DBA Menzies*

### Oral Argument Requested

# INDEX OF RECORDS

| DATE | DESCRIPTION | DKT. NO. | PAGE NUMBER |
|---|---|---|---|
| 12/16/19 | Defendant Menzies Aviation, Inc.'s Notice of Removal Action Under U.S.C. § 1332 (Diversity of Citizenship) | 1 | 5 |
| 03/17/20 | Excerpt of Production of Plaintiff's Initial Disclosures, Documents Bates Labeled RenaldoNavarro 000001-3; RenaldoNavarro 000012 | - | 11 |
| 07/14/20 | Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One | - | 15 |
| 10/15/20 | Defendant Menzies Aviation, Inc.'s Notice of Motion and Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment | 28 | 21 |
| 11/02/20 | Plaintiff's Opposition to Defendant Menzies Aviation Inc.'s Motion for Summary Judgement | 31 | 46 |
| 11/05/20 | Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, and Evidentiary Objections to Plaintiff's Evidence | 34 | 78 |
| 11/05/20 | Exhibit 45 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>Supplemental Declaration of Christopher Ward | 48-1 | 96 |

| DATE | DESCRIPTION | DKT. NO. | PAGE NUMBER |
|---|---|---|---|
| 11/19/20 | Exhibit 46 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Plaintiff's Initial Disclosures Pursuant to Federal Rule of Civil Procedure 26(a)(1) | 48-2 | 101 |
| 11/19/20 | Exhibit 47 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Volume I of Deposition Transcript of John Qually | 48-3 | 105 |
| 11/19/20 | Exhibit 48 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Volume II of Deposition Transcript of John Qually | 48-4 | 115 |
| 11/19/20 | Exhibit 49 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Deposition Transcript of Tracy Aguilera | 48-5 | 124 |
| 11/19/20 | Exhibit 50 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Deposition Transcript of Raul Vargas | 48-6 | 141 |
| 11/19/20 | Exhibit 51 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Deposition Transcript of Andrew Dodge | 48-7 | 163 |

| DATE | DESCRIPTION | DKT. NO. | PAGE NUMBER |
|---|---|---|---|
| 11/19/20 | Exhibit 52 to Defendant Menzies Aviation, Inc.'s Reply Brief In Support of its Motion for Summary Judgment<br>    Deposition Transcript of Randall Davies | 48-8 | 180 |
| 01/07/21 | Order for Supplemental Briefing | 56 | 185 |
| - | Court of Appeals Docket # 21-15355 United States Court of Appeals for the Ninth Circuit | - | 187 |
| 01/14/21 | Defendant Menzies Aviation, Inc.'s Supplemental Brief in Support of its Motion for Summary Judgment and in Response to Court's Order for Supplemental Briefing | 58 | 189 |
| 01/22/21 | Plaintiff's Supplemental Brief in Support of His Opposition to Defendant Menzies Aviation Inc.'s Motion for Summary Judgment | 60 | 204 |

CHRISTOPHER WARD, CA Bar No. 238777
  cward@foley.com
ARCHANA A. MANWANI, CA Bar No. 272989
  amanwani@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:   213.486.0065

SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
  sabarbanel@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                    Defendants. | Case No. 3:19-cv-8157<br><br>**DEFENDANT MENZIES AVIATION, INC.'S NOTICE OF REMOVAL OF ACTION UNDER U.S.C. § 1332 (DIVERSITY OF CITIZENSHIP)**<br><br>Filed concurrently with:<br>  (i)   Declaration of Christopher Ward,<br>  (ii)  Certification of Interested Entities and Parties<br>  (iii) Civil Case Cover Sheet<br><br>State Court Action Filed:  10/23/19<br><br>Action Removed:  December 16, 2019 |

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA:**

**PLEASE TAKE NOTICE** that Defendant Menzies Aviation, Inc. ("Menzies"), pursuant to 28 U.S.C. § 1332, hereby invokes this Court's jurisdiction and removes the above-captioned case, pending in Superior Court for the State of California, County of San Francisco (the "Superior Court"), Case No. CGC-19-580227, to the United States District Court for the Northern District of California, on the following grounds:

## I.    RELEVANT PROCEDURAL HISTORY

1.    Plaintiff Renaldo Navarro ("Plaintiff") commenced this Action on or about October 23, 2019 by filing a Complaint in the Superior Court for the State of California, County of San Francisco, entitled *Renaldo Navarro v. Menzies Aviation, Inc., doing business as Menzies and Does 1 through 10, inclusive*, Case No. CGC-19-580227 (the "Action").

2.    Plaintiff served Menzies on November 20, 2019 via personal service. [Declaration of Christopher Ward ("Ward Decl.") at ¶ 4.] A true and correct copy of the Summons, Complaint and all other process and pleadings in this matter are attached as Exhibit A ("Ex. A") to the Ward Declaration and incorporated herein by reference.

3.    Plaintiff's Complaint alleges causes of action accruing in the State of California for discrimination and retaliation under the California Fair Employment and Housing Act, wrongful termination in violation of public policy, and intentional infliction of emotional distress.

## II.    COMPLETE DIVERSITY EXISTS

4.    Plaintiff states in his Complaint that he "worked for Defendants [sic] at 1601 Old Bayshore Hwy, Burlingame." [Ward Decl., Ex. A (Complaint) at ¶ 8.] A review of Plaintiff's employment documents shows that at the time of his employment with Menzies, Plaintiff was residing in San Mateo County, California. [Ward Decl. at ¶ 7.] For purposes of assessing diversity jurisdiction, Plaintiff is a citizen of the State of California. *See Kantor v. Wellesley Galleries, Ltd.*, 704 f. 2d. 1088, 1090 (9th Cir. 1983) (holding that for diversity purposes, a person is a citizen of the state in which he is domiciled).

5.    Plaintiff admits that Menzies is a Delaware corporation. [Ward Decl., Ex. A (Complaint)

at ¶ 2.]  Menzies is headquartered in Fort Worth, Texas.  [Ward Decl. at ¶ 2.]  For the purposes of diversity of citizenship, Menzies is a citizen of both Delaware and Texas. 28 U.S.C. § 1332(c)(1) (for purposes of diversity of citizenship, a corporation is a citizen of every state or foreign country where it is incorporated and where it has its principal place of business); *Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010) (holding principal place of business for purposes of citizenship "refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities").

6.     Because Plaintiff is a citizen of California and Menzies is a citizen of Delaware and Texas, complete diversity of Citizenship exists in this matter and there are no non-diverse defendants that would preclude jurisdiction pursuant to 28 U.S.C. § 1441(b).

## III.     <u>THE AMOUNT IN CONTROVERSY REQUIREMENT IS SATISFIED</u>

7.     "A defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). If the plaintiff subsequently contests or challenges the amount in controversy, only then is the defendant is required to show by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional threshold.  *Id*. at 87-89.

8.     While Menzies denies the allegations in Plaintiff's Complaint, both specifically and generally, including denying that Plaintiff actually suffered or will be entitled to any damages, from the face of the Complaint, the amount in controversy in this action exceeds $75,000.00, exclusive of interests and costs.

9.     Plaintiff alleges that he was discriminated against, retaliated against and wrongfully terminated, and was subject to intentional infliction of emotional distress.  [*See generally* Ward Decl., Ex. A (Complaint).]  He seeks compensatory, consequential, statutory, emotional distress, and punitive damages for these claims.  [*Id.*]

10.     The aggregate of these alleged damages and attorney's fees will far exceed $75,000.00. Specifically:

a.     Plaintiff alleges he is owed lost wages and earnings under his claims of discrimination, retaliation, and wrongful termination.  During the time that he was working for Menzies, Plaintiff earned wages of $23.16 per hour for regular full-time hours (and $34.74 per hour for overtime

hours). [Ward Decl. at ¶ 8.] Plaintiff alleges his employment with Menzies ended in August 2018 and that he typically worked eight-hour shifts, five days a week [Ward Decl., Ex. A (Complaint) at ¶¶ 13, 16-17], such that his claim for lost straight time wages alone, as of the date of removal, exclusive of any interest or expected overtime hours, amounts to approximately $59,000. [Ward Decl. at ¶ 8.] Additionally, a review of Plaintiff's records shows that over the year prior to Plaintiff's employment with Menzies ended, he worked on average approximately 20-25 hours of overtime per pay period. [*Id.*] A reasonable estimate of Plaintiff's overtime wages in this period, exclusive of any interest is approximately $24,000, making Plaintiff's actual claim for lost wages, as of the time of this removal, approximately **$83,000**. [*Id.*] Assuming a trial date sometime in December 2020, an estimate of Plaintiff's claim for lost wages alone, from the date of his alleged termination through the time of trial, amounts to approximately **$150,750.80** [*Id.*]

b. Plaintiff alleges that the conduct of Menzies caused him "intangible loss of such employment-related opportunities such as experience in the positions held and sought by Plaintiff, and additional amounts of money Plaintiff would have received if Plaintiff had been properly promoted, received proper wage increases, and increased hours of work." [*See e.g.* Ward Decl., Ex. A (Complaint) at ¶ 47.] The amount of such demands are unknown, but would further increase the estimates set forth above.

c. Plaintiff also alleges that the conduct of Menzies caused him to suffer "great mental pain, embarrassment, humiliation, distress, anguish and suffering…." [See e.g. Ward Decl., Ex. A (Complaint) at ¶ 63.] The amount of such emotional distress damages are unknown, but based on Plaintiff's allegations, such damages are not nominal in character.

d. Plaintiff also seeks punitive damages, which California courts have indicated, conservatively, may be two to three times the amount of compensatory damages. *See e.g. Bankhead v. ArvinMeritor, Inc.*, 205 Cal. App. 4th 68 (2012) (approving $4.5 million in punitive damages following a $1.85 award for compensatory damages); *Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC*, 205 Cal. App. 4th 999 (2012) (approving $2.4 million in punitive damages following a jury award of $804,000 in compensatory damages). Applying a conservative 2:1 ratio, Plaintiff's claim for punitive damages, based on his claim for lost and future wages alone, amounts to approximately $301,501.60

($150,750.80 x 2).

        e.     Based on such broad allegations and demands for damages, it is reasonable to estimate that the amount in controversy far exceeds $75,000.00. In fact, the total amount estimated herein, which excludes interest, attorneys' fees and costs, any damages related to Plaintiff's claims for pain and suffering, is **$452,252.40** (150,750.80 + 301,501.60).

## IV.    THIS NOTICE OF REMOVAL IS TIMELY

11.    This Notice of Removal is being filed within thirty (30) days after Plaintiff served Defendant with the Complaint on November 20, 2019. This removal is also made within one year of Plaintiff's filing his Complaint. Therefore, this Notice is timely filed under 28 U.S.C. § 1446(b) and (c).

## V.    CONCLUSION

12.    Because Plaintiff and Menzies are citizens of different states and the amount in controversy is greater than $75,000.00, this Court has original jurisdiction over all causes of action alleged in this matter pursuant to the provisions of 28 U.S.C. § 1332 and the entire action may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1441.

13.    Menzies believes that the documents contained in Exhibit A to the Ward Declaration comprise the complete record of filings made in the San Francisco County Superior Court.

14.    Pursuant to 28 U.S.C. § 1446(d), Menzies is filing written notice of this removal with the clerk of the Superior Court for the State of California, San Francisco County. Copies of the Notice of Removal are also being served on Plaintiff's counsel pursuant to 28 U.S.C. § 1446(d).

15.    This Notice of Removal is filed subject to and with full reservation of rights, including but not limited to, defenses and objections to venue, improper service of process, and personal jurisdiction. No admission of fact, law or liability is intended by this Notice of Removal, and all defenses, motions and pleas are expressly reserved.

    WHEREFORE, Defendant Menzies Aviation, Inc. pray that the Action be removed from the Superior Court of the State of California, County of San Francisco to the United States District Court for the Northern District of California, and for such further relief as may be just and proper, and that this Court accept jurisdiction of the Action and henceforth that the Action be placed on the docket of this Court for further proceedings, the same as though the Action had originally been instituted in this

Court.

DATED:  December 16, 2019        **FOLEY & LARDNER LLP**
                                      Christopher Ward
                                      Archana A. Manwani
                                      Sara Alexis Levine Abarbanel


                                      */s/ Christopher Ward*
                                      CHRISTOPHER WARD
                                      Attorneys for Defendant MENZIES AVIATION, INC.

Some people working in Mensis as a fueller on 130 sides have always complained to Andrew. They often call him but he does not reply to the cellphone. if there is a problem. we keep calling him and he is sleeping. so everyone is reporting to me and there is one hour of them looking at andrew he is asleep as to why the fueller took a picture of him and send it to me.if andrews hours of duty they always have a delay and the fueller ask him about the airline complain that they always ask who is the supervisor. The fueller said it's Andrew and they just shaking their head and they said thats why its delay again.if the fueller tell Andrew he said dont worry about it. I'm just wondering why you suspended me because of helping the people and my concern in this company .If this is the benefits for the sake of my concern .I will not intervene again just do and focus my job

We the fuelers on Menzies 130 side would like to make a petition against Andrew Dodge.the way he supervised his very unprofessional.when he run the operation or supervised people are not taken their breaks it's because the way he set up the flights.and he always blaming the people if there's a delay or always saying lock of man power and trucks issues.the truth is he doesn't know how to run the show.we also addressed the problem to the higher position managers (Nicco.John.Renil)as usuals nothing happened looks like they always covering his mistakes.or maybe these managers don't know anything about fueling also like Andrew Dodge lock of experience about fueling.we think this is the right time to broadcast the problem in this Company.we're hoping this problem will be resolved.



## MENZIES AVIATION

### MISSED PUNCH FORM (MPF)

This form needs to be completed when the Time & Attendance system does not accurately indicate the length of time you are to be paid. Missed punches are when you did not punch in/out or the scanner malfunctions.

This form will not be processed if any of the following required information is missing:
1. Your name AND clock #
2. The date of the missed punch
3. The clock in/out and/or break start/end not recorded
4. Reason why you did not punch in/out
5. Your signature and the date you signed
6. Your (Duty) Manager's name and the date he/she signed

After filling in all the required fields, hand the form to your (Duty) Manager.

Employee Clock # (!!!): 704584
Employee name: Andrew Dodge
Date not recorded: 08 / 18 / 18

USE MILITARY TIMES

Clock-in not recorded: 12 : 00
Break-start not recorded: _____
Break-end not recorded: _____
Clock-out not recorded: 01 : 00

| US Time | Military Time | US Time | Military Time |
|---|---|---|---|
| 12 AM | 0 | 12 PM | 12 |
| 1 AM | 1 | 1 PM | 13 |
| 2 AM | 2 | 2 PM | 14 |
| 3 AM | 3 | 3 PM | 15 |
| 4 AM | 4 | 4 PM | 16 |
| 5 AM | 5 | 5 PM | 17 |
| 6 AM | 6 | 6 PM | 18 |
| 7 AM | 7 | 7 PM | 19 |
| 8 AM | 8 | 8 PM | 20 |
| 9 AM | 9 | 9 PM | 21 |
| 10 AM | 10 | 10 PM | 22 |
| 11 AM | 11 | 11 PM | 23 |

PRINT CLEARLY

Reason (please check one):
☒ Time Restriction   ☐ Employee Forgot   ☐ Other: _____
☐ **Authorized Meal Penalty**

(Duty) Manager Signature: _____

**Operational requirements necessitated a change, with management approval, to the above noted employee's scheduled meal period, which caused the employees meal period to begin after the end of the fifth hour of work/tenth hour of work (in the case of a second meal period). The employee's meal period was then taken as soon as operational circumstances allowed**

Employee Signature: _____   Date: 8-18-18

The (Duty) Manager will determine if the missed punch is excused or unexcused. The determination of whether a missed punch is excused or unexcused will not affect the employee's pay, and the employee will be paid for all hours worked, including all hours worked on a date of a missed punch. Both employee and (Duty) Manager are required to sign the form.

⬇ This section to be completed by your (Duty) Manager ⬇

(Duty) Manager Name and Signature: _____

Date: 8/23/18   Excused: (Yes) No

### EXCELLENCE FROM TOUCHDOWN TO TAKEOFF 

RenaldoNavarro 000003

13

9:48 AM



Mark >

Thu, Nov 8, 4:23 PM

Text Message
Today 22:33

What time you coming?

I'm here sorry I was sleeping in
my car

Date 11-7-18

Delivered

yes

iMessage

Arlo Garcia Uriarte, SBN 231764
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for Plaintiff
**RENALDO NAVARRO**

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO, | Case No.: 3:19-CV-08157-VC |
| Plaintiff, | **PLAINTIFF RENALDO NAVARRO'S INTERROGATORIES TO DEFENDANT MENZIES AVIATION, INC., SET ONE** |
| v. | |
| MENZIES AVIATION INC., doing business as MENZIES and DOES 1 through 10, inclusive, | |
| Defendants. | |

PROPOUNDING PARTY:    Plaintiff RENALDO NAVARRO

RESPONDING PARTY:    Defendant MENZIES AVIATION, INC.

SET NO.:    ONE

Plaintiff Renaldo Navarro hereby requests that Defendant Menzies Aviation, Inc. respond to each of the following interrogatories set forth below under oath and within thirty (30) days of service, pursuant to Rule 33 of the Federal Rules of Civil Procedure.

///

///

///

///

///

_Navarro v. Menzies Aviation, Inc., Case No. 3:19-CV-08157-VC_
_Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One_

15    1

# INTERROGATORIES

**INTERROGATORY NO. 1.**

State all of PLAINTIFF's job titles during his employment with YOU.

(As used in this Interrogatory, the following words, when used in all capitals, shall have the following meanings:

"PLAINTIFF" shall refer to Plaintiff Renaldo Navarro.

"YOU" and "YOUR" refer to Defendant Menzies Aviation, Inc., and/or to any of its past or present officers, directors, employees and/or agents, and/or all of its divisions, subsidiaries, affiliated or related or predecessor companies.)

**INTERROGATORY NO. 2.**

State all of PLAINTIFF's job duties during the RELEVANT PERIOD.

(As used in this Interrogatory, the following word, when used in all capitals, shall have the following meaning:

"RELEVANT PERIOD" shall refer to the past five (5) years until PLAINTIFF's termination of employment in or around August 29, 2018.)

**INTERROGATORY NO. 3.**

IDENTIFY PLAINTIFF's supervisors during the RELEVANT PERIOD.

(As used in this Interrogatory, the following word, when used in all capitals, shall have the following meaning:

"IDENTIFY," when used in reference to a natural PERSON, shall mean to state such person's full name, last-known home and business address, last-known business affiliation, employer, and position therewith, and the latest date that such information was true, to YOUR knowledge; when used in reference to a business, firm, partnership, joint venture, company or corporation, shall mean to state, to the extent known, its full name, state of incorporation or creation, address of its principal place of business, and its principal activities or products; when referring to a lawsuit or other legal proceeding, shall mean to state the court of jurisdiction, venue, case number, case title, attorneys of record, and filing date; when used in reference to DOCUMENTS , shall mean to describe specifically the document, including a description of its

_Navarro v. Menzies Aviation, Inc., Case No.  3:19-CV-08157-VC_
_Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One_

16    2

type (e.g., letter, memorandum, telegram, chart, etc.), and to state its date, author, addressee, title, file identification number or symbol, and to identify the present location and the name and address of the present custodian of such document. If any such DOCUMENTS is no longer in YOUR possession or subject to YOUR control, state what disposition was made of it and the date of such disposition, identifying the PERSON having knowledge of its content.)

**INTERROGATORY NO. 4.**

IDENTIFY YOUR supervisors who worked the swing shifts before PLAINTIFF's shift during the RELEVANT PERIOD.

**INTERROGATORY NO. 5.**

State the job duties of YOUR supervisors who worked the swing shifts before PLAINTIFF's shift during the RELEVANT PERIOD.

**INTERROGATORY NO. 6.**

State YOUR policy on DISCIPLINARY ACTIONS during the RELEVANT PERIOD whenever YOUR swing supervisors did not perform their respective job duties.

"DISCIPLINARY ACTIONS" shall mean any form of warnings, reprimands or suspensions related to non-compliance with the employer's company policies, and work-related performance that fails to satisfactorily meet job requirements as set forth in the relevant job description, work action plan, or as directed by an employee's supervisor.)

**INTERROGATORY NO. 7.**

State DODGE's tasks in a WORKDAY during the RELEVANT PERIOD.

(As used in this Interrogatory, the following words, when used in all capitals, shall have the following meanings:

"DODGE" shall refer to YOUR employee, Andrew Dodge.)

**INTERROGATORY NO. 8.**

State all complaints that PLAINTIFF made to YOU regarding DODGE during the RELEVANT PERIOD.

**INTERROGATORY NO. 9.**

IDENTIFY all PERSONS who have knowledge of the complaints that PLAINTIFF

*Navarro v. Menzies Aviation, Inc., Case No. 3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

<u>17</u>  3

1  made to YOU regarding DODGE during the RELEVANT PERIOD.

2  (As used in this Interrogatory, the following word, when used in all capitals, shall have

3  the following meaning:

4  "PERSON(S)" means any natural person, together with all federal, state, county,

5  municipal and other government units, agencies or public bodies, as well as firms, companies,

6  corporations, partnerships, proprietorships, joint ventures, organizations, groups of natural

7  persons or other associations or entities separately identifiable whether or not such associations

8  or entities have a separate legal existence in their own right.)

9  **INTERROGATORY NO. 10.**

10  State all facts regarding each INVESTIGATION related to PLAINTIFF's complaints to

11  YOU regarding DODGE's work during the RELEVANT PERIOD.

12  (As used in this Interrogatory, the following word, when used in all capitals, shall have

13  the following meaning:

14  "INVESTIGATION" shall mean to include the facts relating to the receipt/intake of

15  complaints by any of YOUR employees, YOUR efforts to investigate the complaints, any

16  findings or determination made by YOU with respect to the complaints and actions taken by

17  YOU in response to YOUR findings or determinations.)

18  **INTERROGATORY NO. 11.**

19  IDENTIFY all PERSONS who have knowledge of the facts regarding each

20  INVESTIGATION related to PLAINTIFF's complaints to YOU regarding DODGE's work

21  during the RELEVANT PERIOD.

22  **INTERROGATORY NO. 12.**

23  State all complaints made to YOU by any of your present or former employees about

24  DODGE's work during the RELEVANT PERIOD.

25  **INTERROGATORY NO. 13.**

26  IDENTIFY all PERSONS who have knowledge of the complaints made to YOU by any

27  of your present or former employees about DODGE's work during the RELEVANT PERIOD.

28  //

*Navarro v. Menzies Aviation, Inc., Case No. 3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

18   4

**INTERROGATORY NO. 14.**

State all facts regarding each INVESTIGATION YOU conducted related to the complaints made to YOU by any of your present or former employees about DODGE's work during the RELEVANT PERIOD.

**INTERROGATORY NO. 15.**

IDENTIFY all PERSONS who have knowledge of the facts regarding each INVESTIGATION YOU conducted related to the complaints made to YOU by any of your present or former employees about DODGE's work.

**INTERROGATORY NO. 16.**

State all DISCIPLINARY ACTIONS taken by YOU against DODGE during his employment with YOU.

**INTERROGATORY NO. 17.**

Describe YOUR Code of Conduct that applied to PLAINTIFF during the RELEVANT PERIOD.

**INTERROGATORY NO. 18.**

State YOUR policy on imposing DISCIPLINARY ACTIONS on YOUR employees for signing a petition to make a complaint during the RELEVANT PERIOD.

**INTERROGATORY NO. 19.**

State YOUR policy on suspension of employment during the RELEVANT PERIOD.

**INTERROGATORY NO. 20.**

State YOUR basis for suspending PLAINTIFF's employment in or around August 23, 2018.

**INTERROGATORY NO. 21.**

IDENTIFY all individuals involved in the determination to suspend PLAINTIFF.

**INTERROGATORY NO. 22.**

State YOUR policy on termination of employment during the RELEVANT PERIOD.

**INTERROGATORY NO. 23.**

IDENTIFY all individuals involved in the determination to terminate PLAINTIFF.

*Navarro v. Menzies Aviation, Inc., Case No. 3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

19    5

**INTERROGATORY NO. 24.**

State the specific violation in the Code of Conduct that was YOUR reason for terminating PLAINTIFF's employment.

**INTERROGATORY NO. 25.**

List all DOCUMENTS related to PLAINTIFF that YOU DESTROYED.

(As used in this Interrogatory, the following word, when used in all capitals, shall have the following meaning:

"DESTROYED" shall mean an act that renders the subject useless for its intended purpose, though it does not literally demolish or annihilate it, which includes cancellation, obliterating, shredding, burning, and tearing into fragments; deletion of data stored on tapes, hard disks and other forms of electronic media.)


Dated: July 14, 2020                    LIBERATION LAW GROUP, P.C.



By: _____
        Arlo Garcia Uriarte
        Attorneys for Plaintiff

*Navarro v. Menzies Aviation, Inc., Case No.  3:19-CV-08157-VC*
*Plaintiff Renaldo Navarro's Interrogatories to Defendant Menzies Aviation, Inc., Set One*

20     6

CHRISTOPHER WARD, CA Bar No. 238777
  cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:  213.486.0065

JASON WU, CA Bar No. 313368
  jwu@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:  415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro,<br><br>                                   Plaintiff,<br><br>        vs.<br><br>Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                                   Defendants. | Case No. 3:19-cv-8157<br><br>**DEFENDANT MENZIES AVIATION, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Filed concurrently with:<br>    (i)    Appendix of Supporting Evidence, and<br>    (ii)   Proposed Order<br><br>DATE:   November 19, 2020<br>TIME:   10:00 a.m.<br>PLACE: Videoconference<br><br>State Court Action Filed:  10/23/19<br><br>Action Removed:  December 16, 2019 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 19, 2020 at 10:00 a.m., or as soon thereafter as counsel may be heard via videoconference hearing hosted by the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Menzies Aviation, Inc. ("Menzies") will and hereby does move this Court for an order granting summary judgment as to all causes of action alleged in Plaintiff Renaldo Navarro's Complaint, or in the alternative, partial summary judgment. This Motion is made upon the grounds that:

1.      Plaintiff's first cause of action alleging race and national origin discrimination fails because Plaintiff cannot state a *prima facie* claim of discrimination based on anything other than speculation, he cannot create a genuine issue of material fact with respect to Menzies' honest and good-faith belief that Plaintiff engaged in misconduct amounting to harassment of subordinate employees, and he cannot carry his burden to show by substantial evidence that Menzies' articulated reasons were pretext for unlawful discrimination;

2.      Plaintiff's second cause of action alleging retaliation fails because he cannot state a *prima facie* claim of retaliation where his alleged protected activity was in fact illegal activity under federal labor law, he cannot create a genuine issue of material fact with respect to Menzies' honest and good-faith belief that he engaged in misconduct, and he cannot carry his burden to show by substantial evidence that Menzies' articulated reasons were pretext for unlawful retaliation;

3.      Plaintiff's third cause of action alleging wrongful termination in violation of public policy fails because the claim is duplicative and derivative of his statutory discrimination and retaliation causes of action, such that the failure of the first two causes of action renders his wrongful termination in violation of public policy claim deficient as a matter of law; and

4.      Plaintiff's fourth cause of action alleging intentional infliction of emotional distress fails because he alleges nothing more than garden variety employment termination claims which fall within the preemptive sweep of California's Workers' Compensation Act.

This Motion is based upon this Notice, the attached Memorandum of Points and Authorities, Menzies' Appendix of Supporting Evidence and the exhibits thereto, the records and pleadings on file herein, all of which the Court is requested to take judicial notice thereof, and upon such oral or

MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No. 15-CV-02392-WHO

-1-

documentary evidence as may be presented at the time of hearing thereon.

DATED:  October 15, 2020

**FOLEY & LARDNER LLP**
Christopher Ward
Jason Wu


_____/s/ Christopher Ward_____
CHRISTOPHER WARD
Attorneys for Defendant MENZIES AVIATION, INC.

4838-6278-0877.4

**ISSUES TO BE DECIDED PER CIVIL LOCAL RULE 7-4(a)(3)**

1.      Can Plaintiff Renaldo Navarro state a *prima facie* claim of race and/or national origin discrimination where he has admitted he has no tangible evidence that any unlawful motive attended the challenged actions of Menzies Aviation and he can only speculate that his race or national origin must have played some role in those actions?

2.      Can Plaintiff survive summary judgment on his national origin and discrimination claims when he cannot create a genuine issue of material fact as to whether Menzies received information supporting an honest and good-faith belief that he abused his authority as a supervisor and therefore harassed subordinate employees?

3.      Can Plaintiff survive summary judgment on his national origin and discrimination claims by carrying his burden to establish, through substantial evidence, pretext when he admits he has no tangible evidence that Menzies' stated reasons for its actions were pretext for a discriminatory motive and he cannot advance a similarly situated comparison of circumstances supporting a non-speculative assertion of pretext?

4.      Can Plaintiff satisfy his obligation to state a *prima facie* claim of retaliation where the activity he claims was protected was in fact a violation of federal labor law and therefore does not constitute protected activity?

5.      Can Plaintiff survive summary judgment on his retaliation claim when he cannot create a genuine issue of material fact as to whether Menzies received information supporting an honest and good-faith belief that he abused his authority as a supervisor and therefore harassed subordinate employees?

6.      Can Plaintiff survive summary judgment on his retaliation claim by carrying his burden to establish, through substantial evidence, pretext when he admits he has no tangible evidence that Menzies' stated reasons for its actions were pretext for a retaliatory motive and he cannot advance a similarly situated comparison of circumstances supporting a non-speculative assertion of pretext?

7.      Can Plaintiff maintain a valid claim of wrongful termination in violation of public policy where such claim is derivative and duplicative of his statutory discrimination and retaliation claims such that the failure of those statutory claims renders his wrongful termination claim legally deficient?

8. Can Plaintiff maintain a valid claim of intentional infliction of emotional distress when his allegations only amount to the type of garden variety termination-of-employment circumstances that fall within the preemptive sweep of the California Workers' Compensation Act?

4838-6278-0877.4

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.      INTRODUCTION ........................................................................................................ 1

II.     FACTUAL SUMMARY ............................................................................................. 1

        A.      PLAINTIFF UNDERSTOOD THE IMPORTANCE OF SUPERVISORS
                FOLLOWING COMPANY POLICY AND SUPPORTING OTHER
                LEADERSHIP BY NOT UNDERMINING THEIR AUTHORITY ............................ 1

        B.      AFTER MENZIES ACQUIRED ASIG, PLAINTIFF BECAME SUBJECT TO
                MENZIES' CONDUCT POLICIES PROHIBITING HARASSMENT AND
                INTIMIDATION OF OTHERS ................................................................................ 2

        C.      AFTER PROMOTING ANDREW DODGE, MENZIES COACHED HIM ON
                OPERATIONAL IMPROVEMENTS IN RESPONSE TO COMPLAINTS BY
                PLAINTIFF ............................................................................................................ 3

        D.      PLAINTIFF BUTTED HEADS WITH DODGE ABOUT OPERATIONAL
                ISSUES, RESULTING IN THE UNION COMPLAINING THAT SOMEONE
                WAS PRESSURING FUELERS TO SIGN A PETITION .................................... 4

        E.      AFTER DODGE COMPLAINED ABOUT PLAINTIFF'S ACTIONS TOWARD
                HIM, MENZIES SUSPENDED PLAINTIFF TO ALLOW FOR AN
                INVESTIGATION INTO THE SITUATION ........................................................ 4

        F.      MENZIES' INVESTIGATION GENERATED MULTIPLE SOURCES OF
                INFORMATION SUPPORTING THE CONCLUSION THAT PLAINTIFF
                PRESSURED FUELERS TO SIGN THE PETITION .......................................... 5

        G.      MENZIES TERMINATED PLAINTIFF BASED ON THE INFORMATION
                PROVIDED FOR THE SOLE REASON THAT IT CANNOT ALLOW
                MANAGEMENT TO HARASS SUBORDINATE EMPLOYEES .......................... 6

        H.      FURTHER PETITIONS PARROTED PLAINTIFF'S PETITION ALREADY
                INVESTIGATED BY MENZIES, WITH FUELERS CONTINUING TO
                DISCLAIM MISTREATMENT BY DODGE ...................................................... 7

III.    BECAUSE PLAINTIFF CANNOT CREATE A DISPUTE OF MATERIAL FACT NOR
        SATISFY HIS EVIDENTIARY BURDENS, MENZIES IS ENTITLED TO SUMMARY
        JUDGMENT ON EACH OF PLAINTIFF'S CAUSES OF ACTIONS .................................... 8

4838-6278-0877.4

A. PLAINTIFF'S FIRST CAUSE OF ACTION ALLEGING RACE AND NATIONAL ORIGIN DISCRIMINATION FAILS BECAUSE HE CANNOT STATE A *PRIMA FACIE* CASE NOR MEET HIS PRETEXT BURDEN ...................9

    1. Plaintiff's Mere Belief Of Possible Discrimination Does Not Satisfy His *Prima Facie* Burden And Menzies Had Honest, Good-Faith Reasons For Its Actions .................................................10

    2. Plaintiff's Reliance On Mere Speculation Cannot And Does Not Create A Genuine Dispute That Survives Summary Judgment .....................11

B. PLAINTIFF CAN NEITHER STATE A *PRIMA FACIE* CLAIM OF RETALIATION BECAUSE HE ENGAGED IN NO PROTECTED ACTIVITY NOR MEET HIS PRETEXT BURDEN .......................................................13

C. PLAINTIFF'S DERIVATIVE AND DUPLICATIVE WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY CAUSE OF ACTION FAILS FOR THE SAME REASONS HIS STATUTORY CLAIMS FAIL ................14

D. PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CAUSE OF ACTION IS PREEMPTED AND BARRED BY THE WORKERS' COMPENSATION ACT .......................................................15

IV. CONCLUSION.......................................................................................16

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abiola v. ESA Mgmt., LLC*,
  No. 13-cv-03496-JCS, 2014 U.S. Dist. LEXIS 26918 (N.D. Cal. Mar. 3, 2014)................................15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................................................................8

*Aragon v. Republic Silver State Disposal*,
  292 F.3d 654 (9th Cir. 2002) .......................................................................................................9, 11

*Bracke v. City of L.A.*,
  60 F. App'x 120 (9th Cir. 2003) .......................................................................................................15

*Castelli v. Douglas Aircraft Co.*,
  752 F.2d 1480 (9th Cir. 1985) .........................................................................................................13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...........................................................................................................................8

*Clark v. Amtrust N. Am.*,
  No. 16-cv-05561-MEJ, 2018 U.S. Dist. LEXIS 23624 (N.D. Cal. Feb. 13, 2018) ...........................14

*Cole v. Fair Oaks Fire Prot. Dist.*
  43 Cal. 3d 148 (1987) ......................................................................................................................15

*Collier v. Windsor Fire Prot. Dist. Bd. of Dirs.*,
  No. C 08-2582 PJH, 2011 U.S. Dist. LEXIS 115649 (N.D. Cal. Oct. 6, 2011) ...............................11

*Cucuzza v. City of Santa Clara*,
  104 Cal. App. 4th 1031 (2002) ........................................................................................................10

*Guz v. Bechtel Nat'l, Inc.*,
  24 Cal. 4th 317 (2000) ..................................................................................................................9, 10

*Horn v. Cushman & Wakefield W., Inc.*,
  72 Cal. App. 4th 798 (1999) ..............................................................................................................9

*Incalza v. Fendi N. Am., Inc.*,
  479 F.3d 1005 (9th Cir. 2007) ...........................................................................................................9

*Kodwavi v. Intercontinental Hotels Grp. Res., Inc.*,
  966 F. Supp. 2d 971 (N.D. Cal. 2013) ...........................................................................................9, 11

*Mitri v. Walgreen Co.*,
  No. 1:10-cv-538 AWI SKO, 2011 U.S. Dist. LEXIS 59433 (E.D. Cal. June 3, 2011) .......................14

*Montoya v. Mgmt. Training Corp.*,
  No. 1:10-CV-00451-AWI-MJS, 2011 U.S. Dist. LEXIS 125520 (E.D. Cal. Oct. 27,
  2011) ...................................................................................................................................14

*Morgan v. Regents of Univ. of Cal.*,
  88 Cal. App. 4th 52 (2001) .................................................................................................10

*Mueller v. City. of L.A.*,
  176 Cal. App. 4th 809 (2009) .............................................................................................15

*Nealy v. City of Santa Monica*,
  234 Cal. App. 4th 359 (2015) ........................................................................................9, 10

*Nilsson v. City of Mesa*,
  503 F.3d 947 (9th Cir. 2007) ..............................................................................................13

*Ramirez v. AvalonBay Cmtys., Inc.*,
  2015 U.S. Dist. LEXIS 130475, 2015 WL 5675866 (N.D. Cal. Sept. 26, 2015) ...............14

*Shoemaker v. Myers*,
  52 Cal. 3d 1 (1990) .............................................................................................................16

*Stewart v. Leland Stanford Junior Univ.*,
  No. C 05-04131 JW, 2006 U.S. Dist. LEXIS 20137 (N.D. Cal. Apr. 5, 2006) ..................13

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ..............................................................................................9

**Statutes**

29 U.S.C. § 159 .............................................................................................................................13

Cal. Lab. Code § 3601 ..................................................................................................................15

**Other Authorities**

Fed. R. Civ. P. 56 ......................................................................................................................1, 8

Fed. R. Civ. P. 56(a) ......................................................................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In August 2018, Menzies Aviation received a complaint from the union representing a group of employees that someone was pressuring those unionized workers to sign a petition complaining about a supervisor's manner of running the operation.  Soon thereafter, this complaint grew into information coming from multiple sources that Plaintiff Renaldo Navarro – himself a supervisor and therefore a member of Menzies management – had pressured employees to sign the petition, a conclusion validated by testimony under oath given by Plaintiff's former subordinates.  Based on this information, Menzies reasonably and in good faith concluded Plaintiff had abused his authority and therefore harassed employees and decided to terminate his employment.  Because Plaintiff cannot genuinely dispute any of the *material* facts regarding the information provided to Menzies, none of his claims can survive.

Plaintiff's denials of the misconduct attributed to him and reported to Menzies by multiple sources is of no import, because he cannot and does not dispute Menzies received such information. Unable to dispute the bases for Menzies' good-faith conclusions, Plaintiff's opposition efforts will likely devolve into flailing efforts to compare how Menzies handled the complaints about him to information regarding purely operational concerns raised against another supervisor.  But those two circumstances are not remotely similar in character, and absent any valid, non-speculative evidence – which Plaintiff admits he does not have – he can neither sustain prima facie claims of discrimination, retaliation or wrongful termination nor can he show Menzies' stated reasons for its actions were pretext.  Plaintiff further offers nothing more than standard employment-related facts that do not fall outside the preemptive scope of the California Workers' Compensation Act allowing him to maintain a cause of action for intentional infliction of emotional distress.  Pursuant to Fed. R. Civ. P. 56 then, Menzies is entitled to and requests the Court enter summary judgment in its favor as to all causes of action.

### II.   FACTUAL SUMMARY

#### A.   Plaintiff Understood The Importance Of Supervisors Following Company Policy And Supporting Other Leadership By Not Undermining Their Authority

In September 2005, Plaintiff began working for Aircraft Service International, Inc. ("ASIG") as a

Fueler at San Francisco International Airport ("SFO"). [Exhibit 12, 23:15-25.[1]] A local of the Service Employees International Union (the "Union") represents these SFO Fuelers, and therefore represented Plaintiff until he became a supervisor. [Exhibit 1, ¶ 2.] At the time, BBA Aviation owned ASIG, and during BBA's ownership, ASIG promoted Plaintiff to Fueling Supervisor, giving him additional responsibilities that included working effectively with Fuelers and managing their workload. [Exhibit 1, ¶ 2; Exhibit 12, 25:17-26:10, 27:19-25.] The Supervisor duties also included basic shift oversight of a part of the fueling operation, assigning Fuelers to service flights and when take their breaks, and "maintaining harmony among coworkers and resolving grievances." [Exhibit 18; Exhibit 13, 12:9-14, 16:25-17:11, 19:9-13; Exhibit 17, 13:22-15:1, 17:16-19:22.]

As a supervisor, Plaintiff understood he held a leadership and management role. [Exhibit 12, 28:1-6.] He also affirms that as a supervisor, it was important to: (i) be honest in his communications; (ii) follow and reinforce company policies; (iii) set a positive example for non-supervisors; (iv) support other members of management before rank-and-file employees; (v) work effectively with other supervisors and not undermine their authority; (vi) avoid involving rank-and-file employees in his personal grievances or pressuring them to get involved in disputes; (vii) explain documents before asking employees to sign such materials; and (viii) take responsibility for his errors and mistakes. [Exhibit 12, 28:23-33:1, 34:2-4.]

**B.** **After Menzies Acquired ASIG, Plaintiff Became Subject To Menzies' Conduct Policies Prohibiting Harassment And Intimidation Of Others**

On February 1, 2017, Menzies acquired the ASIG business and all ASIG employees became part of the Menzies enterprise. [Exhibit 1, ¶ 2; Exhibit 12, 23:15-25, 24:17-22, 25:17-19, Exhibit 15, 7:4-15.] In connection with this change, ASIG employees – including Plaintiff – became subject to Menzies policies and conduct standards. [Exhibit 1, ¶ 4; Exhibit 15, 11:18-12:20, 15:23-16:10.] As stated in the Employee Handbook, these expectations included prohibitions against "the use of abusive, malicious, and/or threatening … conduct toward any coworker … that causes or tends to cause a threatening,

---

[1] All evidentiary citations herein refer to the materials in Menzies' Appendix of Supporting Evidence and, where appropriate, to the specific portion of the evidence supporting the fact. In this citation as an example, it refers to Exhibit 12 of the Appendix of Supporting Evidence, which are the excerpts of the transcript from Plaintiff's deposition, page 23, lines 15 to 25 of that transcript.

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-8157

hostile or intimidating work environment." [Exhibit 19.] In a separate Code of Conduct document, Menzies also explains that "We all have a right to work free from intimidation and harassment and in an environment where we feel safe and comfortable." [Exhibit 20.] It further states that "We expect all employees to treat each other with courtesy, dignity and respect." [*Id.*]

## C. After Promoting Andrew Dodge, Menzies Coached Him On Operational Improvements In Response To Complaints By Plaintiff

In February 2016, ASIG hired Andrew Dodge as a Fueler. [Exhibit 17, 12:19-13: 9.] Dodge describes himself as "a Class A Fueler" who earned a promotion to supervisor about a year later. [Exhibit 17, 13:2-12, 38:13-39:1.] However, after becoming supervisor, Dodge had growth opportunities that resulted in him fielding questions about when Fuelers would receive breaks. [Exhibit 17, 39:2-14.] And while some Fuelers had concerns with Dodge's operations-management abilities, the only complaints Menzies received about Dodge came either from Plaintiff, with pictures of Dodge purportedly asleep on the job, or merely relating to Fuelers missing meal and rest breaks. [Exhibit 8, ¶¶ 2-4; Exhibit 9, ¶¶ 2-4; Exhibit 13, 24:20-25:25; Exhibit 14, 42:17-43:2, 54:15-25, Exhibit 15, 38:18-39:9; Exhibit 16, 31:12-16, 73:16-74:14.]

Menzies took action in response, which included Dodge managers' speaking to him about these concerns, performing quality assurance checks, and giving Dodge guidance and direction on how to improve his performance. [Exhibit 13, 25:23-25; Exhibit 14, 51:2-52:17; Exhibit 15, 40:11-25; Exhibit 16, 27:13-28:3, 37:17-38:9, 38:22-39:8; Exhibit 17, 21:11-19, 32:14-33:3, 48:3-20, 49:1-7.] As for Plaintiff's allegations about sleeping on the job, Dodge disclosed to Menzies that he suffers from sleep apnea and often napped after his shift before driving home. [Exhibit 13, 26:16-19; Exhibit 14, 43:23-44:2; Exhibit 17, 20:20-25, 21:11-19, 23:15-21.] Menzies also confirmed that the pictures of Dodge sleeping occurred during off-hours in non-working areas, such that there was no behavioral concern for the instances about which Plaintiff had complained.[2] [Exhibit 14, 44:22-45:23; Exhibit 15, 50:20-52:19; Exhibit 16, 28:24-29:11, 29:25-30:9; Exhibit 17, 26:20-27:15.] However, none of the complaints or other information Menzies received about Dodge included allegations of harassment or mistreatment by

---

[2] If anything, Menzies had an obligation to reasonably accommodate Dodge, and because there was no issue with his sleeping during off-hours, Menzies' handling of Plaintiff's complaints about Dodge's disability was completely appropriate.

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-8157

4838-6278-0877.4

1 Dodge of the Fuelers; rather, they all pertained to operational issues only. [Exhibit 5, ¶ 8; Exhibit 8, ¶¶

2 2-4; Exhibit 9, ¶¶ 2-4; Exhibit 11, ¶¶ 3-6; Exhibit 14, 54:4-21; Exhibit 17, 50:25-51:17.]

**D.** **Plaintiff Butted Heads With Dodge About Operational Issues, Resulting In The**

**Union Complaining That Someone Was Pressuring Fuelers To Sign A Petition**

5 Dodge frequently worked the afternoon "swing" shift before handing off to Plaintiff, who

6 typically worked the graveyard shift. [Exhibit 12, 43:4-13; Exhibit 17, 5:2-4, 13:22-15:1, 28:1-18.]

7 Dodge also sometimes worked the graveyard shift to cover days off or call offs. [Exhibit 17, 28:1-18.]

8 For his part, Dodge described Plaintiff as "a great supervisor." [Exhibit 17, 28: 19-23.]

9 However, Plaintiff felt Dodge was "doing bad things to him" and against other fuelers and complained

10 to Menzies, though such complaints occurred long before the relevant timeframe here. [Exhibit 12,

11 46:16-47:11; 49:15-18; 51:9-17; 28:24-29:15, 30:8-19, 31:21-32:13.] A supervisor colleague who

12 witnessed the friction between the two thought that while both Dodge and Plaintiff behaved childishly in

13 their conflicts, Plaintiff "had it out for Dodge and was regularly taking actions that undermined Dodge."

14 [Exhibit 4, ¶ 6.] Plaintiff admits telling Dodge he was doing a poor job apportioning work, providing

15 Fuelers breaks, and was causing delays. [Exhibit 12, 67:12-17, 68:7-69:4.]

16 Menzies first learned of a petition circulating about Dodge when the Union informed Human

17 Resources Manager Tracy Aguilera that Fuelers were complaining about being forced to sign a petition.

18 [Exhibit 15, 23:24-24:10, Exhibit 16, 11:19-12:3, 13:22-14:6, 15:12-22.] Fuelers were also reporting

19 directly to Dodge that Plaintiff was pressuring them to sign a petition complaining about him. [Exhibit

20 17, 39:15-40:5, 44:17-45:2, 46:12-47:6.]

**E.** **After Dodge Complained About Plaintiff's Actions Toward Him, Menzies**

**Suspended Plaintiff To Allow For An Investigation Into The Situation**

23 On August 16, 2018, Dodge reported to his managers what Fuelers were sharing regarding being

24 forced to sign a petition by Plaintiff. [Exhibit 17, 41:14-20.] To commence an investigation, his

25 managers asked Dodge to summarize his concerns in writing, which Dodge did in his own words

26 detailing how he felt Plaintiff was mistreating him. [Exhibit 21; Exhibit 17, 42:18-23, 44:17-45:2,

27 45:10-21.] Dodge included with his written submission a screen shot of a text message Plaintiff admits

28 authoring appearing to threaten Dodge with a petition. [Exhibit 21; Exhibit 12, 56:22-25, 69:25-70:8.]

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-8157

4838-6278-0877.4

At the time Dodge made this complaint to Menzies, Plaintiff had not yet provided the actual petition to Menzies but later did. [Exhibit 12, 71:4-21.] That petition complained about the way Dodge ran the operation, contending "the people"' were not taking breaks because of the way Dodge sets up flights and that Dodge blamed "the people" for flight delays. [Exhibit 22.] Plaintiff had signed that petition. [Exhibit 22; Exhibit 12, 46:6-7, 52:23-25.]

Menzies commenced an investigation into the entire scenario surrounding the petition, including what Dodge had reported about Fuelers being pressured by Plaintiff to sign it. [Exhibit 15, 24:25-25:17, 28:7-10.] In connection with that investigation, Duty Manager John Qually informed Plaintiff on August 23, 2018 that Menzies was suspending him and attempted to deliver a document memorializing the suspension, which Plaintiff refused to sign. [Exhibit 23; Exhibit 14, 40:1-15, 47:19-48:10.] Plaintiff claims the only reason provided for his suspension was that it was inappropriate for him as a member of management to sign a petition against another member of management. [Exhibit 12, 77:1-8.]

Following that interaction, Qually submitted to Menzies a written statement reporting what he described to have happened during that conversation. [Exhibit 23; Exhibit 14, 46:17-48:10, 48:23-49:8.] In that statement, Qually reported that Plaintiff had said that "As far as the petition he said that all the guys that signed it are all adults and can read what it's all about before signing it and making it sound like they did so of their own free will." [Exhibit 23.] Qually also reported that Plaintiff said he hoped Menzies would terminate him "so he can go to his Lawyer and file a suit against the company for being biased or harassment and get 2 years pay like he did with Swissport."[3] [*Id.*]

**F.     Menzies' Investigation Generated Multiple Sources Of Information Supporting The Conclusion That Plaintiff Pressured Fuelers To Sign The Petition**

After receiving Dodge's complaint and the petition from Plaintiff, Menzies' SFO Director of Operations Raul Vargas directed Safety Supervisor Kevin Blumberg to investigate all the circumstances surrounding the petition and Dodge's report. [Exhibit 16, 14:9-15:11, 16:5-9, 17:12-18, 59:8-21.] As part of his investigation, Blumberg instructed Plaintiff to submit a statement explaining his side of the

---

[3] Plaintiff made legal claims against a previous employer (and Menzies competitor) called Swissport. [Exhibit 12, 14:4-9, 15:5-12.] From that experience, Plaintiff testified that he believes bringing legal claims against an employer following termination makes it likely that he will extract a settlement, including in this case with respect to Menzies. [Exhibit 12, 16:14-19, 17:3-7.]

story, which Plaintiff did.  [Exhibit 24; Exhibit 12, 85:12-86:8, 97:20-22, 98:8-10.]  Nowhere in that statement did Plaintiff contend Dodge harassed other Fuelers; rather, it referred to the same pictures Menzies had determined did *not* show Dodge sleeping on the job.  [Exhibit 24.]  The statement provided by Plaintiff also said "I'm just wondering why you suspended me because of helping *the people*."[4]  [*Id*.]

During the investigation, three employees provided written statements to Menzies describing pressure to sign the petition, with one such petition specifically identifying Plaintiff as the perpetrator.  [Exhibit 25; Exhibit 15, 25:18-23; Exhibit 16, 17:12-22, 21:8-22:10, 52:22-53:21.]  Another supervisor also reported that Plaintiff asked him to sign the petition and specifically told Menzies he felt pressured to do so.[5]  [Exhibit 4, ¶¶ 3-5, 7; Exhibit 16, 57:21-59:5.]  Plaintiff admits he has no factual basis to dispute whether any of this information was provided to Menzies.  [Exhibit 12, 65:17-24.]  In addition, multiple Fuelers confirm under oath that they felt either pressured or misled by Plaintiff to sign the petition, including two individuals who state that Plaintiff approached them multiple times after they refused to sign and they witnessed Plaintiff doing the same to other Fuelers.  [Exhibit 5, ¶¶ 3-5; Exhibit 7, ¶¶ 3-7; Exhibit 6, ¶¶ 3-6; Exhibit 10, ¶¶ 2-5; Exhibit 14, 25:18-23; Exhibit 16, 52:22-53:21.]  Still other Fuelers testify that Plaintiff gave them a signature page to execute without explaining its purpose, adding they would not have signed it had they known it related to a petition against Dodge.  [Exhibit 6, ¶¶ 3-5; Exhibit 10, ¶¶ 2-5; Exhibit 14, 25:18-23; Exhibit 16, 52:22-53:21.]

### G. Menzies Terminated Plaintiff Based On The Information Provided For The Sole Reason That It Cannot Allow Management To Harass Subordinate Employees

As Menzies' investigation was developing this information, Aguilera initially recommended against termination of Plaintiff.  [Exhibit 16, 33:24-34:4, 56:6-16.]  However, in emails both Blumberg and Vargas challenged that recommendation, with Vargas feeling anything short of termination was not proper because of what he viewed as the severity of the conduct involved.  [Exhibit 15, 33:17-35:15; Exhibit 16, 52:1-8, 63:18-64:4.]  After they discussed the full scope of the situation and the investigation

---

[4] While Plaintiff denies authoring the petition, its repeated curious use of "the people" and Plaintiff's later statement admitting he believed he was helping "the people" could certainly support the inference that Plaintiff played some role in the petition's preparation.  [*Compare* Exhibit 22 and Exhibit 24.]

[5] That same supervisor never requested any other employees sign the petition because in his capacity as a supervisor, he believed it would be inappropriate to do so.  [Exhibit 4, ¶ 4.]

findings, Aguilera's opinion changed and she agreed termination was appropriate. [Exhibit 15, 33:17-35:15; Exhibit 16, 52:1-8, 71:10-16, 71:24-73:4.] Vargas, as the decision-maker, then instructed Aguilera to proceed with Plaintiff's termination. [Exhibit 26.]

The sole reason for Vargas's decision was his belief that Plaintiff harassed Fuelers by pressuring at least some of them to sign the petition against Dodge. [Exhibit 26, Exhibit 15, 17:13-18:2, Exhibit 16, 19:8-16, 22:20-23:3, 23:15-24:5.] Though some signed voluntarily, Vargas felt even one situation of a supervisor pressuring rank-and-file employees to be inappropriate, necessitating termination as a corrective measure. [Exhibit 16, 34:18-35:15, 52:22-53:19, 56:22-57:9, 60:23-61:14, 64:17-65:15.] Vargas captured this reasoning clearly in writing, stating that because Menzies had concluded that Plaintiff "as a member of the management team, was soliciting signatures and intimidating Employees to sign a petition … We cannot allow our management team to harass our people in any way." [Exhibit 26.] Aguilera then informed Plaintiff of the decision. [Exhibit 12, 87:2-88:4.] Plaintiff claims the reason she provided is that as a member of management, he should not have signed a petition against another manager. [Exhibit 12, 88:15-23.] Plaintiff admits both that no other reason was given to him, and that he has no tangible evidence – only speculation – that either his race or national origin played any role in the suspension and termination decisions. [Exhibit 12, 88:24-93:23, 94:7-95:7.]

**H.** **Further Petitions Parroted Plaintiff's Petition Already Investigated By Menzies, With Fuelers Continuing To Disclaim Mistreatment By Dodge**

At some point after Plaintiff's termination, Menzies received a second petition regarding Dodge that repeated the claims of the previous petition investigated by Menzies and resulting in Plaintiff's termination. [Exhibit 27.] As with the first petition, the specific allegations focused on operational issues such as delays and missed breaks and contained no allegation of actual harassment by Dodge.[6] [*Compare* Exhibit 22 and Exhibit 27.] Thereafter, Union shop steward Rafael Vargas appears to have prepared a letter noting the previous submission of two petitions involving Dodge, although Menzies has no copy of that letter in any of its own files. [Exhibit 1, ¶ 7; Exhibit 28.] It was this letter – lacking any signatory support or indicia of personal knowledge – that first articulated "harassment" by Dodge, even

---

[6] As with the first petition and Plaintiff's statement following his suspension, the second petition repeatedly referred to "the people" as the purported victims of Dodge's shortcomings. [Exhibit 24.]

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-8157

as it focused on delays and missed breaks. [Exhibit 28.] Vasquez also worked on a different part of the operation from Dodge, raising questions about his personal knowledge. [Exhibit 17, 40:20-41:6.]

While Plaintiff admits this second petition and Vasquez's letter occurred after his termination (such that one could question how he would have such material in his possession), he produced to Menzies these materials and copies of his text messages containing the language of Vasquez's letter, suggesting some continued involvement by Plaintiff in a campaign against Dodge.[7] [Exhibits 28 and 29; Exhibit 12, 102:20-103:6.] Additionally, both the second petition and Vasquez's letter pertain to the same complaints addressed in the first petition which Menzies had already investigated. [Exhibits 27 and 28; Exhibit 15, 42:13-43:2.] And as noted, multiple Fuelers – including those who wanted to sign the petition out of concern for operational problems – disclaim any contention that Dodge engaged in any of the type of harassing, intimidating or other similar behavior that prompted Vargas to terminate Plaintiff's employment. [Exhibit 5, ¶ 8; Exhibit 8, ¶¶ 2-4; Exhibit 9, ¶¶ 2-4; Exhibit 11, ¶¶ 3-6.]

## III. BECAUSE PLAINTIFF CANNOT CREATE A DISPUTE OF MATERIAL FACT NOR SATISFY HIS EVIDENTIARY BURDENS, MENZIES IS ENTITLED TO SUMMARY JUDGMENT ON EACH OF PLAINTIFF'S CAUSES OF ACTIONS

Fed. R. Civ. P. 56 authorizes courts to enter partial summary judgment as to whole causes of action or claims within a cause of action when doing so will isolate and dispose of invalid claims. Fed. R. Civ. P. 56(a). Rule 56 entitles a moving party to summary judgment when the undisputed material facts show that there is no legal merit to a plaintiff's claim or he cannot support a valid claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once a moving party shows it can meet this burden, the opposing party can only withstand summary judgment by going beyond its own pleadings and affidavits and identifying either specific legitimately disputed facts or legal bases creating a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Plaintiff's Complaint advances four causes of action alleging (i) race and national origin discrimination, (ii) retaliation, (iii) wrongful termination in violation of public policy, and (iv)

---

[7] Menzies only learned about these documents when it obtained copies from Plaintiff's production made with his Rule 26(a) Initial Disclosures. [Exhibit 1, ¶ 7; Exhibit 2, ¶ 7.] When asked how Plaintiff had possession of materials not in Menzies' file, Plaintiff responded that "the people" gave the documents to him. [Exhibit 12, 101:23-102:7.]

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
Case No. 3:19-cv-8157

intentional infliction of emotional distress ("IIED"). As to the first three causes of action, all analyzed under the *McDonnell-Douglas* burden shifting approach, the Court should enter summary judgment because Plaintiff cannot set forth valid *prima facie* claims, and even if he could, his self-serving speculation as to Menzies' motives for its actions do not qualify as substantial evidence of pretext necessary to create a dispute of material fact. And as for his IIED cause of action, Plaintiff has advanced nothing more than a garden variety claim challenging the termination of his employment which falls within the preemptive sweep of the California Workers' Compensation Act. Menzies is therefore entitled to summary judgment on each and every cause of action advanced by Plaintiff.

A. **Plaintiff's First Cause Of Action Alleging Race And National Origin Discrimination Fails Because He Cannot State A *Prima Facie* Case Nor Meet His Pretext Burden**

To assert a *prima facie* case of race or national origin discrimination, amongst other things Plaintiff must offer some valid indication that he was performing his job satisfactorily and some other circumstance suggests discriminatory motive. *See Kodwavi v. Intercontinental Hotels Grp. Res., Inc.*, 966 F. Supp. 2d 971, 983 (N.D. Cal. 2013); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 379 (2000); *Nealy v. City of Santa Monica*, 234 Cal. App. 4th 359, 380 (2015). Only if he can do so, Menzies then has a minimal burden to articulate a legitimate, nondiscriminatory reason for the challenged adverse employment action. *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 658 (9th Cir. 2002). Meeting this burden does not require Menzies to prove Plaintiff engaged in misconduct, merely demonstrate that it had a good-faith basis for reaching the conclusions and taking the actions it did. *See Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1013 (9th Cir. 2007) ("Under California law, an employer has good cause to terminate an employee if it has 'fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual'") (*quoting Cotran v. Rollins Hudig Hall Int'l, Inc.*, 17 Cal. 4th 93 (1998); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (noting that courts only require an employer honestly believed its reasons for it actions, even if its reason is foolish or trivial).

Once Menzies articulates a legitimate reason for its actions, Plaintiff can only survive summary judgment by coming forward with substantial evidence that its legitimate reasons were a pretext for unlawful discrimination. *Aragon*, 292 F.3d at 658-59; *Horn v. Cushman & Wakefield W., Inc.*, 72 Cal.

App. 4th 798, 806-07 (1999). Mere speculation does not satisfy this burden, and if Plaintiff can only provide speculation, rather than substantial evidence of pretext, his claim must end in summary judgment. *Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1038 (2002) (a showing that only gives rise to speculation or unreasonable inferences about the employer's motivation does not create a triable issue); *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 77 (2001) (speculative evidence "does not rise to the level of the substantial evidence of pretext required to avoid summary judgment").

Under this analytical approach, even if Plaintiff could meet his *prima facie* burdens – which he cannot – Menzies had an honest and good faith belief that Plaintiff engaged in significant misconduct which supported its decisions to suspend him for investigation and then terminate his employment. And having admitted he has no evidence of unlawful motive and can only speculate as to why Menzies took such actions, Plaintiff cannot satisfy his substantial evidence burden to show pretext. The Court should therefore enter summary judgment in favor of Menzies on Plaintiff's discrimination cause of action.

### 1. Plaintiff's Mere Belief Of Possible Discrimination Does Not Satisfy His *Prima Facie* Burden And Menzies Had Honest, Good-Faith Reasons For Its Actions

Plaintiff's discrimination cause of action blending race and national origin theories does not even get off the ground because he admits he has <u>no</u> evidence to support a theory that some circumstance suggests discriminatory motive. *See Guz*, 24 Cal. 4th at 379 (2000); *Nealy*, 234 Cal. App. 4th at 380. Rather, his testimony makes plain Plaintiff is simply speculating that his race and national origin played any factor in his suspension and subsequent termination. [Exhibit 12, 88:24-93:23, 94:7-95:7.] Plaintiff's self-serving beliefs are simply not "circumstances suggesting discriminatory motive."

However, even if Plaintiff's rank speculation excused him from satisfying his *prima facie* burden, Menzies had legitimate reasons for its decisions to suspend and then terminate Plaintiff. Menzies received information from multiple sources indicating Plaintiff's subordinates felt either pressured or misled by Plaintiff to sign a petition against Dodge. [Exhibit 21; Exhibit 25; Exhibit 12, 56:22-25, 69:25-70:8; Exhibit 15, 23:24-24:10, 25:18-23; Exhibit 16, 11:19-12:3, 13:22-14:6, 15:12-22, 17:12-22, 21:8-22:10, 52:22-53:21; Exhibit 17, 39:15-40:5, 41:14-20, 44:17-45:2, 46:12-47:6.] Multiple other Fuelers additionally testify under oath that Plaintiff engaged in such conduct *directly toward them* and/or that they witnessed him doing the same toward others. [Exhibit 5, ¶¶ 3-5; Exhibit 7, ¶¶ 3-7;

Exhibit 6, ¶¶ 3-6; Exhibit 10, ¶¶ 2-5; Exhibit 14, 25:18-23; Exhibit 16, 52:22-53:21.]  It is of no moment – and therefore not a *material* dispute – that Plaintiff denies engaging in such conduct, because the critical question is whether the multiple sources of evidence provided (which Plaintiff *cannot* deny Menzies received) support an honest belief that Plaintiff abused his authority and therefore harassed others.  *Kodwavi*, 966 F. Supp. 2d at 984 ("Plaintiff's arguments focus on whether or not he actually threatened or assaulted LoGrasso, but the truth of that matter is not relevant to whether the Hotel had a legitimate, non-discriminatory basis for terminating him. Instead, the key inquiry is whether the Hotel had a good faith belief in the basis for the action it took'"); *Collier v. Windsor Fire Prot. Dist. Bd. of Dirs.,* No. C 08-2582 PJH, 2011 U.S. Dist. LEXIS 115649, at *33 (N.D. Cal. Oct. 6, 2011) ("[T]he court need not determine whether plaintiff actually committed the misconduct that led to his dismissal, but only whether the factual basis on which defendants concluded that a dischargeable act had been committed was reached honestly").  And unlike in many employment discrimination cases, Menzies' reason for Plaintiff's termination is clearly articulated in an objective writing in the form of Vargas's email stating "We cannot allow our management team to harass our people in any way."  [Exhibit 26.]  In fact, even Plaintiff essentially concedes the information provided to Menzies supports a good-faith termination decision, having admitted that as a supervisor Menzies reasonably expected him to it support other members of management before rank-and-file employees, avoid undermining their authority, not involve employees in disputes with others, and explain to employees documents they were being asked to sign.  [Exhibit 12, 28:23-33:1, 34:2-4.]  Such facts, which Plaintiff cannot legitimately dispute, more than demonstrate Menzies' honest belief that Plaintiff had harassed Fuelers and abused his authority and good-faith reasons for the actions it took.

### 2.    Plaintiff's Reliance On Mere Speculation Cannot And Does Not Create A Genuine Dispute That Survives Summary Judgment

With Menzies having articulated legitimate reasons for its actions, Plaintiff must now show such reasons were pretext for discrimination and go beyond mere speculation to do so.  *Aragon*, 292 F.3d at 658-59.  Having conceded he has no such tangible evidence and his entire claims of discrimination rest on his self-serving speculation [Exhibit 12, 88:24-93:23, 94:7-95:7], Plaintiff is already in a woeful position to carry this substantial evidence burden.  At best, Plaintiff is likely to argue pretext exists

because Menzies supposedly took disparate action with respect to purported complaints of harassment against Dodge compared to how Menzies addressed the various behaviors by Plaintiff reported to it. The problem with this argument is that Menzies had information clearly complaining about Plaintiff *pressuring* and *misleading* employees to sign a petition, amounting to a harassing abuse of authority, whereas the information supplied about Dodge related to operational concerns only. Indeed, to this day, Fuelers who wanted to and voluntarily signed the petition disclaim any harassing behavior by Dodge, and neither the first nor second petition complaining about his actions toward "the people" make any specific or even general allegations of harassment. [*Compare* Exhibit 22 and Exhibit 27.]

To say both circumstances involve complaints of harassment which Menzies handled disparately is a sleight-of-hand facile argument. In fact, the only place an allegation of harassment against Dodge even superficially occurs is the purported Rafael Vasquez November 18, 2018 letter – seemingly authored long after Plaintiff's termination – which Plaintiff produced and Menzies never received detailing the same operational issues from earlier petitions that Menzies had already investigated. [Exhibit 1, ¶ 7; Exhibit 2, ¶ 7 Exhibit 28.] Indeed, even Dodge acknowledges that Menzies looked into such complaints and gave him direction on how to improve, showing that Menzies took the concerns expressed about Fuelers and scheduling and did address them appropriately with Dodge. [Exhibit 13, 25:23-25; Exhibit 14, 51:2-52:17; Exhibit 15, 40:11-25; Exhibit 16, 27:13-28:3, 37:17-38:9, 38:22-39:8; Exhibit 17, 21:11-19, 32:14-33:3, 48:3-20, 49:1-7.] These same Fuelers explicitly deny both that Dodge engaged in any harassing conduct and that they were complaining about any such purported harassment instead of purely operational issues. [Exhibit 5, ¶ 8; Exhibit 8, ¶¶ 2-4; Exhibit 9, ¶¶ 2-4; Exhibit 11, ¶¶ 3-6.] For Plaintiff to thus argue his conduct and the purported complaints about Dodge support some kind of apples-to-apples, substantial evidence-based comparison calling into question the good-faith basis of Menzies' actions is just as speculative an exercise as Plaintiff's testimony that he has no evidence of discrimination, he merely thinks that must be what happened. [Exhibit 12, 88:24-93:23, 94:7-95:7.] Such self-serving arguments do not create genuine disputes of material fact as to the reasons for Menzies' action, and Menzies is therefore entitled to summary judgment.

///

///

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
-12-
Case No. 3:19-cv-8157

**B.** **Plaintiff Can Neither State A *Prima Facie* Claim Of Retaliation Because He Engaged In No Protected Activity Nor Meet His Pretext Burden**

Plaintiff's retaliation claim requires the same *McDonnell-Douglas* three-part burden shifting analysis employed to analyze his discrimination allegations. *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007). Accordingly, to establish such a claim, Plaintiff must show: (1) he engaged in a protected activity; and (2) a causal link existed between the protected activity and the adverse employment action. *Id*. If he can do so, the same follow-up analysis applies in that after Menzies articulates a legitimate, non-retaliatory reason for its action, Plaintiff must overcome the legitimacy of such reasons with substantial, non-speculative evidence of pretext. *Id.* As with his discrimination theories, Plaintiff can neither show a *prima facie* claim nor satisfy his pretext burden.

Plaintiff asserts that his signing of the first petition against Dodge satisfies his *prima facie* burden to show he engaged in protected activity. But critical to this case is the fact that Fuelers at Menzies are represented by the Union and Plaintiff was a non-Union member of Menzies management. [Exhibit 1, ¶ 2.] Federal labor law makes it unlawful for managers and supervisors in unionized work environments to negotiate terms and conditions of employment or address employee grievances directly with represented employees outside the mechanisms established by collective bargaining. *See*, *e.g.*, 29 U.S.C. § 159; *see also Castelli v. Douglas Aircraft Co*., 752 F.2d 1480, 1485 (9th Cir. 1985) (noting that absent authorization under a collective bargaining agreement, the federal policy of exclusive representation requires the union, rather than third parties, to deal directly with employees regarding grievances), *and Stewart v. Leland Stanford Junior Univ*., No. C 05-04131 JW, 2006 U.S. Dist. LEXIS 20137, at *11 (N.D. Cal. Apr. 5, 2006) (noting that bypassing the collective bargaining representative puts an employer at risk of violating federal labor law). Indeed, that is why the Union complained to Aguilera about someone pressuring employees to sign a petition against Dodge – because doing so violated its exclusive representation established by the collective bargaining relationship between Menzies and the Union. [Exhibit 15, 23:24-24:10, Exhibit 16, 11:19-12:3, 13:22-14:6, 15:12-22.] In this circumstance then, Plaintiff's signing of a petition involving Dodge was an unlawful labor practice that put Menzies at risk of a valid grievance of direct dealing by Menzies' management. Far from engaging in protected activity, Plaintiff actually engaged in illegal activity, and as a consequence, he

MENZIES AVIATION, INC.'S MOTION FOR SUMMARY JUDGMENT
-13-
Case No. 3:19-cv-8157

4838-6278-0877.4

cannot rely on such actions to carry his *prima facie* burden.

Setting this fundamental flaw aside, all the same reasons why Menzies had a legitimate basis for its actions and Plaintiff cannot show pretext by substantial evidence on his discrimination claims apply here. As Vargas asserted both in his contemporaneous email instruction to Aguilera and through his deposition testimony, the sole reason he directed the termination of Plaintiff was that Menzies had valid information indicating he had pressured subordinate employees to sign a petition. Vargas reached that conclusion on an honest, good-faith basis, and Plaintiff using his supervisory position to coerce other employees is most certainly not protected activity. Moreover, Plaintiff acknowledges the only reason given him for his termination was his involvement in the petition, and he has no tangible evidence to suggest otherwise, such that he cannot meet his burden to show pretext. [Exhibit 12, 88:24-93:23, 94:7-95:7.] Much like his discrimination cause of action must end in summary judgment, Plaintiff's retaliation cause of action similarly fails.

## C. Plaintiff's Derivative And Duplicative Wrongful Termination In Violation Of Public Policy Cause Of Action Fails For The Same Reasons His Statutory Claims Fail

"The central assertion of a claim of wrongful termination in violation of public policy is that the employer's motives for terminating the employee are so contrary to fundamental norms that the termination inflicted an injury sounding in tort." *Clark v. Amtrust N. Am.*, No. 16-cv-05561-MEJ, 2018 U.S. Dist. LEXIS 23624, at *61 (N.D. Cal. Feb. 13, 2018) (*quoting Roby v. McKesson Corp.*, 47 Cal. 4th 686, 702 (2009)). To assess such claims, California courts apply the same *McDonnell-Douglas* burden shifting analysis used for allegations of discrimination and retaliation. *See Montoya v. Mgmt. Training Corp.*, No. 1:10-CV-00451-AWI-MJS, 2011 U.S. Dist. LEXIS 125520, at *14-15 (E.D. Cal. Oct. 27, 2011); *Mitri v. Walgreen Co.*, No. 1:10-cv-538 AWI SKO, 2011 U.S. Dist. LEXIS 59433, at *35 (E.D. Cal. June 3, 2011) ("When a plaintiff alleges retaliatory employment termination as a claim for wrongful termination in violation of public policy, California follows the burden-shifting analysis of *McDonnell Douglas Corp*"). Additionally, when a wrongful termination in violation of public policy claim effectively derives from and depends on the same essential facts as a statutory employment discrimination claim, the failure of the statutory claims renders the wrongful termination claim invalid as a matter of law. *See Ramirez v. AvalonBay Cmtys., Inc.*, 2015 U.S. Dist. LEXIS 130475, 2015 WL

5675866, at *11 (N.D. Cal. Sept. 26, 2015) ("Where no predicate violation of the law has occurred, a plaintiff cannot state a claim for wrongful termination in violation of the law").

Given that Plaintiff's wrongful termination case requires the same analytical approach as his failed discrimination and retaliation claims, and asserts the same allegedly wrongful behavior by Menzies, the same analysis detailed above applies with equal measure and requires the same conclusion. In short, Plaintiff engaged in no activity protected by public policy – if anything, he violated federal labor policy by involving himself directly in matters that are the exclusive province of the Union. And Menzies certainly had valid sources of information to reach the honest conclusion that Plaintiff abused his authority as a supervisor and therefore harassed Fuelers, facts Plaintiff cannot overcome with his purely speculative arguments. The Court should therefore award summary judgment to Menzies on Plaintiff's wrongful termination cause of action.

**D.** **Plaintiff's Intentional Infliction Of Emotional Distress Cause Of Action Is Preempted And Barred By The Workers' Compensation Act**

California's Worker's Compensation Act ("WCA") provides in pertinent part: "Liability for the compensation provided in this division, *in lieu of any other liability whatsoever* to any person … shall … exist against an employer for any injury sustained by his or her employees arising out of and in the course of employment." Cal. Lab. Code § 3601 (emphasis supplied). As the California Supreme Court further explained:

> [W]hen the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability.

*Cole v. Fair Oaks Fire Prot. Dist.* 43 Cal. 3d 148, 160, (1987); *see also Mueller v. City of L.A.*, 176 Cal. App. 4th 809, 823 (2009) ("there is no independent recovery for intentional infliction of emotional distress in the employment arena because that injury comes under the exclusive remedy of workers' compensation law"). California courts have accordingly routinely recognized termination decisions and investigations related to the termination occur as part of the employment relationship and are therefore barred by the WCA. *See, e.g.*, *Bracke v. City of L.A.*, 60 F. App'x 120, 122 (9th Cir. 2003); *Abiola v.*

*ESA Mgmt., LLC*, No. 13-cv-03496-JCS, 2014 U.S. Dist. LEXIS 26918, at *16 (N.D. Cal. Mar. 3, 2014); *Shoemaker v. Myers*, 52 Cal. 3d 1, 25 (1990).

Plaintiff's IIED claim simply re-hashes the allegations of his other three causes of action, and certainly allege nothing so extreme or shocking-to-the-conscience that allow him to avoid workers' compensation exclusivity. Rather, his claims are the garden-variety types of termination claims courts treat as barred by the WCA. Without even having to delve into the substantive meritless nature of Plaintiff's IIED allegations then, the Court can easily and should conclude that Menzies is entitled to summary judgment of Plaintiff's Fourth Cause of Action.

## IV.   CONCLUSION

For all the foregoing reasons, Menzies requests the Court enter complete summary judgment in its favor on all causes of action in Plaintiff's Complaint, or in the alternative, partial summary judgment.

DATED:  October 15, 2020

**FOLEY & LARDNER LLP**
Christopher Ward
Jason Wu


_____*/s/ Christopher Ward*_____
CHRISTOPHER WARD
Attorneys for Defendant MENZIES AVIATION, INC.

Arlo García Uriarte, SBN 231764
Ernesto Sánchez, SBN 278006
Un Kei WU, SBN 270058
Daniel P. Iannitelli, SBN 203388
Elizabeth Lyons, SBN 327742
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFNORNIA

| | |
|---|---|
| Renaldo Navarro<br><br>    Plaintiff,<br><br>vs.<br><br>Menzies Aviation Inc., DOING BUSINESS AS MENZIES; DOES 1 through 10<br><br>    Defendants. | Case No.: 3:19-cv-08157 VC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT MENZIES AVIATION INC.'S MOTION FOR SUMMARY JUDGEMENT**<br><br>Date:    November 19, 2020<br>Time:    10:00 a.m.<br>Place:    video conference link<br><br>Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor<br><br>Action Removed: December 16, 2019<br>Action Filed:    October 23, 2019 |

# TABLE OF CONTENTS

I.    INTRODUCTON ................................................................................ - 1 -

II.   STATEMENT OF FACTS ................................................................. - 1 -

    A.    PLAINTIFF WAS A SKILLED AND EXPERIENCED SUPERVISOR RECOGNIZED FOR MAINTAINING A HARMONIOUS WORK ENVIRONMENT AMONG FUELERS IN FURTHERANCE OF MENZIES' BUSINESS OBJECTIVES. .............................................. - 1 -

    B.    MENZIES DID NOT DISTRIBUTE EMPLOYMENT HANDBOOKS NOR THE CODE OF CONDUCT TO THE FUELERS NOR TO THE FUELING SUPERVISORS. ............................................................ - 2 -

    C.    MENZIES' DECISION TO PROMOTE ANDREW DODGE TO FUELING SUPERVISOR DEMONSTRATES MENZIES'S PREFERENTIAL TREATMENT FOR A WHITE SUPERVISOR. ................ - 3 -

    D.    BETWEEN 2017 AND 2018 DODGE REPEATEDLY VIOLATED MENZIES'S POLICIES AND CALIFORNIA LAW RESULTING IN NUMEROUS COMPLAINTS TO PLAINTIFF, THE UNION, AND MENZIES'S MANAGEMENT. ....................................................... - 4 -

        1.    Dodge Repeatedly Slept on the Job and Caused Break Violations ......... - 4 -

        2.    Menzies Received Complaints of Harassment and Abuse By Dodge. ...................................................................................... - 5 -

        3.    Navarro Escalated Complaints About Dodge, Including Harassment, t to Management. ................................................. - 6 -

    E.    MENZIES IGNORED COMPLAINTS OF DODGE'S ABUSE OF POWER, HARASSMENT, AND DENYING MEAL BREAKS. AS A RESULT, FUELERS AUTHORED A PETITION TO ADD DODGE'S UNCHECKED MISCONDUCT AND UNPROFESSIONAL BEHAVIOR. .... - 7 -

    F.    DODGE PRECIPITATES THE INVESTIGATION AND IS TOLD TO SUBMIT A STATEMENT ABOUT PLAINTIFF. ........................................... - 7 -

    G.    MENZIES SUSPENDS PLAINTIFF IMMEDIATELY AFTER SUBMITTING THE PETITION FOR SUPPORTING THE FUELERS IN THEIR COMPLAINTS AGAINST DODGE. ...................................................... - 7 -

    H.    MENZIES IMMEDIATE FOCUS ON NAVARRO DEMONSTRATES A LACK OF INTENT TO DISCOVER THE UNDERLYING INTENT OF THE PETITION LEADS TO A DISHONEST INVESTIGATION. .................. - 8 -

I.     MENZIES TERMINATED PLAINTIFF FOR PURPORTED HARASSMENT OF FUELERS. RAUL VARGAS' KNEE JERK REACTION TO TERMINATE PLAINTIFF WAS WHOLLY RETALIATORY TO PROTECT DODGE, PUSH THE FUELERS BACK AND TEACH THE FILIPINO FUELERS A LESSON.  AN EXAMINATION OF HIS ACTIONS ILLICIT THIS CONCLUSION. ............. - 9 -

J.     AS A RESULT OF MENZIES' ONGOING FAILURE TO HOLD DODGE ACCOUNTABLE, FUELERS SUBMITTED A SECOND PETITION CONCERNING THE SAME ISSUES. AT THE TIME, PLAINTIFF WAS UNINVOLVED AND TERMINATED FROM THE WORKPLACE. ................................................................................ - 10 -

K.     TERMINATION OF PLAINTIFF IS A TRAGEDY - A LIFELONG EMPLOYEE WHO HAD MENZIES BEST INTEREST - KICKED OUT FOR FURTHERING A HARMONIOUS WORKPLACE THAT SHOULD NOT INCLUDE INTIMIDATION NOR HARASSMENT.  PLAINTIFF HAS NOT RECOVERED FROM THE INJUSTICE. ...................................... - 10 -

III.    LEGAL STANDARD ................................................................... - 11 -

IV.    ARGUMENT ................................................................................ - 11 -

A.     PLAINTIFF ESTABLISHES A *PRIMA FACIE* CASE OF DISCRIMINATION BECAUSE MENZIES INVESTIGATION WAS NOT GOOD FAITH AND SUBSTANTIAL EVIDENCE EXISTS THAT A WHITE SUPERVISOR WAS TREATED PREFERENTIALLY. ............... - 11 -

    1.    Menzies' Inadequate Investigation Was A Deficient Basis To Form A Good-Faith Belief that Plaintiff Engaged in Harassment ................. - 12 -

    2.    Menzies After-Acquired Evidence Is Immaterial to Show The Decision-Makers Held A Good-Faith, Legitimate Belief That Plaintiff Pressured Employees To Sign The Petition. ........................... - 15 -

    3.    Plaintiff Can Establish Substantial Evidence of Pretext. ..................... - 16 -

B.     PLAINTIFF ESTABLISHES A *PRIMA FACIE* CASE OF RETALIATION BECAUSE HE ENGAGED IN PROTECTED ACTIVITY BY LENDING SUPPORT AND REPEATEDLY NOTIFYING MANAGEMENT OF FILIPINO FUELERS COMPLAINTS OF DODGE'S HARASSMENT LEADING MENZIES TO SILENCE HIM BY TERMINATING HIS EMPLOYMENT. ........................................ - 18 -

    1.    Plaintiff's Involvement With the Petition Is The Culmination of A Several Reports Made By Plaintiff And Other Filipino Fuelers Regarding Dodge's Unlawful Harassment And Constitutes Protected Activity ............................................................................... - 18 -

    2.    Plaintiff Is Protected Under FEHA Retaliation Because He Was a Prospective Witness to Dodge's Unlawful Harassment And Menzies' Failure to Take Corrective Action. ........................................ - 20 -

        3.     Menzies Exaggerates, and Misreads the Law, In Concluding That The Act of Signing The Petition Is a Violation of Federal Law Under 29 USC § 159. ............................................................................ - 20 -

C.     PLAINTIFF ESTABLISHED A CLAIM OF WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY BECAUSE MENZIES DISCHARGED PLAINTIFF FOR CHALLENGING UNLAWFUL WORKING CONDITIONS ........................................................ - 22 -

D.     PLAINTIFF'S IIED CLAIM IS AN EXCEPTION TO EXCLUSIVE REMEDY RULE BECAUSE MENZIES ENGAGED IN CONDUCT OUTSIDE COMPENSATION BARGAIN – A SCHEME TO PROTECT DODGE,  TERMINATE AND MAKE AN EXAMPLE OUT OF PLAINTIFF  FOR PURSUING FUELER'S CLAIMS OF HARASSMENT, INTIMIDATION, ABUSE OF POWER AND DISCRIMINATION. ........................................................................................ - 24 -

        1.     Intentional Infliction of Emotional Distress Is Not Barred Because Menzies Engaged In A Campaign to Terminate Plaintiff and Retaliate – Misconduct That Exceeded The Normal Risks Of The Employment Relationship. .................................................................. - 24 -

# TABLE OF AUTHORITIES

## CASES

*Adickes*, 398 U.S., at 158–159. ...................................................................17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ..........................16

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ..........................17

*Castelli v. Douglas Aircraft Co., 752 F.2d 1480* (9th Cir. 1985) ..................28

*Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1047 (2016) ...........................................................................................................26

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986 ..................................16

*Charles J. Vacanti, M.D., Inc. v. SCIF* (2001) 65 CCC 1402..........................31

*City of Moorpark v. Superior Court of Ventura County (Dillon)* (1998) 63 CCC 944, 952 ...........................................................................................................31

*De Peralta v. Fox Restaurant Concepts* (2018) 83 CCC 478 .........................32

*Flait v. North American Watch Corp.*, 3 Cal. App. 4th 467, 476–477 (1992)...............25

*Garcia-Paz v. Swift Textiles, Inc.,* 873 F. Supp. 547, 560 (D. Kan. 1995) ....24

*Gupta v. Trustees of California State Univ.*, 40 Cal. App. 5th 510, 519 (2019)...........23

*Guz v. Bechtel National, Inc.* 24 Cal.4th 317, 355, 100 (2000) ....................17

*Harris v. City of Santa Monica,* 56 Cal.4th 203, 229 (2013)..........................22

*Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948);.......................................17

*Kodwavi v. Intercontinental Hotels Grp. Res., Inc.*, 966 F. Supp. 2d 971, 984 (N.D. Cal. 2013)......................................................................................................21

*Lake City Foundry Co. v. N. L. R. B., C.A.7 (Ill.)* 1970, 432 F.2d 1162.........28

*Light v. Department of Parks and Recreation* (2017) 82 CCC 987................32

*McDonnell Douglas Corp. v. Green* 411 U.S. 792 (1973) .............................18

*Miller v. Department of Corrections* 36 Cal.4th 446, 470. (2005.................18

*Mixon v. Fair Employment and Housing Com.*, 92 Cal.App.3d, 1306, 1319 (1987). ..................22

*N.L.R.B. v. Raytheon Co.*, 398 U.S. 25, on remand 445 F.2d 272 .................27

*N.L.R.B. v. WKRG-TV, Inc.*, 470 F.2d 1302, 1316 (5th Cir. 1973)................29

*Nadaf–Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 991–

992 ......................................................................................................................18

*Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 283 (2009). ................................18

*Paleg v. Kmart Corp*. United States District Court, C.D. California (July 11, 2017)
2017 WL 2974923, 82 Cal. Comp. Cases 747 ...........................................................32

*Reeves v. Safeway Stores*, 121 Cal. App.4th 95, 120–121 ...............................................24

*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297 ............................................18

*Serri v. Santa Clara University*, 226 Cal.App.4th 830, 861 (2014) .................................17

*Shoemaker v. Myers* (1990) 55 CCC 494, 508 .................................................................31

*Spitzer v. Good Guys, Inc.* 80 Cal.App.4th 1376 (2000) .................................................18

*Steele v. Youthful Offender Parole Bd*., 162 Cal. App. 4th 1241, 1255 (2008) ..............26

Stevenson v. Superior Court (1997) 16 Cal.4th 880, 889–890 [66 Cal.Rptr.2d 888,
941 P.2d 1157] ............................................................................................................30

*Stewart v. Leland Stanford Junior Univ*., No. C 05-04131 JW, 2006 WL 889437
(N.D. Cal. Apr. 5, 2006) .............................................................................................28

*Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839,
610 P.2d 1330]* ...........................................................................................................29

*Vanderhule v. Amerisource Bergen Drug Corp.* United States District Court, C.D.
California (January 17, 2017)  2017 WL 168911, 82 Cal. Comp. Cases 128 ...........32

*Wirtz v. Kansas Farm Bureau Services, Inc*. (D.Kan.2003) 274 F.Supp.2d 1198,
1212, fn. ....................................................................................................................25

*Yanowitz v. L'Oreal USA, Inc.* 36 Cal.4th 1028, 1042 (2005) .........................................24

Yau v. Allen (2014) 229 Cal.App.4th 144, 154 [176 Cal.Rptr.3d 824] ...........................29

*Young v. Libbey-Owens Ford Co.* (1985) 168 Cal. App. 3d 1037, 1044 ..........................31

## **STATUTES**

29 USC § 159 ....................................................................................................................27

Fed. R. Civ. P. 56(a) .........................................................................................................16

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiff Navarro has established a prima facie case of race and national origin discrimination showing preferential treatment towards a white fueling supervisor against Filipino fuelers and Plaintiff, a Filipino fueling supervisor?

2. Whether Menzies' inadequate investigation can be considered good faith when it relies on faulty assumptions, was done in bad faith and designed only to terminate Navarro?

3. Whether Plaintiff has established by substantial evidence a question of fact regarding pretext offered by Menzies?

4. Whether Plaintiff has established a prima facie case of FEHA retaliation because he supported fuelers in their attempt for Menzies to address unprofessional behavior by Dodge that included harassment and discrimination?

5. Whether the cause of action for wrongful termination against public policy can be supported by evidence that Plaintiff and fuelers were reporting violations of meal breaks and harassment by Dodge?

6. Whether the claim for Intentional Infliction of Emotional Distress falls within Workers' Compensation exclusive remedy when Plaintiff suffered from the illegal scheming of Menzies to terminate him in retaliation for reporting harassment and statutory violations to management?

## I.    __INTRODUCTON__

       Renaldo Navarro was a loyal and effective Fueling Supervisor for over thirteen years. Initially Navarro lent a helping hand to an inexperienced White Supervisor, Andrew Dodge. Beginning in 2017, Mr. Navarro began to receive reports from Filipino Fuelers that Mr. Dodge was creating an unsafe work environment and denying meal periods. The complaints worsened to discrimination, intimidation and harassment.  Mr. Navarro and other Fuelers reported Dodge's abuse to management. As fuelers became more verbal in their concern for Dodge's performance failures,  he became more intent on wheeling power over a majority Filipino workforce through threats and intimidation—shining bright lights from his truck at Fuelers working on the tarmac and even turning to physical confrontation.  Faithful to his Fuelers and concerned for the impact that Dodge's attitude and mismanagement had on Menzies' business objective, Mr. Navarro spoke to Dodge and upper management about the complaints. Sadly, Menzies management minimized the complaints and turned a blind eye—effectively condoning Dodge's discriminatory behaviors. Problems escalated. Mr. Navarro's involvement as a Supervisor became more critical for Fuelers as Menzies ignored their complaints.

       The Fuelers initiated a petition to implore Menzies management. Fuelers asked Plaintiff to sign and submit the petition to management – which he did. In response, Menzies terminated Plaintiff based on a pre-determined investigation. Menzies had no legitimate reason to terminate Plaintiff. Rather the decision reflects discriminatory and retaliatory animus designed to push back on the need to properly investigate the petition by the Filipino fuelers.  Menzies used Plaintiff Navarro's termination an example and intimidate the fuelers further for escalating their concerns.

## II.    __STATEMENT OF FACTS__

      **A.  Plaintiff Was a Skilled and Experienced Supervisor Recognized for Maintaining a Harmonious Work Environment Among Fuelers In Furtherance of Menzies' Business Objectives.**

       Plaintiff started working as Fueler for ASIG Aviation in 2005. Plaintiff's Appendix of Supporting Evidence ("PASE"), Exhibit 37, Deposition of Renaldo Navarro ("Navarro Depo."), 23:20-25. While Plaintiff was employed by ASIG, he was promoted to a Supervisor role and assigned additional job responsibilities.  Navarro Depo., 25: 20-25.  As a supervisor, Plaintiff is

responsible for effectively managing the Fueler's workload by providing oversight of fueling operation, assigning Fuelers to service flights and when to take their breaks. Menzies Appendix of Evidence ("AOE"), Exh. 18, Fueling Supervisor Job Description; Navarro Depo., 26:1-10. PASE, Exh. 42, Deposition of John Qually ("Qually Depo), 12:9-14. The Fueling Supervisor is also responsible for communicating with airline representatives and overseeing the safety of the operation. Qually Depo., 17:6-11.

Critically, Fueling Supervisors are responsible for ensuring that fuelers are working safely and resolve any safety concerns raised by fuelers, ensure fuelers are following procedures, and address any equipment problems or any other issues raised. Qually Depo., 18:5-22. The Fueling Supervisor is also responsible for giving fuelers breaks and meal periods in accordance with the labor laws and the CBA. Qually Depo., 19:9-13. Central to the Fueling Supervisor's job responsibilities is managing fuelers' daily shift airline fueling assignments together with figuring out the necessary equipment they need to ensure timely fueling of airplanes to avoid flight delays. Qually Depo., 20:20-25-22:5; Exh. 18.

Plaintiff was a reputable, well-respected and even-handed supervisor and Union member Fuelers often turned to Plaintiff to address workplace issues and act as a liaison between Union members and management. PASE Exh. 32, Declaration of Rafael Vasquez ("Vasquez Decl.") ¶ 2; PASE Exh. 34, Declaration of July Macapagal ("Macapagal Decl."), ¶ 2. Plaintiff was well known for keeping flight schedules and maintaining harmonious work environment for Fuelers. PASE Exh. 33, Canlas Decl. ¶ 17. PASE Exh. 35, Declaration of Modesto Compas ("Compas Decl.") ¶ 4. Even Andrew Dodge considered Mr. Navarro to be "a great supervisor. There's no questions asked. He was there for a long time, and, you know, he's – he did his job." AOE Exh. 17, Deposition of Andrew Dodge ("Dodge Depo."), 28:19-23.

Mr. Navarro's self-perception is that of a professional that provides vital services for the good of the airline industry and this country he loves. He treated his job with respect and pride. Navarro Depo. ¶ 4.

### B. Menzies Did Not Distribute Employment Handbooks nor the Code of Conduct to the Fuelers nor to the Fueling Supervisors.

Menzies alleged that the Code of Conduct and the Employment Handbook should have alerted Plaintiff of prohibited intimidation, abuse and harassment justifying termination. AOE Exhs. 19 and 20.

At the time Menzies took over ASIG operations at San Francisco International Airport ("SFO") in February 2017, they were revising their employment handbook and did not provide Fuelers and Fueling Supervisors with copies or training. PASE, Exh. 40, Deposition of Tracy Aguilera ("Aguilera Depo."), 13:24-14:3. Vasquez Decl. ¶ 22, PASE Exh. 33, ¶ 18, Declaration of Jezen Canlas ("Canlas Decl."), PASE Exh. 34 ¶ 7, Macapagal Decl., ¶ 7. Declaration of Renald Navarro ("Navarro Decl."), ¶11. Human Resources Manager Tracy Aguilera confirmed that standard practice was to review the newly implemented Employment Handbook, including the Code of Conduct section, with employees in the HR office and have them sign an acknowledgement form. Aguilera Depo., 14:25-16:19. However, Aguilera could not confirm whether Plaintiff was informed of the newly implemented code of conduct, nor whether he signed an acknowledgement form confirming his receipt of the employee handbook and code of conduct. Aguilera Depo16:20-24. Menzies production of documents to Plaintiff did not contain Plaintiff's signature acknowledging receipt. In fact, all of the acknowledgement forms produced by Defendant Menzies in Plaintiff's personnel file have a blank signature line. PASE Exh. 30, Declaration of Arlo Uriarte ("Uriarte Decl."), ¶ 7. PASE Exh. 44.

### C. Menzies' Decision to Promote Andrew Dodge to Fueling Supervisor Demonstrates Menzies's Preferential Treatment for A White Supervisor.

Dodge was hired in February 2016 and Menzies' General Manager Renil Lal surprisingly promoted him to Fueling Supervisor within one year. Dodge Depo. 12:19-13:15. Dodge had less seniority than many of the Filipino fuelers who were regarded as more qualified. Canlas Decl. ¶¶ 4, 7. According to Mr. Canlas and Mr. Navarro, at least three other Fuelers were better equipped to be supervisors than Andrew Dodge. *Id.,* Navarro Decl. ¶ 12. During Dodge's first months as Fueling Supervisor, Mr. Navarro as well as other Fuelers willingly assisted Mr. Dodge to succeed as a Fueling Supervisor. Navarro Decl. ¶5.

### D. Between 2017 and 2018 Dodge Repeatedly Violated Menzies's Policies and California Law Resulting in Numerous Complaints to Plaintiff, the Union, and Menzies's Management.

Plaintiff, the Union Steward, and the Fuelers repeatedly communicated complaints to management about Dodge. Navarro Decl. ¶ 7. Plaintiff testified that around a year prior to the petition, he reported the Fuelers' complaints regarding Dodge to Menzies management, including Renil Lal, John Qually, Nicco Bernadino, and Tracy Aguilera. Navarro Depo., 49: 15-24, 50:2-5.

#### 1. Dodge Repeatedly Slept on the Job and Caused Break Violations

Manager Qually testified that Plaintiff reported Dodge sleeping on the job and "it was brought to the higher ups" including Renil Lal. Qually Depo. 26:1-9. Mr. Dodge caused flight delays that affected the operation and mismanaged shift schedules resulting in Fuelers missing their meal breaks. Exh. 33, Decl. of Canlas, ¶ 7, 15; Exh. 34, Decl. of Macapagal, ¶ 4, 5. Exh. 35, Decl. of Compas, ¶ 7, Exh. 36, Decl. of Mark Ilagan, ¶ 5.5.1

---

[1] In response to claims that Dodge was sleeping on the job, Menzies argues that Dodge disclosed his sleep apnea condition to management and that they determined Plaintiff's reports of Dodge sleeping only occurred after his shift. MSJ MPA 3:20-21, footnote 2. Menzies claims Dodge often slept at work after his shift and before driving home and that, if anything, they had a duty to reasonably accommodate Dodge. However, Dodge denied that any formal accommodation was in place and several Fuelers testified and produced photos showing Dodge sleeping during shift hours, in his truck on the tarmac, creating safety concerns and resulting in fuelers missing breaks.[Exh 43 Photo of Dodge sleeping]. Dodge testified that his work responsibilities included "monitor[ing] the fuelers, if they need help with something, or also monitor their safety." Dodge Deposition, 18:4-5. Dodge further testified that Fuelers were dependent on him coverage and coordinating meal breaks. Id. 18:4-8. Menzies has an obligation to ensure that Dodge was capable of performing his essential job functions safely even within its duty to accommodate. See Ceja-Corona v. CVS Pharmacy, Inc., 664 F. App'x 649, 650 (9th Cir. 2016); Green v. State, 42 Cal.4th 254, 257 (2007). However, evidence indicates that management did not implement an accommodation to ensure that Dodge was performing his essential functions effectively with his sleep apnea. Id. 22:23-25, 23:1-15, 26:1-17, 44:25, 45:1-3. Also, given the safety concerns it is questionable that he can perform his functions safely.

Dodge was aware that his job duties as a supervisor obligated him to provide his employees with meal and rest breaks in accordance with California and federal law. Dodge Depo., 18:15-19:8. Multiple witnesses, including Fuelers and airline operators, observed Dodge sleeping during his shift. Plaintiff received complaints from Fuelers that Dodge was seen sleeping in his truck on the tarmac, creating a serious safety concern. This was captured in photos submitted to Menzies. Exh. 43. The Union also raised complaints to management regarding Dodge's frequent sleeping during shifts. Vasquez Decl. ¶¶ 6, 8; Multiple fuelers also reported Dodge sleeping on shift to Plaintiff and provide Plaintiff with photos of this conduct. Abusive and threatening conduct from Dodge toward fuelers.

### 2. Menzies Received Complaints of Harassment and Abuse By Dodge.

While Menzies denies that they received any complaints regarding Dodge's harassing or abusive conduct as a supervisor, MSJ MPA 3:25-26, 6:1-2, this assertion is contradicted by the evidentiary record. Employees and Plaintiff testified to that Dodge engaged in abusive, hostile and threatening conduct toward Fuelers. In addition to Plaintiff's complaints, the Fuelers made multiple complaints to the Union regarding Andrew Dodge. Vasquez Decl., ¶3. Shop Steward Rafael Vasquez declared that,

> Before August 2018, between 2017 and 2018, the Fuelers made multiple complaints to the Union regarding an abusive supervisor by the name of Andrew Dodge. The complaints included verbal abuse, threats, and even physical confrontations with some of the fuelers. These complaints were communicated to management for over a year. We would have meetings with management every week to two weeks. The complaints were communicated during these meetings. The shop stewards would communicate these to management attendees: Renil Lal, John Qually, Nicco, Raul Vargas would often attend. They knew that especially the Filipino fuelers were being harassed and discriminated by Mr. Dodge.

*Id.* ¶ 3.

Mr. Dodge was promoted to a position of power around the time that Trump was elected to President 2016/2017. Mr. Dodge engaged in "really strange behaviour towards the Filipino Fuelers." Vasquez Decl., ¶ 4. As Mr. Vasquez explained, Fuelers complained that Dodge flashed the lights from the company truck on Filipino Fuelers acting as if he was an ICE Agent. Vasquez Decl., ¶ 4. Fuelers complained that they believed that Dodge was subjecting them to discrimination. Canlas Decl., ¶5. An example provided by Mr. Canlas was that Dodge would use

his flashlight to watch over Filipino Fuelers. Exh. 33, Canlas Decl., ¶ 6, Navarro Decl. ¶ 8. Mark Ilagan reported a specific incident toward Mr. Dodge where he believed that he was harassed by Dodge for use of a company truck. He goes on to say that this abuse of authority by Dodge was often targeted toward Filipino Fuelers. Exh. 36, Ilagan Decl., ¶ 7 Navarro Decl. ¶¶ 6, 8-10. Mr. Ilagan reported this to Navarro, who in turn was able to diffuse the situation and reported it to management. Navarro Decl. ¶ 13,

Further, Shop Steward Rafael Vasquez confirmed in a written latter dated November 18, 2018, that "I have spoken to the Menzies Aviation Fueling Director Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous abuse his authority and at times harass Fuelers under his charge." AOE Exh. 28.

### 3. Navarro Escalated Complaints About Dodge, Including Harassment, t to Management.

Mr. Navarro, as required by his duties as a supervisor, escalated complaints that Fuelers brought to him regarding Dodge's harassment and informed Renil Lal, John Qually, Nicco Bernardino, Tracy Aguilera. Navarro Depo., 49:15-24, 50:2-5, 51:9-17. Navarro Decl. ¶ 13, AOE Exh. 18, MENZIES 000202.

Despite initial support from Fuelers and Mr. Navarro, Dodge's ineptitude lead to a fast deterioration of working conditions for Fuelers. Qually testified that he knew about the break violations. He acknowledged that fuelers were shorthanded and overworked with too many flights. He acknowledged that fuelers complained to him. Qually Depo., 51:2-52:1.

Menzies denial that it received complaints of harassment from Navarro is not supported by available evidence. Menzies concedes that the reports warranted counseling Dodge, however conveniently ignored and took no corrective action to address Dodge's abuse of power and harassment. Dodge testified that Plaintiff raised complaints to him directly more than ten times that he was not doing his job properly. Exh. 39, Dodge Deposition 30:8-19. Dodge further testified that he spoke to John Qually, Renil Lal and Nico Bernadino regarding Plaintiff's complaints. *Id.* 30:20-25, 31:1-2.

### E. Menzies Ignored Complaints of Dodge's Abuse of Power, Harassment, and Denying Meal Breaks. As A Result, Fuelers Authored A Petition To Add Dodge's Unchecked Misconduct and Unprofessional Behavior.

In response to the escalating problems and ongoing violations of Menzies' policies under Dodge's supervision, Fuelers initiated a petition and gathered signatures from Fuelers and two Fueling Supervisors, including Plaintiff, in further effort to convince Menzies' management to hold Dodge equally accountable to workplace policies and California labor laws. AOE, Exh. 22.

Fueler Jezen Canlas initiated the petition and gathered signatures. Canlas Decl., ¶¶ 8-10; Navarro Depo., 44: 16-46:7; Vasquez Decl., ¶¶ 9, 10. Counter Menzies representation of the facts, Plaintiff did not initiate or author the petition. *Id.*; Navarro Depo., 44:16-46:5 . Plaintiff signed the petition in response to a request from a Fueler, Jezen Canlas. Navarro Depo., 48: 5-13 and 45:1-22. Plaintiff did not ask anybody to sign the petition. Canlas Decl., ¶¶ 10, 12, 13; Navarro Depo. 49: 15-24. Another Fueling Supervisor July Macapagal signed the petition. AOE Exh. 22; Macapagal Decl., ¶ 6. He was never investigated. *Id.*

### F. Dodge Precipitates the Investigation and Is Told To Submit A Statement About Plaintiff.

Counter to Menzies' assertion, Dodge did not testify that he received reports from Fuelers *that Plaintiff* was pressuring them to sign a petition, merely that Dodge heard a petition was going around against him. Dodge Depo., 41:14:20. MSJ MPA 4:23-24. Exh. 21. Mr. Dodge testified that he never saw the petition. Dodge Depo., 42:5-8. On August 16, 2018, Dodge, at the request of management, wrote a statement complaining Mr. Navarro and mentions that Mr. Navarro is about to turn in the petition against him. AOE Exh. 2. Dodge Depo., 43:10-18.

Along with the statement he submitted the text messages from Mr. Navarro. In their rush to pin the whole matter on Navarro – context was lost. Meanings were placed into Mr. Navarro's words that were not true nor intended. Navarro Decl., ¶18.

### G. Menzies Suspends Plaintiff Immediately After Submitting The Petition For Supporting the Fuelers In Their Complaints Against Dodge.

Following the requests of his Fuelers, August 22, 2018. Plaintiff submitted the petition in

a meeting with Menzies management including Director Raul Vargas.  Navarro Depo., 57:1-58:14 . Canlas Decl., ¶ 11, Navarro Decl., ¶15.

Plaintiff signed the petition but did not force others to sign. Navarro Decl., ¶ 14. He delivered the petition to management:  Raul Vargas.  Navarro Decl., ¶15. After giving the petition to Raul Vargas at about 4 to 5 p.m. on August 23, 2018 he was suspended the next morning. *Id.* It is clear from the evidence that at this point Menzies had already decided that it would focus its attention on Mr. Navarro ignore the underlying complaints found in the petition. Raul Vargas testified that after he received the petition and reviewed the contents, he talked to Aguilera "to have the investigation"… into "how the petition was put together." Exh. 41, Vargas Deposition, 14:9-24. Navarro Decl., ¶ 15. Although Vargas had in hand a signed petition by twenty-six Fuelers complaining that Dodge engaged in unprofessional conduct and denied Fuelers meal and rest periods, he testified that he did not instruct Aguilera to investigate anything further than "how the petition was created." *Id.* 14: 25, 15:1-14.

### H.  Menzies Immediate Focus On Navarro Demonstrates a Lack of Intent To Discover the Underlying Intent Of The Petition Leads to A Dishonest Investigation.

Aguilera testified that Safety and Security Manager Kevin Blumberg was directed to begin an investigation to find out "what was going on." Aguilera Depo.  25: 8-13. Menzies decides to deflect focus from Mr. Dodge to Mr. Navarro. Indeed, Menzies suspended Mr. Navarro based on Dodge's statement. However, Menzies took no action to discipline or suspend Dodge in response to the many reports against him.

Plaintiff was not provided an opportunity to give his side of the events. He met with Vargas and Blumberg:  "The whole meeting lasted about 3-5 minutes.  Aside from this interaction, there were no other meetings, phones calls or interviews about the petition or the working conditions created by Mr. Dodge." Id. at ¶16. In this meeting, the "investigator"  Kevin Blumberg explained that signing the petition and siding with the fuelers was not appropriate. Blumberg told him to make a statement that he will not do this again.  Navarro Decl. ¶¶14-15.

Aguilera admits that, on August 29, 2018, Kevin Blumberg provided the results of his

investigation. Aguilera further testified that no written findings of the investigation exist other than Blumberg's August 29, 2018 email that only concerned Plaintiff. Aguilera Depo., 32:19-33:12. Mr. Blumberg's email summarizing his findings reflect that his investigation only focused on Mr. Navarro and his alleged participation and solicitation of signatures from employees against Dodge. AOE Exh. 26, MENZIES 000198.

Director of Operations Raul Vargas further testified that, aside from Blumberg's email, there were no other written documents reflecting the outcome of their investigation. Exh. 41, Vargas Deposition, 17:21-25, 18:1-6. Vargas admits that portion of the petition that complained about breaks and delays were not investigated. *Id.* 29:14-19. Vargas testified that, from Blumberg's investigation, Menzies concluded that Plaintiff wrote the petition. Exh. 41, 16:10-22, Vargas Deposition, 17:1-15. Vargas further testified that this conclusion was drawn from Plaintiff's text messages to Dodge, however, Plaintiff texts simply state, "I'm holding on to the petition, I haven't submitted it." AOE, Exh. 21, Exh. 41,Vargas Depo., 17:1-15. When further pressed, Vargas stated that they came to this conclusion based on the statements submitted by employees, but then backs off and acknowledged that the statements "—it doesn't say about Mr. Navarro writing the petition. It says about Mr. Navarro forcing the employees to sign the petition." *Id.* 18:7-19. When questioned how the second petition is relevant to this conclusion, his excuse is that he spoke to HR about Dodge already and that he had only been as the Director of SFO for three months at that point. He admits that he did not have much context with regards to what went on during the last year. *Id.* 27:13-25, 28:1-10.

## I. Menzies Terminated Plaintiff For Purported Harassment of Fuelers. Raul Vargas' Knee Jerk Reaction to Terminate Plaintiff Was Wholly Retaliatory to Protect Dodge, Push the Fuelers Back and Teach the Filipino Fuelers a Lesson. An Examination of His Actions Illicit This Conclusion.

According to Ms. Aguilera, Mr. Navarro was terminated for **unprofessional behavior** by a supervisor. Aguilera Depo. 33:17-22. When asked to clarify what harassing conduct Plaintiff engaged in that served as a basis for his termination, Vargas testified that forcing employees to sign the petition constituted harassment because "when you have—you take advantage of your rank, that is harassment because of how the other people feel." *Id.* However, the statements on

which Vargas admits relying upon to find harassment, only report that Navarro's involvement in the petition to sign made them feel uncomfortable. AOE, Exh. 24. Vargas also was unable to confirm the number of employees who were questioned and reported feeling intimidated. *Id.* 22:23-25, 23:1-11. He could only identify that the investigation only relied on three statements out of the twenty-six people who signed the petition. Vargas seemed to argue that because of these statements he questions the validity of the whole petition due to them maybe being forced to sign. *Id.* 25:8-25, 26:1.

Raul Vargas, Director of Operations recommended termination based on the self-serving investigation findings that Mr. Navarro solicited signatures and harassed employees. AOE Exh. 26, MENZIES 000197.

### J. As a Result of Menzies' Ongoing Failure to Hold Dodge Accountable, Fuelers Submitted A Second Petition Concerning the Same Issues. At the Time, Plaintiff Was Uninvolved And Terminated From The Workplace.

Following Plaintiff's termination, Rafael Vasquez took it upon himself to submit a second petition against Mr. Dodge. Vasquez Decl. ¶15. Mr. Vasquez explains that the reason he wrote the second petition was because the Filipino Fuelers were getting harassed and subjected to abusive by Mr. Dodge; "It had been going on for over a year already." *Id* .at ¶16. The second petition was signed by two individuals, Jayson Manalang and Wesley Faatalale, who claimed in declarations submitted with Menzies MSJ that Plaintiff pressured them to sign the first petition. AOE Exh. 27. However, Plaintiff was already removed from the workplace at the time the second petition occurred and was in no position to pressure Manalang and Faatalale. If they felt pressured, why sign the second petition? Mr. Dodge testified that he never saw the petition. Dodge Depo., 42:5-8. Moreover, Menzies management never discussed the petition with Mr. Dodge. Dodge Depo., 41:14-20.

### K. Termination of Plaintiff is a Tragedy - A lifelong employee Who Had Menzies Best Interest - Kicked Out for Furthering a Harmonious Workplace That Should not include Intimidation nor Harassment. Plaintiff has not recovered from the Injustice.

Mr. Navarro has struggled since his termination. He says that it is painful what happened to him. What did he really do wrong? He keeps getting in his head trying to find an explanation.

He had Menzies' interest in mind all along. He signed the petition in furtherance of Menzies' interest and yet, by aiding the fuelers to get their message across, his life has been damaged. His sleep and appetite continues to be affected to this day. He has sought medical assistance. He continues to worry about financial abilities, to pay for his home, help his family, here and in the Philippines. He has jumped from one lesser job to another just to make ends meet. His mind continues to be bothered by such injustice. He keeps shaking his head, 2005 to 2018, all those years serving SFO, travelers, the airline industry, Menzies….and what, they turned over his life, to protect someone who was a bad employee – with 2 years of service? Navarro Decl., ¶¶ 19-23.

## III. LEGAL STANDARD

The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 242–43 (1986).

The clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes v. SH Kress & Co.*, 398 U.S., at 158–159. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co*., 334 U.S. 249 (1948); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

## IV. ARGUMENT

### A. Plaintiff Establishes a *Prima Facie* Case of Discrimination Because Menzies Investigation Was Not Good Faith And Substantial Evidence Exists That A White Supervisor Was Treated Preferentially.

California has adopted the three-stage burden-shifting test for discrimination claims set forth in *McDonnell Douglas Corp. v. Green* 411 U.S. 792 (1973). "This so-called McDonnell

Douglas test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297.

Proof of discriminatory intent often depends on inferences rather than direct evidence. *Spitzer v. Good Guys, Inc.* 80 Cal.App.4th 1376 (2000). And because it does, "very little evidence of such intent is necessary to defeat summary judgment." *Nadaf–Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 991–992. Put conversely, summary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff. *Spitzer v. Good Guys, Inc.*, supra, 80 Cal.App.4th at p. 1386; see generally, *Miller v. Department of Corrections* 36 Cal.4th 446, 470. (2005); *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 283 (2009).

### 1. Menzies' Inadequate Investigation Was A Deficient Basis To Form A Good-Faith Belief that Plaintiff Engaged in Harassment

Menzies argues that all is required of an employer is a good-faith belief that Plaintiff engaged in the terminable conduct and Plaintiff's denials that he did so are insufficient to show overcome an employer's honest belief that served as a non-discriminatory reason for termination. MSJ MPA 11:1-21. To this end, Menzies contests that decision-makers Vargas and Aguilera, honestly believed that (1) Plaintiff pressured employees to sign the petition and (2) this conduct amounted to harassment and intimidation in a violation of its Code of Conduct. MSJ MPA 7:4-16. However, Plaintiff advances specific evidence—beyond his own denials—demonstrating that Vargas and Aguilera's basis for believing Plaintiff harassed Fuelers was based on a pre-determined investigation and not in good-faith.

Counter to Menzies' claim that it conducted an investigation into "the entire scenario surrounding the petition, including what Dodge had reported about Fuelers being pressured by Plaintiff to sign it" its assertion is not supported by the record. MSJ MPA, 5:6-7. In reality, Menzies only investigated Dodge's statement concerning Plaintiff and never investigated the

petition's underlying reports that Dodge was acting unprofessionally and denying meal breaks to Fuelers. Further, Menzies claims that its investigation was also prompted by a Union complaint is unsubstantiated and subject to genuine dispute. Vasquez Decl., ¶ 10.

In an attempt to dilute Dodge's role in sparking an investigation, Menzies claims that it first learned of the petition after Aguilera received a call from Union representative, Charles Owinche, reporting that members were being pressured to sign a petition. However, Aguilera testified that she never received a return call from Owinche in response to her request for a copy of the petition and who was being forced to sign. Exh. 40, Aguilera Deposition, 24:7-20. Effectively, this lead went unsubstantiated, and was never tied to Plaintiff. Further, Union Steward Vasquez testified that he knows Owinche and spoke to him about the petition. Vasquez testified that Menzies' claim that it received such a complaint from Owinche "does not make sense" because the Union office, including Owinche, was actively seeking signatures on the petition, including support from supervisors, like Plaintiff. Exh. 32, Vasquez Decl., ¶ 9, 10, 11.

Despite Menzies attempt to obfuscate the timeline, the record clearly shows that once Dodge verbally reported concerns regarding Plaintiff, Menzies acted promptly to initiate an investigation by first asking Dodge to write a statement summarizing his concerns. MSJ MPA 4:23-26. AOE, Exh. 21, Safety and Security Manager Kevin Bloomberg was tasked with investigating. Exh. 32, Decl. Vasquez ¶ 5, Exh. 40, Aguilera Deposition, 24:15-25, 25:1-17. Blumberg did not attempt to talk with the Union regarding the petition. AOE Exh 26. His email summarizing the evidence collected and findings of his investigation confirms that he only relied on the statements Fuelers Isaiah Banks and Charles Lawrence stating Plaintiff made them **uncomfortable** by signing the petition, his conversation with Plaintiff, the Dodges statements and texts.[2] AOE Exh. 26. AOE 26, Aguilera Depo. 25:18-25, 28:7-18, 33:4-12. His email findings

---

[2] Further, the Fueler statements submitted by Menzies and gathered in their investigation constitute inadmissible hearsay and do not qualify as an exception under Federal Rules of Evidence 803, including RFE 803(6)(B), Business Records Exception to prove they underlying content actually occurred because they were not made as part of a regularly conducted business activity of Menzies. AOE Exhibit 23; *Annett v. Univ. of Kansas*, 93 F. Supp. 2d 1135 (D. Kan. 2000) (holding that a letter containing statements made by Native American state university

make no mention of findings with respect to the petition's underlying complaints concerning Dodge. *Id.* Aguilera and Vargas testified that no other written conclusions regarding the investigation exist concerning the underlying reports about Dodge. Aguilera Depo. 32:19-25, 33:1-12.

Menzies chose not to interview numerous individuals who deny Plaintiff's asked or pressured fuelers to sign. The petition was signed by twenty-four Fuelers, seventeen of whom are Filipino, and two Filipino supervisors, and yet, Menzies interviewed no signatories. Navarro Decl. ¶14; AOE Exh. 26. Testimony by Union representative Rafael Vasquez and member Jezen Canlas confirm that they started the petition and asked other Fuelers to sign, not Plaintiff. Exhibits 5, Exhibit 11, Exhibit 1, 45:1-22. Such interviews would be critical to determining whether Plaintiff's conduct amounted to terminable harassment in violation of Menzies' Code of Conduct, particularly because the written statements collected make no mention of harassment or abuse by Plaintiff, merely that their signature on the petition made them uncomfortable.

For Menzies to establish that its decision makers held a good faith belief that Plaintiff engaged in terminable conduct, the basis for that conclusion must be honest and impartial. The case cited by Menzies affirms as much. *Kodwavi v. Intercontinental Hotels Grp. Res., Inc.*, 966 F. Supp. 2d 971, 984 (N.D. Cal. 2013) held that the employer demonstrated a good-faith, honest basis for terminating plaintiff based on "a thorough investigation, speaking to ***scores of witnesses***, and reviewing Plaintiff's entire personnel file." Here, Menzies' investigation ignored key witnesses, presumably because they would support Plaintiff, and came to the conclusory finding that Plaintiff's conduct amounted to harassment. Menzies' investigation does not satisfy the good-faith standard articulated by the court in *Kodwavi,* and therefore Menzies fails to establish that it held a legitimate, non-discriminatory reason to terminate Plaintiff.

professor to the university was not made as part of professor's duties to produce records for the university and was not admissible to prove that the adverse action occurred to support professor's discrimination claims under Title VII). Menzies submitted a third statement by Mario Caballero Salazar authenticated by Aguilera. Menzies AOE Exh. 1. However, her email dated August 27, 2018 only makes reference to two statements. Menzies AOE Exh. 26.

Further, Menzies cites *Collier v. Windsor Fire Prot. Dist. Bd. of Directors*, No. C 08-2582 PJH, 2011 WL 4635036, at 4 (N.D. Cal. Oct. 6, 2011) for the position that the court need not determine whether plaintiff actually committed the misconduct that led to the dismissal, only whether a factual basis for the employer's decision was reached honestly. The *Collier* ruling is entirely inapplicable here. There, the court analyzed the employer's burden applicable to a procedural and substantive due process challenge brought by a public employee firefighter. *Id.* at 4. The decision does not address an employer's burden under FEHA to establish a legitimate, non-discriminatory basis for termination under the *McDonnell-Douglas* burden shifting framework applicable here.

### 2. Menzies After-Acquired Evidence Is Immaterial to Show The Decision-Makers Held A Good-Faith, Legitimate Belief That Plaintiff Pressured Employees To Sign The Petition.

In its Appendix of Evidence submitted in support of its MSJ, Menzies includes eight declarations by Fuelers claiming pressure by Plaintiff or that they were presented with only a signature page. Notably, these declarations were collected in September 2020 and years after Menzies conducted the investigation that served as the basis for Plaintiff's termination. None of the Declarants submitted statements, nor were they interviewed by Menzies, prior to Plaintiff's termination. Further, while two of the declarants claim to have felt pressured by Plaintiff to sign, their signatures also appear on the second petition submitted to Menzies after Plaintiff was terminated and absent from the workplace, rendering him incapable of being in any position to force anyone to sign the petition. Two additional declarants specifically testify that Jezen Canlas, not Plaintiff, asked them to sign the petition. AOE Exhs. 8 & 9. Most critically, however, after-acquired evidence is immaterial to proving that an employer held a legitimate, non-discriminatory basis for termination. The statements made in these declarations concerning Plaintiff's conduct were unknown to Menzies' decisionmakers when they fired Plaintiff, and therefore have no bearing in supporting that Menzies held a legitimate reason for termination. *Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407, 431 (2014) (holding that after-acquired evidence is simply irrelevant during all phases of the three-stage burden-shifting approach designed to establish liability.); *and see Horne v. Dist. Council 16 Internat. Union of Painters & Allied Trades*, 234 Cal. App. 4th

524, 540 (2015).

### 3. Plaintiff Can Establish Substantial Evidence of Pretext.

Even assuming that Menzies believed that Plaintiff asked employees to sign the petition, and if that further formed a good-faith belief that Plaintiff violated Menzies' Code of Conduct, Plaintiff can establish substantial evidence that Menzies' purported reason is pre-text to mask a discriminatory motive. [3]

First, Menzies assertions that Plaintiff admitted that he has no tangible evidence to support his termination is a gross misrepresentation. Plaintiff testified that he believes he was subjected to discrimination because Menzies took no action against Dodge, a White supervisor, but fired Plaintiff for reporting valid problems to management concerning Dodge's misconduct. See Navarro Deposition 91:14-25. Such comparator evidence is probative of pretext. Evidence that an employer treated "similarly situated employees outside the plaintiff's protected class more favorably is probative of the employer's discriminatory or retaliatory intent. *Guz*, supra, 24 Cal. 4th at 366, *internal quotations removed*; *McDonnell Douglas Corp.*, supra, 411 U.S. at 804 (holding that evidence that white employees who engaged in comparable conduct were retained or rehired while the plaintiff, who is black, was laid off); *and see Gupta v. Trustees of California State Univ.*, 40 Cal. App. 5th 510, 519 (2019).

Menzies' does not dispute that it received information concerning Dodge's conduct and

---

[3] Even assuming that Menzies believed that Plaintiff improperly pressured employees to sign the petition was a factor in their decision to terminate his employment, Plaintiff can still prevail upon showing that discrimination was the ***substantial motivating factor.*** Under FEHA, Plaintiff is only required to show that discrimination was a ***substantial motivating factor*** behind the adverse action to affix employer liability, even if other factors would have led the employer to make the same decision at the same time. See *Harris v. City of Santa Monica,* 56 Cal.4th 203, 229 (2013). A complainant need not prove that discriminatory animus was the sole motivation behind a challenged action. *Mixon v. Fair Employment and Housing Com.*, 92 Cal.App.3d, 1306, 1319 (1987). *Id.* In so doing, California courts recognize that discrimination need not be a "but for" cause in the employment decision to find liability. See *Harris, supra,* 56 Cal.4th at 232.

mismanagement that warranted corrective action. MSJ MPA 3:16-18. The petition itself reported Dodge for engaging in unprofessional behavior, the very reason that Aguilera testified was the basis for Plaintiff's termination. AOE Exh. 22; Aguilera Depo., 33:17-22. However, Menzies' claims it only counseled Dodge—a response that pales in comparison to the termination decision handed down to Plaintiff—demonstrating different treatment. Indeed, Menzies ignored and took no action in response to numerous reports through 2017 to 2018 of Dodge's violations of workplace policies, code of conduct and California labor laws. Vasquez Decl. ¶¶ 6, 8

Menzies attempt to cast Plaintiff's conduct in contrast to complaints concerning Dodge as an apples-to-oranges comparison is not well taken. MSJ MPA 12:9-26. Menzies admits that it terminated Plaintiff because they concluded that Plaintiff soliciting signatures and intimidating employees. AOE ¶ 26; MENZIES 000197. Vargas testified that "One person, just one person complaining about supervisor harassment is enough to take action." Exh. 41; Vargas Depo., 41:18-25, 42 35:1. While Menzies claims that it only received complaints regarding Dodge's harassment after Plaintiff was terminated, this assertion is contradicted by testimony of several Fuelers who report complaining to management on numerous occasions for over a year prior to Plaintiff's termination regarding Dodge's abusive and harassing conduct toward Fuelers. At the very least, a genuine, material dispute of fact exists as to whether Menzies' received complaints.

Plaintiff testified that he has observed discriminatory terminations of Asian coworkers, whereas White employees, including Dodge, faced no repercussions for violating company policies. Exhibit 37, Navarro Deposition, 91:14-25. Navarro Decl., ¶ 7. Other Fuelers also testified that Menzies perpetuated a harassing and discriminatory treatment toward Filipino employees by Dodge, Aguilera, and Menzies management. Vasquez Decl., ¶ 3; Canlas Decl., ¶ 5, 6; Navarro Decl., ¶ 6, 8-10, Ilagan Decl. ¶ 7.

Finally, Menzies' investigation into Plaintiff's conduct was conclusory and did not interview additional Fuelers or the Union Representative responsible for starting the petition. When an employer's investigation of an employee, used to justify the employee's termination, and the employer's failure to interview witnesses for potentially exculpatory information is

evidence that the termination was a pretext. *Reeves v. Safeway Stores*, 121 Cal. App.4th 95, 120–121; *Nazir v. United Airlines, Inc.*, 178 Cal. App. 4th 243, 280 (2009).[4]

### B. Plaintiff Establishes a *Prima Facie* Case of Retaliation Because He Engaged in Protected Activity By Lending Support and Repeatedly Notifying Management of Filipino Fuelers Complaints of Dodge's Harassment Leading Menzies To Silence Him By Terminating His Employment.

To prove a prima facie case of retaliation under the Fair Employment and Housing Act, plaintiffs must show 1) they engaged in a "protected activity," 2) the employer subjected the employee to an adverse employment action, and 3) there was a causal link between the protected activity and the employer's action. See *Yanowitz v. L'Oreal USA, Inc.* 36Cal.4th 1028, 1042 (2005). Of course, an employee need not explicitly and directly inform his or her employer he or she believes the employer's conduct was discriminatory or otherwise forbidden by FEHA. *Id.* at p. 1046. "The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1047 (2005) *quoting Garcia-Paz v. Swift Textiles, Inc.,* 873 F. Supp. 547, 560 (D. Kan. 1995).

### 1. Plaintiff's Involvement With the Petition Is The Culmination of A Several Reports Made By Plaintiff And Other Filipino Fuelers Regarding Dodge's Unlawful Harassment And Constitutes Protected Activity.

Menzies' attempts to skirt liability by claiming that the complaints they received regarding Dodge concerned only operational issues and did not contain reports of harassment or abuse. MSJ MPA 12:3-5. Menzies's narrow focus on the words of the petition itself, concerning Dodge's unprofessional behavior and denying Fuelers meal and rest breaks, conveniently ignores

---

[4] Menzies may have inadvertly forgotten to use the Errata sheet provided by Plaintiff and posted or included by the deposition officer as part of the certified transcript. The errata sheet was included on Sept. 2, 2020. A copy of the Errata sheet is found in Ex. 38. There are substantive changes to the cited testimony by Menzies.

the repeated reports by Plaintiff and the Union prior to the petition complaining of Dodge's misconduct and harassment of Filipino Fuelers to Menzies management. This claim is unsupported by the evidentiary record and constitutes a fact subject to genuine dispute. Indeed, the petition was the culmination of these efforts that went largely ignored by Menzies. Canlas Decl., ¶¶ 8-9. Such narrow focus of protected activity is not supported by California law. Rather, to prevail in establishing protected activity under FEHA, "an employee is not required to use legal terms or buzzwords when opposing discrimination. The court will find opposing activity if the employee's comments, **when read in their totality**, oppose discrimination." *Yanowitz v. L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1047 (2005) *quoting Wirtz v. Kansas Farm Bureau Services, Inc*. (D.Kan.2003) 274 F.Supp.2d 1198, 1212, fn. Omitted. This enactment aids enforcement of the FEHA and promotes communication and informal dispute resolution in the workplace. *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 472 (2005) (quoting *Flait v. North American Watch Corp.*, 3 Cal. App. 4th 467, 476–477 (1992)).

Plaintiff testified that he reported to Renil Lal and John Qually about the way Mr. Dodge treated Filipino fuelers. Navarro Decl., ¶ 13. Other Fuelers also testified that Plaintiff's involvement was one of many reports to management regarding Dodge's mistreatment of Filipino Fuelers. Further, Menzies' claim that the only complaint of harassment regarding Dodge was a letter received from Union Steward Rafeal Vasquez after Plaintiff's termination is contradicted by the content of Mr. Vasquez's letter itself. MSJ MPA 7:19-26; AOE Exh. 28.. The November 18, 2018 letter states that Mr. Vasquez reported Dodge's harassment and abuse to Raul Vargas **on three prior occasions.** This is echoed in the testimony of other Fuelers. Further, Union members testified that they attended regular meetings with management which they reported Dodge's harassing and abusive conduct toward Filipino Fuelers. Vargas Depo., ¶ 8; Canlas Decl., ¶ 15.

Here, the evidentiary record demonstrates a long history of complaints to management regarding Dodge, which Plaintiff was an integral part. Employees' belief that they are complaining about prohibited conduct "may be inferred from the **nature and content of their repeated complaints.** The issue of a plaintiff's subjective, good faith belief involves questions of

credibility and ordinarily cannot be resolved on summary judgment." *Castro-Ramirez v. Dependable Highway Express, Inc.*, 2 Cal. App. 5th 1028, 1047 (2016) (quotations omitted).

### 2. Plaintiff Is Protected Under FEHA Retaliation Because He Was a Prospective Witness to Dodge's Unlawful Harassment And Menzies' Failure to Take Corrective Action.

California courts have found that FEHA prohibits "[e]mployer retaliation against employees who are believed to be ***prospective*** complainants or witnesses for complainants" because the absence of such protection would "undermine[] this legislative purpose just as effectively as retaliation after the filing of a complaint. *Steele v. Youthful Offender Parole Bd.*, 162 Cal. App. 4th 1241, 1255 (2008). Menzies was aware that Plaintiff observed Dodge engaging in harassing conduct and abuse toward Filipino Fuelers – Plaintiff previously reported as much to Menzies and sought corrective action. Further, Plaintiff, as a supervisor, was in a central position both to (1) the number and variety of complaints raised against Dodge (2) Menzies's repeated failure to correct or prevent further incidents of harassment from occurring, and (3) Plaintiff also felt discriminated against in contrast to Menzies' favoritism toward Dodge. Against this backdrop, Plaintiff was a central player both in witnessing harassment and unsafe working conditions. As the court in *Steele* articulate, preemptive retaliation against a prospective witness to discrimination is unlawful and prohibited under FEHA. Menzies rush to terminate Plaintiff before investigating Dodge's conduct and refusal to interview Plaintiff with respect to his own observation about Dodge's conduct suggests a quick hack job aimed at silencing a central witness to a year-long period of unchecked harassment of Filipino Fuelers. Indeed, Plaintiff testified that after he was suspended, he was never allowed to explain his side of the story for signing the petition, nor his reason for siding with fuelers, demonstrating Menzies' intent to silence Plaintiff. Navarro Decl. ¶ 16, 17.

### 3. Menzies Exaggerates, and Misreads the Law, In Concluding That The Act of Signing The Petition Is a Violation of Federal Law Under 29 USC § 159.

Menzies claims that Plaintiff's retaliation claim fails because he did not engage in protected activity under FEHA, and attempts to characterize his conduct as illegal activity under federal labor law. 29 USC § 159 is not designed merely to protect particular election or

organizational campaign but is **designed to protect employees** in exercise of their organizational rights. *N.L.R.B. v. Raytheon Co.*, 398 U.S. 25, on remand 445 F.2d 272. In lending support to Fuelers by signing the petition, Plaintiff does not interfere with the Union's right to petition but instead furthers that purpose. Plaintiff has asserted all along that he does nothing more. His position is supported by the actual Union members who did solicit signatures.

Raul Vargas, in articulating his reason to terminate, mentions nothing of Union interference. Even if Menzies's claim that Plaintiff's conduct amounted to asking Fuelers to sign a petition, such conduct does not constitute interference with Union business or right to grieve. Rather, Plaintiff was actually assisting the Union. The content of the petition in no way sought to change members rights under the CBA, but seeks to address Dodge's mismanagement that lead to working conditions violations. Union member Jezen Canlas requested assistance from Mr. Navarro. The Fuelers, with the assistance of the Union, initiated the petition and asked Navarro to add his name and submit to management. That does not amount to unlawful labor practice. Further, of note, is that July Macapagal, another supervisor also lent his support, he was not investigated nor terminated. Menzies' was aware of this, and yet, If Menzies did believe that Plaintiff's involvement with the petition as a supervisor violated employees' bargaining rights, their uneven handling of this purported issues signals Menzies' retaliatory targeting of Plaintiff. While Raul Vargas requests that July Macapagal also be investigated as a supervisor who signed the petition, Macapagal testified that he was never questioned, nor investigated for lending his signature to the petition. Macapagal Decl., ¶ 6.

The cases that Menzies cites lend no support to their position. In *Castelli v. Douglas Aircraft Co., 752 F.2d 1480* (9th Cir. 1985) employee filed suit challenging his discharge and alleging that union breached its duty of fair representation. The Court granted summary judgment in favor of the employer and union. Employee appealed the grant of summary judgment in the union's favor. The Court of Appeals, Poole, Circuit Judge, held that: (3) the policy that the union is the exclusive representative of all employees in the bargaining unit for purposes of collective bargaining generally requires that the union, rather than privately retained counsel, deal with the

employer in the settlement of employee grievances.

Menzies then cites *Stewart v. Leland Stanford Junior Univ.*, No. C 05-04131 JW, 2006 WL 889437 (N.D. Cal. Apr. 5, 2006). But there again the issue was the right of a union member to have their own legal representation. Honorable James Ware was clear in his pronouncement that "federal labor statutes disfavor the involvement of privately retained attorneys in grievance proceedings because such participation would undermine the policy of exclusive representation." *Stewart v. Leland* at *4 (citing *Castelli v. Douglas Aircraft*, at 1484).

Cases that have more similar factual scenarios under 29 USC § 159 point the other direction and is more illustrative of the rights contained within the subchapters. In *Lake City Foundry Co. v. N. L. R. B., C.A.7 (Ill.)* 1970, 432 F.2d 1162, the Court there illustrated that statements by company secretary to employee who was wearing union button that company did not want union, that it was no good and that employee would no longer get personal loans from company if union got in and that employee would lose all overtime and there would be layoffs because union would want strikes, and questioning of employee whether she knew "those union guys had been around here," constituted no more than expression of opinion and were permissible. While in *N.L.R.B. v. WKRG-TV, Inc.*, 470 F.2d 1302, 1316 (5th Cir. 1973), the Court there was clear in instructing that there must be a more substantial exhibition of pressure than a passing remark or a statement of pro-union conviction. So long as nothing in the words, deeds, or atmosphere of the alleged "solicitation" contain the seeds of potential reprisal, punishment, or intimidation, the involvement of the supervisors does not rise to the levels of supervisory "solicitation" that we condemned.

Therefore, cases that analyze what amounts to "solicitation" or "pressure" such that it rises to the level of interference, focus on an effect that indicate union members were forced to act against their will. Here, the petition was assisted by Mr. Navarro, not undermined.

### C. Plaintiff Established A Claim of Wrongful Termination in Violation of Public Policy Because Menzies Discharged Plaintiff For Challenging Unlawful Working Conditions.

Plaintiff's wrongful discharge claim rests on his assistance and assertion of important state

rights. The right of employees for meal breaks. The right of employees to be free from discrimination and harassment. In assisting the efforts of the fuelers asserting such rights he was terminated. [W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions. *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170. "The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm." *Yau v. Allen* (2014) 229 Cal.App.4th 144, 154.

"[T]he cases in which violations of public policy are found generally fall into four categories: (1) refusing to violate a statute; (2) performing a statutory obligation (3) exercising a statutory right or privilege; and (4) reporting an alleged violation of a statute of public importance." *Gantt v Sentry Insurance* (1992)1 Cal.4th1083, 1090–1091, internal citations and footnote omitted, overruled on other grounds in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80, fn. 6. "[T]ermination of an employee most clearly violates public policy when it contravenes the provision of a statute forbidding termination for a specified reason … ." [A]n employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity." *Green, supra, 19 Cal.4th at p. 87*, internal citation omitted. "FEHA's policy prohibiting disability discrimination in employment is sufficiently substantial and fundamental to support a claim for wrongful termination in violation of public policy." *Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 660. "California's minimum wage law represents a fundamental policy for purposes of a claim for wrongful termination or constructive discharge in violation of public policy." *Vasquez v. Franklin Management Real Estate Fund, Inc.* (2013) 222 Cal.App.4th 819, 831−832.

Here, for over a year Plaintiff was attempting to put into focus the illegal activities that Andrew Dodge engaged in. The straw that broke Menzies' back and therefore schemed to terminate him, was his support of the Fuelers in the efforts to enforce meal break rights and

"unprofessional behavior" by Mr. Dodge.  When the petition put into focus the actions of Andrew Dodge towards the fuelers, which upon investigation included harassment, abuse of power and discrimination, instead of performing their duties under the law, Menzies schemed against Navarro to shield Dodge, push back the fuelers and therefore make the problem go away.

### D. Plaintiff's IIED Claim Is An Exception To Exclusive Remedy Rule Because Menzies Engaged in Conduct Outside Compensation Bargain – A Scheme To Protect Dodge,  Terminate and Make an Example Out Of Plaintiff  For Pursuing Fueler's Claims of Harassment, Intimidation, Abuse of Power And Discrimination.

Workers' compensation is not the exclusive remedy when an employer's conduct is outside of the compensation bargain. *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 7; *City of Moorpark v. Superior Court of Ventura County (Dillon)* (1998) 18 Cal.4th 1143, 1157–60.  Those situations exist when the employer steps out of its proper role or engages in conduct of questionable relationship to the employment. *Shoemaker at 503*.  In those cases, an employee may pursue a civil claim against the employer.

In assessing whether an exception to the exclusive remedy rule exists for a cause of action, courts first determine whether the alleged acts are of the kind reasonably contemplated by the compensation bargain. The California Supreme Court has stated, "[T]he critical issue is whether the alleged acts, bereft of their motivation, can ever be viewed as a normal aspect of the employer relationship or claims process. Where the tortious act is not closely connected to a normal employer or insurer action, it is not subject to exclusivity." *Charles J. Vacanti, M.D., Inc. v. SCIF* (2001) 14 P.3d 234, 244.  One court stated, "Workers' compensation awards may fall short of making the tort victim 'whole' and provide no deterrent effect on an intentionally wrongdoing tortfeasor." *Young v. Libbey-Owens Ford Co.* (1985) 168 Cal. App. 3d 1037, 1044.

#### 1. Intentional Infliction of Emotional Distress Is Not Barred Because Menzies Engaged In A Campaign to Terminate Plaintiff and Retaliate – Misconduct That Exceeded The Normal Risks Of The Employment Relationship.

In *Vanderhule v. Amerisource Bergen Drug Corp.* United States District Court, C.D. California (January 17, 2017)  2017 WL 168911, 82 Cal. Comp. Cases 128 (U.S. District Court held that claim for intentional infliction of emotional distress was not barred by exclusive remedy

rule based on harassment and discrimination); *Paleg v. Kmart Corp*. United States District Court, C.D. California (July 11, 2017) 2017 WL 2974923, 82 Cal. Comp. Cases 747 (U.S. District Court held plaintiff's intentional infliction of emotional distress claim not barred by exclusive remedy rule). Also, in one case, the Court of Appeal held that an employee may pursue a claim for intentional infliction of emotional distress in the employment context when the conduct at issue violates the FEHA. The plaintiff alleged that her supervisor engaged in sexual harassment, discrimination based on sex, sexual orientation, marital status and retaliation over her friendship with a co-worker the supervisor believed to be a lesbian. *Light v. Department of Parks and Recreation* (2017) 82 CCC 987. See also *De Peralta v. Fox Restaurant Concepts* (2018) 83 CCC 478.

Here, Navarro suffered severe emotional distress as a victim of a scheme to remove him in order to protect Mr. Dodge while pushing away the Filipino fuelers who complained of abusive working conditions. The actions of Menzies in ignoring the underlying claim and intentionally making up that Mr. Navarro was pressuring fuelers goes beyond normal work. Navarro alleges retaliation and discrimination for assisting the fuelers in bettering their working conditions. Such despicable conduct by Menzies if proven is simply beyond the compensation bargain contemplated by Workers Compensation.

Date: November 2, 2020                    Liberation Law Group, PC


                                          Arlo Uriarte
                                          Elizabeth Lyons

CHRISTOPHER WARD, CA Bar No. 238777
  cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:   213.486.0065

JASON WU, CA Bar No. 313368
  jwu@foley.com
SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
  sabarbanel@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro,<br><br>                  Plaintiff,<br><br>vs.<br><br>Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                  Defendants. | Case No. 3:19-cv-8157<br><br>**DEFENDANT MENZIES AVIATION, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT, AND EVIDENTIARY OBJECTIONS TO PLAINTIFF'S EVIDENCE**<br><br>DATE:   November 19, 2020<br>TIME:   10:00 a.m.<br>PLACE: Videoconference<br><br>State Court Action Filed:  10/23/19<br><br>Action Removed:  December 16, 2019 |

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................... 1

II.   PLAINTIFF FAILS TO BOTH DISPUTE MENZIES' *MATERIAL* FACTS AND TO
      ESTABLISH HIS OWN "FACTS" NECCESARY TO CHALLENGE MENZIES'
      HONEST BELIEF AND/OR SUPPLY SUBSTANTIAL EVIDENCE OF PRETEXT ............ 1

      A.    PLAINTIFF FAILS TO DISPUTE THE MATERIAL FACTS ESTABLISHING
            MENZIES' HONEST BELIEF HE ENGAGED IN MISCONDUCT AND
            UNDERCUTTING HIS SEARCHING PRETEXT ARGUMENTS .............................. 2

      B.    PLAINTIFF'S ARGUMENTS DEPEND UPON "FACTS" NOT
            ESTABLISHED WITH PROPER EVIDENCE AND WHICH HIS OWN
            EVIDENCE AFFIRMATIVELY UNDERMINES AND DISPROVES........................ 6

            1.    Plaintiff Cannot Avoid Summary Judgment With A Completely
                  New Set Of Allegations Never Raised In This Case ........................................ 7

            2.    Plaintiff Does Not Establish His Eleventh-Hour "Facts"
                  Regarding Dodge's Alleged Actions With Legitimate, Admissible
                  Evidence........................................................................................................... 8

            3.    Plaintiff's Claim That Menzies' Investigation Was A Sham Fails
                  To Create A Valid Connection To His New "Facts" And The
                  Relevant Time................................................................................................... 8

            4.    Plaintiff's Ploys To Garner Sympathy And Paint Himself As An
                  Innocent Supporter Of "The People" Do Not Align With His Own
                  Evidence........................................................................................................... 9

III.  PLAINTIFF'S RED HERRING PRETEXT ARGUMENTS DEPENDING UPON
      SPECULATION AND UNREASONABLE INFERENCES REGARDING MENZIES'
      MOTIVES ARE NOT SUSTAINED BY SUBSTANTIAL ADMISSIBLE EVIDENCE ...... 10

      A.    PLAINTIFF'S ACCUSATIONS AGAINST DODGE CONTRADICT HIS OWN
            ADMISSIONS AND LEGALLY CANNOT SERVE AS SUBSTANTIAL
            EVIDENCE OF PRETEXT ..................................................................................... 11

      B.    PLAINTIFF'S ARGUMENTS DEPEND ON INADMISSIBLE MATERIAL,
            NOT SUBSTANTIAL EVIDENCE ......................................................................... 12

IV.   EVIDENTIARY OBJECTIONS TO PLAINTIFF'S INADMISSIBLE MATERIAL ............. 13

V.    CONCLUSION...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aragon v. Republic Silver State Disposal*,
    292 F.3d 654 (9th Cir. 2002) ...................................................8

*Block v. City of Los Angeles*,
    253 F.3d 410 (9th Cir. 2001) ...........................................7, 11

*Bracke v. City. of L.A.*,
    60 F. App'x 120 (9th Cir. 2003) .......................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...........................................................8

*Cucuzza v. City of Santa Clara*,
    104 Cal. App. 4th 1031 (2002) ..................................2, 8, 10

*Gov't Employees Ins. Co. v. Superior Court*,
    79 Cal. App. 4th 95 (2000) ........................................4, 7, 11

*Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*,
    397 F.3d 1217 (9th Cir. 2005) ........................................7, 11

*Horne v. Dist. Council 16 Int'l Union of Painters & Allied Trades*,
    234 Cal. App. 4th 524 (2015) ..............................................5

*Incalza v. Fendi N. Am., Inc.*,
    479 F.3d 1005 (9th Cir. 2007) ..............................................4

*Morgan v. Regents of Univ. of Cal.*,
    88 Cal. App. 4th 52 (2001) .........................................2, 8, 9

*Ramirez v. AvalonBay Cmtys., Inc.*,
    2015 U.S. Dist. LEXIS 130475, 2015 WL 5675866 (N.D. Cal. Sept. 26, 2015) ...................13

*Salas v. Sierra Chem. Co.*,
    59 Cal. 4th 407 (2014) .......................................................5

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002) ..............................................4

## I.     INTRODUCTION

In light of the wealth of evidence presented by Menzies Aviation in support of its motion reporting complaints of Plaintiff Renaldo Navarro pressuring employees to sign a petition about operational problems with Andrew Dodge's performance, it comes as little surprise that Plaintiff has not created a genuine dispute of *material* fact regarding Menzies' honest belief that Plaintiff engaged in such conduct and decided to terminate him on that basis.  Nor is it surprising that the factual premises Plaintiff attempts to argue to support *prima facie* claims of discrimination and retaliation and claim Menzies' reasons for its action were pretextual do not withstand evidentiary scrutiny and fail to rise to anything beyond speculative factual façades lacking actual substance, and thus fail to sustain Plaintiff's burdens under Fed. R. Civ. P. 56 and the *McDonnell Douglas* analysis.

What is surprising is the degree Plaintiff goes hoping to distract from Menzies' legitimate showing and the deficiencies in his *prima facie* and pretext arguments.  Plaintiff builds his entire opposition on a wholly new set of disparaging non-operational accusations about Dodge and complaints to Menzies that have avoided all mention in any of the written complaints about Dodge and all prior points in this litigation – including both Plaintiff's testimony when asked to identify his evidence and his counsel's questioning of Menzies' witnesses.  Plaintiff may not avoid summary judgment with after-the-fact contradictions of his testimony and never-advanced accusations at odds with all the evidence any more than he can establish pretext based on an evidentiary proffer comprised of speculation, hearsay, and unreasonable opinion inferences lacking proper foundation and personal knowledge.  Working through and rejecting these distractions makes plain Plaintiff has not met his burdens to create a triable issue regarding Menzies' motives and honest belief he engaged in misconduct.  The Court should thus grant complete summary judgment for Menzies.

## II.    PLAINTIFF FAILS TO BOTH DISPUTE MENZIES' *MATERIAL* FACTS AND TO ESTABLISH HIS OWN "FACTS" NECCESARY TO CHALLENGE MENZIES' HONEST BELIEF AND/OR SUPPLY SUBSTANTIAL EVIDENCE OF PRETEXT

For all the sleight-of hand and new accusations made about Dodge that punctuate Plaintiff's opposition materials, they fail to genuinely dispute the *material* facts establishing Menzies' honest belief that Plaintiff committed misconduct and showing his pretext arguments depend not on substantial

admissible evidence, but upon inadmissible factual assertions, speculation and hearsay. *See Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1038 (2002); *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 77 (2001). Quizzically, Plaintiff instead supplies evidence reinforcing the good-faith character of Menzies' honest belief, while his other evidentiary material fails to support the factual façades he tries to build, undermining his speculative arguments of pretext. With Menzies' *material* facts not disputed and Plaintiff's pretext claims lacking legitimate facts and evidence, the Court should grant summary judgment to Menzies as to all cause of action in the Complaint.

A.  **Plaintiff Fails To Dispute The Material Facts Establishing Menzies' Honest Belief He Engaged In Misconduct And Undercutting His Searching Pretext Arguments**

Predictably, Plaintiff continues to claim "I didn't do it" in the face of extensive evidence – including his own evidence – indicating he pressured and/or misled at least some into signing the first petition detailing only operational problems against Dodge. [Exhibit 22.] However, as Menzies made clear, such denials do not create disputes of any *material* fact. Rather, it is the facts establishing what information Menzies received about Plaintiff's actions and their impropriety, and the facts eviscerating Plaintiff's eleventh-hour arguments of pretext, that are material. Critically, Plaintiff failed to dispute all the following facts establishing Menzies' honest belief Plaintiff engaged in the reported behavior and showing his pretext contentions do not withstand the substantial evidence scrutiny the law demands:

- **Menzies received information from multiple sources, with some specifically identifying Plaintiff, complaining about pressure to sign the petition**. Regardless of his denials about his conduct, Plaintiff does not and cannot dispute that Menzies received information from the Union, Dodge[1], Macapagal, and three fuelers expressing to varying degrees pressure to sign a petition. [Exhibit 4, ¶¶ 3-5, 7; Exhibit 15, 23:24-24:10, Exhibit 16, 11:19-12:3, 13:22-14:6, 15:12-22, 57:21-59:5; Exhibit 17, 39:15-40:5, 41:14-20, 44:17-45:2, 46:12-47:6; Exhibit 21; Exhibit 24; Exhibit 25.] In addition to such information, even as Plaintiff claims his own words are taken out of context, the text message he sent to Dodge and subsequent written statement reinforce some involvement by Plaintiff in the petition and his appearing to use it to threaten Dodge. [Exhibit 21 and 24.] The only

---

[1] Plaintiff argues fuelers never reported to Dodge that it was Plaintiff pressuring them to sign the petition. However, Dodge did in fact testify that fuelers specifically identified "Ray" as the individual pressuring them about the petition. [Exhibit 17, 39:15-40:5.]

one of these facts Plaintiff half-heartedly attempts to dispute is the Union's complaint about someone pressuring members to sign the petition, but that effort is nothing more than rhetorical speculation questioning the communication, not competent evidence legitimately disputing the fact. [Exhibit 32, ¶ 11.]  Plaintiff clearly does not create a legitimate dispute as to any of the information provided to Menzies about Plaintiff's actions that show Menzies had an honest belief he abused his authority and harassed and intimidated others.

- **Plaintiff understood the conduct expectations for which Menzies terminated him**.  Attempting to suggest Menzies did not act in good faith because it never apprised Plaintiff of prohibitions against harassment or abuse of authority, Plaintiff argues he never received Menzies' Code of Conduct or Employee Handbook.  This is clear distraction from two things that are actually material and which Plaintiff does not dispute: (i) Menzies maintains policies prohibiting intimidation and harassment [Exhibit 19 and 20]; and (ii) independent of such policies, Plaintiff understood that the type of conduct reported to Menzies is inappropriate for a supervisor.  [Exhibit 12, 28:1-6, 28:23-33:1, 34:2-4.]  There is no dispute then that Menzies enforced its policies and Plaintiff understood the expectations captured in those policies, such that Plaintiff has not impugned the good-faith nature of Menzies' actions.

- **Menzies considered information from multiple sources prior to making its decision**.  Laboring to paint Menzies' investigation as a pre-determined sham, Plaintiff argues Menzies did not rely upon proper sources in its investigation.  But such arguments do not ultimately dispute that Menzies asked Plaintiff to provide a statement (which he prepared independently and thus had full opportunity to say whatever he wanted to say), and received information from three Fuelers and one supervisor (a Filipino supervisor at that) all reporting pressure to sign the petition.  [Exhibit 4, ¶¶ 3-5, 7; Exhibit 15, 23:24-24:10, Exhibit 16, 11:19-12:3, 13:22-14:6, 15:12-22, 57:21-59:5; Exhibit 17, 39:15-40:5, 41:14-20, 44:17-45:2, 46:12-47:6; Exhibit 21; Exhibit 24; Exhibit 25.]  Plaintiff's text message and statement can be reasonably interpreted to support these witness reports, and given all this information provided to Menzies, it was not some sham exercise by Menzies merely because it did not interview every individual who signed the petition.  There is nothing pretextual in crediting consistent information indisputably received from multiple sources, and Plaintiff thus does not create

any legitimate dispute as to whether Menzies' honestly believed that Plaintiff engaged in misconduct. *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1013 (9th Cir. 2007); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (noting that courts only require an employer honestly believed its reasons for it actions, even if its reason is foolish or trivial.)

- **Menzies addressed the concerns directed against Dodge, not ignore them nor focus its attention only on Plaintiff**. In another "sham investigation" claim, Plaintiff *argues* Menzies singled him out while ignoring other concerns. However, the *evidence* establishes otherwise. As Dodge admitted, Menzies addressed such concerns directly with him. [Exhibit 13, 25:23-25; Exhibit 14, 51:2-52:17; Exhibit 15, 40:11-25; Exhibit 16, 27:13-28:3, 37:17-38:9, 38:22-39:8; Exhibit 17, 21:11-19, 32:14-33:3, 48:3-20, 49:1-7.] Objective documentation also shows Menzies' concern about Macapagal's potential involvement in the petition – another fact Plaintiff ignores. [Exhibit 26 (noting "There is another supervisor involved" and requesting an investigation).] However, Menzies received no evidence of Macapagal pressuring employees, which is not surprising given Macapagal's recognition that it is inappropriate for a supervisor to ask other employees to sign the petition.[2] [Exhibit 4, ¶ 4.]

- ***None* of the purported racist behavior by Dodge appears in the petitions or contemporaneous information provided to Menzies**. For all the attacks against Dodge never alleged in this case until suddenly surfacing in opposition to summary judgment[3] – none of those speculative opinions and hearsay-based "facts" appear in the information provided to Menzies in August 2018. [Exhibits 22, 24, 27 and 28.] Rather, all the written information provided to Menzies about Dodge relates exclusively to the same operational concerns Menzies addressed with Dodge. [*Id.*] Ironically from there, Plaintiff's evidence confirms that the only document even arguably claiming "harassment" by Dodge *was never provided to Menzies* – rather, Rafael Vasquez concedes he provided it *to Plaintiff* months after Plaintiff's termination. [Exhibit 31, ¶ 20.]

---

[2] In a blow to Plaintiff's speculative pretext arguments about Menzies' purported animus toward Filipinos, if Menzies truly bore such animus, Macapagal's signature would have supplied reason to also "persecute" him. That Macapagal suffered no adverse consequence reinforces the legitimate evidence about Menzies' motives and undermines Plaintiff's arguments that such motives were pretext for discrimination or for retaliation.

[3] *Gov't Employees Ins. Co. v. Superior Court*, 79 Cal. App. 4th 95, 98 (2000) (a court may not deny a motion for summary judgment based on issues not raised by the plaintiff's complaint).

- **The witnesses who provided evidence to both Menzies and Plaintiff do not support, and expressly deny, the purported harassment by Dodge.**  It is quite telling that Plaintiff secured declarations from two individuals who also provided testimony in support of Menzies' motion, but Plaintiff could not obtain statements from those witnesses walking back their clear assertions that all complaints actually reported to Menzies about Dodge were operational in character only.  [*Compare* Exhibits 4 and 32 and Exhibits 11 and 35.]  That these witnesses adhere to their assertions is material to reinforcing Menzies' good-faith reliance on the information received in August 2018 and showing the insufficient character of Plaintiff's arguments at pretext.[4]

- **The only information about Dodge sleeping brought to Menzies pertained to off-duty time**.  Plaintiff goes back to the well of Dodge's sleep apnea disability, again arguing Menzies ignored the complaints about him sleeping at work.  Again however, Plaintiff fails to overcome the evidence that Menzies did consider that complaint, verifying that for the instances brought to its attention, Dodge was not on duty (and none of Plaintiff's witnesses claim to have reported to Menzies, or have personal knowledge of Menzies' awareness, of any instance of Dodge sleeping while on duty or in an operational area).  [Exhibit 13, 26:16-19; Exhibit 14, 43:23-44:2, 44:22-45:23; Exhibit 15, 50:20-52:19; Exhibit 16, 28:24-29:11, 29:25-30:9; Exhibit 17, 20:20-25, 21:11-19, 23:15-21, 26:20-27; Exhibit 32, ¶ 6; Exhibit 36, ¶ 6.]  There accordingly is no dispute that Menzies considered the information about Dodge sleeping, but determined it did not need to take any disciplinary action (and arguably would have violated disability laws[5] if it had).

---

[4] Citing to *Salas v. Sierra Chem. Co.*, 59 Cal. 4th 407 (2014) and *Horne v. Dist. Council 16 Int'l Union of Painters & Allied Trades*, 234 Cal. App. 4th 524 (2015), Plaintiff argues the declarations given by fuelers are "after-acquired evidence" upon which Menzies cannot rely at summary judgment.  Plaintiff misrepresents these cases and how they are inapplicable.  In *Salas* and *Horne*, the employer attempted to retroactively rely upon after-acquired evidence to establish a legitimate, non-discriminatory basis for its actions.  Here however, Menzies had multiple sources of <u>contemporaneous</u> information supporting its honest belief in Plaintiff's misconduct.  The declarations therefore do not retroactively create Menzies' reasons for its actions; rather, they reinforce the good-faith character of Menzies' honest belief based on the contemporaneous information and show the deficiencies in Plaintiff's pretext arguments.  The declarations are accordingly not after-acquired evidence at all, but instead reinforce contemporaneous evidence that Plaintiff had intimidated and harassed employees and refute Plaintiff's pretext argument that Menzies treated one complaint differently than another.

[5] With respect to Plaintiff's perverse argument that Menzies did not accommodate Dodge's disability and this "non-accommodation" somehow establishes pretext, whether Menzies or Dodge explicitly called it an accommodation, the fact is Menzies acted appropriately – and lawfully – by not taking disciplinary action.  Dodge reported his disability and Menzies rightly took no action in response to

- **Plaintiff remained involved in a campaign against Dodge following his termination**. Regardless of his denials, Plaintiff's own evidence confirms he continued railing against Dodge and remained involved after his termination. [Exhibits 28-29.] That Vasquez provided his November 18th letter to Plaintiff – but not to Menzies – confirms Plaintiff had an axe to grind with Dodge and severely undercuts his pretext-based attempts to cast his actions toward Dodge as benign. [Exhibit 32, ¶ 20.]

- **Plaintiff was a good supervisor**. One would think, given the overt allegations of racism suddenly injected into this case, that neither Dodge nor Menzies would be complimentary toward Plaintiff. But Menzies does not dispute that Plaintiff was a strong supervisor, and even included Dodge's compliment of Plaintiff in its motion. It makes no sense – and undermines Plaintiff's speculative pretext claims – that Menzies would endorse Plaintiff's self-serving testimony, yet be looking for nefarious way to rid itself of him because of his Filipino race (only to then replace him with another Filipino supervisor, [Exhibit 36, ¶¶ 1-2]) or because of his purported innocent involvement in the petitions against Dodge clearly addressing only operational concerns. [Exhibits 22, 27.]

There simply is no genuine dispute as to any of the foregoing facts, and in some cases it is Plaintiff's own evidence that makes their undisputed nature clear. And because these foregoing material facts are not in genuine dispute, Plaintiff both has not come anywhere close to impugning Menzies' honest belief that he engaged in misconduct and shown his arguments at pretext for what they truly are – distracting arguments not based on substantial evidence-supported facts, but speculation, opinion, unreasonable inference and desperate innuendo. Such claims cannot withstand summary judgment.

**B.**     <u>Plaintiff's Arguments Depend Upon "Facts" Not Established With Proper Evidence And Which His Own Evidence Affirmatively Undermines And Disproves</u>

Unable to create genuine disputes of the foregoing *material* facts, Plaintiff's opposition devolves into a façade of purported "facts" advanced for the first time at this procedural stage with no structure behind them. In addition to being a legally improper effort to avoid summary judgment, Plaintiff's arguments to show he has *prima facie* claims and a sufficient showing of pretext depend on the Court accepting: (i) Plaintiff has valid *admissible* substantial evidence that Menzies bore animus toward Filipinos and employees complaining about working conditions; (ii) Menzies had the purported overt

sleeping off-duty in non-operational areas after Dodge completed a graveyard shift.

complaints against Dodge brought to its attention in a contemporaneous time period to the undisputed complaints about Plaintiff, thus making its investigation a sham; and (iii) Plaintiff innocently participated in the campaign against Dodge, such that the Court should sympathize with his irrelevant character and emotional distress claims and relax his pretext burden.  The problem for Plaintiff is that he does not establish any of these red herring "facts" with substantial admissible evidence.

### 1. Plaintiff Cannot Avoid Summary Judgment With A Completely New Set Of Allegations Never Raised In This Case

Given the extreme character of the accusations against Dodge, it is astonishing that Plaintiff's opposition is somehow the first time any such accusations have appeared.  None of the petitions or Plaintiff's other written materials come anywhere close to identifying such wild accusations.  [Exhibits 22, 24, 25, 27.]  The Complaint is bereft of such allegations, as are Plaintiff's previous factual summaries presented to the Court and Menzies.  [*See* Docket Nos. 1-2 and 14.]  In fact, despite being specifically asked about his complaints against Dodge and what evidence he had to support his assertions of discrimination and retaliation, Plaintiff never identified anything remotely so incendiary during his deposition, only to now submit an after-the-fact declaration containing such contentions.  [Exhibit 12, 46:16-47:11; 49:15-18; 51:9-17; 28:24-29:15, 30:8-19, 31:21-32:13, 88:24-93:23, 94:7-95:7.]  Plaintiff's own discovery never hinted at such "facts" either – despite asking Menzies' witnesses extensively about Dodge's performance issues and complaints about him, Plaintiff's counsel never inquired about any such overt racism by Dodge or reports of the same to Menzies.  [Exhibits 46-52.]  And of course, Menzies presented consistent evidence from Dodge's subordinates disclaiming any such harassment and racism.  [Exhibits 4-11, 32, 35.]

Not only does it challenge credulity to think Plaintiff would have such strong purported facts to support his case only to withhold them until this eleventh hour, the seeming invention of such information after never previously disclosing it effectively contradicts his own admissions in an improper attempt to avoid summary judgment based on new information.  *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005); *Block v. City of Los Angeles*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001) ("a party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts"); *Gov't Employees Ins. Co.*, 79 Cal. App. 4th

at 98 (a court may not deny a motion for summary judgment based on issues not raised by the plaintiff's complaint). The Court should see this latest turn in Plaintiff's campaign against Dodge for what it truly is – desperate character assassination to avoid summary judgment – not valid facts or argument supported by substantial and admissible evidence of pretext.

  **2.  Plaintiff Does Not Establish His Eleventh-Hour "Facts" Regarding Dodge's Alleged Actions With Legitimate, Admissible Evidence**

  In addition to their highly dubious character and legal impropriety at this late stage, Plaintiff's defamatory accusations against Dodge highlight the improper nature of the *evidence* proffered to attack Menzies' motives and the insufficiencies in Plaintiff's *prima facie* and pretext arguments. And this is where (as shown in Menzies' evidentiary objections, *infra*) Plaintiff's only-now-raised contentions truly fall apart: they depend upon opinions, speculation, hearsay, and inference without foundation or personal knowledge. Repeatedly Plaintiff's witnesses concede the motives attributed to Menzies are "opinions" and "belief" speculatively drawn from false conclusions that Menzies supposedly never addressed complaints about Dodge's performance. [Exhibit 32, ¶¶ 5-7, 11, 14, 18; Exhibit 33, ¶¶ 4-5, 16; Exhibit 35, ¶ 5.] What thus becomes clear from Plaintiff's proffer is its dependency upon self-serving speculation and opinions, not actual facts. Plaintiff's <u>substantial</u> evidence burden demands far more than such incendiary late-hour additions to the case narrative constructed upon inference, not actual fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) (Rule 56 requires a non-moving party go beyond its own pleadings and affidavits and identifying specific legitimately disputed facts); *Aragon v. Republic Silver State Disposal*, 292 F.3d 654, 658 (9th Cir. 2002); *Cucuzza*, 104 Cal. App. 4th at 1038 (a showing that only gives rise to speculation or unreasonable inferences about employer motivation does not create a triable issue); *Morgan*, 88 Cal. App. 4th at 77 (speculative evidence "does not rise to the level of the substantial evidence of pretext").

  **3.  Plaintiff's Claim That Menzies' Investigation Was A Sham Fails To Create A Valid Connection To His New "Facts" And The Relevant Time Period**

  As for Plaintiff's assertion that Menzies had purported incendiary racism and harassment complaints before it at the same time as the complaints about Plaintiff, and conducted a sham investigation while ignoring the information about Dodge, it is abundantly clear <u>none</u> of the written

materials provided to Menzies reflect any such egregious allegations. [Exhibits 22, 24, 25, 27, 28.] Rather, all material reduced to writing pertains to operational concerns like flight delays and missed breaks. [*Id.*] And critically, Plaintiff's witnesses do not establish a valid nexus between the dubious and entirely new non-written complaints about Dodge to the time period Menzies received complaints about Plaintiff. Plaintiff admitted the only complaints he ever made about Dodge were perhaps "years" prior to his termination. [Exhibit 12, 46:16-47:11; 49:15-18; 51:9-17; 28:24-29:15, 30:8-19, 31:21-32:13.] And the best Plaintiff's witnesses could say is that such purported actions by Dodge and complaints about him happened "in 2017 and 2018." [Exhibit 31, ¶ 13; Exhibit 32, ¶¶ 3-4; Exhibit 33, ¶¶ 5, 15; Exhibit 34, ¶ 4; Exhibit 35, ¶ 7; Exhibit 36, ¶ 6.]

Even if he could properly hide the ball until summary judgment opposition and contradict prior testimony indicating he had no such information, Plaintiff's evidentiary proffer at best indicates that the dubious complaints about Dodge occurred long before the complaints about him. Denigrating Menzies' investigation against this background thus becomes a wholly deficient argument at pretext. Menzies' actions in August 2018 certainly support an honest belief in the misconduct attributed to Plaintiff based on information from the Union, Dodge, three fuelers reporting pressure, and Macapagal reporting the same. [Exhibit 4, ¶¶ 3-5, 7; Exhibit 15, 23:24-24:10, Exhibit 16, 11:19-12:3, 13:22-14:6, 15:12-22, 57:21-59:5; Exhibit 17, 39:15-40:5, 41:14-20, 44:17-45:2, 46:12-47:6; Exhibit 21; Exhibit 24; Exhibit 25.] With the legitimate contemporaneous evidence about Dodge pertaining only to operational concerns, Plaintiff has not raised a legitimate argument that Menzies' investigation was a sham.

4. **Plaintiff's Ploys To Garner Sympathy And Paint Himself As An Innocent Supporter Of "The People" Do Not Align With His Own Evidence**

In an obvious ploy to engender sympathy and cast himself a persecuted victim, Plaintiff paints himself as a champion of others innocently swept into the petition against Dodge, rounded out with claims of emotional distress and character evidence completely irrelevant at summary judgment. But even this transparent strategy falls flat because Plaintiff cannot dispute key *material* facts about the conduct identified to Menzies from multiple sources, not the least of which is Macapagal's undisputed report that Plaintiff asked him to sign and Macapagal felt pressured to do so.[6] Plaintiff's own evidence

---

[6] It is telling that Plaintiff secured a declaration from Macapagal that does *not* repudiate the statements

further undercuts the picture he tries to draw by conceding that the only document referring to any form of harassment by Dodge *was never provided to Menzies* but Vasquez did supply it – months after the termination – to Plaintiff after also texting about it.  [Exhibit 32, ¶ 20.]

For all his laboring to dispute pressuring at least some employees to sign and claims of innocent involvement in the petition, such factual façades neither withstand scrutiny nor create a dispute about what actually matters – the information provided to Menzies about Plaintiff's conduct.  None of Plaintiff's efforts create a legitimate dispute as to any of the following: (i) the Union's report; (ii) Dodge's complaint about Plaintiff, supported by the text message where Plaintiff refers to the petition; (iii) Macapagal's report; or (iv) statements from three fuelers complaining about being pressured or misled.  In the face off these undisputed facts and failed attempts to paint factual contentions unsupported by legitimate evidence, Plaintiff's arguments that Menzies did not have an honest belief that Plaintiff engaged in misconduct are neither credible nor legally sufficient.  And against this backdrop of undisputed facts, Plaintiff simply cannot sustain *prima facie* claims nor sufficiently argue pretext based on speculation, never-before-made accusations, and self-serving opinions and beliefs about Menzies' motives.  *Cucuzza*, 104 Cal. App. 4th at 1038.

## III.   PLAINTIFF'S RED HERRING PRETEXT ARGUMENTS DEPENDING UPON SPECULATION AND UNREASONABLE INFERENCES REGARDING MENZIES' MOTIVES ARE NOT SUSTAINED BY SUBSTANTIAL ADMISSIBLE EVIDENCE

Unable to dispute the *material* facts supporting Menzies' honest belief Plaintiff engaged in the misconduct, and falling equally short in creating factual counterpoints withstanding scrutiny and supported by substantial *admissible* evidence, Plaintiff's opposition strategy crystalizes into a scorched earth, sleight-of-hand effort to distract attention away from the material facts about him.  To this end, he escalates his attacks on Dodge into full-scale character assassination with allegations somehow avoiding all mention in any document or prior point in this litigation.  Having thus disparaged Dodge as some mal-adjusted, Trump-flag toting bigot and Menzies' managers for no reason other than their skin color[7],

---

made in Macapagal's earlier declaration that he reported to Menzies feeling pressured when Plaintiff asked him to sign the petition.  [*Compare* Exhibit 4 and 34.]  For all his denials, it jumps off the page that Plaintiff could not get Macapagal to dispute these critically material facts.

[7] It bears mentioning that for all Plaintiff's and his witnesses' attacks on Menzies personnel for being

Plaintiff tries to build a pretext argument with a strained extrapolation of Menzies' "real" motives based on Dodge's purported racism. It is critical the Court see these procedurally improper and shameful attacks and subsequent leap to impugn Menzies' motives for what they really are – a red herring pretext argument designed to cover up the argument's dependence on inadmissible speculation and unreasonable inferences.

A. **Plaintiff's Accusations Against Dodge Contradict His Own Admissions And Legally Cannot Serve As Substantial Evidence Of Pretext**

One could reasonably expect that if Dodge truly were the bigot Plaintiff has made him out to be, the purported "facts" of Dodge's supposedly overt actions and complaints about them – all of which Menzies disputes – would have at some point been reduced to writing or raised in this case prior to this late hour. It defies credulity to think Menzies employees made *multiple* written petitions about Dodge with respect to operational matters, took pictures of him sleeping, and authored letters using the term "harassment" months after Plaintiff's termination (but indisputably never provided to Menzies), yet none of Dodge's alleged overtly racist behavior appears in such writings. The multiple declarations from Fuelers – including Filipino Fuelers – testifying they wanted to sign the petitions but disclaiming any contention of harassment adds to the extraordinarily dubious nature of these new contentions. Not only does it raises concerning questions why such accusations have avoided any prior mention, by only now disclosing them, Plaintiff has effectively contradicted his own testimony through subsequent declaration and tried to avoid summary judgment with entirely new material in a way the law does not tolerate. *See Hambleton Bros. Lumber Co.*, 397 F.3d at 1225; *Block*, 253 F.3d at 419 n. 2 ("a party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts"); *Gov't Employees Ins. Co.* 79 Cal. App. 4th at 98 (a court may not deny a motion for summary judgment based on issues not raised by the plaintiff's complaint).

The Court should completely disregard Plaintiff's eleventh-hour disparagement of Dodge and the purported "facts" he offers in service of that campaign. They ultimately amount to nothing more than an attempted distraction from the *material* facts he cannot genuinely dispute that demonstrate the propriety

white, Raul Vargas – a Hispanic – is indisputably the decision-maker on Plaintiff's termination. [Exhibit 26.]

of summary judgment.  And cutting through such noise, Plaintiff's opposition does not present *any* legitimate and material fact supported by evidence – let alone substantial admissible evidence – even suggesting Menzies' stated reasons for suspending and then terminating his employment were pretext for discrimination and retaliation.

### B.     <u>Plaintiff's Arguments Depend On Inadmissible Material, Not Substantial Evidence</u>

Even setting aside the improper and dubious nature of the novel accusations lobbed at Dodge then extrapolated into arguments about Menzies' motives, such information <u>is not substantial, admissible evidence of pretext</u> – no matter how salacious Plaintiff tries to make it to distract from its deficient evidentiary character.  As noted in Menzies' evidentiary objections *infra*, the accusations contained in Plaintiff's declaration and those of other declarants depend on hearsay, are made without proper foundation to explain the declarant's purported personal knowledge, and constitute overt speculation, with witnesses freely stating their accusations of Menzies' purported anti-Filipino animus are "opinion" or "belief."  As but one example of such unreasonable inferences, witnesses describe a circumstance of Dodge supposedly flashing vehicle lights and jump to the conclusion that Dodge was attempting to intimidate Filipinos like an ICE agent without offering any additional facts or descriptions of Dodge's behavior to support such a speculative conclusion.[8]  [Exhibit 32, ¶ 4; Exhibit 33, ¶ 6; Exhibit 36, ¶ 5.]  Additionally, and as noted above, no witness creates a credible temporal nexus between the supposed race complaints about Dodge and the period Menzies assessed the petitions against Dodge (bereft of such incendiary accusations) and the complaints about Plaintiff in August 2018.  [Exhibit 31, ¶ 13; Exhibit 32, ¶¶ 3-4; Exhibit 33, ¶¶ 5, 15; Exhibit 34, ¶ 4; Exhibit 35, ¶ 7; Exhibit 36, ¶ 6.]  These problems with Plaintiff's proffer come into sharper focus when compared with the Fueler statements (including from witnesses provided declarations to both parties) that they signed the petition because of operational issues only.  [Exhibits 4-11, 32, 35.]

When the Court cuts through the noise and distraction attempted by Plaintiff, the only actually valid and admissible evidence he offers to argue Menzies' reasons for terminating Plaintiff were pretext for retaliation and discrimination are that: (i) Plaintiff and other Fuelers are Filipino; (ii) Dodge is

---

[8] Given that Dodge often worked graveyard shifts, even if this incident occurred there are myriad reasons why Dodge might be flashing vehicle lights.  Calling it a race-based ICE-like effort at intimidation with no further description of *facts* belies the extent of the unreasonable inference.

Caucasian, and (iii) Menzies promoted Dodge (and Macapagal and another Filipino after Plaintiff's termination [Exhibit 4, ¶ 1; Exhibit 36, ¶¶ 1-2]) over other Filipino fuelers. Everything else he offers is inadmissible and/or unreasonable inferences about Menzies' motives without a temporal nexus to the August 2018 petition and reports of Plaintiff's actions. The law is clear that such a meager showing does not satisfy Plaintiff's <u>substantial</u> evidence of pretext burden necessary to create a triable of issue regarding Menzies' motives in terminating Plaintiff's employment. Consequently, for all the race-baiting noise Plaintiff has added to the narrative of this case at this eleventh hour, it does not satisfy his burdens under Fed. R. Civ. P. 56 and the *McDonnell Douglas* analysis. Neither Plaintiff's discrimination nor retaliation claim thus withstands Menzies' showing that summary judgment is proper, and the failure of those two principal claims requires the derivative failure of his wrongful termination and intentional infliction of emotional distress causes of action. *Ramirez v. AvalonBay Cmtys., Inc.*, 2015 U.S. Dist. LEXIS 130475, 2015 WL 5675866, at *11 (N.D. Cal. Sept. 26, 2015) ("Where no predicate violation of the law has occurred, a plaintiff cannot state a claim for wrongful termination in violation of the law"); *See, e.g.*, *Bracke v. City. of L.A.*, 60 F. App'x 120, 122 (9th Cir. 2003) (recognizing terminations and related investigations occur as part of the employment relationship and derivative intentional infliction of emotional distress claims are preempted).

## IV. EVIDENTIARY OBJECTIONS TO PLAINTIFF'S INADMISSIBLE MATERIAL

Menzies objects to the following materials contained in Plaintiff's Appendix of Evidence on the basis that Plaintiff has not established an appropriate foundation and/or reliable indicia that the witness testimony is based upon personal knowledge as required by Fed. R. Evid. 602:

- Exhibit 31: ¶ 9, line 26- line 1; ¶ 6, lines 16-17; ¶ 7, lines 22-23; ¶ 8, lines 24-25; ¶ 12, lines 10-11; ¶ 12, lines 11-13; ¶ 13, lines 14-21; ¶ 20, lines 20-21; ¶ 21, lines 26-27; ¶ 23, lines 8-10.

- Exhibit 32: ¶ 2, lines 11-13; ¶ 3, lines 16-23; ¶ 4, lines 1-2; ¶ 4, lines 24-27; ¶ 5, lines 3-6; ¶ 6, lines 7-10; ¶ 6, lines 7-14; ¶ 8, lines 15-18; ¶ 9, lines 21-22; ¶ 10, lines 23-27; ¶ 11, lines 2-6; ¶ 13, line 17; ¶ 14, lines 18-21; ¶ 15, lines 23-24; ¶ 17, line 3; ¶ 18, lines 4-6; ¶ 19, lines 7-8; ¶ 21, line 13.

- Exhibit 33: ¶ 4, lines 8-11; ¶ 5, lines 12-15; ¶ 6, lines 16-17; ¶ 7, lines 18-24; ¶ 9, line 28- line 2; ¶ 10, lines 4-5; ¶ 11, lines 6-7; ¶ 13, line 9; ¶ 13, lines 10-13; ¶ 15, lines 14-16; ¶ 16, lines 18-19; ¶ 17, lines 20-22.

- Exhibit 34: ¶ 3, lines 6-7; ¶ 4, lines 8-11; ¶ 5, lines 12-13.

- Exhibit 35: ¶ 2, lines 5-7; ¶ 5, lines 14-17; ¶ 6, lines 19-21; ¶ 7, lines 22-24.

- Exhibit 36: ¶ 5, lines 12-13; ¶ 6, lines 14-16; ¶ 7, lines 18-19; ¶ 9, lines 23-24; ¶ 10, lines 27-28; ¶ 11, line 1.

Menzies objects to the following materials contained in Plaintiff's Appendix of Evidence on the basis that it is hearsay or based on hearsay statement and is offered for the truth of the matter asserted in violation of Fed. R. Evid. 801-802:

- Exhibit 31: ¶ 7, lines 21-23; ¶ 8, lines 24-25; ¶ 10, lines 2-7; ¶ 13, lines 14-21; ¶ 18, line 12.

- Exhibit 32: ¶ 2, lines 14-15; ¶ 3, lines 16-19; ¶ 6, line 7; ¶ 7, lines 11-13; ¶ 13, lines 10-12; ¶ 13, lines 12-15; ¶ 13, lines 15-17.

- Exhibit 33: ¶ 5, lines 14-15; ¶ 6, lines 16-17; ¶ 8, lines 25-27; ¶ 17, line 8-line 2.

- Exhibit 34: ¶ 4, lines 8-11.

- Exhibit 35: ¶ 7, lines 22-24.

- Exhibit 36: ¶ 5, lines 11-13; ¶ 8, lines 20-22.

Menzies objects to the following material contained in Plaintiff's Appendix of Evidence on the basis that its probative value is substantially outweighed by unfair prejudice to Menzies and undue delay by Plaintiff in identifying such evidence as supporting his claims when he has never before raised any such allegations in this case and testified he was not aware of any such evidence at his deposition. *See* Fed. R. Evid. 403; *Hambleton Bros. Lumber Co.*, 397 F.3d at 1225; *Block*, 253 F.3d at 419 n. 2 ("a party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts"); *Gov't Employees Ins. Co.* 79 Cal. App. 4th at 98 (a court may not deny a motion for summary judgment based on issues not raised by the plaintiff's complaint). Many examples of such evidence also constitute improper lay opinion evidence pursuant Fed. R. Evid. 701.

- Exhibit 31: ¶ 8, lines 24-25; ¶ 22, lines 1-2.

- Exhibit 32: ¶ 4, lines 24-27; ¶ 4, lines 1-2; ¶ 5, lines 3-6; ¶ 8, lines 15-18; ¶ 12, lines 8-9; ¶ 13, lines 15-17; ¶ 14, lines 18-20; ¶ 16, lines 25-27.

- Exhibit 33: ¶ 5, lines 12-13; ¶ 6, lines 16-17; ¶ 17, lines 20-22.

- Exhibit 35: ¶ 5, lines 15-17; ¶ 6, lines 20-21.

- Exhibit 36: ¶ 7, lines 17-19.

## V.    __CONCLUSION__

Because Plaintiff has not created a genuine dispute of *material* fact regarding the information provided to Menzies supporting its honest belief that he engaged in misconduct and has not met his *prima facie* and pretext burdens with substantial admissible evidence, offering instead speculation and unreasonable inferences, the Court should enter complete summary judgment in its favor on all causes of action in Plaintiff's Complaint, or in the alternative, partial summary judgment.

DATED:  November 5, 2020                    **FOLEY & LARDNER LLP**
                                            Christopher Ward
                                            Jason Wu
                                            Sara Alexis Levine Abarbanel


                                            _____*/s/ Christopher Ward*_____
                                            CHRISTOPHER WARD
                                            Attorneys for Defendant MENZIES AVIATION, INC.

# EXHIBIT 45

CHRISTOPHER WARD, CA Bar No. 238777
    cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE: 213.972.4500
FACSIMILE:   213.486.0065

JASON WU, CA Bar No. 313368
    jwu@foley.com
SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
    sabarbanel@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE: 415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro,<br><br>                              Plaintiff,<br><br>          vs.<br><br>Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive,<br><br>                              Defendants. | Case No. 3:19-cv-8157<br><br>**SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD**<br><br><br><br>State Court Action Filed:  10/23/19<br><br>Action Removed:  December 16, 2019 |

## <u>SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD</u>

I, Christopher Ward, declare as follows:

1.      I am an attorney admitted to practice before all state and federal courts in the State of California, including the United States District Court for the Northern District of California, and a partner at Foley & Lardner LLP, counsel of record for Defendant Menzies Aviation, Inc.  I have personal knowledge of the facts contained in this declaration, and if called upon as a witness, I could and would competently testify thereto.

2.      On March 17, 2020, Plaintiff's counsel served on me Plaintiff's Fed. R. Civ. P. 26(a)(1) Initial Disclosures.  A true and correct copy of Plaintiff's Initial Disclosures produced to me by Plaintiff's counsel is attached hereto as **Exhibit 46**.

3.      On July 27, 2020, Plaintiff's counsel deposed Menzies' Duty Manager John Qualley for a first time, and on July 28, 2020, Plaintiff's counsel completed the deposition of Mr. Qually.  Following those depositions, in addition to receiving certified copies of the transcripts of both depositions, I received condensed copies of the transcripts of both depositions, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of Volume I of the condensed transcript of Mr. Qually's deposition is attached hereto as **Exhibit 47**, and a true and correct copy of Volume II of the condensed transcript of Mr. Qually's deposition is attached hereto as **Exhibit 48**.  Because Exhibits 47 and 48 are offered in their entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcripts relevant, I am providing the condensed transcripts to reduce the amount of material filed with the Court.

4.      On August 25, 2020, Plaintiff's counsel deposed Menzies' Human Resources Manager Tracy Aguilera.  Following that deposition, in addition to receiving a certified copy of the transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of the condensed transcript of Ms. Aguilera's deposition is attached hereto as **Exhibit 49**.  Because Exhibit 49 is offered in its entirety to show Plaintiff's counsel never inquired about certain allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant, I am

1 providing the condensed transcript to reduce the amount of material filed with the Court.

2      5.      On August 25, 2020, Plaintiff's counsel deposed Menzies' former SFO Director of

3 Operations Raul Vargas.  Following that deposition, in addition to receiving a certified copy of the

4 transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I have

5 read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true and

6 correct copy of the condensed transcript of Mr. Vargas's deposition is attached hereto as **Exhibit 50**.

7 Because Exhibit 50 is offered in its entirety to show Plaintiff's counsel never inquired about certain

8 allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant,

9 I am providing the condensed transcript to reduce the amount of material filed with the Court.

10      6.      On July 28, 2020, Plaintiff's counsel deposed Menzies' Fueling Supervisor Andrew

11 Dodge.  Following that deposition, in addition to receiving a certified copy of the transcript of that

12 deposition, I received a condensed copy of the transcript of the deposition, and I have read, reviewed

13 and maintained a copy of those transcripts in connection with this matter.  A true and correct copy of the

14 condensed transcript from Mr. Dodge's deposition is attached hereto as **Exhibit 51**.  Because Exhibit 51

15 is offered in its entirety to show Plaintiff's counsel never inquired about certain allegations made by

16 Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant, I am providing the

17 condensed transcript to reduce the amount of material filed with the Court.

18      7.      On July 28, 2020, Plaintiff's counsel deposed Menzies' Senior Vice President of U.S.

19 Fuel Consortiums Randall Davies.  Following that deposition, in addition to receiving a certified copy of

20 the transcript of that deposition, I received a condensed copy of the transcript of the deposition, and I

21 have read, reviewed and maintained a copy of those transcripts in connection with this matter.  A true

22 and correct copy of the condensed transcript from Mr. Davies' deposition is attached hereto as **Exhibit**

23 **52**.  Because Exhibit 52 is offered in its entirety to show Plaintiff's counsel never inquired about certain

24 allegations made by Plaintiff regarding Andrew Dodge, making the entire deposition transcript relevant,

25 I am providing the condensed transcript to reduce the amount of material filed with the Court.

26 ///

27 ///

28 ///

SUPPLEMENTAL DECLARATION OF CHRISTOPHER WARD
Case No. 3:19-cv-8157

-3-

4840-7026-6833.1

I declare under penalty of perjury under the laws of the States of California and Illinois, and the laws of the United States, that the foregoing is true and correct.

Executed on November 5, 2020 at Chicago, Illinois.


/s/ Christopher Ward
Christopher Ward

# EXHIBIT 46

1  Arlo Garcia Uriarte, SBN 231764
2  LIBERATION LAW GROUP, P.C.
   2760 Mission Street
3  San Francisco, CA 94110
   Telephone: (415) 695-1000
4  Facsimile: (415) 695-1006
5  **Attorney for Plaintiff Renaldo Navarro**

6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8

9  RENALDO NAVARRO,                    Case No. 3:19-cv-08157-VC

10                  Plaintiff,         **PLAINTIFF'S INITIAL DISCLOSURES
                                       PURSUANT TO FEDERAL RULE OF
11      vs.                            CIVIL PROCEDURE 26(a)(1)**

12  MENZIES AVIATION, INC., DOING      State Court Action Filed:  10/23/19
13  BUSINESS AS MENZIES; and DOES 1    Action Removed:  12/16/19
    through 10, inclusive,
14                                     **Judge:  Hon. Vince Chhabria**
                    Defendants.
15

16

17

18        Plaintiff Renaldo Navarro (hereinafter "Plaintiff") makes the following initial disclosures

19  pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure:

20        A.    **Rule 26(a)(1)(A)(i) Individuals.** Plaintiff believes the following individuals are

21  likely to have discoverable information that Plaintiff may use to support his claims:

22              1.    Renaldo Navarro, may be contacted through counsel;

23              2.    Jezen Canlas, 650-452-3810;

24              3.    Rafael Vasquez, 510-715-0014;

25              4.    Lorvino Samonte, 650-451-8701;

26              5.    July Macapagal, phone number unknown;

27              6.    Andrew Dodge, phone number unknown;

28              7.    William Rodriguez, phone number unknown;

8.  Anastacio Manuel, phone number unknown;

9.  Ricardo Almelda, phone number unknown;

10. Patrick Moran, phone number unknown;

11. Rex Tosan, phone number unknown;

12. Wesley Faatalale, phone number unknown.

The individuals listed above, aside from Plaintiff, are Plaintiff's former co-workers, managers, and/or supervisors. They are likely to have discoverable information concerning the allegations made by Plaintiff in his complaint, including but not limited to matters related to: Plaintiff's termination, Plaintiff's emotional distress due to his termination, and Plaintiff's general day-to-day working conditions.

Without assuming any duty to supplement these disclosures beyond that imposed by Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff reserves the right to identify and/or call as witnesses such other individuals with knowledge of relevant facts as may be discovered or subsequently identified in the course of this litigation, including any individuals listed in Defendant's initial disclosures or subsequent discovery responses.

B.  **Rule 26(a)(1)(A)(ii) Documents.** The following categories of documents, data compilations, and tangible things are in the possession, custody, or control of Plaintiff and may be used to support their claims:

1.  The records produced by Defendant as part of its response to Plaintiff's records request per California Labor Code § 226;

2.  The documents produced concurrently with these initial disclosures, Batestamped "RenaldoNavarro 000001-000014."

Without assuming any duty to supplement these disclosures beyond that imposed by Rule 26(e) of the Federal Rules of Civil Procedure, Plaintiff reserves the right to produce, disclose, or introduce additional documents that may be discovered later during this litigation or that may be otherwise subsequently identified.

1    C. **Rule 26(a)(1)(A)(iii) Damages.** Plaintiff's computation of damages will include: (1)

2    wage loss damages due to his termination; (2) emotional distress damages due to his termination;

3    (3) interest; (4) attorney's fees and costs; and (5) any other damages deemed appropriate by the

4    Court or relevant law. An exact damage estimate or number is not known at this time. Plaintiff

5    will supplement this answer at a later date.

6    D. **Rule 26(a)(1)(A)(iv) Insurance.** Plaintiff is not aware of any relevant insurance

7    agreement.

8

9    DATED: March 17, 2020                    LIBERATION LAW GROUP, P.C.

10

11

12                                           _____

13                                           Arlo Garcia Uriarte
                                             Attorney for PLAINTIFF

14

# EXHIBIT 47

**DEPOSITION OF JOHN QUALLY - 07/27/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**

**Page 1**

```
(1)           IN THE UNITED STATES DISTRICT COURT
(2)        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
(3)
(4)
(5)   RENALDO NAVARRO,
(6)              Plaintiff,
(7)   v.                          No.  3:19-CV-8157
(8)   MENZIES AVIATION, INC.,
      doing business as MENZIES
(9)   and DOES 1 through 10,
      inclusive,
(10)
(11)             Defendants.
      _____/
(12)  Zoom Remote Deposition of
(13)     JOHN QUALLY
(14)  Monday, July 27, 2020
(15)        Volume I
(16)   (Pages 1 through 32)
(17)
(18)
(19)
(20)
(21)  REPORTED BY:  CINDY TUGAW, CSR #4805
(22)
(23)
(24)            NOGARA REPORTING SERVICE
               5 Third Street, Suite 415
               San Francisco, California 94103
(25)             (415) 398-1889
```

**Page 2**

```
(1)              I N D E X
(2)                              Page Number
(3)  EXAMINATION BY MR. URIARTE          4
(4)              ---o0o---
(5)          E X H I B I T S
(6)  Plaintiff's
(7)  Exhibit 1   Plaintiff Renaldo       9
                 Navarro's Notice of
(8)              Deposition of John
                 Qually
(9)
     Exhibit 2   Missed Punch Form      28
(10)
(11)             ---o0o---
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 3**

```
(1)       BE IT REMEMBERED that, pursuant to Notice of
(2)   Taking Deposition and on Monday, the 27th day of July,
(3)   2020, commencing at the hour of 8:58 o'clock a.m.
(4)   thereof, via Zoom videoconference, before me, CINDY
(5)   TUGAW, a Certified Shorthand Reporter in the State of
(6)   California, personally appeared,
(7)                JOHN QUALLY,
(8)   Called as a witness by the Plaintiff, having been by me
(9)   first duly sworn, was examined and testified as
(10)  hereinafter set forth.
(11)             ---o0o---
(12)         APPEARANCES OF COUNSEL
(13)  For the Plaintiff
         LIBERATION LAW GROUP, P.C.
(14)     2760 Mission Street
         San Francisco, California 94110
(15)     BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
(16)
(17)  For the Defendants
         FOLEY & LARDNER, LLP
(18)     555 California Street, Suite 1700
         San Francisco, California 94104
(19)     BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
(20)
      Also Present:  David Ho, Zoom Host.
(21)
(22)             ---o0o---
(23)
(24)
(25)
```

**Page 4**

(1)      **THE REPORTER:** At this time, I will ask counsel to

(2) stipulate on the record that there is no objection to

(3) this deposition officer administering a binding oath to

(4) the witness via Zoom, starting with the noticing

(5) attorney.

(6)      **MR. URIARTE:** So stipulated.

(7)      **THE REPORTER:** Mr. Wu?

(8)      **MR. WU:** So stipulated on behalf of defendant,

(9) Menzies Aviation.

(10)      EXAMINATION BY MR. URIARTE

(11)      **MR. URIARTE: Q.** Good morning, Mr. Qually. My

(12) name is Arlo Uriarte. I am attorney for Renaldo

(13) Navarro. Do you understand that?

(14)      **A.** Yes.

(15)      **Q.** And you are aware that Mr. Navarro has an

(16) action against Menzies for his termination?

(17)      **A.** I heard, yes.

(18)      **Q.** And you know that you are here for your

(19) deposition as a witness?

(20)      **A.** Yes.

(21)      **MR. URIARTE:** David, can we have Exhibit 1 brought

(22) up, please.

(23)      **ZOOM HOST:** Give me one second. I'm bringing it

(24) up right now. Hold on.

(25)      **MR. URIARTE:** Okay.

---

**Page 5**

(1) **Q.** So, Mr. Qually, could you please state your
(2) name, your full name, for the record?
(3) **A.** John David Qually.
(4) **Q.** And your last name is Q-u-a-l-l-y, is that
(5) correct?
(6) **A.** Yes.
(7) **Q.** And what's your current position at Menzies?
(8) **A.** Duty manager.
(9) **Q.** Have you had your deposition taken before?
(10) **A.** No.
(11) **Q.** Okay. Let me just kind of give you some idea
(12) of what we're doing here today and some of the ground
(13) rules with regards to depositions.
(14) So we have a court reporter, as you noticed.
(15) The court reporter, Cindy, she is taking down
(16) everything that we are saying, so it's very important
(17) that only one person speak at a time. Usually I'll be
(18) doing the questions, and we will be waiting for you to
(19) give us some answers. Sometimes your attorney may
(20) object.
(21) Do allow your attorney to finish his objection
(22) before you answer. Normally you will answer after his
(23) objection unless your attorney tells you not to answer.
(24) But do give him some time to finish his objection, that
(25) way the court reporter can have that on the record.

---

**Page 6**

(1) Do you understand that?
(2) **A.** Okay. Yes.
(3) **Q.** It's very important that you understand the
(4) question that's before you before you answer. Do you
(5) understand that?
(6) **A.** Yes.
(7) **Q.** Okay. The reason being is that, although we
(8) are in an informal setting here and we are, you know,
(9) not together, and we definitely are not in a courtroom,
(10) your testimony, because it's under oath before a court
(11) reporter, has the same force and effect as if you were
(12) testifying in court.
(13) Do you understand that?
(14) **A.** Yes.
(15) **Q.** If you don't understand the question somehow,
(16) you know, because of the way I put the words together,
(17) or just because of the question that's before you and
(18) you don't understand, just ask for me to rephrase it or
(19) say that you don't understand it, and we'll attempt to
(20) make sure that you understand the question. Okay?
(21) **A.** Okay.
(22) **Q.** If you need a break, we can take a break.
(23) Just let me know. Usually I'll ask you to answer the
(24) question before we can take a break. If for any reason
(25) you need to talk to your attorney, we can always go off

---

**Page 7**

(1) the record to give you some time to talk to your
(2) attorney, but just let me know. If for any reason,
(3) because some sort of electronic or communication break
(4) here happens, we'll just kind of work through that.
(5) Okay?
(6) **A.** Okay.
(7) **Q.** Find a way to work through that.
(8) If for any reason the communication lines
(9) break up so that the question is not clear, do let us
(10) know about that, okay, if there is some sort of
(11) transmission error or something like that.
(12) **A.** Okay.
(13) **Q.** We will be bringing up -- I see that it seems
(14) like you're in some sort of office setting. Are you
(15) using a laptop or desktop computer?
(16) **A.** No, I'm actually on my phone.
(17) **Q.** On your phone. So we'll give you some time
(18) because sometimes we'll show you some documents, and
(19) that might look a little bit small on your phone, so
(20) you might have to make it bigger and all that. There's
(21) not a lot of documents, but we will be showing you some
(22) documents. So don't be shy or hesitate to ask for more
(23) time looking at the documents before you answer
(24) questions concerning those documents. Okay?
(25) **A.** Okay.

---

**Page 8**

(1) **Q.** Is there any reason why you can't give your
(2) best testimony here today?
(3) **A.** No.
(4) **Q.** Are you sleep deprived at all? Did you work
(5) last night?
(6) **A.** No.
(7) **Q.** Okay. Are you under any type of medication or
(8) any substance that might affect your ability to express
(9) yourself, enunciate or to remember?
(10) **A.** No.
(11) **Q.** Okay. So when did you become a Menzies
(12) employee?
(13) **A.** I forget the date in actuality, but I was part
(14) of ASIG, which rolled into Menzies, in 2005.
(15) **Q.** All right. So in 2005 you were an ASIG
(16) employee, is that what it is?
(17) **A.** Yes. And then recently they've merged into
(18) Menzies and it just carried over.
(19) **Q.** Right. So I think that was like 2016 or
(20) sometime around there, correct?
(21) **A.** Yeah, sounds about right.
(22) **Q.** Yeah. Okay.
(23) **MR. URIARTE:** David, are you ready to show us
(24) Exhibit 1?
(25) **ZOOM HOST:** Yes, I will bring it up on the screen.

---

**Page 9**

(1) Since he's using the phone, I will bring it up on the
(2) share screen.
(3)     **MR. URIARTE:** Oh, okay. So share screen is better
(4) if it's by phone?
(5)     **ZOOM HOST:** Yes, or he could click on the link
(6) that I sent to him if he's comfortable using the phone.
(7)     **MR. URIARTE:** How do you send the link? Oh,
(8) through the Chat.
(9)     **ZOOM HOST:** Yes, just click on the link that's on
(10) the Chat window.
(11)     **MR. URIARTE:** Gotcha. I'm doing that right now.
(12) Oh, good. Awesome. That is nice. So then this
(13) document, each one of us can control the document, is
(14) that correct?
(15)     **ZOOM HOST:** You could download it and view it,
(16) correct, each individual.
(17)     **MR. URIARTE:** Okay. Gotcha. Gotcha.
(18)     **ZOOM HOST:** But if the witness is having trouble
(19) seeing it on the phone, I can bring it up on the share
(20) screen if you'd like.
(21)     **MR. URIARTE:** Let's see what Mr. Qually is able to
(22) do.
(23)     (Plaintiff's Exhibit 1 marked for
(24)     identification.)
(25)     **MR. URIARTE: Q.** Do you see the document, Mr.

**Page 10**

(1) Qually?
(2)     **A.** I do not.
(3)     **Q.** I think, if you want to look at it through the
(4) Chat, it's under the Chat window, but I guess -- yeah,
(5) can we do a share screen on that, then?
(6)     **ZOOM HOST:** Okay. I will bring it up through a
(7) share screen. Coming.
(8)     **MR. URIARTE: Q.** There you go. Do you see that
(9) now, Mr. Qually?
(10)     **A.** Let me go back to that. Somehow -- let's see.
(11) I got it. I got it. Yes.
(12)     **Q.** So Exhibit 1 we will mark into the record.
(13) And it is a notice of deposition of John Qually. Do
(14) you see that?
(15)     **A.** Yes.
(16)     **Q.** Okay. Were you able to -- did you receive
(17) this document before today? This is a notice for you
(18) to appear for today, essentially.
(19)     **A.** Yes.
(20)     **Q.** Did you do anything to prepare for today's
(21) deposition?
(22)     **A.** Just had a meeting with the Menzies lawyer.
(23)     **Q.** Okay. And I don't want to hear anything with
(24) regard to what you guys spoke about, you and your
(25) lawyers. Aside from meeting with your lawyers, did you

**Page 11**

(1) talk to anybody else?
(2)     **A.** No.
(3)     **Q.** Did you maybe review some documents in order
(4) to prepare for today's deposition?
(5)     **A.** I reviewed the documents that were sent to me.
(6)     **Q.** Okay. Do you remember any of those documents
(7) at all?
(8)     **A.** I remember only one of them.
(9)     **Q.** Okay. What is that?
(10)     **A.** That was the initial of the statement by --
(11) let's see, how am I going to put this? It was a letter
(12) that I typed up in regards to Mr. Navarro.
(13)     **Q.** Was that the letter regarding when he was
(14) suspended and the notice of suspension, is that what
(15) you're talking about?
(16)     **A.** Yes.
(17)     **Q.** Okay. Aside from that, do you remember any of
(18) the documents that you reviewed for today's deposition?
(19)     **A.** No.
(20)     **Q.** Did you talk to Mr. Dodge at all to prepare
(21) for today's deposition?
(22)     **A.** No.
(23)     **Q.** Any of the higher-ups? Any of your
(24) co-workers?
(25)     **A.** No.

**Page 12**

(1)     **Q.** Okay. All right. So let's see. So you
(2) said -- when you started with ASIG -- and is that the
(3) right way to call it, ASIG, by the way, A-S-I-G, ASIG?
(4) Do you guys say that, ASIG?
(5)     **A.** Yes.
(6)     **Q.** When you started with ASIG, what was your
(7) position with them?
(8)     **A.** Supervisor.
(9)     **Q.** Can you tell me what the duties of a
(10) supervisor would be?
(11)     **A.** The duties are basically overseeing of the --
(12) overseeing and assigning the flights to the fuelers and
(13) making communication with the airlines on -- as we go
(14) through the day.
(15)     **Q.** And by 2018, how many fuelers were assigned to
(16) a supervisor? Do you remember?
(17)     **A.** It could -- I guess it varies by shift.
(18)     **Q.** I see. What would be the range, like would
(19) you say between three and ten, or was there like a
(20) range?
(21)     **A.** I guess it depends on the shift. Some shifts
(22) had upwards of 12 to 15. Some shifts had anywhere from
(23) three to four.
(24)     **Q.** Gotcha. And the interesting -- or the date
(25) most interesting for us is August of 2018 because

**Page 13**

(1) that's the date that Mr. Navarro was terminated. Do
(2) you remember that?
(3)     A. I don't remember the exact date, no.
(4)     Q. Okay. And so a lot of my questions will refer
(5) to what the state of the employment was during those --
(6) in 2018, because there might have been changes since
(7) 2018 or changes before 2018. And that's why we'll
(8) focus on August of 2018 a lot.
(9)        So in or around August of 2018, how many
(10) supervisors did Menzies have at that time?
(11)     A. We had I believe -- I'm trying to remember --
(12) around six to eight, I believe.
(13)     Q. And as a duty manager, what were your duties
(14) in relation to the supervisors?
(15)     A. Basically I was their superior. I was -- you
(16) know, interacted with them to help them accomplish what
(17) tasks they needed and make sure they had all the
(18) support that they need for their job.
(19)     Q. Gotcha. Okay. So can we go through that a
(20) little bit, kind of like the organizational structure
(21) that Menzies had in or around August of 2018.
(22)        So you said earlier there were about, did you
(23) say, six supervisors?
(24)     A. I believe six to about eight, yes.
(25)     Q. And so above the supervisors are the duty

**Page 14**

(1) managers, is that what it was?
(2)     A. Yes.
(3)     Q. And how many duty managers were there at that
(4) time?
(5)     A. Four.
(6)     Q. Four duty managers. And then with regards to
(7) you, were the supervisors assigned to specific duty
(8) managers or was it just who the duty manager was on
(9) that day?
(10)     A. It was basically the manager who was on duty
(11) that day.
(12)     Q. So then if you were working on a shift wherein
(13) Mr. Navarro was there, then you would be supervising
(14) Mr. Navarro. That's how it worked?
(15)     A. Yes.
(16)     Q. Gotcha. And then, so it's the supervisors,
(17) then the duty managers, and then who else above the
(18) duty managers?
(19)     A. It would be the general manager.
(20)     Q. And then anybody above the general manager?
(21)     A. Now we have a director.
(22)     Q. So there is a director on-site now?
(23)     A. Yes.
(24)     Q. But in 2018, no?
(25)     A. Not that I recall, no.

**Page 15**

(1)     Q. Okay. And who was the general manager in
(2) August of 2018, if you know?
(3)     A. I believe the general manager -- the acting
(4) general manager around that time was Renil, R-e-n-i-l.
(5)     Q. And then what's the last name?
(6)     A. Lal, L-a-l.
(7)     Q. L-a-l?
(8)     A. Yes.
(9)     Q. And then, aside from yourself, who else were
(10) the duty managers?
(11)     A. I believe -- there's been some changes since
(12) then, but Simon Casey was one of them. I can't
(13) remember the rest of them.
(14)     Q. Okay. So you remember Simon Casey. And
(15) that's C-a-s-s-e-y?
(16)     A. C-a-s-e-y.
(17)     Q. C-a-s-e-y. Okay. And then yourself, and then
(18) two other duty managers?
(19)     A. Yeah.
(20)     Q. Okay. All right. And then before ASIG, where
(21) did you work?
(22)     A. United Airlines.
(23)     Q. And what was your job?
(24)     A. Lead ramp service.
(25)     Q. Lead?

**Page 16**

(1)     A. Yeah.
(2)     Q. What was the next?
(3)     A. Ramp service.
(4)     Q. Lead ramp services. Okay. And how long were
(5) you with United?
(6)     A. Eight and a half years.
(7)     Q. So when did you become a duty manager for ASIG
(8) or Menzies?
(9)     A. It was back -- honestly, I don't remember the
(10) exact date, but it's been -- I've been a duty manager
(11) for roughly four years.
(12)     Q. Four years now?
(13)     A. Yeah.
(14)     Q. Okay. So like 2016, around that time?
(15)     A. Around that time.
(16)     Q. Were you a duty manager by the time Menzies
(17) came in?
(18)     A. Around that time, yes.
(19)     Q. Like close, yeah. I guess the key question is
(20) when Menzies took over ASIG, were you already a duty
(21) manager or you became a duty manager after Menzies came
(22) in?
(23)     A. I was already.
(24)     Q. Okay. Gotcha. All right.
(25)        So we were talking about the role of

**Page 17**

(1) supervisors with regards to how they work with fuelers,
(2) right? You said earlier that you would -- one of the
(3) duties would be to assign flights to the fuelers for
(4) the shift, right?
(5)    **A.** Yes.
(6)    **Q.** That's one of the duties. What other duties
(7) do supervisors have?
(8)    **A.** They -- besides assigning the flights, they
(9) are obviously in communication with airlines as needed.
(10) They're overseeing the safety of the operation, making
(11) sure that, you know, everything is going safely.
(12)    **Q.** Okay. So is it the supervisor that's actually
(13) on the headphone with the plane during the fueling
(14) operation, or with the airline?
(15)    **A.** No.
(16)    **Q.** No? That could be any of the fuelers?
(17)    **A.** Well, the fuelers don't communicate with the
(18) flight crew. They communicate with the airline
(19) representative.
(20)    **Q.** Gotcha. Okay. And who is that? Is that the
(21) fueler or is that the supervisor?
(22)    **A.** Sometimes both. But, in general, when you're
(23) actually fueling, it would be more so the fueler than
(24) the supervisor.
(25)    **Q.** Okay. Are supervisors sometimes -- like do

**Page 18**

(1) they sometimes help with the fueling operation, like
(2) they go to the actual airplane and help with the
(3) fueling of the airplane? Do they sometimes do that?
(4)    **A.** They sometimes, yes.
(5)    **Q.** And earlier you said they make sure -- they
(6) ensure the safety of the operation. How are
(7) supervisors keyed to that? How are supervisors
(8) important in the safety of the operation?
(9)    Do you understand the question, Mr. Qually?
(10)    **A.** Yeah. No, they're just -- they're there to,
(11) you know, ensure the fuelers are working safely. If
(12) there's any safety concerns, they do what they can to
(13) resolve them, whether it be on the fueler's end or the
(14) equipment end, you know. They help do whatever needs
(15) to be done to keep everything safe.
(16)    **Q.** Gotcha. And what kinds of situations
(17) sometimes come up when it comes to the safety? Can you
(18) give us an example of safety concerns that sometimes
(19) come up?
(20)    **A.** Sometimes a fueler is not following proper
(21) procedures on the fueler's end, equipment not working
(22) right. So they may have an issue with the equipment.
(23)    **Q.** So is it safe to say then that the supervisors
(24) are kind of overseeing each one of these fueling
(25) operations with regards to the airplane?

**Page 19**

(1)    **A.** Yes.
(2)    **Q.** Okay. And then what other duties do
(3) supervisors have with regards to the fuelers?
(4)    **A.** Basically, you know, for operational purposes,
(5) it's making sure that the flights are getting done, the
(6) fuelers are getting to the flights when they're
(7) supposed to, you know, addressing whatever issues may
(8) come up.
(9)    **Q.** What about giving breaks, for example, like
(10) timing the breaks, when people can go for meal periods,
(11) when people can go for their ten-minute breaks, is that
(12) the supervisor's duties?
(13)    **A.** Yes.
(14)    **MR. WU:** Objection. Relevance.
(15)    **MR. URIARTE: Q.** And then what about clocking in
(16) and clocking out, do the supervisors have any duties
(17) with regards to that?
(18)    **MR. WU:** Same objection.
(19)    **THE WITNESS:** No.
(20)    **MR. URIARTE: Q.** Like if there are issues with
(21) regards to they forgot to clock out or, oh, they forgot
(22) to clock in, something like that, is that the
(23) supervisor's duty or is that somebody else's?
(24)    **MR. WU:** Same objection.
(25)    **MR. URIARTE: Q.** Mr. Qually?

**Page 20**

(1)    **A.** No.
(2)    **Q.** So who's responsible for like fixing clock-ins
(3) and clock-outs?
(4)    **MR. WU:** Same objection.
(5)    **THE WITNESS:** The fueler.
(6)    **MR. URIARTE: Q.** I'm sorry?
(7)    **A.** The fueler.
(8)    **Q.** The fueler?
(9)    **A.** Whoever did not clock in or out.
(10)    **Q.** And then who does the fueler have to talk to
(11) with regards to that?
(12)    **A.** They would usually come to us as the manager
(13) or go straight to payroll.
(14)    **Q.** Gotcha.
(15)    **MR. WU:** And, Arlo, can we assume I'm asserting
(16) the same objections for this line of questioning just
(17) to keep things flowing?
(18)    **MR. URIARTE:** Sure.
(19)    **MR. WU:** Thank you.
(20)    **MR. URIARTE: Q.** How does the supervisor avoid
(21) causing delays in these fuelings -- delays to the
(22) airlines, right? I hear that sometimes the fueling
(23) operation is what causes the delay, right? Can that
(24) happen, Mr. Qually?
(25)    **A.** It can.

**Page 21**

(1)    Q.  And what happens?  Why are delays caused by
(2)  the fueling operation?  Why does that happen?
(3)    A.  Many different factors involved.  It could be
(4)  the way the flights were set up for the fueler.  It
(5)  could be an equipment issue.  It varies depending on
(6)  the situation.  I mean, there's no set reason for that.
(7)    Q.  Is that something that the supervisors try to
(8)  avoid as part of their duties, they try to avoid any
(9)  delays?
(10)    A.  Yes.
(11)    Q.  And I guess they try to avoid delays by having
(12)  like the proper number of fuelers working there, right?
(13)  I mean, you have to be properly staffed in order to
(14)  avoid delay, correct?
(15)    A.  That's one, yes.
(16)    Q.  And then you have to make sure that they have
(17)  the right equipment, that they're doing things
(18)  correctly?
(19)      It looks like we lost -- are you still there?
(20)    A.  Yeah, hold on just a moment.
(21)      What was your question again?
(22)    Q.  Yeah, I guess that goes into what we were
(23)  talking about earlier, that the supervisors have to
(24)  make sure that the fuelers are using the right
(25)  equipment, they're using the right procedures and all

**Page 22**

(1)  of those kind of things, like assist in avoiding
(2)  delays.  Is that correct?
(3)    MR. WU:  Objection.  Compound.
(4)    MR. URIARTE:  Q.  Mr. Qually?
(5)    A.  Yes.
(6)    Q.  All right.
(7)      (Discussion off the record.)
(8)    MR. URIARTE:  Q.  So you had a working
(9)  relationship with plaintiff Renaldo Navarro, right?  Is
(10)  that correct, Mr. Qually?
(11)    A.  Yes.
(12)    Q.  Were you social with Mr. Navarro at all?  Did
(13)  you guys like go to baptisms or Christmases or
(14)  whatever?
(15)    A.  No.
(16)    Q.  Okay.  So you knew him from work only, is that
(17)  correct?
(18)    A.  Yes.
(19)    Q.  You didn't have some sort of social or
(20)  family-related kind of relationship, right?  Is that
(21)  correct?
(22)    A.  No.
(23)    Q.  And you supervised Mr. Navarro when you were
(24)  the duty manager and he was the supervisor, is that
(25)  correct?

**Page 23**

(1)    A.  Partially, yes.
(2)    Q.  And why do you say "partially"?
(3)    A.  Because when Mr. Navarro was the graveyard
(4)  supervisor, I was the morning manager, so we would just
(5)  see each other on passing in the morning.
(6)    Q.  Gotcha.  So it wasn't often or did that not
(7)  ever happen where you guys shared the majority of your
(8)  shift?
(9)    MR. WU:  Objection.  Vague.
(10)    THE WITNESS:  No, we never shared --
(11)    MR. WU:  You can answer if you understand the
(12)  question.
(13)    MR. URIARTE:  Yeah.
(14)    THE WITNESS:  No, I did not overlap on a shift
(15)  outside of maybe an hour or two.
(16)    MR. URIARTE:  Q.  And that's because Mr. Navarro
(17)  did graveyard, is that correct?
(18)    A.  Yes.
(19)    Q.  Which is -- in 2018, graveyard for Mr.
(20)  Navarro, what was that?  Like 10:00 to 7:00, is that
(21)  what it was?
(22)    A.  About that, yes.
(23)    Q.  And then your morning shift was what?
(24)    A.  I started at 5:00 a.m.
(25)    Q.  Gotcha.  Mr. Navarro, from a fueler, became a

**Page 24**

(1)  supervisor, is that correct?
(2)    A.  I had no -- that would be my guess.  I don't
(3)  know -- I don't have any knowledge on where he started,
(4)  but that's my understanding.
(5)    MR. WU:  I don't want you to guess.
(6)    MR. URIARTE:  Q.  Yeah, no guessing.
(7)      I guess what I was leading to was whether you
(8)  had any part in recommending or having Mr. Navarro be
(9)  promoted from fueler to supervisor.  Do you remember
(10)  anything like that?
(11)    A.  No.
(12)    Q.  So you weren't part of that process at all?
(13)    A.  No.
(14)    Q.  Did you and Mr. Navarro get along at all?  Was
(15)  your relationship cordial or was it combative?  How
(16)  would you characterize your relationship with Mr.
(17)  Navarro?
(18)    A.  Working relationship was okay.  No, you know,
(19)  just -- it was okay.
(20)    Q.  Did Mr. Navarro ever bring up any complaints
(21)  to you?
(22)    A.  From time to time, yes.
(23)    Q.  And what would be the nature of those
(24)  complaints?
(25)    A.  Varies.  Could be airline issue, staffing

## Page 25

(1) issue. It just depends on the day and what he felt to
(2) complain about.
(3)     **Q.** And before his termination, did he ever bring
(4) up complaints against Andrew Dodge to you?
(5)     **A.** Yes.
(6)     **Q.** And what was the nature of those complaints?
(7)     **A.** It wasn't many. Let's see if I can remember,
(8) because it's been a while. But there was probably
(9) one -- I can remember at least one where Andrew might
(10) have been caught seen sleeping on the job.
(11)     **Q.** And he brought that up to you?
(12)     **A.** Yes.
(13)     **Q.** So was Andrew also a graveyard shift
(14) supervisor?
(15)     **A.** Yes. At that time.
(16)     **Q.** Okay. So you're coming in to work, and Mr.
(17) Navarro is mentioning to you that maybe Andrew Dodge
(18) was sleeping on the job. And so what would you, as a
(19) duty manager, do about that?
(20)     **A.** Well, there were different shifts, so they
(21) weren't working together.
(22)     **Q.** Okay.
(23)     **A.** So when the complaints came, I addressed the
(24) complaints with Andrew.
(25)     **Q.** Okay.

## Page 26

(1)     **A.** And it was brought up to the higher-ups.
(2)     **Q.** And who were the higher-ups at that time?
(3)     **A.** Let's see. Who was it? Renil was one of
(4) them.
(5)     **Q.** Who?
(6)     **A.** Renil Lal. Because he was the acting GM at
(7) the time, so --
(8)     **Q.** Okay. Anybody else, do you remember?
(9)     **A.** No.
(10)     **Q.** Did anything happen because of the complaints
(11) that Andrew Dodge was sleeping? Do you know what
(12) happened to Andrew Dodge? Was he reprimanded? Was he
(13) written up?
(14)     Did anything happen because of that?
(15)     **A.** Not that I know of.
(16)     **Q.** Did Mr. Dodge explain to you what happened or
(17) did he admit it or anything like that?
(18)     **A.** He did. He had sleep depravation -- or sleep
(19) apnea, sorry.
(20)     **Q.** So he had sleep apnea, and so --
(21)     **A.** According to what I heard, what the
(22) explanation was, at times it's easy for a person to
(23) fall asleep.
(24)     **Q.** Aside from his -- aside from Mr. Navarro
(25) mentioning that Mr. Dodge was sleeping, any other

## Page 27

(1) complaints that you -- before his termination, any
(2) complaints that Mr. Navarro brought up to you?
(3)     **A.** No.
(4)     **Q.** So that was the main thing that he brought up
(5) to you?
(6)     **A.** Yes.
(7)     **Q.** In your memory, do you remember if you were
(8) part of any kind of reprimand or disciplinary action
(9) against Mr. Navarro? Were you part of any of those?
(10)     **A.** No.
(11)     **Q.** What's your -- can you give us your sense as
(12) to how Mr. Navarro was as a supervisor? Was he a good
(13) supervisor? Was he an effective supervisor?
(14)     Do you have any sense for his abilities as a
(15) supervisor at Menzies at that time?
(16)     **MR. WU:** Objection. Vague. Compound.
(17)     **THE WITNESS:** Let's see. Without having worked
(18) with him a lot, but he -- he got the job done. He was
(19) okay. He was an okay supervisor.
(20)     **MR. URIARTE: Q.** Do you remember any complaints
(21) from airlines or delays or anything like that? Do you
(22) remember any of that?
(23)     **A.** No, not that I recall.
(24)     **Q.** What about with Mr. Dodge? Were there any
(25) complaints against airlines, or delays that Mr. Dodge

## Page 28

(1) may have caused, or anything like that, around the time
(2) of August 2018 and before that?
(3)     **A.** Not that I know of.
(4)     **MR. URIARTE:** David, can we have Exhibit 2 brought
(5) up, please.
(6)     **ZOOM HOST:** Coming up shortly.
(7)     **MR. URIARTE:** Thank you.
(8)     (Plaintiff's Exhibit 2 marked for
(9)     identification.)
(10)     **MR. URIARTE: Q.** Exhibit 2. Do you see Exhibit 2
(11) at all, Mr. Qually?
(12)     **A.** Yes.
(13)     **Q.** Is that your signature on this page?
(14)     **A.** Yes, it is.
(15)     **Q.** Okay. I wasn't really sure. Okay. I'll give
(16) you a moment to take a look at it. I don't know if you
(17) remember this at all. Do you remember this document at
(18) all, Mr. Qually?
(19)     **A.** I remember -- obviously I signed it, so, yeah.
(20)     **Q.** Yeah, you could have signed it, but it doesn't
(21) mean you remember it today.
(22)     **A.** Well, I mean, I don't remember a lot from back
(23) then, but --
(24)     **Q.** Yeah. Well, let me ask you this. Do you
(25) remember having a discussion with Mr. Dodge about a

**Page 29**

(1) missed punch in about August of 2018?

(2) **A.** Not that I recall.

(3)    Can I take a five-minute break?

(4) **Q.** Sure. You need a break, you said?

(5) **A.** Yes, just for a couple of minutes.

(6) **MR. URIARTE:** Yes, let's get off the record.

(7) Yeah, go ahead.

(8)    (Recess taken from 9:36 to 10:38 a.m.)

(9) **MR. URIARTE:** Let's get back on the record. So

(10) the witness had asked for a break, but it's been an

(11) extended break now. I don't know even how long it's

(12) been. I know it's been --

(13) **MR. WU:** It's been about 40 minutes.

(14) **MR. URIARTE:** Yeah, like 40 minutes. We were able

(15) to reach the witness. His attorney, Jason Wu, was able

(16) to reach the witness, and the witness has agreed to

(17) reappear today at 3:00 o'clock to continue the

(18) deposition.

(19) **MR. WU:** That's our understanding as well.

(20) **MR. URIARTE:** Great. Thank you. All right, guys.

(21) Thank you very much. I'll see you at 3:00.

(22)    (Whereupon, the recessed

(23)    at 10:39 o'clock a.m.)

(24)    ---o0o---

(25)

**Page 30**

(1)    CERTIFICATE OF WITNESS

(2)    ---o0o---

(3)

(4)    I, JOHN QUALLY, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)    _____

(13)                Signature

(14)    _____

(15)                  Date

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 31**

(1) STATE OF CALIFORNIA    )

(2) COUNTY OF SAN FRANCISCO )

(3)    I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)    JOHN QUALLY,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)    I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)    Dated the 7th day of August, 2020.

(22)

(23)

(24)

(25)    CINDY TUGAW

       CSR No. 4805 (California)

**Page 32**

(1) John Qually
   c/o Foley & Lardner

(2) 555 California Street, Suite 1700
   San Francisco, CA 94104

(3) Attn: Jason Y. Wu, Esq.

(4) Date: August 7th, 2020
   Re: Navarro vs. Menzies

(5) Deposition Date: Monday, July 27, 2020

(6) Dear Mr. Qually,

(7)    Please be advised the original transcript of
   your deposition is ready for your review.

(8)    Pursuant to FRCP Rule 30(e), you have
   30 days following the date of this notice to read,
   correct if necessary, and sign your transcript unless
   the attending parties and the deponent agree on the

(10) record or otherwise in writing to a longer or shorter
   time period. The deponent may change the form or the

(11) substance of the answer to a question, and may either
   approve the transcript of the deposition by signing it,

(12) or refuse to approve the transcript by not signing it.
   You are not required by law to read and sign your

(13) deposition transcript. All parties will be informed of
   the corrections. The original transcript will then be

(14) sealed and sent to the examining attorney pursuant to
   the applicable law.

(15)    You may either come to our office to read and
   sign the original transcript, or you may contact your

(16) attorney or the attorney who arranged for you to be
   present at your deposition. If they have ordered a

(17) copy of the transcript, you may review their copy and
   make corrections by submitting, signing and returning

(18) the attached form. If you choose to review your
   transcript at our office, please call first to make an

(19) appointment. Should you have any question regarding
   these instructions, please call.

(20)

(21) Sincerely,

(22)

(23) NOGARA REPORTING SERVICE
   5 Third Street, Suite 415
   San Francisco, California 94103

(24) (415) 398-1889

(25) cc: All counsel, original deposition

# EXHIBIT 48

DEPOSITION OF JOHN QUALLY, VOLUME II - 07/28/2020

RENALDO NAVARRO vs. MENZIES AVIATION, INC.

CONDENSED TRANSCRIPT AND CONCORDANCE

PREPARED BY:

NOGARA REPORTING SERVICE
5 Third Street, Suite 415
San Francisco, CA  94103
Phone:  (415) 398-1889
FAX:  (415) 398-0611

NRS

NOGARA
REPORTING SERVICE

**Page 33**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

RENALDO NAVARRO,

          Plaintiff,

v.               No.  3:19-CV-8157

MENZIES AVIATION, INC.,

  doing business as MENZIES

and DOES 1 through 10,

inclusive,

         Defendants.

_____/

Zoom Remote Deposition of

    JOHN QUALLY

Tuesday, July 28, 2020

    Volume II

 (Pages 33 through 58)

REPORTED BY:  CINDY TUGAW, CSR #4805

            NOGARA REPORTING SERVICE

           5 Third Street, Suite 415

         San Francisco, California 94103

             (415) 398-1889

**Page 34**

I N D E X

                   Page Number

EXAMINATION BY MR. URIARTE        36

        ---o0o---

E X H I B I T S

Plaintiff's

Exhibit 6    Employee Performance    46

          Development dated

          8/20/18

         PREVIOUSLY MARKED EXHIBITS

Exhibit 10   Statement by Rafael    53

          Vasquez dated 11/18/18

        ---o0o---

**Page 35**

BE IT REMEMBERED that, pursuant to Notice of

Taking Deposition and on Tuesday, the 28th day of July,

2020, commencing at the hour of 2:07 o'clock p.m.

thereof, via Zoom videoconference, before me, CINDY

TUGAW, a Certified Shorthand Reporter in the State of

California, personally appeared,

          JOHN QUALLY,

called as a witness by the Plaintiff, having been by me

previously duly sworn, was examined and testified

further as hereinafter set forth.

       ---o0o---

      APPEARANCES OF COUNSEL

For the Plaintiff

   LIBERATION LAW GROUP, P.C.

   2760 Mission Street

   San Francisco, California 94110

   BY:  ARLO GARCIA URIARTE, Attorney at Law

    (415) 695-1000

For the Defendants

   FOLEY & LARDNER, LLP

   555 California Street, Suite 1700

   San Francisco, California 94104

   BY:  JASON Y. WU, Attorney at Law

    (415) 984-9848

  Also Present:  David Ho, Zoom Host.

       ---o0o---

**Page 36**

EXAMINATION BY MR. URIARTE

**MR. URIARTE:**  Let's get back on the record.

**Q.**  Mr. Qually, how are you?  Thank you for coming

back today.

    Off the record we had a little bit of a

clarification discussion with your counsel.  And I just

wanted you to confirm that, in preparation for your

deposition, that aside from your counsel, you also

spoke with Tracy from HR, Andrew Dodge, and also Ran --

**A.**  Randy Davies.

**Q.**  -- Randy Davies, correct?

**A.**  Correct.

**Q.**  And then, aside from those people, did you

talk to anybody else in preparation --

**A.**  No.

**Q.**  -- for your deposition?

**A.**  No.

**Q.**  That's a no?

**A.**  No.

**Q.**  Great.  So let's just jump right in here.

Yesterday you were having a little bit of a difficulty

trying to remember the different supervisors and

different managers that were at Menzies Aviation office

in 2018.  And I've got a list of names here.  I wanted

to throw it by you.  In August of 2018, Nico, N-i-c-o,

**Page 37**

(1) was a supervisor?

(2)    **A.** He -- actually, I was doing a little research

(3) after that question. Nico was the nighttime duty

(4) manager.

(5)    **Q.** There you go. And then you have Renil Lal,

(6) right?

(7)    **A.** Yes.

(8)    **Q.** And do you remember what his position was in

(9) August 2018?

(10)    **A.** To the best of my knowledge, he was the

(11) temporary GM.

(12)    **Q.** Okay. And then you have Randy Davies, is that

(13) correct?

(14)    **A.** Yes, the regional vice president, yes.

(15)    **Q.** And then we just went through that, that he's

(16) actually regional vice president of another division.

(17)    **A.** Right.

(18)    **Q.** But do you remember who the regional vice

(19) president that was for the Menzies fueling operation at

(20) all?

(21)    **A.** As far as what?

(22)    **Q.** I think his name is Kevin something, does that

(23) ring a bell?

(24)    **A.** There was a Kevin Bloomberg, but he was the

(25) safety and security manager, I guess you could say.

**Page 38**

(1)    **Q.** Okay. And then you have Tracy who was at the

(2) human resources department, correct?

(3)    **A.** Correct.

(4)    **Q.** Do you remember any other supervisors during

(5) that time aside from Andrew Dodge?

(6)    **A.** Tuvita Tokotaha.

(7)    **Q.** Tuvita, T-u-v-i-t-a, correct?

(8)    **A.** Yes. July was also one.

(9)    **Q.** Who else?

(10)    **A.** Edsel Patawran.

(11)    **Q.** Anybody else?

(12)    **A.** I think Mark Iligan, but he's kind of part

(13) supervisor, part fueler.

(14)    **Q.** Okay. And his name is Mark?

(15)    **A.** Yes.

(16)    **Q.** All right. Anybody else that you remember as

(17) a supervisor?

(18)    **A.** Ray Santana.

(19)    **Q.** Ray Santana?

(20)    **A.** Yeah.

(21)    **Q.** Okay. Anybody else? And that's in August of

(22) 2018, right?

(23)    **A.** Yes.

(24)    **Q.** Okay. Anybody else?

(25)    **A.** That's all I can remember off the top of my

**Page 39**

(1) head at this time.

(2)    **Q.** Okay. Great. Thank you very much.

(3)    And then there was a person by the name of

(4) Jeff who was from Seattle who was helping out. Do you

(5) remember that?

(6)    **A.** Jeff Stevenson, yes.

(7)    **Q.** And what was his role, do you remember?

(8)    **A.** To the best of my knowledge, he was in town

(9) helping out the new managers, you know, director and

(10) GM, get into the station, to the best of my knowledge.

(11) But I never -- you know, he had multi different tasks

(12) in this station, but what his actual role was, I don't

(13) know.

(14)    **Q.** Okay. Sounds good. Were you involved in the

(15) decision-making with regards to the suspension for Ray

(16) Navarro?

(17)    **A.** No.

(18)    **Q.** So you were not asked by any of the managers,

(19) "Hey, what's your opinion on this, do you think it's

(20) correct for us to suspend Mr. Navarro?"

(21)    **A.** No.

(22)    **Q.** No, okay. Were you at the meeting where Ray

(23) Navarro was -- where it was communicated to Ray Navarro

(24) that he was going to be suspended?

(25)    **A.** No. If you -- no.

**Page 40**

(1)    **Q.** And I read your note, and I think I've got to

(2) piece it together a little bit, and let me see if this

(3) is correct. What happened was, after the suspension

(4) meeting, they asked you to deliver the suspension

(5) notice, and then Ray Navarro -- a couple of days later,

(6) and then Ray Navarro would not sign it. Is that how it

(7) happened?

(8)    **A.** He, as I remember, trying to serve him with a

(9) suspension document, and he did refuse to sign.

(10)    **Q.** But that was -- when did you try to serve --

(11) when did you try to serve it to Ray Navarro? Did that

(12) happen after the meeting, same day?

(13)    **A.** I believe it must have -- I can't remember a

(14) hundred percent, but it must have been before the

(15) meeting.

(16)    **Q.** Okay.

(17)    **A.** But like I say, I don't have -- not knowing

(18) when Tracy had the meeting, but, you know, so my guess

(19) would be -- like I say, it's a guess, but it was

(20) probably before the meeting with them.

(21)    **Q.** So because it's a guess, you don't actually

(22) know whether it was before the meeting or after the

(23) meeting?

(24)    **A.** Correct.

(25)    **Q.** You don't remember.

## Page 41

(1)    MR. WU: And, John, we don't want you to guess
(2) today. It's a forbidden word that makes attorneys'
(3) ears perk up a little bit.
(4)    THE WITNESS: Yeah.
(5)    MR. WU: If you have an idea, please let us know,
(6) but, otherwise, don't guess.
(7)    THE WITNESS: Okay.
(8)    MR. URIARTE: Q. What about with regards to the
(9) termination? Were you involved at all in the
(10) decision-making behind the decision to terminate Ray
(11) Navarro?
(12)    A. No.
(13)    Q. So nobody asked for your opinion? You never
(14) gave your opinion?
(15)    A. No.
(16)    Q. Did you do any investigation or ask around,
(17) anything like that?
(18)    A. No.
(19)    (Discussion off the record.)
(20)    MR. URIARTE: Q. Do you remember seeing the
(21) petition that was going around against Andrew Dodge
(22) before Mr. Navarro was terminated?
(23)    A. No.
(24)    Q. So what about today, like, have you seen that
(25) petition today? Have you seen it since his termination

## Page 42

(1) at all?
(2)    MR. WU: I'm going to object here on grounds of
(3) attorney-client privilege and instruct the witness to
(4) answer only as to whether he's seen the document
(5) outside of any confidential or communications with his
(6) attorneys.
(7)    MR. URIARTE: Q. That's correct, Mr. Qually, yes.
(8) So my question really is whether you've ever seen the
(9) -- either of the petitions, either of the two petitions
(10) that were circulated, not because your attorney
(11) showed it to you but because of other events.
(12)    A. As I said, no.
(13)    Q. Would it be accurate to state that as a duty
(14) manager, that Andrew Dodge is an employee that you
(15) would have been supervising?
(16)    A. At some point, yes.
(17)    Q. And so it wasn't like an interest of yours to
(18) figure out what it is that the fuelers were complaining
(19) about against Dodge? That wasn't an interest of yours?
(20)    MR. WU: Objection. Vague.
(21)    You can answer if you understand the question.
(22)    THE WITNESS: I did not hear complaints directly
(23) from the fuelers.
(24)    MR. URIARTE: Q. Okay. So you're saying none of
(25) the fuelers ever came up to you and said, hey, these

## Page 43

(1) negatives things are happening? You never heard that?
(2)    A. No.
(3)    Q. What about the video, did you ever see that
(4) video where they put together a video of Mr. Dodge
(5) sleeping and all that? Did you see that one?
(6)    A. No.
(7)    Q. You knew that a petition was going around
(8) against Mr. Dodge? Did you know that, as it was
(9) happening?
(10)    A. I have heard through -- that, yes, there was.
(11)    Q. And did you see the note that Andrew Dodge
(12) wrote, the statement he wrote around the same time that
(13) the petition was going around, was that something that
(14) you saw?
(15)    A. I did not.
(16)    Q. Do you know one way or the other if Menzies
(17) Aviation ever did an investigation with regards to the
(18) facts that are contained within those petitions?
(19)    A. No.
(20)    Q. You don't know?
(21)    A. I don't know if -- what was done with all the
(22) information.
(23)    Q. I see. Were you made aware at some point that
(24) Mr. Dodge was suffering from sleep apnea?
(25)    A. Yes.

## Page 44

(1)    Q. And how were you made aware of that?
(2)    A. He brought it to our attention.
(3)    Q. Do you know when that was?
(4)    A. No, I don't have the exact date.
(5)    Q. Was it before or after the termination of Ray
(6) Navarro?
(7)    A. Before.
(8)    Q. A lot of time before? I think Mr. Dodge came
(9) in in 2016. And then Ray Navarro was August of 2018.
(10) So that's kind of like the time frame there. I don't
(11) know if that assists you, but do you know about when
(12) Mr. Dodge let you know of his condition?
(13)    A. I don't have the exact date, no.
(14)    Q. And did you see any kind of medical note or a
(15) medical slip or anything like that written by a doctor?
(16)    A. Personally, no.
(17)    Q. Did somebody tell you that he had one?
(18)    A. He told me he gave it to the general manager
(19) at the time, Renil.
(20)    Q. Renil Lal?
(21)    A. Yes.
(22)    Q. Did Mr. Lal ever talk to you about the note,
(23) the medical note?
(24)    A. No.
(25)    Q. Was there some sort of accommodation or a game

**Page 45**

(1) plan with regards to how to deal with the sleep apnea,
(2) anything like that?
(3)     A. Nothing directed to me.
(4)     Q. Did you think that maybe the sleep apnea
(5) condition was interfering with his job?
(6)     A. No.
(7)     Q. You didn't think that it's of concern?
(8)     A. There's always a concern, but I don't believe
(9) it interfered with his job.
(10)     Q. And why is that?
(11)     A. Because most of the time, as I heard, it was
(12) already, like, early in the morning, like, 1:00, 2:00,
(13) 3:00 o'clock in the morning when there's nothing on the
(14) airport. When he's actually on the airport, he was not
(15) sleeping. He was actually doing his job.
(16)     Q. Did you see that one picture of him where he's
(17) inside the truck and he's sleeping? Did you see that
(18) one?
(19)     A. I've seen one, yes.
(20)     Q. And that's not a concern at all for Menzies?
(21)     A. For me personally or Menzies? Me, personally,
(22) the time frame, no. Whether the company did, I can't
(23) say.
(24)     Q. So I guess you weren't part of some sort of
(25) discussion as to whether his condition interfered with

**Page 46**

(1) him being able to correctly perform his job functions,
(2) right? You weren't purview to that type of discussion?
(3)     A. Correct.
(4)     Q. Have you seen the termination notice of
(5) Renaldo Navarro?
(6)     A. No.
(7)     Q. So you saw only the suspension notice, right?
(8)     A. Correct.
(9)     Q. And then you actually -- did you write that?
(10) Did you actually -- were you the one who wrote it?
(11)     A. The one that basically saying that he -- that
(12) I attempted to serve him the suspension notice and he
(13) refused to sign?
(14)     Q. No, no, let me put it up, that way we're
(15) talking about the same thing. I'm talking about the
(16) actual notice itself.
(17)     So it's Exhibit 6, please, David.
(18)     (Plaintiff's Exhibit 6 marked for
(19)     identification.)
(20)     MR. URIARTE: Q. Do you see that, Mr. Qually?
(21)     A. Oh, that one. Okay. Yes, I did -- that was
(22) the one -- that was the -- okay, yes. That was a
(23) suspension document that was tried to serve to
(24) Mr. Navarro that he refused to sign.
(25)     Q. Correct. So my question first is did you type

**Page 47**

(1) this up?
(2)     A. Yes.
(3)     Q. So you typed it up, is that right?
(4)     A. You know what, hold on a minute. No, I did
(5) not type that.
(6)     Q. Okay. So somebody gave this to you to -- for
(7) example, it seems like somebody filled out the field
(8) "Employee Name: Renaldo Navarro," "Today's Date,"
(9) "Airport/Location," "Clock #," "Department." Somebody
(10) put that information in there.
(11)     Were you the one who put that in there?
(12)     A. Negative, no.
(13)     Q. Do you know who did that?
(14)     A. Do I remember, no. There's only --
(15)     Q. Who asked you to serve the document?
(16)     A. I believe it was HR.
(17)     Q. Meaning Tracy?
(18)     A. Tracy.
(19)     Q. Okay. So this might refresh your recollection
(20) with regards to before or after the meeting. So it
(21) says "Today's Date" on the top there, and it says
(22) August 20, 2018. Do you see that?
(23)     A. Okay.
(24)     Q. And then, if you scroll down and you see your
(25) signature, it's a different date. Your signature has a

**Page 48**

(1) date of August 23. Do you see that?
(2)     A. Yes.
(3)     Q. Does that help you or refresh your
(4) recollection at all with regards to when you served
(5) this?
(6)     A. When he refused to sign, I dated it on the
(7) 23rd because that's when I tried to serve it to him.
(8)     Q. I see. So that's when your encounter with him
(9) actually happened, is that correct?
(10)     A. Correct.
(11)     Q. So you only had one encounter with him, one
(12) attempt?
(13)     A. Correct.
(14)     Q. And because he was not -- he wasn't working at
(15) that point, correct?
(16)     MR. WU: Objection. Vague.
(17)     THE WITNESS: I can't remember --
(18)     MR. WU: You can answer if you understand the
(19) question.
(20)     THE WITNESS: I understand the question. I don't
(21) remember if that was his scheduled shift. I don't
(22) remember if that was his scheduled day or not.
(23)     MR. URIARTE: Q. I understand you're a little
(24) confused. By the time you were trying to serve him,
(25) was he already serving the suspension or he had not

## Page 49

(1) started serving the suspension? Do you see what I'm
(2) saying?
(3)     **A.** He -- best of my knowledge, he had not served
(4) his suspension.
(5)     **Q.** So he didn't start serving the suspension
(6) until you tried to serve him the suspension notice, is
(7) that correct?
(8)     **A.** To the best of my knowledge, yes.
(9)     **Q.** Okay. Did you leave him with a copy?
(10)     **A.** He had a copy, yes.
(11)     **Q.** When you say he had a copy, was the copy --
(12) the copy that he had, that came from you or --
(13)     **A.** He took a picture of it with his phone.
(14)     **Q.** I see. Okay. So, okay. All right. And then
(15) let me just read under goal and the expectation part
(16) there, it says, "It is expected that employees will
(17) follow all policies and procedures. Failure to follow
(18) Company policies and procedures will result in further
(19) disciplinary action up to and including termination."
(20)     Do you read that?
(21)     **A.** Yes.
(22)     **Q.** Are you knowledgeable at all with regards to
(23) the policies and procedures that this notice was
(24) talking about?
(25)     **A.** Directly, no.

## Page 50

(1)     **Q.** It says "Failure to follow Company policies
(2) and procedures..." Do you know what company policies
(3) and procedures that he failed to follow?
(4)     **A.** Let's see. I can't remember off my head, no.
(5)     **Q.** Do you have an opinion as to why he was
(6) suspended or terminated from Menzies, like, do you know
(7) the specific violation he may have violated?
(8)     Do you have any kind of memory as to that, or
(9) what's your memory with regards to that?
(10)     **MR. WU:** Objection. Compound. Lack of
(11) foundation.
(12)     You can answer if you understand the question.
(13)     **THE WITNESS:** Can you repeat it.
(14)     **MR. URIARTE:** Q. Yeah. So sitting here today and
(15) looking back at the suspension and the termination, we
(16) know that Menzies -- Menzies' position is he violated
(17) certain policies and procedures, right?
(18)     So just kind of talking about that, do you
(19) have a memory or an understanding in your head what it
(20) is that Mr. Navarro actually violated to justify his
(21) termination?
(22)     **MR. WU:** Same objection.
(23)     **THE WITNESS:** To justify, looking back now?
(24)     **MR. URIARTE:** Q. Yes.
(25)     **A.** I can't think of it off my head, no. I can't,

## Page 51

(1) no.
(2)     **Q.** Did you -- like either part of the petition or
(3) part of what was happening, or anything like that, did
(4) you ever have a discussion with Mr. Dodge with regards
(5) to his fuelers and his fuelers maybe not being able to
(6) take breaks? Did you ever engage in such a discussion
(7) with him?
(8)     **A.** It probably came up once or twice, yes.
(9)     **Q.** And was this once or twice before the
(10) termination of Mr. Navarro?
(11)     **A.** Likely, yes.
(12)     **Q.** And can you tell us what your memory is of
(13) that, like, what was that discussion about?
(14)     **A.** Basically fuelers not being able to take a
(15) break just by the fact that they were shorthanded or
(16) just lots of flights. Nothing I can remember in
(17) general, but those are usually the only things that
(18) would prevent that.
(19)     **Q.** Okay. And what brought up the need to talk to
(20) Mr. Andrew Dodge about the breaks and his fuelers?
(21) What brought it up to you? What kind of triggered
(22) that?
(23)     **MR. WU:** Objection. Assumes facts not in
(24) evidence.
(25)     **THE WITNESS:** Sometimes a fueler would complain to

## Page 52

(1) me, but that's it.
(2)     **MR. URIARTE:** Q. And did Mr. Dodge have any
(3) opinion or did he kind of have his position as to why
(4) these breaks were short -- I mean, the breaks weren't
(5) happening, or the breaks were late, or anything like
(6) that?
(7)     Did Andrew Dodge try to explain himself as to
(8) why those things were happening?
(9)     **MR. WU:** Objection. Assumes facts not in
(10) evidence.
(11)     **THE WITNESS:** Yes.
(12)     **MR. URIARTE:** Q. And what would he say in those
(13) discussions?
(14)     **A.** He gave me the explanation of what happened
(15) during the night and why some fuelers weren't able to
(16) get a longer break than they did or any break at all.
(17) And that's it, you know.
(18)     We -- there is a policy where, if they don't
(19) get a break, they get a missed meal penalty. So they
(20) get paid for their lunch.
(21)     **Q.** Did you ever have a discussion with a Rafael
(22) Vasquez about Andrew Dodge?
(23)     **A.** I might have at one point. I don't recall.
(24)     **Q.** And what do you remember as to that
(25) discussion?

**Page 53**

(1)    MR. WU:  Objection.  Lack of foundation.

(2)    THE WITNESS:  I don't recall what was talked about

(3)    in that conversation.

(4)    MR. URIARTE:  Q.  So -- okay.  So let's just kind

(5)    of clarify.  Are you saying maybe you had a discussion

(6)    with him about Andrew Dodge and maybe not?  Or you may

(7)    recall a particular discussion, you just don't remember

(8)    the contents of it?  Is that -- yeah, can you just

(9)    clarify the nature of your memory?

(10)    A.  We probably had a conversation, but what we

(11)    talked about, I don't recall.

(12)    Q.  Let me show you Exhibit 10.  So Exhibit 10 is

(13)    a statement from Rafael Vasquez, I guess, about his

(14)    efforts to talk to Raul Vargas about something about

(15)    Andrew Dodge.  If you see the date below, it says

(16)    November 2018.  Do you see that?

(17)    A.  Yes.

(18)    Q.  Does this refresh your recollection as to

(19)    about when you may have talked to Rafael Vasquez about

(20)    Andrew Dodge?

(21)    A.  No.  And, for the record, I have not seen this

(22)    before.

(23)    Q.  Okay.  Maybe another way of putting it is did

(24)    you talk to Rafael Vasquez before Mr. Navarro was

(25)    terminated or after his termination?  Do you remember

**Page 54**

(1)    that at all?

(2)    A.  If I talked to Rafael, it would have been

(3)    before.

(4)    Q.  So here he says something about "I have spoken

(5)    to The Menzies Aviation Fueling Director Raul Vargas on

(6)    three separate occasions regarding Mr. Andrew Dodge,

(7)    who continues to abuse his authority and at times

(8)    harass Fuelers under his charge."

(9)    Do you have any information or knowledge with

(10)    regards to that allegation, "continues to abuse his

(11)    authority and at times harass Fuelers under his

(12)    charge"?

(13)    Does that ring a bell at all, Mr. Qually?

(14)    A.  No.

(15)    Q.  And in the complaint that you received against

(16)    Andrew Dodge, was there any type of language along

(17)    these lines or actions along these lines, like

(18)    harassing, abusing authority?

(19)    Was that the types of complaints that you

(20)    received?

(21)    A.  No.

(22)    Q.  So you received complaints about meal breaks

(23)    and rest breaks, but nothing about harassing fuelers,

(24)    right?  You never heard that type of complaint?

(25)    A.  Correct.

**Page 55**

(1)    Q.  Aside from breaks, what other types of

(2)    complaints did you receive from fuelers about Andrew

(3)    Dodge?

(4)    A.  I mean, there could be many different ways,

(5)    but usually the only complaints were, you know, working

(6)    too much or working too hard or too many flights, stuff

(7)    like that.  That's pretty much it.

(8)    Q.  And that's a function of scheduling, right?

(9)    Is that what that is?

(10)    A.  Correct.

(11)    MR. URIARTE:  Okay.  I have no further questions

(12)    for Mr. Qually.

(13)    MR. WU:  No further questions on my end, either.

(14)    MR. URIARTE:  Great.  Thank you, Mr. Qually.

(15)    Thanks for being patient with us.  I think we're done

(16)    with your deposition, and have a nice rest of the day.

(17)    THE WITNESS:  Okay.  Thank you.

(18)    (Whereupon, the deposition concluded at 2:37

(19)    o'clock p.m.)

(20)    ---o0o---

(21)

(22)

(23)

(24)

(25)

**Page 56**

(1)    CERTIFICATE OF WITNESS

(2)    ---o0o---

(3)

(4)    I, JOHN QUALLY, hereby declare under

(5)    penalty of perjury that I have read the foregoing

(6)    deposition testimony; and that the same is a true

(7)    and correct transcription of my said testimony

(8)    except as corrected pursuant to my rights under

(9)    Rule 30(e) of the Federal Rules of Civil

(10)    Procedure.

(11)

(12)    _____

(12)    Signature

(13)

(14)    _____

(14)    Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 57

(1) STATE OF CALIFORNIA        )
                              )
(2) COUNTY OF SAN FRANCISCO )

(3)        I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)                  JOHN QUALLY,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)        I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)        Dated the 7th day of August, 2020.

(22)

(23)

(24)

                  CINDY TUGAW

(25)              CSR No. 4805 (California)

## Page 58

(1) John Qually
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn: Jason Y. Wu, Esq.
(4) Date: August 7th, 2020
    Re: Navarro vs. Menzies
(5) Deposition Date: Tuesday, July 28, 2020
(6) Dear Mr. Qually,
(7)        Please be advised the original transcript of
    your deposition is ready for your review.
(8)        Pursuant to FRCP Rule 30(e), you have
    30 days following the date of this notice to read,
(9) correct if necessary, and sign your transcript unless
    the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
    time period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)        You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition

**NOGARA REPORTING SERVICE**          (415) 398-1889                    Page 57 to Page 58

# EXHIBIT 49

**DEPOSITION OF TRACY AGUILERA - 08/25/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**

**Page 1**

```
(1)           IN THE UNITED STATES DISTRICT COURT
(2)       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
(3)
(4)
(5)  RENALDO NAVARRO,
(6)             Plaintiff,
(7)  v.                          No.  3:19-CV-8157
(8)  MENZIES AVIATION, INC.,
     doing business as MENZIES
(9)  and DOES 1 through 10,
     inclusive,
(10)
             Defendants.
(11) _____/
(12) Zoom Remote Deposition of
(13)     TRACY AGUILERA
(14)  Tuesday, August 25, 2020
(15)
(16)
(17)
(18)
(19)
(20)
(21) REPORTED BY:  CINDY TUGAW, CSR #4805
(22)
(23)
                NOGARA REPORTING SERVICE
(24)         5 Third Street, Suite 415
          San Francisco, California 94103
(25)             (415) 398-1889
```

**Page 2**

```
(1)             I N D E X
(2)                                 Page Number
(3)  EXAMINATION BY MR. URIARTE           5
(4)  EXAMINATION BY MR. WU               48
(5)  FURTHER EXAMINATION BY MR. URIARTE  53
(6)             ---o0o---
(7)           E X H I B I T S
(8)  Plaintiff's
(9)  Exhibit 8    Petition to Menzies      26
                  Management from Menzies
(10)              Fuelers
(11) Exhibit 9    Termination notice for   48
                  Renaldo Navarro
(12)
     Exhibit 11   Employee Performance     35
(13)              Development dated
                  8/29/2018
(14)
     Exhibit 12   Email chain culminating  31
(15)              in an email from Raul
                  Vargas to Tracy Aguilera
(16)              dated August 29, 2018
(17) Exhibit 13   Menzies Aviation Code of 18
                  Conduct
(18)
     Exhibit 14   Menzies Aviation Employee 21
(19)              Handbook California - 2017
(20) Exhibit 15   Menzies Aviation Applicant 23
                  Declaration Form
(21)
     Exhibit 17   Employee Performance     43
(22)              Development Steps to
                  Progressive Discipline
(23)
     Exhibit 18   Job Description, Fueling  54
(24)              Supervisor (North America)
(25)
```

**Page 3**

```
(1)               I N D E X
(2)             (Continued)
(3)  Plaintiff's                    Page Number
(4)  Exhibit 19   Letter from Rafael Vasquez  41
                  to whom it may concern
(5)               dated 11/18/2018 with
                  attached petition
(6)
     Exhibit 20   Menzies Aviation Employee   44
(7)               Handbook California - 2018
(8)               ---o0o---
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 4**

```
(1)          BE IT REMEMBERED that, pursuant to Notice of
(2)  Taking Deposition and on Tuesday, the 25th day of
(3)  August, 2020, commencing at the hour of 1:04 o'clock
(4)  p.m. thereof, via Zoom videoconference, before me,
(5)  CINDY TUGAW, a Certified Shorthand Reporter in the
(6)  State of California, personally appeared,
(7)              TRACY AGUILERA,
(8)  called as a witness by the Plaintiff, having been by me
(9)  first duly sworn, was examined and testified as
(10) hereinafter set forth.
(11)            ---o0o---
(12)       APPEARANCES OF COUNSEL
(13) For the Plaintiff
         LIBERATION LAW GROUP, P.C.
(14)     2760 Mission Street
         San Francisco, California 94110
(15)     BY:  ARLO GARCIA URIARTE, Attorney at Law
         (415) 695-1000
(16)
(17) For the Defendants
         FOLEY & LARDNER, LLP
(18)     555 California Street, Suite 1700
         San Francisco, California 94104
(19)     BY:  JASON Y. WU, Attorney at Law
         (415) 984-9848
(20)
     Also Present:  David Ho, Zoom Host.
(21)
                ---o0o---
(22)
(23)
(24)
(25)
```

**Page 5**

(1)    THE REPORTER:  At this time, I will ask counsel to
(2) stipulate on the record that there is no objection to
(3) this deposition officer administering a binding oath to
(4) the witness via Zoom, starting with the noticing
(5) attorney.
(6)    MR. URIARTE:  No objection from plaintiff.
(7)    MR. WU:  And no objections for defendant, Menzies
(8) Aviation.
(9)    (Whereupon, the Witness was duly sworn by the
(10)    Reporter.)
(11)    EXAMINATION BY MR. URIARTE
(12)    MR. URIARTE:  Q.  Good afternoon, Ms. Aguilera.
(13)    A.  Good afternoon.
(14)    Q.  Could you please state and spell your full
(15) legal name for the record.
(16)    A.  Tracy T r-a-c-y, Marie, M-a-r-i-e, Aguilera,
(17) A-g-u-i-l-e-r-a.
(18)    Q.  Thank you.  Have you had your deposition taken
(19) before?
(20)    A.  Yes.
(21)    Q.  And how many times?
(22)    A.  Two or three.  A couple times.
(23)    Q.  And are these like as part of your duties as
(24) an HR professional?
(25)    A.  Yes.

**Page 6**

(1)    Q.  All of them?  All of these depos where you
(2) testified you testified as an HR professional?
(3)    A.  Yes.
(4)    Q.  And were they all for Menzies?
(5)    A.  Yes.
(6)    Q.  When was the last one?
(7)    A.  It's been a while.  It's been a while.  I
(8) can't give you an exact time.
(9)    Q.  Yeah, we don't need -- we sometimes don't
(10) expect them.  Like maybe within the last five years or
(11) more than five years?
(12)    A.  Yes.
(13)    Q.  Has it been more than a year ago?
(14)    A.  I believe so.
(15)    Q.  So within the last one and five years,
(16) essentially, is that correct?
(17)    A.  Yes.
(18)    Q.  Have all two or three of them occurred within
(19) the last one and five years or some were older than
(20) that?
(21)    A.  No, I believe they were within one to five
(22) years.
(23)    Q.  So my name is Arlo Uriarte.  I am the attorney
(24) for plaintiff Navarro.  And you're aware that
(25) Mr. Navarro has an action against Menzies, correct?

**Page 7**

(1)    A.  Yes.
(2)    Q.  And you know who Renaldo Navarro is?
(3)    A.  Yes.
(4)    Q.  How long did you actually work with Mr.
(5) Navarro?
(6)    A.  When Menzies Aviation purchased ASIG, so it
(7) would be around 2017.
(8)    Q.  So Menzies arrived -- do you remember what
(9) part of the year Menzies actually started their
(10) operation in SFO --
(11)    A.  Yeah --
(12)    Q.  -- for ASIG?
(13)    A.  Oh, for ASIG.  Could have been June or July.
(14)    Q.  So about June or July 2017?
(15)    A.  Yes.
(16)    Q.  And then were you already at SFO doing other
(17) parts of airport services for Menzies?
(18)    A.  Yes.
(19)    Q.  And then how long has Menzies been in San
(20) Francisco Airport?
(21)    A.  I can't give you an exact date.
(22)    Q.  Yeah, what about yourself, about how long --
(23)    A.  I've been at SFO since 1997.
(24)    Q.  All for Menzies?
(25)    A.  No.

**Page 8**

(1)    Q.  And so in 1997 who did you work for?
(2)    A.  I started with Ogden Aviation, then I went to
(3) Aeroground.  And then due to the purchase of Aeroground
(4) by Menzies, I'm now with Menzies Aviation, however,
(5) Menzies does own Ogden.
(6)    Q.  Gotcha.  But when Aeroground -- when did they
(7) get purchased by Menzies?
(8)    A.  I believe around 2005.
(9)    Q.  And what was your position in 2005 when you
(10) started with Menzies?
(11)    A.  I was an HR coordinator/manager.
(12)    Q.  By the time in 2017 when Menzies purchased
(13) ASIG, what was your title?
(14)    A.  Human resource manager.
(15)    Q.  And within the human resources department in
(16) SFO, did you have other people working in the
(17) department?
(18)    A.  Yes.
(19)    Q.  How many people did you supervise?
(20)    A.  Two directly and one indirectly.
(21)    Q.  And how do you differentiate the indirectly?
(22)    A.  Two were -- reported directly to me and the
(23) third was in my office, however, she works for the
(24) recruiting department.
(25)    Q.  Gotcha.  Okay.  So I think you've been doing a

**Page 9**

(1) really good job answering my basic questions there. So
(2) as you can tell, although we're in an informal setting,
(3) you have been giving testimony that the court reporter
(4) is taking down. And she will come up with a booklet
(5) that you will be able to review and make changes to.
(6) Are you aware of that?
(7)     A. Yes.
(8)     Q. And I should tell you that if you do make
(9) changes to that booklet, later on, for purposes of
(10) trial, somebody like me or another person might
(11) question you as to why you made changes. Okay?
(12)     Do you understand that?
(13)     A. Yes, I understand.
(14)     Q. And that's why we should try to make sure that
(15) you understand the question and that you provide your
(16) best testimony here today. Okay? Understood?
(17)     A. Understood.
(18)     Q. And you also understand that you're under
(19) oath, correct?
(20)     A. Yes.
(21)     Q. And you understand that oath?
(22)     A. Yes.
(23)     Q. Is there any reason why you cannot provide
(24) your best testimony here today?
(25)     A. No.

**Page 10**

(1)     Q. Are you under any type of medication or
(2) substance that affects your memory?
(3)     A. No.
(4)     Q. Did you do anything to prepare for today's
(5) deposition?
(6)     A. No.
(7)     Q. Did you talk to anybody, aside from your
(8) attorney, did you talk to anybody to prepare for
(9) today's deposition?
(10)     A. No, just my counsel.
(11)     Q. And then did you review any documents?
(12)     A. Just what my counsel has shown me.
(13)     Q. And what documents were those?
(14)     MR. WU: Objection. Attorney-client privilege.
(15) I'm going to instruct the witness not to answer.
(16)     MR. URIARTE: With regards to documents that were
(17) reviewed for today's deposition? I think we're
(18) entitled to know what she reviewed.
(19)     MR. WU: I think she already testified that she
(20) only reviewed what was shown to her by counsel.
(21)     MR. URIARTE: Q. All right. Aside from the
(22) documents that your counsel showed you, did you review
(23) any other documents?
(24)     A. No.
(25)     Q. Do you have notes or anything in front of you

**Page 11**

(1) that you're using for today's testimony?
(2)     A. No.
(3)     Q. What's the highest level of education that you
(4) finished with?
(5)     A. High school.
(6)     Q. And then any kind of HR-related classes that
(7) you've taken in the last five years?
(8)     A. No.
(9)     Q. Any wage and hour related seminars or classes
(10) that you've taken in the last five years?
(11)     A. I'm sorry, I can't hear you. I didn't.
(12)     Q. Any kind of wage and hour seminars or
(13) compliance classes or anything like that?
(14)     A. No.
(15)     Q. And then how long have you been an HR manager
(16) for Menzies at SFO airport?
(17)     A. Ten years.
(18)     Q. When Menzies took over ASIG, did Menzies bring
(19) with it its own employment policies and handbook?
(20)     A. They had one, yes.
(21)     Q. Were those distributed to the employees that
(22) they took over in July of 2017?
(23)     A. I'm sorry, can you repeat the question.
(24)     Q. Sure. When Menzies took over ASIG in July of
(25) 2017, did they distribute the Menzies employment

**Page 12**

(1) handbooks and policies --
(2)     A. Not right at the time, no.
(3)     Q. When were those eventually distributed?
(4)     A. I don't have an exact date. I do know that we
(5) posted the notice stating that they would be following
(6) the Menzies Aviation policies.
(7)     Q. Okay. And where was that notice posted?
(8)     A. It was posted in the employee bulletin board.
(9)     Q. And then where would -- like if somebody
(10) wanted to see them, where would they see them?
(11)     A. They would see them in the HR department. We
(12) were preparing a package for them.
(13)     Q. If somebody needed to see them, you said they
(14) could see it in the HR department, is that correct?
(15)     A. Yes, once we put them all together.
(16)     Q. By August of 2018, had you put them all
(17) together?
(18)     A. I believe they did have a package for them.
(19)     Q. For each one of them?
(20)     A. Yes.
(21)     Q. Are you certain of that or are you guessing on
(22) that?
(23)     A. No, I believe they did have a package put
(24) together.
(25)     Q. And when you say "they," who's "they"?

**Page 13**

(1)   **A.** The corporate office.

(2)   **Q.** So I would imagine that the corporate office

(3) would have kind of like the same materials they would

(4) have for the other Menzies departments, other

(5) Menzies --

(6)   **A.** I'm sorry?

(7)   **Q.** I would imagine that the Menzies corporation

(8) would be using the same employment handbooks as they

(9) were using for the other services that Menzies was

(10) already doing at SFO, right? Those would be the same

(11) handbooks?

(12)   **A.** Well, yes, they have a California Menzies

(13) handbook, yes.

(14)   **Q.** So that's the part I don't understand too

(15) much. Why did it take a little bit of time to package

(16) them for the Menzies fuelers?

(17)   Did you hear the question?

(18)   **A.** No, I didn't hear your question.

(19)   **Q.** Okay. So the question is if there's a

(20) California employment handbook -- by July of 2017,

(21) Menzies was already at San Francisco Airport, correct?

(22) Ms. Aguilera?

(23)   **A.** Yes, I believe it was around July.

(24)   **Q.** No, what I mean is by July of 2017, there were

(25) already operations in San Francisco?

**Page 14**

(1)   **A.** Yes.

(2)   **Q.** Other services, correct?

(3)   **A.** Yes.

(4)   **Q.** So those services already had an employment

(5) handbook for California, correct?

(6)   **A.** Yes.

(7)   **Q.** So wasn't that the same handbook that was

(8) going to be used for Menzies fuelers?

(9)   **A.** I can't answer that because I know they were

(10) revising our handbook.

(11)   **Q.** I see. Okay. And then, but we don't know the

(12) exact date that the handbook was distributed to the

(13) Menzies fuelers?

(14)   **A.** No.

(15)   **Q.** And I took a look at the documents that were

(16) produced to us by your attorneys, and I didn't see any

(17) type of acknowledgment paperwork with regards to Mr.

(18) Navarro or acknowledging receipt of corporate policies.

(19)   **A.** Hmm.

(20)   **Q.** So do you know anything about that, whether

(21) you've seen one or anything like that?

(22)   **A.** No, I actually didn't look, but I do know that

(23) a package was put together for all of the ASIG

(24) employees for them to sign.

(25)   **Q.** Right. Because that's the normal procedure,

**Page 15**

(1) right, you give it to the employees and then they

(2) acknowledge receipt of it, correct?

(3)   **A.** Yes.

(4)   **Q.** And they acknowledge that they have been given

(5) one, isn't that the practice?

(6)   So the practice, Ms. Aguilera, is that once

(7) the handbooks become available, you provide the

(8) handbook to the employee and then they sign an

(9) acknowledgment for receipt of them, is that correct?

(10)   **A.** Yes.

(11)   **Q.** And then are you familiar with the Menzies

(12) code of conduct?

(13)   **A.** Yes.

(14)   **Q.** And that's another kind of set of policies or

(15) paperwork that's given to each employee, is that

(16) correct?

(17)   **A.** It's in the handbook, yes.

(18)   **Q.** Oh, so it's part of the handbook?

(19)   **A.** Yes, it is.

(20)   **Q.** Is there a separate acknowledgment of receipt

(21) for the code of conduct or it's all just one?

(22)   **A.** It's all just one.

(23)   **Q.** Was there ever a training with regards to the

(24) Menzies California handbook and code of conduct? Was

(25) there any kind of training like that?

**Page 16**

(1)   **A.** There was, when the employees came in to sign

(2) all the documents, we went over the documents with

(3) them.

(4)   **Q.** So how did that go? You called some of the

(5) employees one by one or like a seminar? How did that

(6) go?

(7)   **A.** They would come in according to their

(8) schedule, if they didn't have flights, they would come

(9) into the HR department. We would -- I would arrange it

(10) with their manager.

(11)   **Q.** Like how many people would come in at one

(12) time?

(13)   **A.** A couple at a time.

(14)   **Q.** And then when you said you would go over it

(15) with them, you actually went through some of the pages

(16) and --

(17)   **A.** What they were signing, yes.

(18)   **Q.** What they signed.

(19)   **A.** Either myself or my clerk.

(20)   **Q.** I see. Do you have an independent

(21) recollection of doing something like that with

(22) Mr. Renaldo Navarro?

(23)   **A.** No, I can't say that I do. I didn't do a lot

(24) of them. My clerk did a lot of them, most of them.

(25)   **Q.** In July or August of 2018, who was your clerk?

**Page 17**

(1)   **A.** I believe it was Loretta Katoa.

(2)   **Q.** We're going to need a spelling for the last

(3) name.

(4)   **A.** K-a-t-o-a.

(5)   **Q.** Was there another clerk or was it just

(6) Loretta?

(7)   **A.** No, I had Loretta and I had another clerk, her

(8) name was Precious.

(9)   **Q.** Do you remember her last name?

(10)   **A.** Sagaga.

(11)   **Q.** Do you know the spelling of that?

(12)   **A.** I believe it's S-a-g-a-g-a.

(13)   **Q.** What is your understanding as to why Menzies

(14) terminated Mr. Navarro?

(15)   **A.** For harassment.

(16)   **Q.** And as you know, harassment is a bit of a term

(17) of art in employment circles. So what type of

(18) harassment are we talking about? When you say

(19) harassment in this circumstance, what kind of

(20) harassment?

(21)   **A.** Unprofessional conduct, forcing employees

(22) to -- pressuring employees.

(23)   **Q.** Pressuring employees to sign the petition, is

(24) that what you mean?

(25)   **A.** Yes.

**Page 18**

(1)   **Q.** Any other reason?

(2)   **A.** No.

(3)   **Q.** Is it your understanding that -- is it your

(4) understanding that somehow in the code of conduct

(5) there's something there that addresses the concern that

(6) you're not supposed to force employees to sign a

(7) petition?

(8)   **A.** Yes.

(9)   **Q.** And do you remember seeing something like that

(10) in the code of conduct?

(11)   **A.** Yes.

(12)   **MR. URIARTE:** So, David, can we get Exhibit 13,

(13) please.

(14)    (Plaintiff's Exhibit 13 marked for

(15)    identification.)

(16)   **ZOOM HOST:** I sent a Chat to Tracy, and she should

(17) be able to open that link, and she has a laptop, so she

(18) can see the whole document.

(19)   **MR. URIARTE:** Okay. Very good. So you're not

(20) going to open it over here or --

(21)   **ZOOM HOST:** If you like, I can do that. It's up

(22) to you.

(23)   **MR. URIARTE:** Yeah, can we do that?

(24)   **ZOOM HOST:** Okay. Sure. Coming back up.

(25)   **MR. URIARTE:** I think Jason and I are kind of used

**Page 19**

(1) to that by now. Okay.

(2)   **Q.** So, Ms. Aguilera, I think what my

(3) understanding is that you -- in your laptop you also

(4) have a copy of Exhibit 13, but on your screen right now

(5) what is showing is also Exhibit 13. So if you could

(6) just let me know what part of the code of conduct I can

(7) look at with regard to forcing employees to sign the

(8) petition.

(9)   **A.** I'm having trouble seeing your -- I'll look at

(10) my handbook. It would fall under "Gross Misconduct."

(11)   **Q.** Okay. Can you give me a page number?

(12)   **A.** Page 15.

(13)   **Q.** Is that the handbook or the code of conduct?

(14)   **A.** I'm looking under the code of conduct in the

(15) handbook.

(16)   **Q.** Okay. You said gross -- I'm sorry.

(17)   **A.** It's under Section 4, "Performance Standards,"

(18) 4.1, "Code of Conduct."

(19)   **Q.** All right. Are we looking at the same

(20) document when you see the document on your screen now?

(21) Because we don't have Roman numerals on our copies that

(22) were produced by your attorneys. I guess that's all we

(23) have for the code of conduct.

(24)    Are you looking at a different document,

(25) Ms. Aguilera?

**Page 20**

(1)   **A.** I've just opened up the company handbook so I

(2) could see it better.

(3)   **Q.** I see. And you're saying in the company

(4) handbook you see it as where?

(5)   **A.** On page 15. "Performance Standards," "Code of

(6) Conduct, "Gross misconduct while on company property or

(7) while conducting company business, including attempting

(8) bodily injury, fighting or threatening violence,

(9) boisterous or disruptive activity that interferes with

(10) your job duties, others' job duties or passenger

(11) service."

(12)   **Q.** And can you tell me maybe at the bottom of the

(13) page what it says as to the date of that document?

(14)   **A.** Menzies Aviation 2017.

(15)   **MR. URIARTE:** I see. So maybe, Jason, is there a

(16) way, like if we take a break later on, for us to get a

(17) copy of what Ms. Aguilera is referring to?

(18)   **MR. WU:** Yeah, we can talk about that when we go

(19) off the record.

(20)   **MR. URIARTE:** Sounds good. I'll put that aside.

(21)   **Q.** And you said page 15, Section 4, right?

(22)   **A.** Yes.

(23)   **ZOOM HOST:** Arlo, I think I found it on the

(24) employee handbook, if you want me to bring that up

(25) or --

**Page 21**

(1)     **MR. URIARTE:** Yes, please.

(2)     **ZOOM HOST:** Hold on.

(3)     **MR. URIARTE:** Exhibit 14.

(4)     **ZOOM HOST:** Correct. Let me bring that up.

(5)     **MR. URIARTE:** Thank you.

(6)     (Plaintiff's Exhibit 14 marked for

(7)     identification.)

(8)     **MR. URIARTE:** David, I don't think it's there

(9) because I think we're looking for "Gross Misconduct" as

(10) a header.

(11)     **THE WITNESS:** It's under Section 4, "Performance

(12) Standards," and then 4.1, "Code of Conduct, and then in

(13) that body at the bottom there's "Gross Misconduct."

(14)     **MR. URIARTE:** Q. Okay. Let me take a look at

(15) 4.1. We only have copies of whatever your attorneys

(16) provided us.

(17)     **MR. WU:** Arlo, I'm looking at this right now.

(18)     **MR. URIARTE:** Okay.

(19)     **MR. WU:** If you look very closely at the bottom of

(20) each page, it looks like, for whatever reason, only the

(21) odd numbered pages got copied.

(22)     **MR. URIARTE:** Oh, I see what you mean.

(23)     **MR. WU:** 1, 3, 5, 7.

(24)     **MR. URIARTE:** Yeah, yeah. Okay. I'll fix that up

(25) during a break. Let's just go to the next topic. Very

**Page 22**

(1) good. Thank you for that. It looks like that's

(2) exactly what happened.

(3)     Q. So then I think, Ms. Aguilera, you were the

(4) one who put together the termination paperwork, the

(5) notice of change in status of the employee?

(6)     A. Yes.

(7)     Q. And then you were the one who put the words

(8) "Code of Conduct" in that form, is that correct?

(9)     A. Yes.

(10)     Q. And so when you said -- when you put those

(11) words "Code of Conduct," that's what you were referring

(12) to?

(13)     A. Yes.

(14)     **MR. URIARTE:** Give me a second.

(15)     (Discussion off the record.)

(16)     **MR. URIARTE:** Q. Okay. Was that something --

(17) with regards to the code of conduct in August of 2018,

(18) how are we going to figure out whether that policy had

(19) been communicated to the employees at that point?

(20)     A. At that point, all employees should have had a

(21) copy of the handbook.

(22)     Q. So that would have been like almost a year,

(23) maybe a year into Menzies entering SFO fuelers, right?

(24)     A. I can't give you an exact date.

(25)     Q. So you're saying that at that point, your

**Page 23**

(1) memory is that they had the handbook at that point

(2) already, is that correct?

(3)     A. Yes.

(4)     Q. And who would know for certain whether that's

(5) true or not?

(6)     A. The documents should be in the files.

(7)     Q. Yeah, well, I guess what I can represent to

(8) you is that -- and I should show you that -- let's look

(9) at Exhibit 15, please.

(10)     (Plaintiff's Exhibit 15 marked for

(11)     identification.)

(12)     **MR. URIARTE:** Q. So here is one of those

(13) documents that lists the signature. If we look below,

(14) it's got a blank, no employee name, no employee

(15) signature. This was produced to us by your attorneys.

(16)     And so I have yet -- I mean, I guess, if you

(17) get back to your office and you see some sort of

(18) acknowledgment form that has Mr. Navarro's signature on

(19) it, I think that would be helpful, but we have yet to

(20) see that.

(21)     Okay, Ms. Aguilera? Did you understand my

(22) request?

(23)     A. Yes.

(24)     Q. All right. How did you first find out that

(25) there was a petition circulating about Andrew Dodge?

**Page 24**

(1)     A. The union notified me.

(2)     Q. And how did they notify you?

(3)     A. They called me. It wasn't "they." Charles

(4) called me, the man named Charles that worked in the

(5) union office.

(6)     Q. And what did Charles say to you?

(7)     A. He said, "Tracy, are you aware that there's a

(8) petition being circulated? Our members -- several

(9) members have called and complained that they were being

(10) forced to sign a petition."

(11)     Q. Okay. And then anything else that Charles

(12) said to you?

(13)     A. No.

(14)     Q. And so, in response to that, what did you do?

(15)     A. Well, I asked him if he had a copy of the

(16) petition and who was being forced, but he never got

(17) back to me on that. With that being said, I made

(18) contact with the acting general manager at the time,

(19) and his name was Renil Lal, and I told him that I

(20) received the call from the union.

(21)     Q. Okay. And did Renil get you a copy of the

(22) petition?

(23)     A. Not right away. I don't believe -- no, he did

(24) not.

(25)     Q. Do you know how long before you actually got a

**Page 25**

(1) copy of it?

(2)     A. I got it -- actually, I got it from Raul

(3) Vargas. I'd seen it.

(4)     Q. I see. Okay. And did you read the petition

(5) itself?

(6)     A. I've seen the names on there, yes, but I

(7) didn't go through each one. I'm sorry.

(8)     Q. What about the topic that the petition was

(9) talking about, did you read that part?

(10)     A. No, I -- I gave everything to Kevin Blumberg

(11) to open up an investigation.

(12)     Q. And what was the investigation for?

(13)     A. Well, to find out what was going on.

(14)     Q. What do you mean, "to find out what was going

(15) on"?

(16)     A. With the petition, why it was being

(17) circulated.

(18)     Q. Okay. And then what was the conclusion of

(19) Kevin, the security person?

(20)     A. The conclusion?

(21)     Q. Yes.

(22)     A. It was that Rey Navarro was forcing employees

(23) to sign a petition to have Andrew Dodge removed.

(24)     Q. Okay. And that's what is contained in the

(25) email, right, is that what you're talking about, where

**Page 26**

(1) Mr. Blumberg actually sent an email to you with the

(2) result of his investigation?

(3)     A. Yes.

(4)     Q. Okay. So that's with regards to the inquiry

(5) as to Mr. Navarro's involvement in the petition itself,

(6) right? But what about the part of, like, what the

(7) fuelers were complaining about? Was that ever

(8) investigated?

(9)     A. I'm sorry, can you repeat that.

(10)     Q. Sure. What about the part, that section of

(11) the petition where the fuelers are asking for certain

(12) relief or what they're complaining about, right, in the

(13) petition, was that part of the petition ever

(14) investigated?

(15)     A. What part are you talking about?

(16)     MR. URIARTE: Okay. Let me show you. So let's

(17) bring up Exhibit 8.

(18)         (Plaintiff's Exhibit 8 marked for

(19)         identification.)

(20)     MR. URIARTE: Q. Can you see Exhibit 8,

(21) Ms. Aguilera?

(22)     A. Yes.

(23)     Q. Do you remember this to be the petition that

(24) we're talking about?

(25)     A. This is the one that I believe was given to

**Page 27**

(1) Raul Vargas.

(2)     Q. Okay. Let's scroll to page 2 just to make

(3) sure Ms. Aguilera sees the whole document. It's a

(4) three-page document.

(5)         And this is the one that has Renaldo Navarro's

(6) signature on line 16, as you see there. Do you see

(7) that, Ms. Aguilera?

(8)     A. Yes.

(9)     Q. Okay. And then it also has the signature of

(10) the other supervisor, July Macapagal. Do you see that?

(11)     A. Yes.

(12)     Q. Okay. So we've been calling this the first

(13) petition. So if we scroll back to page 1 -- and I

(14) understand that you've said that you asked the security

(15) department or Raul Vargas asked the security department

(16) to investigate the role of Mr. Navarro. I understand

(17) that part.

(18)         What I'm now distinguishing with you is with

(19) regards to the subject matter of this petition. And

(20) I'll let you read it, or if you want, I can read it for

(21) you.

(22)         Are you able to read it fine, Ms. Aguilera?

(23)     A. Yes, I know how to read, yes.

(24)     Q. Okay. So it says, "We the fuelers on Menzies

(25) 130 side would like to make a petition against Andrew

**Page 28**

(1) Dodge. The way he supervised is very unprofessional

(2) when he run the operation or supervised, people are not

(3) [taking] their breaks it's because the way he set up

(4) the flights" -- okay? -- "and he always blaming the

(5) people there's a delay or always saying lack of

(6) manpower and trucks issues."

(7)         Okay. So let's just stop there. That part of

(8) the petition, was that ever investigated?

(9)     A. The whole scenario was investigated by Kevin

(10) Blumberg.

(11)     Q. Aside from the email that contains some of

(12) Mr. Blumberg's conclusion, is there another document

(13) that addresses these concerns?

(14)     A. I don't have them.

(15)     Q. So if there is an investigation, it would be

(16) part of what Mr. Blumberg engaged in, correct? Is that

(17) correct?

(18)     A. Yes.

(19)     Q. Okay. Let's go on to the next one. "The

(20) truth is he doesn't know how to run the show, we also

(21) addressed the problem to the higher position managers

(22) (Nicco, John and Renil) as usual nothing happened,

(23) looks like they always covering his mistake or maybe

(24) these managers don't know anything about fueling also

(25) like Andrew Dodge lack of experience about fueling."

(1)     Did you read this part of the petition?  And
(2) pertaining to July, August of 2018, did you read this
(3) part of the petition?
(4)     A.  I believe I did.
(5)     Q.  And as an HR or human resources professional,
(6) when you read this part of the petition, does that put
(7) you in any type of concern?
(8)     A.  Disciplinary action and -- disciplinary
(9) action -- let me back up here.
(10)     This was given to Raul.  In HR I had no issues
(11) regarding Andrew's performance.  This was given to Raul
(12) and we had Kevin Blumberg investigate it.
(13)     Q.  Okay.  Does the part about "looks like they
(14) are always covering his mistake," referring to Nicco,
(15) John and Renil, does that raise any red flags of
(16) concern for you as the HR manager?
(17)     A.  No.
(18)     Q.  You were around when Mr. Dodge was promoted to
(19) supervisor, correct?
(20)     A.  I believe so.
(21)     Q.  Meaning that he was a fueler for about a year,
(22) then he received a promotion as a supervisor, is that
(23) correct?
(24)     A.  Yes.
(25)     Q.  And for that promotion, were there other

(1) people vying for that promotion?
(2)     A.  I don't know.  I don't remember.
(3)     Q.  Given that Mr. Dodge had only one year of
(4) experience, do you remember any of the old-timers,
(5) old-timer fuelers, also wanting to be a supervisor?
(6) Does that refresh your recollection at all?
(7)     A.  Can you repeat the question.
(8)     Q.  Sure.  Mr. Dodge received a promotion to
(9) supervisor after only one year of being a fueler.  At
(10) that point there were many fuelers who had worked there
(11) as fuelers for many, many years who also wanted to be a
(12) supervisor.  Do you remember any of those --
(13)     A.  No, we post the position, they would apply for
(14) the position, they would be reviewed by the manager,
(15) and the person best qualified for the position would be
(16) granted the promotion.
(17)     Q.  And for fueling supervisor, who would be the
(18) manager that decides that?
(19)     A.  It would have been the -- between the general
(20) manager and the director.
(21)     Q.  So it would have been Renil and John Qually or
(22) Renil and the operations manager?
(23)     A.  It would have been Renil.
(24)     Q.  It would have been Renil.
(25)     A.  Uh-huh.

(1)     Q.  And do you know where Renil is today?
(2)     A.  I don't -- I know he's at the airport.  I
(3) don't know where he works.
(4)     Q.  Would you agree that when fuelers have an
(5) issue, they're supposed to bring their issue up to a
(6) supervisor, that's the way the chain of command works?
(7)     A.  Usually, yes.
(8)     Q.  And then supervisors, as part of their duties,
(9) job responsibilities, they're supposed to try to work
(10) with these issues and try to bring that up to upper
(11) management if they can't resolve it, isn't that right?
(12)     A.  Yes.
(13)     MR. URIARTE:  I think we're going to need to take
(14) a five-minute break, Jason.  Can we get off the record,
(15) please, Cindy.
(16)     THE REPORTER:  Yes.
(17)     MR. URIARTE:  Thank you.
(18)     (Brief recess.)
(19)     MR. URIARTE:  Let's get back on the record.  All
(20) right.  So why don't we take a look at Exhibit 12.
(21)     (Plaintiff's Exhibit 12 marked for
(22)     identification.)
(23)     MR. URIARTE:  Q.  The first one I wanted to -- I
(24) guess we can stay here.  Ms. Aguilera, do you see the
(25) section of the August 29, 2018, 5:01 p.m. email from

(1) Raul Vargas?  And really what I first want to put my
(2) attention to -- or put your attention to, it says,
(3) "Could you also open an investigation for July" --
(4) which should be Macapagal.  Do you see that,
(5) Ms. Aguilera?
(6)     MR. WU:  Tracy, I think you are on mute.
(7)     THE WITNESS:  I'm sorry.  To answer your question,
(8) yes, I see it.
(9)     MR. WU:  Thank you.
(10)     MR. URIARTE:  Q.  Was an investigation ever opened
(11) for July Macapagal?
(12)     A.  It was turned over to Kevin Blumberg.
(13)     Q.  Was there any result of that investigation
(14) that was put on paper?
(15)     A.  Not that I've seen, no.
(16)     Q.  Did Mr. Blumberg let you know the result of
(17) that investigation?
(18)     A.  No.
(19)     Q.  And then let's go down on the second page.
(20) Here is the email from Mr. Blumberg.  And I just want
(21) to make sure, when we were talking about the results of
(22) the investigation of Mr. Blumberg, are we talking about
(23) this email here, August 29, 2018 at 3:58 p.m.?
(24)     A.  I see it, yes.
(25)     Q.  So aside from this, there's no other written

Page 33

(1) document that writes or has further conclusions
(2) regarding his investigation? Ms. Aguilera?
(3)    A. No, I don't have a copy of it.
(4)    Q. Okay. I guess my question is more -- when we
(5) see Mr. Blumberg's product or result of his
(6) investigation into the petition, this is what we're
(7) looking at right here, the email that he wrote to you
(8) with his conclusions, is that correct?
(9)    A. This says a statement, yes.
(10)    Q. Aside from this statement, is there any other
(11) written document?
(12)    A. Not that I have.
(13)    Q. And here his conclusion really is
(14) "unprofessional behavior by a supervisor." Do you see
(15) that?
(16)    A. Yes, I see it.
(17)    Q. Just taking that kind of like in its
(18) isolation, "unprofessional behavior by a supervisor,"
(19) would that result in a termination? Is that something
(20) that would normally result in a termination?
(21)    A. It depends on the caliber of the -- what he's
(22) done.
(23)    Q. And your recommendation actually was not to
(24) terminate, correct?
(25)    A. Myself and our directors, yes -- my director,

Page 34

(1) yes. Talin.
(2)    Q. Correct. So Talin and yourself had a
(3) discussion, and your recommendation to Mr. Vargas was
(4) not to terminate but instead issue a final warning, is
(5) that correct?
(6)    A. It was not to terminate, yes.
(7)    Q. Did you recommend the final warning to
(8) Mr. Vargas?
(9)    A. I was going to. Oh, to Mr. Vargas, no. Let
(10) me back up, I'm sorry.
(11)    Q. Go ahead.
(12)    A. Yes, I did write up the document, but it
(13) was -- and my recommendation was made.
(14)    Q. Did you actually send that document to
(15) Mr. Vargas?
(16)    A. I don't believe so.
(17)    Q. Now, was there ever a discussion between you
(18) and Mr. Vargas about, hey, there's an option here of
(19) issuing a final warning; was that discussion made?
(20)    A. No. I gave my recommendation.
(21)    Q. So you gave your recommendation of not
(22) terminating, but you didn't communicate an option to
(23) Mr. Vargas. Is that an accurate way of characterizing
(24) it?
(25)    A. Not via email. After I made my

Page 35

(1) recommendation, and he came up to my office and we
(2) discussed it, and that's when Kevin came up and said --
(3) and gave me the details of the investigation.
(4)    Q. And so Raul Vargas went to your office, you
(5) had a discussion about it, and in that discussion the
(6) final warning option was discussed?
(7)    A. He asked me why I came to that conclusion of
(8) not to terminate, and I told him based on Renaldo's
(9) tenure and what was in his personnel file.
(10)    Q. Okay. And what's your opinion as to why
(11) Mr. Vargas did not follow that recommendation?
(12)    A. After speaking with Mr. Vargas and Kevin in my
(13) office and them going into detail about harassment, my
(14) opinion changed, and I reviewed it with my director,
(15) and we were in agreement to terminate him.
(16)    Q. And then I guess I understand all of that.
(17) But I think the only kind of unclear portion of that is
(18) the -- and maybe let's pull it up.
(19)    MR. URIARTE: If we could pull up Exhibit 11. I
(20) wanted to kind of focus on the issue of the issuance of
(21) the final warning and what Mr. Vargas knew about that.
(22)    (Plaintiff's Exhibit 11 marked for
(23)    identification.)
(24)    MR. URIARTE: Q. And issuance is not the right
(25) word, right? You drafted a document of final warning.

Page 36

(1)    A. I lost you.
(2)    Q. Here we go. Do you see the final warning
(3) there, Ms. Aguilera?
(4)    A. There it is. Yes, I do.
(5)    Q. So I want to kind of get into the
(6) circumstances of -- so you wrote this up as an option,
(7) right? Do you see that, "Today's date: August 29"?
(8) Did you ever show this to Mr. Vargas?
(9)    A. I can't say that I showed this to him.
(10)    Q. Did you discuss it as an option with him?
(11)    A. I can't remember word for word that was said
(12) in the meeting.
(13)    Q. But I guess my question is do you remember
(14) any -- do you have any memory as to a discussion about
(15) a final warning being an option?
(16)    A. There could have been. I can't tell -- I
(17) can't give you the details.
(18)    Q. All right. Then let's go back to Exhibit 12,
(19) please. With regards to Mr. Blumberg's investigation,
(20) did you find out whether or not Mr. Blumberg spoke to
(21) Mr. Navarro?
(22)    A. I don't know the details.
(23)    Q. Do you know if Mr. Blumberg spoke to the
(24) fuelers that signed the petition?
(25)    A. I don't know the details.

**Page 37**

(1)    **MR. URIARTE:** All right. Let's go to the last, I
(2) guess -- if we can go to Menzies 200, which is on the
(3) bottom, David, a little bit more, like two pages down.
(4) All right. Go up a little bit, please. Let's see the
(5) date stamp. There we go.
(6)    **Q.** So, Ms. Aguilera, this string of emails, did
(7) you provide this to your attorney? Is this something
(8) you printed out and provided to your attorney?
(9)    **A.** I sent this to my manager. I sent it to
(10) Talin.
(11)    **Q.** Gotcha. All right. So you see here it says,
(12) "On August 27, 2018, at 5:11 PM Tracy Aguilera wrote."
(13) Do you see that?
(14)    **A.** Yes.
(15)    **Q.** And then it says "Talin," and then it has
(16) different points. Do you see that?
(17)    **A.** Yes.
(18)    **Q.** Okay. And then if we go down a little bit --
(19) a little bit down, please, David -- here's the question
(20) I have. It says, "Now today, 10/27/2018 Raul Vargas
(21) receives the same petition from Rafael Martinez, no
(22) signature just wanting Andrew removed - I did not
(23) attach it to this email."
(24)    Do you see that?
(25)    **A.** Yes, I do, and that's a typo with the date.

**Page 38**

(1)    **Q.** That's a typo with the date?
(2)    **A.** Yeah, it shouldn't have been October.
(3)    **Q.** Okay. So it should have been October 27,
(4) 2018?
(5)    **A.** No, I believe --
(6)    **Q.** I mean -- yeah.
(7)    **A.** I believe it should have been August 27th.
(8)    **Q.** Okay. So you believe that to be a typo?
(9)    **A.** I believe so.
(10)    **Q.** All right. So are you saying that two days
(11) before Mr. Navarro was terminated, Mr. Rafael Martinez
(12) also gave Raul Vargas a petition asking Andrew to be
(13) removed?
(14)    **A.** Yes.
(15)    **Q.** With regards to the suspension on August 20,
(16) who recommended and approved the suspension?
(17)    **A.** Raul Vargas and Kevin Blumberg.
(18)    **Q.** Before the issue with the petition, did you
(19) receive any complaints or did you hear about complaints
(20) from fuelers against Andrew Dodge?
(21)    **A.** Only from Rey.
(22)    **Q.** Did you see the pictures that were circulating
(23) of Mr. Andrew Dodge sleeping on the job? Was that
(24) something that you saw?
(25)    **A.** Yes, I did see one.

**Page 39**

(1)    **Q.** And that was before the petition, correct?
(2)    **A.** Yes.
(3)    **Q.** And Rey complaining about Andrew Dodge,
(4) wouldn't you say that that could have been part of his
(5) duties as a supervisor?
(6)    **A.** Yes.
(7)    **Q.** Aside from Rey, you did not hear from fuelers
(8) complaining about Andrew Dodge?
(9)    **A.** No.
(10)    **Q.** At that time, in July or August of 2018, aside
(11) from Mr. Dodge, was there any other white supervisor
(12) working for the fueling department?
(13)    **A.** I -- I really don't know. I can't -- I don't
(14) know.
(15)    **Q.** It could be that Mr. Dodge was the only white
(16) supervisor?
(17)    **A.** Could be.
(18)    **Q.** Did you ever have a discussion with Renil with
(19) regards to Rey Navarro's complaints against Andrew
(20) Dodge?
(21)    **A.** Yes.
(22)    **Q.** And how many times do you think Renaldo
(23) Navarro complained to Renil about Andrew Dodge? Do you
(24) remember any of that?
(25)    **A.** No.

**Page 40**

(1)    **Q.** Was it more than two times?
(2)    **A.** Possibly.
(3)    **Q.** Less than five and more than two, maybe?
(4)    **A.** Possibly.
(5)    **Q.** And with regards to -- and this happened
(6) before the petition, correct?
(7)    **A.** Him showing me the picture, yes.
(8)    **Q.** And then did you see the video, the kind of
(9) comical video that the fuelers made?
(10)    **A.** No.
(11)    **Q.** What about Renil and you discussing complaints
(12) against Andrew Dodge, how many times did you guys
(13) discuss that?
(14)    **A.** I spoke to Renil a couple of times and told
(15) him Rey's concerns.
(16)    **Q.** Okay. And what did Renil say?
(17)    **A.** He would check into it.
(18)    **Q.** Any result from it or any kind of follow-up
(19) from it from Renil?
(20)    **A.** No, he said he would -- well, he told me that
(21) he would talk to Andrew, and that's it. Rey didn't
(22) come in and make formal complaints. He would just --
(23) he showed me the picture and the picture was Andrew
(24) Dodge sitting in his car outside after -- sleeping in
(25) his truck after he was off work.

**Page 41**

(1)     Q.  Wasn't there another picture where he was kind

(2) of like in a Menzies vehicle as well?

(3)     A.  That's the one I'm talking about.  He was in

(4) the Menzies truck sitting outside.

(5)     Q.  And do you remember any kind of concern about

(6) Andrew Dodge like causing delays to flights?  Was that

(7) something that was discussed?

(8)     A.  No, it wasn't discussed with me.

(9)     Q.  What about Andrew Dodge causing fuelers to

(10) miss breaks?

(11)     A.  No.

(12)     Q.  Did Andrew Dodge ever get some sort of

(13) reprimand as a result of the petition?

(14)     A.  No.

(15)     Q.  Sitting here today, do you remember if any

(16) kind of reprimand was ever issued -- has been issued to

(17) Andrew Dodge?

(18)     A.  No.

(19)     MR. URIARTE:  Can we have Exhibit 19, please,

(20) David.

(21)     (Plaintiff's Exhibit 19 marked for

(22)     identification.)

(23)     MR. URIARTE:  Q.  So Exhibit 19 starts with a

(24) statement by Mr. Rafael Vasquez.  Do you see the

(25) document, Ms. Aguilera?

**Page 42**

(1)     A.  Yes.

(2)     Q.  It says that, quote, "On September 6th, 2018"

(3) -- it's about nine days after the termination of

(4) Mr. Navarro -- "I was asked by Menzies fuelers to write

(5) a Petition on behalf of the Fuelers on 130 side vs.

(6) Andrew Dodge.  The petition was written out and signed

(7) by the Fuelers" and then turned over to the union.  In

(8) addition, it was also given to Raul Vargas.

(9)     Were you made aware of this particular

(10) petition?

(11)     A.  After it was given to Raul Vargas and given to

(12) Kevin Blumberg.

(13)     Q.  So, and just to make sure we're speaking of

(14) the same thing, so there was a first petition, and this

(15) seems to be the second petition.  And this is a

(16) separate petition, you understand that?

(17)     A.  Yes.

(18)     Q.  What came out of this second petition, if

(19) anything?

(20)     A.  Nothing on the HR side.  There was no union

(21) grievance, there was no complaint by the union except

(22) for the original phone call I received.

(23)     Q.  And so you said it was given to Mr. Blumberg.

(24) Was an investigation actually done because of this

(25) second petition?

**Page 43**

(1)     A.  If I'm not mistaken, this is for the same

(2) issue.

(3)     Q.  So no additional investigation was done?

(4)     A.  Not to my knowledge.

(5)     MR. URIARTE:  Now, let's go to Exhibit 17, please.

(6)     (Plaintiff's Exhibit 17 marked for

(7)     identification.)

(8)     MR. URIARTE:  Q.  Okay.  You see Exhibit 17, I

(9) believe it's Employee Performance Development and Steps

(10) to Progressive Discipline.

(11)     If you could go down a little bit, David, that

(12) would be better.

(13)     This is a reverse pyramid here.  And you're

(14) familiar with this, Ms. Aguilera?

(15)     A.  Yes, I am.

(16)     Q.  My question here really is how come

(17) progressive discipline was not instituted?

(18)     A.  Harassment has zero tolerance.

(19)     Q.  And was it discussed as an option?

(20)     A.  I'm sorry?

(21)     Q.  Was it discussed as an option?

(22)     A.  Progressive discipline for harassment?

(23)     Q.  Yes.

(24)     A.  No.

(25)     Q.  Is that written somewhere where harassment,

**Page 44**

(1) the type Mr. Navarro was accused of, has zero

(2) tolerance?

(3)     A.  Any type of harassment.

(4)     Q.  If we go back to Exhibit 19, at the bottom

(5) here it says, "I have spoken to Menzies Aviation

(6) Fueling Director Raul Vargas on three separate

(7) occasions regarding Andrew Dodge, who [continues] to

(8) abuse his authority and at times harass Fuelers under

(9) his charge."

(10)     Was that type of harassment investigated?

(11)     A.  I can't tell you -- I didn't see the

(12) investigation, but this was turned over to Kevin

(13) Blumberg.

(14)     MR. URIARTE:  Okay.  Aside from the employee

(15) handbook, Jason, I have no further questions.

(16)     MR. WU:  Arlo, can we go off the record for a

(17) second?

(18)     MR. URIARTE:  Sure.

(19)     (Brief recess.)

(20)     (Plaintiff's Exhibit 20 marked for

(21)     identification.)

(22)     MR. WU:  Can we go back on the record now?

(23)     THE REPORTER:  Yes.

(24)     MR. WU:  Earlier in the deposition, Mr. Uriarte

(25) asked Ms. Aguilera about a document that was described

**Page 45**

(1) as the Menzies employee handbook. That document was
(2) marked as Exhibit 14. It appears on its face that the
(3) document seems to have been missing some pages. So in
(4) the meantime, we have been able to locate what appears
(5) to be a complete version of that document, at least
(6) that was saved on our Foley system.
(7) We haven't had a chance to confer with the
(8) client about whether it's a true and accurate copy of
(9) the employee handbook. We haven't been able to confer
(10) with our client about whether it's an accurate or
(11) authentic copy of the handbook or whether it would be
(12) responsive to any of the discovery requests that have
(13) been propounded in this case thus far.
(14) That said, we did send a copy of that document
(15) to Mr. Uriarte as well as to the vendor handling this
(16) deposition just so that it can be used as an exhibit
(17) and for that sole purpose. That isn't a formal
(18) production, and it isn't subject to any objections
(19) that are stated in our original discovery responses.
(20) And Mr. Uriarte is, of course, welcome to try
(21) and lay foundation for that document himself through
(22) this witness if he can.
(23) **MR. URIARTE:** Okay. Great. Thank you, Jason.
(24) **Q.** Ms. Aguilera, I think the first thing -- and,
(25) Jason, maybe you can help us with this -- the bottom of

**Page 46**

(1) this document has some dates on the bottom right side.
(2) The screen -- there you go. So here we have a Menzies
(3) Aviation 2018 version, and I believe the witness
(4) earlier said she was looking at a 2017 version. But
(5) let's just go through the section itself to see if
(6) maybe they are identical anyway.
(7) So, Ms. Aguilera, could you just remind us --
(8) so the question area was concerning what part of the
(9) code of conduct did you use in order to indicate a
(10) violation that Mr. Navarro was terminated for, and then
(11) you identified the section as Section 4.1, which is
(12) found in the employee handbook. Is that correct,
(13) Ms. Aguilera?
(14) **A.** Correct.
(15) **Q.** Okay. And so I just want to make a
(16) distinction. So when you say -- when you say "code of
(17) conduct," not that it's a code of conduct separate
(18) handout as part of the handbook, but code of conduct,
(19) Section 4.1 of performance standards in the employment
(20) handbook, correct?
(21) **A.** Yes.
(22) **Q.** Okay. And then could you just take a look at
(23) Section 4.1 just to make sure that your -- because you
(24) were reading from a 2017 version. Can we at least
(25) establish whether the version you were reading or

**Page 47**

(1) reviewing is the same as what we have now which is a
(2) 2018 version.
(3) **A.** Yes.
(4) **Q.** Do you believe them to be the same?
(5) **A.** Yes.
(6) **Q.** Okay. And then could you just point to us
(7) where you were reading from earlier.
(8) **A.** Can you go down some more? Let's see. I
(9) can't get it to go down, I don't know why.
(10) **Q.** I think --
(11) **A.** Where it says, "Gross misconduct while on
(12) Company property."
(13) **Q.** Gotcha. So there's a bullet point that says,
(14) "Gross misconduct while on Company property or while
(15) conducting Company business, including: attempting
(16) bodily injury, fighting or threatening violence,
(17) boisterous or disruptive activity that interferes with
(18) your job duties, other's job duties, or passenger
(19) service." Is that the section?
(20) **A.** Correct.
(21) **Q.** So, again, when you wrote "code of conduct" in
(22) the termination documents, that's what you were
(23) referring to, is that correct?
(24) **A.** Correct.
(25) **Q.** And so let's just pull up Exhibit 9 just to be

**Page 48**

(1) on the sure side here.
(2) (Plaintiff's Exhibit 9 marked for
(3) Identification.)
(4) **MR. URIARTE: Q.** Here we have Exhibit 9 which on
(5) the bottom of the page has your signature. Let me just
(6) have you identify that. Is that your signature,
(7) Ms. Aguilera?
(8) **A.** Yes.
(9) **Q.** And this is a document that you gave to Mr.
(10) Navarro?
(11) **A.** Yes.
(12) **Q.** And, again, here's where it says, "Comments:
(13) Code of Conduct." And that's the reason for his
(14) termination, correct?
(15) **A.** Correct.
(16) **MR. URIARTE:** So I've got no further questions,
(17) Jason.
(18) **MR. WU:** Okay. Just a few questions from my end.
(19) David, could we please pull up Exhibit 8.
(20) **ZOOM HOST:** Give me one second. I need to close
(21) some of the tabs. One moment.
(22) EXAMINATION BY MR. WU
(23) **MR. WU: Q.** Okay, Ms. Aguilera, do you remember
(24) looking at this document earlier while Mr. Uriarte was
(25) asking you questions about this?

**Page 49**

(1)  **A.** Yes.

(2)  **Q.** And do you remember Mr. Uriarte asking you

(3)  about the sentence that begins in the middle of that

(4)  first paragraph, "The truth is he doesn't know how to

(5)  run the show, we also addressed the problem to the

(6)  higher position managers (Nicco, John and Renil) as

(7)  usual nothing happens, looks like they always covering

(8)  his mistake or maybe these managers don't know anything

(9)  about fueling also like Andrew Dodge lack of experience

(10) about fueling."

(11)      Do you remember Mr. Uriarte reading that

(12) sentence to you?

(13)  **A.** Yes.

(14)  **Q.** Earlier I believe he asked you whether that

(15) sentence raised any red flags or concerns for you, and

(16) I believe your response was no.  Do you remember

(17) testifying to that?

(18)  **A.** Yes.

(19)  **Q.** Why does that sentence not raise red flags or

(20) concerns for you?

(21)  **A.** Because the managers, in the positions they're

(22) in, they do know how to run an operation.  Andrew, I've

(23) had no complaints about his work performance.  And

(24) they've all been trained in fueling.

(25)  **Q.** And Mr. Uriarte also asked you some questions

**Page 50**

(1)  later on about the extent to which you had discussions

(2)  regarding Andrew Dodge's work performance.  If there

(3)  were issues with Andrew Dodge's work performance, would

(4)  those typically be brought to your attention or to

(5)  someone else's attention?

(6)  **A.** Usually it would go to the manager, if there

(7)  were issues, it would go to -- it's a protocol.  It

(8)  would go to the supervisor, the supervisor would go to

(9)  the general manager, the general manager would go to

(10) the director.

(11)      Usually if there's -- I usually get involved

(12) if it comes down to a final warning or a suspension

(13) pending termination.

(14)  **Q.** Okay.  But in terms of everyday work

(15) performance, that's something that you're not usually

(16) involved with?

(17)  **A.** No.

(18)  **MR. WU:**  David, we can take off Exhibit 8.  Thank

(19) you.

(20)  **Q.** Mr. Uriarte also asked you about some pictures

(21) of Andrew Dodge that you had seen.

(22)  **A.** Yes.

(23)  **Q.** I think I lost count.  How many photos have

(24) you seen?

(25)  **A.** One or two.  I believe I can really remember

**Page 51**

(1)  one.

(2)  **Q.** And in that -- I'm sorry, I didn't mean to

(3)  interrupt.

(4)  **A.** Possibly two.  I'm trying to think.  There was

(5)  one sitting -- oh, there was one sitting in the truck,

(6)  but he was off duty.  And he had a habit of just

(7)  sitting in his truck after he got off work, and he

(8)  would sleep in front of the parking lot in his truck,

(9)  take a quick nap.

(10)      And I know he'd be off work because I come to

(11) work at 8:30, and he'd get off work -- I think his

(12) schedule ended, like, 6:00 or 7:00.  But I would go up

(13) and sometimes I'd knock on the window and say, "Are you

(14) okay?"

(15)      "Oh, yeah, I'm just taking a nap before I

(16) drive home."

(17)      "Okay."  So I knew he was off the clock.

(18)  **Q.** Okay.  And do you remember anything about the

(19) other photo that you might have seen?

(20)  **A.** I believe I seen one of him sitting in the

(21) supervisor chair, but, again, he was off duty.

(22)  **Q.** And how were you able -- I'm sorry, I didn't

(23) mean to interrupt.

(24)  **A.** I was going to say I knew he was off duty

(25) because his shift ended at, again, 6:00 or 7:00.  I

**Page 52**

(1)  come in at 8:30.  And it was -- like the picture

(2)  outside, it was, you know, after 8:30, it was light

(3)  out, and I actually seen him.  But the one in the

(4)  office I only know because, you know, even Rey would

(5)  say, "This is what I took this morning," and Rey would

(6)  come in later.

(7)  **Q.** Okay.  So just to make sure I understood that

(8)  all correctly, the photo where Andrew was sleeping in

(9)  his truck, you could tell he was off duty because there

(10) was light out in the photo?

(11)  **A.** Yes, it was light, because I come in at 8:30

(12) in the morning, and he's off work by then.

(13)  **Q.** And the second photo with Andrew sleeping in

(14) the supervisor's office, you knew that he was off duty

(15) because Rey mentioned that it was a photo he took in

(16) the morning?

(17)  **A.** Yeah, exactly, yes.

(18)  **Q.** And Andrew would be off duty in the morning?

(19)  **A.** Yes, because he worked graveyard.

(20)  **Q.** Do you remember Mr. Uriarte asking you whether

(21) Mr. Navarro complaining about any issues with Andrew

(22) Dodge would be part of Mr. Navarro's duties as a

(23) supervisor?

(24)  **A.** Yes.

(25)  **Q.** And do you remember answering yes to that

Page 53

(1) question?
(2)    **A.** Yes.
(3)    **Q.** Okay. Would it be part of Mr. Navarro's
(4) duties as a supervisor to pressure or coerce
(5) lower-level employees into signing a petition against a
(6) fellow supervisor?
(7)    **A.** No, that's not part of his duties.
(8)    **MR. WU:** I think that's all the questions on my
(9) end.
(10)    **MR. URIARTE:** Okay.
(11)        FURTHER EXAMINATION BY MR. URIARTE
(12)    **MR. URIARTE: Q.** Ms. Aguilera, you make a point
(13) of saying that Mr. Dodge was off duty. If Mr. Dodge
(14) was not off duty and was actually on duty sleeping,
(15) that would be a problem?
(16)    **A.** Yes, it would be a problem.
(17)    **Q.** If he was sleeping inside the airport tarmac,
(18) that would be a problem?
(19)    **A.** Yes, it would be a problem that would need to
(20) be addressed.
(21)    **Q.** That would be actually not performing your
(22) essential job functions, right? Almost like an excuse
(23) for even sleep apnea, you're not performing your
(24) essential job functions, right? So that would be a
(25) major problem in a sense, correct?

Page 54

(1)    **MR. WU:** Objection. Improper hypothetical.
(2)        But you can answer.
(3)    **MR. URIARTE: Q.** Ms. Aguilera?
(4)    **A.** It -- it could be.
(5)    **Q.** With regards to job duties, I think we have
(6) Exhibit 18. And one of the items there is "Maintaining
(7) harmony among workers and resolving grievances" as part
(8) of the primary accountabilities and duties of a fueling
(9) supervisor. Does that make sense to you?
(10)    **A.** I'm sorry, I couldn't hear you.
(11)    **MR. URIARTE:** I'm sorry. So we're pulling up
(12) Exhibit 18.
(13)        (Plaintiff's Exhibit 18 marked for
(14)        identification.)
(15)    **MR. URIARTE: Q.** But "Maintaining harmony among
(16) workers and resolving grievances" as part of the
(17) primary accountabilities and duties of a fueling
(18) supervisor. Do you see that?
(19)    **A.** I don't see where --
(20)    **Q.** I think it's eight -- yeah, it's the eighth
(21) bullet point under "Primary Accountabilities" -- right
(22) there.
(23)    **A.** Yes, I see that.
(24)    **Q.** That's part of the duties of a fueling
(25) supervisor, correct?

Page 55

(1)    **A.** Yes, it's in the job description.
(2)    **MR. URIARTE:** Okay. No further questions.
(3)    **MR. WU:** Nothing else from me.
(4)    **MR. URIARTE:** Thank you, Ms. Aguilera. Thank you
(5) very much.
(6)    **MR. WU:** Thanks so much for your time, Tracy.
(7)    **THE WITNESS:** Thank you.
(8)        (Whereupon, the concluded at 2:51
(9)        o'clock p.m.)
(10)            ---oOo---
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 56

(1)            CERTIFICATE OF WITNESS
(2)                ---oOo---
(3)
(4)        I, TRACY AGUILERA, hereby declare under
(5) penalty of perjury that I have read the foregoing
(6) deposition testimony; and that the same is a true
(7) and correct transcription of my said testimony
(8) except as corrected pursuant to my rights under
(9) Rule 30(e) of the Federal Rules of Civil
(10) Procedure.
(11)
(12)    _____
(13)            Signature
(14)    _____
(15)            Date
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 57

(1) STATE OF CALIFORNIA      )
                           )
(2) COUNTY OF SAN FRANCISCO )

(3)      I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)                TRACY AGUILERA,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)      I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)      Dated the 10th day of September, 2020.

(22)

(23)

(24)

                    CINDY TUGAW

(25)                CSR No. 4805 (California)

## Page 58

(1) Tracy Aguilera
     c/o Foley & Lardner
(2) 555 California Street, Suite 1700
     San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  September 10, 2020
     Re:  Navarro vs. Menzies
(5) Deposition Date:  Tuesday, August 25, 2020
(6) Dear Ms. Aguilera,
(7)      Please be advised the original transcript of
     your deposition is ready for your review.
(8)      Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
(9) necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
(10) or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
     the applicable law.
(15)      You may either come to our office to read and
     sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
     transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
     these instructions, please call.
(20)
     Sincerely,
(21)
(22)
     NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
     San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition

# EXHIBIT 50

**DEPOSITION OF RAUL VARGAS - 08/25/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA 94103**
**Phone: (415) 398-1889**
**FAX: (415) 398-0611**

**NRS**
**NOGARA REPORTING SERVICE**

## Page 1

```
(1)          IN THE UNITED STATES DISTRICT COURT
(2)       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
(3)
(4)
(5)   RENALDO NAVARRO,
(6)            Plaintiff,
(7)   v.                          No.  3:19-CV-8157
(8)   MENZIES AVIATION, INC.,
      doing business as MENZIES
(9)   and DOES 1 through 10,
      inclusive,
(10)
               Defendants.
(11)   _____/
(12)   Zoom Remote Deposition of
(13)       RAUL VARGAS
(14)   Tuesday, August 25, 2020
(15)
(16)
(17)
(18)
(19)
(20)
(21)   REPORTED BY:  CINDY TUGAW, CSR #4805
(22)
(23)
                 NOGARA REPORTING SERVICE
(24)            5 Third Street, Suite 415
               San Francisco, California 94103
(25)               (415) 398-1889
```

## Page 2

```
(1)             I N D E X
(2)                                Page Number
(3)   EXAMINATION BY MR. URIARTE          4
(4)   EXAMINATION BY MR. WU              73
(5)   FURTHER EXAMINATION BY MR. URIARTE 74
(6)               ---oOo---
(7)           E X H I B I T S
(8)   Plaintiff's
(9)   Exhibit 1    Plaintiff Renaldo        9
               Navarro's Amended Notice
(10)             of Deposition of Raul
               Vargas
(11)
      Exhibit 8    Petition to Menzies     26
(12)             Management from Menzies
               Fuelers
(13)
      Exhibit 9    Termination notice for  60
(14)             Renaldo Navarro
(15)  Exhibit 11   Employee Performance    61
               Development dated
(16)             8/29/2018
(17)  Exhibit 12   Email chain culminating 66
               in an email from Raul
(18)             Vargas to Tracy Aguilera
               dated August 29, 2018
(19)
      Exhibit 19   Letter from Rafael Vasquez  43
(20)             to whom it may concern
               dated 11/18/2018 with
(21)             attached petition
(22)               ---oOo---
(23)
(24)
(25)
```

## Page 3

```
(1)         BE IT REMEMBERED that, pursuant to Notice of
(2)   Taking Deposition and on Tuesday, the 25th day of
(3)   August, 2020, commencing at the hour of 9:03 o'clock
(4)   a.m. thereof, via Zoom videoconference, before me,
(5)   CINDY TUGAW, a Certified Shorthand Reporter in the
(6)   State of California, personally appeared,
(7)                  RAUL VARGAS,
(8)   called as a witness by the Plaintiff, having been by me
(9)   first duly sworn, was examined and testified as
(10)  hereinafter set forth.
(11)               ---oOo---
(12)          APPEARANCES OF COUNSEL
(13)  For the Plaintiff
          LIBERATION LAW GROUP, P.C.
(14)      2760 Mission Street
          San Francisco, California 94110
(15)      BY:  ARLO GARCIA URIARTE, Attorney at Law
          (415) 695-1000
(16)
(17)  For the Defendants
          FOLEY & LARDNER, LLP
(18)      555 California Street, Suite 1700
          San Francisco, California 94104
(19)      BY:  JASON Y. WU, Attorney at Law
          (415) 984-9848
(20)
      Also Present:  David Ho, Zoom Host.
(21)
                  ---oOo---
(22)
(23)
(24)
(25)
```

## Page 4

```
(1)      THE REPORTER:  Good morning.  At this time, I will
(2)  ask counsel to stipulate on the record that there is no
(3)  objection to this deposition officer administering a
(4)  binding oath to the witness via Zoom, starting with the
(5)  noticing attorney.
(6)      MR. URIARTE:  No objection.
(7)      MR. WU:  And no objections on behalf of Menzies
(8)  Aviation.
(9)      (Whereupon, the Witness was duly sworn by the
(10)  Reporter.)
(11)        EXAMINATION BY MR. URIARTE
(12)     MR. URIARTE:  Good morning, Mr. Vargas.
(13)     A.  Good morning.
(14)     Q.  Could you please state and spell your name for
(15)  the record.
(16)     A.  Yes, so my name is Raul Vargas, R-a-u-l, last
(17)  name V, as in Victor, a-r-g-a-s.
(18)     Q.  Okay.  And if I ask you what your formal name
(19)  is, like, for example, what's on your passport or
(20)  something like that, what would you say?
(21)     A.  Raul Herman Vargas Aroca.
(22)     Q.  And so, Herman, Herman is H-e-r-m-a-n, is that
(23)  what it is?  Herman, did you hear me?
(24)     A.  Yes, it's H-e-r-m-a-n.
(25)     Q.  And then I missed your mother's maiden name.
```

**Page 5**

(1)   **A.** It's A-r-o-c-a.

(2)   **Q.** A-r-o-c-a?

(3)   **A.** Yes.

(4)   **Q.** Thank you. Okay. My name is Arlo Uriarte. I

(5) am the attorney for Renaldo Navarro. And are you aware

(6) that Mr. Navarro has an action against Menzies?

(7)   **A.** Yes, I am.

(8)   **Q.** And could you please tell me what your current

(9) position is with Menzies.

(10)   **A.** I'm director of operations assigned in Los

(11) Angeles Airport.

(12)   **Q.** And then in August of 2018, what was your

(13) position?

(14)   **A.** I was the director of operation for San

(15) Francisco Airport.

(16)   **Q.** Would you say being the director of operation

(17) to Los Angeles is a promotion?

(18)   **A.** It was a promotion for me.

(19)   **Q.** When did you become director of operation for

(20) Los Angeles?

(21)   **A.** September 1st -- yes, September 1st.

(22)   **Q.** Of last year?

(23)   **A.** Yes.

(24)   **Q.** Have you had your deposition taken before?

(25)   **A.** No.

**Page 6**

(1)   **Q.** So let me just kind of go through some ground

(2) rules of what we're doing here today. First of all, we

(3) have the court reporter, Cindy. She is taking down

(4) everything that we are saying, including your attorney.

(5) And so we try to make it as easy for her as possible

(6) with regard to not talking over one another. Is that

(7) okay?

(8)   **A.** Perfect.

(9)   **Q.** Okay. And then we also need to make verbal

(10) responses, you know, because this is on video,

(11) sometimes you shake your head or you make some sort of

(12) gesture, but none of that is written onto the record

(13) unless you actually verbalize the response. Okay?

(14)   **A.** Okay.

(15)   **Q.** You have been placed under oath. Do you

(16) understand that?

(17)   **A.** I understand that.

(18)   **Q.** And do you understand what that oath means?

(19)   **A.** No.

(20)   **Q.** So what that oath means is that you have sworn

(21) to tell the truth. Okay?

(22)   **A.** Yes.

(23)   **Q.** And in swearing to tell the truth, you're also

(24) saying that you're declaring under penalty of perjury

(25) that you will tell the truth. Do you understand that

**Page 7**

(1) portion of it?

(2)   **A.** Yes, I do.

(3)   **Q.** Okay. While we are in a video deposition and

(4) while we seem to be informal and not in court, what you

(5) say and the testimony that you provide here today

(6) actually has the same weight and effect as if you were

(7) testifying in court in front of a judge, in front of a

(8) jury, in front of attorneys. It would be just the

(9) same. Do you understand that?

(10)   **A.** I do understand.

(11)   **Q.** And that makes it quite important that

(12) whatever you say here today is your best testimony,

(13) your best memory, your best recollection. Okay?

(14)   **A.** Yes.

(15)   **Q.** And if you have to -- it would be a good idea

(16) for you to qualify your response if you're not sure of

(17) the response. Do you understand that?

(18)   **A.** Yes, I do.

(19)   **Q.** If you make a response, for example, if you

(20) say "red" and then the court reporter actually writes

(21) down the word "red," we will assume that you meant red.

(22) Okay?

(23)   **A.** I do understand that.

(24)   **Q.** And later on, after you have been given the

(25) chance to actually review your testimony, sometimes

**Page 8**

(1) witnesses will change whatever they said during a

(2) deposition. But I must advise you that if you do

(3) change your testimony in a later court proceeding or in

(4) changing it in the deposition transcript, that somebody

(5) like me or another attorney or even sometimes the judge

(6) will cross-examine you or question you or doubt your

(7) credibility with regard to the changes you make to

(8) today's testimony.

(9)   Is that understandable?

(10)   **A.** I do understand that, sir.

(11)   **Q.** Thank you. Is there any reason why you cannot

(12) give your best testimony here today?

(13)   **A.** There is no reason.

(14)   **Q.** Okay. Aside from telling me what you and your

(15) attorneys have discussed, what did you do in order to

(16) prepare for today's deposition?

(17)   **A.** Well, I have my notes. And I had a meeting

(18) with Jason where he explained to me about the

(19) deposition. I've never been in one before.

(20)   **Q.** Okay. Don't tell me anything about what you

(21) talked about with Jason. When you say you have your

(22) notes, what do you mean by that?

(23)   **A.** My notes in terms of emails that I sent during

(24) that time.

(25)   **Q.** Okay. You have that in front of you?

**Page 9**

(1)   **A.** I have it with me, yes.

(2)   **Q.** I guess, maybe during the break, maybe if you

(3) could make a copy of those notes and then send them to

(4) your attorney by email, or something like that, because

(5) we would want a copy of your notes.

(6)   **A.** Okay.

(7)   **Q.** Is that okay?

(8)   **A.** Yes. Sure.

(9)   **Q.** Okay. And then, aside from the emails that

(10) you say and your notes, anything else that you

(11) reviewed?

(12)   **A.** Anything else -- nothing else, sorry.

(13)   **Q.** Okay. Did you talk to anyone to prepare for

(14) today's deposition aside from your attorney?

(15)   **A.** I didn't talk to anybody in relation to this.

(16)   **Q.** Because of the video transmission or the data

(17) transmission, I didn't hear that totally clear, but

(18) what I assume what you said was that you have not

(19) talked to anyone in relation to -- with regards to

(20) preparing for today. Is that what you said?

(21)   **A.** Yes.

(22)   **MR. URIARTE:** So we will mark as Exhibit 1 the

(23) deposition notice. David, could you have Exhibit 1 on

(24) the screen, please. Thank you.

(25)   (Plaintiff's Exhibit 1 marked for

**Page 10**

(1)   identification.)

(2)   **MR. URIARTE: Q.** Okay. So this is always a good

(3) way of testing the technology. Mr. Vargas, do you see

(4) what's been marked as Exhibit 1 on your screen?

(5)   **A.** Yes.

(6)   **Q.** Are you using a laptop or a phone?

(7)   **A.** I'm using a laptop.

(8)   **Q.** Oh, great. That's better. Okay.

(9)   Have you seen this document before?

(10)   **A.** Yes.

(11)   **Q.** Great. Very good. All right.

(12)   Mr. Vargas, our information is that Mr.

(13) Navarro was terminated August 29, 2018. Do you

(14) remember that about the right time frame?

(15)   **A.** I don't remember the right time.

(16)   **Q.** Okay. Do you remember the circumstances

(17) around his termination?

(18)   **A.** Yes, I do.

(19)   **Q.** In relation to his termination, before

(20) deciding to terminate Mr. Navarro, did you actually

(21) hear about the petition going around in the workplace

(22) first?

(23)   **A.** Yes, I did.

(24)   **Q.** And how long would you say before his

(25) termination did you hear about the petition going

**Page 11**

(1) around in the workplace?

(2)   **A.** I don't recall that.

(3)   **Q.** Would you say that it was going around for a

(4) month already and then his termination happened?

(5)   **A.** I don't recall it.

(6)   **Q.** Can you give me your best estimate, like a

(7) week, or do you have a time frame in your head at all?

(8)   **A.** I don't have a time frame in my head right

(9) now.

(10)   **Q.** So you don't remember kind of like whether it

(11) was days or weeks?

(12)   **A.** I don't remember when this was brought to my

(13) attention.

(14)   **Q.** And "this" being the petition, correct?

(15)   **A.** In relation to the petition.

(16)   **Q.** I think, Mr. Vargas, we need you to speak up a

(17) little bit or maybe get closer to the microphone.

(18)   **A.** Yes.

(19)   **Q.** Thank you. So what about this: Do you

(20) remember who brought the petition to your attention?

(21)   **A.** Tracy Aguilera.

(22)   **Q.** So it was HR who actually let you know that,

(23) hey, there's this petition going around?

(24)   **A.** HR.

(25)   **Q.** Aside from Tracy, did anybody else talk to you

**Page 12**

(1) about the petition?

(2)   **A.** Nobody else talked to me. She was the first

(3) person who talked to me about the petition.

(4)   **Q.** Okay. And then when you say she's the first

(5) person, was she also the only person that talked to you

(6) about the petition?

(7)   **A.** No.

(8)   **Q.** Did anybody else talk to you about the

(9) petition before Mr. Navarro's termination?

(10)   **A.** Yes.

(11)   **Q.** Who else?

(12)   **A.** Our operation manager for fuel.

(13)   **Q.** Who was that?

(14)   **A.** I don't recall his last name. Renil.

(15)   **Q.** Renil?

(16)   **A.** Renil.

(17)   **Q.** R-e-n-i-l?

(18)   **A.** That is, yes.

(19)   **Q.** I believe he's not with the company anymore,

(20) correct?

(21)   **A.** He's not.

(22)   **Q.** Do you know where he is right now?

(23)   **A.** I do not know.

(24)   **Q.** All right. Aside from Renil, did anybody else

(25) talk to you about the petition?

**Page 13**

(1)  A. Nobody else.

(2)  Q. Okay. What did Renil tell you about the

(3) petition?

(4)  A. That there was a petition going around to

(5) terminate Andrew.

(6)  Q. To terminate Andrew. Anything else?

(7)  A. Nothing else that I can recall.

(8)  Q. Okay. Did you actually read the petition?

(9)  A. I read the petition, yes, I did.

(10)  Q. And you read the petition before the

(11) termination?

(12)  A. Yes, I did.

(13)  Q. And when you read it, that's what it said, to

(14) terminate Andrew?

(15)  A. I don't recall exactly what it says, but it

(16) was about Andrew's performance, and it was about

(17) removing Andrew from the position.

(18)  Q. And then, aside from saying that to you,

(19) anything else Renil told you about the petition?

(20)  A. Nothing else -- nothing else that I can

(21) recall.

(22)  Q. Okay. What about Tracy, what did she talk to

(23) you about the petition?

(24)  A. Well, Tracy told me about everything that she

(25) was getting information from. The first conversation I

**Page 14**

(1) had with her, it was about somebody from the union

(2) contacting her to let her know that somebody was

(3) requesting to sign a petition to the employees.

(4)  Q. Anything else?

(5)  A. Yes. She mentioned that -- that employees

(6) were -- were not agreeing on signing it.

(7)  Q. Okay. Anything else?

(8)  A. Nothing else that I can recall.

(9)  Q. And then, with regards to the content of the

(10) petition, after you read it, did you make any decision

(11) related to the contents of the petition?

(12)  A. Yes, I talked to Tracy to -- to have the

(13) investigation.

(14)  Q. What type of investigation?

(15)  A. An investigation about the petition and about

(16) the -- how the petition was made.

(17)  Q. How the petition was --

(18)  A. Performed.

(19)  Q. Was performed?

(20)  A. Yes.

(21)  Q. So you mean, when you say "how the petition

(22) was performed," you mean how the petition was put

(23) together, correct?

(24)  A. Yes.

(25)  Q. Anything else that you asked Tracy to do in

**Page 15**

(1) relation to the petition?

(2)  A. Nothing else at that time.

(3)  Q. Okay. And so you said to do an investigation

(4) about the petition. What does that mean? What did you

(5) actually tell Tracy to do?

(6)  A. To perform an investigation about how --

(7) because we received some calls from the union, and also

(8) received some information about Andrew, that he

(9) received a message from Navarro. So at that time it

(10) was important for me to understand how that petition

(11) was created. How they did it.

(12)  Q. All right. And then you said also about how

(13) the petition was put together. So why was it important

(14) for you to know how or who put together the petition?

(15)  A. Because of the feedback that I received from

(16) Tracy, from HR.

(17)  Q. And what's that information that you received

(18) from HR?

(19)  A. As I said before, she told me that somebody

(20) from the union contact her telling her that there was a

(21) person asking for sign a petition, who was forcing the

(22) employees to do it.

(23)  Q. And did you ever find out who actually put

(24) together the petition?

(25)  A. Yes, we did.

**Page 16**

(1)  Q. And who was it?

(2)  A. Mr. Navarro.

(3)  Q. I'm sorry?

(4)  A. Mr. Navarro.

(5)  Q. And how did you reach -- how was that

(6) conclusion reached? Like how did you guys reach the

(7) conclusion that Mr. Navarro wrote the petition?

(8)  A. There was an investigation done, performed by

(9) the safety department.

(10)  Q. So the safety department person actually said

(11) Mr. Navarro wrote the petition, is that your

(12) understanding?

(13)  A. Yes. And also because of the messages that

(14) Andrew received from Mr. Navarro.

(15)  Q. Right. But that message said, "I'm holding on

(16) to the petition. I haven't submitted it." It doesn't

(17) say, "I wrote the petition that I'm going to give." Do

(18) you know what I'm saying? It says, "I'm holding on to

(19) the petition and I haven't submitted it."

(20)   So I don't know how that text message kind of

(21) leads to the conclusion that he wrote it. Can you

(22) explain it to me?

(23)   MR. WU: Objection. Assumes facts not in

(24) evidence.

(25)   You can answer if you understand the question.

**Page 17**

(1)   **MR. URIARTE: Q.** Mr. Vargas?

(2)   **A.** Well, I think that when you receive a message

(3) from -- I don't know where -- somebody in relation to a

(4) petition, that is an alert.

(5)   **Q.** Is what?

(6)   **A.** Is an alert.

(7)   **Q.** Okay. But I guess my question is how does

(8) that text message lead you to conclude that Mr. Navarro

(9) wrote the petition?

(10)   **A.** That was not the one that drove me to

(11) understand that Mr. Navarro did the petition.

(12)   **Q.** What did make you understand that Mr. Navarro

(13) wrote it?

(14)   **A.** Well, because the investigation from the

(15) safety department.

(16)   **Q.** Okay. So the investigation from the safety

(17) department actually has a report?

(18)   **A.** They have statements from employees.

(19)   **Q.** Statements from employees. Okay. Anything

(20) else?

(21)   **A.** They had a statement from employees and their

(22) final outcome out of the investigation.

(23)   **Q.** Are you talking about the final outcome as

(24) they wrote it in the email?

(25)   **A.** Yes.

**Page 18**

(1)   **Q.** Okay. So aside from the final outcome that

(2) they wrote in the email, is there another document that

(3) they put together or that was it?

(4)   **A.** No.

(5)   **Q.** That was it?

(6)   **A.** That was it.

(7)   **Q.** Okay. And then the statement from the

(8) employees, from that you conclude that Mr. Navarro

(9) wrote it?

(10)   **A.** Yes.

(11)   **Q.** Okay. So if I read those statements,

(12) somewhere in those statements it would say Mr. Navarro

(13) wrote the petition?

(14)   **A.** I think that -- no, it doesn't say about Mr.

(15) Navarro writing the petition. It's says about Mr.

(16) Navarro forcing the employees to sign the petition

(17) which is -- this isn't about writing the petition.

(18) It's about creating harassment environment in the

(19) workplace.

(20)   **Q.** Okay. I understand that. I understand that.

(21) Your attorneys have kind of said that to me many times,

(22) so I understand that. But I'm still kind of like

(23) before that, right? I'm still trying to get to the

(24) point of trying to understand how you got to the

(25) conclusion in your head that, hey, Mr. Navarro wrote

**Page 19**

(1) this petition.

(2)   **A.** Well, and if I can go back --

(3)   **Q.** Yes.

(4)   **A.** -- I never asked to investigate on who wrote

(5) the petition.

(6)   **Q.** So for you that wasn't important?

(7)   **A.** No.

(8)   **Q.** So when you finally concluded that termination

(9) was the proper discipline, that wasn't part of the --

(10) for you, that's not the important part, right?

(11)   **A.** About who wrote the petition, no, no, not at

(12) all.

(13)   **Q.** For you it was, hey, you've got this guy

(14) forcing employees to sign the petition. That's what it

(15) was, right?

(16)   **A.** Yes.

(17)   **Q.** I got it. Okay. So that leads to the

(18) question of when -- so let's say August 29 is

(19) eventually the time that he gets terminated. Do you

(20) remember about when you concluded in your head, hey, I

(21) need to terminate Mr. Navarro? Do you remember when?

(22)   **A.** The specific date, no, but it should be around

(23) that time.

(24)   **Q.** Like within days of it or within a week or --

(25)   **A.** I cannot tell. I don't -- I don't recall it.

**Page 20**

(1)   **Q.** Okay. And then with regards to forcing

(2) employees to sign the petition, I saw those letters

(3) from different employees, them saying whatever they're

(4) saying, and then I saw the one from Andrew as well. I

(5) see that.

(6)   But did the investigation, or did you, ever

(7) ask to talk to the fuelers?

(8)   **A.** No.

(9)   **Q.** Okay. Did you ever ask to talk to the union

(10) representative?

(11)   **A.** Well, the union representative, he brought a

(12) letter for me -- for me, too.

(13)   **Q.** Right. You mean like an additional petition,

(14) is that what you're saying?

(15)   **A.** It was a different letter.

(16)   **Q.** What letter was that?

(17)   **A.** It was pretty much the same as the petition.

(18)   **Q.** Right. But I think that -- I don't want to

(19) confuse you. We should probably maybe clear this up.

(20) That second petition by Rafael Vasquez or Rafael

(21) Martinez, right, is that what you're talking about?

(22)   **A.** Yes.

(23)   **MR. WU:** Objection. Lack of foundation.

(24)   **MR. URIARTE: Q.** That second petition, that was

(25) like already in October, wasn't it?

**Page 21**

(1)   **A.** I don't recall the date.

(2)   **Q.** Okay. So, but before concluding that Navarro

(3) actually forced employees to sign the petition, I kind

(4) of want to make sure that I get all of the steps that

(5) you took to be satisfied that your conclusion was

(6) correct. All right?

(7)   **A.** Yes.

(8)   **Q.** So I saw the investigation statement. I saw

(9) the letters from the employees. That's understandable.

(10) But other than that -- and then you talked to Tracy as

(11) well, right? You had email communication with Tracy.

(12) Other than those steps, did you do any other steps?

(13)   **A.** No. Well, actually I was waiting for the

(14) final outcome from the investigation. And it was not

(15) just the feedback that I received from the safety

(16) department. Also the conversations I had with Tracy in

(17) relation to this case.

(18)   **Q.** Okay. But did you ever ask the safety

(19) department, hey, did you guys talk to the fuelers?

(20)   **A.** Yes, I did.

(21)   **Q.** And what did they say?

(22)   **A.** They told me that they -- he was -- so the

(23) safety department told me that Mr. Navarro was forcing

(24) employees to sign the petition, and he was creating --

(25) he was harassing people to have this petition signed.

**Page 22**

(1)   **Q.** Okay. So forcing employees to sign the

(2) petition. What's wrong with that?

(3)   **A.** Well, I think that when you have -- you take

(4) advantage of your rank, that is harassment because of

(5) how the other people feel.

(6)   **Q.** Anything else that's wrong with that?

(7)   **A.** Yes. So when they use this rank, people feel

(8) scared of having this confrontation with the

(9) supervisor, so they prefer to sign the petition without

(10) understanding what the petition was for.

(11)   **Q.** So are you saying that the safety department

(12) talked to everybody that signed that petition and

(13) verified whether they actually signed it or not?

(14)   **A.** I cannot guarantee that they talked to hundred

(15) percent of the employees.

(16)   **Q.** Okay. But do you know how many people they

(17) talked to?

(18)   **A.** I don't know exactly how many people they

(19) talked to.

(20)   **Q.** And then you used the word "harassment." How

(21) are you using that word "harassment"? What do you mean

(22) by that?

(23)   **A.** Well, for me, harassment is pretty much --

(24) it's to force or intimidate people. So, in this case,

(25) when he's taking his rank as a supervisor, telling

**Page 23**

(1) people to sign a petition that they don't know what

(2) it's for, that for me is intimidation. And that's how

(3) they -- the employees felt.

(4)   **Q.** How many employees are we talking about --

(5)   **A.** Well --

(6)   **Q.** -- that felt like that?

(7)   **A.** I'm sorry?

(8)   **Q.** How many employees felt like that?

(9)   **A.** I cannot tell you exactly the number of, but I

(10) can tell you in terms of the -- the statements we

(11) received. There were around three employees.

(12)   **Q.** And then there were over 20 people who signed

(13) the petition, right?

(14)   **A.** Yeah.

(15)   **Q.** So out of the more than 20 people who signed

(16) the petition, three people felt like, oh, maybe I

(17) didn't read it and then I signed it and maybe I --

(18)   **MR. WU:** Objection. Objection. Lack of

(19) foundation. Calls for speculation. Misstates prior

(20) testimony.

(21)   **MR. URIARTE: Q.** So, Mr. Vargas, when your

(22) attorney objects, we allow him to finish his objection

(23) so that it's written into the record. Please allow him

(24) to finish, and then you can answer afterwards unless

(25) your attorney tells you not to answer. Okay?

**Page 24**

(1)   **A.** So, for me, if we have people that feel that

(2) way, it's really important to ensure that we have the

(3) right environment for our employees. Harassment is a

(4) really important matter in our environment in a

(5) business.

(6)   **Q.** I got that. I got that. So you've got three

(7) people complaining about the way that the harassment --

(8)   **A.** We have -- remember -- sorry, can I --

(9)   **Q.** Please, please.

(10)   **A.** So, remember, we had those three guys, but

(11) also we had some feedback from the union saying that

(12) this person was harassing people to sign the petition.

(13)   **Q.** Okay. But what about the subject matter of

(14) the petition itself? Weren't they doing the same thing

(15) as well? You said it's very important for you that

(16) people work in a proper environment, right?

(17)   **A.** Yes.

(18)   **Q.** But the nature of the petition itself kind of

(19) complains about the environment, right?

(20)   **A.** Yes.

(21)   **Q.** Okay. So isn't that also a valid concern?

(22)   **A.** It is. Definitely it is.

(23)   **Q.** Okay. And what was done about that?

(24)   **A.** Well, I think that it's important from the

(25) extent of the document, where the document is coming

**Page 25**

(1) from, if the document is signed by people who felt
(2) harassment. So what's the validation of that document?
(3)      **Q.** But we also have other people who didn't feel
(4) that way, right?
(5)      **A.** We don't know.
(6)      **MR. WU:** Objection. Lack of foundation.
(7) Misstates prior testimony.
(8)      **MR. URIARTE: Q.** So I guess my question is this:
(9) So the document itself, the petition itself, talks
(10) about things that they're not happy about, correct?
(11) Would you agree with that?
(12)      **A.** I disagree with it.
(13)      **Q.** Okay.
(14)      **A.** I don't agree with it because you're saying
(15) "they," and at this point, when I see there's employees
(16) forced to sign it, it means that there is somebody, one
(17) person, that is pretty much complaining for that, not
(18) the whole thing.
(19)      **Q.** I see what you're saying. You're saying
(20) because you believe that there's one person forcing
(21) people to sign, that you don't believe the petition
(22) anymore.
(23)      **A.** I don't -- I don't -- I don't have the same
(24) validity of the petition anymore.
(25)      **Q.** Validity?

**Page 26**

(1)      **A.** Validity, I'm sorry.
(2)      **Q.** No problem. I talk the same way, so I totally
(3) understand you.
(4)      Okay. I get that. I guess, from your mind, I
(5) could see how you could think that way. But that might
(6) not make sense when you take into consideration a
(7) second petition after the termination of Mr. Navarro.
(8) What about that?
(9)      **A.** The second petition, it was not brought after.
(10)      **Q.** It was. It was. It was brought after.
(11)      **MR. WU:** Objection. Assumes facts. Lack of
(12) foundation.
(13)      **MR. URIARTE:** I'll show it to you so we can put
(14) that to rest. I'll show that to you, don't worry.
(15)      So here's -- can we have Exhibit 8 up, please,
(16) David. Thank you.
(17)      (Plaintiff's Exhibit 8 marked for
(18)      identification.)
(19)      **MR. URIARTE: Q.** So, Mr. Vargas, do you see this
(20) one --
(21)      **A.** Yes.
(22)      **Q.** -- which we've been calling the first
(23) petition?
(24)      Is this the one -- do we agree this is the one
(25) that you saw initially when you say that you talked to

**Page 27**

(1) Tracy and Renil? Does that make sense?
(2)      **A.** I cannot confirm a hundred percent that this
(3) was the one.
(4)      **Q.** Okay. So if we go down a little bit, yeah,
(5) you'll see Mr. Navarro's signature on this one.
(6)      **A.** Yes.
(7)      **Q.** And this document actually comes from your
(8) company, if you see the Menzies number there, Menzies
(9) 153. And so line 24 there on the second page -- I'm
(10) sorry, line 16 of the second page has Mr. Navarro's
(11) signature. Do you see that?
(12)      **A.** Yes.
(13)      **Q.** All right. So, again, going back to your
(14) conclusion earlier, you're saying, if you think that
(15) Mr. Navarro was forcing all of these people to sign the
(16) petition, you believe the petition is now without
(17) validity, is that correct?
(18)      **A.** Well, I don't think that it has the same
(19) validity, definitely. Now, what is most important to
(20) bring out is that I had a conversation with HR about
(21) Andrew, because they were -- in the letter I believe
(22) they complained also about him falling asleep on the
(23) operation.
(24)      So I had this conversation with HR. And they
(25) explained to me and they addressed that issue before I

**Page 28**

(1) started working at Menzies. Because, again, I started
(2) June 2018. And this was happening -- this happened in
(3) August.
(4)      **Q.** Yes. Right. So you started in June of 2018,
(5) and this was happening in August. So you didn't have
(6) that much kind of context with regard to what was
(7) happening from the last year, is that correct?
(8)      **A.** (Indicates affirmatively.)
(9)      **Q.** Mr. Vargas?
(10)      **A.** Yes.
(11)      **MR. WU:** Arlo, I'm sorry to interrupt. Can we
(12) take a quick break in the next five minutes? Whatever
(13) is a good stopping point for now.
(14)      **MR. URIARTE:** That's fine. We can take a break
(15) now. No problem.
(16)      **MR. WU:** Thanks a lot, Arlo. Let's go off the
(17) record.
(18)      **MR. URIARTE:** No problem.
(19)      (Brief recess.)
(20)      **MR. URIARTE: Q.** So we were talking about Exhibit
(21) 8, Mr. Vargas. My question is with regards to the
(22) actual things that the fuelers were complaining about.
(23) And I just want to clarify something.
(24)      Was there ever an investigation by Menzies
(25) with regard to the context or the content of their

**Page 29**

(1) petition, the subject matter of their petition?

(2)     **A.** Well, there was an investigation before in

(3) terms of what they were complaining about, that this

(4) was happening at the company. And that was the

(5) conversation that I had with Tracy, with HR, in

(6) relation to this petition, what they were saying.

(7)     **Q.** And what was the result of that investigation?

(8)     **A.** Well, that Andrew pretty much falls asleep

(9) because he has sleep onea [sic].

(10)     **Q.** You're talking about sleep apnea?

(11)     **A.** Yes.

(12)     **Q.** Anything else?

(13)     **A.** And -- no, nothing else.

(14)     **Q.** What about the complaint that rest breaks or

(15) breaks were being -- were being missed or not taken?

(16)     **A.** I don't recall about that.

(17)     **Q.** What about like delays that were being caused

(18) by Andrew, was that ever investigated?

(19)     **A.** No, no, not brought to my attention.

(20)     **Q.** So when you read this petition, I guess the

(21) focus became Mr. Navarro asking people to sign the

(22) petition. That was your focus, right?

(23)     **A.** Yeah. The environment that he create by doing

(24) that.

(25)     **Q.** Okay. And you didn't really put focus on the

**Page 30**

(1) environment that Mr. Dodge was creating as alleged by

(2) this petition?

(3)     **A.** Well, I did when I asked HR about that

(4) petition, about those things that happened before I got

(5) there, and that was what I received from HR.

(6)     **Q.** So what I heard you say, they already --

(7)     **A.** That they already took action on it.

(8)     **Q.** And that's with regard to the sleep apnea?

(9)     **A.** That is regard of everything.

(10)     **Q.** Okay. So you're saying you did ask Tracy

(11) about what the fuelers were talking about in the

(12) petition, correct?

(13)     **A.** (Indicates affirmatively.)

(14)     **Q.** Okay. And that involved what was happening to

(15) Andrew Dodge before, and something about sleep apnea

(16) and sleeping and him falling asleep, correct?

(17)     **A.** Yes.

(18)     **Q.** Anything else, aside from that, that came as a

(19) result of your inquiry with regards to the petition?

(20)     **A.** Also that, for me, nothing else for me to take

(21) action for.

(22)     **MR. WU:** And, Raul, if you could just give a brief

(23) pause between the end of Arlo's question and the

(24) beginning of your answer. I think sometimes, when

(25) there's a bit of overlap, is when we're getting that

**Page 31**

(1) feedback and it's becoming a little unclear.

(2)     **THE WITNESS:** Okay.

(3)     **MR. URIARTE: Q.** Did you ever have a discussion

(4) with Mr. Navarro, before this whole petition started,

(5) did you ever have a discussion with Mr. Navarro about

(6) Andrew Dodge?

(7)     **A.** Not that I recall.

(8)     **Q.** So you don't remember him going up to you and

(9) trying to talk to you about concerns about Andrew

(10) Dodge?

(11)     **A.** No, I don't recall that.

(12)     **Q.** Aside from the petition and maybe Mr. Navarro,

(13) did you ever get complaints against -- or about Andrew

(14) Dodge in those -- June, July, August, the time you were

(15) there?

(16)     **A.** No, I did not.

(17)     **Q.** And so you were not involved in the promotion

(18) of Mr. Dodge, correct?

(19)     **A.** No, I was not.

(20)     **Q.** And before being at Menzies at the San

(21) Francisco Airport, where were you working?

(22)     **A.** I was working for TAS.

(23)     **Q.** What does that mean?

(24)     **A.** TAS, Total Airport Services. I worked there

(25) as a general manager in San Francisco.

**Page 32**

(1)     **Q.** And how long were you working for TAS?

(2)     **A.** Four months.

(3)     **Q.** So before TAS, who did you work for?

(4)     **A.** I worked before that as operation manager for

(5) a company called Emser Tile for a year.

(6)     **Q.** Can you spell that?

(7)     **A.** Emser is E-m, as in Mike, s, as in Sierra,

(8) e-r, as in royal, Tile, T-i-l-e.

(9)     **Q.** So that's a nonairport job?

(10)     **A.** It was a nonairport job. And before that I

(11) worked for 16 years for the LATAM Airlines. LATAM,

(12) it's L, as in Lima, A-T, tango, A-M, as in Mike,

(13) Airlines.

(14)     **Q.** Where is that, LATAM Airlines?

(15)     **A.** It's South America.

(16)     **Q.** What country in South America?

(17)     **A.** It's the biggest network airline in South

(18) America.

(19)     **Q.** I thought Avianca was the biggest.

(20)     **A.** No, no.

(21)     **Q.** They're not?

(22)     **A.** They're the oldest.

(23)     **Q.** So in your job as the director of operations

(24) in San Francisco, can you just give me a list of your

(25) responsibilities there, especially when it comes to,

**Page 33**

(1) like, June to August of 2018. What were your duties
(2) and responsibilities?
(3)     A. Pretty much whatever -- as US director of
(4) operation, I'm looking for different -- different
(5) elements. So I have four different elements. The
(6) first one is financial. I look for all the financials
(7) of the station, all the four business lines that we
(8) have there at that moment, which it was the fueling
(9) business, the ramp business, the cargo business and the
(10) GSC business. GSC is ground service equipment. So we
(11) provide service to all the equipment that pretty much
(12) you see on the runway.
(13)     So I look also in terms of customer service,
(14) all the retention or attraction of new customers,
(15) interactions. I also look into the safety, ensuring
(16) that we run a smooth operation in a safe basis, putting
(17) all the safety processes in place to reduce every kind
(18) of risk out there on the ramp or in the different
(19) departments.
(20)     And I also look into the people. What I mean
(21) by the people, well, I make sure that environments, the
(22) retention, the attraction of new employees, and how can
(23) we retain employees in the long-term.
(24)     Q. Okay. Thank you for that. Being that you
(25) were new to the San Francisco Airport operation, before

**Page 34**

(1) pulling the trigger and actually recommending the
(2) termination of Mr. Navarro, did you talk to anyone with
(3) regards to that decision?
(4)     A. Yes. I talked to HR.
(5)     Q. Who else?
(6)     A. I talked to HR and nobody else about that
(7) decision.
(8)     Q. So you didn't talk to Renil and say, "Renil, I
(9) know you've been here a while. What do you think about
(10) this?"
(11)     A. I don't recall it, talking to Renil.
(12)     Q. How much did you know about Mr. Navarro at the
(13) time that you terminated him?
(14)     A. I didn't know that much about Mr. Navarro.
(15)     Q. Okay. Did you know that he had been working
(16) for Menzies a long time at that point?
(17)     A. Yes, I did.
(18)     Q. And then what were you trying to accomplish by
(19) choosing to terminate Mr. Navarro?
(20)     A. Well, I think that, as I said before, my job
(21) there is to ensure that we can retain employees. And
(22) the only way to retain employees is to ensure an
(23) environment where they work is a good environment. So
(24) when you have one person, just one person, complaining
(25) about supervisor harassment, then you need to take

**Page 35**

(1) actions.
(2)     Q. So your belief is that it was all Mr. Navarro
(3) complaining, it was just him?
(4)     A. I think that, based on the statements we
(5) received, they were focused on that -- on him.
(6)     Q. Okay. But what about all those other people
(7) that signed the petition?
(8)     A. Well, as I said before, we need to ensure that
(9) environment is good. So, for me, just one person
(10) complaining about harassment, it's an issue.
(11)     Q. Okay.
(12)     A. More than one, then you have a petition signed
(13) by people. So we have a person, and more than one
(14) person being harassed to sign a petition, that is a
(15) huge issue for me.
(16)     MR. URIARTE: Okay. All right. Can we take a
(17) look at Exhibit 8 again, please.
(18)     David, are you there?
(19)     ZOOM HOST: Yes, coming up shortly.
(20)     MR. URIARTE: Thank you.
(21)     ZOOM HOST: Give me one second. It's not coming
(22) up.
(23)     MR. URIARTE: No problem. Thank you, David.
(24)     Q. Let's go to the top part of Exhibit 8, please.
(25) So it says, "To: Menzies Management. Sir/madam."

**Page 36**

(1)     Do you read that, Mr. Vargas?
(2)     A. Yes, I do.
(3)     Q. All right. Could you read where it starts
(4) "We" for us, please.
(5)     A. "We the fuelers on Menzies 130 side would like
(6) to make a petition against Andrew Dodge." Let me --
(7)     Q. You'll have to move --
(8)     A. There it is. Thank you. I'll start again.
(9)     It says, "We the fuelers on Menzies 130 side
(10) would like to make a petition against Andrew Dodge.
(11) The way he supervised is very unprofessional when he
(12) run the operation or supervised, people are not taken
(13) their breaks it's because the way he set up the
(14) flights, and he always blaming the people there's a
(15) delay or always saying lack of manpower and trucks
(16) issues. The truth is he doesn't know how to run the
(17) show, we also addressed the problem to the higher
(18) position managers (Nicco, John and Renil) as usual
(19) nothing happened, looks like they always covering his
(20) mistake or maybe these managers don't know anything
(21) about fueling also like Andrew Dodge lack of experience
(22) about fueling."
(23)     Q. Okay.
(24)     A. "We think" --
(25)     Q. Go ahead.

**Page 37**

(1)    A. "We think this is the right time to broadcast
(2) the problem in this company. We are hoping this
(3) problem will be addressed."
(4)    Q. Okay. Was this problem ever addressed,
(5) Mr. Vargas?
(6)    A. It was addressed at the moment, but I was not
(7) there.
(8)    Q. I'm sorry?
(9)    A. It was addressed at the moment because this is
(10) old case, but I was not there when that happened.
(11)    Q. Okay. When did you go to Los Angeles?
(12)    A. September.
(13)    Q. Of?
(14)    A. September -- September 1st, 2019.
(15)    Q. So that was a year later, right?
(16)    A. Yes.
(17)    Q. So within -- from August to -- August 2018 to
(18) September 2019, was there anything done about what was
(19) written here?
(20)    A. No, as I said before, the conversation with
(21) HR, because I was not aware of all this that was
(22) happening with Andrew, I had a conversation with HR
(23) where they -- where HR told me about what happened and
(24) what the final outcome of that investigation was.
(25)    Q. With regards to the investigation on the sleep

**Page 38**

(1) apnea, is that correct?
(2)    A. In regards to the issues that they were
(3) having -- that they are complaining about Andrew.
(4)    Q. Okay. So it says, "the way he supervised is
(5) very unprofessional when he run the operation or
(6) supervised." Anything that was done about that?
(7)    A. At the moment that I get there, I hadn't had
(8) any problem with Andrew. And I didn't get any
(9) complaint from any fueler in relation to Andrew.
(10)    Q. Did you talk to any of the fuelers about the
(11) way he supervises is very unprofessional and run the
(12) operation or supervise?
(13)    A. I'm sorry, no, I did not talk to any fuelers
(14) about the way he supervise.
(15)    Q. Do you know if Tracy or HR did that?
(16)    A. In the conversations we had, it wasn't
(17) specific about his performance in terms of OTP, which
(18) is operational -- on time performance, I'm sorry.
(19)    Q. And then it says -- okay. I'm sorry, I think
(20) we missed the last part. Did you say something there?
(21)    A. No.
(22)    Q. Okay. "People are not taking their breaks
(23) it's because the way he set up the flights." That one,
(24) did you ask about that? Was that something that was
(25) taken care of?

**Page 39**

(1)    A. Well, I didn't receive no complaints about
(2) people not taking the breaks. And I want to -- can
(3) I -- the policy that I have, when I manage people, is
(4) really open. And what I do is I always invite people,
(5) when they have issues, to talk about the problems they
(6) have. The moment that I raised all those points with
(7) people, I never would receive no complaints from no
(8) fueler in relation to Andrew's performance.
(9)    Q. Okay. But if you see the second page there of
(10) this petition, they did. They did come forward, right?
(11) Because you have 25, 26 people signing.
(12)        If you have an open-door policy about letting
(13) you know about the complaint, wasn't this what these
(14) people are doing? I don't see how --
(15)    MR. WU: Objection. Lack of foundation.
(16) Misstates prior testimony.
(17)        You can answer if you understand the question.
(18)    THE WITNESS: I think that that question I already
(19) answered.
(20)    MR. URIARTE: Q. Which is you don't believe that
(21) these people were really complaining?
(22)    A. We have people feel harassed to sign this
(23) petition.
(24)    Q. So you feel every one of these people were
(25) harassed to sign this petition, is that correct?

**Page 40**

(1)    A. No what I believe. It's what I know. What I
(2) know is there's people that felt harassed to sign this
(3) petition.
(4)    Q. All right. But you didn't actually talk to
(5) the people, you just --
(6)    A. No, I did not. I'm sorry. I did not. I
(7) received all the documentation and find out outcome of
(8) the investigation.
(9)    Q. All right. Can we go back to the first page,
(10) please. It talks about "looks like they are always
(11) covering his mistake." Do you see that?
(12)    A. Yes, I see that.
(13)    Q. Okay. So what do you understand from that
(14) phrase?
(15)    A. From that phrase, that the duty managers are
(16) covering their mistakes.
(17)    Q. That Nicco, John and Renil is covering the
(18) mistakes of Andrew Dodge. Is that how you understand
(19) that?
(20)    A. Yes. Sorry.
(21)    Q. Did you inquire as to that? Did you do
(22) anything with regards to that statement?
(23)    A. Again, I didn't do anything about this
(24) statement other than talk to HR to understand where
(25) this was coming from. We already talked about the

**Page 41**

(1) outcome of that conversation with HR.

(2) **Q.** Okay. Mr. Vargas, let me put it directly

(3) here. If it's true, just theoretically, if it's true

(4) that Nicco, John and Renil are covering up for the

(5) mistakes of Andrew Dodge, would that be something that

(6) maybe Nicco, John and Renil should be terminated for?

(7) **A.** I think that it would be important to make an

(8) investigation before we take into consideration.

(9) **Q.** But that's a serious allegation, right?

(10) **A.** I'm sorry?

(11) **Q.** That's a serious allegation.

(12) **MR. WU:** Objection. Improper hypothetical.

(13) You can answer the question.

(14) **MR. URIARTE: Q.** That's a serious allegation.

(15) **A.** And as I said before, for me, anything that

(16) affect the environment of our employees is valid.

(17) **Q.** Yeah, it's valid, definitely. But my question

(18) was that would be serious, wouldn't you agree, as a

(19) manager, if somebody --

(20) **A.** Again, it all depends on the investigation.

(21) So I cannot tell you, because the letter says that,

(22) but --

(23) **Q.** Sure.

(24) **A.** -- we did an investigation as we did with

(25) Navarro.

**Page 42**

(1) **Q.** I agree. But that's not what I'm asking. I'm

(2) asking a more simple question, which is, if that

(3) allegation by itself, right, alleging that Nicco, John

(4) and Renil are covering up for the mistake of Andrew

(5) Dodge, just that allegation itself, standing on its

(6) own, would you characterize that as a serious

(7) allegation?

(8) **MR. WU:** Objection. Improper hypothetical.

(9) **MR. URIARTE:** You can answer.

(10) **THE WITNESS:** I already did.

(11) **MR. URIARTE: Q.** And what was your answer?

(12) **A.** That I will have to perform an investigation

(13) to understand exactly.

(14) **Q.** That would be the result, right? That would

(15) be the result, the conclusion. I'm not talking about

(16) the result or the conclusion. I'm just talking about

(17) how you would characterize an allegation such as that.

(18) **A.** Well, and as I said, if I see something like

(19) that, I will perform an investigation. So if I perform

(20) an investigation, it means that it is important.

(21) **Q.** Okay. And did you perform the investigation?

(22) **A.** No, I did not. As I said, I talked to HR

(23) about this case, specific case. Based on the fact that

(24) there were people harassed to sign this petition, I did

(25) not perform that investigation.

**Page 43**

(1) **MR. URIARTE:** Okay. Let's look at Exhibit 19,

(2) please.

(3) **ZOOM HOST:** One second, coming up.

(4) **MR. URIARTE: Q.** Actually, Mr. Vargas, did you

(5) have a conversation with Renil about how many times Mr.

(6) Navarro or other people had gone up to Renil with

(7) regards to Andrew Dodge?

(8) **A.** No, I did not. I don't recall it.

(9) **MR. URIARTE:** Okay. So can we have Exhibit 19,

(10) please.

(11) (Plaintiff's Exhibit 19 marked for

(12) identification.)

(13) **MR. URIARTE:** Thank you.

(14) **Q.** So Exhibit 19 starts with a statement by

(15) Mr. Vasquez. You know Mr. Vasquez, right? I think you

(16) called him Rafael Martinez or something like that. It

(17) might be Vasquez Martinez, actually. But he was the

(18) shop steward for Menzies, is that correct?

(19) **A.** Yes.

(20) **Q.** Okay. And here, if you go to page 2, please.

(21) Just to kind of make sure, this refers to you -- here's

(22) the petition Mr. Vasquez kind of wrote up. Does this

(23) look familiar to you?

(24) **MR. WU:** Objection. Assumes facts not in

(25) evidence.

**Page 44**

(1) **MR. URIARTE: Q.** Mr. Vargas?

(2) **A.** I don't recall it.

(3) **Q.** Okay. If you go to the bottom of the page,

(4) and, again, this is a document that we received from

(5) your company lawyers. Do you see the handwriting that

(6) "Raul Vargas received" -- I can't read anything more

(7) than that. Do you see that, "Raul Vargas"?

(8) **A.** Well, "Raul Vargas," yes, I see that.

(9) **Q.** Did you write that or somebody else wrote

(10) that?

(11) **A.** That's not my writing.

(12) **Q.** So let's go back to page 1. It says here, "On

(13) September 6th, 2018 I was asked by Menzies on the 130

(14) side to write up a Petition on behalf of the Fuelers on

(15) the 130 side versus Andrew Dodge. The petition was

(16) written out and signed by the Fuelers on 130 side of

(17) the SFO Team." Do you see that?

(18) **A.** Yes.

(19) **Q.** And just to assist you with regards to

(20) context, September 6th, 2018, Mr. Navarro was not

(21) working for Menzies anymore, correct?

(22) **A.** I believe so. I don't recall the date, but --

(23) **Q.** I think your attorney and I would agree that

(24) the termination documents say August 29, 2018. Okay?

(25) **MR. WU:** And I would just say that the witness can

**Page 45**

(1) only testify to what he knows. So I'm not going to
(2) agree or disagree with that statement.
(3)     MR. URIARTE: Okay. I'll represent to you,
(4) Mr. Vargas, that by September 6th, 2018, Mr. Navarro
(5) was not your employee anymore.
(6)     Q. So then he goes on to talk about you. "The
(7) petition was then officially turned in to the SEIU. In
(8) addition, the Petition was also turned over to Raul
(9) Vargas." Do you remember that?
(10)     A. I don't recall it. I don't recall having that
(11) petition, to tell you the truth.
(12)     Q. So you don't remember Mr. Vasquez getting
(13) close to you and giving you some pieces of paper?
(14)     A. I do not.
(15)     Q. "There have been two separate Petitions turned
(16) in to Menzies Aviation Fueling Department Director Raul
(17) Vargas." Do you remember that?
(18)     A. Well, I believe the first one was the one that
(19) they signed.
(20)     Q. Okay. And then the second one, do you
(21) remember receiving a second one?
(22)     A. I don't recall it.
(23)     Q. Okay. All right. "I have spoken to Menzies
(24) Aviation Fueling Director Raul Vargas on three separate
(25) occasions regarding Mr. Andrew Dodge." Do you remember

**Page 46**

(1) that?
(2)     A. No, I do not.
(3)     Q. When I say "Rafael Vasquez," does a face go
(4) into your mind?
(5)     A. Yes, I do remember Rafael who was the steward
(6) that was on leave of absence during the time that I was
(7) over there.
(8)     Q. He was on leave of absence during the time?
(9)     A. Yeah. I don't recall if he was during the
(10) time that this petition was made or not, but I recall
(11) him being on leave of absence for most of the time.
(12)     Q. But do you remember talking to him?
(13)     A. Yes, I do remember talking to him about
(14) operational things.
(15)     Q. Do you remember talking to him about Andrew
(16) Dodge?
(17)     A. I don't recall it.
(18)     Q. Do you remember talking to him three times
(19) about the same topic?
(20)     A. About what?
(21)     Q. I'm sorry?
(22)     A. About what? Three times about what?
(23)     Q. Three times about any topic but it's the same
(24) topic?
(25)     A. I do -- I do remember that.

**Page 47**

(1)     Q. So you remember him going to you on several
(2) occasions talking to you about the same topic?
(3)     A. About topics, about operational things.
(4)     Q. Okay. And what kinds of operational things
(5) would he talk to you about?
(6)     A. Talk about issues on -- on the operation.
(7)     Q. Okay. Like give me an example.
(8)     A. Talk about attendance issues. Talking about
(9) safety issues. We used to have -- we used to have
(10) meetings with the union every two weeks, if I remember
(11) correctly, to talk about operational issues.
(12)     Q. Okay. And that when you say these meetings
(13) with the union every two weeks, that was Mr. Vasquez?
(14)     A. Some of the meetings Mr. Vasquez was in there.
(15)     Q. Was he the one leading the discussion for the
(16) union?
(17)     A. No.
(18)     Q. Did you say "yes" or "no"?
(19)     A. I said no.
(20)     Q. Okay. So for the union somebody else talked,
(21) right, not Mr. Vasquez?
(22)     A. Well, he was talking, too, but the lead of the
(23) union was another person that I don't recall right now.
(24)     Q. In those meetings, do you remember them
(25) talking about Andrew Dodge at all?

**Page 48**

(1)     A. No, no, I don't.
(2)     Q. Okay. And here he says "on three separate
(3) occasions regarding Mr. Andrew Dodge, who continues to
(4) abuse his authority and at times harass Fuelers under
(5) his charge." Did you ever talk to Mr. Vasquez about
(6) that?
(7)     A. I don't recall it.
(8)     Q. Okay. So it could have happened or might not
(9) have happened, what's your memory like?
(10)     A. I can't recall it.
(11)     Q. Okay. All right. So if we just scroll down
(12) more pages, please, second page. Second page of
(13) Exhibit 19. So the second page of Exhibit 19 looks
(14) like the petition that Mr. Vasquez gave to you
(15) according to him. Okay?
(16)     MR. WU: Assumes facts.
(17)     MR. URIARTE: Q. I'll kind of give you a moment
(18) here to read it. Let me know when you finish reading
(19) it.
(20)     A. Looks like kind of the same as the letter they
(21) brought me when they signed the petition. It's the
(22) same as the petition.
(23)     Q. You mean the first one?
(24)     A. I mean -- I don't know if this -- this letter.
(25) Yeah.

**Page 49**

(1)    **Q.** Okay. And then are you done reading it,
(2) Mr. Vargas? I mean -- go ahead.
(3)    **A.** Do you want me to read the entire --
(4)    **Q.** Yes, please.
(5)    **A.** Give me a couple of minutes.
(6)    **Q.** Yeah, yeah, please, take your time. I just
(7) want to make sure that your -- maybe it will refresh
(8) your recollection.
(9)    **A.** Okay. (Witness reviews document.)
(10)    Good.
(11)    **Q.** Very good. Thank you. Does that refresh your
(12) recollection at all with regards to Mr. Vasquez giving
(13) you this piece of paper?
(14)    **A.** I don't -- I don't recall it. I mean, it
(15) looks like the same letter that the -- the fuelers
(16) signed.
(17)    **Q.** Well, if you go down a little bit, if we go to
(18) the next page, you'll see these signatures. This is
(19) the actual petition here. But, again, this is a
(20) different set of signatures. And it has Mr. Vasquez at
(21) the end there. But this is definitely a different set
(22) of signatures from Exhibit 8 which we saw earlier,
(23) which was what we're calling the first petition.
(24)    **A.** Can you move a little bit up?
(25)    **Q.** Sure.

**Page 50**

(1)    **A.** A little bit more.
(2)    **Q.** David? Yeah.
(3)    **A.** Thank you. Okay.
(4)    **Q.** Okay?
(5)    **A.** What is the first name there? Sorry.
(6)    **Q.** Yeah, I wasn't given a better copy. I don't
(7) know. Okay. So do you remember seeing these
(8) signatures at all?
(9)    **A.** I don't recall it.
(10)    **Q.** Not at all, okay. So is it safe then to say
(11) that you're not sure whether you received this second
(12) petition or not from Mr. Vasquez?
(13)    **A.** Yes.
(14)    **Q.** So you could have received it and you may not
(15) have received it. Is that like your best memory?
(16)    **A.** My best memory is that not receiving this
(17) paper.
(18)    **Q.** I'm sorry, your best memory is that you did
(19) not receive this paper?
(20)    **A.** That I don't remember receiving this paper.
(21)    **Q.** All right. So let's agree for a second that
(22) you received this paper in September. Correct? Would
(23) you have done something about it if you had received
(24) this paper in September?
(25)    **MR. WU:** Objection. Improper hypothetical. Lacks

**Page 51**

(1) foundation.
(2)    You can answer.
(3)    **THE WITNESS:** If I get that, I will -- I will want
(4) to look at it and perform an investigation.
(5)    **MR. URIARTE: Q.** But as far as you know, no
(6) investigation happened as a result of Exhibit 19,
(7) correct?
(8)    **MR. WU:** Objection. Lacks foundation.
(9)    **THE WITNESS:** Can I respond?
(10)    **MR. WU:** Yes, you can answer. You can answer
(11) unless I instruct you specifically not to.
(12)    **THE WITNESS:** All right. Can you repeat the
(13) question.
(14)    **MR. URIARTE: Q.** Sure. As far as you know, based
(15) on this petition, this second petition that we called
(16) it, as far as you know, no investigation happened
(17) because of it?
(18)    **A.** As far as I know, no investigation happened
(19) because of it.
(20)    **Q.** Is that correct?
(21)    **A.** That is correct, as far as I know.
(22)    **Q.** Very good. Were you involved in the decision
(23) to suspend Mr. Navarro while the investigation was
(24) going on?
(25)    **A.** I don't recall it.

**Page 52**

(1)    **Q.** And then did HR give you recommendation with
(2) regards to other options available aside from
(3) termination?
(4)    **A.** Well, the recommendation -- the recommendation
(5) from HR was not to terminate him.
(6)    **Q.** And you didn't follow that?
(7)    **A.** No, actually, I asked why those
(8) recommendations, which I think it's normal procedure.
(9)    **Q.** So you're saying you asked the recommendation
(10) from HR, and then what did HR say?
(11)    **A.** That based on the -- on the recommendation and
(12) the conversation they had with the director, they're
(13) recommending not to terminate, but it was just -- I'm
(14) sorry, that it was just a recommendation, I'm sorry.
(15)    **Q.** Okay. So HR's recommendation is not to
(16) terminate, right?
(17)    **A.** Yes.
(18)    **Q.** But you did not follow that, right?
(19)    **A.** No, because I -- I needed to see the final
(20) outcome of the investigation to take the right
(21) decision.
(22)    **Q.** And what did you see in the final outcome that
(23) made you conclude that termination was the right
(24) action?
(25)    **A.** I get the final outcome from safety department

**Page 53**

(1) with the statements, plus the messages from Navarro to
(2) Andrew, plus, well, the letter with the petition, the
(3) call from the union in that there is somebody
(4) instigating the people to sign this petition.
(5)    **Q.** Okay. Weren't there other options available?
(6)    **MR. WU:** Objection. Vague.
(7)    You can answer.
(8)    **THE WITNESS:** There are always different options.
(9)    **MR. URIARTE: Q.** Did you consider those options?
(10)    **A.** I think the harassment for me is -- is very
(11) important. I need to look into the environment for all
(12) the employees and not just one.
(13)    **Q.** Okay.
(14)    **A.** And I think that is important that this person
(15) was supervisor.
(16)    **Q.** So you're saying the harassment is so
(17) important that that was like a very big part of why you
(18) decided to terminate. That's what you're saying?
(19)    **A.** Yes.
(20)    **Q.** So what did you learn -- what if you learned
(21) that harassment was also going on between Andrew Dodge
(22) and the fuelers, would that be enough to terminate
(23) Andrew Dodge?
(24)    **MR. WU:** Objection. Improper hypothetical. Lacks
(25) foundation.

**Page 54**

(1)    You can answer.
(2)    **THE WITNESS:** We investigated everything.
(3) Everything -- we need to investigate everything to look
(4) into how that is affecting the employees.
(5)    **MR. URIARTE: Q.** Right. I know you have to
(6) investigate. I guess my hypothetical is more, if you
(7) learned that harassment was actually going on between
(8) Andrew Dodge and his fuelers, then it would lead to the
(9) conclusion that he should be terminated, too, right?
(10)    **MR. WU:** Same objection.
(11)    **MR. URIARTE: Q.** Is that correct, Mr. Vargas?
(12)    **A.** It is. I protect the team.
(13)    **Q.** I was looking at some of your corporate
(14) documents with regards to handbooks and HR materials
(15) and all that. And there's this thing called
(16) progressive discipline. Were you aware of that?
(17)    **A.** Yes, I am.
(18)    **Q.** Okay. And why is it that you did not use
(19) progressive discipline in this situation?
(20)    **A.** Because there are cases that they're severe,
(21) and then that's one of the outcome of the
(22) investigation.
(23)    **Q.** So it's like serious enough to terminate?
(24)    **A.** Yes.
(25)    **Q.** Is that a yes?

**Page 55**

(1)    **A.** Yes, it is a yes.
(2)    **Q.** Okay. And then did you ask or were you
(3) curious, maybe you should have had a conversation with
(4) Mr. Navarro?
(5)    **A.** I don't participate in the investigations.
(6)    **Q.** Maybe like a phone call to Mr. Navarro to get
(7) his side of the story?
(8)    **A.** No, I do not. I do not participate in any
(9) investigation.
(10)    **Q.** And do you know whether or not they actually
(11) talked to Mr. Navarro and got his side of the story?
(12)    **A.** I just get the final outcome.
(13)    **Q.** You just get the final decision?
(14)    **A.** The final outcome for -- from the
(15) investigation.
(16)    **Q.** My question is different. My question is when
(17) you were looking at all the different elements to
(18) decide whether to terminate or not, did you try to find
(19) out whether somebody talked to Mr. Navarro to get his
(20) side of the story?
(21)    **A.** No, I did not. I did not try to find out.
(22)    **Q.** Would you say that's kind of like basic
(23) investigation right there?
(24)    **MR. WU:** Objection. Lack of foundation. Improper
(25) hypothetical.

**Page 56**

(1)    You can answer if you know.
(2)    **THE WITNESS:** I won't say that is -- it all
(3) depends on the kind of investigation they're running.
(4)    **MR. URIARTE: Q.** They -- what's the last word?
(5)    **A.** They are running.
(6)    **Q.** That they are running. Okay. But you didn't
(7) look into what kind of investigation they were running?
(8)    **A.** I just look into the final outcome of the
(9) investigation.
(10)    **Q.** And you never, like, got into your head and
(11) said, what does Mr. Navarro say about all of this?
(12) That's not something that you ever asked yourself?
(13)    **A.** No, I do not. I do not because I just look
(14) into that final outcome of the investigation. So I
(15) think that that question is for the people who perform
(16) the investigation.
(17)    **Q.** So you said earlier that the goal of
(18) terminating Mr. Navarro was to protect the employees
(19) from the harassment, right? The environment of
(20) harassment, correct?
(21)    **A.** Yes.
(22)    **Q.** How is it different, in achieving that goal,
(23) how is termination different from, let's say, a
(24) suspension?
(25)    **A.** Well, I think that is important, too, if you

Page 57

(1) find out that there is a harassment in the -- in the
(2) crew and in the environment, then the only way for you
(3) to ensure that we remove that harassment from the
(4) environment is to remove the person who is doing the
(5) harassment. In that every case is different, but when
(6) you have three people complaining about it, and at the
(7) same time you have a petition involving another
(8) employee which you're trying to achieve by harassing
(9) people is -- is not good.
(10)    Q. Okay. But the part about that that needs a
(11) little bit of explanation is you have this -- you say
(12) at the same time you have this petition, but what about
(13) the people that actually wrote the petition, right? So
(14) they have a concern, right? So --
(15)    A. Well, we go back to the same -- to the same
(16) conversations we had before, of the petition, when you
(17) have somebody that is pushing somebody to sign a paper
(18) that they don't even know what it's for.
(19)    Q. Right. For those three people, right?
(20)    A. Could be one, two, three, I don't know.
(21)    Q. Now, in your emails, you mentioned July or
(22) Julie Macapagal, it M-a-c-a-p-a-g-a-l. Actually, the
(23) name of an old Filipino president. July Macapagal.
(24) Does that name sound familiar to you?
(25)    A. He's also part of a supervisor crew.

Page 58

(1)    Q. Was an investigation ever conducted?
(2)    A. Well, I investigate. I saw the name of the
(3) person that it was on that list. And I request to open
(4) an investigation about that person.
(5)    Q. Was an investigation opened?
(6)    A. Yeah, but because I needed to know if this
(7) supervisor was also -- was also harassed to sign
(8) this -- this petition.
(9)    Q. Okay. And what was the result of the
(10) investigation?
(11)    A. That he was.
(12)    Q. I'm sorry?
(13)    A. That he was. He was also intimidated to sign
(14) the paper.
(15)    Q. I'm unclear about that. What is that --
(16) that's a person, a guy, right? A male?
(17)    A. Yes.
(18)    Q. He's a guy.
(19)    A. Yes.
(20)    Q. So what was -- what was Mr. Macapagal -- what
(21) did Mr. Macapagal do?
(22)    A. He's a supervisor.
(23)    Q. Yeah, and he signed the petition, correct?
(24)    A. The petition, yes.
(25)    Q. And then what was the result of the

Page 59

(1) investigation on Mr. Macapagal?
(2)    A. That he was forced to sign that paper.
(3)    Q. That he was forced to sign the paper, is that
(4) correct?
(5)    A. Yes.
(6)    Q. You talked to Mr. Macapagal?
(7)    A. No, I did not.
(8)    Q. Okay. So who gave you the results of the
(9) investigation?
(10)    A. Safety department. It was a conversation we
(11) had.
(12)    Q. Over the telephone?
(13)    A. No, person to person.
(14)    Q. Who in the safety department?
(15)    A. Kevin Blumberg.
(16)    MR. URIARTE: Let me get you, before we forget, so
(17) it's Kevin Blumberg, B-l-u-m-b-e-r-g. All right.
(18)    Q. So he told you that Mr. Macapagal told him
(19) that he was forced to sign the petition, is that
(20) correct?
(21)    A. Yes.
(22)    Q. Did you review the termination notice before
(23) it was issued?
(24)    A. No, I did not.
(25)    MR. URIARTE: I just want to make sure we're clear

Page 60

(1) on this. Exhibit 9, please, David. Thank you.
(2)    (Plaintiff's Exhibit 9 marked for
(3)    identification.)
(4)    MR. URIARTE: So if you could just scroll all the
(5) way, David, so Mr. Vargas can see the whole document.
(6) So this will be Exhibit 9. This is "Notice to
(7) Employees as to Change in Relationship" dated August
(8) 29, 2018. I'm good with my word with regard to the
(9) date there, even though Jason did not want to go with
(10) me on it.
(11)    Q. So do you see that, Mr. Vargas?
(12)    A. Yes, I see that.
(13)    Q. Okay. So you didn't see this document before
(14) it was issued?
(15)    A. I don't recall it, but it looks like the first
(16) time that I see this document.
(17)    Q. No problem. And then when it says "Code of
(18) Conduct," does that mean anything to you?
(19)    A. Yeah.
(20)    Q. What does that mean to you?
(21)    A. It means that the person was not conducting
(22) correctly.
(23)    Q. Okay. And specifically what was he not
(24) conducting correctly?
(25)    A. He was forcing people to sign a petition.

**Page 61**

(1)   **Q.** Okay. Anything else that he wasn't doing
(2) correctly?
(3)   **A.** I think that is enough for me.
(4)   **Q.** I'm just trying to complete things, so I'm
(5) sorry I keep saying, "Anything else? Anything else?"
(6) I'm just making sure it's complete.
(7)     So aside from him forcing people to sign the
(8) petition, anything else that might have caused him to
(9) violate code of conduct, or was that it?
(10)   **A.** I think that -- I think that -- well, no,
(11) nothing -- well, but the reason why we terminate --
(12)   **Q.** Yeah.
(13)   **A.** -- because of forcing people to sign a
(14) petition.
(15)   **MR. URIARTE:** Gotcha. Okay.
(16)     And then could we have Exhibit 11, please.
(17)     (Plaintiff's Exhibit 11 marked for
(18)     identification.)
(19)   **MR. URIARTE: Q.** So here's Exhibit 11. This one
(20) was given to us by your lawyers as well. It's Menzies
(21) 95, if you look on the bottom.
(22)   **A.** Can you repeat that.
(23)   **Q.** I'm sorry?
(24)   **A.** Can you repeat it, please.
(25)   **Q.** Sure. So this is Exhibit 11. This is a

**Page 62**

(1) document we received from your lawyers as well. It's
(2) Bates stamped Menzies 095. You see on the bottom of
(3) the document there? Based on this track on the left
(4) side there, it seems like it came from Ms. Aguilera's
(5) computer.
(6)     So then, if we go up on the top part of this
(7) document, this document seems to be an employee
(8) performance development, Renaldo Navarro, August 29.
(9) Do you see that?
(10)   **A.** Yes, I see it.
(11)   **Q.** Okay. Did you see this document before today?
(12)   **A.** No.
(13)   **Q.** You have not? Okay.
(14)   **A.** I don't recall it.
(15)   **Q.** Okay. You don't recall it. Do you recall a
(16) discussion with Tracy, Ms. Aguilera, with regard to
(17) final warning and what could be written in the final
(18) warning, anything like that?
(19)   **A.** I think -- well, there was a conversation
(20) about it in relation to the different options we had
(21) with Mr. Navarro.
(22)   **Q.** Okay. But did you discuss the use of a final
(23) warning for Mr. Navarro? Did you discuss that with
(24) Ms. Aguilera?
(25)   **A.** I don't recall it.

**Page 63**

(1)   **Q.** All right. And here it says this option, I
(2) guess, would have placed Mr. Navarro on final warning
(3) for unprofessional conduct of a supervisor, right? Do
(4) you see that?
(5)   **A.** Yes.
(6)   **Q.** And it says "distributing a petition and
(7) disruption of the workforce." Do you see that?
(8)   **A.** Yes, I do see it.
(9)   **Q.** And then it says, "You are being placed on a
(10) Final Warning which is your last and final opportunity
(11) to" -- we don't know. I'm thinking it's like "change
(12) your behavior," maybe. I don't know. We don't know
(13) that. And then, "Any infraction, no matter how minor
(14) in any of the 4 categories of Attendance, Conduct,
(15) Safety or Work Performance, may result in your
(16) immediate discharge." Do you see that?
(17)   **A.** Yes, I see that.
(18)   **Q.** And then the Final Warning box is marked.
(19)   **A.** Uh-huh. Yes.
(20)   **Q.** Okay. And then if you see a little bit down,
(21) just to make sure, there's no signature because it was
(22) not used, presumably, correct? So my question about
(23) this document is what's wrong with this option,
(24) Mr. Vargas?
(25)   **MR. WU:** Objection. Improper hypothetical. Lacks

**Page 64**

(1) foundation.
(2)   **THE WITNESS:** I think that, based on the
(3) investigation we come up with, this was not the option,
(4) the right option for me at that moment.
(5)   **MR. URIARTE: Q.** Thinking about it now and
(6) knowing a little bit more about the situation?
(7)   **A.** I already had final outcome of the
(8) investigation. Make sure I need to have the right -- I
(9) need to take the right decision.
(10)   **Q.** You still think it's the right decision then,
(11) Mr. Vargas?
(12)   **A.** I do believe that it was the right decision,
(13) and that's why I took it. And you can tell when I
(14) asked Tracy on -- in terms of her recommendation,
(15) because I needed to ensure that we had all information
(16) available to take the right decision moving forward.
(17)   **Q.** Okay. I guess I would have to ask, though,
(18) don't you think that a final warning, one more little
(19) mistake, may have resulted in the same outcome for you
(20) in your goal of eliminating harassment? Because your
(21) goal is to eliminate harassment.
(22)   **A.** Yes.
(23)   **Q.** And a final warning like this --
(24)   **MR. WU:** Improper -- sorry, I didn't know if you
(25) were done with your question. I don't mean to cut off

**Page 65**

(1) your question, Arlo.

(2) MR. URIARTE: It's okay, Jason. Go ahead with

(3) your objection.

(4) MR. WU: The objection is improper hypothetical

(5) and lack of foundation.

(6) MR. URIARTE: Q. Mr. Vargas?

(7) A. I'm sorry, but I don't know. That's the

(8) reason why I'm thinking about risk, I need to ensure

(9) that we can reduce the risk as much as we can. So

(10) since I don't know what's going to happen with a

(11) warning, the way for me to reduce the risk is

(12) terminating the person.

(13) Q. Go ahead.

(14) A. With enough documentation to support that

(15) decision.

(16) Q. Right. And for you the documentation is the

(17) conclusion of the security people, right? And then the

(18) statement of the three people that you're talking

(19) about.

(20) A. Do you want me to go through it?

(21) Q. No, no, we've gone through it. Don't worry

(22) about it. But that's your position, you felt like you

(23) had enough documentation to do a termination?

(24) A. Yes.

(25) Q. And you're avoiding the risk. Now, the risk

**Page 66**

(1) that you're talking about is the risk that Mr. Navarro

(2) will continue to harass, correct?

(3) A. Yes.

(4) MR. URIARTE: So let's go to Exhibit 12, please.

(5) (Plaintiff's Exhibit 12 marked for

(6) identification.)

(7) MR. URIARTE: Q. Okay. Have you seen Exhibit 12

(8) before, Mr. Vargas?

(9) A. Yes, I did.

(10) Q. Did you review it for today's deposition?

(11) A. Yes.

(12) Q. I have a couple of questions. If we go to

(13) page 2 -- all right. So, actually, I guess we need to

(14) go to page 3. We are on the day before, August 28, at

(15) 4:27 p.m. It looks like Tracy sends you an email that

(16) says, "After reviewing the case with my HR Director."

(17) And do you know who that HR director is?

(18) A. Talin. It's the person who's listening to us

(19) or participating today.

(20) Q. So "After reviewing the case with my HR

(21) Director, our recommendation is not to terminate the

(22) employee at this time." Do you see that?

(23) A. Yes, I see that.

(24) Q. Okay. And at this point you're two months

(25) into your job. Two months into being in the San

**Page 67**

(1) Francisco Menzies fueling operation, is that correct?

(2) June, July -- oh, maybe three months.

(3) A. Maybe three months, yes.

(4) Q. Maybe three months, is that correct?

(5) A. Yes.

(6) Q. And then you know that Tracy and Talin have

(7) both been in the company a longer time than you at this

(8) point in time, correct?

(9) A. Yes.

(10) Q. You knew that?

(11) A. Yes, I did.

(12) Q. Okay. So then we go up a little bit. I guess

(13) your response to this is on page 2, actually. The

(14) bottom of page 2. And then you -- in the bottom,

(15) please, one more. No, a little bit more, David.

(16) Bottom of this page. Yeah, keep going.

(17) MR. WU: David, it looks like you're on page 3,

(18) not page 2.

(19) MR. URIARTE: Oh, that's why, yeah. Bottom of

(20) page 2. There you go.

(21) Q. So I guess your response to that was to say,

(22) "Hello Tracy, Could you please explain this

(23) recommendation." Is that correct?

(24) A. That is correct.

(25) Q. And then, so we go up, and we have here a --

**Page 68**

(1) what do you call this -- the statement with regard to

(2) Kevin Blumberg, the safety and security manager, do you

(3) see that?

(4) A. Yes.

(5) Q. And this is the security conclusion that you

(6) spoke of, correct?

(7) A. Yes.

(8) Q. And then if we go up a little bit more, and I

(9) believe on page 1, Tracy kind of tells you, look at the

(10) statement below, look at the attachments, and the

(11) petition. I mean, you say to Tracy, right? Do you see

(12) that?

(13) A. This is my final --

(14) Q. I think we need to go down a little bit.

(15) Before that, Tracy actually responds to your email with

(16) regards to getting an explanation to their

(17) recommendation, right?

(18) A. Yes.

(19) Q. Okay. And she kind of lists all her reasons

(20) why she makes that recommendation after talking to

(21) Talin. Do you see that?

(22) A. I don't.

(23) Q. I'm sorry?

(24) A. I don't see that.

(25) Q. Well, where she says, "Please see my

Page 69

(1) documented findings below that I originally sent."

(2) A. Right.

(3) Q. I guess below might be -- yeah, do you see

(4) that? "And Kevin statement," the security person. "I

(5) have also attached the statements from the Employees

(6) and the petition." Do you see that?

(7) Stop, David, go down a little bit. We're on

(8) the right place.

(9) Do you see that?

(10) A. Yes.

(11) Q. And then she goes, "I can only make a

(12) recommendation. The final decision is yours."

(13) A. Yes. Go ahead.

(14) Q. No, go ahead.

(15) A. She's not telling me anything. She's just

(16) telling me that the recommendation, this is my

(17) recommendation, but she's not, as HR, thinking about

(18) all the statements and documentation she got.

(19) Q. Correct. Would you agree that what she said

(20) to you is she's giving you the bases of why she

(21) recommends that, right?

(22) A. She's just giving me -- she's just giving me

(23) the recommendation.

(24) Q. Okay. And then she's telling you, "I cannot

(25) have the meeting with Rey at 4:30 today without a

Page 70

(1) decision." Do you see that?

(2) A. Yes.

(3) Q. Okay. Does that line kind of refresh your

(4) recollection about anything?

(5) A. Yes.

(6) Q. Okay. What does it refresh your recollection

(7) about?

(8) A. I'm sorry, but what -- I'm not -- can you

(9) repeat that question.

(10) Q. Yes. So "I cannot have the meeting with Rey

(11) at 4:30 today without a decision."

(12) When I read that, if I was reading that, I'm

(13) like, oh, man, somebody's like rushing me, something

(14) like that. So I'm thinking that maybe in your head it

(15) refreshes your recollection with regard to how it was

(16) for you, right? Because somebody has to make a final

(17) decision, right?

(18) What was happening at that point?

(19) A. Well, but it's important to also mention that

(20) that 4:30 doesn't mean we need to have that -- that

(21) decision before that. We can move the meeting with Rey

(22) Navarro easily later on to ensure that we take the

(23) right decisions on that. That's pretty much normal

(24) process we have, if we don't have the decision, we need

(25) to investigate more.

Page 71

(1) Q. Okay. So at this point did you think that you

(2) needed to investigate more?

(3) A. Yes, definitely, because she was not answering

(4) my question on that -- at that point.

(5) Q. Okay. Very good. All right. And then if we

(6) go up a little bit. So here is your response, I guess,

(7) August 29 at 5:01 p.m. And you kind of made the

(8) decision to terminate Mr. Navarro, correct?

(9) A. Yes.

(10) Q. So in the hour between 4:04 p.m. and 5:01

(11) p.m., what additional investigation occurred?

(12) A. Well, we had a -- we had a conversation with

(13) HR also, and I reviewed all the documentation in terms

(14) of what the outcome of the investigation was. And at

(15) that point I took the decision to terminate Mr.

(16) Navarro.

(17) Q. Okay. Anything else that you did in that

(18) hour?

(19) A. Well, we talked -- as I say, we talked with

(20) HR, talked about the case. We collected all the

(21) documentation, put all the documentation together. And

(22) then we took the right -- the last decision, and that's

(23) why I send that email to HR.

(24) Q. At this point you were not provided a document

(25) with regard to the final warning, right? You didn't

Page 72

(1) review that at this point?

(2) A. No, I did not. That's HR. And I think that

(3) is also important to remember -- it's important to

(4) remark that HR take decisions -- decisions in terms

(5) of --

(6) Q. In terms of?

(7) A. The person.

(8) Q. HR made decisions in terms of the person, you

(9) said?

(10) A. Of the person, exactly.

(11) Q. And what do you mean by that?

(12) A. Because they look into everything that you're

(13) saying, or they take a look to the seniority of the

(14) person, that this person is being 15 years at the

(15) company, so they look on the -- on the recommendation

(16) of the document, warnings and all that, and then, based

(17) on that, they gave a recommendation.

(18) Now, we, as directors, we look into the more

(19) open situation of -- in terms of the whole operation,

(20) how this will affect the rest of the employees. And

(21) during that -- during that meeting, of course, we

(22) agreed on -- on a final termination for Mr. Navarro.

(23) Q. And when you say "agreed," who actually agreed

(24) with you?

(25) A. HR.

**Page 73**

(1)    **Q.** Meaning Talin and Tracy?

(2)    **A.** Yes. So then Tracy agreed because she had a

(3)  conversation with Talin, so we all agreed on -- on this

(4)  termination.

(5)    **MR. URIARTE:** Okay. Why don't we take a

(6)  five-minute break and then we'll be right back. Thank

(7)  you.

(8)    **MR. WU:** All right.

(9)    (Brief recess.)

(10)    **MR. URIARTE:** Okay, Mr. Vargas, it looks like I

(11)  have no further questions for you today.

(12)    **THE WITNESS:** Okay.

(13)    **MR. WU:** And I have just a few questions for you,

(14)  Raul.

(15)    EXAMINATION BY MR. WU

(16)    **MR. WU: Q.** So, Raul, during the time you were

(17)  the director of operations at SFO, aside from the

(18)  petition, did you hear of any complaints that Andrew

(19)  Dodge was harassing employees?

(20)    **A.** No, I did not.

(21)    **Q.** During the time you were the director of

(22)  operations at SFO, aside from the petition, did you

(23)  hear of any complaints that Andrew Dodge wasn't giving

(24)  fuelers breaks?

(25)    **A.** No, I did not.

**Page 74**

(1)    **Q.** During the time you were the director of

(2)  operations at SFO, aside from the petition that we've

(3)  already been discussing, did you hear any complaints

(4)  that Andrew Dodge wasn't running the operations

(5)  smoothly?

(6)    **A.** I did not.

(7)    **Q.** During the time you were director of

(8)  operations at SFO, aside from the petition, have you

(9)  heard any complaints about Andrew's job performance?

(10)    **A.** No, I did not.

(11)    **Q.** During the time you were the director of

(12)  operations at SFO, did you ever hear of any grievance

(13)  filed by the union against Andrew Dodge?

(14)    **A.** There is nothing on Andrew Dodge.

(15)    **MR. WU:** Okay. I think that's all the questions I

(16)  have on my end, Arlo, unless you have any further

(17)  questions.

(18)    **MR. URIARTE:** Yeah, let me just follow up with

(19)  what you just said.

(20)    FURTHER EXAMINATION BY MR. URIARTE

(21)    **MR. URIARTE: Q.** Mr. Vargas, you said there was

(22)  nothing on Andrew Dodge, right? One, two, three, four,

(23)  five items there. You never heard anybody complaining

(24)  about harassing him, you never heard that he was not

(25)  giving breaks, you never heard that he was not running

**Page 75**

(1)  operations smoothly, you never heard complaints about

(2)  his job performance, you never heard of grievances

(3)  against Andrew Dodge, right?

(4)    **A.** I don't recall having any -- any of those

(5)  conversations to nobody.

(6)    **Q.** Okay. So now you don't recall those kinds of

(7)  conversations, that's correct, right?

(8)    **A.** Yes.

(9)    **Q.** Okay. But did you ever ask Renil about it,

(10)  about these items?

(11)    **A.** We talked with Renil about those -- the items

(12)  when -- when -- no, I don't recall, I'm sorry. No.

(13)    **Q.** Okay. So you don't recall whether you talked

(14)  to Renil or not, is that correct?

(15)    **A.** No, not about that -- not about that specific

(16)  topic.

(17)    **Q.** Okay. So let me just clarify this because

(18)  it's a little bit unclear. You do not recall or the

(19)  way you remember it is that you did not talk to Renil

(20)  about it?

(21)    **A.** In relation to Renil, I do not recall talking

(22)  to Renil about Andrew's performance.

(23)    **Q.** You do not recall talking to Renil about all

(24)  these different items, correct?

(25)    **A.** Correct.

**Page 76**

(1)    **Q.** And when you say you do not recall, does that

(2)  mean it could have happened or does that mean you

(3)  didn't do it?

(4)    **A.** It means that I don't have anything documented

(5)  that's important, and I don't recall having a

(6)  conversation.

(7)    **Q.** Okay. What about with Tracy or with HR? Do

(8)  you recall talking to them about all these different

(9)  items?

(10)    **A.** We had a conversation, as I said, in terms of

(11)  the investigation and in terms of what the letter --

(12)  letter said about Andrew, as I explained it before, and

(13)  nothing else on that.

(14)    **MR. URIARTE:** Okay. All right. Thank you.

(15)    **THE WITNESS:** Thank you.

(16)    **MR. URIARTE:** Thank you, Mr. Vargas.

(17)    **MR. WU:** Thank you very much for your time, Raul.

(18)  We appreciate it.

(19)    **THE WITNESS:** Thank you very much.

(20)    **MR. URIARTE:** We'll stop the record.

(21)    (Whereupon, the concluded at 11:15

(22)  o'clock a.m.)

(23)    ---o0o---

(24)

(25)

**Page 77**

```
(1)              CERTIFICATE OF WITNESS

(2)                   ---o0o---

(3)

(4)        I, RAUL VARGAS, hereby declare under

(5)  penalty of perjury that I have read the foregoing

(6)  deposition testimony; and that the same is a true

(7)  and correct transcription of my said testimony

(8)  except as corrected pursuant to my rights under

(9)  Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)        _____

                         Signature

(13)

(14)        _____

                           Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```

**Page 78**

```
(1)  STATE OF CALIFORNIA      )
                              )
(2)  COUNTY OF SAN FRANCISCO )

(3)        I, CINDY TUGAW, a Certified Shorthand Reporter

(4)  of the State of California, duly authorized to

(5)  administer oaths pursuant to Section 8211 of the

(6)  California Code of Civil Procedure, do hereby certify

(7)  that

(8)                RAUL VARGAS,

(9)  the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)       I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)       Dated the 10th day of September, 2020.

(22)

(23)

(24)

                    CINDY TUGAW

(25)                CSR No. 4805 (California)
```

**Page 79**

```
(1)  Raul Vargas
     c/o Foley & Lardner
(2)  555 California Street, Suite 1700
     San Francisco, CA 94104
(3)  Attn:  Jason Y. Wu, Esq.
(4)  Date:  September 10, 2020
     Re:  Navarro vs. Menzies
(5)  Deposition Date:  Tuesday, August 25, 2020

(6)  Dear Mr. Vargas,
(7)        Please be advised the original transcript of
     your deposition is ready for your review.
(8)        Pursuant to FRCP Rule 30(e), you have 30 days
     following the date of this notice to read, correct if
(9)  necessary, and sign your transcript unless the
     attending parties and the deponent agree on the record
(10) or otherwise in writing to a longer or shorter time
     period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
     approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
     You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
     the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
     the applicable law.
(15)       You may either come to our office to read and
     sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
     present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
     make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
     transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
     these instructions, please call.
(20)
     Sincerely,
(21)

(22)
     NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
     San Francisco, California 94103
(24) (415) 398-1889
(25) cc:  All counsel, original deposition
```

# EXHIBIT 51

---

**DEPOSITION OF ANDREW DODGE - 07/28/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

---

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA  94103**
**Phone:  (415) 398-1889**
**FAX:  (415) 398-0611**

**NRS**
NOGARA REPORTING SERVICE

**Page 1**

(1)             IN THE UNITED STATES DISTRICT COURT

(2)      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

(3)

(4)

(5) RENALDO NAVARRO,

(6)            Plaintiff,

(7) v.                          No.  3:19-CV-8157

(8) MENZIES AVIATION, INC.,

    doing business as MENZIES

(9) and DOES 1 through 10,

    inclusive,

(10)

             Defendants.

(11) _____/

(12) Zoom Remote Deposition of

(13)    ANDREW DODGE

(14)  Tuesday, July 28, 2020

(15)

(16)

(17)

(18)

(19)

(20) REPORTED BY:  CINDY TUGAW, CSR #4805

(21)

(22)

(23)         NOGARA REPORTING SERVICE

        5 Third Street, Suite 415

        San Francisco, California 94103

(24)          (415) 398-1889

(25)

**Page 2**

(1)              I N D E X

(2)                          Page Number

(3) EXAMINATION BY MR. URIARTE             4

(4)             ---o0o---

(5)           E X H I B I T S

(6) Plaintiff's

(7) Exhibit 3    Copy of two photographs    26

(8) Exhibit 5    Statement by Andrew Dodge  42

             dated 8-16-18

(9)

     Exhibit 8    Petition from Menzies     33

(10)              fuelers to Menzies

              Management

(11)

     Exhibit 10   Statement by Rafael       40

(12)              Vasquez dated 11/18/18

(13)             ---o0o---

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 3**

(1)        BE IT REMEMBERED that, pursuant to Notice of

(2) Taking Deposition and on Tuesday, the 28th day of July,

(3) 2020, commencing at the hour of 9:00 o'clock a.m.

(4) thereof, via Zoom videoconference, before me, CINDY

(5) TUGAW, a Certified Shorthand Reporter in the State of

(6) California, personally appeared,

(7)              ANDREW DODGE,

(8) Called as a witness by the Plaintiff, having been by me

(9) first duly sworn, was examined and testified as

(10) hereinafter set forth.

(11)            ---o0o---

(12)        APPEARANCES OF COUNSEL

(13) For the Plaintiff

     LIBERATION LAW GROUP, P.C.

(14) 2760 Mission Street

     San Francisco, California 94110

(15) BY:  ARLO GARCIA URIARTE, Attorney at Law

     (415) 695-1000

(16)

(17) For the Defendants

     FOLEY & LARDNER, LLP

(18) 555 California Street, Suite 1700

     San Francisco, California 94104

(19) BY:   JASON Y. WU, Attorney at Law

     (415) 984-9848

(20)

     Also Present:  David Ho, Zoom Host.

(21)

             ---o0o---

(22)

(23)

(24)

(25)

**Page 4**

(1)    **ZOOM HOST:**  Good morning.  I am David Ho and I

(2) will be the Zoom host.  I am going to be -- as soon as

(3) the deposition gets going, I'll be off screen and I'll

(4) mute myself.  The only time you will hear my voice if

(5) there are any exhibits that you need to bring up.  And

(6) so, Cindy, take it away.

(7)    **THE REPORTER:**  At this time, I will ask counsel to

(8) stipulate on the record that there is no objection to

(9) this deposition officer administering a binding oath to

(10) the witness via Zoom, starting with the noticing

(11) attorney.

(12)    **MR. URIARTE:**  No objection.

(13)    **MR. WU:**  No objections for defendant Menzies

(14) Aviation.

(15)    (Whereupon, the Witness was duly sworn by the

(16)    Reporter.)

(17)     EXAMINATION BY MR. URIARTE

(18)    **MR. URIARTE:  Q.**  Good morning, Mr. Dodge.  My

(19) name is Arlo Uriarte.  I am attorney for Renaldo

(20) Navarro in this matter of Mr. Navarro against Menzies.

(21)    Are you aware of that?

(22)    **A.**  Yes.

(23)    **Q.**  Okay.  Would you please state and then spell

(24) your full name for the record, please.

(25)    **A.**  Yeah.  Andrew Dodge, A-n-d-r-e-w, and then

**Page 5**

(1) D-o-d-g-e.

(2) **Q.** Okay. And, Mr. Dodge, what's your current

(3) position with Menzies?

(4) **A.** I am a supervisor here at Menzies.

(5) **Q.** Have you had your deposition taken before?

(6) **A.** Yes.

(7) **Q.** And in what context?

(8) **A.** Can you, like, rephrase the question?

(9) **Q.** Yeah. Why was your deposition -- why did you

(10) provide a deposition?

(11) **A.** I had an incident on the -- on the airport.

(12) **Q.** Okay. So it was your case or was it somebody

(13) else's case?

(14) **A.** It was somebody else's versus Menzies.

(15) **Q.** Gotcha. And do you remember the name of that

(16) person?

(17) **A.** The first name. It was a police officer named

(18) Robert.

(19) **Q.** Okay. So it was a police officer who filed a

(20) lawsuit against Menzies, and you were a witness?

(21) **MR. WU:** I'm just going to object, relevance, to

(22) this line of questioning.

(23) But you can answer.

(24) **THE WITNESS:** It was something against Menzies

(25) Aviation because I was a part of it.

**Page 6**

(1) **MR. URIARTE: Q.** Okay. Was it a personal injury

(2) action? Was it -- can you give me -- do you know?

(3) **A.** It was just a -- it was a dispute of him

(4) saying that I hit him from the butt -- hit him from --

(5) his vehicle from behind.

(6) **Q.** Gotcha. And when did you provide your

(7) deposition? What year?

(8) **A.** Actually, it was 2020. I think it was January

(9) or February of 2020.

(10) **Q.** Okay. And you were driving a Menzies vehicle?

(11) **A.** Yes. I was driving a Menzies fueling

(12) equipment, yes. A Menzies fueling truck.

(13) **Q.** So I'll give you some instructions for today.

(14) Most important I think is the fact that we do have a

(15) court reporter here, Cindy, who's taking down

(16) everything that we are saying, that you will be saying,

(17) that your counsel will be saying.

(18) At the end, although we are in an informal

(19) setting and we're doing this through Zoom, your

(20) testimony, the words that you provide, the answers that

(21) you provide here today, will have the same force and

(22) effect as if you were testifying in court.

(23) Do you understand that?

(24) **A.** Yup.

(25) **Q.** You have to say yes or no as opposed to, like,

**Page 7**

(1) yup or --

(2) **A.** Yes, I understand.

(3) **Q.** Okay. Instead of nodding your head or --

(4) **A.** Yeah, I gotcha. I gotcha.

(5) **Q.** And then it's very important that you

(6) understand the question before you answer. A booklet

(7) will come out of this deposition. You'll be able to

(8) review it. But if you make any changes, attorneys like

(9) myself or another attorney or the court might question

(10) you or might question your credibility because you

(11) changed your answer. Okay?

(12) Do you understand that?

(13) **A.** Yes.

(14) **Q.** Are you able to provide your best testimony

(15) here today?

(16) **A.** Yes.

(17) **Q.** There's nothing precluding you from being able

(18) to articulate or remember things from the past?

(19) **A.** I mean, it's been a while. It's been a while

(20) since -- since I've seen Ray or seen -- had an incident

(21) with Ray, so --

(22) **Q.** Aside from the passage of time, are you under

(23) some sort of medication or substance that can affect

(24) your ability to remember?

(25) **A.** No, no substance, no.

**Page 8**

(1) **Q.** All right. Yeah, so we will -- of course, all

(2) we are entitled to here, Mr. Dodge, is your best memory

(3) and your best recollection. So if you have to qualify

(4) your memory, that's totally fine. If you don't

(5) remember, that's totally fine. I will test your

(6) memory, but we don't want you to guess. Your attorney

(7) doesn't want you guess. I don't want you to guess.

(8) Nobody wants you to guess. Okay?

(9) **A.** Okay.

(10) **Q.** I will ask for a range or an estimate, and

(11) that's very different from a guess. But let's go --

(12) when we're in those questions, let's test our memory

(13) and let's see how good your memory is with regards to

(14) those. Okay? But you can qualify. Okay?

(15) Do you understand that?

(16) **A.** Yes, I understand.

(17) **Q.** If there's any kind of technical issues that

(18) occur, if you don't hear or you're not understanding

(19) the questions, let us know. Okay? We'll work through

(20) that.

(21) **A.** Okay.

(22) **Q.** It looks like -- are you using your phone?

(23) **A.** Yeah, my cell phone. I don't have my laptop

(24) with me. Sorry.

(25) **Q.** That's fine. Are you in the office right now?

**Page 9**

(1)  **A.** Yeah. I'm just -- I'm in one of the offices,
(2)  but I'm just going to close the door.
(3)  **Q.** Okay.
(4)  **A.** Sorry. Okay.
(5)  **Q.** Are you working right now? Are you on your
(6)  shift or something?
(7)  **A.** No, no. No, I'm not working right now, no.
(8)  **Q.** All right. You got notice of this deposition
(9)  some time ago, some weeks ago, is that correct?
(10) **A.** Yes, I -- yeah.
(11) **Q.** And in preparation for today's deposition, did
(12) you talk to anybody? Aside from your attorneys, did
(13) you talk to anybody?
(14) **A.** No.
(15) **Q.** Did you review any documents to prepare for
(16) today?
(17) **A.** With my attorney-client.
(18) **Q.** So you reviewed some documents with your
(19) attorney. Do you remember what documents you reviewed
(20) to prepare for today's deposition?
(21) **A.** Just some of the -- how do you say? What do
(22) you call the document numbers that shows you, like,
(23) different things? I don't know what you guys call
(24) them.
(25) **Q.** Are you talking about the complaint?

**Page 10**

(1)  **A.** No. I can't think of the name. Just marked
(2)  with numbers, like -- I can't think of the name.
(3)  **Q.** If it comes back to you, let me know. Are
(4)  they like -- are they documents that you prepared in
(5)  the past?
(6)  **A.** Documents I prepared?
(7)  **Q.** Yes.
(8)  **A.** It was like -- one was something that I wrote
(9)  in the past.
(10) **Q.** Right. There's one letter that you wrote to
(11) management about Ray, is that correct? That one the
(12) you --
(13) **A.** Yeah.
(14) **Q.** Did you review the petition written against
(15) you at all?
(16) **A.** I don't recall the petition, no.
(17) **Q.** All right. Well, if you remember -- if you
(18) remember what that -- are you talking about a
(19) legal-looking document? Is that what you reviewed?
(20) **A.** I don't recall.
(21) **Q.** Okay. All right. So --
(22) **MR. WU:** Arlo?
(23) **MR. URIARTE:** Yes.
(24) **MR. WU:** I'm sorry for the interruption. Could we
(25) go off the record and could I have a breakout room with

**Page 11**

(1)  Mr. Dodge for just a minute?
(2)  **MR. URIARTE:** Sure. David? Are you there?
(3)  **VIDEO OPERATOR:** Yes. Mr. Wu, we do not have a
(4)  breakout room for this particular -- if we can off go
(5)  of the record and have him call you, and then he can
(6)  reconnect.
(7)  **MR. URIARTE:** Or I can leave, if you want, or you
(8)  guys can talk on the phone. I think you should
(9)  probably mute and then talk on the phone or something.
(10) **MR. WU:** You know, honestly -- are we off the
(11) record?
(12) **MR. URIARTE:** Yes, let's go off the record, Cindy.
(13)       (Brief recess.)
(14) **MR. URIARTE:** Let's get back on the record. We
(15) are back on the record.
(16) **Q.** So, Mr. Dodge, off the record we kind of had a
(17) discussion to try to refresh your recollection in
(18) regards to preparing for today's deposition. So can
(19) you just state for the record the people that you spoke
(20) with as well in preparation for today's deposition.
(21) **A.** Yeah. John Qually, Randy Davies, and also
(22) Tracy Aguilera as well.
(23) **Q.** And how long was that conversation for?
(24) **A.** Like a couple hours.
(25) **Q.** More like two hours or more like five hours?

**Page 12**

(1)  **A.** No, more like two hours.
(2)  **Q.** Okay. Sounds good. All right.
(3)      Can you tell me the highest level of education
(4)  that you achieved.
(5)  **A.** I have some college.
(6)  **Q.** Did you graduate from college?
(7)  **A.** No, I did not.
(8)  **Q.** And when you say college, what college did you
(9)  go to?
(10) **A.** I attended DeAnza Community College.
(11) **Q.** Did you get an AA?
(12) **A.** No. I was going for my AA.
(13) **Q.** And when was the last time you actually
(14) participated in a class at DeAnza? Like what year?
(15) **A.** I want to say like 2015, 2016.
(16) **Q.** And what were you trying -- what AA were you
(17) trying to graduate?
(18) **A.** Criminal justice.
(19) **Q.** And when did you start with Menzies? What
(20) year?
(21) **A.** February of 2016.
(22) **Q.** So February of 2016, is that with Menzies
(23) already?
(24) **A.** That was when we were ASIG.
(25) **Q.** So that's still ASIG.

**Page 13**

(1)     A. Yeah.

(2)     Q. And then shortly thereafter -- shortly

(3) thereafter, Menzies came in, is that correct?

(4)     A. Yeah, Menzies came in, like, 2018, or

(5) something like that, or in 2000 -- or like in the

(6) middle of 2018, I want to say.

(7)     Q. All right. What was the position you had when

(8) you started with ASIG?

(9)     A. When I first started at ASIG, I was a fueler.

(10)    Q. How long were you a fueler for before becoming

(11) a supervisor?

(12)    A. I want to say about a year.

(13)    Q. And who approved your promotion to supervisor

(14) from a fueler?

(15)    A. Renil Lal, the general manager at the time.

(16)    Q. The termination of Mr. Navarro is about August

(17) of 2018. Do you remember that?

(18)    A. Yeah, I remember him not being there anymore.

(19)    Q. And in August of 2018, you were a supervisor,

(20) correct?

(21)    A. Yes.

(22)    Q. And your shift was -- can you tell me, what

(23) was your shift?

(24)    A. During the time -- like, your question is,

(25) like -- like, now or in the past?

**Page 14**

(1)     Q. In August of 2018.

(2)     A. I was -- I was doing swing shift and -- which

(3) would start -- swing shift. It would probably start

(4) around, what, 2:00 or 3:00 in the afternoon until about

(5) 11:00 p.m. at night. And then I would also cover

(6) graveyard at the time, which started around 11:00 p.m.

(7) to about 7:00 a.m., if someone called off work. I also

(8) covered people's call sicks as well.

(9)     Q. Gotcha. Okay. So if you had your regular

(10) shift, which was the swing shift, of 2:00 to 3:00 until

(11) 11:00 p.m., you sometimes overlapped with the beginning

(12) of Renaldo Navarro's shift, is that correct, graveyard?

(13)    A. So I would see -- I would see Ray and give him

(14) an update on the shift on what's going on and what

(15) needs to be done, who's here, who called out. And

(16) sometimes you go a little past that because operation

(17) can be a little bit busy, but we never overlapped by no

(18) more than 30 minutes or 20 minutes.

(19)    Q. So it would be kind of like a handoff?

(20)    A. Yeah. It's always a handoff to the next

(21) supervisor. You give them the cell phone and just talk

(22) about what happened on the operation, and stuff that

(23) needs to be done, or flights that come in, or flights

(24) that were delayed, or anything about what's going on

(25) with the fuelers, or anything about the equipment, you

**Page 15**

(1) know, stuff like that.

(2)     Q. Gotcha. And then, aside from yourself, so you

(3) have Andrew Dodge, you have Renaldo Navarro, a

(4) supervisor. Who else were supervisors at that time, in

(5) August of 2018?

(6)     A. Just a quick question. When you mean

(7) supervisors, are you talking about supervisors as,

(8) like, in general all the supervisors, or are you

(9) talking about supervisors that I just worked with on my

(10) side of the airport?

(11)    Q. No, I'm talking about the same level as you,

(12) so, like, fueling --

(13)    A. So on my operation on my side of the airport,

(14) it was he, Ray Navarro, July -- I can't pronounce his

(15) last name. July, Edsel and Tevita.

(16)    Q. What was the last one? I'm sorry.

(17)    A. Tevita.

(18)    Q. How do you spell that?

(19)    A. T-e-v-i-t-a.

(20)    Q. Okay. And when you say your side, is that the

(21) 103? Is what you guys called it?

(22)    A. The one at the time, yes, it was is 130 side.

(23) The 1-3-0 side.

(24)    Q. I mean 130.

(25)    A. Yes.

**Page 16**

(1)     Q. How many sides were there?

(2)     A. We had the 130 side, the 135 side, and we had

(3) another side -- like about three -- three or four

(4) sides.

(5)     Q. Gotcha. And then above the supervisors were

(6) duty managers, correct?

(7)     A. Yes.

(8)     Q. And at that time, in August of 2018, who do

(9) you remember the duty managers to be?

(10)    A. At the time, the duty managers were John

(11) Qually and Nico.

(12)    Q. That was working the 130 side?

(13)    A. Working -- duty managers were actually just

(14) the whole operation.

(15)    Q. So you remember John Qually. You remember

(16) Nico. Right?

(17)    A. Yes.

(18)    Q. Just a second. And then Renil was the general

(19) manager, correct?

(20)    A. Yes.

(21)    Q. And then Randy Davies was the vice president,

(22) but he's in Texas, is that correct?

(23)    A. Yeah, he was -- he was gone the beginning of

(24) 2018, though, so --

(25)    Q. I see. All right. Very good.

**Page 17**

(1) Why don't you give me -- have your duties --
(2) have your duties as a supervisor changed from August
(3) 2018 to today?
(4) A. Well, up until the Corona virus in March it
(5) was the same, but now I just got back from furlough, so
(6) I'm kind of just doing training as of right now, going
(7) back.
(8) Q. Gotcha. Yeah, I mean, I think everybody is
(9) hoping that things kind of go back to normal hopefully
(10) soon, but it doesn't look that way.
(11) Okay. So let's just talk about your duties.
(12) And I really want to focus on your duties and
(13) responsibilities with regards to August of 2018 as a
(14) supervisor.
(15) A. Yeah.
(16) Q. Can you tell me what you remember to be your
(17) duties and responsibilities.
(18) A. So as a supervisor at the time -- at the time
(19) was to -- when you first come in, was to get the other
(20) supervisor's information: Get the cell phone, find out
(21) who's on the operation, who called out sick. After
(22) that it was to schedule the flights.
(23) So I would set up -- find out what flight are
(24) coming in during my shift, what time the plane was
(25) coming in, what time the plane was leaving, and from

**Page 18**

(1) there put fuelers on a schedule for, hey, you're going
(2) to go from this flight to this flight.
(3) And also, after that, it was to drive on the
(4) airport and just monitor the fuelers, if they needed
(5) help with something, or also monitor their safety. So
(6) making sure they're wearing their uniform. Making sure
(7) they're wearing their vest, earplugs, had their boots
(8) on. Make sure -- just come and check on them and make
(9) sure their equipment is running properly.
(10) And also, if they call me, I would go assist
(11) them, or, you know -- and also just change things
(12) throughout the operation. Maybe the guy might call me
(13) and be, hey, my flight never showed up, and then I
(14) might just change their flights around.
(15) Q. Right. Were you also in charge of providing
(16) breaks for people, like when they can go on --
(17) A. Oh, yes, of course. So you would -- when you
(18) schedule flights, you would -- before their fifth hour,
(19) California law, you try to find a break period for 30
(20) minutes. There were days that sometimes the way the
(21) flights came in, you know, the guys would be fueling
(22) and would go over that because they're still on the
(23) aircraft. You can't just leave the aircraft. They
(24) would have to take their break after they were done
(25) fueling the aircraft.

**Page 19**

(1) Q. Right. So the fuelers under your supervision,
(2) they depended on you for when they can take their
(3) breaks?
(4) A. Yes. They would take -- some of the guys
(5) were, Hey, I need to take a break, or asking ahead of
(6) time, Hey, what time am I taking my break? So
(7) everything would be coordinated depending on what's
(8) going on on the operation at the time.
(9) Q. And then, like you said, there are times where
(10) the fuelers would depend on you to help out with a
(11) particular situation. So you become kind of like an
(12) extra hand as well?
(13) A. Say that again. Like, what do you mean?
(14) Sorry.
(15) Q. Like if they're busy or they're shorthanded,
(16) you could come in also to help them?
(17) A. Yeah, if there was something going on in the
(18) operation, I would report to my duty manager, know
(19) what's going on, let him know, Hey, we're short. Can I
(20) get some assistance from your side? And if we didn't
(21) have the manpower, I would help on a flight and hook up
(22) and help, you know.
(23) Q. Exactly. Okay. And then, during the swing
(24) shift, how many fuelers did you normally supervise?
(25) A. On a busy day, on a really busy day, I have

**Page 20**

(1) between maybe eight to ten guys on a really busy day,
(2) with full staff.
(3) Q. Gotcha. And then if it's slow or not too
(4) busy --
(5) A. There's some nonbusy days. Probably --
(6) MR. WU: Andrew, make sure you hear Arlo's entire
(7) question before you start.
(8) THE WITNESS: Sorry.
(9) MR. URIARTE: Q. Yeah, because, Andrew, sometimes
(10) it gets hard for the court reporter, for Cindy, to
(11) actually kind of write down what we're saying if we're
(12) talking on top of each other. So let's give each
(13) other -- let's try give each other like a pause in
(14) between.
(15) A. Okay.
(16) Q. Thank you. So you said -- we were talking
(17) about, like, maybe on a slow or a normal day, how many
(18) people would you supervise?
(19) A. About maybe five or six guys.
(20) Q. Okay. In August of 2018, did you have some
(21) sort of accommodation or medical condition that where
(22) you actually asked the employer for an accommodation in
(23) the workplace?
(24) A. I had given Renil Lal a doctor's note at the
(25) time, like in 2017, from my doctor, having sleep apnea.

**Page 21**

(1)  Q. And did you and the company or Renil kind of
(2) go through how to deal with the condition, the medical
(3) condition, with regards to your job and, you know, what
(4) type of -- was there any type of accommodation worked
(5) out?

(6)  A. I don't recall any conversation with Renil. I
(7) just don't remember the conversations we had in the
(8) past.

(9)  Q. Okay.

(10)  A. I don't remember.

(11)  Q. Did you have some sort of official or in place
(12) disability accommodation that kind of changed your
(13) normal workday that the company had to accommodate?

(14)      Was something like that in place?

(15)  A. Well, they tried, like I said -- I mean, how
(16) you say, like it was -- I remember trying to stay doing
(17) things, stay -- like stay on top of doing things, try
(18) not to just, you know, sit in one place. Just move
(19) around.

(20)  Q. Right. I guess I'm asking more from like a
(21) formal perspective. Usually different companies deal
(22) with this in different ways, but usually, when an
(23) employee goes to an employer and says, hey, I have this
(24) medical condition that affects my workday, usually
(25) something is worked out, and then some things written

**Page 22**

(1) down saying, okay, well, here's what we're going to do.

(2)  A. Well, see --

(3)  Q. Something like that. Did you guys do
(4) something like that?

(5)  A. See, with the doctor's note and what they
(6) were -- what they were reading was is that -- I don't
(7) know how to describe it. Sleep apnea is something --
(8) is a disease that you just -- I don't know how to
(9) describe it. It's just a disease that you have, and
(10) it's something hard to work with, you know, for
(11) accommodations. Do you know what I mean?

(12)  Q. Yeah, yeah.

(13)  A. It just happens.

(14)  Q. I'm familiar with sleep apnea personally. I'm
(15) also familiar with it because we've represented people
(16) with sleep apnea, so I know it very well. Right, I
(17) understand.

(18)      My understanding is sometimes the difficulty
(19) with you, probably, would be like if you become
(20) stationary, not moving or something, then you click and
(21) you fall asleep or whatever, right?

(22)  A. Yes, you're right.

(23)  Q. I understand that. But I guess my question
(24) more is almost like on a formal, written, you know -- I
(25) just wanted to know what procedure you went through,

**Page 23**

(1) what was in place, whether there was something --

(2)  A. Yes.

(3)  Q. -- in writing, or was it more informal, and
(4) you just told them the condition and nothing else.

(5)  A. Well, like, even with a piece of paper from
(6) the doctor stating, because, like I said, in the past
(7) people were saying, like, I was just sleeping, but I
(8) provided a doctor's note showing what I had. I didn't,
(9) you know -- I didn't know about it either until I had
(10) to go see the doctor, and that's when I provided them
(11) with a note what I had because I had to go to sleep
(12) tests and all that, and they finally diagnosed me with
(13) that. And I had to show proof why it was happening,
(14) you know.

(15)  Q. Okay. So then who did you actually give that
(16) doctor's note to?

(17)  A. Renil.

(18)  Q. To Renil. And then did Renil talk to you
(19) about it?

(20)  A. I don't remember the -- we sat down. I just
(21) don't remember the conversation.

(22)  Q. Okay. Did you guys work something out? Was
(23) there some sort of game plan or --

(24)  A. I don't remember, to be honest.

(25)  Q. Okay.

**Page 24**

(1)  A. I don't remember.

(2)  Q. And was there like a piece of paper that came
(3) out of your meeting or anything like that?

(4)  A. I honestly don't remember.

(5)  Q. No problem. Aside from Renil, who else did
(6) you talk to about your sleep apnea?

(7)  A. John Qually.

(8)  Q. And what did you talk to John Qually about?

(9)  A. I just let him know that I gave Renil a piece
(10) of paper stating that, hey, what the condition that I
(11) have.

(12)  Q. Okay. And then -- I'm sorry. Did you and
(13) John Qually work something out or some sort of
(14) agreement or game plan, anything like that?

(15)  A. I don't remember any -- I don't remember a
(16) conversation like that. I just don't remember. Too
(17) long ago.

(18)  Q. So how many conversations did you have with
(19) John Qually about your sleep apnea?

(20)  A. When I -- the day -- the day I gave Renil that
(21) note back in, like, 2017, or something like that, I had
(22) let John know and Nico know at the time.

(23)  Q. So just one time? Just one conversation?

(24)  A. Yeah. And then sometimes, like if I was -- if
(25) I was, like, nodding off, John would kind of wake me

**Page 25**

(1) up, and "Sorry, man." And he'd understand. He'd say,
(2) "Oh, I remember."
(3)     Q. Gotcha. Did you ever tell your staff -- not
(4) your staff -- the fuelers about your condition?
(5)     A. A lot of them actually knew about it just
(6) because some of my fuelers actually have it, so the
(7) other guys kind of knew right away.
(8)     Q. Gotcha.
(9)     A. Yeah.
(10)     MR. URIARTE: I've got to do something. Let's
(11) take a five-minute break and go off the record for five
(12) minutes.
(13)     MR. WU: No problem. That's fine.
(14)     MR. URIARTE: Thank you.
(15)     (Brief recess.)
(16)     MR. URIARTE: Back on the record, Cindy?
(17)     THE REPORTER: Yes, go ahead.
(18)     MR. URIARTE: Let me show you what we'll mark as
(19) Exhibit 3.
(20)     David, do you have Exhibit 3, please?
(21)     VIDEO OPERATOR: Yes. I will bring that up
(22) shortly.
(23)     MR. URIARTE: I think we'll need a screen share
(24) for Mr. Dodge.
(25)     (Plaintiff's Exhibit 3 marked for

**Page 26**

(1)     identification.)
(2)     MR. URIARTE: Q. Mr. Dodge, do you know if
(3) clicking on the Chat box -- there you go. We have a
(4) screen share. Do you see it?
(5)     A. Yes.
(6)     Q. Great. So when we were talking about
(7) sleeping, I guess these pictures were taken of you. So
(8) you're saying that when you were falling asleep in the
(9) office or in the vehicle like that, that was part of
(10) your sleep apnea condition?
(11)     MR. WU: Objection.
(12)     THE WITNESS: Yeah.
(13)     MR. WU: Objection. Assumes facts not in evidence
(14) that these are photos of him.
(15)     MR. URIARTE: So, Mr. Dodge, just let your
(16) attorney finish his objection, and then you can answer
(17) after if you understand the question.
(18)     THE WITNESS: Sorry. Can you repeat the question
(19) one more time? Sorry.
(20)     MR. URIARTE: Q. Yes. So in these photographs,
(21) that's you, right, in the photograph?
(22)     A. Yeah, that's me, yes.
(23)     Q. And are you saying that when you fall asleep
(24) like this, that you -- that these events right here
(25) were part of your sleep apnea condition?

**Page 27**

(1)     A. I can tell you that in the photo, the one with
(2) the truck, yes. The one in the office, that was at the
(3) end -- I was done with my shift already.
(4)     Q. Gotcha. And do you remember if the one in the
(5) office was after a graveyard shift? Is that what that
(6) was?
(7)     A. I can't remember the dates. It's in the
(8) office. I don't remember. But I remember this -- I
(9) remember this photo.
(10)     Q. Gotcha. So you're saying the one in the
(11) office you were already done with your shift, and you
(12) went to the office to just nod off, is that correct?
(13)     A. I was done. I had transferred all my
(14) information. I went to the office and, yeah, fell
(15) asleep.
(16)     Q. And then the vehicle, is this -- the vehicle
(17) is a vehicle located in the tarmac? Is that where it
(18) is?
(19)     A. It's black and white, so I can't -- yeah.
(20)     Q. Okay. But you remember that the vehicle --
(21) when you were sleeping in the vehicle in this
(22) photograph, that was because of sleep apnea, is that
(23) correct?
(24)     A. Yeah, yes.
(25)     Q. Okay. So we're done with Exhibit 3.

**Page 28**

(1)     Can you tell me, by August of 2018, how long
(2) you had been working with Renaldo Navarro at that time?
(3)     A. Good question. Do you mean like how long had
(4) I been working with him as a co-worker, as like a --
(5) how do you say -- as a -- supervisors together or as,
(6) in general, a fueler and a supervisor?
(7)     Q. Yes. In general.
(8)     A. Since I began working for ASIG in 2016, I was
(9) his night fueler. So I began working with him as a
(10) night fueler, and then once I got promoted, I became a
(11) swing supervisor, so I would transfer my information to
(12) him.
(13)     And then while -- our schedules changed, and
(14) then I would cover the days he was off as a swing -- I
(15) mean, as a graveyard. And then there -- if someone
(16) called off, and I would see him from the night shift or
(17) into the morning shift, or I would cover his sick day.
(18) So, yeah, I worked with him a lot.
(19)     Q. Gotcha. And what was your general opinion
(20) with regards to Ray Navarro and how he did his job?
(21)     A. Oh, Ray's a great supervisor. There's no
(22) questions asked. He was there for a long time, and,
(23) you know, he's -- he did his job.
(24)     Q. And you and Ray -- at some point you and Ray
(25) started to have, like, difference of opinion with

**Page 29**

(1) regards to mainly your work performance.

(2)        Is that like a good way of putting it?

(3)        A. Yeah, yes. We bumped -- started bumping heads

(4) after my promotion. There was just a lot of

(5) disagreements after my promotion. After my promotion,

(6) that's when we started to bump heads.

(7)        Q. Yeah. And what was coming up as an issue?

(8) Why were you guys bumping heads?

(9)        A. It was more just agreement on how we saw

(10) things, you know. The reason I say that is because he

(11) ran his shift one way, I'd run my shift a different

(12) way, and another supervisor runs their shift a

(13) different way. So he just never liked the way I did

(14) my -- the way I ran things because, also, he had more

(15) experience, and I'm the new supervisor.

(16)        Q. Gotcha. Would it be fair to say that some of

(17) the fuelers would go to Ray and complain about you?

(18)        A. I honestly do not know what fuelers, you

(19) know, unless they spoke to me. I don't know what other

(20) people would say behind my back.

(21)        Q. Right. But I guess what I'm saying is, was it

(22) possible that some of the fuelers that you were

(23) supervisor -- you were supervising were complaining to

(24) him, and then he was kind of, like, bringing that

(25) complaint over to you and criticizing you because of

**Page 30**

(1) what he heard from the fuelers you're supervising?

(2)        MR. WU: Objection. Vague. Calls for

(3) speculation.

(4)        You can answer if you know.

(5)        THE WITNESS: Yeah, I don't know. I mean, he

(6) brings stuff up, but I don't know if that was just him

(7) or the fuelers. I don't know.

(8)        MR. URIARTE: Q. Before Ray being terminated, can

(9) you maybe quantify how many times Ray complained about

(10) you or talked to you and told you that you weren't

(11) doing your job properly?

(12)        Do you remember how many times that happened?

(13)        A. We had a lot of confrontations, and he had a

(14) lot of complaints against him -- him and I when we were

(15) just having issues. I can't say a number of times, but

(16) it was lot.

(17)        Q. Would you say that more than ten times? That

(18) many?

(19)        A. Yeah, I would say more than ten times.

(20)        Q. And you and him, did you guys ever talk to a

(21) duty manager or the general manager to try to, you

(22) know, figure things out, and, you know, any of the duty

(23) managers talk to you about this situation?

(24)        A. Oh, yeah, yes. I did speak to John about the

(25) situation going on. I spoke to Nico about the

**Page 31**

(1) situation going on. I spoke to Renil about the

(2) situation going on.

(3)        Q. Okay. And, well, did they provide any kind of

(4) solution or any kind of course of action?

(5)        A. Yes. Renil brought -- a couple times brought

(6) us in to try to solve the -- try to solve what's going

(7) on.

(8)        Yes.

(9)        A. But when Renil was speaking on a way to

(10) resolve, Ray would always kind of interrupt Renil, you

(11) know, interrupt him, wouldn't let him finish, or didn't

(12) like what he would say. So there was just a lot of

(13) things that Renil would try to fix, and then we'd come

(14) to an agreement, and then for maybe a good while it

(15) worked, and then it just -- again, we'd bump heads

(16) again.

(17)        Q. Gotcha.

(18)        A. And it was always about different things.

(19) There's a lot of different things that happened.

(20) Different subjects, though.

(21)        Q. Yeah, yeah. What are those subjects that you

(22) would remember? Like what --

(23)        A. Scheduling. It was always about how I

(24) scheduled things. It would come down to something

(25) about breaks, something about all the people don't like

**Page 32**

(1) you. Him saying I shouldn't be a supervisor. Stuff

(2) like that.

(3)        Q. Yeah. And when you say scheduling, you're

(4) talking about how you're scheduling the fuelers with

(5) regards to their workday and them being able to take

(6) breaks? Is that what it is?

(7)        A. Yeah, scheduling meaning how I schedule my

(8) flights to my crew.

(9)        Q. And then breaks, what were the complaints

(10) about breaks?

(11)        A. He was saying that I was giving the breaks

(12) late or not giving their breaks at all. Stuff like

(13) that.

(14)        Q. Did you ever inquire, you or Renil, with

(15) regard to, like, where he was getting his information?

(16) Because he wasn't working with you, so how did he know

(17) about the breaks and the scheduling and all of that?

(18)        A. Renil would -- Renil would investigate, find

(19) out what was going on from fuelers and ask what was

(20) going on. And, if anything, Renil -- if anything was

(21) questioned, Renil would ask me. But the main question,

(22) Renil would ask me if I am giving the fuelers breaks.

(23) He never said fuelers are complaining. It would be

(24) more like, Andrew, what did you -- can I see what you

(25) did, or can I see your text messages, stuff like that,

**Page 33**

(1) to see what I was doing. But he never said, hey,
(2) Andrew, so and so said they didn't get their break.
(3) You know what I mean?
(4)     **Q.** Okay. And did Renil ever suggest to you a
(5) better what way of doing things? Was there anything
(6) like that?
(7)     **A.** No, because -- no, because Renil knew how the
(8) operation was as well. Him being a general manager,
(9) he's been in that position knowing how the schedules
(10) work as well. He sees that.
(11)     **Q.** Okay. And Renil thought that you were
(12) providing the breaks properly?
(13)     **A.** Yeah.
(14)     **MR. URIARTE:** Okay. Let me show you Exhibit 8.
(15)     **VIDEO OPERATOR:** Okay. I will bring that up
(16) shortly.
(17)     **MR. URIARTE:** Okay.
(18)     (Plaintiff's Exhibit 8 marked for
(19)     identification.)
(20)     **MR. URIARTE:** Are you doing a screen share on
(21) that, David?
(22)     **THE WITNESS:** I see it now.
(23)     **MR. URIARTE:** Great. Okay. Do you know what
(24) Exhibit 8 is? I'll give you some time to take a look
(25) at that. Do you see that at all?

**Page 34**

(1)     **A.** Yes, I see it.
(2)     **MR. WU:** I'm going to object on the ground of
(3) attorney-client privilege.
(4)     If you've seen this document before, you can
(5) certainly talk about that. If you've only seen it
(6) during discussions with your attorney, I'd instruct the
(7) witness not to divulge the content of any of those
(8) discussions.
(9)     **MR. URIARTE:** Sure. Definitely, yeah. There's no
(10) question like that pending.
(11)     **Q.** But, yeah, Mr. Dodge, don't tell me the
(12) conversation that you had with your attorney with
(13) regards to this document. What I need to inquire about
(14) is what you know about this document and your memory,
(15) events related to this document. Okay?
(16)     **A.** Okay.
(17)     **Q.** So, yeah. So are you able to actually see
(18) this -- well, I'm not able to -- there you go.
(19)     **MR. URIARTE:** Actually, David, can you make it --
(20) because I'm not able to control it, can you make it so
(21) that -- there you go. That's good.
(22)     **Q.** So have you seen this document before,
(23) Mr. Dodge? Aside from maybe looking it over with your
(24) attorney, aside from that event, before that, like in
(25) 2018, did you see this document before?

**Page 35**

(1)     **A.** No, I did not.
(2)     **Q.** Okay. So you haven't seen this document at
(3) all?
(4)     **A.** No.
(5)     **Q.** I see. Okay. So, essentially, like back in
(6) August of 2018, nobody at Menzies, none of the duty
(7) managers, not the general manager, Renil, nobody from
(8) Menzies went through this document with you before?
(9)     **A.** No, they did not.
(10)     **Q.** Okay. Can we get to page 2 of Exhibit 8,
(11) please. So this is the -- what we call -- I guess this
(12) would be the first petition. And then I think there's
(13) a third page as well. Can you get the third -- there
(14) you go.
(15)     So I believe July Macapagal is a supervisor,
(16) is that correct, Mr. Dodge?
(17)     **A.** Yes.
(18)     **Q.** And then we go to page 2, and here on page 2 I
(19) think is where Mr. Navarro's signature is. If you look
(20) at line 16, he's the only other supervisor, I think,
(21) that also signed this.
(22)     I wanted to see from -- so if you look at No.
(23) 1, the first person who signed it, can you identify to
(24) me fuelers that you've worked with.
(25)     **A.** Fuelers that were, like, on my shift?

**Page 36**

(1)     **Q.** Yes.
(2)     **A.** Or in general worked with?
(3)     **Q.** People that you supervised as a supervisor.
(4)     **A.** I supervised all these people.
(5)     **Q.** Okay. You're sure about that? There's a lot
(6) of names here.
(7)     **A.** I supervised all these people.
(8)     **Q.** Okay. Great. All right. That makes that
(9) easy.
(10)     And then let's go to page 1. And then if we
(11) can just make page 1 a little bit bigger for -- there
(12) you go.
(13)     So in the bottom there, the one you don't see
(14) in the screen -- there you go. Perfect. Thank you
(15) very much. So this is page 1. So let me just read it.
(16) It says, "To: Menzies Management. Sir/madam, We the
(17) fuelers on Menzies 130 side would like to make a
(18) petition against Andrew Dodge. The way he supervised
(19) is very unprofessional when he run the operation or
(20) supervised, people are not taken their breaks it's
(21) because the way he set up flights, and he always
(22) blaming the people there's a delay or always saying
(23) lack of man power and trucks issues."
(24)     Okay. So let's kind of stick to that one --
(25) that second sentence there, "The way he supervised is

**Page 37**

(1) very unprofessional when he run the operation...people
(2) are not taken their breaks it's because the way he set
(3) up flights."
(4)      And, again, this is August of 2018. At that
(5) time, I know that you, Ray and Renil had some
(6) conversations, and then you also had conversations with
(7) Renil with regards to the breaks in your text messages.
(8)    **A.** Uh-huh.
(9)    **Q.** Aside from that, did Menzies talk to you in
(10) relation to this petition about how people are
(11) complaining about their breaks? Was that a
(12) conversation that you had?
(13)    **A.** No.
(14)    **Q.** What's your opinion on that, when you read
(15) your people are not taking their breaks because of the
(16) way he sets up flights --
(17)    **A.** So --
(18)    **Q.** -- and then you have, you know, 26 people
(19) signing that statement? Can you tell me what your
(20) opinions is in regards to that or your reaction?
(21)    **A.** Yeah. I mean, like I said, people got their
(22) breaks. It would just be determined on how the day was
(23) set up, you know, because aircrafts, the way you fuel
(24) aircrafts, sometimes you can be on a flight for two
(25) hours, you know, three hours, you know. It just

**Page 38**

(1) depends on how long you're waiting for that fuel to be
(2) done, you're waiting for that mechanic to be done. And
(3) then, you know, we always serve out a break. You know
(4) what I mean? They'd get their breaks.
(5)    **Q.** Right. But sometimes they'd just be --
(6)    **A.** It just depends on how the flights are coming
(7) in and stuff like that, you know. That's how -- how we
(8) ran it, you know, and that's how I was trained as well.
(9) You just -- and also, like I said, sometimes you're
(10) short manpower and sometimes you fuel longer a little
(11) bit and then get your break. It just depends, like I
(12) said, on the schedule.
(13)    **Q.** I see. What about this item here with regards
(14) to "Andrew Dodge lack of experience about fueling"?
(15) What do you think about that?
(16)    **A.** To be honest, that's just -- I don't know -- I
(17) don't know what word he used for that, but I became a
(18) supervisor because I know what I doing. I was
(19) trained on everything. I was actually -- at the time,
(20) before Menzies bought us, I was considered a Class A
(21) fueler, which is one of the top fuelers. Like, having
(22) that title is really high, meaning I know how to do
(23) everything, from fueling, defueling, driving every
(24) piece of equipment on the thing, knowing how to fix
(25) equipment. It's just the knowledge of fueling in

**Page 39**

(1) general, safety. I was, like, one of the top people.
(2)    **Q.** Okay. Aside from this petition, did you have
(3) fuelers go up to you and complain to you about their
(4) breaks, like maybe they're late, maybe they're short,
(5) or anything like that?
(6)      Was that something that was happening in or
(7) around August of 2018?
(8)    **A.** I actually had people asking me, Hey, when am
(9) I going to get my break? And, you know, they'll come
(10) up to me, ask me what's going on, or can I see what
(11) you're planning, and I always talk to my fuelers.
(12) That's the main thing about the job, is communication,
(13) communication, talking and finding out, you know,
(14) plans, planning things out.
(15)    **Q.** So why do you think these fuelers, you know,
(16) all 26 of them, signed a petition against you? Why
(17) would that happen?
(18)    **A.** Honestly, I don't know -- actually, a lot of
(19) these names on here that I see people call me saying
(20) that, you know, they were forced to sign a petition.
(21) And they would tell me, Hey, I didn't want to sign it,
(22) you know, but they were forced to sign it, or they
(23) didn't read it, or stuff like that.
(24)    **Q.** I see. And they were forced to sign the
(25) petition. Like, do you know by whom and why they were

**Page 40**

(1) forced to sign the petition?
(2)    **A.** A lot of the guys -- a lot of the guys on the
(3) list would call me and say Ray was telling them to sign
(4) the paper to try to get me terminated or -- how do you
(5) say -- demoted from being a supervisor.
(6)    **Q.** Gotcha. And then do you know who Rafael
(7) Vasquez is?
(8)    **A.** Yeah. At the time, he was one -- a fueler and
(9) a union representative.
(10)    **Q.** Okay. Did you know that it was actually
(11) Rafael Vasquez who put together the petition?
(12)    **MR. WU:** Objection. Assumes facts not in
(13) evidence.
(14)    **MR. URIARTE: Q.** Did you know that, Mr. Dodge?
(15)    **A.** No, I did not.
(16)    **MR. URIARTE:** Let's go ahead and put up Exhibit
(17) 10.
(18)      (Plaintiff's Exhibit 10 marked for
(19)      identification.)
(20)    **MR. URIARTE: Q.** So here we go. So this one will
(21) be Exhibit 10. And as you see, it's signed by Rafael
(22) Vasquez. I think there's a date in the bottom there of
(23) November 18, 2018, when he signed this statement.
(24)      So did you have problems with Rafael Vasquez
(25) at all in or around August or November of 2018? Were

Page 41

(1) you having problems with him, Mr. Dodge?
(2)    A.  Rafael didn't work with me on my side of the
(3) airport.
(4)    Q.  Oh, I see.  I see.  So he's on another side of
(5) the airport?
(6)    A.  Yes.
(7)    Q.  Gotcha.  Okay.  So it looks like, from this
(8) statement that he signed, that says that he was asked
(9) by Menzies Aviation fuelers to write a petition on
(10) behalf of the fuelers on the 130 side.
(11)        Did you know that they -- that these fuelers
(12) submitted two petitions?  Did you know that?
(13)    A.  No, I did not.
(14)    Q.  Okay.  So, based on your responses, is it fair
(15) to say that nobody from Menzies Aviation ever sat you
(16) down to discuss one or two petitions that were written
(17) out against you at that time while it was happening?
(18)    A.  No.  I'm the one that brought it up to Renil,
(19) saying that there was a petition going around, because
(20) one of the fuelers had called me about it.
(21)    Q.  So you knew that a petition was going around,
(22) but nobody from Menzies Aviation management ever kind
(23) of, like, sat down with you or talked to you about it,
(24) right?  Is that correct?
(25)    A.  No, I don't -- I never, no.

Page 42

(1)    Q.  And you found out that there was a petition
(2) going around against you, but you never read the actual
(3) petition.  Is that how it was?
(4)    A.  Yeah, I never got to see it, no.
(5)    Q.  And you're saying that the first time you saw
(6) it was actually a part of this litigation.  Is that
(7) what you're saying?
(8)    A.  Yes.
(9)    MR. URIARTE:  Let's put up Exhibit 5, please.
(10)    VIDEO OPERATOR:  Okay.  Coming up shortly.
(11)    MR. URIARTE:  Thank you.
(12)        (Plaintiff's Exhibit 5 marked for
(13)        identification.)
(14)    MR. URIARTE:  It's not a very good copy, so I
(15) guess Exhibit 5, Mr. Dodge, if we can just make it
(16) smaller so he sees the whole thing.  There you go.
(17)    A.  Yeah.
(18)    Q.  Is this the letter that you wrote after you
(19) found out that a petition was being turned in against
(20) you?
(21)    A.  I can't read what I wrote, but I think this is
(22) the one I wrote after I found out there was a petition.
(23) One of the fuelers called me.
(24)    Q.  Correct.  Correct.  If you go to the bottom of
(25) it, I think this is your signature, right?

Page 43

(1)    A.  Yeah.
(2)    Q.  That one there?
(3)    A.  Yes.
(4)    Q.  Okay.  And did you have a meeting with Menzies
(5) management about this letter at all?
(6)    A.  I do not recall -- I don't remember from when
(7) I wrote it.  I think I wrote it during my shift, and I
(8) turned it in or -- I either wrote it in the office with
(9) Raul at the time or -- I just don't remember.
(10)    Q.  I see.  I see.  So it's possible that you
(11) wrote it with the assistance of Raul.  Is that what
(12) you're saying?
(13)    A.  Yeah, it was Raul or Renil that told me to
(14) write -- write a statement.
(15)    Q.  And why did they tell you to write a
(16) statement?  Do you know?
(17)    A.  Just to have it on file that they were going
(18) to look into it.
(19)    Q.  Okay.  But how did that meeting start?  Was
(20) that -- like, why did you kind of arrive at that
(21) meeting?
(22)    A.  Like, why did I -- are you saying, like, why
(23) did I write it or --
(24)    Q.  No.  Well, you said that you had a meeting
(25) with Raul or Renil --

Page 44

(1)    A.  It wasn't a meeting.  It was more like a --
(2) like you walk in, let them know, hey, this is what's
(3) going on on the operation.  Like, here's -- like this
(4) is what people are telling me.
(5)    Q.  Okay.
(6)    A.  And they tell you, hey, just write statement
(7) down and --
(8)    Q.  Okay.  Okay.  So it started with a fueler
(9) calling you and saying, Hey, there's a petition going
(10) around against you.  Is that how it started?
(11)    A.  Yes.
(12)    Q.  Okay.  And then, with that information, you
(13) then go to Renil or Raul.  We don't know, right?  Renil
(14) or Raul or both of them?
(15)    A.  Yeah, it was either/or.  Yeah, it was
(16) either/or.
(17)    Q.  So you went to either one of them to tell them
(18) that?  What exactly did you tell them?
(19)    A.  "Oh, hey, I got a phone call from a couple of
(20) fuelers on my personal cell at home saying that
(21) they" -- "there was a petition going around against me
(22) that they didn't want to sign, but they felt forced to
(23) sign it."
(24)        And then when I told them that -- I don't
(25) remember if it was Renil or Raul -- they just told me

**Page 45**

(1) to write a statement down and to turn it in to them and
(2) that they would look into it.
(3)     Q.  All right.  And then when you say -- how much
(4) help did you get from Renil or Raul with regards to
(5) writing the statement?  Like, did you guys --
(6)     A.  I don't know what -- like, from there on, I
(7) don't know what they -- how they did their
(8) investigation or anything like that.  So I just went on
(9) and kept doing my job.
(10)     Q.  I see.  But with regards to writing the
(11) statement, are these words totally yours?
(12)        Like, you sat there and started --
(13)     A.  Yeah, I went to a different office and wrote
(14) this statement.
(15)     Q.  I see.  I see.  Okay.  And then you turned it
(16) in?
(17)     A.  Yes.
(18)     Q.  Would it be not accurate to say that they
(19) helped you with the words that are in this statement?
(20)     A.  Those are all me.  No, they didn't help me
(21) with wording at all.
(22)     Q.  All right.  But when they said -- when they
(23) told you to write this statement, did they tell you
(24) what to write about?
(25)     A.  No.  They just said write -- like, write

**Page 46**

(1) what's going on, like, why -- you know, what you heard.
(2) Stuff like that.
(3)     MR. URIARTE:  All right.  So we're done with
(4) Exhibit 8.  I need like a five-minute break.  Let's see
(5) where we are.  Let's take a five-minute break.  Off the
(6) record.
(7)     MR. WU:  That's fine.  Thank you.
(8)        (Brief recess.)
(9)     MR. URIARTE:  Let's go back on the record.  We
(10) don't have much more, but let me go through a couple
(11) more here.
(12)     Q.  Mr. Dodge, you said that a fueler had called
(13) you that a petition was going around.  Do you remember
(14) who that fueler was?
(15)     A.  Yeah, Mario Caballero -- Caballero.  Mario
(16) Caballero.
(17)     Q.  And you said that he felt like he was forced
(18) to sign the petition or he didn't understand the
(19) petition.  Is that what he said?
(20)     A.  When I -- when I received a phone call from
(21) him, his first words, "Hey, Andrew, just want to let
(22) you know there's a petition going around.  I didn't
(23) want to sign it, but he made me sign it.  I'm just
(24) letting you know.  I don't want to get into trouble or
(25) anything."

**Page 47**

(1)        And then -- and I said -- told him thank you,
(2) and I would -- I said, "Thank you, and I will," you
(3) know, "talk to management."
(4)     Q.  Okay.  And when you say "he made me sign it,"
(5) who's "he"?
(6)     A.  He mentioned Ray Navarro.
(7)     Q.  Okay.  And, then, let's go back to Exhibit 10,
(8) please.
(9)     VIDEO OPERATOR:  Hold on.  I'll bring it up.
(10)     MR. URIARTE:  Thank you.
(11)     THE WITNESS:  Okay.
(12)     MR. URIARTE:  Q.  So I wanted to discuss something
(13) here.  It says, "There have been two separate Petitions
(14) turned into Menzies Aviation Fueling Department
(15) Director Raul Vargas."  Do you see that?
(16)     A.  Yes.
(17)     Q.  Okay.  Did Raul Vargas ever talk to you about
(18) these two petitions?
(19)     A.  Sorry, can you repeat that one more time.  You
(20) broke up.
(21)     Q.  Sure.  Did Raul Vargas ever talk to you about
(22) two petitions being signed against you?
(23)     A.  No, he did not.
(24)     Q.  Did Raul Vargas ever talk to you about how you
(25) give your breaks, and fuelers complaining against you,

**Page 48**

(1) or anything like that?
(2)     A.  No, he did not.
(3)     Q.  Did anybody from Menzies, you know, from John
(4) Qually, the duty mangers, or Renil Lal at that time,
(5) did any one of them kind of, like, talk to you about
(6) maybe, you know, you giving your breaks better or
(7) having some sort of plan of action?
(8)     A.  Like I said before, Renil and I spoke, but he
(9) just wanted -- he reviews my schedules.  I used to turn
(10) in -- we'd turn, like, you know, a shift report in
(11) every night.
(12)     Q.  Okay.
(13)     A.  And, also, I would turn in my schedules to him
(14) so he would see everything written down, so -- from
(15) what I did.  So, basically, for example, with let's say
(16) fueler A, I'd write down his flights, and in the middle
(17) I'll put a "B," stands for break, and what else he did.
(18) You know what I mean?  And then I also -- he could
(19) research the times, you know, because -- with the phone
(20) app or online.
(21)     Q.  Okay.  And you went through -- you went
(22) through meetings with Renil Lal about that in around
(23) August of 2018?
(24)     A.  I -- I don't remember the time or date, any of
(25) that.

**Page 49**

(1)    Q.  Did Mr. Lal ever tell you that he was doing
(2) that as part of, you know, investigating these
(3) petitions against you?
(4)    A.  No.  He one time mentioned that Ray was
(5) complaining, so he just wanted to see what I did
(6) compared -- you know, compared to other supervisors and
(7) how they were doing their schedules.
(8)    Q.  I see.  And -- okay.  And out of those
(9) meetings, was any kind of -- was there any
(10) recommendation given to you as to, like, do your job
(11) better, or was there any comment or anything like that?
(12)    A.  I don't recall what he said to me at all.
(13)    Q.  Did you have to change the way you were doing
(14) things in order to give your breaks better or something
(15) like that?
(16)    A.  No.  Up until March, I was doing the same way.
(17)    Q.  And you're saying up until March of 2020?
(18)    A.  Yeah, until I got furloughed, yes.
(19)    Q.  Okay.  Also in Exhibit 10, it says, "I have
(20) spoken to The Menzies Aviation Fueling Director Raul
(21) Vargas on three separate occasions regarding Mr. Dodge,
(22) who continues to abuse his authority and at times
(23) harass Fuelers under his charge."
(24)        Do you see that?
(25)    A.  Yes, I do see that.  Yeah.

**Page 50**

(1)    Q.  What do you think -- what's your opinion on
(2) that with regard to Rafael Vargas stating that you
(3) continue to abuse your authority?
(4)        Do you know anything about that?
(5)    A.  I mean --
(6)    MR. WU:  Objection.  Assumes facts not in
(7) evidence.
(8)        But you can answer.
(9)    MR. URIARTE:  Q.  Mr. Dodge?
(10)    A.  Sorry.  Okay.  I -- I mean, from when I see
(11) that, I can tell you that's just not true.  I mean,
(12) I've never harassed any of my employees or any of that
(13) type of circumstance.
(14)    Q.  I see.  When you say -- when it says "abuse
(15) his authority," like how would you be able to abuse
(16) your authority during your shifts?
(17)    A.  Honestly, I don't know how I could abuse my
(18) authority to this current day.  I'm still a supervisor
(19) here --
(20)    Q.  I see.
(21)    A.  -- with the same employees.
(22)    Q.  I'm sorry.  What was that?
(23)    A.  I said I'm still a supervisor here with the
(24) same employees.
(25)    Q.  Okay.  And have any fuelers gotten a complaint

**Page 51**

(1) against you that you were harassing them?
(2)    A.  No.
(3)    Q.  Have any of the fuelers ever come up to you
(4) and said, hey, Andrew, you know, you're doing this
(5) wrong, or, you know, complained to you about not giving
(6) their breaks, or them working too hard because you're
(7) not doing your job?  Anything along those lines?
(8)    A.  I've had fuelers just come up to me and try
(9) to, like, give suggestions on how they want to -- how
(10) they see things -- on how they see things, but, you
(11) know -- and then I have to explain to them what's going
(12) on, and I'd show them, and they would understand.
(13) That's about it.
(14)        But I've never had -- I've had someone coming
(15) up to me asking when they would get their break, and I
(16) would explain to them as well, you know, the situation,
(17) and they would understand.
(18)    Q.  I see.  All right.  Can we go back to Exhibit
(19) 5, please.  Okay.  I know it's hard to read, but I was
(20) going to start with -- well, that first sentence kind
(21) of ends with "the company don't need me, that I'm a bad
(22) supervisor, and all I do is cause delays."
(23)        What do you mean by that, "all I do is cause
(24) delays"?
(25)    MR. WU:  Objection.  Objection.  Assumes facts not

**Page 52**

(1) in evidence.  The document speaks for itself.  But the
(2) witness can answer.
(3)    THE WITNESS:  So when you say -- I mean, what
(4) you're saying is -- I'm not saying that I'm causing it.
(5) What I'm saying is Ray's complaining about that I'm
(6) causing delays and stuff like that.
(7)    MR. URIARTE:  Q.  Correct.  Yeah, that's how I
(8) understand it as well, Mr. Dodge.  But these are the
(9) things that Ray is saying that you're doing wrong,
(10) right?
(11)    A.  Yeah.  And to be the honest, that's not true.
(12) Has there been delays?  Of course there's been delays.
(13) But that's not just because of the way I ran my shift.
(14) It's just things happen at the airport.
(15)    Q.  So it's your opinion that when delays happen,
(16) it's not because of your bad work performance.  It's
(17) just it would happen to any supervisor.  Is that your
(18) opinion?
(19)    A.  Yeah.  Yes, sorry.  I mean, yes, it happens to
(20) everybody.
(21)    Q.  Okay.  And you're not -- not because of lack
(22) of your abilities or lack of your work, but just like
(23) if some other supervisor was working that shift, there
(24) would be the same delays.  Is that how you would put
(25) it?

**Page 53**

(1)    **A.** Well, that's because every shift is different,

(2) so airplanes don't always have the same schedule on

(3) every supervisor's shift, so things happen differently

(4) to all of us.

(5)    **Q.** Right. But your work performance has some

(6) sort of bearing with regards to delays that are caused

(7) by fueling operations, right? Isn't that what --

(8)    **A.** Delays are caused by either aircrafts delayed

(9) by the operations at the airport, delayed by ground

(10) crew, delayed by, you know -- there's different --

(11) there's different reasons why the plane could be

(12) delayed.

(13)    **Q.** And at least around August of 2018, is it your

(14) opinion that you weren't -- your operation, your

(15) fueling operation, wasn't really the cause of the

(16) delays that were happening? Is that your opinion on

(17) that?

(18)    **A.** Our side -- our side, the 130 side, is a very

(19) good fueling operation. We barely took any delays.

(20)    **Q.** Okay. And then towards the end of this

(21) letter, it says, "Ray shows up at 5:30 or 9:00 p.m.

(22) when Renil and Jeff" -- do you see "Jeff" there? Is

(23) that Jeff Cook?

(24)    **A.** No, that's Jeff. He's a -- a manager out of

(25) Seattle International.

**Page 54**

(1)    **Q.** Oh, okay. So he told Ray not to come early

(2) anymore. Do you see that?

(3)    **A.** Okay, yeah. That's a -- yeah, yeah.

(4)    **Q.** So that would be Jeff Cook or --

(5)    **A.** No, that's Jeff -- I don't remember his last

(6) name. I can get his last name for you, but I just

(7) don't remember his last name.

(8)    **Q.** And that Jeff -- that Jeff, you said, works

(9) for Menzies in Seattle International?

(10)    **A.** Yeah, that's his main station, yes.

(11)    **Q.** I see. So how come he would get involved in

(12) telling Ray not to come in early?

(13)    **A.** So the reason -- we were going through a

(14) transition, you know, from ASIG to Menzies. At the

(15) time, Renil was the acting general manager. Raul

(16) Vargas was the director -- new director we had, so they

(17) were getting things together. So Jeff would come down

(18) and help our station.

(19)    **MR. URIARTE:** Gotcha. Okay. I have no further

(20) questions.

(21)    **MR. WU:** No questions on my end either.

(22)    **MR. URIARTE:** Okay. Thank you, Mr. Dodge. Thank

(23) you for your time today. Thank you for providing this

(24) deposition.

(25)    **THE WITNESS:** You're welcome.

**Page 55**

(1)    (Whereupon, the deposition

(2) concluded at 10:32 o'clock a.m.)

(3)    ---o0o---

(4)

(5)

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

**Page 56**

(1)         CERTIFICATE OF WITNESS

(2)            ---o0o---

(3)

(4)      I, ANDREW DODGE, hereby declare under

(5) penalty of perjury that I have read the foregoing

(6) deposition testimony; and that the same is a true

(7) and correct transcription of my said testimony

(8) except as corrected pursuant to my rights under

(9) Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)    _____

                 Signature

(13)

(14)    _____

                 Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 57

(1) STATE OF CALIFORNIA      )
                             )
(2) COUNTY OF SAN FRANCISCO )

(3)        I, CINDY TUGAW, a Certified Shorthand Reporter

(4) of the State of California, duly authorized to

(5) administer oaths pursuant to Section 8211 of the

(6) California Code of Civil Procedure, do hereby certify

(7) that

(8)              ANDREW DODGE,

(9) the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)        I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)        Dated the 7th day of August, 2020.

(22)

(23)

(24)

              CINDY TUGAW

(25)          CSR No. 4805 (California)

## Page 58

(1) Andrew Dodge
    c/o Foley & Lardner
(2) 555 California Street, Suite 1700
    San Francisco, CA 94104
(3) Attn:  Jason Y. Wu, Esq.
(4) Date:  August 7th, 2020
    Re:  Navarro vs. Menzies Aviation
(5) Deposition Date:  Tuesday, July 28, 2020
(6) Dear Mr. Dodge,
(7)        Please be advised the original transcript of
    your deposition is ready for your review.
(8)        Pursuant to FRCP Rule 30(e), you have
    30 days following the date of this notice to read,
(9) correct if necessary, and sign your transcript unless
    the attending parties and the deponent agree on the
(10) record or otherwise in writing to a longer or shorter
    time period.  The deponent may change the form or the
(11) substance of the answer to a question, and may either
    approve the transcript of the deposition by signing it,
(12) or refuse to approve the transcript by not signing it.
    You are not required by law to read and sign your
(13) deposition transcript.  All parties will be informed of
    the corrections.  The original transcript will then be
(14) sealed and sent to the examining attorney pursuant to
    the applicable law.
(15)        You may either come to our office to read and
    sign the original transcript, or you may contact your
(16) attorney or the attorney who arranged for you to be
    present at your deposition.  If they have ordered a
(17) copy of the transcript, you may review their copy and
    make corrections by submitting, signing and returning
(18) the attached form.  If you choose to review your
    transcript at our office, please call first to make an
(19) appointment.  Should you have any question regarding
    these instructions, please call.
(20)
    Sincerely,
(21)
(22)
    NOGARA REPORTING SERVICE
(23) 5 Third Street, Suite 415
    San Francisco, California 94103
(24) (415) 398-1889
    cc:  All counsel, original deposition
(25)

**NOGARA REPORTING SERVICE**          (415) 398-1889          **Page 57 to Page 58**

# EXHIBIT 52

Case 3:19-cv-05079-VC Document 48-8, Filed 11/19/20 Page 2 of 17

**DEPOSITION OF RANDALL DAVIES - 07/28/2020**

**RENALDO NAVARRO vs. MENZIES AVIATION, INC.**

CONDENSED TRANSCRIPT AND CONCORDANCE

**PREPARED BY:**

**NOGARA REPORTING SERVICE**
**5 Third Street, Suite 415**
**San Francisco, CA 94103**
**Phone: (415) 398-1889**
**FAX: (415) 398-0611**

**NRS**

**NOGARA REPORTING SERVICE**

**Page 1**

```
(1)          IN THE UNITED STATES DISTRICT COURT
(2)      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
(3)
(4)
(5)  RENALDO NAVARRO,
(6)            Plaintiff,
(7)  v.                          No.  3:19-CV-8157
(8)  MENZIES AVIATION, INC.,
     doing business as MENZIES
(9)  and DOES 1 through 10,
     inclusive,
(10)
            Defendants.
(11)  _____/
(12)  Zoom Remote Deposition of
(13)    RANDALL DAVIES
(14)  Tuesday, July 28, 2020
(15)
(16)
(17)
(18)
(19)
(20)  REPORTED BY:  CINDY TUGAW, CSR #4805
(21)
(22)
             NOGARA REPORTING SERVICE
(23)        5 Third Street, Suite 415
            San Francisco, California 94103
(24)            (415) 398-1889
(25)
```

**Page 2**

```
(1)              I N D E X
(2)                            Page Number
(3)  EXAMINATION BY MR. URIARTE          4
(4)              ---o0o---
(5)            E X H I B I T S
(6)  No Exhibits Marked
(7)              ---o0o---
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)
```

**Page 3**

```
(1)       BE IT REMEMBERED that, pursuant to Notice of
(2)  Taking Deposition and on Tuesday, the 28th day of July,
(3)  2020, commencing at the hour of 1:02 o'clock p.m.
(4)  thereof, via Zoom videoconference, before me, CINDY
(5)  TUGAW, a Certified Shorthand Reporter in the State of
(6)  California, personally appeared,
(7)            RANDALL DAVIES,
(8)  called as a witness by the Plaintiff, having been by me
(9)  first duly sworn, was examined and testified as
(10)  hereinafter set forth.
(11)            ---o0o---
(12)      APPEARANCES OF COUNSEL
(13)  For the Plaintiff
        LIBERATION LAW GROUP, P.C.
(14)    2760 Mission Street
        San Francisco, California 94110
(15)    BY:  ARLO GARCIA URIARTE, Attorney at Law
        (415) 695-1000
(16)
(17)  For the Defendants
        FOLEY & LARDNER, LLP
(18)    555 California Street, Suite 1700
        San Francisco, California 94104
(19)    BY:  JASON Y. WU, Attorney at Law
        (415) 984-9848
(20)
     Also Present:  David Ho, Zoom Host.
(21)
              ---o0o---
(22)
(23)
(24)
(25)
```

**Page 4**

```
(1)   THE REPORTER:  At this time, I will ask counsel to
(2)  stipulate on the record that there is no objection to
(3)  this deposition officer administering a binding oath to
(4)  the witness via Zoom, starting with the noticing
(5)  attorney.
(6)   MR. URIARTE:  No objection.
(7)   MR. WU:  And no objection from defendant, Menzies
(8)  Aviation.
(9)      (Whereupon, the Witness was duly sworn by the
(10)    Reporter.)
(11)      EXAMINATION BY MR. URIARTE
(12)   MR. URIARTE:  Q.  Good afternoon, Mr. Davies.
(13)  Could we ask you to please state and spell your full
(14)  legal name for the record.
(15)   A.  It is Randall, R-a-n-d-a-l-l, Paul, P-a-u-l,
(16)  Davies, D-a-v-i-e-s.
(17)   Q.  Thank you, Mr. Davies.  Thank you for being
(18)  here.  And I understand that you're here pursuant to a
(19)  notice of deposition that you may have seen, is that
(20)  correct?
(21)   A.  I have not seen a deposition, only what my
(22)  lawyer told me.
(23)   Q.  Okay.
(24)   A.  Be deposed at a deposition.
(25)   Q.  Gotcha.  My name is Arlo Uriarte.  I am the
```

**Page 5**

(1) attorney for Renaldo Navarro in his action against
(2) Menzies Aviation. Do you understand that?
(3)    **A.** Yes.
(4)    **Q.** I think, right off the bat, I wanted to
(5) clarify, were you at all involved, maybe, in the
(6) suspension or termination of Mr. Navarro?
(7)    **A.** No.
(8)    **Q.** Could you state what your position was with
(9) Menzies Aviation in August of 2018.
(10)    **A.** I was the senior vice president of U.S. fuel
(11) consortiums, and that's the position I have today.
(12)    **Q.** Okay. And in that position you had the San
(13) Francisco International Airport fuelers within your
(14) jurisdiction, I would say?
(15)    **A.** No.
(16)    **Q.** Oh, okay. So the San Francisco fuelers were
(17) not within your area of responsibility?
(18)    **A.** No, I only have the fuel farm employees only
(19) at San Francisco Airport.
(20)    **Q.** So would it be safe to say that Renaldo
(21) Navarro, who was a fueling supervisor, was not within
(22) your area of responsibility or one of the employees
(23) within your supervisory kind of role?
(24)    **A.** That's correct.
(25)    **Q.** All right. So do you have any knowledge

**Page 6**

(1) whatsoever with regards to the events and the process
(2) they went through with regards to Renaldo Navarro and
(3) his termination?
(4)    **A.** I'm only aware of what my lawyer told me --
(5) our lawyer told us. Prior to this --
(6)    **Q.** Let me just stop you there. We are not
(7) entitled to any information regarding your conversation
(8) with your attorney, between you and your attorney.
(9)    **A.** Okay.
(10)    **Q.** So I don't want to be purview to that, and I
(11) don't want you to inadvertently waive that privilege.
(12)    **A.** Okay.
(13)    **Q.** I think it's best that you protect that
(14) privilege.
(15)    So you were saying you are only aware of --
(16) maybe I'll paraphrase for you and see if it's better
(17) this way.
(18)    You were only made aware because of this
(19) litigation and your attorney alerting you to it? Is
(20) that a good way of putting it?
(21)    **A.** Yes. Correct.
(22)    **Q.** But as the events were happening, you were not
(23) at all involved in that?
(24)    **A.** Not at all, no.
(25)    **Q.** Okay. Great. That makes for a very short --

**Page 7**

(1) that's why I wanted to make sure. For one reason or
(2) another, you are listed as a witness here. And maybe
(3) that was an error or maybe that is just because we were
(4) not aware of the difference. Maybe you could explain
(5) that to us.
(6)    The San Francisco farm employees as opposed to
(7) the San Francisco International Airport employees, can
(8) you just kind of explain that distinction?
(9)    **A.** Yes, I can. So in San Francisco there's two
(10) operations operated by Menzies. One is the into-plane
(11) fueling operation which reports to another vice
(12) president, okay, and then also is the fuel facility or
(13) fuel farm employees that report directly to me.
(14)    **Q.** Okay.
(15)    **A.** Two operations of the same company, but two
(16) different reporting structures.
(17)    **Q.** Gotcha. Gotcha. And who would be that other
(18) vice president that's involved in the other side of the
(19) operations?
(20)    **A.** At this time, it is Joe Conlon.
(21)    **Q.** And then, in August of 2018, do you know?
(22)    **A.** It would have been Kevin Brown.
(23)    **MR. URIARTE:** Okay. Well, thank you. I mean,
(24) with that, Mr. Davies, I will not pursue any other line
(25) of questioning.

**Page 8**

(1)    I don't know, Mr. Wu, if you have a
(2) different -- if you have other questions.
(3)    **MR. WU:** No questions on my end, Arlo.
(4)    **MR. URIARTE:** Okay. Thank you, Mr. Davies. Sorry
(5) for subjecting you to this process. It looks like we
(6) have the wrong person, the wrong vice president.
(7)    **THE WITNESS:** Okay. No problem. Thank you. Have
(8) a great day.
(9)    **MR. WU:** Thank you very much, Randy.
(10)    (Whereupon, the deposition
(11)    concluded at 1:07 o'clock p.m.)
(12)    ---oOo---

**Page 9**

```
(1)              CERTIFICATE OF WITNESS

(2)                  ---o0o---

(3)

(4)      I, RANDALL DAVIES, hereby declare under

(5)  penalty of perjury that I have read the foregoing

(6)  deposition testimony; and that the same is a true

(7)  and correct transcription of my said testimony

(8)  except as corrected pursuant to my rights under

(9)  Rule 30(e) of the Federal Rules of Civil

(10) Procedure.

(11)

(12)         _____

                     Signature

(13)

(14)         _____

                        Date

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```

**Page 11**

```
(1)  Randall Davies
     c/o Foley & Lardner
(2)  555 California Street, Suite 1700
     San Francisco, CA 94104
(3)  Attn:  Jason Y. Wu, Esq.
     Date:  August 7th, 2020
(4)  Re:  Navarro vs. Menzies Aviation
     Deposition Date:  Tuesday, July 28, 2020
(5)
     Dear Mr. Davies,
(6)
          Please be advised the original transcript of
(7)  your deposition is ready for your review.
          Pursuant to FRCP Rule 30(e), you have
(8)  30 days following the date of this notice to read,
     correct if necessary, and sign your transcript unless
(9)  the attending parties and the deponent agree on the
     record or otherwise in writing to a longer or shorter
(10) time period.  The deponent may change the form or the
     substance of the answer to a question, and may either
(11) approve the transcript of the deposition by signing it,
     or refuse to approve the transcript by not signing it.
(12) You are not required by law to read and sign your
     deposition transcript.  All parties will be informed of
(13) the corrections.  The original transcript will then be
     sealed and sent to the examining attorney pursuant to
(14) the applicable law.
          You may either come to our office to read and
(15) sign the original transcript, or you may contact your
     attorney or the attorney who arranged for you to be
(16) present at your deposition.  If they have ordered a
     copy of the transcript, you may review their copy and
(17) make corrections by submitting, signing and returning
     the attached form.  If you choose to review your
(18) transcript at our office, please call first to make an
     appointment.  Should you have any question regarding
(19) these instructions, please call.

(20) Sincerely,

(21)

(22)

(23) NOGARA REPORTING SERVICE
     5 Third Street, Suite 415
(24) San Francisco, California 94103
     (415) 398-1889
(25) cc:  All counsel, original deposition
```

**Page 10**

```
(1)  STATE OF CALIFORNIA      )
                              )
(2)  COUNTY OF SAN FRANCISCO  )

(3)      I, CINDY TUGAW, a Certified Shorthand Reporter

(4)  of the State of California, duly authorized to

(5)  administer oaths pursuant to Section 8211 of the

(6)  California Code of Civil Procedure, do hereby certify

(7)  that

(8)             RANDALL DAVIES,

(9)  the witness in the foregoing deposition, was by me duly

(10) sworn to testify the truth, the whole truth and nothing

(11) but the truth in the within-entitled cause; that said

(12) testimony of said witness was reported by me, a

(13) disinterested person, and was thereafter transcribed

(14) under my direction into typewriting and is a true and

(15) correct transcription of said proceedings.

(16)     I further certify that I am not of counsel or

(17) attorney for either or any of the parties in the

(18) foregoing deposition and caption named, nor in any way

(19) interested in the outcome of the cause named in said

(20) caption.

(21)     Dated the 7th day of August, 2020.

(22)

(23)

(24)

                CINDY TUGAW

(25)            CSR No. 4805 (California)
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENALDO NAVARRO,<br><br>              Plaintiff,<br><br>      v.<br><br>MENZIES AVIATION, INC.,<br><br>             Defendant. | Case No. 19-cv-08157-VC<br><br>**ORDER FOR SUPPLEMENTAL BRIEFING**<br><br>Re: Dkt. No. 28 |

The Court has determined that it would not be appropriate to consider Dodge's alleged race-based harassment of Filipino fuelers in ruling on summary judgment with respect to Navarro's race discrimination claim. After reviewing the entire record, including the complaint, the case summaries provided in multiple joint case management statements, and depositions conducted by plaintiff's counsel prior to the motion, it is clear that Navarro improperly sandbagged Menzies by including this previously undisclosed set of allegations and supporting declarations in his opposition to the pending motion, after discovery had been completed.

Thus, the Court must decide whether to rule on the summary judgment motion while excluding the new evidence, or deny the motion without prejudice and reopen discovery to allow Menzies to explore these new allegations. The following questions are relevant to that issue:

(1) What is the proper legal standard for deciding whether to reopen discovery as opposed to simply deciding the motion without considering the new allegations and evidence?

(2) What sort of prejudice would Menzies suffer if the Court decided to reopen discovery, permitting Menzies to file a renewed motion for summary judgment

thereafter?

(3) Would it be appropriate to condition the reopening of discovery on payment of all or part of the costs and fees Menzies has incurred up to this point? If so, what portion of costs and fees should be paid?

(4) Could the Court order the plaintiff's lawyers, as opposed to the plaintiff himself, to pay those costs and fees? Could the Court order that the plaintiff and his lawyers be jointly and severally liable?

(5) For Menzies: Assuming the Court could order payment of costs and fees Menzies has incurred up to this point as a condition of reopening discovery, what are Menzies' total costs and fees?

(6) For Navarro: Assuming the Court has authority to condition reopening discovery on payment of costs and fees, does Navarro prefer that the Court: (a) simply decide the summary judgment motion now without considering the new allegations and evidence about race-based harassment by Dodge; or (b) reopen discovery conditioned on the payment of costs and fees?

Menzies must address these questions in a supplemental brief and any supporting documents to be filed by January 15, 2021 at 5:00 p.m. Navarro must file a supplemental brief and any supporting documents addressing these questions by January 22, 2021 at 5:00 p.m. The briefs should not exceed 15 pages. The parties should be prepared to discuss the issue at the February 2 case management conference, which will be held on the record.

**IT IS SO ORDERED.**

Dated: January 7, 2020

VINCE CHHABRIA
United States District Judge

186

If you view the [ Full Docket ] you will be charged for 2 Pages $0.20

**General Docket**
**United States Court of Appeals for the Ninth Circuit**

| | |
|---|---|
| **Court of Appeals Docket #:** 21-15355 | **Docketed:** 03/01/2021 |
| **Nature of Suit:** 4442 Civil Rights Jobs | |
| Renaldo Navarro v. Menzies Aviation, Inc. | |
| **Appeal From:** U.S. District Court for Northern California, San Francisco | |
| **Fee Status:** Paid | |

**Case Type Information:**
    **1)** civil
    **2)** private
    **3)** null

**Originating Court Information:**
    **District:** 0971-3 : 3:19-cv-08157-VC
    **Court Reporter:** Richard John Duvall, Court Reporter Supervisor
    **Trial Judge:** Vince Chhabria, District Judge
    **Date Filed:** 12/16/2019

| Date Order/Judgment: | Date Order/Judgment EOD: | Date NOA Filed: | Date Rec'd COA: |
|---|---|---|---|
| 02/08/2021 | 02/08/2021 | 02/26/2021 | 02/26/2021 |

| | | |
|---|---|---|
| 05/04/2021 | 6 | MEDIATION ORDER FILED: This case is RELEASED from the Mediation Program. Counsel are requested to contact the Circuit Mediator should circumstances develop that warrant settlement discussions while the appeal is pending. The briefing schedule previously set by the court is amended as follows: Appellant Renaldo Navarro opening brief due 06/30/2021. Appellee Menzies Aviation, Inc. answering brief due 07/30/2021. Appellant's optional reply brief is due within 21 days afer service of the answering brief. [12101659] (BLS) [Entered: 05/04/2021 01:39 PM] |
| 06/17/2021 | 7 | Filed (ECF) Streamlined request for extension of time to file Opening Brief by Appellant Renaldo Navarro. New requested due date is 07/30/2021. [12146914] [21-15355] (Uriarte, Arlo) [Entered: 06/17/2021 09:56 AM] |
| 06/17/2021 | 8 | **Streamlined request [7] by Appellant Renaldo Navarro to extend time to file the brief is approved. Amended briefing schedule: Appellant Renaldo Navarro opening brief due 07/30/2021. Appellee Menzies Aviation, Inc. answering brief due 08/30/2021. The optional reply brief is due 21 days from the date of service of the answering brief.** [12146955] (JN) [Entered: 06/17/2021 10:18 AM] |
| 07/27/2021 | 9 | Filed (ECF) Appellant Renaldo Navarro Motion to extend time to file Opening brief until 08/30/2021. Date of service: 07/27/2021. [12184942] [21-15355] (Uriarte, Arlo) [Entered: 07/27/2021 06:46 PM] |
| 07/28/2021 | 10 | Filed clerk order (Deputy Clerk: th): Granting Unopposed Motion [9] (ECF Filing) filed by Appellant to extend time to file the opening brief. Appellant Renaldo Navarro opening brief due 08/30/2021. Appellee Menzies Aviation, Inc. answering brief due 09/29/2021. The optional reply brief is due 21 days after service of the answering brief. [12185286] (TH) [Entered: 07/28/2021 10:29 AM] |
| 08/30/2021 | 11 | Submitted (ECF) Opening Brief for review. Submitted by Appellant Renaldo Navarro. Date of service: 08/30/2021. [12215626] [21-15355] (Uriarte, Arlo) [Entered: 08/30/2021 03:41 PM] |
| 08/30/2021 | 12 | Submitted (ECF) excerpts of record. Submitted by Appellant Renaldo Navarro. Date of service: 08/30/2021. [12215633] [21-15355] (Uriarte, Arlo) [Entered: 08/30/2021 03:44 PM] |
| 08/30/2021 | 13 | Filed clerk order: The opening brief [11] submitted by Renaldo Navarro is filed. Within 7 days of the filing of this order, filer is ordered to file 6 copies of the brief in paper format, accompanied by certification (attached to the end of each copy of the brief) that the brief is identical to the version submitted electronically. Cover color: blue. The excerpts of record [12] submitted by Renaldo Navarro are filed. Within 7 days of this order, filer is ordered to file 3 copies of the excerpts in paper format securely bound on the left side, with white covers. The paper copies shall be submitted to the principal office of the Clerk. [12215725] (LA) [Entered: 08/30/2021 04:13 PM] |
| 09/03/2021 | 14 | Received 3 paper copies of excerpts of record [12] in 4 volume(s) and index volume filed by Appellant Renaldo Navarro. [12219960] (KWG) [Entered: 09/03/2021 11:24 AM] |
| 09/03/2021 | 15 | Received 6 paper copies of Opening Brief [11] filed by Renaldo Navarro. [12220520] (SD) [Entered: 09/03/2021 04:12 PM] |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| U.S. Court of Appeals for the 9th Circuit - 09/23/2021 22:33:58 | | | |
| PACER Login: | sabarbanel | Client Code: | 043015-0278 |
| Description: | Case Summary | Search Criteria: | 21-15355 |
| Billable Pages: | 1 | Cost: | 0.10 |

CHRISTOPHER WARD, CA Bar No. 238777
  cward@foley.com
**FOLEY & LARDNER LLP**
555 SOUTH FLOWER STREET, SUITE 3500
LOS ANGELES, CA 90071-2411
TELEPHONE:  213.972.4500
FACSIMILE:   213.486.0065

JASON WU, CA Bar No. 313368
  jwu@foley.com
SARA ALEXIS LEVINE ABARBANEL, CA Bar No. 324045
  sabarbanel@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET, SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant MENZIES
AVIATION, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Renaldo Navarro, | Case No. 3:19-cv-8157 |
| Plaintiff, | **DEFENDANT MENZIES AVIATION, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN RESPONSE TO COURT'S ORDER FOR SUPPLEMENTAL BRIEFING** |
| vs. | |
| Menzies Aviation, Inc., DOING BUSINESS AS MENZIES; and DOES 1 through 10, inclusive, | |
| Defendants. | DATE:   February 2, 2021<br>TIME:   10:00 a.m.<br>PLACE: Videoconference |
| | State Court Action Filed: 10/23/19 |
| | Action Removed:  December 16, 2019 |

## **TABLE OF CONTENTS**

I.  THE WEIGHT OF AUTHORITY REQUIRES EXCLUDING THE IMPROPER EVIDENCE AND RULING ON SUMMARY JUDGMENT ON THE FACTS AND EVIDENCE PROPERLY IN THE RECORD, NOT REOPENING DISCOVERY ..................1

    A.  Both The Ninth Circuit And Other Circuits Consistently Indicate That Courts Should Rule On Summary Judgment Without Reopening Discovery............................1

    B.  The Existence Of Formal Mechanisms To Reopen Discovery Counsel Against Reopening Discovery When A Plaintiff Does Not Seek Such Relief And Opposes Summary Judgment With New Materials ........................................................................3

II.  MENZIES WILL SUFFER SIGNIFICANT AND INCURABLE PREJDUICE IF THE COURT DENIES ITS MOTION AND REOPENS DISCOVERY............................................5

    A.  Menzies Will Suffer Significant Financial Prejudice And Impairment To Its Ability To Make Reasoned Business Decisions It Should Have Had The Opportunity To Consider Under Much Different Time And Financial Constraints ........5

    B.  Reopening Discovery Will Severely Prejudice Menzies' Ability To Defend Against The New Allegations In Ways That Cannot Be Cured ....................................6

III. IT WOULD NOT BE APPROPRIATE TO REOPEN DISCOVERY CONDITIONED UPON PAYMENT OF MENZIES' COSTS AND FEES, BUT IF THE COURT WERE TO CONSIDER IT, IT HAS AUTHORITY TO DO SO ...........................................................8

    A.  Courts Have Authority Under Different Circumstances Than Those Present Here To Condition Doing So On Payment Of Legal Fees And Cost ......................................9

    B.  If The Court Were To Conditionally Reopen Discovery, The Proper Award To Menzies Is $131,661.65 Plus Its Fees Incurred In Preparing This Brief ........................9

IV.  IF THE COURT ORDERS PAYMENT OF MENZIES' FEES AND COSTS, COUNSEL CAN AND MUST BE RESPONSIBLE FOR THE FULL AMOUNT ....................................10

V.  MENZIES' TOTAL COSTS AND FEES INCURRED TO THIS POINT ARE $153,650.99 PLUS THE AMOUNTS INCURRED PREPARING THIS BRIEF ....................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alford v. JP Morgan Chase Bank, N.A.*,
　No. 16-cv-04723-HSG, 2017 U.S. Dist. LEXIS 212129 (N.D. Cal. Dec. 27, 2017) ...........................4

*Allergia, Inc. v. Bouboulis*,
　No. 14-CV-1566 JLS (RBB), 2017 U.S. Dist. LEXIS 90844 (S.D. Cal. June 13, 2017) ....................2

*Burrell v. Cty. of Santa Clara*,
　No. 11-CV-04569-LHK, 2013 U.S. Dist. LEXIS 70555 (N.D. Cal. May 17, 2013)............................3

*Busker v. Wabtec Corp.*,
　750 F. App'x 522 (9th Cir. 2018) ...................................................................................................2

*Colbert v. City of Chicago*,
　851 F.3d 649 (7th Cir. 2017)..........................................................................................................3

*Coleman v. Quaker Oats Co.*,
　232 F.3d 1271 (9th Cir. 2000).........................................................................................................2

*Dixon v. Cty. of Sonoma*,
　No. 18-cv-07137-EMC, 2020 U.S. Dist. LEXIS 191434 (N.D. Cal. July 1, 2020)............................2

*Emplrs. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*,
　353 F.3d 1125 (9th Cir. 2004).........................................................................................................4

*Hernandez v. Creative Concepts, Inc.*,
　295 F.R.D. 500 (D. Nev. 2013) .......................................................................................................3

*Mass Probiotics, Inc. v. Aseptic Tech., LLC*,
　No. SA CV 16-1394-DOC, 2017 U.S. Dist. LEXIS 223447 (C.D. Cal. Dec. 21, 2017)....................9

*Microsoft Corp. v. EEE Bus. Inc.*,
　No. C 07-01839 JSW, 2009 U.S. Dist. LEXIS 28885 (N.D. Cal. Apr. 6, 2009) .................................9

*Mitchell v. Pilgrim's Pride Corp.*,
　817 F. App'x 701 (11th Cir. 2020) .................................................................................................3

*Party Animal Inc. v. Evanger's Dog & Cat Food Co.*,
　No. CV 17-3422 PSG, 2019 U.S. Dist. LEXIS 234197 (C.D. Cal. Mar. 5, 2019) .............................9

*Patel v. City of Long Beach*,
　564 F. App'x 881 (9th Cir. 2014) ...................................................................................................2

*Pickern v. Pier 1 Imps. (U.S.), Inc.*,
　457 F.3d 963 (9th Cir. 2006)................................................................................................1, 2, 3, 4, 9

*Quiroz v. Horel*,
    85 F. Supp. 3d 1115 (N.D. Cal. 2015) ................................................................................3

*Rashad v. Jetyd Corp.*,
    No. CV 11-08455 DMG, 2013 U.S. Dist. LEXIS 189990 (C.D. Cal. Sep. 6, 2013)............2

*Tribble v. Raytheon Co.*,
    No. CV 07-3058-JFW, 2009 U.S. Dist. LEXIS 142388 (C.D. Cal. Sep. 23, 2009) .............3

*Vesom v. Atchison Hosp. Ass'n*,
    279 F. App'x 624 (10th Cir. 2008) ......................................................................................3

*Ward v. Clark Cty.*,
    285 F. App'x 412 (9th Cir. 2008) ........................................................................................2

*Wasco Prods. v. Southwall Techs., Inc.*,
    435 F.3d 989 (9th Cir. 2006)................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 8 ...............................................................................................................1, 10

Fed. R. Civ. P. 15 .............................................................................................................2, 4

Fed. R. Civ. P. 15(d) ............................................................................................................3

Fed. R. Civ. P. 16(f) ........................................................................................................9, 10

Fed. R. Civ. P. 16(f)(2) ........................................................................................................9

Fed. R. Civ. P. 37(c)(1) ........................................................................................................9

Fed. R. Civ. P. 56(d) ..........................................................................................................3, 4

Fed. R. Civ. P. 56(h) .......................................................................................................9, 10

In response to the Court's Order of January 7, 2021 in connection with Menzies Aviation's currently pending Motion for Summary Judgment (the "Motion"), Menzies submits the following supplemental brief addressing the questions posed by the Court.

## I.  THE WEIGHT OF AUTHORITY REQUIRES EXCLUDING THE IMPROPER EVIDENCE AND RULING ON SUMMARY JUDGMENT ON THE FACTS AND EVIDENCE PROPERLY IN THE RECORD, NOT REOPENING DISCOVERY

Although Fed. R. Civ. P. 8 creates a liberal pleading standard at a case's outset, that liberal standard should and does contain important limits that respect a defendant's right to fair notice of the basis for theories of recovery and what it should understand as the scope of allegations against which it must defend.  *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006).  As a consequence, when a plaintiff opposes a motion for summary judgment that focuses on the theories he has advanced by arguing previously undisclosed allegations or claims, the authority in this Circuit strongly indicates that the remedy is not to reopen discovery – or that such a step is even an available option.  Rather, the proper course of action is for the plaintiff to proceed only with the factual record of which he fairly allowed development and the court to rule on summary judgment based on that record.  The fact that the Federal Rules of Civil Procedure provide multiple formal mechanisms to seek leave to reopen discovery *before* submitting substantive summary judgment opposition materials further indicates that the proper course here is for the Court to rule on the Motion on an "as is" basis.

### A.  Both The Ninth Circuit And Other Circuits Consistently Indicate That Courts Should Rule On Summary Judgment Without Reopening Discovery

*Pickern* illustrates why in the circumstances here, the Court should decline to consider the newly presented material (as it has already decided to do) and rule on the Motion based only on the scope of allegations properly at issue.  In that case, the plaintiff alleged violations of the Americans with Disabilities Act's architectural barrier requirements, focusing the case prior to summary judgment on the defendant's alleged failure to provide a ramp in an otherwise inaccessible location.  *Id*. at 968.  In opposition to summary judgment, the plaintiff argued for the first time allegations of other architectural barriers beyond those previously at issue, including slope of ramps, cross-slope of sidewalks, emergency fire exits, and emergency landings.  *Id*. at 966.  Agreeing with the defendant's objections, both the

<u>193</u>

district judge and the Ninth Circuit agreed the proper sanction was to set aside the new allegations because plaintiff failed to include them in her complaint and neglected to timely move to amend her complaint as the procedural rules allowed. *Id.* at 968-69. Importantly, neither court contemplated reopening of discovery as a potential, let alone proper, remedy in such circumstances; rather, they instructed that a plaintiff's appropriate course of action is to seek leave to amend the complaint prior to summary judgment, and if the plaintiff has failed to do so, the court should disregard the new material and rule on summary judgment based on the proper scope of the case. *Id.* at 969.

The Ninth Circuit has consistently restated and reinforced this rationale. *See Patel v. City of Long Beach*, 564 F. App'x 881, 882 (9th Cir. 2014) (refusing to consider new theories raised for the first time in opposition to summary judgment); *Ward v. Clark Cty.*, 285 F. App'x 412, 412 (9th Cir. 2008) (affirming summary judgment after plaintiff raised new allegations to oppose summary judgment, noting a party may not circumvent Rule 8's requirements by asserting a new allegation in response to a motion for summary judgment; *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (affirming summary judgment and ignoring novel allegations only raised in opposition to the motion) ("summary judgment is not a procedural second chance to flesh out inadequate pleadings"); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000) (noting that allowing a plaintiff to proceed on a new theory would prejudice defendants because "[a] complaint guides the parties' discovery putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations"). The district courts of this Circuit have consistently followed this rationale and followed *Pickern*'s roadmap.[1] *See Dixon v. Cty. of Sonoma*, No. 18-cv-07137-EMC, 2020 U.S. Dist. LEXIS 191434, at *25 (N.D. Cal. July 1, 2020) (refusing to address new allegations raised for the first time in opposition to summary judgment); *Allergia, Inc. v. Bouboulis*, No. 14-CV-1566 JLS (RBB), 2017 U.S.

---

[1] Menzies' research did not identify a single Ninth Circuit appellate or district court case where, after the defendant moved for summary judgment following the close of discovery, the court permitted an amendment of the complaint under Fed. R. Civ. P. 15 or considered new material that did not fairly relate back to the allegations of the Complaint. *Cf. Busker v. Wabtec Corp.*, 750 F. App'x 522, 524 (9th Cir. 2018) (considering the new theory of liability because the operative complaint could fairly be read as containing the factual basis for such a theory); *Rashad v. Jetyd Corp.*, No. CV 11-08455 DMG (PJWx), 2013 U.S. Dist. LEXIS 189990, at *8-9 n.2 (C.D. Cal. Sep. 6, 2013) (considering new material because the plaintiff's claims and essential facts remained the same as that pled in the complaint). Here, given the Court's finding that Plaintiff sandbagged Menzies, it would seem the Court has already concluded Plaintiff's new information does not fairly relate back to or fall within the Complaint's scope of notice to Menzies, such that these decisions have no bearing on the issues now under consideration.

Dist. LEXIS 90844, *12 (S.D. Cal. June 13, 2017) (awarding summary judgment based only on properly noticed allegations and refusing plaintiff's untimely request to amend his complaint); *Quiroz v. Horel*, 85 F. Supp. 3d 1115, 1126 n.8 (N.D. Cal. 2015) (refusing to consider new theories raised in opposition and ruling on summary judgment); *Hernandez v. Creative Concepts, Inc.*, 295 F.R.D. 500, 505 (D. Nev. 2013) (citing *Pickern* to note that "A plaintiff is not permitted to raise a new or inadequately pled claim at the summary judgment stage"); *Burrell v. Cty. of Santa Clara*, No. 11-CV-04569-LHK, 2013 U.S. Dist. LEXIS 70555, at *32 (N.D. Cal. May 17, 2013) (refusing to consider plaintiff's numerous new facts and theories and proceeding to rule on summary judgment on proper record); *Tribble v. Raytheon Co.*, No. CV 07-3058-JFW (SHx), 2009 U.S. Dist. LEXIS 142388, at *14 (C.D. Cal. Sep. 23, 2009) (finding the plaintiff could not allege new bases for claims and awarding defendant summary judgment). *Pickern* and its progeny also find substantial support from the decisions of other circuits contemplating similar circumstances. *See*, *e.g.*, *Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 708 (11th Cir. 2020) (refusing to consider new allegations in opposition brief and affirming summary judgment for defendant, nothing this "principle applies here even though [the plaintiff] characterizes the allegations at issue as 'additional evidence' rather than 'additional claims'"); *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (finding a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition); *Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631-32 (10th Cir. 2008) (striking two affidavits submitted in opposition to summary judgment and ruling on the record before the Court because the plaintiff "chose to sandbag" rather than submit material explaining the delay).

**B.**     **The Existence Of Formal Mechanisms To Reopen Discovery Counsel Against Reopening Discovery When A Plaintiff Does Not Seek Such Relief And Opposes Summary Judgment With New Materials**

Fed. R. Civ. P. 15(d) provides a mechanism by which Plaintiff could have attempted to change the scope of this case with the information first presented in opposition to the Motion, directing that "on motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading" alleging new material, potentially even potentially discovery has closed. Similarly, Fed. R. Civ. P. 56(d) creates an avenue to reopen discovery *prior to filing a substantive opposition* to a summary

judgment motion, stating that if the non-movant can show "by affidavit or declaration" specific inability to present facts "essential to justify its opposition," a district court may (but is not required) to allow time for additional discovery. Had Plaintiff made such a motion under Rule 15 or submitted a Rule 56(d) declaration explaining his inability to present the facts first raised in substantive opposition to summary judgment, Menzies would have had reasonable arguments to oppose such a request.[2] Aside from the merits of any potential opposition to either a Rule 15 motion or Rule 56(d) declaration, Plaintiff submitted neither prior to opposing the Motion, making the potential merit of any such requests moot.

More importantly to the question raised by this Court, the existence of these procedural steps (themselves governed by significant legal authority) to address circumstances where a plaintiff wishes to oppose summary judgment with information not previously raised in the litigation reinforces the conclusions reached by *Pickern*. Plaintiff was not without opportunity for potential recourse if he felt he had not properly put Menzies on notice of the allegations first raised in opposition to the Motion, and could have sought relief from the Court using those mechanisms. He chose not to, and in context with *Pickern*, the affirmative obligations and procedures Rules 15 and 56(d) create suggest that courts should not relieve litigants of their notice and discovery burdens when they do what Plaintiff has done here.

Together creating a holistic view of how courts should entertain new information at the late stage of summary judgment (at least after discovery has closed), *Pickern*, Rule 15 and Rule 56(d) strongly indicate that the following is the answer to the first question posed by the Court: <u>If a non-movant has neither made a proper request to amend the pleadings under Rule 15 nor shown a qualifying reason for additional time and discovery under Rule 56(d), and chooses instead to file a substantive opposition to summary judgment relying on new information, the Court should decline to consider the new information nor reopen discovery and rule on the motion based on the scope of the case the non-movant</u>

---

[2] *See, e.g.*, *Emplrs. Teamsters Local Nos. 175 & 505 Pension Tr. Fund v. Clorox Co.*, 353 F.3d 1125, 1129-30 (9th Cir. 2004) (noting that a proper request for relief under Rule 56(d) requires non-movants to make "(a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists") ("The district court does not abuse its discretion by denying further discovery if the movant has failed diligently to pursue discovery in the past"); *Alford v. JP Morgan Chase Bank, N.A.*, No. 16-cv-04723-HSG, 2017 U.S. Dist. LEXIS 212129, at *7-9 (N.D. Cal. Dec. 27, 2017) (denying plaintiff's request to reopen discovery to add additional allegations where plaintiff had "known about the facts and legal theories giving rise to his proposed amendment since the case was filed" and defendant had already filed its motion for summary judgment) (noting that even though the plaintiff did not seek to add a new cause of action, even the addition more facts in support of the same causes of action is improper at such late stage of litigation).

created.  Menzies asks the Court to apply that standard here.

## II.     MENZIES WILL SUFFER SIGNIFICANT AND INCURABLE PREJDUICE IF THE COURT DENIES ITS MOTION AND REOPENS DISCOVERY

If the Court were to defer ruling on or deny without prejudice the Motion and reopen discovery, Menzies will suffer significant incurable prejudice, in large part due to the amount of time that has already passed since the relevant underlying events and the consequences of the ongoing COVID-19 pandemic.  While much of such prejudice may resemble – at a superficial level – the "typical" concerns raised by defendants who have litigated one set of allegations, then be faced with the specter of defending a different case, the specific circumstances of this matter make such types of prejudice significantly more severe to Menzies.

### A.     Menzies Will Suffer Significant Financial Prejudice And Impairment To Its Ability To Make Reasoned Business Decisions It Should Have Had The Opportunity To Consider Under Much Different Time And Financial Constraints

As detailed more specifically *infra*, Menzies has already invested heavily in defense of this litigation, choosing to defend it aggressively rather than exploring costs-of-defense savings in the form of early dispute resolution, based on its view of this case as a strong candidate for summary judgment based on how Plaintiff defined this case and the evidence he offered in support.  This has included preparing five witnesses for deposition, deposing the Plaintiff, and conducting extensive witness interviews – under the challenging circumstances created by the COVID pandemic – to confirm the material it already had.  These investments informed and cemented Menzies' commitment to defending aggressively what it viewed as a weak case.  Plaintiff's counsel presumably has also accrued significant legal fees and costs for which Menzies would be liable in the event of an adverse judgment.  This combination of the work done and the professional fees liability, irrespective of any damages risks, has effectively made Menzies "pot-committed" to playing this case out based on a scope of allegations that Plaintiff attempted to redraw and which reopening discovery would severely upset.

Levying these costs and fees on Plaintiff and/or his counsel will not dramatically change this paradigm.  For one thing, doing so does not in any way reduce Menzies' potential liability for all the legal fees Plaintiff's counsel has already incurred, plus the additional fees and costs counsel will incur if

discovery and pre-trial litigation of this case resumes.  Additionally, if Menzies must conduct discovery on and defend new allegations, the costs and fees it has already incurred to investigate and prepare another dispositive motion should at least approximate – if not greatly exceed given the new limitations on its access to information, *see infra* – what it has already spent in this case, putting its legal fees and costs to get through discovery and dispositive motion practice north of $300,000 without even considering Plaintiff's legal fees.  That is an extraordinary cost for pre-trial litigation of a single-plaintiff employment case with a relatively narrow universe of facts.  The potential liabilities in such a scenario would create enormous pressures both to settle this case prior to trial and take it trial that are dissonant to the type of case, depriving Menzies of the benefit of the business decisions made at a time when such potential risks and pressures were more modest.  Causing Menzies to reexamine such crucial business decisions against a financial landscape that would not exist had Plaintiff presented his allegations in a timely manner would be also be highly prejudicial.  While a fee award against Plaintiff and/or his counsel would mitigate these concerns to some degree, no such award tethered to what Menzies has already incurred in this case can put it back in the same or similar financial and business-decision positions it would have been had Plaintiff presented his new allegations in a timely manner.

**B.** **Reopening Discovery Will Severely Prejudice Menzies' Ability To Defend Against The New Allegations In Ways That Cannot Be Cured**

While ordering Plaintiff and/or his counsel to cover some or all of Menzies' legal fees and costs could theoretically alleviate some of aforementioned concerns, there is no remedy in the event of reopened discovery capable of curing the serious jeopardy to Menzies' basic ability to defend against Plaintiff's new allegations.  Nearly two and a half years have already passed (and perhaps even longer, depending on the dates of the events from Plaintiff's new allegations[3]) since the factual events underlying this case and Plaintiff's new contentions occurred.  During such passage of time in any case, employers progressively lose access to the information necessary to investigate claims and support their defenses.  Not only do witness memories fade and blur, but objective evidence that might have existed becomes lost due to destruction protocols. For example, some of Plaintiff's new allegations purport to

---

[3] As noted in Menzies' reply in support of the Motion, Plaintiff's declarants were imprecise about when the events constituting Plaintiff's new allegations of harassment against Andrew Dodge occurred, dating them as far back as some unidentified point in 2017.  [*See* Docket No. 34, p. 9, lines 3-9.]

occur in highly secure areas of San Francisco International Airport ("SFO"), where video surveillance exists. Had Menzies known of a need to investigate such allegations in a timely manner, it might have had access to video evidence of the events in question. Three or more years later, any such video records have almost surely been purged from any archives.

These "passage of time" prejudices are more pronounced in this matter compared to "ordinary" litigation for two key reasons, both of which are outside Menzies' control. Despite learning of his termination in August 2018, Plaintiff did not commence this action until October 23, 2019, thereby allowing substantial time to lapse before providing basic notice to Menzies of allegations of racial harassment.[4] Plaintiff thus effectively imposed an immediate 14-months-of-lost-time disadvantage from the outset of this case. His decision to wait 13 more months until after Menzies fully investigated and prepared its defense before opposing summary judgment with new allegations compounded an already substantial disadvantage to Menzies. In addition to these Plaintiff-created limitations, Menzies has had to investigate and prepare its defenses – and would have to do so again – in the midst of a once-in-a-century pandemic that has negatively impacted Menzies' basic access to information. In March 2020 – coinciding with when Plaintiff first moved beyond the notice provided by his basic pleadings – the onset of the COVID pandemic and immediate drop in passenger air travel forced massive business changes onto Menzies. In addition to financial losses, the reduction in business has forced Menzies to terminate or furlough thousands of employees across the United States, with an equivalent impact on its SFO workforce. These job eliminations have had a corresponding impact on Menzies' access to potential witnesses and the information they may have – a consequence Menzies has already had to navigate in this case. For example, three Menzies employees submitted contemporaneous statements to Menzies complaining of pressure by Plaintiff, and Menzies received similar information from the Union business representative. [See Docket No. 28-1, Exhibit 25.] All three employees lost their jobs or otherwise left their employment at Menzies, and the Union business representative at issue left that role and Menzies no longer has contact information for him. As another example, Kevin Blumberg – the individual who

---

[4] Following his termination, Plaintiff did bring an unfair labor practice charge against Menzies that the National Labor Relations Board ultimately dismissed for lack of jurisdiction. However, that charge focused only on the allegation that Menzies terminated Plaintiff for his involvement in the petition and did not raise any of the race/harassment allegations levied against Dodge found in this action.

investigated the complaints raised by and against Plaintiff – is also no longer at Menzies and has declined to respond to its efforts to contact him. Given that Plaintiff's new allegations include discussions about Dodge amongst Union members [*See* Docket No. 32, Exhibits 32-33], the loss of access to Union personnel and other witnesses potentially capable of advancing Menzies' investigation and defense efforts is critical and will only increase as time and the current pandemic persist. Had Plaintiff acted in a timely manner and/or the pandemic not so impacted Menzies' business, these prejudices would likely not be as significant as they now are.

Reopening discovery in January 2021 and forcing Menzies to either investigate and defend itself with its access to information more restricted than before will put Menzies in the unenviable position of either (i) knowing its ability to fully defend itself has been curtailed while still having to undertake extraordinary effort and expense to pursue its defense; or (ii) reconsidering its business decision to eschew cost savings in lieu of an aggressive defense strategy with the negotiations leverage now materially altered. There is no financial remedy – even if Menzies could feel reasonably sure it would recover its defense costs – that could cure either the "usual prejudices" or those compounded by Plaintiff's delays and the COVID pandemic.

III. **IT WOULD NOT BE APPROPRIATE TO REOPEN DISCOVERY CONDITIONED UPON PAYMENT OF MENZIES' COSTS AND FEES, BUT IF THE COURT WERE TO CONSIDER IT, IT HAS AUTHORITY TO DO SO**

The Court's third question asks whether it would be appropriate to condition the reopening of discovery on payment by Plaintiff of all or part of Menzies' costs and fees up to this point, and if so, what portion of those costs and fees should shift to Plaintiff. As to propriety of such a conditional remedy, Menzies contends that regardless of any fee shifting options, the legal standards outlined in Section I *supra* make such an action inappropriate. Menzies further avers that such a conditional reopening of discovery would be inappropriate because any amount of fee shifting – even 100% of what Menzies has incurred in this case – cannot and will not cure the prejudices Menzies will continue to face if the Court reopens discovery for all the reasons specified in Section II *supra*. That said, if the Court were to condition reopen discovery on a fees and costs award, from Menzies' perspective the Court has inherent and explicit authority to order such fee shifting as a sanction against Plaintiff.

**A.** **Courts Have Authority Under Different Circumstances Than Those Present Here To Condition Doing So On Payment Of Legal Fees And Cost**

Notwithstanding Menzies' position that applicable legal standards and fairness considerations do not permit reopening discovery, it acknowledges the Court's inherent authority to sanction Plaintiff at the summary judgment stage and/or for discovery missteps. Fed. R. Civ. P. 56(h) authorizes the Court to sanction a party for submitting affidavits or declarations in bad faith or solely for delay, with such sanctions including attorney's fees. *See Microsoft Corp. v. EEE Bus. Inc.*, No. C 07-01839 JSW, 2009 U.S. Dist. LEXIS 28885, at *5-6, 8 (N.D. Cal. Apr. 6, 2009) (finding defendant's late disclosure on damages after establishing liability prejudiced the plaintiff and ordering payment of resulting fees and costs). Fed. R. Civ. P. 37(c)(1) also addresses the failure to disclose or supplement information and authorizes the Court to impose sanctions in response.[5] *See Mass Probiotics, Inc. v. Aseptic Tech., LLC*, No. SA CV 16-1394-DOC (GJSx), 2017 U.S. Dist. LEXIS 223447, at *18 (C.D. Cal. Dec. 21, 2017) (considering reopening discovery with payment for the other party's reasonable expenses, including attorney's fees, caused by the disclosure failure). The Court could alternatively see reopened discovery as tantamount to a change to its scheduling order, and Fed. R. Civ. P. 16(f) permits sanctions for failure to obey a scheduling or other pretrial order, including imposing reasonable expenses and attorney's fees. Fed. R. Civ. P. 16(f)(2). *See Party Animal Inc. v. Evanger's Dog & Cat Food Co.*, No. CV 17-3422 PSG (FFMx), 2019 U.S. Dist. LEXIS 234197, at *21 (C.D. Cal. Mar. 5, 2019) (giving plaintiff the option to reopen discovery and pay defendant's associated costs and fees or to forego additional discovery).[6]

**B.** **If The Court Were To Conditionally Reopen Discovery, The Proper Award To Menzies Is $131,661.65 Plus Its Fees Incurred In Preparing This Brief**

Between the outset of this case and January 11, 2021 (when Menzies' counsel began preparing this brief and gathered the data on its total fees and costs), Menzies has incurred a total of $145,267.34 in legal fees and $8,383.65 in costs, for a total of $153,650.99. If Menzies confines those figures to a

---

[5] Rule 37(c) also instructs that if a party fails to provide information in a timely manner, "the party is not allowed to use that information … to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

[6] Both *Mass Probiotics* and *Party Animal* deal with significantly different circumstances than those at issue here. Menzies contends the *Pickern* line of authority is the far more applicable authority.

March 3, 2020-January 11, 2021 range, they reduce to $123,278.00/$8,383.65/$131,661.65. Menzies has also incurred fees preparing this brief which it does not have available at the time of filing, but will bring to the Court's attention at the February 2, 2021 Case Management Conference.

Menzies submits that the amount from March 3, 2020 through January 11, 2021 ($131,661.65), plus its fees incurred in preparing this supplemental brief, are the amount the Court should order paid to Menzies if such an order is to focus on what Menzies has incurred to this point. Menzies uses March 3, 2020 as the relevant date because that is when the parties submitted their first Joint Case Management Conference statement which required Plaintiff to describe the nature of his claims, effectively moving beyond the Complaint and setting the parameters for what Menzies should understand it needed to defend. In fairness, Menzies acknowledges that fees incurred prior to March 3, 2020 relate to a time when Rule 8 governed the scope of Plaintiff's notice obligations and Menzies would likely have incurred effectively the same costs and fees between the filing of this case and March 2, 2020 regardless of the detail provided by the Complaint. From March 3rd onward however, Menzies designed its strategy and continued tailoring it based on what Plaintiff communicated in his Case Management Conference narrative and subsequent discovery that reinforced the narrow scope of allegations Menzies investigated. Had Plaintiff been more forthright, Menzies would have embarked on a different strategy, and it thus submits that any fee and cost award should relate to the date when Menzies can fairly say Plaintiff first failed to disclose the information raised in substantive opposition to the Motion.

IV. **IF THE COURT ORDERS PAYMENT OF MENZIES' FEES AND COSTS, COUNSEL CAN AND MUST BE RESPONSIBLE FOR THE FULL AMOUNT**

With respect to the Court's fourth question, Menzies believes there is clear authority to impose the full amount against Plaintiff's counsel, either via an order applicable only to counsel or one that makes Plaintiff and counsel jointly and severally liable for the entire amount. Both Fed. R. Civ. P. 16(f) and various portions of Rule 37 expressly authorize courts to impose sanctions against "the party, its attorney, or both." And while Rule 56(h) does not explicitly authorize the Court to levy fees and costs against counsel – only against a "submitting party" – the Rule does authorize the Court to hold the attorney in contempt and subject counsel "to other appropriate sanctions," indicating an inherent authority to include counsel as "the submitting party" and impose a fees and costs award.

Additionally, and from Menzies' perspective, not only can the Court order Plaintiff's counsel to pay any amount of Menzies' fees and costs, but it *must* do so if Menzies is to have a reasonable belief that it will in fact receive the ordered remedy. As Menzies understands it, Plaintiff has limited economic means and also suffered economic struggles because of the pandemic, having lost work and benefits as a consequence of being furloughed from the job he found after leaving Menzies' employ. The probable reality is that Plaintiff does not now and will not in the future have the economic means to pay any meaningful amount of Menzies' fees and costs, such that it would be unjust to reopen discovery and allow Plaintiff to litigate a completely different case while giving Menzies a remedy of little practical value. Making Plaintiff's counsel liable in some fashion or another for 100% of any fees and costs award is the only way Menzies could have reasonable assurance that, if it must pivot to litigate a different case than the one it has defended aggressively to this point, it can at least reasonably believe it will receive the remedy intended to compensate it for such an exchange.

## V. MENZIES' TOTAL COSTS AND FEES INCURRED TO THIS POINT ARE $153,650.99 PLUS THE AMOUNTS INCURRED PREPARING THIS BRIEF

In response to the Court's fifth question, Menzies has incurred $145,267.34 in fees and $8,383.65 in costs, for a total of $153,650.99, through January 11, 2021.[7] It has incurred additional fees to prepare this brief, and will share these additional amounts at the February 2, 2021 hearing.

DATED: January 14, 2021

FOLEY & LARDNER LLP
Christopher Ward
Jason Wu
Sara Alexis Levine Abarbanel


_____/s/ Christopher Ward_____
CHRISTOPHER WARD
Attorneys for Defendant MENZIES AVIATION, INC.

---

[7] Menzies prefers not to file its privileged and confidential billing records demonstrating these fees and costs amounts. Should the Court require backup as part of any award, Menzies will be happy to do so and assumes something can be worked out to protect its privileged and confidential nature.

Arlo García Uriarte, SBN 231764
LIBERATION LAW GROUP, P.C.
2760 Mission Street
San Francisco, CA 94110
Telephone: (415) 695-1000
Facsimile: (415) 695-1006

Attorneys for PLAINTIFF
RENALDO NAVARRO

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFNORNIA

| | |
|---|---|
| Renaldo Navarro<br><br>       Plaintiff,<br><br>  vs.<br><br>Menzie's Aviation Inc., DOING BUSINESS AS MENZIES; DOES 1 through 10<br><br>       Defendants. | Case No.: 3:19-cv-08157 VC<br><br>**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF HIS OPPOSITION TO DEFENDANT MENZIES AVIATION INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    February 2, 2021<br>Time:   10:00 a.m.<br>Place:  Video Conference<br><br>Hon. Vince Chhabria<br>San Francisco Courthouse<br>Courtroom 4 – 17th Floor<br><br>Action Removed:  December 16, 2019<br>Action Filed:     October 23, 2019 |

# I.  PROCEDURAL BACKGROUND

The complaint in this matter was filed in the San Francisco County Superior Court on October 23, 2019. Menzies removed the matter to the United States District Court on December 16, 2019. Menzies then declined consent to the case assignment to Magistrate Judge Kandis A. Westmore.

The matter was reassigned to District Judge Vince Chhabria for all further proceedings. The first Joint Case Management statement was filed on March 3, 2020. The first case management conference was held via Zoom on March 11, 2020. After the conference, the following scheduling order was issued:

- Parties agree to participate in private ADR. The deadline to complete private ADR is 7/1/2020. Parties are ordered to file an ADR stipulation within 7 days of today's date.
- Last day to amend pleadings due by 5/11/2020.
- Close of Fact Discovery due by 8/14/2020.
- Designation of Experts due by 10/8/2020.
- Rebuttal Reports due by 10/15/2020.
- Close of Expert Discovery due by 10/30/2020.
- Last day to hear Dispositive Motion Hearing set for 10/1/2020 10:00 AM in San Francisco, Courtroom 04, 17th Floor before Judge Vince Chhabria.
- Final Pretrial Conference set for 11/30/2020 10:00 AM in San Francisco, Courtroom 04, 17th Floor.
- Jury Trial set for 12/7/2020 08:30 AM in San Francisco, Courtroom 04, 17th Floor before Judge Vince Chhabria.

On July 15, 2020, a second case management order was issued. It vacated the pretrial conference scheduled for 11/30/2020 and the trial set for 12/7/2020 due to concerns brought about by the COVID-19 pandemic.[1] The Court also extended the last day to hear dispositive motions to 11/5/2020 and set a further Case Management Conference for 9/16/2020, 10:00 AM.

Later, by stipulation and Court order, the hearing for Summary Judgment (the "Motion") was extended and scheduled for November 19, 2020. The Court rescheduled the Motion hearing, and it was eventually held on December 17, 2020.

---

[1] This matter is now one year old – yet the parties have had to engage in discovery during the pandemic.  Given that no trial date is currently set and it would be amiss to say that the pandemic has not had an effect in this litigation, it would be reasonable to adjust the pretrial order given this new reality.

## II.    STATEMENT OF FACTS

### A.  Plaintiff's Complaint Includes Race and National Origin Discrimination Allegations

Plaintiff filed his state court Complaint on October 23, 2019 [dkt. 1, Ex. A]. It contains four causes of action: (1) Race and National Origin Discrimination; (2) Retaliation; (3) Wrongful Termination against Public Policy; and (4) Intentional Infliction of Emotional Distress. Therefore, race and national origin discrimination has been one of Plaintiff's claims from the outset.

Plaintiff alleges that Menzies displayed favoritism for Dodge over Filipino fueling supervisors. Complaint ¶ 28. The Complaint further states that Plaintiff complained several times about this to Defendant, but Menzies never instituted corrective action. *Id.* at ¶ 30. Plaintiff unequivocally states that he was suspended, retaliated against, and terminated by Menzies because of his Filipino race and Philippines national origin. *Id.* His Right to Sue Notice, attached to the Complaint, similarly states that Menzies took adverse action against Plaintiff and that the company discriminated and retaliated against him. Menzies' favoritism[2] based on race and national origin is also described in the Right to Sue Notice:

> Respondent displayed favoritism for supervisor as a Caucasian supervisor over the Filipino's supervisors like the complainant.
> Respondent suspended, retaliated and terminated complainant  because of his Filipino race and Philippines national origin

### B.  Plaintiff's Initial Disclosures Identifies Vasquez and Canlas as Potential Witnesses and Contains Documents Related to Vasquez's Knowledge of Plaintiff's Race and National Origin Allegations

Initial Disclosures were exchanged by the Parties in March 2020. *See,* Exhibit 1. Therein, Plaintiff provided Menzies witness information, particularly the contact information for the witnesses who provided declarations in question here, Jezen Canlas and Rafael Vazquez. Clearly, the purpose of this was to alert Menzies that these witnesses had relevant information regarding

---

[2] The evidence submitted by Plaintiff and challenged by the Court with regard to discrimination suffered by Filipino fuelers is mainly for the purpose of showing favoritism by Menzies for the Caucasian Fueling Supervisor, Andrew Dodge.

Plaintiff's allegations. Menzies chose not to depose them.

Additionally, through the Initial Disclosures process, Plaintiff provided documents to Menzies. One of these documents, Batestamp 0009, is a letter authored by Rafael Vazquez dated November 18, 2018. *See*, Exhibit 2. This letter states that he spoke to Mr. Raul Vargas on three separate occasions. Mr. Vargas is Menzies' Director of Aviation Fueling and the person who ultimately decided to terminate Plaintiff. In the aforementioned letter, Mr. Vasquez writes: "I have spoken to…Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass Fuelers under his charge." Also, Plaintiff's Initial Disclosures document production included copies of text messages received by Mr. Navarro from Mr. Vazquez mirroring the language of Mr. Vasquez's letter.

### C. Discovery Conducted By the Parties:  One Deposition By Menzies; Two Special Interrogatories on the Nature of the Discrimination Claim; Plaintiff consistently inquired regarding discrimination of other Filipino Fuelers

Menzies served ten (10) Special Interrogatory questions on July 7, 2020. Only two of the questions concerned substantive allegations in the Complaint. Number one asks for a list of witness related to the allegations in the complaint. Plaintiff provided names of eleven witnesses, Jezen Canlas and Rafael Vazquez. The second interrogatory in question, along with the relevant part of Plaintiff's, response is copied below:

> **SPECIAL INTERROGATORY NO. 2**
> Please state with particularity the knowledge that each alleged witness to the COMPLAINT has that is in any way relevant to the allegations contained in the COMPLAINT.
> **RESPONSE TO SPECIAL INTERROGATORY NO. 2**
> Responding Party objects to this request on the ground that this interrogatory is vague and ambiguous so as to make a response impossible without speculation as to the meaning of the question. Responding Party further objects to the extent that this interrogatory seeks or encompasses information protected by the attorney-client privilege and/or attorney work product doctrine. Without waiving these specific objections, Responding Party responds as follows:
> 1. Jezen Canlas – Existence of the petitions filed against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.
> 2. Rafael Vasquez – Existence of the petitions filed against Andrew Dodge, Rafael's initiative to author the second petition against Andrew Dodge, Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino, and Plaintiff's employment was suspended and terminated because Plaintiff signed the Petition against Andrew Dodge as an act of Retaliation.

*Exhibit 3,* Plaintiff's Responses to Menzies Special Interrogatories.

Aside from these two questions, no further questions were posed with regard to Plaintiff's substantive claims of discrimination, favoritism, etc. In other words, Menzies never asked for Plaintiff to state all facts to support his claims. *See, Exhibit 3* for a copy of Plaintiff's Responses to Menzies Special Interrogatories.

Plaintiff served discovery requests on July 14, 2020. Request for Production of Documents requested documents regarding complaints by Plaintiff to Menzies (#14); complaints made by any of Menzies former or present employees regarding discrimination during Plaintiff's tenure (#15). Complaints by former and current employees against Dodge (#19); Investigations conducted following complaints by current and former employees against Dodge (#20); petitions against Dodge (#21); and, disciplinary actions, charges, and lawsuits of any kind against Dodge (#22). *See*, Exhibit 4.

Special Interrogatories were served as well, and among the questions included (##8-16) were complaints against Dodge, investigations of such complaints, including by any of Menzies present or former employees about Dodge. *See*, Exhibit 5.

**Deposition of Plaintiff**

Counsel for Menzies made the strategic decision never to use the word discrimination during the entire deposition of Plaintiff. Also, no use of the word favoritism. No questions of being treated differently, no questions on fuelers being treated differently. Counsel's questions on reason for his termination substantially begins in page 88 when Plaintiff is asked about the reason provided to him by Menzies regarding his termination. After that, the focus of the questions changes to whether race or national origin was mentioned to Plaintiff by Menzies as the reason for his suspension or termination. There were questions on whether Plaintiff saw papers that indicated that he was being terminated because of his race or national origin. Finally, on page 90, Plaintiff was asked if race played a role in his suspension. Plaintiff says yes. When asked as to what the belief stems from, Plaintiff indicates that maybe it is because he is Asian and Dodge was white. When asked for evidence, Plaintiff states that in addition to his race, in response to the

problems he and others brought up to management, no actions were taken, while it was he who was terminated. When asked as to who told him that race was a factor, Plaintiff illustrates different treatment with regard to flight delays caused by Dodge compared to flight delays caused by "us." Counsel for Menzies then cautions Plaintiff that it is not about what Plaintiff thinks or feels, or what he believes, but instead who told him. Plaintiff answers then, that he has a lot of Asian coworkers, when they commit mistakes, they are terminated. Plaintiff then relents and says this is what he feels. Counsel for Menzies does not follow up on the disparate treatment of Asian coworkers. In fact, Plaintiff was never asked whether he thought Dodge discriminated against Filipino fuelers. *See* Navarro Depo., Exh. 6, pp. 88-105.

**Deposition of Menzies' Witnesses**

Plaintiff's counsel deposed four witnesses listed by Menzies. Andrew Dodge on July 28, 2020; Ex. 7. John Qually on July, 27, 2020 and July 28, 2029; Ex. 8. Tracy Aguilera on August 25, 2020; Ex. 9. Raul Vargas on August 25, 2020; Ex. 10.

In Andrew Dodge's deposition, Plaintiff's counsel directly asks Mr. Dodge about Mr. Vazquez's allegations that Andrew Dodge harassed fuelers, pointing to the November 18, 2018, letter from Mr. Vasquez. Mr. Dodge denied that he ever harassed or abused his authority. Mr. Dodge was asked whether any fuelers complained about harassment against him. "No" was the answer. Dodge Depo., Exh. 7, pp. 49-51.

During Mr. Qually's deposition, it seemed that either his memory of events from two years ago has been severely affected, or he meant to say "no" or "do not remember" to questions of past events – so that no further questioning could be instigated. He denied any involvement in the termination, suspension and investigation related to Navarro, despite being his direct supervisor. Qually Depo., Exh. 8,14:12-14; 39:14-17; 41:8-12; 16-17. He denied any knowledge as to the reason for the termination nor the policies and procedures Navarro was accused of violating. *Id.*at 49:14-25; 50:23-25. He denies hearing any complaints from fuelers. *Id.* at 42:21-23. He remembers a discussion with Mr. Vasquez about Dodge before Mr. Navarro's termination but not the subject matter at all. He also denies complaints of harassment and abuse of authority

leveled against Mr. Dodge by other fuelers. *Id.* at pages 52-54.

Tracy Aguilera (a Caucasian HR Professional) indicated that as for the quick promotion of Andrew Dodge to supervisor, she did not remember if other people were vying for the promotion. Aguilera Depo., Exh. 9, 29:25-30:1. She acknowledged that in August 27, 2018, Raul Vargas received the Vasquez second petition from Vasquez himself. *Id.* at 37:18-38:9. She does not remember any reprimands handed to Dodge. *Id.* at 41:15-18. The Vasquez November 18, 2018, letter was also discussed with Ms. Aguilera. She does not remember if complaints of harassment from Vazquez regarding harassment of other fuelers were investigated, nor if she otherwise became aware of any investigation results, even though she intimates that Menzies has zero tolerance for harassment. *Id.* at 43:18; 44:4-13.

Raul Vargas is the Director of Operations, and the highest decision maker that instructed the termination of Navarro. Mr. Vargas admits to interacting with Mr. Vazques. Pp. 20:9-22. He denied receiving complaints against Mr. Dodge. P. 31:12-16. When pressed as to the allegations in the petition itself, Mr. Vargas admits that he did not talk to any fuelers about the way Dodge supervised. P. 38:10-14. Mr. Vargas was asked about the different treatment or "covering up" language in the petition for the mistakes of Mr. Dodge, while he believes it was important to investigate such, none was made. 41:2-16; 42:1-25. Mr. Vargas does admit meeting with Mr. Vazques but denies talking to him about Andrew Dodge, and admits to having him in the union meetings. Mr. Vargas was pressed about complaints against Dodge at the union meetings and talking to Mr. Vazques about Dodge, but unfortunately, Mr. Vargas can't recall. Pp. 45-48. Mr. Vargas does admit that no investigation was conducted with regard to the second petition. P. 51:14-19. Mr. Vargas admits he never tried to find out if Mr. Navarro's side of the story was evaluated. He did not try to find out. P. 55:16-56:20. Even Mr. Vargas' counsel asked him whether he heard about any complaints of harassment against other employees. P. 73:15-20.

### III.   ANALYSIS

**A.** **Plaintiff Urges the Court to Reconsider its Decision to Exclude Evidence of Dodge's Alleged Race-Based Harassment of Filipino Fuelers Without Further Discovery**

Before addressing the Court's questions, Plaintiff must emphasize his position that Menzies was not sandbagged or blindsided by new or different claims[3] regarding Dodge's alleged race-based harassment of Filipino fuelers. This is true for two principal reasons. First, the Dodge allegations are consistent with Plaintiff's original claims because he has always complained of race/national origin discrimination and retaliation; and second, Defendant had ample opportunity to conduct discovery that could have revealed the allegations in question. Menzies had this ample opportunity because: (1) Plaintiff identified Vasquez and Canlas as relevant witnesses in his Initial Disclosures; (2) Plaintiff produced a letter authored by Vasquez stating in relevant part, "I have spoken to…Raul Vargas on three separate occasions regarding Mr. Andrew Dodge, who continuous to abuse his authority and at times harass Fuelers under his charge;" (3) Defendant failed to ask a general contention interrogatory, something akin to "state all facts supporting your claim of race/national origin discrimination;" and (4) when Defendant asked generally in a special interrogatory, "Please state with particularity the knowledge that each alleged witness to the COMPLAINT has that is in any way relevant to the allegations contained in the COMPLAINT," Plaintiff identified Vasquez and Canlas and stated they possessed knowledge regarding "Defendant's discrimination committed against Plaintiff on the basis of his race and national origin for favoring Andrew Dodge, a Caucasian, over Plaintiff, a Filipino." Menzies chose not to explore these avenues, so Plaintiff should not be prevented from doing so even if the evidence was presented in opposing summary judgment.

Defendant was effectively alerted that Vasquez and Canlas had or may have had the kind of information in question here and chose to take a minimalist approach. In other words, Menzies elected to not depose these witnesses, to not ask more targeted questions through written

---

[3] The distinction between "new or different claims" and "new but related allegations" is pivotal when assessing the applicability of the case law cited by Menzies when it objected to the evidence in question. Plaintiff's analysis of that case law is included below.

discovery, or to take any other conceivable, similar steps. Ostensibly, Menzies made a strategical choice to develop the factual record as little as possible so that Plaintiff would have less summary judgment opposition evidence. Menzies should now live with the ramifications of that strategy, which means the evidence in question should be considered not excluded. Thus, Plaintiff does not believe reopening discovery is necessary or appropriate considering the situation at hand.

Furthermore, the case law cited by Menzies when it objected to the evidence in question is distinguishable. Defendant relied on *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.* 397 F.3d 1217, 1225 (9th Cir. 2005) in attacking the information contained in the Vasquez and Canlas declarations. *Hambleton*, in relevant part, discusses the "sham" affidavit rule, which states "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Hambleton citing, Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir.1991).

Unlike in *Hambleton*, Plaintiff's original allegations are not contradicted by the declaration evidence submitted in his opposition to the instant Motion. Plaintiff has complained of race and national origin discrimination from the outset. Vasquez and Canlas did not offer contradictions; they provided additional details about the toxic atmosphere at Menzies, particularly the actions of Andrew Dodge. While these witness elaborations are new, they are not different nor contradictory. Plus, Defendant had a fair opportunity to depose these witnesses or ask more targeted written discovery questions to uncover their testimony. Defendant elected not do so. All of this makes the instant case very different than *Hambleton* or *Kennedy*.

1. **Menzies' Reliance on Pickern is Misplaced As Subsequent Cases Illustrate Our Facts Are More Akin to Court Rulings That Have Not Precluded the Evidence**

In *Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963 (9th Cir. 2006)* ("Pickern") the Ninth Circuit held that a district court need not address allegations raised for the first time after the close of discovery and in response to a motion for summary judgment if the plaintiff's pleadings did not provide sufficient notice of those allegations. *Pickern* at 965. "Plaintiff's claim can be distinguished from the list of hypothetical possibilities rejected in *Pickern (citation omitted).* Whereas the plaintiff's complaint in Pickern did not allege any specific conduct by the

defendant, plaintiff in this case alleges that defendant engaged in specific prohibited conduct." *Threshold Enterprises Ltd. v. Functional Brands, LLC,* No. C07-1400 BZ, 2007 WL 1747122, at *1 (N.D. Cal. June 18, 2007). Navarro alleges discrimination based on race and national origin, including favoritism towards a white supervisor. *See Navarro Complaint and attached Right to Sue Notice.*

In *Pesci v. McDonald*, No. 5:15-CV-00607-SVW-E, 2015 WL 12672094, at *11 (C.D. Cal. Oct. 22, 2015) the district court held that the fact that post shift allegations were not in the complaint did not preclude the evidence of violations in Plaintiff's summary judgment opposition. While the Defendant there argued these were new allegations, the Court held that Defendant had adequate notice and illustrated that "[a]lthough Defendant is correct that Pesci failed to allege post-shift uncompensated working time in her complaint, in one interrogatory response, she stated that there were times when she was not able to leave work until 4:30 p.m. (Pesci Depo. at 52:18-24). Moreover, in her deposition, Pesci stated that she was routinely required to work 15 to 30 minutes after her shift on a daily basis and was not compensated for that time."

**B. <u>Question #1: The Proper Legal Standard for Deciding Whether to Reopen Discovery</u>**

Discovery is typically reopened upon request of one of the litigants. The "[movant] bears the burden of showing the necessity for more time and why the previously allotted time was insufficient. We will only find that the district court abused its discretion if the movant diligently pursued its previous discovery opportunities, and if the movant can show how allowing additional discovery would have precluded summary judgment." *Maurey v. University of Southern California* (9th Cir. 2001) 12 Fed.Appx. 529, 533, as amended on denial of reh'g (Aug. 23, 2001) (internal citations omitted). *See also*, *Nidds v. Schindler Elevator Corp.* (9th Cir. 1996) 113 F.3d 912, 920–921 *citing, Qualls v. Blue Cross of California, Inc.*, 22 F.3d 839, 844 (9th Cir.1994) ("The burden is on the party seeking additional discovery to proffer sufficient facts to show that the evidence sought exists, *id.,* and that it would prevent summary judgment.")

However, regardless of litigant requests, the Court's "power to administer the court calendar and to control the time and conduct of trial is broad. Scheduling of discovery, motions,

and trial must be left to the discretion of trial judges. A trial judge's discretion must be guided by fairness and reason." *U.S. v. Doe* (9th Cir. 1980) 627 F.2d 181, 183–184. *See also*, *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 369 (9th Cir.1985) ) ("The district court is given broad discretion in supervising the pretrial phase of litigation, and its decisions regarding the preclusive effect of a pretrial order ...will not be disturbed unless they evidence a clear abuse of discretion."); *Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 607 (9th Cir.1992); *Zivkovic v. Southern California Edison Co.* 302 F.3d 1080, 1087 (9th Cir. 2002).

## C. <u>Question #2:  Menzies Would Not Suffer Prejudice if the Court Decided to Reopen Discovery or Permitting t to File a Renewed Motion for Summary Judgment</u>

If the Court ordered the reopening of discovery in order to allow Menzies a renewed opportunity to assess Dodge's alleged race-based harassment of Filipino fuelers, there would be no prejudice to Menzies. Theoretically, there would be prejudice if Menzies was required to re-do work already performed or if the delay would adversely impact its position in moving for summary judgment. Neither are the case here.

Menzies would be given a second chance to perform new work, which it could have and likely should have done in the first place. Namely, deposing additional witnesses (particularly Vasquez and Canlas), and/or serving additional written discovery requests about the alleged race-based harassment, and/or asking Plaintiff more specific deposition questions. All of this is additional work, not the re-doing of old work.

After any new work is done, Menzies would be in a very similar position regarding the instant Motion. The main difference is the Court's ruling would be delayed. The delay would not curtail Menzies' ability to defend itself in this lawsuit (in fact, reopening discovery would only enhance Menzies' ability to defend itself because it would have another chance to rebut relevant evidence) nor would it unfairly "eschew cost savings in lieu of an aggressive defense strategy with the negotiations leverage now materially altered." Menzies Supplemental Brief Response, page 8:11-13. Menzies would still get the opportunity to move for summary judgment, which is the main cost-savings decision it made in the first place. Menzies could also be directed to

address a limited or distinct set of issues for its supplemental Summary Judgment/Adjudication motion.

Furthermore, Menzies would not be in a different negotiating position. Defendant has had the opportunity to continue settlement negotiations since it moved for summary judgment (it has elected not do) and will continue to have that opportunity up until the Court's ruling if it so chooses. The prejudice highlighted by Defendant in its supplemental brief here is exaggerated.

### D. Plaintiff Should Not Have to Pay Menzies to Complete Discovery it Could Have but Elected Not to Conduct; Conditioning of Fees Must be Limited to Actual Harm, f Any.

As noted in Menzies brief, this Court is authorized under Fed. R. Civ. P. 56(h) to sanction a party for submitting affidavits or declarations in bad faith. Plaintiff submits that its actions were not in bad faith. Indeed, the cases cited by Menzies in support of its request for sanctions are for egregious conduct not found here, such as willfully delaying expert report for over one-year and producing it on the eve of trial (*Mass Probiotics, Inc. v. Aseptic Technology, LLC*, No. SA CV 16-1394-DOC (GJSx), 2017 U.S. Dist. WL 10621233) or a Plaintiff that conducted no discovery and sought to reopen discovery and expert disclosures (*Party Animal Inc. v. Evangers's Dog and Cat Food Co.*, No. CV 17-3422 PSG (FFMx), WL 10944854).

As discussed above, Plaintiff complaint allegations, initial disclosures and evidence provided in discovery gave Menzies notice that additional evidence exits to support Plaintiff's claims. Plaintiff's Complaint, plead under state law and procedure filed in state court, was sufficient to put Menzies on notice of broad race discrimination claims. Rather than seek a more definite statement when it removed this case federal court, Menzies elected to conduct very limited discovery. Plaintiff's initial disclosure specifically identified the very witnesses who provided the declarations at issue as having knowledge to support the claims in his complaint. Menzies' election to forego those depositions in discovery should not now be a cost borne by Plaintiff.

To the extent that Menzies was truly unaware of the evidence or potential for evidence from the disclosed witnesses (Menzies initial disclosure provided similar general statements about

witness information), and if the Court does indeed find some bad faith on the part of Plaintiff, any sanction should be limited to actual costs that Menzies would not have had to incur. In *Microsoft Corp. v. EEE Bus. Inc.*, No. C-07-01839 JSW, 2009 U.S. Dist. WL 28885 at *3 (N.D. Cal. Apr. 6, 2009), the court ordered only payment of fees and costs directly associated with the Defendants' conduct that required the re-opening of discovery for the second time in the case. In granting sanctions, the court in *Microsoft* also ordered the Plaintiff to provide a declaration "setting out the fees and costs incurred as a result of the twice-reopened discovery in this matter" and permitting Defendant to respond as to its reasonableness. *Id.*

In its brief, without providing a supporting declaration as to costs incurred and for what purpose, Menzies requests that Plaintiff pay nearly its entire litigation costs of $153,650.99. This request, on its face, is unreasonable. The discovery that Menzies conducted to date, special interrogatories, requests for production of documents and the single deposition of Plaintiff would have been conducted even with more specific statements in disclosures. The witnesses identified by Plaintiff has not changed and Menzies elected not to depose them during discovery. Plaintiff should not be required to pay for Menzies lack of diligence in discovery.

To answer question number 3: If any sanction is to be paid by Plaintiff, it should be limited to costs for a second deposition of Plaintiff so that Menzies can ask specific questions as to the evidence presented in the subject declarations. The cost of deposing declarants, identified as witnesses by Plaintiff, would have been borne by Menzies had it elected to take the depositions during discovery. Allowing Menzies to take those depositions, if it choses to do so, is a cost that it should bear. All of the costs incurred by Menzies to date would have been incurred even with more specific disclosures, as a necessary part of its defense. It should not know be permitted to shift the entire costs of its defense to Plaintiff.

Should the Court determine that Plaintiff should pay sanctions more than the cost of completing Plaintiff's deposition, Plaintiff requests that Menzies submit evidence by way of declarations specifying the fees and costs it believes are tied to any failure of Plaintiff, and the opportunity to challenge it for reasonableness. *Microsoft, supra*, at *3. Furthermore, the parties

should brief more fully the issue of any alleged sanctionable action by Plaintiff or his counsel before any conclusion is set. While Plaintiff's counsel's actions are not agreeable to the Court, it does not rise to the level that requires any sanction.

To answer question number 4: Counsel for Navarro believes that while we do not agree that monetary sanctions should be ordered, the Court has the power to order fees against only to Counsel.

### E. Question of Payment of Sanctions by Plaintiff and/or its Counsel

Whether any sanctions are awarded against counsel or client is a determination to be made by the Court without input by Plaintiff, as this question creates a conflict of interest. As discussed above, the circumstances here do not warrant sanctions. To answer the Court's question number 6: Navarro and his Counsel wants the alleged "new allegations" and evidence about race-based harassment by Dodge to be considered. Given the amount of money that Menzies' requests, it is very hard to agree to the payment of costs and fees as a condition.

Lastly, in 16 years of practice, counsel for Plaintiff has tried to practice as fairly and respectfully with all Courts, all attorneys, litigants, employees and specially with clients. It has not been this attorney's practice to "sandbag" or hide the ball. This Court's conclusion with regard to "sandbagging" has hurt.


Date: January 22, 2021                  Respectfully Submitted,

                                        Liberation Law Group, PC


                                        _____

                                        Arlo Garcia Uriarte